**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MURRAY METALLURGICAL COAL | ) | Case No. 20-10390 (JEH) |
| HOLDINGS, LLC, *et al.*,[1] | ) | |
| | ) | Judge John E. Hoffman, Jr. |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF ROBERT D. MOORE IN SUPPORT OF CHAPTER 11 PETITIONS

I, Robert D. Moore, hereby declare under penalty of perjury:

### Qualifications

1.       I am the President, Chief Executive Officer, and Chief Financial Officer of Murray

Energy Holdings Co. (together with its subsidiaries, "Murray"), the largest privately-owned coal

company in the United States.  Murray is also the ultimate parent company of Murray Metallurgical

Coal Holdings, LLC ("Met Holdings") and its subsidiaries (Met Holdings and its subsidiaries are

collectively referred to herein as the "Debtors").

2.       I was named Chief Executive Officer of Murray as of October 28, 2019, and have

served as Chief Financial Officer of Murray since 2007.  Prior to that, I held a number of financial

and other senior management positions within Murray and have more than 20 years of experience

in management, operations, finance, accounting, and acquisitions in the United States coal

industry.  I received my Bachelor of Science degree from The Ohio State University in Accounting

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Murray Metallurgical Coal Holdings, LLC (4633); Murray Eagle Mining, LLC (4268); Murray Alabama Minerals, LLC (4047); Murray Alabama Coal, LLC (3838); Murray Maple Eagle Coal, LLC (4435); and Murray Oak Grove Coal, LLC (4878).  The Debtors' primary business address is 46226 National Road, St. Clairsville, OH 43950.

and Finance, Certified Public Accountant certification from the State of Ohio, and a Master of

Business Administration from The Ohio State University.

3.      As Chief Executive Officer and Chief Financial Officer, I am responsible for

overseeing Murray's operations and financial activities including, but not limited to, monitoring

cash flow, business relationships, workforce issues, and financial planning.

4.      I also serve as Vice President of four of the above-captioned Debtors: (i) Met

Holdings, (ii) Murray Eagle Mining, LLC, (iii) Murray Maple Eagle Coal, LLC, and (iv) Murray

Alabama Minerals, LLC.  As Vice President, I am responsible for overseeing the Debtors' and

their debtor subsidiaries' operations and financial activities in a similar capacity to my role at

Murray.  As a result of my position with the Debtors, my review of public and non-public

documents, and my discussions with other members of the Debtors' management team, I am

generally familiar with the Debtors' businesses, financial affairs, policies and procedures, day-to-

day operations, and books and records.

5.      Commencing on February 11, 2020 (the "Petition Date"), the Debtors filed

voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C.

§§ 101–1532 (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern

District of Ohio (the "Court") and they are operating their businesses and managing their

operations as debtors in possession.  I submit this declaration to assist the Court and parties in

interest in understanding the circumstances compelling the commencement of these chapter 11

cases and in support of the Debtors' chapter 11 petitions filed contemporaneously herewith.

6.      Except as otherwise noted, I have personal knowledge of the matters set forth in

this declaration (the "Declaration"), or have gained knowledge of such matters from my

discussions with the Debtors' employees or retained advisors and/or my review of relevant

documents and information concerning the Debtors' operations and financial affairs in the ordinary course of my responsibilities. Certain actions, including the gathering of information relative to this Declaration, have been undertaken by individuals or advisors acting at my direction. References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such in reliance on the explanations provided by, and the advice of, counsel. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. This Declaration has been prepared to assist the Court and parties in interest in understanding the Debtors' operations and events leading up to the commencement of their chapter 11 cases. If called upon to testify, I could and would testify competently as to the facts set forth herein.

## Introduction

7.      The parent Debtor in these chapter 11 cases, Met Holdings, is an unrestricted subsidiary of Murray formed specifically for the acquisition of certain assets from the chapter 11 estates of Mission Coal Company, LLC ("Mission") and its affiliated debtors in April 2019.

8.      More specifically, in April 2019, Murray Metallurgical Coal Properties, LLC, which is a subsidiary of Murray Energy, and Javelin Investment Holdings LLC ("Javelin Investments") formed Met Holdings as a new unrestricted joint venture subsidiary to acquire certain metallurgical coal mining complexes and other assets from Mission's bankruptcy estate. Following the Mission transaction, Met Holdings owns five subsidiary entities, which own assets in Alabama and West Virginia. In particular, Met Holdings owns 100% of Murray Eagle Mining, LLC and Murray Alabama Coal, LLC. Murray Eagle Mining, LLC owns 100% of Murray Alabama Minerals, LLC and Murray Maple Eagle Coal, LLC. Murray Alabama Coal, LLC owns 100% of Murray Oak Grove Coal, LLC.

9.     Below is a simplified organizational chart showing where Met Holdings and its subsidiaries fit into the Murray Energy Holdings corporate structure:



10.     The assets acquired from Mission include two established metallurgical coal mines and one inactive mine:  the Oak Grove Mine ("Oak Grove") in Alabama, the Maple Eagle No. 1 Mine in West Virginia ("Maple Eagle"), and the inactive North River mine in Alabama ("North River") (together with Maple Eagle and Oak Grove, the "Mining Complexes").  The Debtors' ultimate parent, Murray, manages the Debtors' assets, including the Mining Complexes, pursuant to a Management Services Agreement entered into between Met Holdings and Murray (the "Management Services Agreement"), which is described in more detail below.  The metallurgical coal-producing operations and reserves at Oak Grove and Maple Eagle provided Murray with strategic and valuable entry into the metallurgical coal market.  Presently, the only ongoing activity at North River is reclamation work being performed by Murray.

11.     In 2018, when the Mining Complexes were still owned, operated, and controlled by Mission Coal Company, LLC, such operations generated approximately $261 million in revenue related to 2.35 million tons of coal sales and $10 million of EBITDA.

**The Murray Energy Chapter 11 Cases**

12.     As noted above, Murray is the largest privately-owned coal company in the United States.   In 2018, Murray produced approximately 53 million tons of high quality bituminous coal. The broader Murray enterprise had historically been able to navigate the challenges of the coal marketplace.  However, facing rapidly deteriorating conditions across the coal industry, like many of its competitors, to preserve and maximize the value of its enterprise, Murray was compelled to seek bankruptcy protection, joining more than 40 other coal companies that have filed bankruptcy since 2008, with more than half a dozen major operators filing in the last year alone.

13.     Indeed, on October 29, 2019, Murray and 98 of its affiliates (collectively, the "Murray Debtors") (which do not include the six Debtors here), filed chapter 11 petitions in the United States Bankruptcy Court for the Southern District of Ohio.   Additional information regarding the Murray Debtors' chapter 11 cases can be found in the *Declaration of Robert D. Moore, President, Chief Executive Officer, and Chief Financial Officer, of Murray Energy Holdings Co., In Support of Chapter 11 Petitions*, filed at Docket No. 10 in the chapter 11 cases of *Murray Energy Holdings Co. et al.*, Case No. 19-56885 (JEH).

14.     These industry-wide coal bankruptcies affected multiple mines and thousands of workers across the United States.  They have had a material impact on the coal industry in general and Murray in particular.  Murray's competitors have successfully used bankruptcy to reduce debt and lower their cost structures by, among other things, eliminating cash interest obligations and pension and other benefit obligations, leaving them in a better position to compete for volume and

pricing in the current market, while Murray continued to satisfy significant financial obligations by the weight of its own capital structure.

**Murray Metallurgical is not a Debtor in the Murray Chapter 11 Cases**

15.     Met Holdings and its five subsidiaries were not included as debtors in the Murray Debtors' chapter 11 cases.   While the Murray Debtors and the Met Holdings Debtors are commonly managed and operate in the same industry, there are a number of material differences between them.   These distinctions warranted the adoption of a different approach to debt restructuring matters.   A few of the more material distinctions between the Murray Debtors and Met Holdings Debtors are outlined below.

16.     First, while the Murray Debtors are primarily focused on serving the ***thermal*** coal market, the Met Holdings Debtors produce ***metallurgical*** coal.   Thermal coal is principally used by the electric utility industry to produce steam to drive turbines that generate electricity.   The thermal coal markets traditionally served by Murray have been severely challenged over the last decade, both in the domestic market and abroad, by changes in legislative priorities, the discovery and production of abundant quantities of natural gas, as well as the development and installation of a substantial number of wind and solar energy facilities.

17.     Metallurgical coal, on the other hand, is a globally scarce resource that is critical for the production of coke, an integral component for steel production.   The market for metallurgical coal has its own unique challenges that are distinct from economic forces affecting the thermal coal market.   Significantly, the price of metallurgical coal is driven by domestic and international demand for steel, which has been impacted by recent shifts in purchasing behavior caused, at least in part, by global trade conflicts.

18.     Second, in connection with the acquisition of the Mining Complexes from Mission, Met Holdings had a unique debt and equity capital structure from the rest of the Murray enterprise. As described below, the financing for the acquisition of the Met Holdings assets consisted primarily of new loans from Mission's debtor in possession lenders (known as the "Take-Back Facility"), and new commitments from additional funding sources, including an entity affiliated with Javelin Investments or its principals, all as more fully described below.

19.     Third, because the underlying business of Met Holdings and its subsidiaries had just recently emerged from the Mission chapter 11 cases with the reduction of certain legacy and other liabilities, it was anticipated that further restructuring efforts would be unnecessary.

20.     Primarily for these reasons, Met Holdings and its subsidiaries were not included in the Murray Debtors' chapter 11 cases.  Met Holdings and its subsidiaries are not obligors on the debtor-in-possession financing in the Murray Debtors' chapter 11 cases.  As so-called "unrestricted subsidiaries," the assets of the Met Holdings Debtors' estates are not pledged to Murray's creditors, and Murray's relationship with the Met Holdings Debtors' estates is solely that of majority equity owner and manager.

21.     After the Murray Debtors' bankruptcy filing, Met Holdings and its subsidiaries continued to operate the Mining Complexes.  Notwithstanding the 'stand-alone' nature of the Met Holdings operations, as described in more detail below, Met Holdings and its subsidiaries have faced significant financial and operational difficulties partly as a result of the Murray Debtors' chapter 11 cases.

22.     As of the Petition Date, the Met Holdings Debtors have outstanding debt obligations of approximately $270 million, and limited liquidity.  In the months leading up to the Petition Date in these chapter 11 cases, the Met Holdings Debtors have been working closely with

their stakeholders and professional advisors to address their immediate liquidity concerns as well as their long term strategic goals.  These efforts included the Debtors' entry into an amendment to the Take-Back Facility, dated December 24, 2019 (the "Bridge Financing Amendment"), initially with their lenders under the Take-Back Facility (as defined herein) and later with funds advanced by Murray.  The Bridge Financing Amendment was designed to provide the Met Holdings Debtors with sufficient liquidity to pay critical expenses while continuing to explore alternative paths forward.

23.     Among other pre-petition initiatives, the Debtors had undertaken a marketing and sales process for Maple Eagle, and were anticipating that a potential sale of that mine could both provide additional resources to address their liquidity needs and relieve the Debtors and Murray of ongoing reclamation liability.

24.     Ultimately, the time afforded by the aforementioned Bridge Financing proved beneficial. After extensive arm's length negotiations, Met Holdings, Murray Energy, the so-called Take-Back Lenders (as defined herein) and Javelin Global Commodities (UK) LTD ("Javelin Global") have entered into a Restructuring Support Agreement, dated February 11, 2020 (the "RSA"), whereby the parties agreed to the terms of a comprehensive restructuring of the Debtors' assets (the "Restructuring"), liabilities, and operations.

25.     There are three fundamental elements of the Restructuring:

- First, the Debtors will seek approval for an expeditious sale of the assets comprising the Maple Eagle mining complex.  In this regard, the Debtors seek authorization to enter into an Asset Purchase Agreement with Panther Creek Mining LLC ("Panther Creek"), pursuant to which Panther Creek will serve as a stalking horse bidder in an auction sale process for Maple Eagle;

- The second element of the Restructuring is the proposed sale of the Oak Grove mining complex though a joint bid from the Take Back Lenders and Murray Energy, which sale will be effectuated through a Chapter 11 plan to be filed by March 13, 2020.  The business model underlying the joint bid is the immediate

resumption of mining activity at Oak Grove, which the prospective purchasers intend to occur without significant delay or further interruption to operations; and

- The final element of the Restructuring is a commitment by Murray to continue paying for and performing reclamation activities at North River.

26.     In addition, the RSA includes a commitment by the Take Back Lenders and Murray to provide approximately $50 million of debtor in possession financing, which will be used to pay for the costs associated with these chapter 11 cases, including the start-up costs related to the resumption of mining operations at Oak Grove.  Given the substantial amount of money needed to restart mining activity at Oak Grove, the Debtors' "first day motions" seek the Court's authority to pay fairly substantial amounts to key parties, including vendors, insurers, bonding companies, and employees, whose services will need to be secured before Oak Grove can resume production of saleable quantities of metallurgical coal.

27.     After evaluating all feasible strategic alternatives, the Debtors and their major stakeholders are convinced that the Restructuring contemplated by the RSA is the best possible solution to address the many challenges currently faced by the Debtors and the industry in which they operate.  The alternative was an immediate shut down of the Oak Grove mining complex with the concomitant loss of roughly 510 jobs, the loss of a trading partner for dozens of vendors and contract counter-parties, and the prompt commencement of reclamation at Oak Grove to comply with environmental regulations.

28.     To help familiarize the Court with the Debtors, their business and the circumstances leading up to these chapter 11 cases, I have organized the remaining portion of this Declaration as follows:

- **Part I** provides a general overview of the Debtors' business operations;

- **Part II** explains the Debtors' corporate structure;

- **Part III** describes the Debtors' customer relationships;

- **Part IV** provides information about the Debtors' employees;

- **Part V** describes the Debtors' prepetition capital structure and indebtedness;

- **Part VI** describes additional obligations owed by the Debtors;

- **Part VII** explains the market conditions that led to the commencement of these chapter 11 cases; and

- **Part VIII** describes the Debtors' restructuring efforts in the preceding months leading up the filing of these chapter 11 cases.

### Debtors' History and Operations

I.    **Debtors' Mining Operations**

29.    Met Holdings is an indirect subsidiary of Murray engaged in the mining, processing, and marketing of metallurgical coal from deep subterranean and surface mines.  Unlike thermal coal, which is primarily used to produce steam in the electricity industry, metallurgical coal is a globally scarce resource that is critical for the production of coke, an integral component of steel production.  Coke is mixed with iron ore and other products in a blast furnace to produce steel.  Steelmakers in the United States and abroad blend a variety of metallurgical coal qualities to achieve the required, specific coke chemistry in blast furnaces.  The Debtors mine coal with volatility in the low- and high-vol ranges, and their typical end customers include steel and coke producers and industrial customers.

30.    The Debtors own and operate two active coal mining complexes and one inactive mine in Alabama and West Virginia.  The larger of the two Mining Complexes, Oak Grove, is an underground longwall mine located in Bessemer, Alabama.  The other Mining Complex, Maple Eagle, is an underground continuous mining and surface mining complex located in Powellton, West Virginia.  The Debtors own a third mine, North River, which is not currently being operated, but is considered an extension of the Oak Grove complex.

### A.    Oak Grove Mine

31.    Oak Grove is located in Bessemer, Alabama.  It commenced mining operations in 1975 and was owned and operated by US Steel until 2003.  Mission acquired Oak Grove in 2015, and owned and operated it until the April 2019 sale to Met Holdings.

32.    Oak Grove is an underground longwall mining complex that mines in the Blue Creek seam in Alabama, and it is unique in producing a high quality, mid-volume coal with low sulfur and low ash.  The Debtors estimate that there are approximately 40 million tons of clean recoverable coal at Oak Grove.

33.    Oak Grove contains long-wall mining equipment as well as a recently built preparation plant and a thermal dryer.  The mine is approximately 1,000 feet deep and is home to 511 employees, 389 of which are unionized.  Although Oak Grove is a relatively old coal mine, it is up-to-date and the vast majority of the infrastructure repairs needed to maximize production from the mine have already been made.

34.    The Debtors believe Oak Grove remains a promising mine with much potential, as it has both large reserves (containing the best metallurgical coal in the United States) and high capacity.

### B.    Maple Eagle Mine

35.    Maple Eagle is located in Powellton, West Virginia.  It was opened in 2007 by Walter Energy, which owned and operated it until it was acquired by Mission in February, 2016. Maple Eagle was sold to Met Holdings in April, 2019.

36.    Maple Eagle is a surface and underground continuous mining complex that mines on the Eagle Seam, which contains high volume coal with excellent coking characteristics.  Maple Eagle produces an average of approximately 435,000 tons of coal per year, and the Debtors

estimate there are approximately 18 million tons of clean recoverable tons of coal at Maple Eagle. Maple Eagle currently has 18 employees, all of which are non-unionized.

### C.    North River Mine

37.    Murray Alabama Minerals, LLC owns North River, a surface mine located in Fayette and Tuscaloosa Counties, Alabama.  It is not currently operational. There are certain reclamation obligations that are being performed at North River Mine.

### D.    Management Services Agreement

38.    In accordance with the Management Services Agreement, Murray manages all aspects of the Debtors' mining operations, including (a) coordination and management of employees and contractors at the mines, (b) modeling and engineering services, (c) sales and marketing services, (d) logistics management, (e) human resources and employee-related functions, (f) provision of information technology systems and related services, (g) compliance and investor relations services, (h) financial/accounting and loan related services, and (i) legal services.  In exchange, the Debtors are obligated to pay a quarterly management fee of $1,000,000 to Murray.

39.    In addition, the Debtors rely on the Murray Debtors to provide certain other services to the Debtors in the ordinary course.

## II.    Debtors' Corporate Structure

40.     Each of the Debtors is an unrestricted subsidiary of Murray, meaning the Debtors' assets are not pledged to Murray's creditors.  Met Holdings is 79% owned by Murray Metallurgical Coal Properties, LLC (a direct subsidiary of Murray) and 21% owned by Javelin Investments.  Met Holdings is a Delaware limited liability company and is governed by a board of managers (the "Board of Managers").  Met Holdings was formed on March 28, 2019 for the purpose of acquiring

assets, including the Mining Complexes from Mission pursuant to an asset purchase agreement

dated April 3, 2019 (the "Asset Purchase Agreement").  The United States Bankruptcy Court for

the Northern District of Alabama approved the sale of Mission's assets to Met Holdings on April

15, 2019.

41.    The following chart illustrates the Debtors' organizational structure in summary

form:



III.        **The Debtors' Customer Relationships**

42.        As described in more detail in Part V below, at present, the Debtors sell their coal

exclusively to Javelin Global, which markets and sells the coal to third-parties.  Javelin Global is

a global commodities trading, logistics, operations, and investment company focused on thermal

and metallurgical coal, iron ore, steel and steel scrap, oil and gas, and related markets.

43.    On April 29, 2019, each of Murray Oak Grove Coal, LLC ("Murray Oak Grove") and Murray Maple Eagle Coal, LLC ("Murray Maple Eagle") entered into agreements with Javelin Global: the Javelin Master Agreements, the Working Capital Facilities, the Prepayment Facility, and the Javelin Marketing Agreements (each as defined herein) (collectively, the "Javelin Coal Sale Contracts").[2]  Pursuant to the Javelin Coal Sale Contracts, each of Murray Oak Grove and Murray Maple Eagle appointed Javelin Global as the exclusive marketing agent and offtaker for Oak Grove and Maple Eagle.  Additional information regarding the Debtors' relationship with Javelin Global is set forth in more detail further below.

## IV.    Debtors' Employees

44.    The Debtors' employees are the lifeblood of their Mining Complexes.  The Debtors have a longstanding history and valued partnership with their union, the United Mine Workers of America ("UMWA").

45.    The Debtors employ approximately 529 individuals on an hourly or salaried basis. These employees include miners, engineers, truck drivers, mechanics, and electricians.  As of the January 31, 2020, there were 511 employees at Oak Grove and 18 employees at Maple Eagle.

46.    The Debtors provide their employees with health and welfare benefit plans, including medical, prescription drug, dental, and vision plans.  Like other coal companies, the Debtors also incur costs and make award payments in accordance with the Federal Mine Safety

---

[2] The Javelin Coal Sale Contracts include: (i) the Master Coal Purchase and Sale Agreement, dated April 29, 2019, between Javelin Global and Murray Oak Grove Coal, LLC; (ii) the Murray Oak Grove Coal, LLC Prepaid Purchase Agreement Confirmation, dated April 29, 2019; (iii) the Coal Marketing Agreement, dated April 29, 2019, between Javelin Global and Murray Oak Grove Coal, LLC; (iv) the Master Coal Purchase and Sale Agreement, dated April 29, 2019, between Javelin Global and Murray Maple Eagle Coal, LLC; (v) the Amendment to Master Coal Purchase and Sale Agreement, dated April 29, 2019, between Javelin Global and Murray Oak Grove Coal, LLC; and (vi) the Amendment to Master Coal Purchase and Sale Agreement, dated April 29, 2019, between Javelin Global and Murray Maple Eagle Coal, LLC.  The description of the Javelin Agreements contained herein is for information purposes only and is qualified in its entirety by the terms of the Javelin Agreements.  Nothing in this Declaration constitutes a request to assume any of the Javelin Agreements pursuant to section 365 of the Bankruptcy Code or otherwise.

and Health Act of 1977, 30 U.S.C. §§ 901–45 (the "Black Lung Act"). Separately, the Debtors are subject to workers' compensation laws in the states in which they operate. The Debtors maintain workers' compensation coverage through a third-party insurance provider.

47.    As set forth in more detail in the *Debtors' Motion for Entry of An Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief*, filed simultaneously herewith, on April 20, 2019, Murray Oak Grove Coal, LLC and the UMWA entered into a collective bargaining agreement (the "CBA"). As of the Petition Date, there were approximately 389 hourly employees at Oak Grove covered by the CBA.

## V.    Summary of Prepetition Debt

48.    As of the Petition Date, the Debtors have approximately $270 million in debt and liabilities, including but not limited to approximately $169 million related to the Take-Back Facility, approximately $21.5 million under an emergency bridge financing facility,[3] approximately $23.5 million owed to Javelin Global under certain of the Javelin Agreements, and approximately $12.7 million in intercompany liabilities owed to Murray Energy and other affiliates. In addition, the Debtors have approximately $43 million in outstanding trade payables.

### A.    The Take-Back Facility

49.    On April 29, 2019, in connection with Murray Met Holdings' acquisition of the Mining Complexes from Mission, the Debtors entered an agreement whereby they assumed certain loan obligations of Mission (the "Take-Back Agreement"). The Take-Back Agreement memorializes a $158.25 million secured term loan credit facility (the "Take-Back Facility") among the Debtors, as borrowers and guarantors, Wilmington Savings Fund Society, FSB, as

---

[3] This facility is documented by amendments to the Take-Back Facility.

administrative agent, and the additional lenders from time to time party thereto (the "Take-Back Lenders"). The Take-Back Facility matures on April 29, 2023 and is secured by (i) a first priority security interest in, among other things, the Debtors' real and personal property (other than the Prepayment Collateral (as defined herein)) as well as the equity of all the Debtors other than Met Holdings (the "Take-Back Collateral") and (ii) a third priority security interest in, among other things, the Debtors' inventory, coal, as-extracted collateral, accounts receivable, deposit accounts, and contracts and agreements (the "Prepayment Collateral"). The Take-Back Facility bears interest at 8 percent per annum and is payable either in cash or, at any time prior to June 30, 2021, PIK semi-annually. On November 15, 2019, the Debtors entered into a First Amendment to the Take-Back Agreement, whereby Murray Energy Corporation ("Murray Energy") provided an additional $3.5 million to the Debtors under the Take-Back Facility on the same terms as the original facility. As of the Petition Date, there is approximately $165 million in principal and interest outstanding under the Take-Back Facility.

### B.     The Javelin Global Relationship

50.     On April 29, 2019, each of Murray Oak Grove and Murray Maple Eagle entered into agreements with Javelin Global pursuant to which, among other things, each of Murray Oak Grove and Murray Maple Eagle appointed Javelin Global as the exclusive marketing agent and offtaker for Oak Grove and Maple Eagle.

51.     The Master Coal Purchase and Sale Agreement, dated as of April 29, 2019, by and between Murray Oak Grove, as Seller, and Javelin Global, as Buyer (as amended, restated, or otherwise modified from time to time, the "Oak Grove Master Agreement") and the Master Coal Purchase and Sale Agreement, dated as of April 29, 2019, by and between Javelin Global, as Buyer, and Murray Maple Eagle, as Seller (as amended, restated, or otherwise modified from time

to time, the "<u>Maple Eagle Master Agreement</u>" and, together with the Oak Grove Master

Agreement, the "<u>Javelin Master Agreements</u>") establish general terms and provisions that govern

transactions between the parties for the purchase and sale of coal. Individual transactions are

agreed and documented pursuant to a written confirmation letter or document (each a

"<u>Confirmation</u>") between the parties setting out transaction-specific details, including specific

delivery terms, price, and quantity and quality of coal.

52.    The Amendment to Oak Grove Master Agreement, dated as of April 29, 2019, by

and between Murray Oak Grove, as Seller, and Javelin Global, as Buyer (as amended, restated, or

otherwise modified from time to time, the "<u>Oak Grove Advance Facility</u>") and the Amendment to

Maple Eagle Master Agreement, dated as of April 29, 2019, by and between Murray Maple Eagle,

as Seller, and Javelin Global, as Buyer (as amended, restated, or otherwise modified from time to

time, the "<u>Maple Eagle Advance Facility</u>" and, together  with the Oak Grove Working Capital

Facility, the "<u>Advance Facilities</u>") set out the terms pursuant to which Javelin Global would make

weekly advance payments to Murray Oak Grove and Murray Maple Eagle in connection with the

ongoing purchase and sale of coal from each mine.  The Advance Facilities are secured by a second

priority security interest in the Prepayment Collateral (as defined in the Guaranty, Pledge and

Security Agreement, dated as of April 29, 2019, by and between Javelin Global and the Debtors).

Under the Advance Facilities, Javelin Global would make weekly advance payments to Murray

Oak Grove and Murray Maple Eagle for acceptable coal deliveries as follows, subject to the terms

of the Advance Facilities:

- the Coal Inventory Payment: an amount equal to seventy percent (70%) of the
  estimated value of the coal delivered to Javelin Global, subject to certain specified
  adjustments (each such payment, a "<u>Coal Inventory Payment</u>"); and

- the A/R Payment: in advance of the time such payment would otherwise be due and
  payable, for any acceptable shipments of coal made pursuant to the Oak Grove

Master Agreement or Maple Eagle Master Agreement, 95% of the base price of such shipments (as such price is specified in the applicable Confirmation) (each such payment, a "A/R Payment" and together with the Coal Inventory Payment, the "Advance Payments").

As and when it receives payment for the ultimate resale of coal it purchased from Murray Oak Grove or Murray Maple Eagle (such resale known as an "Onward Sale"), subject to its rights thereunder, Javelin Global would remit the final 5%, less certain fees and commissions. On the Friday of each delivery week, Murray Oak Grove or Murray Maple Eagle, as applicable, would pay Javelin Global a fee equal to the Advance Payments balance outstanding as of the prior Friday under the applicable Advance Facility, multiplied by a daily interest rate (for each day elapsed in such delivery week) of three-month LIBOR plus 7.00% divided by 360 days. As of January 31, 2020, the outstanding amount of advances made was $33.3 million.

53.    Murray Oak Grove and Javelin Global also entered into the Prepaid Purchase Agreement Confirmation, dated as of April 29, 2019, by and between Murray Oak Grove, as Seller, and Javelin Global, as Buyer (as amended, restated, or otherwise modified from time to time, the "Prepayment Facility"). The Prepayment Facility is governed by and subject to the Oak Grove Master Agreement and documents the sale and purchase of coal in the amount and with the specifications set out therein. The Prepayment Facility is secured by a first priority security interest in the Prepayment Collateral (as defined in the Guaranty, Pledge and Security Agreement, dated as of April 29, 2019, by and between Javelin Global and the Debtors) and a second priority security interest in the Take-Back Collateral (as defined in the Intercreditor Agreement, dated as of April 29, 2019, by and between Javelin Global and Wilmington Savings Fund Society, FSB). Under the Prepayment Facility, Murray Oak Grove is required to deliver 1 million short tons per calendar year, with cash payment to Javelin Global to the extent quarterly deliveries are below a minimum specified quantity per calendar quarter. On the effective date of the Prepayment Facility, Javelin

Global pre-paid the entire amount of $25 million (the "Pre-Payment") for all coal to be delivered under the Prepayment Facility. The Pre-Payment balance (i) is reduced by a fixed dollar amount per short ton of coal delivered by Murray Oak Grove to Javelin Global and (ii) bears interest at a rate of three-month LIBOR plus 7.00% per year.  As of January 31, 2020, $23.4 million was owed to Javelin Global under the Prepayment Facility.

54.     Pursuant to the Coal Marketing Agreement, dated as of April 29, 2019, by and between Murray Oak Grove, as Producer, and Javelin Global, as Marketer (as amended, restated, or otherwise modified from time to time, the "Oak Grove Marketing Agreement") and the Coal Marketing Agreement, dated as of April 29, 2019,  by and between Murray Maple Eagle, as Producer, and Javelin Global, as Marketer (as amended, restated, or otherwise modified from time to time, the "Maple Eagle Marketing Agreement" and, together with the Oak Grove Marketing Agreement, the "Javelin Marketing Agreements") Murray Oak Grove and Murray Maple Eagle appointed Javelin Global, on an exclusive basis, to perform certain services in connection with the sale of coal in exchange for a marketing commission, including: (i) marketing of coal to prospective customers inside and outside the United States, (ii) providing advice on marketing strategy and brand recognition, (iii) communicating coal sales opportunities to Murray Oak Grove or Murray Maple Eagle, as applicable, (iv) assisting and advising Murray Oak Grove or Murray Maple Eagle, as applicable, in the negotiation of the terms for the sale and delivery of coal to prospective customers, (v) procuring transportation services for delivery of coal and (vi) procuring blending coal.  Javelin Global may act as an agent to procure "agency sale" contracts whereby Murray Oak Grove or Murray Maple Eagle, as applicable, will sell coal to a customer, and may also procure "back-to-back sale" contracts whereby Javelin Global will sell coal to a customer and

Murray Oak Grove or Murray Maple Eagle, as applicable, will undertake to supply coal to Javelin Global on the terms set out in the Javelin Master Agreements.

### C.    The Bridge Loan Facility

55.     Since November, 2019, the Debtors received additional "bridge loans" to afford them an opportunity to explore strategic alternatives. These bridge loans were memorialized in the Third Amendment to the Take-Back Agreement (the "Bridge Loan Facility").  The Bridge Loan Facility was thereafter increased (and amended) on several occasions with funds advanced by MC Southwork and Murray Energy.   The Bridge Loan Facility bears interest at a rate of 8 percent per annum and matures on February 14, 2020, and is secured by the same liens that secure the Take-Back Facility (albeit on a first-out basis).

56.     The Debtors have agreed to "roll up" or immediately repay the Bridge Loan Facility with the proceeds from any debtor in possession financing extended by the Bridge Loan Facility lenders in these chapter 11 cases.  As of the Petition Date, there is approximately $21.5 million in principal outstanding under the Bridge Loan Facility.   Of the $21.5 million, MC Southwork advanced $14.4 million and Murray Energy advanced $7.1 million.

## VI.    Additional Obligations Owed by Debtors

### A.    Obligations to Employees

57.      The Debtors are required to provide benefits to employees for awards related to workers' compensation and Pneumoconiosis (commonly known as black lung disease) under the Black Lung Act.  Coal miners who suffer from black lung disease and their dependents may file disability claims with the U.S. Department of Labor (the "DOL"), which then investigates the claims and assigns liability to make benefit award payments for those claims to a "responsible operator"—typically the miner's most recent employer or a successor of that employer.

58.     Black Lung Act claims include claims for the payment of (a) disability benefit awards to workers who suffer from black lung disease and (b) excise taxes to fund the Black Lung Disability Trust Fund (the "Black Lung Fund").  If a responsible coal operator fails to pay a benefit award, the Black Lung Fund will pay the award and the DOL can (i) assert liens (with the same priority as tax claims) against the assets of the responsible operator and (ii) exercise subrogation rights of the underlying claimant.  In addition, the Black Lung Act requires a coal operator either to secure its payment obligations by posting collateral, or to obtain insurance for its payment obligations.  A coal operator's directors and officers may also be held personally liable for unpaid benefits.  Benefits under the Black Lung Act are in addition to typical workers' compensation benefits.

**B.      Asset Retirement Obligations**

59.     Like other coal companies, the Debtors have asset retirement obligations or "AROs" that are related to mine reclamation and closure costs as well as perpetual water treatment obligations at each Mining Complex.  Reclamation obligations are calculated by reference to the fair value of future anticipated costs to restore surface land to levels equal to or greater than pre-mining conditions, as determined by the federal Surface Mining Control and Reclamation Act as well as certain state laws.

60.     The Debtors' asset retirement obligations consist of spending estimates for surface land reclamation and support facilities at each Murray Complex in accordance with applicable law. Asset retirement obligations are determined using various estimates and assumptions, including, among other things, estimates of disturbed acreage as determined from engineering data, estimates of future costs to reclaim the disturbed acreage, and the timing of these cash flows discounted

using a credit-adjusted, risk-free rate.  As of the Petition Date, the Debtors have approximately $28.6 million in aggregate outstanding surety bond coverage for their reclamation obligations.[4]

### C.      Environmental Obligations

61.      In addition to asset retirement obligations, the Debtors have ongoing obligations under federal environmental laws, including the Clean Water Act and the Clean Air Act, certain analogous state environmental laws, and the Debtors' environmental permits, with respect to discharges to water bodies, air emissions, management and disposal of waste materials, subsidence, and other environmental concerns.  From time to time, the Debtors receive notices of noncompliance from regulatory agencies alleging violations of applicable environmental laws and permit requirements, which in some cases result in the assessment of fines or penalties or construction of capital projects to address alleged violations.  In addition, certain mining operations have given rise to obligations to treat impacted water resources and/or to address alleged subsidence of nearby third party properties.

### D.      Legal Proceedings

62.      The Debtors are party to a number of lawsuits in Alabama and West Virginia state courts.  The vast majority of the legal proceedings involve claims brought by the Debtors' vendors and demands for payment.  There is, however, one claim the Debtors are aware of that was brought by a lessor involving a claim for indemnification.

---

[4] Such amount excludes approximately $7.3 million of surety bond coverage related to assets acquired from the chapter 11 estates of Mission that is held in the name of Seminole West Virginia Mining Complex, LLC, a Mission entity

## Circumstances Leading to Chapter 11

**VII.       Adverse Market Conditions**

63.     As noted above, the Debtors are subject to the same fluctuating market conditions as other companies operating in the coal industry.  Although the metallurgical coal market appears to have stabilized after several years of price declines, the coal industry has recently been in a state of turmoil.   Coal mining businesses across the United States and around the world have experienced pressure from the downward spiral in commodity prices.  Several factors contribute to the health of a coal mining business, including an inventory of suitable sites to mine, a consistent mining program, a relatively consistent outlook for commodity prices, and compliance with restrictive federal and state regulations on coal producers.

64.     Federal and state regulatory authorities impose significant obligations on the coal mining industry with respect to employee health and safety, permitting and licensing requirements, environmental protection, the reclamation and restoration of mining properties after mining has been completed, and the effect of mining on surface and groundwater quality.  The costs of compliance with such obligations has contributed to the Debtors' financial difficulties.  Other regulations, such as those governing mine safety and most notably those administered by the Mine Safety Health Administration, have imposed additional costs on the Debtors.

65.     As noted above, the Debtors are not alone in feeling the pressure on the industry. Other similarly-situated companies have defaulted on their debt obligations, negotiated agreements with creditors to avoid defaulting, effectuated out-of-court restructurings, or gone through the bankruptcy process.  Practically speaking, the fact that so many coal companies have gone through bankruptcy has diminished the Debtors' ability to bargain with vendors and customers.

### VIII.       Debtors' Restructuring Efforts

66.      Confronted with this extremely challenging environment, the Debtors took proactive steps to reduce costs and lessen the burden of their liabilities, including, among other things, reducing their workforce and "idling" the Maple Eagle and Oak Grove mines in the months preceding the Petition Date.  It is not possible or practical to completely shut down operations, especially for underground mines, which risk flooding and other deleterious conditions if they are not properly supervised and protected.  Despite their efforts to reduce operating costs, however, at the present spot price for metallurgical coal, the Debtors are simply unable to repay their liabilities.

67.      More specifically, as a result of reduced coal pricing and reduced financial flexibility following the Murray chapter 11 filings, the Debtors have actively pursued a number of strategic initiatives to preserve and maximize liquidity, including: (i) "hot idling"[5] the Maple Eagle mine in September and the Oak Grove mine in November; (ii) actively marketing the Maple Eagle mine for sale, which will ultimately be effectuated in these chapter 11 cases; (iii) obtaining multiple liquidity extensions under the Advance Facility from Javelin Global; and (iv) raising more than $21.5 million of additional indebtedness under the Bridge Loan Facilitiy.  The Debtors had hoped that these efforts might obviate the need for these chapter 11 cases.

68.      Notwithstanding these efforts, the Debtors have faced ongoing funding challenges, even to pay such basic expenses as biweekly payroll.  The Debtors recognize that the failure to pay their employees would make it virtually impossible to preserve operational potential and would jeopardize the marketability of their Mining Complexes.  Accordingly, the Debtors have

---

[5]  A mine that is in a "hot idle" state means that it is being temporarily idled and maintained in anticipation of returning to operation in the near future.

been working closely with their major stakeholders to address both these immediate liquidity concerns and longer term strategic goals.

69.     The Debtors commenced these chapter 11 cases after extensive negotiations with their stakeholders.  These negotiations culminated in the execution of a Restructuring Support Agreement that contemplates, among other things (i) the expeditious sale of Maple Eagle, (ii) the sale of Oak Grove through a chapter 11 plan, and (iii) completion of reclamation at North River. These three components will be embodied in a Chapter 11 plan that the Debtors expect to file by March 13, 2020.  The Restructuring Support Agreement has been executed by the Debtors, Murray (with the consent of its first lien lenders), the Take-Back Lenders, Javelin Investments, and Javelin Global.  With such broad support, the Debtors are confident that a plan can be confirmed quickly.

70.     The Debtors and their Board of Managers have determined that the restructuring contemplated by the Restructuring Support Agreement will produce the best possible outcome that could reasonably be achieved under the circumstances.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: February 11, 2020                    */s/  Robert D. Moore*
                                                          Name: Robert D. Moore
                                                          Title: Vice President