**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MURRAY METALLURGICAL COAL | ) | Case No. 20-10390 (JEH) |
| HOLDINGS, LLC, *et al.*,[1] | ) | |
| | ) | Judge John E. Hoffman, Jr. |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF AMY LEE,
SENIOR DIRECTOR AT ALVAREZ & MARSAL
NORTH AMERICA, LLC, IN SUPPORT OF FIRST DAY MOTIONS**

I, Amy Lee, hereby declare under penalty of perjury:

1.     I am a Senior Director in the Commercial Restructuring Practice at Alvarez & Marsal North America, LLC ("A&M"),[2] a restructuring advisory services firm with numerous offices throughout the country, and proposed financial advisor to Murray Metallurgical Coal Holdings, LLC ("Met Holdings") one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2.     I have over 14 years of distressed company advisory experience.   I have advised clients in numerous major bankruptcy cases, including Nine West Holdings, Penn Virginia Corporation, Patriot Coal, Cengage Learning, and Lehman Brothers Holdings Inc.   I have substantial knowledge and experience in assisting financially distressed companies with stabilizing

---

[1]   The Debtors in these Chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Murray Metallurgical Coal Holdings, LLC (4633); Murray Eagle Mining, LLC (4268); Murray Alabama Minerals, LLC (4047); Murray Alabama Coal, LLC (3838); Murray Maple Eagle Coal, LLC (4435); and Murray Oak Grove Coal, LLC (4878).  The Debtors' primary business address is 46226 National Road, St. Clairsville, OH 43950.

[2]   Capitalized terms used but not defined in this section have the meanings given to such terms in the applicable First Day Motions.

their financial condition, analyzing their operations and developing business plans to accomplish the necessary restructuring of their operations and finances, through roles in both senior management and as a restructuring advisor. I received my bachelor's degree in economics from Rutgers University.

3.      I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration to assist this United States Bankruptcy Court for the Southern District of Ohio (the "Court") and parties in interest in understanding the circumstances that resulted in the commencement of these chapter 11 cases and in support of:  (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed commencing on the date hereof (the "Petition Date"); and (b) the relief that the Debtors have requested from the Court pursuant to the motions and applications described herein (collectively, the "First Day Motions").

4.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information obtained from the Debtors' management team and advisors, including the A&M team working under my supervision, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I would testify competently to the statements set forth in this declaration.

## I.      Introduction.

5.      As described in greater detail in the *Declaration of Robert D. Moore in Support of Chapter 11 Petitions* (the "Moore Declaration"), the Debtors' businesses have been affected by a sustained downturn in the metallurgical coal market.  In response, the Debtors commenced these chapter 11 cases to implement a comprehensive balance sheet restructuring that will reduce Murray's debt burden and increase liquidity.  To ensure a smooth transition into chapter 11 and

limit the operational disruption of these chapter 11 cases, the Debtors filed several First Day Motions. For the reasons described below, the relief sought in each of the First Day Motions, including the approval of the proposed DIP Facility, is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

6.      Each of the Debtors is an unrestricted subsidiary of Murray Energy Corporation ("Murray Energy"). On October 29, 2019, Murray Energy and its affiliated debtors and debtors in possession (the "MEC Debtors") filed voluntary chapter 11 petitions in the Bankruptcy Court for the Southern District of Ohio (the "MEC Chapter 11 Cases"). The MEC Chapter 11 Cases are being jointly administered under Case No. 19-56885. Significantly, none of the Debtors are debtors in the MEC Chapter 11 Cases.

7.      A&M also serves as financial advisor to the MEC Debtors in the MEC Chapter 11 Cases. I have overseen the team of A&M professionals that has been helping both the MEC Debtors and the Debtors with respect to cash forecasting, the sizing of the potential DIP financing need, the compilation of data and the diligence necessary to draft the First Day Motions, and otherwise prepare for these chapter 11 cases.

8.      The Debtors operate in a highly competitive industry, made more competitive by the downturn in the metallurgical coal market. Further, as explained below, the Debtors' liquidity is severely limited. Thus, it is important for the Debtors to secure first-day relief that will allow them to continue to satisfy their employee and operational obligations in the ordinary course, thereby avoiding unnecessary or misplaced employee and customer attrition.

9.      As a large coal mining company, the Debtors are required to operate in multiple jurisdictions and navigate the complicated operational and regulatory requirements of each. Any restriction on the Debtors' ability to operate in the ordinary course could have materially adverse

ramifications that reverberate throughout the Murray operational structure. The relief requested in the First Day Motions is narrowly tailored to avoid any such disruption.

**II.     Relief Sought in the Debtors' First Day Motions.**[3]

10.     I understand that the Bankruptcy Rules permit the Court to grant relief within the first 21 days after the Petition Date where such relief is necessary to avoid immediate and irreparable harm. The relief requested in the First Day Motions is in the best interests of the Debtors, their creditors, and all other parties in interest. I believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief described below could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture.

11.     A description of the relief requested in and the facts supporting each of the First Day Motions is set forth below.

**A.     Administrative Motions.**

(i)     Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion").

12.     Pursuant to the Joint Administration Motion, the Debtors seek entry of an order directing procedural consolidation and joint administration of their related chapter 11 cases and granting related relief.

13.     Given the integrated nature of the Debtors' operations, and that all of the Debtors are liable for the Debtors' funded debt obligations, joint administration of these chapter 11 cases

---

[3]   Capitalized terms used but not defined in this section have the meanings assigned to such terms in the applicable First Day Motions.

will provide significant administrative convenience without harming the substantive rights of any

party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect

each Debtor entity.  The entry of an order directing joint administration of these chapter 11 cases

will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also

will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater

ease and efficiency.

14.      Moreover, joint administration will not adversely affect the Debtors' respective

constituencies because the Joint Administration Motion seeks only administrative, not substantive,

consolidation of the Debtors' estates.  Parties in interest will not be harmed by the relief requested;

instead, parties in interest will benefit from the cost reductions associated with the joint

administration of these chapter 11 cases.  Accordingly, I believe that the relief requested in the

Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all

other parties in interest.

> (ii)     Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to
> (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate
> Mailing Matrix for each Debtor and (B) Redact Certain Personally
> Identifiable Information for the Debtors' Employees, (II) Approving the
> Form and Manner of Notifying Creditors of the Commencement of the
> Chapter 11 Cases and Other Information, and (III) Granting Related Relief
> (the "Creditor Matrix Motion").

15.      I understand that there are many potential creditors and parties in interest (on a

consolidated basis) in the Debtors' chapter 11 cases.  Converting the Debtors' computerized

information to a format compatible with the matrix requirements would greatly increase the risk

of error with respect to information already on computer systems maintained by the Debtors or

their agents.  Moreover, many of the Debtors' creditors overlap and thus, to the extent that the

Debtors are required to maintain separate mailing matrices, a substantial number of parties likely

would receive multiple copies of the same notice.

16.     Permitting the Debtors to maintain a single consolidated list of creditors in lieu of filing a separate creditor matrix will benefit the Debtors and their estates by allowing the Debtors to more efficiently provide required notices to parties in interest and reduce the potential for duplicate mailings.  The Debtors, working together with the Claims and Noticing Agent before the Petition Date, have already begun to prepare a single, consolidated list of the Debtors' creditors in electronic format.

17.     Moreover, compiling separate top 20 creditor lists for each individual Debtor is not as efficient as the approach suggested in the Creditor Matrix Motion.  The Debtors operate as a single business enterprise and have many overlapping creditors, including creditors on each of their top 20 lists.  I believe a single, consolidated list of the Debtors' 30 largest unsecured, non-insider creditors will aid the U.S. Trustee in its efforts to communicate with these creditors.

18.     Additionally, with approximately 529 employees, the Debtors cannot reasonably know with sufficient certainty whether a release of their personal information could potentially jeopardize their safety.   In these circumstances, the Debtors respectfully submit that it is appropriate to authorize the Debtors to redact from any documents filed or to be filed with the Court in these chapter 11 cases, including the Creditor Matrix and Schedules and Statements, the home addresses of the Debtors' employees.

19.     Accordingly, I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

       (iii)    Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired leases, and Statements of Financial Affairs, and Rule 2015.3 Financial Reports, and (II) Granting Related Relief (the "Schedules Extension Motion").

20.     To prepare their Schedules and Statements, the Debtors and their advisors will have to compile information from books, records, and documents relating to multiple claims, assets, and contracts for six (6) Debtor entities including two (2) mining complexes and a third closed mining operation where the Debtors are engaged in reclamation activities.  Collection of the necessary information therefore will require a significant expenditure of time and effort on the part of the Debtors and their employees.  Additionally, because invoices related to prepetition goods and services may not yet have been received and entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the information required to accurately prepare the Schedules and Statements.

21.     Given the substantial burdens already imposed on the Debtors' management by the commencement of these chapter 11 cases, the competing demands upon the Debtors' employees and advisors to collect information, the time and attention the Debtors must devote to the restructuring process, and the fact that A&M's retention as financial advisor has not yet been approved by the Court, good cause exists to extend the current deadline by 36 days, until 50 days after the Petition Date.  The requested extension will enhance the accuracy of the Statements and Schedules when filed and help avoid the potential necessity of substantial subsequent amendments.

22.     Additionally, the Debtors are not in a position to complete the initial 2015.3 Reports within the time required under Bankruptcy Rule 2015.3, due to (a) the size and complexity of the Debtors' businesses, and (b) the substantial burdens imposed by complying with Bankruptcy Rule 2015.3 in the early days of these chapter 11 cases.

23.     Extending the deadline to file the initial 2015.3 Reports will also enable the Debtors to work with their advisors and the U.S. Trustee to determine the appropriate nature and scope of the reports, and any proposed modifications to the reporting requirements established by

Bankruptcy Rule 2015.3. Moreover, the relief requested in the Schedules Extension Motion will not prejudice any party in interest as the Debtors will work cooperatively with the U.S. Trustee and any other parties in these chapter 11 cases to provide access to relevant information regarding the business and financial affairs of the Debtors.

24.     Accordingly, I believe that the relief requested in the Schedules Extension Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

    (iv)   Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent (the "Prime Clerk Retention Application").

25.     Due to the size of these chapter 11 cases, the Debtors expect that there will be many entities to be noticed. Accordingly, Prime Clerk's engagement is an effective and efficient manner of providing notice to numerous creditors and parties in interest of the filing of and developments in the Debtors' chapter 11 cases. Moreover, Prime Clerk is serving as the claims and noticing agent in the chapter 11 cases of Murray MEC, which are currently pending in the same Court, and as such, has familiarity with the Debtors, their management, their advisors, the Court, and the clerk's office. Additionally, the appointment of Prime Clerk will relieve the Clerk of the administrative burden of processing what may be an overwhelming number of claims. It is my understanding that Prime Clerk is fully equipped to handle the volume of mailing involved in properly sending the required notices to creditors and other interested parties in these chapter 11 cases and processing the claims filed in the Debtors' cases.

26.     Accordingly, I believe that the relief requested in the Prime Clerk Retention Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

(v)     Debtors' Motion Seeking Authority to Implement Certain Notice and Case Management Procedures (the "Case Management Motion").

27.     As contemplated by the General Order and the *Procedures for Complex Chapter 11 Cases* attached thereto, the proposed Case Management Procedures, among other things, (a) establish requirements for filing and serving court filings, (b) delineate standards for notices of hearings and hearing agendas, (c) fix periodic omnibus hearing dates and articulate mandatory guidelines for the scheduling of hearings and objection deadlines, and (d) limit matters that are required to be heard by the Court.

28.     Approval of the Case Management Procedures will promote the efficient and orderly administration of these chapter 11 cases by, among other things, (a) establishing requirements for filing and serving court filings, (b) delineating standards for notices of hearings and hearing agendas, (c) fixing periodic omnibus hearing dates and articulating mandatory guidelines for the scheduling of hearings and objection deadlines, and (d) limiting matters that are required to be heard by the Court.

29.     Given the size and complexity of these chapter 11 cases, I believe that implementing the Case Management Procedures will promote judicial economy and facilitate the fair and efficient administration of these chapter 11 cases.  Specifically, the proposed Case Management Procedures will benefit the Debtors, the Court, and all parties in interest by, among other things:

- providing for omnibus hearings for the Court to consider motions, pleadings, applications, objections, and responses thereto;

- assuring prompt and appropriate notice of matters affecting parties' interests;

- allowing for electronic notice pursuant to the Court's electronic filing system;

- providing ample opportunity to parties in interest to prepare for and respond to matters before the Court;

- reducing the need for emergency hearings and requests for expedited relief;

- reducing the administrative and financial burden that would otherwise be placed on the Debtors and other parties in interest who file documents in these chapter 11 cases; and

- reducing the administrative burdens on the Court and the clerk of the Court.

30.     Aside from provisions in the *Procedures for Complex Chapter 11 Cases*, the Case Management Procedures include additional procedures such as guidelines for electronic service, notice of requests for relief, and the filing and service of adversary proceedings.  I believe the inclusion of these additional procedures will further facilitate the fair and efficient administration of these chapter 11 cases.

31.     Accordingly, I believe that implementing the Case Management Procedures is in the best interests of the Debtors' estates and should be approved on the terms and conditions described in the Case Management Motion.

**B.     Financial Motions.**

(vi)     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief (the "DIP Motion").

32.     The Debtors are in urgent need of liquidity. As of the Petition Date, the Debtors lack the financial wherewithal to fund their operations. The Debtors have managed their cash to retain sufficient liquidity to maintain their Mining Complexes while the Debtors considered all options to maximize value for their stakeholders. Now, to resume mining at Oak Grove, facilitate a sale of Maple Eagle, continue reclamation activities at North River, and fund the administration of these chapter 11 cases, the Debtors urgently require new money financing. Together with the liquidity to be provided through the Postpetition Javelin Facility, such new money financing, in

the form of the proposed DIP Facilities, will serve as a cornerstone of the Debtors' restructuring strategy. Proceeds of the proposed DIP Facilities will be used to honor employee wages and benefits, procure goods and services integral to the Debtors' mining operations, fund operational expenses, pay administrative expenses, and allow the Debtors to maintain positive relationships with all stakeholders. The proposed DIP Facilities send a clear signal to the market that the Debtors have sufficient funding to resume mining operations at Oak Grove, to sell Maple Eagle, and to continue reclamation activities at North River.

33.     By this motion, the Debtors seek approval of the DIP Facilities in the aggregate amount of $68.6 million, that provides for (a) a first-out Senior DIP Facility in an aggregate principal amount, with respect to the Senior DIP Loans, not to exceed $50.4 million, consisting of (i) $28.9 million of new money term loans, (ii) approximately $21.5 million of "rolled" prepetition first out term loan obligations, and (iii) a designation of Javelin Global as a "Secured Designated Coal Contract Counterparty" in connection with the Oak Grove Master Coal Agreement and (b) upon the signing of a stalking horse purchase agreement in connection with the a sale of Maple Eagle, a last-out non-priming Junior DIP Facility, consisting of up to $18.2 million of new money term loans which includes amounts necessary to fund Maple Eagle and Debtor Murray Alabama Minerals, LLC.

34.     The DIP Facilities demonstrate substantial support provided to the Debtors by their prepetition lenders notwithstanding the volatility of existing coal markets. More specifically, certain of the Debtors' prepetition term loan lenders negotiated both the new money $47.1 million DIP Facilities and a restructuring support agreement (the "Restructuring Support Agreement") with the Debtors. The lenders party to the Restructuring Support Agreement have committed to provide the full amount of the DIP Facilities. This committed financing is critical to the Debtors'

ability to avoid irreparable harm and to stabilize their business for the benefit of all of their stakeholders. Moreover, the Restructuring Support Agreement provides the Debtors with a path to emergence upon the completion of the chapter 11 cases, and provides a platform pursuant to which the Debtors hope to achieve consensus.

35.     In exchange for these significant benefits, the Debtors have made certain commitments under the DIP Facilities. These commitments include the rollup of the prepetition bridge loan facility, the encumbrance of the Debtors' unencumbered assets (including, upon entry of a final order, avoidance actions), and the payment of certain fees and expenses to the DIP Lenders. Under the circumstances described above and herein, these commitments are justified by the facts and circumstances of these cases.

36.     The Debtors' advisors conducted a marketing process for third-party DIP financing proposals by contacting 18 parties. Despite this outreach, follow-up calls, and provision of marketing materials to prospective lenders, no third parties submitted an indication of interest to provide alternative DIP financing. Accordingly, the DIP Facilities, which provide the cash needed to execute the "Restructuring" contemplated by the Restructuring Support Agreement, represents the only and best postpetition financing the Debtors could obtain.

37.     *The Debtors' Prepetition Capital Structure*. As of the Petition Date, the Debtors have approximately $270 million in debt and other liabilities, including, but not limited to, approximately $169 million related to the Take-Back Facility, approximately $21.5 million under an emergency bridge financing facility,[4] approximately $23.5 million owed to Javelin Global under certain of the Javelin Agreements (excluding, for the avoidance of doubt, the outstanding amount of advances under the Advance Facilities (as defined below)), and approximately $12.7

---

[4] This facility is documented by amendments to the Take-Back Facility.

million in intercompany liabilities owed to Murray Energy and other affiliates.  In addition, the Debtors have approximately $43 million in outstanding trade payables.

(a)      **The Prepetition Term Loan Credit Facility**

38.      On April 29, 2019, in connection with Met Holdings' acquisition of the Mining Complexes from Mission, the Debtors entered into an agreement whereby they assumed certain loan obligations of Mission (the "Prepetition Term Loan Credit Agreement").  The Prepetition Term Loan Credit Agreement memorializes a $158.25 million secured term loan credit facility (the "Take-Back Facility") among the Debtors, as borrowers and guarantors, the lenders party thereto from time to time (collectively, the "Prepetition Term Loan Lenders"), Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent for such Prepetition Term Loan Lenders (in such capacities, the "Prepetition Term Loan Agent" and, together with the Prepetition Term Loan Lenders and the "Secured Designated Coal Contract Counterparty" under the Prepetition Term Loan Credit Agreement, the "Prepetition Secured Parties").  The Take-Back Facility matures on April 29, 2023 and is secured by (i) a first priority security interest in, among other things, the Debtors' real and personal property (other than the Prepayment Collateral (as defined herein)) as well as the equity of all the Debtors other than Met Holdings (the "Take-Back Collateral") and (ii) a third priority security interest in, among other things, the Debtors' inventory, coal, as-extracted collateral, accounts receivable, deposit accounts, and contracts and agreements (the "Prepayment Collateral").  The Take-Back Facility bears interest at 8 percent per annum and is payable either in cash or, at any time prior to June 30, 2021, in kind semi-annually.  On November 15, 2019, the Debtors entered into a First Amendment to the Prepetition Term Loan Credit Agreement, whereby Murray Energy provided an additional $3.5 million to the Debtors

under the Take-Back Facility on the same terms as the original facility. As of the Petition Date, there is approximately $169 million in principal outstanding under the Take-Back Facility.

(b)  **The Javelin Relationship**

39.     On April 29, 2019, each of Murray Oak Grove and Murray Maple Eagle entered into agreements with Javelin Global pursuant to which, among other things, each of Murray Oak Grove and Murray Maple Eagle appointed Javelin Global as the exclusive marketing agent and offtaker for Oak Grove and Maple Eagle.

40.     ***Oak Grove and Maple Eagle Advance Facilities.*** The Master Coal Purchase and Sale Agreement, dated as of April 29, 2019, by and between Murray Oak Grove, as Seller, and Javelin, as Buyer (as amended, restated, or otherwise modified from time to time, the "Oak Grove Master Agreement") and the Master Coal Purchase and Sale Agreement, dated as of April 29, 2019, by and between Javelin, as Buyer, and Murray Maple Eagle, as Seller (as amended, restated, or otherwise modified from time to time, the "Maple Eagle Master Agreement" and, together with the Oak Grove Master Agreement, the "Javelin Master Agreements") establish general terms and provisions that govern transactions between the parties for the purchase and sale of coal. Individual transactions are agreed and documented pursuant to a written confirmation letter or document (each a "Confirmation") between the parties setting out transaction-specific details, including specific delivery terms, price, and quantity and quality of coal.

41.     The Amendment to Oak Grove Master Agreement, dated as of April 29, 2019, by and between Murray Oak Grove, as Seller, and Javelin, as Buyer (as amended, restated, or otherwise modified from time to time, the "Oak Grove Advance Facility") and the Amendment to Maple Eagle Master Agreement, dated as of April 29, 2019, by and between Murray Maple Eagle, as Seller, and Javelin, as Buyer (as amended, restated, or otherwise modified from time to time,

the "Maple Eagle Advance Facility" and, together with the Oak Grove Advance Facility, the "Advance Facilities") set out the terms pursuant to which Javelin would make weekly advance payments to Murray Oak Grove and Murray Maple Eagle in connection with the ongoing purchase and sale of coal from each mine. The Advance Facilities are secured by a second priority security interest in the Prepayment Collateral (as defined in the Guaranty, Pledge and Security Agreement, dated as of April 29, 2019, by and between Javelin and the Debtors). Under the Advance Facilities, Javelin would make weekly advance payments to Murray Oak Grove and Murray Maple Eagle for acceptable coal deliveries as follows, subject to the terms of the Advance Facilities:

- the Coal Inventory Payment: an amount equal to seventy percent (70%) of the estimated value of the coal delivered to Javelin, subject to certain specified adjustments (each such payment, a "Coal Inventory Payment"); and

- the A/R Payment: in advance of the time such payment would otherwise be due and payable, for any acceptable shipments of coal made pursuant to the Oak Grove Master Agreement or Maple Eagle Master Agreement, 95% of the base price of such shipments (as such price is specified in the applicable Confirmation) (each such payment, a "A/R Payment" and together with the Coal Inventory Payment, the "Advance Payments").

As and when it receives payment for the ultimate resale of coal it purchased from Murray Oak Grove or Murray Maple Eagle (such resale known as an "Onward Sale"), subject to its rights thereunder, Javelin would remit the final 5%, less certain fees and commissions. On the Friday of each delivery week, Murray Oak Grove or Murray Maple Eagle, as applicable, would pay Javelin a fee equal to the Advance Payments balance outstanding as of the prior Friday under the applicable Advance Facility, multiplied by a daily interest rate (for each day elapsed in such delivery week) of three-month LIBOR plus 7.00% divided by 360 days. As of January 31, 2020, the outstanding amount of advances made was $33.3 million.

42.     ***Prepayment Facility.*** Murray Oak Grove and Javelin also entered into the Prepaid Purchase Agreement Confirmation, dated as of April 29, 2019, by and between Murray Oak Grove, as Seller, and Javelin, as Buyer (as amended, restated, or otherwise modified from time to time, the "Prepayment Facility").  The Prepayment Facility is governed by and subject to the Oak Grove Master Agreement and documents the sale and purchase of coal in the amount and with the specifications set out therein. The Prepayment Facility is secured by a first priority security interest in the Prepayment Collateral (as defined in the Guaranty, Pledge and Security Agreement, dated as of April 29, 2019, by and between Javelin and the Debtors) and a second priority security interest in the Take-Back Collateral (as defined in the Intercreditor Agreement, dated as of April 29, 2019, by and between Javelin and Wilmington Savings Fund Society, FSB).   Under the Prepayment Facility, Murray Oak Grove is required to deliver 1 million short tons per calendar year, with cash payment to Javelin to the extent quarterly deliveries are below a minimum specified quantity per calendar quarter. On the effective date of the Prepayment Facility, Javelin pre-paid the entire amount of $25 million (the "Pre-Payment") for all coal to be delivered under the Prepayment Facility. The Pre-Payment balance (i) is reduced by a fixed dollar amount per short ton of coal delivered by Murray Oak Grove to Javelin and (ii) bears interest at a rate of three-month LIBOR plus 7.00% per year.  As of January 31, 2020, $23.4 million was owed to Javelin under the Prepayment Facility.

43.     Pursuant to the Coal Marketing Agreement, dated as of April 29, 2019, by and between Murray Oak Grove, as Producer, and Javelin, as Marketer (as amended, restated, or otherwise modified from time to time, the "Oak Grove Marketing Agreement") and the Coal Marketing Agreement, dated as of April 29, 2019,  by and between Murray Maple Eagle, as Producer, and Javelin, as Marketer (as amended, restated, or otherwise modified from time to time,

the "Maple Eagle Marketing Agreement" and, together with the Oak Grove Marketing Agreement, the "Javelin Marketing Agreements") Murray Oak Grove and Murray Maple Eagle appointed Javelin, on an exclusive basis, to perform certain services in connection with the sale of coal in exchange for a marketing commission, including: (i) marketing of coal to prospective customers inside and outside the United States, (ii) providing advice on marketing strategy and brand recognition, (iii) communicating coal sales opportunities to Murray Oak Grove or Murray Maple Eagle, as applicable, (iv) assisting and advising Murray Oak Grove or Murray Maple Eagle, as applicable, in the negotiation of the terms for the sale and delivery of coal to prospective customers, (v) procuring transportation services for delivery of coal and (vi) procuring blending coal.  Javelin may act as an agent to procure "agency sale" contracts whereby Murray Oak Grove or Murray Maple Eagle, as applicable, will sell coal to a customer, and may also procure "back-to-back sale" contracts whereby Javelin will sell coal to a customer and Murray Oak Grove or Murray Maple Eagle, as applicable, will undertake to supply coal to Javelin on the terms set out in the Javelin Master Agreements.

44.    ***Postpetition Javelin Agreements.***    The prepetition Javelin agreements were a critical component of the Debtors' financing and cash flow. The Debtors respectfully request by this Motion to enter into, perform under, and/or amend the Postpetition Javelin Facility.  The Debtors believe that the relief requested hereby will thus fulfill a critical aspect of the Debtors' postpetition operational financing needs.

45.    While the Debtors' operations are currently idled, coal sale contracts are at the core of the Debtors' business: selling coal pursuant to coal sale contracts generates substantially all of the Debtors' revenue.  The Debtors' competitors similarly ship product pursuant to long- and short-term contracts, and the Debtors historically compete on terms with those competitors.

46.     The Debtors sell their coal exclusively to Javelin Global, which markets and sells the coal to third-parties—the Debtors have no other customers.  Substantially all of the Debtors' revenue is generated by selling coal to Javelin Global.  If the Debtors are unable to resume operating under their agreements with Javelin Global, they will be forced to either forego this revenue or to incur the substantial costs and delay of finding a customer and negotiating new coal sales contracts.  Without an ongoing relationship with Javelin Global, the Debtors will be unable to generate revenue or operate their businesses.

47.     ***The Bridge Loan Facility.***  Since November 15, 2019, the Debtors have received additional "bridge loans" to afford them an opportunity to explore strategic alternatives. These bridge loans were memorialized in amendments to the Prepetition Term Loan Credit Agreement (the "Bridge Loan Facility").  The Bridge Loan Facility has been increased (and amended) on several separate occasions with funds advanced by MC Southwork LLC ("MC Southwork") and/or Murray Energy, amounts owing totaling approximately $21.5 million.   The Bridge Loan Facility bears interest at a rate of 8 percent per annum and matures on February 14, 2020, and is secured by the same liens that secure the Take-Back Facility (albeit on a first-out basis).

48.     The Debtors have agreed to "roll up" or immediately repay the Bridge Loan Facility with the proceeds from any debtor in possession financing extended by the Bridge Loan Facility lenders in these chapter 11 cases.  As of the Petition Date, there is approximately $21.5 million in principal outstanding under the Bridge Loan Facility.  Of the $21.5 million, MC Southwork advanced $14.4 million and Murray Energy advanced approximately $7.1 million.

49.     *The DIP Facilities and Postpetition Javelin Facility*

(a)     **The Debtors' Need for Access to Financing and Use of Cash Collateral**

50.     The Debtors require immediate access to liquidity to resume mining operations at

Oak Grove, conduct a sale process for Maple Eagle, and continue reclamation at North River—all

with an eye toward confirmation of a chapter 11 plan within the timeframe agreed-to within the

Restructuring Support Agreement. As of the Petition Date, the Debtors had very limited liquidity—

an amount less than is needed to pay for its ongoing operations in the ordinary course of business.

In the months prior to the chapter 11 filing, the Debtors have been forced to delay payments and

stretch payment terms for their vendors to retain sufficient liquidity to operate their businesses.

Without a cash infusion at this critical point, the Debtors will be unable to mobilize their workforce

or satisfy key vendors so as to achieve their business objectives. The lack of immediate liquidity

could result in complete shutdown of the Debtors' Mining Complexes and the loss of good paying

jobs for the Debtors' employees. The DIP Facilities, together with the Postpetition Javelin Facility,

provide the necessary cash to meet immediate operational needs and provide the liquidity for a

smooth transition into chapter 11.

(b)     **The DIP Sizing Process**

51.     Since the engagement of A&M, the Debtors and A&M have carefully evaluated the

Debtors' operations, including determining potential liquidity needs for a chapter 11 case. As part

of that analysis, A&M analyzed the Debtors' financial projections and liquidity position. This

analysis was based upon the business plan underlying the Restructuring Support Agreement,

overlaid with the estimated impact of the commencement of these chapter 11 cases.

52.     The Debtors and A&M also considered the adverse market conditions facing the coal industry as a whole. As further described in the Moore Declaration, domestic and international prices for metallurgical coal declined for years and remain in a state of turmoil.  Confronted with this extremely challenging business climate, the Debtors took proactive steps to reduce costs and lessen the burden of their liabilities, including, among other things, reducing their workforce and "hot idling" the Maple Eagle and Oak Grove mines in the months preceding the Petition Date.  It is not possible or practical to completely shut down operations, especially for underground mines, which risk flooding and other deleterious conditions if they are not properly supervised and protected.  Despite their efforts to reduce operating costs, however, at the present spot price for metallurgical coal, the Debtors are simply unable to repay their liabilities.

53.     Notwithstanding efforts to improve liquidity, the Debtors have faced ongoing funding challenges, even to pay such basic expenses as biweekly payroll.  The Debtors recognize that the failure to pay their employees would make it virtually impossible to preserve operational potential and would jeopardize the marketability of their Mining Complexes.  Accordingly, the Debtors have been working closely with their major stakeholders to address both these immediate liquidity concerns and longer term strategic goals.

54.     The Debtors have asked for relief to pay claims to certain prepetition claimants whose goods and services are necessary to the Debtors' operations. Specifically, the Debtors have requested, or will request, authority to pay or provide adequate protection for certain prepetition claims, including surety bond cash collateralization, critical vendors, taxes, employee wages and benefits, certain legacy healthcare obligations, and utilities. Having the authority to make such payments is essential to the success of the Debtors' carefully structured reorganization.  Absent

payment to, or authority to pay, certain claimants, the Debtors' business will suffer irreparable harm. Accordingly such payments were included in the sizing of the DIP Facilities.

55.      In addition to the above operational and industry-wide considerations, A&M and the Debtors also considered the incremental administrative costs of a complex chapter 11 filing with a large number of stakeholders, including multiple lender groups, business entities, unions, and, governmental entities, each of whom will likely be represented by counsel.

56.      Based on these considerations, the Debtors and their advisors determined that smooth postpetition operations would require incremental liquidity of approximately $68.5 million, assuming a roll up of the approximately $21.5 million of the Debtors' first out term loan obligations. The Debtors believe the proposed DIP Facilities will allow them to operate their businesses and satisfy all administrative costs and expenses associated with these chapter 11 cases as they come due.

(c)      <strong>The Need for Postpetition Financing</strong>

57.      The Debtors' liquidity is severely constrained and the Debtors' mines are temporarily idled. The Debtors' limited available cash has strained the Debtors' ability to make payments to the vendors and employees supporting their businesses, and drained the time and attention of senior management at critical periods.

58.      Under the Restructuring Support Agreement, the Debtors intend to restart coal production at Oak Grove, a very expensive proposition to be sure.  Without the cash and stability provided by the DIP Facilities and the Postpetition Javelin Facility, irreparable harm would occur as a result of the Debtors' inability to continue ordinary course operations, which would not only impact revenue generation, but also risk losing the confidence of employees, vendors, and customers.

59.    The proceeds of the DIP Facilities and the advances under the Postpetition Javelin Facility will allow the Debtors to resume mining activities at Oak Grove and fund their postpetition operations. For these reasons, the Debtors believe that it is in their estates' best interest to obtain financing under the DIP Facilities and enter into, and perform under, the Postpetition Javelin Facility.

60.    At the same time, entry into the Postpetition Javelin Facility will allow the Debtors to avoid the substantial expense and delay that would come with terminating their relationship with Javelin Global and instead locating and negotiating with a new customer.

61.    For these reasons, the Debtors believe that it is in their estates' best interest to obtain DIP financing under the DIP Facilities.

*       *       *       *

62.    The proposed DIP Facilities and Postpetition Javelin Facility are critical to the Debtors' ability to administer these chapter 11 cases, provide the Debtors with sufficient liquidity to continue operations in the ordinary course, and pursue a reorganization of their business for the benefit of their employees, vendors, customers, and other stakeholders. The DIP Facilities will allow the Debtors to: (a) fund the expenditures that are essential to the Debtors' continuation as a going concern, (b) provide the liquidity necessary to continue favorable trade terms with vendors and to reassure other stakeholders, (c) fund payroll obligations, and (d) fund the administrative cost of these chapter 11 cases.

63.    Absent the DIP Facilities and Postpetition Javelin Facility, which will assure creditors that the Debtors will have sufficient liquidity to administer these chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders. Without postpetition financing, the Debtors lack sufficient funds to operate their enterprise,

continue paying their debts as they come due, and cover the projected costs of these chapter 11 cases.

64.    Accordingly, I believe that the proposed DIP Facilities, Postpetition Javelin Facility, and use of cash collateral should be approved on the terms and conditions described in the DIP Motion.

> (vii)    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Maintain Existing Business Forms, and (C) Perform Intercompany Transactions and Pay Prepetition Obligations Related Thereto, and (II) Granting Related Relief (the "Cash Management Motion").

65.    In the ordinary course of business, the Debtors operate a cash management system to efficiently collect, disburse, and transfer funds generated by their operations, and to facilitate cash management, forecasting, and reporting, including debit, wire, and automated-clearing-house ("ACH") transfers (the "Cash Management System").  A diagram of the Cash Management System and the associated accounts (the "Debtors' Accounts") is attached as Exhibit 1 to Exhibit A and Exhibit B of the Cash Management Motion.  The Murray enterprise's treasury department maintains daily oversight of the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  Additionally, the Murray enterprise's corporate accounting department regularly reconciles the Debtors' books and records to ensure that all transactions, including Intercompany Transactions, are accounted for properly.

66.    The Cash Management System employed by the Debtors is similar to those commonly employed by businesses comparable in size and scale to the Debtors.  Indeed, large businesses routinely use integrated systems to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple corporate entities.  Continued operation of the Cash Management System is vital to the Debtors'

ability to conduct their operations.  Any disruption of the Cash Management System would be materially detrimental to the Debtors' operations, as their businesses require prompt access to cash.

67.     ***The Cash Management System.***

68.     As of the Petition Date, the Cash Management System includes a total of six bank accounts (each, a "Bank Account," and collectively, the "Bank Accounts").  Each Bank Account is identified in Exhibit 2 to Exhibit A and Exhibit B attached to the Cash Management Motion. All of the Bank Accounts are held at Huntington National Bank (the "Cash Management Bank").

69.     ***Concentration Account.***  A concentration account maintained by Met Holdings (the "Concentration Account") directly funds the Debtors' four Disbursement Accounts (as defined herein), and all funds left in the Disbursement Accounts are swept back into the Concentration Account at the end of each business day.

70.     ***Disbursement Accounts***.  Met Holdings maintains four zero balance disbursement accounts (the "Disbursement Accounts") dedicated to the payment of specific expenses incurred by each of the Debtors.  The Disbursement Accounts are utilized to pay operating expenses (the "Operating Account"), employee and payroll obligations (the "Payroll Account"), healthcare expenses (the "Healthcare Account"), and workers' compensation expenses (the "Workers' Compensation Account") for each of Met Holdings' subsidiary Debtors.

71.     Cash generated from coal sales by the Debtors flows directly into the Operating Account and, as with all the Disbursement Accounts, funds left in the Operating Account are swept into the Concentration Account at the end of each business day.  As explained more fully further below, Javelin Global is the only entity that transfers money into the Operating Account on account of coal sales.

72.   ***Standalone Account.***    Met Holdings maintains one standalone account (the "Standalone Account") that is not integrated into the Cash Management System.   The Standalone Account has a zero or *de minimis* balance and is not used in any meaningful capacity by the Debtors.

73.   The Concentration Account and the Standalone Account are each subject to deposit account control agreements in favor of (i) Javelin Global in connection with the Prepayment Facility and the Working Capital Facility and (ii) Wilmington Savings Fund Society, FSB, as administrative agent for the lenders under the take-back facility.

74.   The Bank Accounts comprising each of the foregoing types of accounts are listed below.[5]

| Account Type | Bank Accounts |
|---|---|
| **Concentration Account** | Met Holdings Account – 6844 |
| **Disbursement Accounts** | Met Holdings Account (Operating) - 7063<br>Met Holdings Account (Payroll) - 7076<br>Met Holdings Account (Health) - 7089<br>Met Holdings Account (Workers' Comp) - 7092 |
| **Standalone Account** | Met Holdings Account - 6950 |

75.   The Debtors pay their Cash Management Bank, on average, approximately $2,700 per month in the aggregate on account of fees incurred in connection with the Concentration Account, Disbursement Accounts, and Standalone Account (the "Bank Fees").   As of the Petition Date, the Debtors believe that approximately $5,000 is outstanding on account of prepetition Bank Fees.

---

[5]   A detailed description of the Debtors' payroll, wages, and benefits programs can be found in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief*, filed contemporaneously herewith.

      a.      ***Compliance with Section 345 of the Bankruptcy Code and Certain of the U.S. Trustee Guidelines***

76.      Huntington National Bank is a designated depository in the Southern District of Ohio.

      b.      ***Compliance with U.S. Trustee Guidelines as to Business Forms.***

77.      The Debtors use a variety of preprinted business forms, including checks, letterhead, correspondence forms, invoices, and other business forms in the ordinary course of business (collectively, the "Business Forms").  The Debtors also maintain books and records to document their financial results and a wide array of necessary operating information, including their profits and expenses.

      c.      ***Intercompany Transactions.***

78.      The Debtors maintain business relationships with each other and with other Murray Energy affiliates and related parties resulting in intercompany receivables and payables in the ordinary course of business (collectively, the "Intercompany Claims").  In addition to the Intercompany Claims between Met Holdings and the other Debtors, Intercompany Claims arise between the Debtors and Murray Energy affiliates.

79.      The Intercompany Claims generally arise from (i) management or services fees arising from a management services agreement, (ii) intercompany payables and receivables generated from payment of certain operating expenses by Met Holdings on behalf of its Debtor affiliates (in accordance with shared services agreements, where applicable), (iii) payables and receivables on account of coal sales (in accordance with shared services agreements, where applicable), and (iv) payables and receivables on account of services performed or goods supplied by one Debtor entity for another Debtor entity or non-debtor affiliate or related parties (or *vice versa*).  Certain Intercompany Claims are settled on a daily basis while others are reflected as

receivables and payables, as applicable, in Met Holdings' or the respective Debtor's or non-debtor

affiliate's accounting system, and paid and settled when due in the normal course of business.

Accordingly, the Debtors can ascertain, trace, and account for all Intercompany Transactions, and

will be able to do so on a postpetition basis.

80.     The Intercompany Transactions among the Debtors and Murray generally fall into

the categories described below.

### d.     *Intercompany Transactions Among Debtors.*

81.     In the ordinary course of business, Met Holdings, as the parent of all of the Debtor

entities, maintains various business relationships with, and performs certain services for, the other

Debtor entities.  Such Intercompany Transactions generally fall into the following categories:

- Operating Expenses/Corporate Overhead: Operating expenses and corporate overhead expenses incurred by the various Debtors are generally paid by Met Holdings out of the Operating Account.  In the ordinary course of business through the Management Services Agreement, Murray Energy's corporate accounting department records the resulting payables and receivables in the Debtors' accounting system.

- Payroll: As described more fully in the Debtors' wages motion, filed contemporaneously with the Cash Management Motion, each operating entity has its own employees, but Murray Energy processes employees' wages on behalf of the Debtors.  Met Holdings funds the Payroll Account (which is a Disbursement Account specifically designated for payroll) from the Concentration Account, and issues checks and ACH transfers to or for the benefit of the respective employees from the Payroll Account.   In the ordinary course of business through the Management Services Agreement, Murray Energy's corporate accounting department records the resulting payables and receivables in the Debtors' accounting system.

- Accounts Payable: Murray Energy processes all of the Debtors' accounts payable in the ordinary course of business on behalf of the Debtors' operating entities, including taxes, payments to holders of royalty interests, and other accounts payable.  In the ordinary course of business through the Management Services Agreement, Murray Energy's corporate accounting department records the resulting payables and receivables in the Debtors' accounting system.

- Capital Expenditures: Murray Energy acts as a governor on all major capital expenditures and approves all projects at the respective Debtor operating entities.  Met Holdings then makes payments from the Operating Account to fund such capital expenditures.  In the ordinary course of business through the Management Services

Agreement, Murray Energy's corporate accounting department records the resulting payables and receivables in the Debtors' accounting system.

- <u>Receipt of Coal Sale Proceeds</u>: All coal sale proceeds from Debtor entity coal sales are received by the Operating Account, regardless of which mine the coal is extracted from. In the ordinary course of business through the Management Services Agreement, Murray Energy's corporate accounting department records the resulting payables and receivables in the Debtors' accounting system.

82.    ***Intercompany Transactions between the Debtors and MEC Debtors.***

83.    As noted above, the Debtors engage in Intercompany Transactions with non-debtor Murray Energy related to (a) transactions related to a Management Services Agreement, and (b) ordinary course intercompany transactions, which include Murray Energy's payment of operating expenses and corporate overhead expenses incurred by the Debtors, funding payroll, processing of accounts receivable, and management and funding of capital expenditures.

84.    In accordance with the Management Services Agreement, Murray Energy manages all aspects of the operations at the Debtors' mining operations, including (a) coordination and management of employees and contractors at the mines, (b) modeling and engineering services, (c) sales and marketing services, (d) logistics management, (e) human resources and employee-related functions, (f) provision of information technology systems and related services, (g) compliance and investor relations services, (h) financial/accounting and loan related services, and (i) legal services.  In exchange, the Debtors are obligated to pay a quarterly management fee of $1,000,000 to Murray Energy.  Where Murray Energy incurs expenses on behalf of the Debtors, Murray Energy invoices the Debtors for such expenses, which may include travel costs, maintenance and rebuilding, permit and licensing costs, consulting fees, certain medical costs, and may also include payments made on corporate credit cards, which are not generally issued to employees of the Debtors.   Certain transactions may require payment by credit card, and to the

extent such payments are made by Murray Energy or a MEC Debtor on behalf of a Debtor, such payments will be reconciled as an Intercompany Transaction.

85.     In addition, certain MEC Debtor entities operate stand-alone businesses that provide goods and services such as machine repair work, parts supply, longwall rebuilds, shipping and docking services, and loading services.  These entities provide goods and services to other MEC Debtors, Debtor entities, or non-debtor affiliates.  That is, rather than the Debtors' mining entities utilizing third-party vendors to, for example, perform a longwall rebuild or machine repair work, such Debtor mining entity may engage with a MEC Debtor entity who performs those services.  In these cases, ordinary course invoices and receipts are generated, and the Debtors' corporate accounting department records the resulting payables and receivables in the Debtors' accounting system.

86.     As of the Petition Date, the Debtors owe Murray Energy and its affiliates approximately $12.7 million on account of Intercompany Claims related to quarterly management services fees pursuant to the Management Services Agreement, reimbursement of costs and expenses under the Management Services Agreement, and other services.

87.     The management services provided by Murray pursuant to the Management Services Agreement and other interactions with MEC Debtors constitute Intercompany Transactions, which gives rise to certain Intercompany Claims.   By Order dated December 10, 2019 (the "MEC Cash Management Order"), the MEC Debtors were authorized to continue their cash management system in the ordinary course, which included the authorization to continue engaging in Intercompany Transactions with its affiliates, including the Debtors.

e.     *Importance of Intercompany Transactions*.

88.     The Intercompany Transactions are an essential component of the Debtors'
operations and centralized Cash Management System.  The Intercompany Transactions generate
operational efficiencies, increase operational flexibility, provide significant cost savings, and
improve the market position of both the Debtors and their non-debtor affiliates, all of which benefit
the Debtors' estates.  Any interruption of the Intercompany Transactions would severely disrupt
the Debtors' operations and result in great harm to the Debtors' estates and their stakeholders.
Accordingly, the Debtors seek authority—and, to the extent applicable, relief from the automatic
stay—to continue the Intercompany Transactions in the ordinary course of business on a
postpetition basis, in a manner substantially consistent with the Debtors' past practices, subject in
all respects to the terms of the Debtors' postpetition financing facility (any order entered by the
court approving the Debtors' entry into such postpetition financing facility, the "DIP Order").[6]

*        *        *        *

89.     Requiring the Debtors to adopt a new, segmented cash management system during
these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the
Debtors' operations.  Importantly, the Cash Management System provides the Debtors with the
ability to quickly track and report the location and amount of funds, which, in turn, allows
management to track and control such funds, ensure cash availability, and reduce administrative
costs through a centralized method of coordinating the collection and movement of funds.  Any
disruption of the Cash Management System could have a negative effect on the Debtors'
restructuring efforts.  Indeed, absent the relief requested in the Cash Management Motion,

---

[6] This motion provides an overview of the Debtors' typical Intercompany Transactions.  The relief requested herein
is applicable with respect to all Intercompany Transactions and is not limited to those Intercompany Transactions
described in this Motion.

requiring the Debtors to adopt a new, segmented cash management system would cause the Debtors' operations to grind to a halt, jeopardizing the Debtors' business enterprise. By contrast, maintaining the current Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.

90.     I believe that parties in interest will not be harmed by the Debtors' continued use of the present Cash Management System, including maintenance of the Bank Accounts and the Intercompany Transactions, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of prepetition obligations. Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Murray enterprise's treasury department. In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interest of the Debtors' estates and creditors.

91.     If the Debtors' ability to conduct transactions by these methods is impaired, the Debtors may be unable to perform under certain contracts, and payments to vendors could be delayed, resulting in unnecessary disruption to their business operations and the incurrence of additional costs. The Debtors respectfully submit that such relief is reasonable and appropriate because the Cash Management Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

92.     At any given time, there may be prepetition amounts outstanding on account of the Cash Management System such as Bank Fees, and Intercompany Claims. Any non-payment of prepetition amounts owed could cause serious disruptions to the Debtors' estates.

93.     The Debtors' continued use of the Cash Management System, including payment of prepetition Bank Fees, and Intercompany Claims, will facilitate their transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in the payment of postpetition amounts due.  As described above, the Debtors in the ordinary course of business engage in Intercompany Transactions with other Debtors and the MEC Debtors, which are an essential component of the Debtors' operations and Cash Management System.  Any interruption of the Intercompany Transactions, or non-payment of prepetition amounts due in connection with the Cash Management System, would severely disrupt the Debtors' operations to the detriment of Debtors and their estates.  Moreover, the Debtors expect their affiliates to continue to honor their obligations to the Debtors on account of Intercompany Claims, and vice versa.

94.     Payments of prepetition Bank Fees will ensure the continued support of the Debtors' Cash Management Bank on a go-forward basis at this critical juncture of the Debtors' chapter 11 cases.

95.     I believe that any disruption to the Cash Management Systems could have a negative effect on the Debtors' restructuring efforts.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and will enable the Debtors to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

**C.     Operational Motions.**

(viii)   Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Payment of (A) Critical Vendors, (B) Lien Claimants, (C) 503(B)(9) Claimants, and (D) Royalty and Leasehold Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief (the "Critical Vendors and Lienholders Motion").

96.     The Debtors seek entry of interim and final orders (a) authorizing the Debtors to pay in the ordinary course of business certain prepetition claims held by certain (i) Critical Vendors, (ii) Lien Claimants, (iii) Shippers, and (iv) 503(b)(9) Claimants (each as defined herein, and collectively, the "Trade Claimants"), in an amount not to exceed $10.0 million on an interim basis and $13.6 million on a final basis, and (iv) Royalty and Leasehold Claimants (as defined herein), in an amount not to exceed $1.4 million on an interim basis and $2.6 million on a final basis, (b) granting administrative expense priority status of Outstanding Orders after postpetition delivery of goods, and (c) granting related relief.

97.     With the assistance of A&M and their other advisors, the Debtors have spent significant time reviewing and analyzing their books and records, consulting operations managers and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable law, regulations, and historical practice to identify certain critical business relationships and suppliers of goods and services—the loss of which would immediately and irreparably harm their businesses.  As part of this analysis, a number of factors were considered, including:

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

- whether a vendor is a sole-source, limited-source, or high-volume supplier of goods or services critical to the Debtors' business operations;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether alternative vendors are available that can provide the requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including, pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor;

- the likelihood that a temporary break in the vendor's relationship with the Debtors could be remedied through use of the tools available in these chapter 11 cases;

- the regional location of vendors with respect to the location of the Debtors' mines and other operations;

- vendors required to address safety / regulatory or compliance related issues; and

- whether failure to pay a particular vendor could result in contraction of trade terms.

**f.      *The Debtors' Trade Claimants.***

98.      In the ordinary course of business, the Debtors extract and process metallurgical coal at their mines and deliver this coal to their customer, Javelin Global.[7]  The Debtors' ability to extract, process, and deliver coal in a timely manner is critically important to their financial performance and depends on their prompt and continuous receipt of a wide range of goods and services.  Given the highly specialized nature of the supplies and materials used in extracting and processing coal and the coal mining industry generally, the Debtors rely directly on specific vendors, suppliers, consultants, and shippers to provide the Debtors with goods and services necessary for the Debtors' business to function properly and to ensure safe mining conditions and

---

[7]  During the pendency of these chapter 11 cases, the Debtors may enter into agreements with other or additional customers who will require the Debtors to be able to extract, process, and deliver their coal in a timely manner.

full compliance with all applicable federal and state rules and regulations.  The vendors, suppliers, consultants, and other shippers that can service the Debtors' supply and repair needs are limited in number.

99.     Moreover, the Debtors routinely transport materials and equipment to and from their mines by rail, barge, and/or truck.  Any disruption to the Debtors' supply and transport network would have an immediate and substantial negative impact on the Debtors' business.  Fast, reliable, and efficient transportation is necessary for the Debtors' successful operations to avoid the depletion of critical materials and equipment for the Debtors' operation and to maximize the revenue from the Debtors' mining operations.  The goods and services provided by the Debtors' vendors, suppliers, consultants, and shippers are therefore essential to the day-to-day operations of the Debtors' business.

100.    The metallurgical coal market has faced significant challenges and pressure.  These challenges have had a significant impact on the domestic and export metallurgical coal market in general, and the Debtors' business in particular.  In the months following the Met Acquisition as a result of a deterioration in the metallurgical coal market prices, the Debtors' financial performance has not rebounded to a point where the Debtors are generating positive cash flow, which has exacerbated the Debtors' liquidity crisis.  As a result, the Debtors stretched payment terms for most vendors, suppliers, consultants, and other shippers to preserve liquidity for operations and for the payment of goods and services that are necessary to ensure safe mining operations.   These prepetition efforts have resulted in the Debtors owing approximately $43 million in aggregate outstanding accounts payable as of the Petition Date.  In light of the Debtors' prepetition financial condition, certain vendors, suppliers, consultants, and shippers imposed additional commercial requirements on the Debtors (including requiring that certain

transactions be conducted cash on delivery) as a condition of continued business and implemented onerous trade terms due to the Debtors' weakened liquidity position.

101.    Given the importance of the Debtors' vendors, suppliers, consultants, and shippers to the Debtors' business enterprise, the Debtors determined that it was necessary and prudent to identify the vendors, suppliers, consultants, and shippers that are most important to the Debtors' go-forward operations.   After a thorough review across the Debtors' mining operations and diligence regarding potential alternative vendors, suppliers, consultants, and shippers, the Debtors determined, in the exercise of their business judgment, that goods and services provided by the Trade Claimants, and the ability to pay a portion of the Trade Claims, are necessary at this critical juncture to the success of these chapter 11 cases, avoid irreparable harm to the Debtors' business, preserve the value of the Debtors' estates, and remain a going-concern.

102.    The Debtors seek authority to pay, in their sole discretion based on their reasonable business judgment, subject to the terms of the interim and final orders, up to approximately $10.0 million on account of certain prepetition Trade Claims on an interim basis, and up to approximately $13.6 million on account of certain prepetition Trade Claims on a final basis.

103.    As noted above, Met Holdings has entered into a Management Services Agreement with Murray Energy pursuant to which Murray Energy manages, administers, and oversees aspects of the operation of the Mining Complexes, which gives rise to certain intercompany claims.  The Critical Vendor Motion is not addressing costs in connection with such management services.  In contrast, the Critical Vendor Motion exclusively addresses claims of third-party vendors and other claimants who deal directly with the Debtors.

g.    *Critical Vendors*.

104.    Certain of the Debtors' vendors (collectively, the "<u>Critical Vendors</u>," and their claims, the "<u>Critical Vendor Claims</u>") provide goods and services that are necessary to the Debtors' business operations.  Many of the Critical Vendors are sole-source or limited-source suppliers or service providers or provide a material economic or operational advantage when compared to other available vendors and service providers.

105.    To identify the Critical Vendors, the Debtors, with the assistance of their advisors, reviewed their books and records, consulted operations management and purchasing personnel, reviewed contracts and related agreements, and analyzed applicable laws, regulations, and historical practices.  The Debtors only intend to make payments contemplated herein to the extent that the Debtors believe a Critical Vendor's failure to do business with the Debtors could significantly disrupt the Debtors' operations and cause material harm to the Debtors' business, goodwill, and market share.  Specifically, in identifying the Critical Vendors, the Debtors examined each of their vendor or service provider relationships with the following five general criteria in mind:  (a) whether a particular vendor is a sole-source or limited-source supplier or service provider of the quality and quantity required by the Debtors in a particular market; (b) whether the Debtors would be unable to obtain comparable products or services from alternative sources on a cost-effective basis within a reasonable timeframe; (c) whether a vendor is able or likely to refuse providing essential products or services to the Debtors if their prepetition balances are not paid; (d) whether an agreement or contract exists by which the Debtors could compel the vendor to continue performing on prepetition terms; and (e) whether the Debtors' inventory levels or service coverage is sufficient to meet customer demands while an alternative vendor is located.  In addition, the Debtors and their advisors examined the health of each vendor

relationship, their familiarity with the chapter 11 process, and the extent to which each vendor's prepetition claims could be satisfied elsewhere in the chapter 11 process.

106.    In summary, the Debtors' selection process balanced the need to ensure that these chapter 11 cases do not disrupt their operations, adversely affect their market share, or injure their customer and vendor relationships, with the need to limit the expenditure of estate resources.  To that end, the Debtors have undertaken a process to ensure that the Critical Vendors are vital to the Debtors' ongoing operations.  Paying targeted Critical Vendor Claims renders a benefit to the Debtors' estates both monetarily and operationally by preserving liquidity and enabling the Debtors to operate smoothly during the chapter 11 cases.

107.    The Debtors' Critical Vendors comprise the following categories:  (a) Safety and Regulatory Compliance Suppliers and Service Providers; (b) Equipment and Parts Suppliers and Service Providers; (c) Materials Suppliers and Service Providers; and (d) Repair and Maintenance Service Providers.  Each category is discussed below.

**(ii)    Safety and Regulatory Compliance Suppliers and Service Providers.**

108.    Mine safety is a preeminent concern for the Debtors.  To ensure their employees' safety and comply with a broad array of federal and state regulations, including rules and regulations promulgated by the Mine Safety and Health Administration ("MSHA"), the Debtors contract with certain vendors that provide specialized equipment and services to maintain safe working conditions at their mines.  For example, the Debtors must have specialized products for roof and other structural supports that meet specific regulatory standards to mitigate the risk of collapse.  The Debtors also require specialized operating equipment, such as miner tracking systems, ventilation components, and fire suppression supplies to comply with federal and state safety regulations.  To the extent the Debtors are paying directly for safety and regulatory compliance equipment, these payments are critical.

109.    Because of the industry-specific nature of these and similar goods and services, as well as the strict regulatory conditions under which the vendors and the Debtors operate, the Debtors work with a limited number of safety and regulatory compliance suppliers and service providers and there are few, if any, ready substitutes in the market to meet the Debtors' demands. Thus, if the Debtors were suddenly forced to change these and similar vendors, they may be forced to suspend operations at their mines due to their inability to meet regulatory requirements while they searched for qualified replacements.  For example, replacing the Debtors' structural support vendors would require the Debtors and their employees to expend significant time and resources in revising their complex mine structural plans, resubmitting such plans to regulators, and awaiting regulatory approval.  Such delays and increased expenses could prove disastrous for the Debtors' continued operations and significantly decrease the value of their estates.

### (iii)    Equipment and Parts Suppliers and Service Providers.

110.    To conduct their day-to-day business of mining coal, the Debtors require a continuous and reliable supply of equipment and parts that are unique to their mining operations. Examples of such equipment includes pumps, shearers, longwall conveyers, power loaders, crushers, locomotives, diesel engines, and all related parts.  Wear and tear on existing equipment creates suboptimal performance over time, forcing the Debtors to continually stock, maintain, or replace the most in-demand parts and components in the ordinary course of business.  Given the unique and highly technical nature of the coal mining industry,[8] much of the Debtors' mining equipment and parts can only be purchased from the original equipment manufacturer or certain after-market manufacturers and suppliers, leaving the Debtors without readily available replacement or substitute vendors.

---

[8]  For instance, most of the Debtors' mining equipment is designed, built, and approved by federal regulators according to requirements established by MSHA.

111.    The specialized equipment and parts that the Debtors require to continue their mining operations and remain competitive may only be available from sole-source or limited-source suppliers, and many of these suppliers may sell equipment and parts to the Debtors based on one-off purchase orders.  If the Debtors are unable to make payments to certain vendors who supply these parts, the Debtors' operations will be severely disrupted or further delayed while the Debtors attempt to locate adequate replacement vendors.  Failing to pay these vendors would therefore significantly harm the Debtors' operations, employees, and creditors, and compromise their restructuring efforts.

### (iv)    **Materials Suppliers and Service Providers.**

112.    In the ordinary course of business, the Debtors rely on certain suppliers for materials that will enable the Debtors to maintain active mining operations.  Examples of such materials include diesel fuel, lubricants, chemicals, rock dust, concrete support blocks, belts, castings, and tires for a wide range of vehicles and loaders used at both surface and underground mining operations.[9]  Many of the Debtors' materials suppliers are local or regionally based and are the only available option to satisfy the Debtors' high-volume demands.  In particular, those materials suppliers that supply diesel fuel, lubricants, and chemicals are critical to ongoing operations at both the point of coal extraction and during the preparation and cleaning process before coal is shipped to the Debtors' customer.  Thus, there is no assurance that the Debtors would be able to obtain alternative materials suppliers without disrupting essential operations, especially given the two locations where the Debtors conduct mining operations.  Without a steady stream of materials, the Debtors will not be able to operate.  It is therefore critical that the Debtors have the authority to pay their materials vendors to continue these essential relationships.

---

[9]  Most of the materials used by the Debtors in their active mining operations are approved by federal regulators according to requirements established by MSHA.

### (v)      Repair and Maintenance Service Providers.

113.    The Debtors rely on a number of key service providers for the repair and maintenance of equipment, infrastructure, and facilities. Although the Debtors or their affiliates perform routine maintenance and repair work during the ordinary course of business, the Debtors rely on specialized service providers for the repair and maintenance of equipment.  This repair and maintenance work requires service providers with specially trained personnel, of which there is a limited number.  The Debtors' current repair and maintenance service providers offer high-quality services that the Debtors are unable to replicate from other providers.  Therefore, preserving the Debtors' access to these service providers is critically important to the Debtors' ongoing operations.

### c.      *Lien Claimants.*

114.    The Debtors seek to pay the prepetition charges of certain contractors, repairmen, and other third-party service providers (the "Lien Claimants," and their claims, the "Lien Claims") that repair, maintain, and otherwise service necessary equipment and machinery used in the Debtors' operations.  Additionally, the Debtors rely on vendors that provide contract labor for their mining operations, as well as materials, such as roof bolts, equipment, machinery, consumables, and other products used in the Debtors' coal production.  Such services, labor, materials, and equipment are central to the Debtors' operations.  Absent payment of the accrued prepetition claims of the Lien Claimants, the Lien Claimants may cease to provide goods and services to the Debtors, and the Debtors would be left with no alternative providers capable of satisfying the Debtors' operational needs.  Thus, it is critical to the continuity of the Debtors' operations that they maintain their relationships with the Lien Claimants.

115.     Importantly, the Debtors believe that the Lien Claimants may be able to assert trade or mechanics' liens over the Debtors' leaseholds, as well as essential parts, machinery, and other equipment.  Absent payment of the outstanding prepetition Lien Claims, the Debtors believe that Lien Claimants may refuse or attempt to refuse to provide goods or service for or honor obligations under existing agreements with the Debtors on a go-forward basis.

**d.     *Shippers.***

116.     In the normal course of their business, the Debtors utilize and make payments to trucking companies and other transportation service providers (the "Shippers," and their claims, the "Shippers Claims") that transport materials and equipment to the Debtors' mines or otherwise facilitate the Debtors' operations.  The services provided by the Shippers are essential to the Debtors' day-to-day operations as the Debtors rely on the Shippers to transport materials and equipment to the mines.  In many cases, the Shippers are irreplaceable and represent the only means of transportation.

117.     If these charges remain unpaid, the Shippers may attempt to assert such possessory liens, and may refuse to deliver or release goods in their possession until their claims are satisfied and their liens redeemed.  The Shippers' possession (and retention) of the Debtors' materials and equipment would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer these chapter 11 cases.  The cost of such disruption to the Debtors' estates would likely be greater than the amount of Shippers Claims that the Debtors may pay if granted the requested authority.  Moreover, the inability to locate suitable replacements for the Shippers could result in the Debtors' mining operations coming to an immediate halt.

      **e.**    *Outstanding Orders*.

118.    Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "Outstanding Orders").  To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.  To prevent any disruption to the Debtors' business operations, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order (a) granting administrative expense priority status under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the postpetition acceptance of goods subject to Outstanding Orders, and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

      **f.**    *The Debtors' Royalty and Leasehold Claimants.*

119.    A mineral interest generally consists of an interest in minerals in place under a parcel of land, typically in the nature of a fee simple interest in real property, which entitles its owner to the exclusive right to, among other things, enter the land to explore for and produce such minerals from the land.  Through a written agreement (a "Royalty Agreement"), owners of mineral interests (the "Royalty and Leasehold Claimants," and their claims, the "Royalty and Leasehold Claims") are entitled to royalty payments from the Debtors in consideration for depleting coal reserves or for transporting mined coal across a royalty owner's property.  The fees owed under the Royalty Agreements are generally calculated upon the sale of mined coal, but payments under certain Royalty Agreements can also be calculated on a production basis (i.e., gross tons produced) or require minimum monthly, quarterly, or annual payments.

120.    As of the Petition Date, the Debtors are party to various Royalty Agreements. Failure to make payments on account of the Royalty Agreements in the ordinary course of business would directly and adversely impact the Debtors' ability to mine coal related to the Royalty Agreements.  The Debtors therefore request authority to pay certain prepetition Royalty and Leasehold Claims on an interim and final basis and to make payments on account of any postpetition Royalty and Leasehold Claims in the ordinary course of business.

121.    By the Critical Vendors and Lienholders Motion, the Debtors seek authority to set a fixed dollar amount of interim relief that can be used to satisfy Trade Claimants across any of the aforementioned categories.  This structure is necessary as the Debtors' analysis of the Trade Claims and their go-forward relationship with the Trade Claimants remains an active, ongoing process.  Allowing the Debtors to utilize an aggregate pool of funds to satisfy Trade Claims on an interim basis, in lieu of set dollar amounts for each category, allows the Debtors to continually analyze their business needs during the early days of these chapter 11 cases and as negotiations with Trade Claimants progress.  For these reasons, it is critical that the Debtors be authorized to utilize their reasonable business judgment to allocate funds where necessary to ensure a smooth landing into chapter 11 and prevent active mining operations from being disrupted.

122.    The Debtors, with the assistance of their advisors, will continue to evaluate all Trade Claimants on an ongoing basis with the goal of ultimately determining an appropriate final allocation between each category of Trade Claimants.  The Debtors, with the assistance of their advisors, have established a protocol whereby senior members of the Debtors' management, with legal oversight as necessary, determine in their reasonable business judgment which Trade Claimants to pay, in what amounts, and on what terms.  Among other things, this process ensures that only those Trade Claimants who are most critical to the Debtors' operations will receive

payment on some or all of their Trade Claims.  The Debtors have every intention of using the relief

requested in the Critical Vendors and Lienholders Motion to recoup working capital, prevent

disruption in their supply chain, and maximize earnings, which will benefit all of the Debtors'

stakeholders.

123.    For these reasons, the relief requested in the Critical Vendors and Lienholders

Motion is in the best interests of the Debtors, their creditors and all other parties in interest.

> (ix)    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A)
> Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable
> Expenses and (B) Continue Employee Benefits Programs, and (II) Granting
> Related Relief (the "Wages and Benefits Motion").

124.    While the Debtors' operations have seen a reduction in active mining, the Debtors'

ability to preserve their businesses, maximize value, and successfully reorganize is dependent on

the expertise and continued enthusiasm, commitment, and service of their active employees

(the "Employees" or "Workforce"). The Debtors must be in a position to pay their Employees for

the work that they do.  The Employees perform a wide variety of functions critical to the

administration of these chapter 11 cases and the Debtors' restructuring efforts.  The Employees'

skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to

preserving operational stability, safety, and efficiency.  In many instances, the Employees include

highly trained personnel who cannot be easily replaced during this critical juncture of these cases

and without whom the Debtors' reorganization efforts likely will be jeopardized.

125.    In the ordinary course of business, the Debtors (a) pay standard and variable wage

compensation and paid time off to their Employees, (b) maintain Employee reimbursement

programs, and (c) maintain certain employee benefits, including medical, dental, vision, and

prescription drug coverage and insurance, life insurance, accidental death and dismemberment

insurance, disability insurance, workers' compensation insurance, a 401(k) savings plan, and other

retirement savings plans for their Employees. In addition, the Debtors incur other employee-related costs such as payments to independent contractors and administrators related to their various employee benefits and collective bargaining agreement (each of the obligations discussed in this paragraph and as further described in detail below, collectively, the "Workforce Programs").

126.    By the Wages and Benefits Motion, the Debtors seek authority to pay the aggregate prepetition amounts owed on account of the Workforce Programs set forth in the table below:

| Workforce Programs | Amounts |
|---|---|
| Wages | $195,000 |
| Independent Contractors | $75,000 |
| Variable Wages | $17,000 |
| Business Expenses | $7,500 |
| Miscellaneous Employee Programs | $140,000 |
| Medical, Dental, Vision Insurance | $3,750,000 |
| Life Insurance & AD&D Insurance | $10,000 |
| Retirement Savings Plans | $16,000 |
| Workers' Compensation Program | $1,700,000 |
| **Total** | **$5,910,500** |

127.    As of the Petition Date, the Debtors estimate that $5,910,500 is outstanding on account of the Workforce Programs. The Debtors do not believe any Employee is owed any prepetition amounts in excess of the $13,650 priority wage cap imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code; however, out of an abundance of caution, the Debtors seek approval to pay such amounts, if any.[10]

---

[10]  Certain Employees in all tiers of the Debtors' organizational structure may be entitled to compensation and Employee Benefits (as defined herein) that exceed the statutory cap on account of accrued vacation, as discussed in greater detail below. None of these amounts (certain of which are required by law in various states) are currently due, but instead would only be due if such Employees are terminated or resign.

### g. *The Debtors' Workforce*

128.    As of the Petition Date, the Debtors' Workforce includes approximately 529 Employees.    Of these Employees, approximately 389 Employees (collectively, the "Union Employees") are covered by a collective bargaining agreement (the "CBA")[11] between Murray Oak Grove Coal, LLC and the International Union, United Mine Workers of America (the "UMWA").[12]  The remainder of the Employees (the "Non-Union Employees") are not covered by any collective bargaining agreements.  Approximately 392 Employees are paid hourly (the "Hourly Employees") and approximately 137 Employees are paid a salary (the "Salaried Employees").[13]

129.    In addition to the Employees, the Workforce also includes independent contractors who were retained for specific mine-related and/or corporate-related projects (the "Independent Contractors").

130.    If the Debtors fail to pay amounts owed or coming due under the Workforce Programs in the ordinary course (the "Workforce Obligations"), their Workforce will suffer personal hardship.  Failure to satisfy the Workforce Obligations in the ordinary course would negatively impact workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtors and their estates. The Debtors have determined that continuation of the Workforce Programs at this time is necessary to preserving and rebuilding Workforce morale during the pendency of these chapter 11 cases and to reducing the level of value-depleting attrition that might otherwise occur.

---

[11]   The description the CBA herein is intended only as a summary, and may be subject to exceptions or conditions set forth in the CBA.  To the extent of a conflict between this declaration and the terms of the CBA, the terms of the CBA shall control.

[12]   The Debtors are not assuming or affirming any contracts, agreements, programs, or applicability of any law related to the CBA, and the Debtors reserve all of their rights with respect to the CBA.

[13] All of the Employee figures in this paragraph include active and inactive Employees.

**h.**   *Employee Payroll, Payroll Deductions, & Payroll Taxes.*

131.   Both Hourly Employees and Salaried Employees are paid bi-weekly on Fridays (or on the preceding business day if a Friday falls on a holiday).  The Hourly Employees at Murray Oak Grove Coal, LLC are paid two weeks in arrears while the Hourly Employees at Murray Maple Eagle Coal, LLC are paid one week in arrears.  Salaried Employees at both mines are paid on the same date as the pay period end (or prior business day if needed).  As a result, Employees often have wages and other compensation that has accrued, but is unpaid, at any given point in time.  In 2019, the Debtors' monthly payroll obligations have averaged approximately $4.7 million.

132.   Murray Energy conducts the payroll administration on behalf of the Debtor entities, except as noted below.  Thus, in the ordinary course of business, Murray Energy processes deductions from Employees' compensation on account of federal, state, and local income taxes, FICA, court-ordered garnishments, employee retirement savings programs, loan repayments, optional supplemental insurance, union dues, uniforms (for Union Employees only), voluntary political or charitable contributions, and other programs (collectively, the "Deductions").  Some Deductions are made from each paycheck, while other Deductions are made less frequently.  In 2019, the Deductions have averaged approximately $1.6 million per month.

133.   In addition to the Deductions, the Debtors are also required by law to pay certain amounts to the appropriate federal, state, and local taxing authorities on account of programs such as Social Security, Medicare, and unemployment insurance (collectively, the "Employer Payroll Taxes").  As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Employer Payroll Taxes is approximately $20,000.  The Employer Payroll Taxes and taxes deducted from employee paychecks are forwarded to ADP, a third-party processing agent, who remits these amounts to the appropriate federal, state, or local taxing

authority.  As of the Petition Date, ADP is owed approximately $5,000 on account of its processing agent services.

134.    The Debtors also offer a self-insured disability compensation plan for Salaried Employees (the "Salary Continuation Plan").  The Salary Continuation Plan covers Salaried Employees who regularly work at least 30 hours per week and who become disabled and are unable to perform their essential duties due to illness or injury.  The Salary Continuation Plan pays eligible Employees 100% of their pre-disability wages for a maximum of 12 weeks, then 50% of pre-disability wages thereafter. The maximum benefit period under the Salary Continuation Plan is 180 days.

135.    The Debtors estimate that, as of the Petition Date, they are liable for accrued but unpaid wages, payroll taxes and other compensation owed to employees in the approximate sum of $195,000, including approximately $65,000 attributable to the Deductions.

### i.    *Independent Contractors and Variable Wages.*

136.    In addition to Employees, the Debtors retain Independent Contractors who undertake mine-related and/or corporate-related projects on an as-needed basis.  As of the Petition Date, the Debtors estimate that the accrued and unpaid amounts owed to Independent Contractors is approximately $75,000.

137.    The Debtors provide Non-Union Employees with three separate variable wage components as part of their compensation (together, the "Variable Wages").  The Debtors offer approximately 100 Employees a variable wage component based on safety and mining performance (the "Operating Variable Wage").  If an eligible Employee meets or exceeds the safety and performance target, such Employee is eligible to receive a pre-determined amount of compensation in addition to such Employees' normal wages.  The Operating Variable Wage is paid in arrears because the Debtors verify via compliance with safety metrics and measurement of

the footage mined prior to paying the Operating Variable Wage.  As of the Petition Date, the Debtors estimate that the accrued and unpaid amounts owed on account of the Operating Variable Wage are approximately $3,500.

138.    The Debtors also award an extra-day or extra-shift variable wage to approximately 120 Salaried Employees (the "Extra-Shift Variable Wage").   The Extra-Shift Variable Wage compensates the Salaried Employees for full shifts worked in addition to the minimum work requirement for Salaried Employees.  The Extra-Shift Variable Wage is normally paid to such eligible Salaried Employees monthly.  As of the Petition Date, the Debtors estimate that the accrued and unpaid amounts owed on account of the Extra-Shift Variable Wage are approximately $3,500.

139.    Finally, the Debtors offer approximately 140 Salaried Employees with a variable wage based upon mining production (the "Monthly Variable Wage").  The Monthly Variable Wage is calculated based on a variety of factors including safety metrics, production volume, and mining cost levels.  Each Salaried Employee has a maximum Monthly Variable Wage based on their job title.  Each month, the Monthly Variable Wage is calculated for each eligible Salaried Employee by multiplying the relative performance and weight of each of the foregoing factors times such Salaried Employee's maximum award.

140.    The Debtors pay the Monthly Variable Wage outside of Salaried Employees' normal bi-weekly or semi-monthly pay period.  Because the Monthly Variable Wage is not paid until mine performance for the previous month is analyzed and processed, checks are typically remitted 2–3 weeks after the end of each month.  The positions of the Employees who are eligible for the Monthly Variable Wage range from administrative assistants and warehouse clerks to certain corporate executives.  On average, the Debtors pay approximately $150,000 per month on

account of the Monthly Variable Wage.  As of the Petition Date, the Debtors estimate that there are approximately $10,000 in accrued and unpaid amounts owed on account of the Monthly Variable Wage.

### j.    *Vacation Days, Holidays, and Personal Days.*

141.    All of the Debtors' Employees are entitled to paid time off ("PTO") on an annual basis.  Non-Union Employees are generally entitled to ten days of PTO plus paid holidays per year.  Non-Union Employees are also entitled to additional PTO per year based on the Non-Union Employee's length of employment with the Debtors where the employee can earn up to a maximum of 20 total days.  On an annual basis, Union Employees are entitled to twelve days of PTO, four floating days of PTO, eleven paid holidays, and six personal and sick leave days pursuant to the CBAs.  Union Employees are expected to take their vacation days based on mine level policies and practices.

142.    Employees' PTO generally does not carry over from one calendar year to the next.[14] Employees' PTO accrues at the beginning of each calendar/contract year, and if an Employee is terminated or leaves the Debtors, he or she receives payment for all of that year's unused PTO.  Conversely, as Employees use vacation and other PTO hours in the normal course of business, the PTO liability decreases.  The Debtors estimate that, as of the Petition Date, total accrued PTO liability is approximately $4.5 million, and as Employees use their PTO in the ordinary course, such liability will reduce accordingly.  The Debtors seek relief to honor any cash PTO claims that arise postpetition in the ordinary course in the event that an Employee is terminated or leaves the Debtors without having used their entitled PTO.

---

[14] Generally, Employees' unused days of PTO is paid in cash at the end of the calendar year, but for this past calendar year transition period, certain Employees' were permitted to carry over their unused days of PTO into January given the Debtors' liquidity concerns.

     **k.**    *Reimbursed Business Expenses.*

143.    In the ordinary course of their business, the Debtors reimburse Employees for a variety of ordinary, necessary, and reasonable expenses that Employees incur within the scope of their job duties.  Such expenses include costs for travel (including lodging, automobile rentals, meals, and internet charges), taxi and mileage costs, and other general business-related expenses.

144.    Employees are expected to use sound judgment when incurring business expenses for which they seek reimbursement.  To be reimbursed, an Employee must submit his or her receipts to a reviewer designated by the Debtors for approval, and must do so on at least a monthly basis.  If approved, the Debtors reimburse the Employee for the reimbursed business expenses by check in the ordinary course of the Debtors' businesses.  As of the Petition Date, the Debtors believe that there is approximately $7,500 in accrued but unpaid amounts owing to Employees for reimbursements on account of business expenses.

     **l.**    *Miscellaneous Employee Programs.*

145.    The Debtors also offer Employees a number of miscellaneous benefits (the "Miscellaneous Employee Programs"), including benefits required by its CBA such as meals when an Employee works more than a certain number of hours and a uniform allowance.  As of the Petition Date, there is approximately $140,000 of accrued but unpaid amounts outstanding that that Debtors owe in connection with the annual uniform allowance pursuant to the CBA.  The uniform allowance equates to $335 per Union Employee, which the Union Employees can use to purchase their uniforms each year.

146.    As of the Petition Date, the Debtors estimate that there are $140,000 in accrued but unpaid amounts owing to Employees on account of the Miscellaneous Employee Programs.  The Debtors also request authority to make future payments under the Miscellaneous Employee Programs in the ordinary course of business.

**m.** *Employee Benefits.*

147.    Prior to the Petition Date, the Debtors offered Employees, their eligible spouses, and their dependents various standard employee benefits, including, without limitation, (a) medical insurance, (b) basic term life and AD&D insurance, (c) short-term disability insurance, (d) retirement savings plans, (e) workers' compensation, and (f) miscellaneous other benefits provided to the Employees in the ordinary course of business (collectively, the "Employee Benefits").   As of the Petition Date, the Debtors were obligated to pay certain contributions to or provide benefits under such plans, programs, and policies to their Employees.

**n.** *Medical, Dental, and Vision Insurance.*

148.    The Debtors offer substantially all Employees basic medical insurance, vision care, prescription drug coverage, and related benefits under medical plans offered by certain of the Debtors.   The medical plan offered to Non-Union Employees is a self-insured PPO plan (the "Non-Union Medical Plan"), under which participants choose healthcare providers in one of three provider networks: the High Performance Network, the Tier I In-Network, and the Tier-II Out-of-Network.   Under the Non-Union Medical Plan, deductibles and out-of-pocket limits vary by provider and Employees typically pay between 10%–50% of the coinsurance, with the remainder of the cost paid by the Non-Union Medical Plan.   The Health Plan, a local claims administrator, administers the Non-Union Medical Plan and supervises claims brought under the Non-Union Medical Plan.

149.    The Debtors' Union Employees are provided medical insurance through a self-insured PPO plan administered by the UMWA Health & Retirement Funds (the "UMWA Medical Plan," and together with the Non-Union Medical Plan, the "Medical Plans"), under which eligible Union Employees and their family members have the choice to use providers within the

network or to use providers outside of the network.  The Debtors contribute 100% of the cost of the UMWA Medical Plan.

150.    The Medical Plans are fully self-insured and the Debtors pay separate administrative fees to The Health Plan and the UMWA Health & Retirement Funds (the "Administrators").  The obligations that the Debtors incur on behalf of the Employees on account of the Medical Plans average approximately $400,000 per month.  The Debtors also pay monthly administration fees of approximately $40,000 to the Administrators.  In addition, the Debtors pay Employees' prescription drug costs which average approximately $360,000 per month.  These are paid bi-weekly to the appropriate Administrator, and can be subsequently offset by rebates.

151.    Notably, the UMWA Health & Retirement Funds began its administrative duties on September 1, 2019.  Until September 1, 2019, Anthem (a Blue Cross Blue Shield company) administered the UMWA Medical Plan.  Anthem has billed the Debtors $3.3 million for the claims it paid as administrator of the UMWA Medical Plan as well as the incurred but not reported (IBNR) claims from the period prior to April 30, 2019.  The Debtors continue to reconcile claims with Anthem and are seeking relief to pay up to $3.3 million.  The Debtors do not concede that Anthem is entitled to such amount, and the Debtors are working to reconcile Anthem's claims.  Nothing in this motion is an admission as to the validity or amount of Anthem's claims, and the Debtors reserve all their rights in connection therewith.

152.    As of the Petition Date, the Debtors estimate that they owe up to approximately $3.75 million on account of the Medical Plans, including $50,000 in fees owed to the Administrators.

     **o.**    *Life Insurance & AD&D Insurance.*

153.    All of the Debtors' Employees are entitled to basic life insurance (the "Life Insurance") and accidental death & dismemberment insurance (the "AD&D Insurance"). Both the Life Insurance and AD&D Insurance for Non-Union Employees are administered by Prudential. For Non-Union Employees, the Life Insurance is provided in an amount up to 200% of an Employee's annual earnings, with a maximum benefit of $350,000. For these same Employees, supplemental Life Insurance and AD&D Insurance are available and are paid for by Non-Union Employees who elect coverage through a payroll deduction.

154.    Pursuant to the CBA, Union Employees receive $90,000 of Life Insurance and $90,000 of AD&D Insurance.[15] Each month, the Debtors pay approximately $30,000 in advance on account of the premiums and administrative fees related to Employees' Life and AD&D Insurance. As of the Petition Date, the Debtors owe approximately $10,000 on account of the Life Insurance and AD&D Insurance. The Debtors also request authority to pay monthly Life Insurance and AD&D Insurance obligations in the ordinary course of business.

     **p.**    *Retirement Savings Plans.*

155.    The Debtors contribute to two (2) employee retirement savings plans: (a) a restricted 401(k) plan (the "Murray Restricted Plan"); and (b) a retirement Murray Oak Grove Coal hourly savings plan offered by UMWA (the "UMWA Plan," and together with the Murray Restricted Plan, the "Retirement Savings Plans"). Both Retirement Savings Plans are administered

---

[15] The CBA provides for payment of $90,000 for non-violent death and payment of $180,000 to the miner's named beneficiary for death due solely to violent, external, and accidental means (whether at work or not at work). In addition, the CBA provides for up to $120,000 for the loss of one or more "members" (including hands, feet, and eyes).

by Transamerica, and administration fees are paid out of plan assets.  Currently, approximately 500 Employees participate in the Retirement Savings Plans.

156.    Under the Murray Restricted Plan, an Employee may contribute a portion of his or her eligible earnings each year on a pre-tax basis to the Murray Restricted Plan, subject to limits imposed by federal law.  These contributions are deducted from the paychecks of participating Employees and held in trust on the Employees' behalf until such amounts can be paid to Transamerica, the administrator, to be held on the Employee's behalf.  The Debtors also match Employees' contributions to the Murray Restricted Plan on a dollar-for-dollar basis, up to 3% of an Employee's wages.  In addition, the Murray Restricted Plan permits Employees to take loans against their individual 401(k) account; to repay such amounts, the Debtors deduct loan payments from such Employee's paycheck and remit such amounts to Transamerica.  The Murray Restricted Plan is administered by Transamerica and the Debtors utilize CBIZ, Inc. to advise the Debtors on investment issues relating to the Murray Restricted Plan.  Fees for Transamerica and CBIZ, Inc. are paid directly out of the Murray Restricted Plan's assets.

157.    The Debtors' contributions to the UMWA Plan is set as a fixed dollar amount per hour under the CBA.  Specifically, under the UMWA Plan, the Debtors contribute $3.50 per hour worked per participating Employee.

158.    The Debtors typically pay approximately $250,000 per month in aggregate contributions to the Retirement Savings Plans.[16]  The Debtors estimate that there are approximately $16,000 in payments outstanding on account of Retirement Savings Plan contributions.  Failure to make payments of these prepetition amounts could impact morale and decrease Employee productivity or increase Employee attrition.

---

[16] This amount does not include Employee contributions that are deducted from paychecks; this only includes contributions paid by the Debtors.

q.    *Workers' Compensation.*

159.    The Debtors maintain workers' compensation insurance for Employees at the levels required by law in the states in which the Debtors operate for claims arising from or related to their employment with the Debtors, including occupational pneumoconiosis (also known as "black lung") claims under applicable state law and costs in connection with the United States Black Lung Benefits Revenue Act of 1977 and the Black Lung Benefits Reform Act of 1977 (collectively, the "Workers' Compensation Program," and any obligations thereto, the "Workers' Compensation Obligations").[17]

160.    The Debtors' Workers' Compensation Program consists of large deductible policies through Rockwood Casualty Insurance Company.[18]  The Debtors owe approximately $1.7 million on account of their Workers' Compensation Obligations.[19]  This amount consists of premiums on account of the large deductible policies, contributions to a loss fund, and administrative fees.

161.    The Debtors anticipate that additional claims arising from prepetition activity will be filed against the Debtors in the ensuing twelve months, resulting in Workers' Compensation Obligations that the Debtors seek authority to pay in the ordinary course of business.  It is critical that the Debtors be permitted to continue their Workers' Compensation Program and to pay outstanding prepetition claims, taxes, charges, assessments, premiums, and third-party administrator fees in the ordinary course of business because alternative arrangements for workers'

---

[17] As of the Petition Date, the Debtors estimate that they owe approximately $20,000 on account of obligations pursuant to the Black Lung Acts.  The Debtors reserve all of their rights with regard to any obligations arising pursuant to the Black Lung Acts.

[18] As of the Petition Date, the Debtors have posted approximately $3,350,000 in collateral on behalf of Rockwood Casualty Insurance Company to backstop certain of the Debtors' Workers Compensation Obligations.

[19] This estimate is based on the Debtors' maintaining current payroll during the duration of the current policy period.

compensation coverage would most certainly be more costly, and the failure to provide coverage may subject the Debtors and/or their officers to severe penalties.

      **r.**    *Summary.*

162.    The Workforce provides the Debtors with services necessary to conduct the Debtors' businesses, and the Debtors believe that absent the payment of the Workforce Obligations owed to, or on account of, the Workforce, the Debtors may experience Workforce turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that without these payments, the Workforce may become demoralized and unproductive, and ultimately the non-payment of prepetition claims could result in the loss of a significant portion of the Workforce. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Workforce Programs is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses in these chapter 11 cases.

163.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Wages and Benefits Motion should be granted.

      (x)    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Continue Their Surety Bond Program and (II) Granting Related Relief (the "<u>Surety Bond Motion</u>").

164.    In the ordinary course of business, the Debtors are required by applicable federal and state laws and regulations to post bonds to certain government units or other public agencies (the "Surety Bond Program"). Such bonds secure the Debtors' performance or payment of certain obligations related to the Debtors' coal mining activities. More specifically, the Surety Bond Program includes, among others, (a) reclamation bonds and supplemental bonds, (b) long term water treatment bonds, (c) road damage bonds, (d) encroachment bonds, (e) utility bonds, (f)

subsidence bonds, (g) federal and state and private coal and land lease bonds, (h) employee related bonds, (i) litigation related bonds, (j) transportation related bonds, and (k) financial assurance (each, a "Surety Bond," and collectively, the "Surety Bonds").

165.    The Surety Bond Program is essential to the Debtors' operations.  For instance, the federal Surface Mining Control and Reclamation Act (the "SMCRA"), 30 U.S.C. § 1201, *et seq.*, and/or applicable state statutes require the Debtors to post surety bonds to ensure funds are available to pay the Debtors' reclamation, subsidence, and related obligations.  Without posting such bonds, the relevant government agency will not issue a permit allowing and/or authorize the Debtors to conduct their mining operations on a particular property.  Without providing, maintaining, or timely replacing the Surety Bonds, the Debtors cannot operate their businesses.

166.    As of the Petition Date, the Debtors have 27 Surety Bonds outstanding, which provide approximately $28.6 million in aggregate Surety Bond coverage.[20]  The Debtors have not posted any cash or other consideration to collateralize the Surety Bonds.  Approximately 75 percent of the Surety Bond coverage secures reclamation obligations to governmental authorities related to the Debtors' mining operations.  The Debtors' remaining Surety Bond coverage secures the Debtors' obligations related to subsidence and private coal lease financial assurances.

167.    The issuance of a Surety Bond shifts the risk of the Debtors' nonperformance or nonpayment from the Debtors to a surety.  Unlike an insurance policy, if a surety incurs a loss on a Surety Bond, it is entitled to recover the full amount of that loss from the principal.  To that end,

---

[20] Excludes approximately $7.3 million of Surety Bond coverage related to assets acquired in the Met Acquisition that is held in the name of Seminole West Virginia Mining Complex, LLC, a Mission entity.  In addition to the 27 Surety Bonds outstanding, the Debtors are in the process of renegotiating certain Surety Bonds that have expired as of the Petition Date.

the Debtors are party to indemnity agreements with Indemnity National Insurance Company (the "Surety"), which set forth the Surety's rights to recover from the Debtors (together, the "Surety Indemnity Agreements").  Pursuant to the Surety Indemnity Agreements, the Debtors agree to indemnify the Surety from any loss, cost, or expense that the Surety may incur on account of the issuance of any bonds on behalf of the Debtors.

168.    The Surety Indemnity Agreements allow the Surety to request collateral security from the Debtors from time to time.  Under the Surety Indemnity Agreements, the Debtors are either required to provide additional collateral at regular intervals or upon demand in response to assertion of liability against a Surety.  As of the Petition Date, the Debtors are due to pay approximately $2,200,000 in additional collateral during the first 21 days of these chapter 11 cases.

169.    Additionally, the Debtors pay premiums associated with each bond issued by the Surety (the "Surety Premiums").  The annual Surety Premiums for the Debtors' Surety Bonds total approximately $750,000,[21] which does not include any additional premiums for defaults under the terms of the Surety Bonds.  The premiums for the Surety Bonds issued by the Surety are paid quarterly, in advance.

170.    The Debtors obtain their Surety Bonds through their broker, The Reschini Group (the "Surety Broker").  The Surety Broker assists the Debtors with obtaining the Surety Bonds and evaluating bond offerings.  The Surety Broker negotiates with the Surety on behalf of the Debtors to procure surety bonds and enable the Debtors to obtain new or replacement surety bonds on favorable terms.  The Debtors compensate the Surety Broker by paying negotiated fees based on a percentage of the face amount of the bonds procured (the "Brokerage Fees"), which are included

---

[21] The Surety Premiums include the Brokerage Fees (as defined below).  The Surety Premiums above do not include premiums associated with the approximately $7.3 million of Surety Bond coverage related to assets acquired in the Met Acquisition that is held in the name of Seminole West Virginia Mining Complex, LLC, a Mission entity

as a portion of the Surety Premiums.  Accordingly, to ensure uninterrupted coverage it is important

that the Debtors honor any prepetition amounts owed in connection with the Brokerage Fees and

pay any Brokerage Fees that may arise on a postpetition basis in the ordinary course of business.

171.   The Debtors' failure to provide, maintain, or timely replace the Surety Bonds may,

therefore, jeopardize the Debtors' ability to conduct their operations.  Moreover, based on the

Debtors' current circumstances, it is not likely that the Debtors will be able to replace existing

Surety Bonds on terms more favorable than those offered by the Surety.  The process of

establishing a new Surety Bond Program would be burdensome to the Debtors, and it is doubtful

that the Debtors could replace all of the Surety Bonds in time to avoid defaults or other

consequences of the applicable obligations.  Continuing the Surety Bond Program is therefore

necessary to maintain the Debtors' current business operations, as well as the existing relationship

with the Surety.  In short, failure to maintain the Surety Bond Program would have a detrimental

impact on the Debtors' businesses and the value of their estates.

> (xi)   Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Insurance Policies and Honor All Obligations In Respect Thereof, (B) Renew, Supplement, and Enter Into New Insurance Policies, (C) Honor the Terms of the Premium Financing Agreements and Pay Premiums Thereunder, (D) Enter into New Premium Financing Agreements in the Ordinary Course of Business, and (II) Granting Related Relief (the "Insurance Motion").

172.   In the ordinary course of business, the Debtors maintain approximately

44 insurance policies (collectively, the "Insurance Policies," and each individually

an "Insurance Policy") that are administered by various third-party insurance carriers

(collectively, the "Insurance Carriers").  The Insurance Policies provide coverage for, among other

things, the Debtors' property, general liability, automobile liability, umbrella coverage, excess

liability, pollution liability, employers' liability, and directors' and officers' liability (including

tail coverage).  The Insurance Policies are essential to the ongoing operation of the Debtors'

businesses. The Debtors' annual premium payments for the Insurance Policies are approximately $5.3 million plus applicable taxes and surcharges.[22]

173.   The Insurance Policies are generally one year in length and renew at different times throughout the year. Insurance premiums are typically prepaid on an annual basis, subject to the payment terms under each Insurance Policy. As of the Petition Date, the Debtors do not believe any insurance premiums are due or outstanding. Out of an abundance of caution, however, the Debtors seek authority to pay any prepetition amounts due and owing on account of the Insurance Policies to ensure uninterrupted coverage under their Insurance Policies. The Debtors also seek authority to continue honoring all payment obligations under the Insurance Policies in the ordinary course of business to ensure uninterrupted coverage thereunder.

174.   Certain Insurance Policies require the Debtors to pay a per-incident deductible (collectively, the "Deductibles"). Generally, if a claim is made against the Insurance Policies, the Debtors' applicable third-party administrator or Insurance Carrier will administer the claim and make payments in connection therewith. The Deductible, if any, is offset against such administrator's or Insurance Carrier's payment obligation. Alternatively, certain of the Debtors' policies use self-insured retentions ("SIRs") instead of Deductibles. If a claim is made against such policies, the Debtors will make payments up to the limit of the SIR, and once the claim value is above the SIR amount, the Insurance Policy will cover the remaining costs. There is significant variation in the amount of Deductibles and SIRs, and the amount of the Deductible or SIR can range up to $5 million depending on the Insurance Policy. As of the Petition Date, the Debtors do

---

[22] Certain Insurance Policies cover the Debtors as well as non-Debtor affiliates. The Murray Energy enterprise as a whole pays aggregate annual insurance premiums of approximately $47.3 million, of which $5.3 million is related to the Debtors' insurance coverage. The Debtors will only pay the portion of the premium related to *their* coverage under the Insurance Policies. The annual premiums paid by the Debtors include commission payments to the Debtors' Brokers (as defined herein).

not believe that they owe any prepetition Deductibles or SIRs under the Insurance Policies.  Out

of an abundance of caution, however, the Debtors seek authority to honor any Deductible or SIR

that may currently exist or otherwise arise under the Insurance Policies in the ordinary course of

business.

175.    Some, but not all, of the Insurance Policies are financed through premium financing

agreements with BankDirect Capital Finance ("BankDirect").    The Premium Financing

Agreements expire on June 1, 2020 and December 15, 2020.   Under the Premium Financing

Agreements, the Debtors are required to make monthly payments of (i) approximately $31,349 on

the 5th day of each month through April 5, 2020, and (ii) approximately $104,694 on the 10th day

of each month through September 10, 2020.  Because the Premium Financing Agreements are an

integral part of the Debtors' insurance programs and vital to their ability to finance and procure

the Insurance Policies, the Debtors seek authority to honor any amounts owed in full to ensure

uninterrupted coverage under their Insurance Policies.

176.    I believe that continuing to perform under the Premium Financing Agreements on

a postpetition basis is in the best interests of the Debtors' estates.   Moreover, in light of their

financial circumstances, alternative insurance premium finance companies may not be willing to

provide insurance premium financing to the Debtors on attractive market terms on a postpetition

basis.  Simply put, it is critical for the Debtors to continue to perform under their existing Premium

Financing Agreements.

177.    The Debtors retain the services of insurance brokers (collectively, the "Brokers")

to help manage their portfolios of risk.  The Debtors obtain all of their Insurance Policies through

their two Brokers: Reschini Agency, Inc. and CAC Specialty.  The Brokers, among other things,

(a) assist the Debtors in obtaining comprehensive insurance coverage for the Debtors' operations

in a cost-effective manner, (b) manage renewal data, (c) market the Insurance Policies, (d) provide

all interactions with Insurance Carriers including negotiating Insurance Policy terms, provisions,

and premiums, and (e) provide ongoing support throughout the applicable Insurance Policy

periods.  The Brokers collect commission payments for their services as part of the premiums paid

on account of the Insurance Policies.

178.    The Debtors do not believe they owe any amounts to the Brokers on account of

fees, commissions, or any other prepetition obligations.  Out of an abundance of caution, however,

the Debtors seek authority to honor any amounts owed to the Brokers to ensure uninterrupted

coverage under their Insurance Policies.

179.    The non-payment of any premiums, Deductibles, SIRs, or related fees (including

fees owed to Brokers) under the Insurance Policies could result in one or more of the Insurance

Carriers terminating or declining to renew their Insurance Policies or refusing to enter into new

insurance policies with the Debtors in the future.  If any of the Insurance Policies lapse without

renewal, the Debtors could be exposed to substantial personal liability or property damages, to the

detriment of all parties in interest.  Moreover, certain of the Debtors' leases and financing

agreements require the Debtors to remain current with respect to certain of their primary Insurance

Policies.

180.    Any interruption in coverage would expose the Debtors to a number of risks,

including:  (a) the possible incurrence of direct liability for the payment of claims that otherwise

would have been covered by the Insurance Policies; (b) the possible incurrence of material costs

and other losses that otherwise would have been reimbursed, such as attorneys' fees for certain

covered claims; (c) the possible inability to obtain similar types and levels of insurance coverage

or premium financing on terms equally favorable as the present coverage; and (d) the possible

incurrence of higher costs for re-establishing lapsed Insurance Policies or obtaining new insurance coverage.  In short, failure to maintain the Insurance Program could have a detrimental impact on the Debtors' businesses and the value of their estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be granted.

> (xii)    Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "Utilities Motion").

181.    In connection with the operation of their business in the United States, the Debtors obtain electricity, natural gas, telecommunications, water, waste management (including sewer and trash), internet, cable, and other similar services (collectively, the "Utility Services") from a number of utility companies or brokers (collectively, the "Utility Companies," and individually, a "Utility Company") to facilitate their business operations.  The Utility Services are essential for the Debtors to maintain their business at multiple sites.  Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, potentially endangering the Debtors' employees' health and safety, and impacting the Debtors' ability to provide supply to Javelin Global and their end customers, which in turn could jeopardize the Debtors' ability to manage their reorganization efforts.

182.    The Utility Services are essential for the Debtors to maintain their business at multiple sites.  Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, potentially endangering the Debtors' employees' health and safety, and impacting the Debtors' ability to provide supply to Javelin Global and their end customers, which in turn could jeopardize the Debtors' ability to manage their reorganization efforts.

183.     The Debtors have only been operational for approximately nine months following the Met Acquisition in April 2019.  Based on monthly Utility Service payments made through January 31, 2020, the Debtors calculate their average monthly costs for Utility Services to be approximately $1.7 million per month. Based on the foregoing, the Debtors estimate that their cost for Utility Services during the next 30 days (not including any deposits to be paid or any unpaid prepetition amount that has already been invoiced) will be approximately $1.7 million.

184.     Additionally, the Debtors have provided certain of the Utility Companies with cash deposits.

185.     The largest Utility Service provider, by a wide margin, is Alabama Power. Payments to Alabama Power have averaged approximately $1.4 million per month, which has an outsized impact on the Debtors' "average" monthly Utility Services bill.   Moreover, the Debtors note that Alabama Power is holding deposits, which the Debtors calculate to be approximately $1.62 million (consisting of two separate deposits of $807,500 each).

186.     If Alabama Power is removed from the calculation of the average monthly payment, the Debtors estimate that the average amount of their Utility Services is reduced to approximately $234,000 per month.  In addition, the Debtors continue to make the majority of these payments on time.

187.     The Debtors intend to pay postpetition obligations owed to the Utility Companies in a timely manner.  Cash held by the Debtors, cash generated in the ordinary course of business, and/or cash otherwise available to the Debtors under their proposed debtor in possession financing facilities will provide sufficient liquidity to pay the Debtors' Utility Service obligations in the ordinary course in accordance with prepetition practice

188.    The Debtors believe that each of the foregoing suffices to satisfy the requirements under section 366 of the Bankruptcy Code.  Nonetheless, as additional adequate assurance, the Debtors propose to deposit $77,253 into a segregated account at Huntington Bank (the "Adequate Assurance Deposit"), which represents an amount equal to approximately one-half of the Debtors' average monthly cost of Utility Services, calculated based on the Debtors' average utility expenses over the seven months ending January 31, 2020, *excluding* expenses for those Utility Companies already holding prepaid amounts or Prepetition Deposits (*i.e.*, Alabama Power, Appalachian Power, and Spire).

189.    The Adequate Assurance Deposit will be held in a segregated account at Huntington Bank for the benefit of the Utility Companies (the "Adequate Assurance Account") for the duration of these chapter 11 cases, subject to the Debtors' right to terminate or discontinue the applicable Utilities Services, and may be applied to any postpetition defaults in payment to the applicable Utility Companies.  The Debtors will hold the Adequate Assurance Deposit, and no liens will encumber the Adequate Assurance Deposit for so long as it remains in the Adequate Assurance Account.

190.    I believe that the Utility Companies are adequately assured against any risk of nonpayment for future services.  The Adequate Assurance Deposit and the Debtors' ongoing ability to meet obligations as they come due in the ordinary course provides assurance of the Debtors' payment of their future obligations.  The payments thereby minimize the risk of termination of the Utility Services, which could result in the Debtors' inability to operate their businesses to the detriment of all stakeholders.

191.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion should be granted.

(xiii)   Debtors' Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief (the "Taxes and Fees Motion").

192.   The Debtors collect, withhold, and incur obligations including severance, excise, sales, use, withholding, income, and property taxes, as well as other business, environmental, and regulatory fees and assessments (collectively, the "Taxes and Fees").  The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities.  Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their bank and other financial institutions.  The Debtors estimate that approximately $2,754,000 in Taxes and Fees have accrued as of the Petition Date.

193.   The Debtors pay the Taxes and Fees to the Authorities on a periodic basis, remitting them monthly, semi-monthly, quarterly, semi-annually, or annually depending on the nature and incurrence of a particular Tax or Fee.  In addition, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities.  The Taxes and Fees are summarized as follows:

| Category | Description | Approximate Amount Accrued as of Petition Date |
|---|---|---|
| **Severance Taxes** | Taxes imposed on the removal or extraction of natural resources such as coal, oil, gas, and limestone from the land or waters within a state or jurisdiction. | $177,000 |
| **Excise Taxes** | Taxes associated with and indirectly connected to coal production and natural resource extraction. | $14,000 |
| **Sales and Use Taxes** | Taxes imposed on the sale and use of certain goods and services. | $300,000 |
| **State Income and Franchise Taxes** | Taxes owed in connection with engaging in business in certain cities based on gross income and franchise taxes. | $6,000 |
| **Property Taxes** | Taxes and obligations related to real and personal property holdings. | $1,271,000 |
| **Trucking Taxes** | Taxes and obligations related to trucking. | $9,000 |

| Category | Description | Approximate Amount Accrued as of Petition Date |
|---|---|---|
| **Fines, Fees, and Assessments** | Fines, fees, and assessments related to permitting, licensing, regulatory assessments, compliance with environmental laws and regulations, fines related to Mine Safety and Health Administration violations, and other fines, fees, and assessments paid to the Authorities. | Approximately $900,000 |
| **Reclamation Taxes** | Federal and state Taxes relating to restoring and reclaiming abandoned land. | $70,000 |
| **Total** | | **$2,754,000** |

### *Severance Taxes*

194.     In the ordinary course of business, the Debtors must pay severance taxes and fees (collectively, the "Severance Taxes") to continue extracting coal.  Generally, the Severance Taxes are a tax on removing or "severing" natural resources, such as coal, from the land or waters within a state or jurisdiction.  Severance tax methodology varies by jurisdiction.  For example, in West Virginia, the applicable Authorities calculate Severance Taxes based on tons of coal produced, processed, and/or sold.  *See* W. Va. Code, § 11-12B-3 (West, Westlaw through 2018 Sess.).  In Alabama, Severance Taxes are based on tons of coal cut, mined, stripped, or otherwise removed.  *See* Ala. Code. § 40-13-2. The Debtors generally remit the Severance Taxes to the relevant Authorities on a monthly basis.

195.     Historically, the Debtors have paid approximately $175,000 in the aggregate on a monthly basis in Severance Taxes to the Authorities.  As of the Petition Date, the Debtors estimate that they have accrued approximately $177,000 in Severance Taxes that have not been remitted to the relevant Authorities.

### s.    *Excise Taxes*

196.    The Debtors also incur fees levied by certain federal Authorities when coal is first sold or used (the "Excise Taxes").  Section 4121 of the Internal Revenue Code ("IRC") imposes a tax on each ton of coal sold, with rates varying by the type of mine producing the coal. 26 U.S.C. § 4121.  A portion of the Excise Taxes imposed is used to fund a statutorily mandated Black Lung Disability Trust Fund.  *See* 26 U.S.C. § 9501.  The Black Lung Disability Trust Fund finances benefits to miners that become disabled on account of Black Lung Disease if and when the mine operator responsible for such benefits ceases to exist, has no successor operator, or is unable to pay such benefits.  The Debtors pay the Excise Taxes on a semi-monthly basis.

197.    The Debtors pay, on average, approximately $9,000 a month in Excise Taxes to the relevant Authorities.  As of the Petition Date, the Debtors estimate that they have incurred approximately $14,000 in Excise Taxes that have not been remitted to the relevant Authorities.

### t.    *Sales and Use Taxes*

198.    The Debtors incur, collect, and remit sales and use taxes to the Authorities in connection with the sale and purchase of goods and services (collectively, the "Sales and Use Taxes").  The Debtors purchase a variety of equipment, materials, supplies, and services necessary for the operation of their business from certain vendors who collect sales taxes in connection with the Debtors' purchase of such goods or services.  Importantly, the Debtors do not incur sales taxes on the purchase of coal from third party suppliers.  But the Debtors incur use taxes for the purchase of equipment, materials, supplies, and services when vendors do not, or are not registered to, collect sales taxes.  In these cases, applicable law generally requires the Debtors to subsequently pay use taxes on such purchases to the applicable Authorities. The Debtors generally remit Sales and Use Taxes on a monthly basis.

199.     On average, the Debtors pay approximately $240,000 a month in aggregate Sales

and Use Taxes to the Authorities.  As of the Petition Date, the Debtors estimate that they have

incurred or collected approximately $300,000 in Sales and Use Taxes that have not been remitted

to the relevant Authorities.

**u.**     ***State Income and Franchise Taxes***

200.     The Debtors are required to pay various state income and franchise taxes, including

annual state filing fees (collectively, the "Income and Franchise Taxes") to continue conducting

their businesses in accordance with state laws.  The Debtors generally remit Income and Franchise

Taxes on a periodic basis.  Failure to pay the Income and Franchise Taxes would likely enable the

applicable Authorities to assert liens or commence enforcement actions against the Debtors.  Such

liens or enforcement actions would disrupt the Debtors' business operations to detriment of the

Debtors' stakeholders.  The Debtors generally remit Income and Franchise Taxes on a quarterly

or annual basis, depending on the Authority.

201.     On average, the Debtors pay approximately $250 a month in Income and Franchise

Taxes to the applicable Authorities.  As of the Petition Date, the Debtors estimate that they owe

approximately $6,000 to the applicable Authorities on account of prepetition Income and Franchise

Taxes.

**v.**     ***Property Taxes***

202.     State and local laws in the jurisdictions where the Debtors operate generally grant

Authorities the power to levy property taxes against the Debtors' personal property (collectively,

the "Personal Property Taxes").  The Debtors pay Property Taxes on a substantial amount of

property that they own.  In addition, the Debtors also lease certain properties where coal mining

operations are located.  The leases may provide that the Debtors will remit applicable Property

Taxes to the landlords, and the landlords then remit the Property Taxes to the applicable Authority.

To avoid the imposition of statutory liens on their real and personal property, the Debtors typically pay Property Taxes on property that they own in the ordinary course of business on an annual or semi-annual basis, depending on the Authority.

203.     Historically, the Debtors incur approximately $88,000 per month in Property Taxes to the applicable Authorities. The Debtors estimate that they have accrued approximately $1,271,000 in Property Taxes as of the Petition Date.

### w.     *Trucking Taxes*

204.     The Debtors, in the ordinary course of business, pay various taxes related to trucking activities (collectively, the "<u>Trucking Taxes</u>").  The Debtors typically pay Trucking Taxes on a monthly basis.  The Debtors pay approximately $2,800 per month in Trucking Taxes to the applicable Authorities.  The Debtors estimate that they have accrued approximately $9,000 in Trucking Taxes as of the Petition Date.

### x.     *Fines, Fees, and Assessments*

205.     The Debtors, in the ordinary course of business, incur various fines, fees and assessments related to licensing and permitting, and for alleged prepetition violations of environmental, health and safety laws, as well as obligations related to subsidence, which the Debtors have not yet remitted to the relevant Authorities (collectively, the "<u>Fines, Fees, and Assessments</u>").  The Debtors typically remit Fines, Fees, and Assessments to the relevant Authorities in the ordinary course of business.  As of the Petition Date, the Debtors estimate that approximately **Error! Reference source not found.** in Fines, Fees, and Assessments will have accrued and remain unpaid to the relevant Authorities.

**y.**   *Reclamation Taxes*

206.    Pursuant to federal and state law, the Debtors are required to make certain payments used to restore and reclaim abandoned land (the "Reclamation Taxes").  The Debtors are required to pay the Reclamation Taxes to the relevant Authorities on a monthly or quarterly basis, depending on the Authority.

207.    Historically, the Debtors pay an average of approximately $23,000 per month in Reclamation Taxes to the applicable Authorities.  As of the Petition Date, the Debtors estimate that they have accrued approximately $70,000 in Reclamation Taxes.

**h.**   *Postpetition Fees and Fines*

208.    As explained above, the Debtors incur and remit Fees and Assessments and Fines in the ordinary course of business.  After the Petition Date, in the ordinary course of business, additional obligations may become payable, including additional Fees and Assessments, Fines, and other obligations including Subsidence Obligations and obligations related to violations of environmental, health, and safety laws and regulations (collectively, the "Postpetition Fees and Fines").  Postpetition Fees and Fines may become payable after the Petition Date, regardless of whether the relevant violation or subsidence occurred prepetition or postpetition.

209.    As of the Petition Date, the Debtors have not accrued any Postpetition Fees and Fines.  However, the Debtors are required to pay Postpetition Fees and Fines as they become due in the ordinary course of business.  In the event Postpetition Fees and Fines are unpaid, the Debtors may be prevented from mining under various mining permits, substantially impacting their ability to operate.

*      *      *      *

210.    I believe that the Debtors' liability to pay the Taxes and Fees may ultimately result in increased tax liability for the Debtors if interest and penalties accrue on the claims for Taxes and Fees, which amounts may also be entitled to priority treatment.

211.    I believe the relief requested in the Taxes and Fees Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief in requested in the Taxes and Fees Motion should be granted.

*[Remainder of page left intentionally blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: February 11, 2020
New York, New York

/s/ Amy Lee
Amy Lee
Alvarez & Marsal North America, LLC
Senior Director, Commercial Restructuring Practice