## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MURRAY METALLURGICAL COAL | ) Case No. 20-10390 (JEH) |
| HOLDINGS, LLC, *et al.*,[1] | ) |
| | ) Judge John E. Hoffman, Jr. |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO UTILIZE THEIR CASH MANAGEMENT SYSTEM, (B) MAINTAIN EXISTING BUSINESS FORMS, AND (C) PERFORM INTERCOMPANY TRANSACTIONS AND PAY POSTPETITION OBLIGATIONS RELATED THERETO, AND (II) GRANTING RELATED RELIEF

Murray Metallurgical Coal Holdings, LLC ("Met Holdings") together with its debtor

subsidiaries (collectively, the "Debtors") respectfully state as follows in support of this motion:[2]

### Relief Requested

1.     The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A**, (i) authorizing the Debtors to (a) continue to utilize their cash management system as

illustrated in **Exhibit 1** of **Exhibit A** (the "Cash Management System"), (b) maintain existing

business forms in the ordinary course of business, and (c) continue to maintain business

relationships with each other and with non-debtor affiliates and related parties (the "Intercompany

---

[1]  The Debtors in these Chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Murray Metallurgical Coal Holdings, LLC (4633); Murray Eagle Mining, LLC (4268); Murray Alabama Minerals, LLC (4047); Murray Alabama Coal, LLC (3838); Murray Maple Eagle Coal, LLC (4435); and Murray Oak Grove Coal, LLC (4878).  The Debtors' primary business address is 46226 National Road, St. Clairsville, OH 43950.

[2]  The facts and circumstances supporting this application are set forth in the *Declaration of Robert D. Moore in Support of Chapter 11 Petitions* (the "Moore Declaration") and *Declaration of Amy Lee, Senior Director of Alvarez & Marsal North America, LLC, in Support of First Day Motions* filed contemporaneously herewith and incorporated by reference herein (collectively, the "First Day Declarations").  Capitalized terms used but not otherwise defined herein have the meanings given to them in the First Day Declarations.

Transactions") consistent with historical practice and pay postpetition obligations related thereto in the ordinary course of business, and (ii) granting related relief.

### Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of Ohio (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *General Order 30-3* from the United States Bankruptcy Court for the Southern District of Ohio, dated December 4, 2019 (the "General Order"). The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105, 345, 363, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, Rules 2015-2, 9013-1(f), and 9013-1(m) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Ohio (the "Local Rules"), and the General Order.

### Background

5.       The Debtors are engaged in the mining and production of metallurgical coal. Unlike thermal coal, which is primarily used by the electric utility industry to generate electricity, metallurgical coal is used to produce coke, which is an integral component of steel production.

6.      The Debtors primarily own and operate two active coal mining complexes and other assets in Alabama and West Virginia. The larger of the two mining complexes, the Oak Grove Mine ("Oak Grove"), is an underground longwall mine located in Alabama. The other mining

complex, known as the Maple Eagle No. 1 Mine ("Maple Eagle" and together with Oak Grove,
the "Mining Complexes"), is an underground continuous mining and surface mining complex
located in West Virginia.[3]  To preserve liquidity, the Maple Eagle mine has been in a "hot idle"[4]
state since September.  The Oak Grove mine has been in a "hot idle" state since November.  The
Debtors have been engaged in a marketing process to sell Maple Eagle for several months.

7.     Each of the Debtors is an unrestricted subsidiary of Murray Energy Corporation
("Murray Energy"), which, along with Javelin Investment Holdings LLC ("Javelin"), acquired the
mines and other assets of the Debtors from Mission Coal Company, LLC ("Mission") in April
2019 (the "Met Acquisition").  At the time of the Met Acquisition, Mission was a debtor in its own
chapter 11 cases pending in the United States Bankruptcy Court for the Northern District of
Alabama.[5]

8.     In connection with the Met Acquisition, on April 29, 2019, Met Holdings entered
into a credit agreement (the "Take-Back Credit Agreement"), which governs, among other things,
a secured term credit facility (the "Take-Back Facility") among Met Holdings, as borrower, its
subsidiaries (the "Met Subs"), as guarantors, Wilmington Savings Fund Society, FSB, as
administrative agent, and any additional lenders from time to time party thereto.  The Take-Back
Facility matures on April 29, 2023, and is secured by substantially all of the Debtors' assets.

9.     In addition, on April 29, 2019, Met Holdings entered into a Management Services
Agreement (the "Management Services Agreement") with Murray Energy pursuant to which
Murray Energy manages, administers, and oversees all aspects of the operation of the Mining

---

[3] The Debtors own a third mine, known as the North River Mine, in Alabama, which is not currently being operated.

[4] A mine that is in a "hot idle" state means that it is being temporarily idled and maintained in anticipation of returning to operation in the near future.

[5] The Mission bankruptcy cases are still pending.

Complexes, including without limitation, the day-to-day operation, maintenance, and business of the Mining Complexes.

10.     Approximately six months after the Met Acquisition, on October 29, 2019, Murray Energy and its affiliated debtors and debtors in possession (the "MEC Debtors") filed voluntary chapter 11 petitions in the Bankruptcy Court for the Southern District of Ohio (the "MEC Chapter 11 Cases").  The MEC Chapter 11 Cases are being jointly administered under Case No. 19-56885. Significantly, none of the Debtors are debtors in the MEC Chapter 11 Cases.

11.     There are a number of differences between these chapter 11 cases and the MEC Chapter 11 Cases, which warrant keeping them separated from the MEC Chapter 11 Cases, including: (i) none of the Debtors are borrowers or guarantors on the debtor in possession financing obligations in the MEC Chapter 11 Cases; (ii) the Debtors are primarily engaged in mining, extraction, and processing of metallurgical coal, whereas the MEC Debtors are primarily engaged in the mining, extraction, and processing of thermal coal, and each of these commodities is subject to different market pressures; (iii) the lenders to the Debtors under the Take-Back Facility are different from the lenders to the MEC Debtors; and (iv) as a result of the Take-Back Facility and other claims against the assets of the Debtors (including obligations to Javelin Global Commodities (UK) LTD ("Javelin Global")), there was perceived to be little to no equity value in the Debtors that would flow up to the MEC Debtors, although there was a belief that the Debtors could survive as a going concern without the need for a chapter 11 filing.

12.     Commencing on February 11, 2020 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of

this motion, the Debtors filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  Also, the Debtors have filed a Notice of Election of Complex Chapter 11 Cases.

13.      The Debtors commenced these chapter 11 cases after extensive negotiations with their major stakeholders concerning a global resolution to the Debtors' financial difficulties.  In an effort to ensure that value is maximized for all stakeholders and that the Debtors' remediation obligations are honored at each of their Mining Complexes, these chapter 11 cases have been commenced with a three-pronged strategy that has the support of the Take-Back Facility lenders, Javelin, Javelin Global, and Murray Energy.  First, the Debtors intend to facilitate the consensual sale of substantially all of the assets of Maple Eagle pursuant to Bankruptcy Code section 363.  Second, the Debtors intend to effectuate a reorganization of their remaining operations, which is premised on the continued and future operation of the Oak Grove mining complex, through a sale of Oak Grove pursuant to a plan.  And third, the Debtors intend to ensure that they can continue to comply with their reclamation obligations at the North River mining complex.  These three elements have been memorialized in a Restructuring Support Agreement among Met Holdings, Murray Energy, the Take-Back Facility lenders, and Javelin Global, all as more fully set forth in the Moore Declaration.

14.      As of the Petition Date, the Debtors have approximately $270 million in debt and liabilities, including but not limited to approximately $169 million related to the Take-Back Facility, approximately $21.5 million under an emergency bridge financing facility,[6] approximately $23.5 million owed to Javelin Global under certain of the Javelin Agreements, and

---

[6] This facility is documented by amendments to the Take-Back Facility.

approximately $12.7 million in intercompany liabilities owed to Murray Energy and other affiliates.  In addition, the Debtors have approximately $43 million in outstanding trade payables.

## The Cash Management System

### I.    Overview

15.     In the ordinary course of business, the Debtors operate a cash management system to efficiently collect, disburse, and transfer funds generated by their operations, and to facilitate cash management, forecasting, and reporting, including debit, wire, and automated-clearing-house ("ACH") transfers (the "Cash Management System").  A diagram of the Cash Management System and the associated accounts (the "Debtors' Accounts") is attached as **Exhibit 1** to **Exhibit A**. Murray Energy's treasury department maintains daily oversight of the Cash Management System and implements cash management controls for entering, processing, and releasing funds. Additionally, Murray Energy's corporate accounting department regularly reconciles the Debtors' books and records to ensure that all transactions, including Intercompany Transactions, are accounted for properly.

16.     The Cash Management System employed by the Debtors is similar to those commonly employed by businesses comparable in size and scale to the Debtors.  Indeed, large businesses routinely use integrated systems to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple corporate entities.  Continued operation of the Cash Management System is vital to the Debtors' ability to conduct their operations.  Any disruption of the Cash Management System would be materially detrimental to the Debtors' operations, as their businesses require prompt access to cash.

## II.    The Cash Management System

17.    As of the Petition Date, the Cash Management System includes a total of six bank accounts (each, a "Bank Account," and collectively, the "Bank Accounts"). Each Bank Account is identified in **Exhibit 2** to **Exhibit A** attached hereto. All of the Bank Accounts are held at Huntington National Bank (the "Cash Management Bank").

18.    *Concentration Account.* A concentration account maintained by Met Holdings (the "Concentration Account") directly funds the Debtors' four Disbursement Accounts (as defined herein), and all funds left in the Disbursement Accounts are swept back into the Concentration Account at the end of each business day.

19.    *Disbursement Accounts*. Met Holdings maintains four zero balance disbursement accounts (the "Disbursement Accounts") dedicated to the payment of specific expenses incurred by each of the Debtors. The Disbursement Accounts are utilized to pay operating expenses (the "Operating Account"), employee and payroll obligations (the "Payroll Account"), healthcare expenses (the "Healthcare Account"), and workers' compensation expenses (the "Workers' Compensation Account") for each of Met Holdings' subsidiary Debtors.

20.    Cash generated from coal sales by the Debtors flows directly into the Operating Account and, as with all the Disbursement Accounts, funds left in the Operating Account are swept into the Concentration Account at the end of each business day. As explained more fully further below, Javelin Global is the only entity that transfers money into the Operating Account on account of coal sales.

21.    *Standalone Account.* Met Holdings maintains one standalone account (the "Standalone Account") that is not integrated into the Cash Management System. The Standalone Account has a zero or *de minimis* balance and is not used in any meaningful capacity by the Debtors.

22.     The Concentration Account and the Standalone Account are each subject to deposit account control agreements in favor of (i) Javelin Global in connection with the Prepayment Facility (as defined herein) and the Working Capital Facility (as defined herein) and (ii) Wilmington Savings Fund Society, FSB, as administrative agent for the lenders under the take-back facility.

23.     The Bank Accounts comprising each of the foregoing types of accounts are listed below.[7]

| Account Type | Bank Accounts |
|---|---|
| **Concentration Account** | Met Holdings Account – 6844 |
| **Disbursement Accounts** | Met Holdings Account (Operating) - 7063<br>Met Holdings Account (Payroll) - 7076<br>Met Holdings Account (Health) - 7089<br>Met Holdings Account (Workers' Comp) - 7092 |
| **Standalone Account** | Met Holdings Account - 6950 |

24.     The Debtors pay their Cash Management Bank, on average, approximately $2,700 per month in the aggregate on account of fees incurred in connection with the Concentration Account, Disbursement Accounts, and Standalone Account (the "Bank Fees").  As of the Petition Date, the Debtors believe that approximately $5,000 is outstanding on account of prepetition Bank Fees.

---

[7] A detailed description of the Debtors' payroll, wages, and benefits programs can be found in the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief*, filed contemporaneously herewith.

### III.    Compliance with the Bankruptcy Code and U.S. Trustee Guidelines

####       A.    Compliance with Section 345 of the Bankruptcy Code and Certain of the U.S. Trustee Guidelines

25.    Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  To comply with section 345 of the Bankruptcy Code, the United States Trustee for Region 9 (the "U.S. Trustee") *Chapter 11 Operating Instructions and Reporting Requirements* (the "U.S. Trustee Guidelines") generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with certain requirements set by the U.S. Trustee.

26.    Huntington National Bank is a designated depository in the Southern District of Ohio.  Accordingly, the Debtors respectfully submit that cause exists to continue to allow the Debtors to utilize their existing Bank Accounts, subject to any reasonable changes the Debtors may implement to the Cash Management System.

####       B.    Compliance with U.S. Trustee Guidelines as to Business Forms

27.    The Debtors use a variety of preprinted business forms, including letterhead, correspondence forms, invoices, and other business forms in the ordinary course of business (collectively, the "Business Forms").  The Debtors also maintain books and records to document their financial results and a wide array of necessary operating information, including their profits and expenses.  To avoid the distraction and unnecessary expense to their estates, the Debtors request authorization to continue using all of the Business Forms in existence before the Petition Date, without reference to the Debtors' status as chapter 11 debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering new Business Forms as required

by the U.S. Trustee Guidelines.  The Debtors submit that once they have exhausted their existing stock of Business Forms, they will ensure that any new Business Forms are clearly labelled "Debtor in Possession," and with respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labelled "Debtor in Possession."

## IV.    Intercompany Transactions

28.    The Debtors maintain business relationships with each other and with non-debtor affiliates and related parties resulting in intercompany receivables and payables in the ordinary course of business (collectively, the "Intercompany Claims").  In addition to the Intercompany Claims between Met Holdings and the other Debtors, Intercompany Claims arise between the Debtors and non-debtor Murray Energy.

29.    The Intercompany Claims generally arise from (i) management or services fees arising from a management services agreement, (ii) intercompany payables and receivables generated from payment of certain operating expenses by Met Holdings on behalf of its Debtor affiliates (in accordance with shared services agreements, where applicable), (iii) payables and receivables on account of coal sales (in accordance with shared services agreements, where applicable), and (iv) payables and receivables on account of services performed or goods supplied by one Debtor entity for another Debtor entity or non-debtor affiliate or related parties (or *vice versa*).  Certain Intercompany Claims are settled on a daily basis while others are reflected as receivables and payables, as applicable, in Met Holdings' or the respective Debtor's or non-debtor affiliate's accounting system, and paid and settled when due in the normal course of business. Accordingly, the Debtors can ascertain, trace, and account for all Intercompany Transactions, and will be able to do so on a postpetition basis.

10

30.    The Intercompany Transactions among the Debtors and Murray Energy generally fall into the categories described below.

**A.    Intercompany Transactions among Debtors**

31.    In the ordinary course of business, Met Holdings, as the parent of all of the other Debtor entities, maintains various business relationships with, and performs certain services for, the other Debtor entities.  Such Intercompany Transactions generally fall into the following categories:

- Operating Expenses/Corporate Overhead: Operating expenses and corporate overhead expenses incurred by the various Debtors are generally paid by Met Holdings out of the Operating Account.  In the ordinary course of business through the Management Services Agreement, Murray Energy's corporate accounting department records the resulting payables and receivables in the Debtors' accounting system.

- Payroll: As described more fully in the Debtors' wages motion, filed contemporaneously with this motion, each operating entity has its own employees, but Murray Energy processes employees' wages on behalf of the Debtors.  Met Holdings funds the Payroll Account (which is a Disbursement Account specifically designated for payroll) from the Concentration Account, and issues checks and ACH transfers to or for the benefit of the respective employees from the Payroll Account.  In the ordinary course of business through the Management Services Agreement, Murray Energy's corporate accounting department records the resulting payables and receivables in the Debtors' accounting system.

- Accounts Payable: Murray Energy processes all of the Debtors' accounts payable in the ordinary course of business on behalf of the Debtors' operating entities, including taxes, payments to holders of royalty interests, and other accounts payable.  In the ordinary course of business through the Management Services Agreement, Murray Energy's corporate accounting department records the resulting payables and receivables in the Debtors' accounting system.

- Capital Expenditures: Murray Energy acts as a governor on all major capital expenditures and approves all projects at the respective Debtor operating entities.  Met Holdings then makes payments from the Operating Account to fund such capital expenditures.  In the ordinary course of business through the Management Services Agreement, Murray Energy's corporate accounting department records the resulting payables and receivables in the Debtors' accounting system.

- Receipt of Coal Sale Proceeds: All coal sale proceeds from Debtor entity coal sales are received by the Operating Account, regardless of which mine the coal is extracted from.  In the ordinary course of business through the Management Services Agreement, Murray

Energy's corporate accounting department records the resulting payables and receivables in the Debtors' accounting system.

**B.**     **Intercompany Transactions between Non-Debtor Murray Energy and the Debtors**

32.     As noted above, the Debtors engage in Intercompany Transactions with non-debtor Murray Energy related to (a) transactions related to a Management Services Agreement, and (b) ordinary course intercompany transactions, which include Murray Energy's payment of operating expenses and corporate overhead expenses incurred by the Debtors, funding payroll, processing of accounts receivable, and management and funding of capital expenditures.

33.     In accordance with the Management Services Agreement, Murray Energy manages all aspects of the operations at the Debtors' mining operations, including (a) coordination and management of employees and contractors at the mines, (b) modeling and engineering services, (c) sales and marketing services, (d) logistics management, (e) human resources and employee-related functions, (f) provision of information technology systems and related services, (g) compliance and investor relations services, (h) financial/accounting and loan related services, and (i) legal services.   In exchange, the Debtors are obligated to pay a quarterly management fee of $1,000,000 to Murray Energy.   Where Murray Energy incurs expenses on behalf of the Debtors, Murray Energy invoices the Debtors for such expenses, which may include travel costs, maintenance and rebuilding, permit and licensing costs, consulting fees, certain medical costs, and may also include payments made on corporate credit cards, which are not generally issued to employees of the Debtors.   Certain transactions may require payment by credit card, and to the extent such payments are made by Murray Energy or a MEC Debtor on behalf of a Debtors, such payments will be reconciled as an Intercompany Transaction.

12

34.     In addition, certain MEC Debtor entities operate stand-alone businesses that provide goods and services such as machine repair work, parts supply, longwall rebuilds, shipping and docking services, and loading services.  These entities provide goods and services to other MEC Debtors, Debtor entities, or non-debtor affiliates.  That is, rather than the Debtors' mining entities utilizing third-party vendors to, for example, perform a longwall rebuild or machine repair work, such Debtor mining entity may engage with a MEC Debtor entity who performs those services.  In these cases, ordinary course invoices and receipts are generated, and the Debtors' corporate accounting department records the resulting payables and receivables in the Debtors' accounting system.

35.     As of the Petition Date, the Debtors owe Murray Energy and its affiliates approximately $12.7 million on account of Intercompany Claims related to quarterly management services fees pursuant to the Management Services Agreement, reimbursement of costs and expenses under the Management Services Agreement, and other services.

36.     The management services provided by Murray Energy pursuant to the Management Services Agreement and other interactions with MEC Debtors constitute Intercompany Transactions, which gives rise to certain Intercompany Claims.   By Order dated December 10, 2019 (the "MEC Cash Management Order"), the MEC Debtors were authorized to continue their cash management system in the ordinary course, which included the authorization to continue engaging in Intercompany Transactions with its affiliates, including the Debtors.  Specifically, the MEC Cash Management Order provides that the MEC Debtors are authorized to:

> Engage in Intercompany Transactions, subject to the terms set forth in this Final Order, in the ordinary course of business and to honor any prepetition Intercompany Claims arising from the same
> …

In re Murray Energy Holdings, Co. et al. (Case No. 19-56885) at Docket No. 389.

13

C.    **Importance of the Intercompany Transactions**

37.    The Intercompany Transactions are an essential component of the Debtors'
operations and centralized Cash Management System.  The Intercompany Transactions generate
operational efficiencies, increase operational flexibility, provide significant cost savings, and
improve the market position of both the Debtors and their non-debtor affiliates, all of which benefit
the Debtors' estates.  Any interruption of the Intercompany Transactions would severely disrupt
the Debtors' operations and result in great harm to the Debtors' estates and their stakeholders.
Accordingly, the Debtors seek authority—and, to the extent applicable, relief from the automatic
stay—to continue the Intercompany Transactions in the ordinary course of business on a
postpetition basis, in a manner substantially consistent with the Debtors' past practices, subject in
all respects to the terms of the Debtors' postpetition financing facility (any order entered by the
court approving the Debtors' entry into such postpetition financing facility, the "<u>DIP Order</u>").[8]

<u>**Basis for Relief**</u>

I.    **Maintaining the Existing Cash Management System Is Essential to the Debtors'
Ongoing Operations and Restructuring Efforts**

38.    The U.S. Trustee Guidelines require debtors in possession to, among other things
(a) establish one debtor in possession bank account for all estate monies required for the payment
of taxes, including payroll taxes, (b) close all existing bank accounts and open new debtor in
possession accounts, (c) make all disbursements of estate funds by check with a notation
representing the reason for the disbursement, and (d) maintain a separate debtor in possession
account for cash collateral.

---

[8]  This motion provides an overview of the Debtors' typical Intercompany Transactions.  The relief requested herein
is applicable with respect to all Intercompany Transactions and is not limited to those Intercompany Transactions
described in this Motion.

39.    These requirements are intended to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent inadvertent payment of prepetition claims.  Considering, however, that the Debtors' business and financial affairs are complex and require the collection, disbursement, and movement of funds through the Debtors' Bank Accounts, enforcement of these provisions of the U.S. Trustee Guidelines during these chapter 11 cases would severely disrupt the Debtors' operations.  Accordingly, the Debtors respectfully request that the Court allow them to operate each of the Bank Accounts listed in **Exhibit 2** attached to **Exhibit A** hereto, as they were maintained in the ordinary course of business before the Petition Date.

40.    The continuation of the Cash Management System is permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as relatively "simple matter[s]." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).  In addition, in granting such relief, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in relevant part*, 997 F.2d 1039, 1061 (3d Cir. 1993).

41.    Here, requiring the Debtors to adopt a new, segmented cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations.  Importantly, the Cash Management System provides the Debtors with the ability to quickly track and report the location and amount of funds, which, in turn, allows

15

management to track and control such funds, ensure cash availability, and reduce administrative costs through a centralized method of coordinating the collection and movement of funds. Any disruption of the Cash Management System could have a negative effect on the Debtors' restructuring efforts. Indeed, absent the relief requested herein, requiring the Debtors to adopt a new, segmented cash management system would cause the Debtors' operations to grind to a halt, jeopardizing the Debtors' business enterprise. By contrast, maintaining the current Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.

42.    The Debtors respectfully submit that parties in interest will not be harmed by their continued use of the present Cash Management System, including maintenance of the Bank Accounts and the Intercompany Transactions, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of prepetition obligations. Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Murray Energy enterprise's treasury department. In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interest of the Debtors' estates and creditors.

43.    Accordingly, the Debtors respectfully request that the Court authorize the continued use of the existing Cash Management System to facilitate the Debtors' transition into chapter 11. Specifically, the Debtors respectfully request that the Court authorize the Cash Management Bank to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business. In this regard, the Cash Management Bank should be authorized to receive, process, honor, and

pay any and all checks, ACH transfers and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto. Notwithstanding the foregoing, any check, draft, or other notification that the Debtors advise the Cash Management Bank to have been drawn, issued, or otherwise presented before the Petition Date may be honored by the Cash Management Bank only to the extent authorized by order of the Court. If the Debtors' ability to conduct transactions by these methods is impaired, the Debtors may be unable to perform under certain contracts, and payments to vendors could be delayed, resulting in unnecessary disruption to their business operations and the incurrence of additional costs.

44. The Debtors further request that the Court authorize the Cash Management Bank to accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH transfers should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH transfers are dated before or subsequent to the Petition Date. The Debtors also request that, to the extent a bank honors a prepetition check or other item drawn on any account either (a) at the direction of the Debtors, (b) in a good-faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of a mistake made despite implementation of reasonable customary item handling procedures, such bank will not be deemed to be liable to the Debtors, their estates, or any other party on account of such prepetition check or other item honored postpetition. The Debtors respectfully submit that such relief is reasonable and appropriate because the Cash Management Bank is not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise. Courts in this district and other districts within the Sixth Circuit routinely grant similar relief. *See, e.g.*, *In re Murray Energy Holdings, Co. et al.*, No. 19-56885 (JEH) (Bankr.

S.D. Ohio Dec. 10, 2019) (authorizing Murray Energy and its debtor affiliates to continue using

its existing cash management system); *In re AcuSport Corp.*, No. 18-52736 (JEH) (Bankr. S.D.

Ohio May 21, 2018) (authorizing debtor's continued use of existing cash management system and

procedures, including authorization for cash management banks to honor and rely on

representations of the debtors with respect to checks or other items); *In re Ed Map, Inc.*, No.

18-55889 (JEH) (Bankr. S.D. Ohio Nov. 7, 2018) (same); *see also In re FirstEnergy Solutions*

*Corp.*, No. 18-50757 (AMK) (Bankr. N.D. Ohio May 8, 2018) (same); *In re Curae Health, Inc.*,

No. 18-05665 (CMW) (Bankr. M.D. Tenn. Aug. 29, 2019) (same); *In re Great Lakes Comnet, Inc.*,

No. 16-00290 (JTG) (Bankr. W.D. Mich. Jan. 1, 2016) (same).

## II.    The Court Should Authorize the Debtors to Continue Using the Business Forms

45.     To avoid disruption of the Cash Management System and unnecessary expense, the

Debtors request that they be authorized to continue to use the Business Forms substantially in the

form existing immediately before the Petition Date, without reference to their status as debtors in

possession. The Debtors submit that parties in interest will not be prejudiced by this relief. Parties

doing business with the Debtors undoubtedly will be aware of their status as debtors in possession

and, thus, changing business forms is unnecessary and would be unduly burdensome. Moreover,

the Debtors submit that once they have exhausted their existing stock of Business Forms, they will

ensure that any new Business Forms are clearly labelled "Debtor in Possession," and with respect

to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such

electronic Business Forms are clearly labelled "Debtor in Possession."

46.     In other large chapter 11 cases, courts in this district and other districts within the

Sixth Circuit have allowed debtors to use their prepetition business forms without the "debtor in

possession" label, as the Debtors' respectfully request the Court to do here. *See, e.g.*, *In re Murray*

*Energy Holdings, Co. et al.,* No. 19-56885 (JEH) (Bankr. S.D. Ohio Dec. 10, 2019) (authorizing

18

Murray Energy and its debtor affiliates to continue using existing forms without the Debtor in Possession label until the forms run out); *In re Ed Map, Inc.*, No. 18-55889 (JEH) (Bankr. S.D. Ohio Nov. 7, 2018) (authorizing the debtors to use their existing business forms, without reference to their status as debtors-in-possession); *see also In re FirstEnergy Solutions Corp.*, No. 18-50757 (AMK) (Bankr. N.D. Ohio May 8, 2018) (same); *In re Coshocton County Memorial Hospital Association*, No. 16-51552 (AMK) (Bankr. N.D. Ohio July 1, 2016) (same); *In re Curae Health, Inc.* No. 18-05665 (CMW) (Bankr. M.D. Tenn. Aug. 29, 2019) (same).

**III.    The Court Should Authorize the Debtors to Pay Prepetition Amounts Owed on Account of the Cash Management System, Including Prepetition Bank Fees**

47.      The Debtors' funds move through the Cash Management System as described above and, at any given time, there may be prepetition amounts outstanding on account of the Cash Management System such as Bank Fees.  Any non-payment of prepetition amounts owed could cause serious disruptions to the Debtors' estates.  As such, the Debtors respectfully request that the Court authorize the Debtors to pay any prepetition amounts owed in connection with the Cash Management System.

48.      Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.    *See, e.g.*, *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983).  In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims.

49.     Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and

a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business,

property of the estate."    11 U.S.C. § 363(b)(1).    A court may authorize non-ordinary course

transactions using property of the estate pursuant to section 363(b) "when a sound business

purpose dictates such action." *Stephens Indus. Inc. v. McClung*, 789 F. 2d 386, 390 (6th Cir. 1986)

(approving a sale of assets pursuant to section 363(b)).    Courts have authorized payment of certain

prepetition claims pursuant to section 363(b) where there is a sound business purpose for doing

so. *See, e.g.*, *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (collecting

cases); *James A. Phillips*, 29 B.R. at 397 (relying on section 363 to allow contractor to pay

prepetition claims of suppliers who were potential lien claimants because the payments were

necessary for general contractors to release funds owed to debtors); *Ionosphere Clubs*, 98 B.R. at

175 (finding that a sound business justification existed to justify payment of certain prepetition

wages).

50.     Courts also authorize payment of prepetition claims in appropriate circumstances

based on section 105(a) of the Bankruptcy Code, which codifies a bankruptcy court's inherent

equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry

out the provisions of this title."    11 U.S.C. § 105(a).    Under section 105(a), courts may authorize

pre-plan payments of prepetition obligations when essential to the continued operation of a

debtor's businesses.    *See Eagle-Picher Indus.*, 124 B.R. at 1023 (authorizing payment of

prepetition indebtedness where the "payment is necessary to avert a serious threat to the Chapter

11"); *Just for Feet*, 242 B.R. at 825−26.    Specifically, a court may use its power under section

105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the

"necessity of payment" rule (also referred to as the "doctrine of necessity").    *See,*

*e.g.*, *Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Railway Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("A general practice has developed however, where bankruptcy courts permit the payment of certain pre-petition claims pursuant to 11 U.S.C. §105, where the debtor will be unable to reorganize without payment."). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175–76 (citing *Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)). Indeed, at least one court has recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497.

51.     The Debtors' continued use of the Cash Management System, including payment of prepetition Bank Fees, will facilitate their transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in the payment of postpetition amounts due. Payments of prepetition Bank Fees will ensure the continued support of the Debtors' Cash Management Bank on a go-forward basis at this critical juncture of the Debtors' chapter 11 cases. Accordingly, the Debtors respectfully submit that a sound business purpose exists to authorize payment of prepetition amounts due in connection with the Cash Management System, including Bank Fees.

52.     Courts in this district and other districts have regularly allowed the payment of prepetition bank fees and prepetition amounts due under credit cards employed in the ordinary course of a debtor's prepetition business. *See, e.g.*, *In re Murray Energy Holdings, Co. et al.*, No.

19-56885 (JEH) (Bankr. S.D. Ohio Dec. 10, 2019) (authorizing Murray Energy and its debtor

affiliates to pay prepetition amounts of bank fees and credit cards consistent with prepetition

practice); *In re AcuSport Corp.*, No. 18-52736 (JEH) (Bankr. S.D. Ohio May 21, 2018)

(authorizing the debtors to pay prepetition amounts on account of bank fees); *see also In re

FirstEnergy Solutions Corp.*, No. 18-50757 (AMK) (Bankr. N.D. Ohio May 8, 2018) (same); *In

re Curae Health, Inc.*, No. 18-05665 (CMW) (Bankr. M.D. Tenn. Aug. 29, 2019) (authorizing the

debtors to pay prepetition amounts on account of bank and credit card fees); *see also In re

Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) (same); *In re Nine

West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. June 26, 2018) (same).

**IV.    The Court Should Authorize the Debtors to Continue Intercompany Transactions in
the Ordinary Course and Grant Administrative Priority Status to Postpetition
Intercompany Claims.**

53.    The Debtors' funds move through the Cash Management System as described

above.  At any given time, there may be Intercompany Claims owed by one Debtor or to another

Debtor, or a Debtor to a non-debtor affiliate or related party (or *vice versa*).  Intercompany

Transactions are made between and among Debtors and non-debtor affiliates and related parties in

the ordinary course as part of the Cash Management System. [9]  The Debtors track all fund transfers

in their accounting system and can ascertain, trace, and account for all Intercompany Transactions

previously described.    The Debtors, moreover, will continue to maintain records of such

Intercompany Transactions.  If the Intercompany Transactions were to be discontinued, the Cash

Management System and related administrative controls would be disrupted to the Debtors' and

---

[9] Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common
among large enterprises similar to the Debtors, the Debtors submit the Intercompany Transactions are ordinary
course transactions within the meaning of 363(c)(1) of the Bankruptcy Code and, thus, do not require this Court's
approval.  Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such
transactions on a postpetition basis.  Moreover, the continued performance of the ordinary course Intercompany
Transactions is integral to ensure the Debtors' ability to operate their businesses as debtors in possession.

each of their estates' detriment.  Accordingly, the Debtors respectfully submit that the continued performance of the Intercompany Transactions is in the best interest of the Debtors' estates and their creditors and, therefore, the Debtors should be permitted to continue such performance.

54.    The Debtors further request that, pursuant to section 503(b)(1) of the Bankruptcy Code, any Intercompany Claims against the Debtors on account of the Intercompany Transactions be accorded administrative expense status and, except as otherwise provided for in the DIP Credit Agreement and DIP Order, subject and junior to claims, including adequate protection claims, granted pursuant to the DIP Order.  If all Intercompany Claims against the Debtors are accorded administrative expense status, each entity will continue to bear ultimate payment responsibility for such ordinary course transactions, thereby reducing the risk that these transactions will jeopardize the recoveries available to each Debtor's respective creditors.   Additionally, granting administrative expense status to claims of non-debtor affiliates on account of Intercompany Transactions will prevent unnecessary disruptions to the Debtors' business, ensure continued performance under the Debtors' prepetition business arrangements with their non-debtor affiliates and related parties, and indirectly benefit the Debtors' through their equity interests in their non-debtor affiliates.  For the avoidance of doubt, the relief requested herein with respect to the postpetition Intercompany Transactions and Intercompany Claims resulting therefrom shall not constitute an admission of the Debtors or any other party as to the validity, priority, or status of any Intercompany Claims or the Intercompany Transaction(s) from which such Intercompany Claims may have arisen.

55.    Administrative expense treatment for Intercompany Claims, as requested herein, has been granted in chapter 11 cases comparable to these chapter 11 cases.  *See, e.g.*, *In re Murray Energy Holdings, Co. et al.,* No. 19-56885 (JEH) (Bankr. S.D. Ohio Dec. 10, 2019) (authorizing

Murray Energy and its debtor affiliates to pay continue to perform intercompany transactions consistent with historical practice, including honoring any prepetition intercompany claims related thereto); *In re Milacron Inc.*, No. 09-11235 (JVA) (Bankr. S.D. Ohio Mar. 11, 2009) (granting administrative expense for intercompany transactions); *see also In re First Energy Solutions Corp.*, No. 18-50757 (AMK) (Bankr. N.D. Ohio May 8, 2018) (same); *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. Apr. 22, 2019) (same); *In re GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. July 13, 2017) (same); *In re The Gymboree Corp.*, No. 17-32986 (KLP) (Bankr. E.D. Va. July 13, 2017) (same).

**V.      Cause Exists to Waive Section 345 of the Bankruptcy Code to the Extent It Is Applicable to the Cash Management System**

56.      Section 345(a) of the Bankruptcy Code governs a debtor's deposits during a chapter 11 case and authorizes deposits of money that "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a).  Section 345(b) of the Bankruptcy Code requires that a debtor's bank post a bond unless a debtor's funds are "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States."  11 U.S.C. § 345(b).

57.      The Debtors believe that the Bank Accounts generally comply with section 345 of the Bankruptcy Code.  To the extent the Bank Accounts are not in compliance with section 345(b) of the Bankruptcy Code, the Debtors submit that cause exists to waive any such noncompliance. Therefore, the Debtors request that section 345 of the Bankruptcy Code be waived to the extent it is applicable to the Cash Management System.

## The Requirements of Bankruptcy Rules 6003 Are Satisfied

58.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture.  For the reasons discussed herein, the relief requested is necessary for the Debtors to operate their businesses in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

59.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Motion Practice

60.     This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this motion.  Accordingly, the Debtors submit that this motion satisfies Local Rule 9013-1(a)).

## Reservation of Rights

61.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of

any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## Notice

62.     The Debtors have provided notice of this motion to the following parties or their respective counsel:  (a) the U.S. Trustee for the Southern District of Ohio; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Take-Back Facility; (d) Javelin Investment Holdings LLC; (e) counsel to the Ad Hoc Group of Prepetition Term Loan Lenders; (f) the administrative agent under the Debtors' proposed debtor-in-possession financing facility; (g) the Environmental Protection Agency and

similar state environmental agencies for states in which the Debtors operate; (h) the offices of the

attorneys general for the states in which the Debtors operate; (i) the United States Attorney's Office

for the Southern District of Ohio; (j) the Internal Revenue Service; (k) the Pension Benefit

Guaranty Corporation; (l) the United Mine Workers of America; (m) counsel to each of the lenders

of the Debtors' proposed debtor-in-possession financing facility; (n) Murray Energy; (o) Javelin

Global; (p) all taxing authorities; (q) all mechanic's lien claimants; (r) all lessors; and (s) any party

that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of

the nature of the relief requested, no other or further notice need be given.

### No Prior Request

63.     No prior request for the relief sought in this Motion has been made to this or any

other court.

*[Remainder of page intentionally left blank]*

WHEREFORE the Debtors respectfully request that the Court an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  February 12, 2020
Columbus, Ohio

/s/ Thomas R. Allen
_____

| | |
|---|---|
| Thomas R. Allen      (0017513) | David M. Hillman (*pro hac vice* pending) |
| Richard K. Stovall    (0029978) | Timothy Q. Karcher (*pro hac vice* pending) |
| James A. Coutinho    (0082430) | Chris Theodoridis (*pro hac vice* pending) |
| Matthew M. Zofchak  (0096279) | |

**Allen Stovall Neuman Fisher & Ashton**          **PROSKAUER ROSE LLP**

17 South High Street, Suite 1220                Eleven Times Square
Columbus, Ohio 43215                      New York, New York 10036
Telephone:    (614) 221-8500                 Telephone:    (212) 969-3000
Facsimile:    (614) 221-5988                 Facsimile:    (212) 969-2900
Email:      allen@asnfa.com                Email:      dhillman@proskauer.com
          stovall@asnfa.com                      tkarcher@proskauer.com
          coutinho@asnfa.com                     ctheodoridis@proskauer.com
          zofchak@asnfa.com

                                            - and -
*Proposed Counsel to the Debtors and*
*Debtors in Possession*

                                 Charles A. Dale (*pro hac vice* pending)
                                 **PROSKAUER ROSE LLP**
                                 One International Place
                                 Boston, Massachusetts 02110
                                 Telephone:    (617) 526-9600
                                 Facsimile:    (617) 526-9899
                                 Email:      cdale@proskauer.com

                                 *Proposed Counsel to the Debtors and Debtors*
                                 *in Possession*

## Exhibit A

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MURRAY METALLURGICAL COAL | ) | Case No. 20-10390 (JEH) |
| HOLDINGS, LLC, *et al.*,[1] | ) | |
| | ) | Judge John E. Hoffman, Jr. |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**ORDER (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE
THEIR CASH MANAGEMENT SYSTEM, (B) MAINTAIN EXISTING BUSINESS
FORMS, AND (C) PERFORM INTERCOMPANY TRANSACTIONS AND PAY
POSTPETITION OBLIGATIONS RELATED THERETO, AND (II) GRANTING
RELATED RELIEF [RELATED TO DOCKET NO. _____]**

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Murray Metallurgical Coal Holdings, LLC (4633); Murray Eagle Mining, LLC (4268); Murray Alabama Minerals, LLC (4047); Murray Alabama Coal, LLC (3838); Murray Maple Eagle Coal, LLC (4435); and Murray Oak Grove Coal, LLC (4878). The Debtors' primary business address is 46226 National Road, St. Clairsville, OH 43950.

Upon the motion  (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") for entry of an order (this "<u>Order</u>"), (i) authorizing the Debtors to (a) continue to operate their Cash Management System, (b) maintain existing Business Forms in the ordinary course of business, and (c) continue to perform the Intercompany Transactions consistent with historical practice, and (ii) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declarations; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *General Order 30-3* from the United States Bankruptcy Court for the Southern District of Ohio, dated December 4, 2019; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "<u>Hearing</u>"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth in this Order.

---

[2]  Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion.

2.      The Debtors are authorized, but not directed, to: (a) continue operating the Cash Management System, substantially as identified in **Exhibit 1** attached hereto and as described in the Motion; (b) honor their prepetition obligations related thereto, including with respect to Bank Fees; (c) maintain existing Business Forms; and (d) continue to perform Intercompany Transactions consistent with historical practice.

3.      The Debtors are authorized, but not directed, to: (a) designate, maintain, close, and continue to use their existing Bank Accounts, including, but not limited to, the Bank Accounts identified in **Exhibit 2** hereto, in the names and with the account numbers existing immediately before the Petition Date; (b) deposit funds in, and withdraw funds from, the Bank Accounts by all usual means, including checks, wire transfers, ACH transfers, and other debits; (c) treat their prepetition Bank Accounts for all purposes as debtor in possession accounts; and (d) open new debtor in possession Bank Accounts.

4.      The Debtors are authorized, but not directed, to continue using the corporate credit cards and to pay any prepetition or postpetition amounts in connection therewith in the ordinary course of business and consistent with prepetition practices.

5.      The Debtors are authorized, but not directed, to continue using, in their present form, the Business Forms, as well as checks and other documents related to the Bank Accounts existing immediately before the Petition Date, *provided*, *however*, that once the Debtors have exhausted their existing stock of Business Forms and checks, they shall ensure that any new Business Forms and checks are clearly labeled "Debtor in Possession," *provided, further*, that with respect to any Business Forms and checks that are generated electronically, the Debtors shall ensure that such electronic Business Forms and checks are clearly labeled "Debtor in Possession."

6.     The Cash Management Bank is authorized to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course, and to receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, credit card payments, and ACH transfers issued and drawn on the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be.

7.     To the extent any Bank Accounts existing as of the Petition Date are not in compliance with section 345(b) of the Bankruptcy Code, the Debtors shall have forty-five days from the date of this Order (or such additional time to which the U.S. Trustee may agree) to either bring such Bank Accounts into compliance with section 345(b) of the Bankruptcy Code or to make such other arrangements as are agreed to by the U.S. Trustee or approved by the Court; *provided* that nothing in the foregoing shall prevent the Debtors or the U.S. Trustee from seeking further relief from the Court to the extent such an arrangement cannot be reached within that time period (or such other period as agreed to by the Debtors and the U.S. Trustee).

8.     Subject to the terms hereof, and in all respects to the terms of the DIP Order, the Debtors are authorized, upon written notice to counsel to the U.S. Trustee and the Official Committee of Unsecured Creditors, if any (the "UCC"), to open any new bank accounts or close any existing Bank Accounts and enter into any ancillary agreements, including deposit account control agreements, related to the foregoing, as they may deem necessary and appropriate; *provided*, that the Debtors shall open any such new Bank Account at banks that have executed a Uniform Depository Agreement with the Office of the United States Trustee for the Southern District of Ohio, or at such banks that are willing to immediately execute such an agreement. Notwithstanding the foregoing, the Debtors are authorized to open, without having to provide

written notice to counsel to the U.S. Trustee and the UCC (if any), the Adequate Assurance Account (as defined in the *Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief*) with the Cash Management Bank and the two accounts to hold proceeds from the Senior DIP Facility and the Junior DIP Facility (both as defined in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*).

9.      The relief granted in this Order is extended to any new bank account opened by the Debtors in the ordinary course of business after the date hereof, which account shall be deemed a "Bank Account," and to the bank at which such account is opened, which bank shall be deemed a "Cash Management Bank."

10.      All banks maintaining any of the Bank Accounts that are provided with notice of this Order shall not honor or pay any bank payments drawn on the listed Bank Accounts or otherwise issued before the Petition Date for which the Debtors specifically issue stop payment orders in accordance with the documents governing such Bank Accounts.

11.      The Debtors' Cash Management Bank is authorized to debit the Debtors' accounts in the ordinary course of business without the need for further order of this Court for all checks drawn on the Debtors' account.

12.     The Cash Management Bank is authorized, without further order of this Court, to charge back to the appropriate accounts of the Debtors any amounts resulting from returned checks or other returned items, including returned items that result from ACH transactions, wire transfers, or other electronic transfers of any kind, regardless of whether such returned items were deposited or transferred prepetition or postpetition and regardless of whether the returned items relate to prepetition or postpetition items or transfers.

13.     Subject to the terms set forth herein, any bank, including the Cash Management Bank, may rely upon the representations of the Debtors with respect to whether any check, draft, wire, or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to any order of this Court, and no bank that honors a prepetition check or other item drawn on any account that is the subject of this Order (a) at the direction of the Debtors, (b) in a good-faith belief that this Court has authorized such prepetition check or item to be honored, or (c) as a result of a mistake made despite implementation of reasonable customary handling procedures, shall be deemed to be nor shall be liable to the Debtors, their estates, or any other party on account of such prepetition check or other item being honored postpetition, or otherwise deemed to be in violation of this Order.

14.     Any banks, including the Cash Management Bank, are further authorized to honor the Debtors' directions with respect to the opening and closing of any Bank Account and accept and hold, or invest, the Debtors' funds in accordance with the Debtors' instructions; *provided* that the Cash Management Bank shall not have any liability to any party for relying on such representations to the extent such reliance otherwise complies with applicable law.

15.     The Debtors are authorized, but not directed, to continue utilizing the Cash Management System to engage in Intercompany Transactions, subject to the terms set forth in this Order, in the ordinary course of business; *provided*, that the Debtors shall (a) keep records of any postpetition Intercompany Transactions that occur during these chapter 11 cases so that all Intercompany Transactions may be readily ascertained, traced, and recorded properly on applicable intercompany accounts and (b) implement accounting procedures to identify and distinguish between prepetition and postpetition Intercompany Transactions; *provided*, *further*, that the Debtors shall not be authorized by this Order to undertake any Intercompany Transactions or set off mutual postpetition obligations relating to intercompany receivables and payables that are (a) not on the same terms as, or materially consistent with, the Debtors' operation of their business in the ordinary course of business during the prepetition period or (b) prohibited or restricted by the terms of the DIP Order.  Any Intercompany Claims against the Debtors arising from the Intercompany Transactions are hereby accorded administrative expense status under section 503(b) of the Bankruptcy Code, subject and junior to the claims, including adequate protection claims, granted pursuant to the DIP Order.

16.     The Debtors shall continue to maintain a matrix summarizing any Intercompany Transactions, the amount paid on account of such Intercompany Transactions, and the parties to such Intercompany Transactions, and shall provide such matrix on a monthly basis to the U.S. Trustee.  Such matrix shall distinguish between prepetition and postpetition transactions.

17.     Nothing contained in the Motion or this Order shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of the Petition Date or (b) alter or impair the validity, priority, enforceability, or perfection of any security interest or lien, in favor of any person or entity, that existed as of the Petition Date.

18.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, whether such checks or other requests were submitted prior to, or after, the Petition Date, *provided* that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Order without any duty of further inquiry and without liability for following the Debtor's instructions.

19.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to

the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

20.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

21.     Notwithstanding the relief granted in this Order, any payment made or to be made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with any interim or final orders entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility and any budget or cash flow forecasts in connection therewith and/or authorizing the Debtors' use of cash collateral and any budget or cash flow forecasts in connection therewith (in either case, the "DIP Order").  To the extent there is any inconsistency between the terms of the DIP Order and any action taken or proposed to be taken hereunder, the terms of the DIP Order shall control.

22.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

23.     The Debtors shall serve this Order in accordance with all applicable rules and shall file a certificate of service evidencing compliance with this requirement.

24.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

25.     The Debtors are authorized to take all reasonable actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

26.     As soon as practicable after entry of this Order, the Debtors shall serve a copy of this Order on the Cash Management Banks.

27.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

SO ORDERED.

Copies to Default List.

### Exhibit 1

**Cash Management System Schematic**



**Exhibit 2**

**Bank Accounts**

| No. | Entity | Bank Name | Account Type | Account No. (Ending) |
|-----|--------|-----------|--------------|----------------------|
| 1. | Murray Metallurgical Coal Holdings LLC | Huntington Bank | Concentration | 6844 |
| 2. | Murray Metallurgical Coal Holdings LLC | Huntington Bank | Zero Balance Disbursement (Operating) | 7063 |
| 3. | Murray Metallurgical Coal Holdings LLC | Huntington Bank | Zero Balance Disbursement (Payroll) | 7076 |
| 4. | Murray Metallurgical Coal Holdings LLC | Huntington Bank | Zero Balance Disbursement (Health) | 7089 |
| 5. | Murray Metallurgical Coal Holdings LLC | Huntington Bank | Zero Balance Disbursement (Workers' Compensation) | 7092 |
| 6. | Murray Metallurgical Coal Holdings LLC | Huntington Bank | Standalone | 6950 |