## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MURRAY METALLURGICAL COAL | ) | Case No. 20-10390 (JEH) |
| HOLDINGS, LLC, *et al.*,[1] | ) |  |
|  | ) | Judge John E. Hoffman, Jr. |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE THEIR INSURANCE POLICIES AND HONOR ALL OBLIGATIONS IN RESPECT THEREOF, (B) RENEW, SUPPLEMENT, AND ENTER INTO NEW INSURANCE POLICIES, (C) HONOR THE TERMS OF THE PREMIUM FINANCING AGREEMENTS AND PAY PREMIUMS THEREUNDER, (D) ENTER INTO NEW PREMIUM FINANCING AGREEMENTS IN THE ORDINARY COURSE OF BUSINESS, AND (II) GRANTING RELATED RELIEF**

Murray Metallurgical Coal Holdings, LLC ("Met Holdings") together with its debtor subsidiaries (collectively, the "Debtors") respectfully state as follows in support of this motion:[2]

### Relief Requested

1.     The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A**, (a) authorizing the Debtors to (i) continue insurance coverage entered into prepetition and satisfy payment of prepetition obligations related thereto, (ii) renew, supplement, or purchase insurance coverage in the Debtors' discretion on a postpetition basis, (iii) honor the terms of the

---

[1]   The Debtors in these Chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Murray Metallurgical Coal Holdings, LLC (4633); Murray Eagle Mining, LLC (4268); Murray Alabama Minerals, LLC (4047); Murray Alabama Coal, LLC (3838); Murray Maple Eagle Coal, LLC (4435); and Murray Oak Grove Coal, LLC (4878).  The Debtors' primary business address is 46226 National Road, St. Clairsville, OH 43950.

[2]   The facts and circumstances supporting this motion are set forth in the *Declaration of Robert D. Moore in Support of Chapter 11 Petitions* (the "Moore Declaration") and *Declaration of Amy Lee, Senior Director of Alvarez & Marsal North America, LLC, in Support of First Day Motions* filed contemporaneously herewith and incorporated by reference herein (collectively, the "First Day Declarations").  Capitalized terms used but not otherwise defined herein have the meanings given to them in the First Day Declarations.

Premium Financing Agreements (as defined herein) and pay premiums thereunder, and (iv) enter into new premium financing agreements, and (b) granting related relief.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of Ohio (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *General Order 30-3* from the United States Bankruptcy Court for the Southern District of Ohio, dated December 4, 2019 (the "General Order"). The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, Rule 9013-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Ohio (the "Local Rules"), and the General Order.

## Background

5.       The Debtors are engaged in the mining and production of metallurgical coal. Unlike thermal coal, which is primarily used by the electric utility industry to generate electricity, metallurgical coal is used to produce coke, which is an integral component of steel production.

6.      The Debtors primarily own and operate two active coal mining complexes and other assets in Alabama and West Virginia. The larger of the two mining complexes, the Oak Grove Mine ("Oak Grove"), is an underground longwall mine located in Alabama. The other mining complex, known as the Maple Eagle No. 1 Mine ("Maple Eagle" and together with Oak Grove,

the "Mining Complexes"), is an underground continuous mining and surface mining complex located in West Virginia.[3]  To preserve liquidity, the Maple Eagle mine has been in a "hot idle"[4] state since September.  The Oak Grove mine has been in a "hot idle" state since November.  The Debtors have been engaged in a marketing process to sell Maple Eagle for several months.

7.      Each of the Debtors is an unrestricted subsidiary of Murray Energy Corporation ("Murray Energy"), which, along with Javelin Investment Holdings LLC ("Javelin"), acquired the mines and other assets of the Debtors from Mission Coal Company, LLC ("Mission") in April 2019 (the "Met Acquisition").  At the time of the Met Acquisition, Mission was a debtor in its own chapter 11 cases pending in the United States Bankruptcy Court for the Northern District of Alabama.[5]

8.      In connection with the Met Acquisition, on April 29, 2019, Met Holdings entered into a credit agreement (the "Take-Back Credit Agreement"), which governs, among other things, a secured term credit facility (the "Take-Back Facility") among Met Holdings, as borrower, its subsidiaries (the "Met Subs"), as guarantors, Wilmington Savings Fund Society, FSB, as administrative agent, and any additional lenders from time to time party thereto.  The Take-Back Facility matures on April 29, 2023, and is secured by substantially all of the Debtors' assets.

9.      In addition, on April 29, 2019, Met Holdings entered into a Management Services Agreement (the "Management Services Agreement") with Murray Energy pursuant to which Murray Energy manages, administers, and oversees all aspects of the operation of the Mining

---

[3] The Debtors own a third mine, known as the North River Mine, in Alabama, which is not currently being operated.

[4] A mine that is in a "hot idle" state means that it is being temporarily idled and maintained in anticipation of returning to operation in the near future.

[5] The Mission bankruptcy cases are still pending.

Complexes, including without limitation, the day-to-day operation, maintenance, and business of the Mining Complexes.

10.     Approximately six months after the Met Acquisition, on October 29, 2019, Murray Energy and its affiliated debtors and debtors in possession (the "MEC Debtors") filed voluntary chapter 11 petitions in the Bankruptcy Court for the Southern District of Ohio (the "MEC Chapter 11 Cases").  The MEC Chapter 11 Cases are being jointly administered under Case No. 19-56885. Significantly, none of the Debtors are debtors in the MEC Chapter 11 Cases.

11.     There are a number of differences between these chapter 11 cases and the MEC Chapter 11 Cases, which warrant keeping them separated from the MEC Chapter 11 Cases, including: (i) none of the Debtors are borrowers or guarantors on the debtor in possession financing obligations in the MEC Chapter 11 Cases; (ii) the Debtors are primarily engaged in mining, extraction, and processing of metallurgical coal, whereas the MEC Debtors are primarily engaged in the mining, extraction, and processing of thermal coal, and each of these commodities is subject to different market pressures; (iii) the lenders to the Debtors under the Take-Back Facility are different from the lenders to the MEC Debtors; and (iv) as a result of the Take-Back Facility and other claims against the assets of the Debtors (including obligations to Javelin Global Commodities (UK) LTD ("Javelin Global")), there was perceived to be little to no equity value in the Debtors that would flow up to the MEC Debtors, although there was a belief that the Debtors could survive as a going concern without the need for a chapter 11 filing.

12.     Commencing on February 11, 2020 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of

4

this motion, the Debtors filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  Also, the Debtors have filed a Notice of Election of Complex Chapter 11 Cases.

13.    The Debtors commenced these chapter 11 cases after extensive negotiations with their major stakeholders concerning a global resolution to the Debtors' financial difficulties.  In an effort to ensure that value is maximized for all stakeholders and that the Debtors' remediation obligations are honored at each of their Mining Complexes, these chapter 11 cases have been commenced with a three-pronged strategy that has the support of the Take-Back Facility lenders, Javelin, Javelin Global, and Murray Energy.  First, the Debtors intend to facilitate the consensual sale of substantially all of the assets of Maple Eagle pursuant to Bankruptcy Code section 363.  Second, the Debtors intend to effectuate a reorganization of their remaining operations, which is premised on the continued and future operation of the Oak Grove mining complex, through a sale of Oak Grove pursuant to a plan.  And third, the Debtors intend to ensure that they can continue to comply with their reclamation obligations at the North River mining complex.  These three elements have been memorialized in a Restructuring Support Agreement among Met Holdings, Murray Energy, the Take-Back Facility lenders, and Javelin Global, all as more fully set forth in the Moore Declaration.

14.    As of the Petition Date, the Debtors have approximately $270 million in debt and liabilities, including but not limited to approximately $169 million related to the Take-Back Facility, approximately $21.5 million under an emergency bridge financing facility,[6] approximately $23.5 million owed to Javelin Global under certain of the Javelin Agreements, and

---

[6] This facility is documented by amendments to the Take-Back Facility.

approximately $12.7 million in intercompany liabilities owed to Murray Energy and other affiliates.  In addition, the Debtors have approximately $43 million in outstanding trade payables.

### The Insurance Policies and Related Payment Obligations

15.    In the ordinary course of business, the Debtors maintain approximately 44 insurance policies (collectively, the "Insurance Policies," and each individually an "Insurance Policy") that are administered by various third-party insurance carriers (collectively, the "Insurance Carriers").  The Insurance Policies provide coverage for, among other things, the Debtors' property, general liability, automobile liability, umbrella coverage, excess liability, pollution liability, employers' liability, and directors' and officers' liability (including tail coverage).  The Insurance Policies are essential to the ongoing operation of the Debtors' businesses.  The Debtors' annual premium payments for the Insurance Policies are approximately $5.3 million plus applicable taxes and surcharges.[7]  A schedule of the Insurance Policies is attached hereto as **Exhibit B**.[8]  In addition to the Insurance Policies, the Debtors maintain several workers' compensation or self-insurance policies that are not reflected in **Exhibit B** and for which relief is not sought in this motion.[9]

---

[7]  Certain Insurance Policies cover the Debtors as well as non-Debtor affiliates.  The Murray Energy enterprise as a whole pays aggregate annual insurance premiums of approximately $47.3 million, of which $5.3 million is related to the Debtors' insurance coverage.  The Debtors will only pay the portion of the premium related to *their* coverage under the Insurance Policies.  The annual premiums paid by the Debtors include commission payments to the Debtors' Brokers (as defined herein).

[8]  The descriptions of the Insurance Policies set forth in this motion are summary in nature.  The actual terms of the Insurance Policies and related agreements will govern in the event of any inconsistency with the description in this motion.  The Debtors request authority to honor obligations and renew all Insurance Policies, as applicable, regardless of whether the Debtors inadvertently fail to include a particular Insurance Policy on **Exhibit B**.

[9]  In addition to the Insurance Policies listed on **Exhibit B**, the Debtors maintain numerous insurance policies with respect to, among other things, workers' compensation, employee health, dental, disability, and life insurance benefits. These policies are described, and relief is requested with respect to such policies, in the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief*, filed contemporaneously herewith.

16.     The Insurance Policies are generally one year in length and renew at different times throughout the year.  Insurance premiums are typically prepaid on an annual basis, subject to the payment terms under each Insurance Policy.  <u>As of the Petition Date, the Debtors do not believe any insurance premiums are due or outstanding</u>.  Out of an abundance of caution, however, the Debtors seek authority to pay any prepetition amounts due and owing on account of the Insurance Policies to ensure uninterrupted coverage under their Insurance Policies.  The Debtors also seek authority to continue honoring all payment obligations under the Insurance Policies in the ordinary course of business to ensure uninterrupted coverage thereunder.

17.     Certain Insurance Policies require the Debtors to pay a per-incident deductible (collectively, the "<u>Deductibles</u>").  Generally, if a claim is made against the Insurance Policies, the Debtors' applicable third-party administrator or Insurance Carrier will administer the claim and make payments in connection therewith.  The Deductible, if any, is offset against such administrator's or Insurance Carrier's payment obligation. Alternatively, certain of the Debtors' policies use self-insured retentions ("<u>SIRs</u>") instead of Deductibles.  If a claim is made against such policies, the Debtors will make payments up to the limit of the SIR, and once the claim value is above the SIR amount, the Insurance Policy will cover the remaining costs.  There is significant variation in the amount of Deductibles and SIRs, and the amount of the Deductible or SIR can range up to $5 million depending on the Insurance Policy.  <u>As of the Petition Date, the Debtors do not believe that they owe any prepetition Deductibles or SIRs under the Insurance Policies</u>.  Out of an abundance of caution, however, the Debtors seek authority to honor any Deductible or SIR that may currently exist or otherwise arise under the Insurance Policies in the ordinary course of business.

18.     Some, but not all, of the Insurance Policies are financed through premium financing agreements with BankDirect Capital Finance ("BankDirect"), copies of which are attached hereto as **Exhibit C** (the "Premium Financing Agreements").  The Premium Financing Agreements expire on June 1, 2020 and December 15, 2020.  Under the Premium Financing Agreements, the Debtors are required to make monthly payments of (i) approximately $31,349 on the 5th day of each month through April 5, 2020, and (ii) approximately $104,694 on the 10th day of each month through September 10, 2020.  Because the Premium Financing Agreements are an integral part of the Debtors' insurance programs and vital to their ability to finance and procure the Insurance Policies, the Debtors seek authority to honor any amounts owed in full to ensure uninterrupted coverage under their Insurance Policies.

19.     The Debtors' ability to renew, modify, or supplement existing Insurance Policies, enter into new Insurance Policies, and pay all obligations related thereto is essential to the preservation of the value of the Debtors' businesses and operations.  Moreover, in many instances, insurance coverage is required by the regulations or laws, the Debtors' credit agreements, and contracts that govern the Debtors' commercial activities, including the requirement by the United States Trustee (the "U.S. Trustee") that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.  Accordingly, the Debtors seek authorization to maintain and/or modify their existing Insurance Policies, pay prepetition obligations related thereto, honor their obligations under the Premium Financing Agreements, and enter into new insurance policies in the ordinary course of business and consistent with prepetition practices.

20.     In addition, to the extent that any premium financing agreement has already expired or expires during the course of these chapter 11 cases, the Debtors seek authority to renew their Premium Financing Agreements, or enter into new premium financing agreements, without

further Court approval.  The Debtors respectfully submit that renewal of the Premium Financing Agreements falls squarely within the ordinary course of the Debtors' business and, but for the potential constraints of section 364 of the Bankruptcy Code, the Debtors would not need the Court's prior approval to renew the Premium Financing Agreements.  To reduce the administrative burden, as well as to confirm their ability to satisfy one of their obligations of operating as debtors in possession, the Debtors seek the Court's authority now to renew the Premium Financing Agreements when and as necessary in the Debtors' business judgment.

### The Debtors' Insurance Brokers

21.     The Debtors retain the services of insurance brokers (collectively, the "Brokers") to help manage their portfolios of risk.  The Debtors obtain all of their Insurance Policies through their two Brokers: Reschini Agency, Inc. and CAC Specialty.  The Brokers, among other things, (a) assist the Debtors in obtaining comprehensive insurance coverage for the Debtors' operations in a cost-effective manner, (b) manage renewal data, (c) market the Insurance Policies, (d) provide all interactions with Insurance Carriers including negotiating Insurance Policy terms, provisions, and premiums, and (e) provide ongoing support throughout the applicable Insurance Policy periods.  The Brokers collect commission payments for their services as part of the premiums paid on account of the Insurance Policies.

22.     The Debtors do not believe they owe any amounts to the Brokers on account of fees, commissions, or any other prepetition obligations.  Out of an abundance of caution, however, the Debtors seek authority to honor any amounts owed to the Brokers to ensure uninterrupted coverage under their Insurance Policies.

## Basis for Relief

**I.     Continuation of the Insurance Policies Is Required by the Bankruptcy Code and U.S. Trustee Operating Guidelines.**

23.     Section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case.  11 U.S.C. § 1112(b)(4)(C).  In addition, in many instances, the coverage provided under the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the *Chapter 11 Operating Instructions and Reporting Requirements*, issued by the United States Trustee for Region 9 (the "U.S. Trustee Operating Guidelines").  Given this backdrop, the Debtors believe it is essential to their estates, and consistent with the Bankruptcy Code and the U.S. Trustee Operating Guidelines, that they maintain and continue to make all payments required under their Insurance Policies, including in connection with the Premium Financing Agreements, and have the authority to supplement, amend, extend, renew, or replace their Insurance Policies as needed, in their business judgment, without further order of the Court.

**II.    Renewing, Supplementing, and Entering into New Insurance Policies, and Paying Obligations Related to the Insurance Policies, Premium Financing Agreements, and to Brokers in the Ordinary Course of Business Are Each Warranted.**

24.     The Bankruptcy Code authorizes the Debtors to continue their prepetition practices with respect to their insurance program, including all payments on account of the Insurance Policies, Premium Financing Agreements, and to Brokers, (the "Insurance Program") as such practices are in the ordinary course of the Debtors' business.  Alternatively, to the extent any such practices fall outside of the ordinary course of business, the Court should authorize the Debtors to maintain, renew, or enter into new Insurance Policies and Premium Financing Agreements on a

postpetition basis, as such relief is in the Debtors' sound business judgment and enables the

Debtors to preserve value, consistent with the policies of chapter 11.

25.      Section 363(c)(1) of the Bankruptcy Code provides that a chapter 11 debtor in

possession "may enter into transactions . . . [or] may use property of the estate in the ordinary

course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  The Bankruptcy Code

does not define "ordinary course of business."  *In re Roth Am., Inc.*, 975 F.2d 949, 952

(3d Cir. 1992).  In determining whether a transaction is in the ordinary course of business, courts

have looked at whether a transaction is "common practice" in a debtor's industry and whether "a

creditor could reasonably expect" the debtor to enter into such a transaction.  *See In re Miller Min.,

Inc.*, 219 B.R. 219, 222 (Bankr. N.D. Ohio 1998) (applying a two-part "horizontal" and "vertical"

test to analyze a postpetition payment); *Deaconess Hosp. LLC v. Nour Mgmn't Co.*,

2010 WL 1254307, at *2 n.9 (N.D. Ohio Mar. 24, 2010) (same); *see also Roth Am.*, 975 F.2d at

952 (adopting a two-part "horizontal" dimension and "vertical" dimension test looking at industry

practice and creditor expectations).  **First**, when determining "common practice," the court

analyzes whether, from an industry-wide perspective, the transaction is of the sort commonly

undertaken by companies in that industry.  *Miller Min.*, 219 B.R. at 223.  **Second**, the transaction

must be analyzed on the "reasonable expectation" dimension, where the court "analyzes the

transaction from the vantage point of a hypothetical creditor and inquires whether the transaction

subjects a creditor to economic risks of a different nature from those he accepted when he initially

contracted with the debtor."  *Id.* at 222.  "In other words, the vertical analysis looks at the 'debtor's

pre-petition business practices and conduct.'"  *In re Blitz U.S.A., Inc.*, 475 B.R. 209, 214

(Bankr. D. Del. 2012) (quoting *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 797

(Bankr. D. Del. 2007)); *see also In re WCI Steel Inc.*, 313 B.R. 414, 417 n.2 (Bankr. N.D. Ohio

2004) (observing that consistent past payments of pension obligations supported a finding that such payments were made in the ordinary course of business).

26.     The Debtors' continuation of the Insurance Program on a postpetition basis is consistent with their prepetition practices.  Additionally, the Debtors believe that maintaining insurance policies and financing payments for such policies is standard practice in most industries, and particularly so in the coal mining industry.  Accordingly, the Debtors are permitted to continue to comply with the Insurance Policies and to renew or obtain new Insurance Policies and Premium Financing Agreements because such actions are in the ordinary course of the Debtors' businesses.

27.     Out of an abundance of caution, to the extent that the Debtors' continuation of the Insurance Program is outside of the ordinary course of business, section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A court may authorize non-ordinary course transactions using property of the estate pursuant to section 363(b) "when a sound business purpose dictates such action." *Stephens Indus. Inc. v. McClung*, 789 F. 2d 386, 390 (6th Cir. 1986) (approving a sale of assets pursuant to section 363(b)); *see also In re Eagle-Picher Holdings, Inc.*, No. 05-12601, 2005 WL 4030132, at *5 (Bankr. S.D. Ohio Aug. 26, 2005) (authorizing the debtors to implement a key employee retention plan pursuant to section 363(b) after finding the use was an "exercise of sound business judgment").  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238

(3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

28.     Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b) of the Bankruptcy Code.  Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions.  *See Granada Invs., Inc. v. DWG Corp.*, 823 F. Supp 448, 454 (N.D. Ohio 1993) (observing that "courts employ the business judgment rule because in order for a corporation to be managed properly and efficiently, latitude must be given in the handling of corporate affairs") (internal quotation omitted); *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence.")  (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

29.     The nature of the Debtors' businesses makes it essential for the Debtors to maintain their Insurance Program on an ongoing and uninterrupted basis.  The non-payment of any premiums, Deductibles, SIRs, or related fees (including fees owed to Brokers) under the Insurance Policies could result in one or more of the Insurance Carriers terminating or declining to renew their Insurance Policies or refusing to enter into new insurance policies with the Debtors in the future.  If any of the Insurance Policies lapse without renewal, the Debtors could be exposed to substantial personal liability or property damages, to the detriment of all parties in interest.

30.     The Debtors similarly believe that continuing to perform under the Premium Financing Agreements on a postpetition basis is in the best interests of their estates.  Moreover, in light of their financial circumstances, alternative insurance premium finance companies may not be willing to provide insurance premium financing to the Debtors on attractive market terms

on a postpetition basis.  Simply put, it is critical for the Debtors to continue to perform under their existing Premium Financing Agreements.

31.     Certain of the Debtors' leases and financing agreements require the Debtors to remain current with respect to certain of their primary Insurance Policies.  Additionally, state and local laws require the Debtors to maintain insurance policies.  Thus, the Debtors must be able to continue their Insurance Policies without disruption to ensure their operations remain in compliance with various legal and contractual obligations.

32.     Further, the continued retention of the Brokers allows the Debtors and their employees to focus on the core operational matters associated with the production and sale of coal.  The Debtors are not well-suited to bring the services provided by the Brokers in-house.  If the Debtors failed to make timely payments to the Brokers, the Debtors may lose access to the Brokers' valuable services, disrupting management to the detriment of all stakeholders.

33.     Any interruption in coverage would expose the Debtors to a number of risks, including:  (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been covered by the Insurance Policies; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed, such as attorneys' fees for certain covered claims; (c) the possible inability to obtain similar types and levels of insurance coverage or premium financing on terms equally favorable as the present coverage; and (d) the possible incurrence of higher costs for re-establishing lapsed Insurance Policies or obtaining new insurance coverage.  In short, failure to maintain the Insurance Program could have a detrimental impact on the Debtors' businesses and the value of their estates.  Accordingly, the Debtors submit that the requirements of section 363(b) of the Bankruptcy Code are satisfied.

III.    **The Debtors Should Be Authorized to Pay All Prepetition Obligations Owed under the Premium Financing Agreements, the Insurance Policies, and to Brokers.**

34.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983).  In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims.

35.     Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. § 363(b)(1).   A court may authorize non-ordinary course transactions using property of the estate pursuant to section 363(b) "when a sound business purpose dictates such action." *Stephens Indus.*, 789 F. 2d at 390.  Courts have authorized payment of certain prepetition claims pursuant to section 363(b) where there is a sound business purpose for doing so. *See, e.g.*, *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *James A. Phillips*, 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors); *Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain prepetition wages).

36.     Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."   11 U.S.C. § 105(a).   Under section 105(a), courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's businesses.  *See Eagle-Picher Indus.*, 124 B.R. at 1023 (authorizing payment of prepetition indebtedness where the "payment is necessary to avert a serious threat to the Chapter 11"); *Just for Feet*, 242 B.R. at 825−26.  Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").  *See, e.g.*, *Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Railway Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("A general practice has developed however, where bankruptcy courts permit the payment of certain pre-petition claims pursuant to 11 U.S.C. §105, where the debtor will be unable to reorganize without payment.").  A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."  *Ionosphere Clubs*, 98 B.R. at 175–76 (citing *Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)).

37.     Paying obligations under the Insurance Policies and the Premium Financing Agreements and any outstanding fees owed to Brokers is warranted under section 363(b) and the doctrine of necessity.  As described above, maintaining the Insurance Policies is necessary to

preserve the value of the Debtors' assets, thereby ensuring the adequate protection of the Debtors' property for any party in interest, and to minimize exposure to risk.  Honoring the Premium Financing Agreements is necessary to maintaining the Insurance Policies, as failure to make the payments required under the Premium Financing Agreements can trigger cancellation of many of those Insurance Policies.  In addition, paying the fees owed to Brokers will ensure that those Brokers will be available to assist the Debtors in procuring additional necessary insurance throughout the course of these chapter 11 cases.  Maintaining the Insurance Policies enables the Debtors to avoid the incurrence of possibly significant liabilities, and therefore represents a sound exercise of their business judgment.  The Insurance Policies protect the Debtors and other parties in interest from losses caused by casualty, natural disaster, fraud, or other unforeseen events.  In fact, in some instances, maintenance of insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the U.S. Trustee's requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.  Accordingly, it is necessary for the Debtors to pay their prepetition insurance premiums, obligations owed under the Premium Financing Agreements, and fees to Brokers to ensure that the Debtors are able to renew, supplement, or purchase insurance coverage on a postpetition basis in the ordinary course of business.

38.    Indeed, courts in this district and others have routinely granted relief similar to that requested herein.  *See, e.g.*, *In re Murray Energy Holdings Co.*, No. 19-56885 (JEH) (Bankr. S.D. Ohio Dec. 3, 2019) (ECF No. 333) (authorizing performance of prepetition obligations necessary to maintain insurance coverage); *In re AcuSport Corp.*, No. 18-52736 (JEH) (Bankr. S.D. Ohio May 21, 2018) (same); *In re FirstEnergy Solutions, Inc.*, No. 18-50757 (AMK) (Bankr. N.D. Ohio Apr. 4, 2018) (same); *In re Milacron Inc.*, No. 09-11235 (JVA)

(Bankr. S.D. Ohio Mar. 12, 2009) (same); *In re Blackhawk Mining LLC*, Case No. 19-11595 (LSS)

(Bankr. D. Del. July 22, 2019) (same); *In re Blackjewel LLC*, No. 19-30289 (FWV)

(Bankr. S.D. W. Va. Aug. 8, 2019) (same).

## IV.     The Debtors Should Be Authorized to Honor and Renew the Premium Financing Agreements.

39.     The Debtors respectfully submit that continuation of the Premium Financing

Agreements and authorization for entry into new premium financing agreements is necessary and

appropriate, and may be authorized under section 363 as set forth above.  In addition, pursuant to

section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment,

incur secured postpetition debt if the debtor has been unable to obtain unsecured credit and the

borrowing is in the best interest of the estate.  *See, e.g.*, *In re Ames Dept. Stores, Inc.*,

115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (stating that with respect to postpetition credit, courts

"permit debtors in possession to exercise their basic business judgment consistent with their

fiduciary duties"); *In re Simasko Prod. Co.*, 47 B.R. 444, 448–49 (D. Colo. 1985) (authorizing

interim financing agreement where debtor's business judgment indicated financing was necessary

and reasonable for benefit of estate).  As discussed above, the Debtors believe that continuing to

perform under the Premium Financing Agreements on a postpetition basis is in the best interests

of their estates.  Moreover, in light of their financial circumstances, alternative insurance premium

finance companies may not be willing to provide insurance premium financing to the Debtors on

attractive market terms on a postpetition basis.  Simply put, it is critical for the Debtors to continue

to perform under their existing Premium Financing Agreements.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

40.     The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, debtor-in-possession financing, and/or anticipated access to cash collateral.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently.   Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion *provided* that the Debtors have sufficient funds on deposit in the applicable bank accounts to cover such payments.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

41.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture.  For the reasons discussed herein, the relief requested is necessary for the Debtors to operate their businesses in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the

relief requested herein *provided* that the Debtors have sufficient funds on deposit in the applicable bank accounts to cover such payments.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

42.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Motion Practice

43.     This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this motion.  Accordingly, the Debtors submit that this motion satisfies Local Rule 9013-1(a).

### Reservation of Rights

44.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver  or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual,

common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

45.     The Debtors have provided notice of this motion to the following parties or their respective counsel:  (a) the U.S. Trustee for the Southern District of Ohio; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Take-Back Facility; (d) Javelin Investment Holdings LLC; (e) counsel to the Ad Hoc Group of Prepetition Term Loan Lenders; (f) the administrative agent under the Debtors' proposed debtor-in-possession financing facility; (g) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors operate; (h) the offices of the attorneys general for the states in which the Debtors operate; (i) the United States Attorney's Office for the Southern District of Ohio; (j) the Internal Revenue Service; (k) the Pension Benefit Guaranty Corporation; (l) the United Mine Workers of America; (m) counsel to each of the lenders of the Debtors' proposed debtor-in-possession financing facility; (n) Murray Energy; (o) Javelin Global; (p) all taxing authorities; (q) all mechanic's lien claimants; (r) all lessors; and (s) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

46.     No prior request for the relief sought in this motion has been made to this or any other court.

WHEREFORE the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  February 12, 2020
Columbus, Ohio

/s/ Thomas R. Allen

| | | | |
|---|---|---|---|
| Thomas R. Allen | (0017513) | David M. Hillman (*pro hac vice* pending) |
| Richard K. Stovall | (0029978) | Timothy Q. Karcher (*pro hac vice* pending) |
| James A. Coutinho | (0082430) | Chris Theodoridis (*pro hac vice* pending) |
| Matthew M. Zofchak | (0096279) | |

**Allen Stovall Neuman Fisher & Ashton**
17 South High Street, Suite 1220
Columbus, Ohio 43215
Telephone:    (614) 221-8500
Facsimile:     (614) 221-5988
Email:          allen@asnfa.com
                    stovall@asnfa.com
                    coutinho@asnfa.com
                    zofchak@asnfa.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone:    (212) 969-3000
Facsimile:     (212) 969-2900
Email:          dhillman@proskauer.com
                    tkarcher@proskauer.com
                    ctheodoridis@proskauer.com

- and -

Charles A. Dale (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
One International Place
Boston, Massachusetts 02110
Telephone:    (617) 526-9600
Facsimile:     (617) 526-9899
Email:          cdale@proskauer.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MURRAY METALLURGICAL COAL | ) | Case No. 20-10390 (JEH) |
| HOLDINGS, LLC, *et al.*,[1] | ) | |
| | ) | Judge John E. Hoffman, Jr. |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**ORDER (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE THEIR INSURANCE
POLICIES AND HONOR ALL OBLIGATIONS IN RESPECT THEREOF, (B) RENEW,
SUPPLEMENT, AND ENTER INTO NEW INSURANCE POLICIES, (C) HONOR THE
TERMS OF THE PREMIUM FINANCING AGREEMENTS AND PAY PREMIUMS
THEREUNDER, AND (D) ENTER INTO NEW PREMIUM FINANCING
AGREEMENTS IN THE ORDINARY COURSE OF BUSINESS, AND (IV) GRANTING
RELATED RELIEF [RELATED TO DOCKET NO. ____]**

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Murray Metallurgical Coal Holdings, LLC (4633); Murray Eagle Mining, LLC (4268); Murray Alabama Minerals, LLC (4047); Murray Alabama Coal, LLC (3838); Murray Maple Eagle Coal, LLC (4435); and Murray Oak Grove Coal, LLC (4878). The Debtors' primary business address is 46226 National Road, St. Clairsville, OH 43950.

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) authorizing the Debtors to (i) continue insurance coverage entered into prepetition and satisfy payment of prepetition obligations related thereto, (ii) renew, supplement, or purchase insurance coverage in the Debtors' discretion on a postpetition basis, (iii) honor the terms of the Premium Financing Agreements and pay premiums thereunder, and (iv) enter into new premium financing agreements, and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declarations; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *General Order 30-3* from the United States Bankruptcy Court for the Southern District of Ohio, dated December 4, 2019, and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth in this Order.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion.

2.      The Debtors shall serve a copy of the Motion and this Order on each Insurance

Carrier listed on **Exhibit B** to the Motion within three business days after the date this Order is

entered.

3.      The Debtors are authorized, but not directed, to:

(a)      (i) continue the Insurance Policies including, but not limited to, those identified on
Exhibit B to the Motion and pay any undisputed prepetition or postpetition
obligations related to the Insurance Policies (including any amounts owed to the
Brokers and any Deductibles) in accordance with and in the amounts consistent
with the same practices and procedures as were in effect prior to the commencement
of the Debtors' chapter 11 cases, and (ii) renew, amend, supplement, extend, or
purchase insurance policies to the extent that the Debtors determine that such action
is in the best interest of their estates; and

(b)      (i) honor the terms of the Premium Financing Agreements identified in Exhibit C
to the Motion and pay premiums thereunder and (ii) enter into, renew, amend,
supplement, or extend premium financing agreements as necessary, to the extent
that the Debtors determine that such action is in the best interest of the their estates.

4.      Notwithstanding anything to the contrary in the Premium Financing Agreements,

the Debtors' filing of these chapter 11 cases shall not constitute a default under the Premium

Financing Agreements.

5.      The banks and financial institutions on which checks were drawn or electronic

payment requests made in payment of the prepetition obligations approved herein are authorized

to receive, process, honor, and pay all such checks and electronic payment requests when

presented for payment, whether such checks or other requests were submitted prior to, or after,

the Petition Date, *provided* that the Debtors have sufficient funds on deposit in the applicable

bank accounts to cover such payments, and all such banks and financial institutions are authorized

to rely on the Debtors' designation of any particular check or electronic payment request as

approved by this Order without any duty of further inquiry and without liability for following the

Debtor's instructions.

6.      Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

7.      Nothing herein alters or amends the terms and conditions of any of the Insurance Policies or relieves the Debtors of any of their obligations under the Insurance Policies.

8.      The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

9.      Notwithstanding the relief granted in this Order, any payment made or to be made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with any interim or final orders entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility and any budget or cash flow forecasts in connection therewith and/or authorizing the Debtors' use of cash collateral and any budget or cash flow forecasts in connection therewith (in either case, the "DIP Order").  To the extent there is any inconsistency between the terms of the DIP Order and any action taken or proposed to be taken hereunder, the terms of the DIP Order shall control.

10.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

11.      The Debtors shall serve this Order in accordance with all applicable rules and shall file a certificate of service evidencing compliance with this requirement.

12.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

13.      The Debtors are authorized to take all reasonable actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

14.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

SO ORDERED.

Copies to Default List.

## **Exhibit B**

**Insurance Policies**

| | Type of Policy | Insurance Issuer | Policy Number | Policy Term | Approximate Annual Gross Premium |
|---|---|---|---|---|---|
| 1. | Property Insurance | Lloyd's (Beazley Led) | PN301440N | 12/15/2019 - 12/15/2020 | $19,669,942[i] |
| 2. | | Markel Bermuda | BMBP110912N | 12/15/2019 - 12/15/2020 | |
| 3. | | Liberty Bermuda | BMBP110911N | 12/15/2019 - 12/15/2020 | |
| 4. | | Arch Bermuda | BMBP110916N | 12/15/2019 - 12/15/2020 | |
| 5. | | RSUI Indemnity | NHT910901 | 12/15/2019 - 12/15/2020 | |
| 6. | | OCIL Bermuda | BMBP110914N | 12/15/2019 - 12/15/2020 | |
| 7. | | Argo Bermuda | BMBP110913N | 12/15/2019 - 12/15/2020 | |
| 8. | | AWAC Bermuda | BMBP110915N | 12/15/2019 - 12/15/2020 | |
| 9. | | Lloyd's (Amtrust) | PN301500N | 12/15/2019 - 12/15/2020 | |
| 10. | | Axis USA | ECF727237-19 | 12/15/2019 - 12/15/2020 | |
| 11. | | HIIG | PRO440293 | 12/15/2019 - 12/15/2020 | |
| 12. | | Starr Surplus Lines Insurance Company | EPR N14337945 | 12/15/2019 - 12/15/2020 | |
| 13. | | NOA | PN306460N | 12/15/2019 - 12/15/2020 | |
| 14. | | RSUI Indemnity | NHT910903 | 12/15/2019 - 12/15/2020 | |
| 15. | | Lloyd's (Markel Led) | KA304650N | 12/15/2019 - 12/15/2020 | |
| 16. | Commercial General Liability | Certain Underwriters at Lloyds Apollo Liability Consortium | PC304000N | 06/01/2019 - 06/01/2020 | $347,784[ii] |
| 17. | Commercial General Liability | Underwriters at Lloyds, London | PC304004N | 06/01/2019 - 06/01/2020 | $71,379[iii] |
| 18. | Pollution Liability | Ironshore Specialty Insurance Company | 002043405 | 06/01/2019 - 06/01/2020 | $1,267,859[iv] |
| 19. | $10,000,000 Umbrella over Primary | Certain Underwriters at Lloyd's Apollo Liability Consortium/ Hiscox | PC304001N | 06/01/2019 - 06/01/2020 | $2,096,325[v] |
| 20. | Excess Liability $5mil xs $10mil | Lexington Insurance Company | 023627440 | 06/01/2019 - 06/01/2020 | $675,229[vi] |
| 21. | Excess Liability $10mil xs $15mil | Certain Underwriters at Lloyds Apollo Liability Consortium/ Amtrust Casualty Consortium | PC304002N | 06/01/2019 - 06/01/2020 | $462,000[vii] |

[i] Approximately $1,231,644 is related to the Debtors' coverage under the Insurance Policies.

[ii] Approximately $15,253 is related to the Debtors' coverage under the Insurance Policies.

[iii] Approximately $3,131 is related to the Debtors' coverage under the Insurance Policies.

[iv] Approximately $25,154 is related to the Debtors' coverage under the Insurance Policies.

[v] Approximately $143,424 is related to the Debtors' coverage under the Insurance Policies.

[vi] Approximately $46,197 is related to the Debtors' coverage under the Insurance Policies.

[vii] Approximately $31,609 is related to the Debtors' coverage under the Insurance Policies.

| | Type of Policy | Insurance Issuer | Policy Number | Policy Term | Approximate Annual Gross Premium |
|---|---|---|---|---|---|
| 22. | Excess Liability $25mil xs $25mil | Ironshore Specialty Insurance Company | 001682306 | 06/01/2019 - 06/01/2020 | $535,500[viii] |
| 23. | Excess Liability $25mil xs $50mil | Starr Surplus Lines Insurance Company | 1000030750191 | 06/01/2019 - 06/01/2020 | $294,000[ix] |
| 24. | Automobile Liability | Travelers Indemnity Company | P8108K952696-IND-19 | 06/01/2019 - 06/01/2020 | $444,607[x] |
| 25. | Aircraft | USAIG | S1HL1-D103 | 05/23/2019 - 05/23/2020 | $59,188 |
| 26. | Fiduciary Liability | Illinois National Insurance Co | 01-478-00-09 | 07/01/2019 - 07/01/2020 | $34,275 |
| 27. | Murray Met Coal Holdings | Rockwood Casualty Insurance Company | WC455863 | 04/29/2019 - 04/29/2020 | $3,790,206 |
| 28. | International Exporters | The Ins Co of the State of PA | WS11013333 | 06/01/2019 - 06/01/2020 | $2,500[xi] |
| 29. | Crime | Continental Insurance Co | 596684319 | 05/05/2019 - 05/05/2020 | $49,500 |
| 30. | Marine General Liability | Ascot Insurance Company | MAPL1910000860-01 | 12/05/2019 - 12/05/2020 | $50,000 |
| 31. | Hull and Machinery incl Collision & Towers Liability | Ascot Insurance Company | MACR1910000859-01 | 12/05/2019 - 12/05/2020 | $515,536 |
| 32. | Protection & Indemnity | West of England | 429995 | 12/05/2019 - 12/05/2020 | $637,000 |
| 33. | COFR | Safe Harbor Pollution | C-16212-19 | 12/05/2019 - 12/05/2020 | $6,300 |
| 34. | Excess Marine $40mil xs $10 mil | Ascot Insurance Company | MAXS1910000861-01 | 12/05/2019 - 12/05/2020 | $75,000 |
| 35. | | Liberty | ATABWTLE001 | 12/05/2019 - 12/05/2020 | |
| 36. | | Atlantic Specialty | B5JH27862 | 12/05/2019 - 12/05/2020 | |
| 37. | | Beazley | V2994E190101 | 12/05/2019 - 12/05/2020 | |
| 38. | Marine Cargo | National Union Fire Ins Co | 0 15912958 | 08/12/2019 - 08/12/2020 | $11,600 |
| 39. | Helicopter | USAIG | SIHL 1-E671 | 12/02/2019 - 12/02/2020 | $61,200 |
| 40. | Special Crime | AIG National Union Fire Ins | 86-342-978 | 08/11/2019 - 08/11/2020 | $6,002 |
| 41. | Breach Response | Underwriters at Lloyds, London | W20307180301 | 09/21/2019 - 09/21/2020 | $36,238 |
| 42. | Hangar and Helipad Building | The Travelers Indemnity Co. | KTK6307330B258 | 03/17/2019 - 03/17/2020 | $11,148 |
| 43. | D&O/EPL/EL-Primary | National Union Fire Ins Co | 01-880-65-22 | 10/13/2019 - 10/13/2026 | $1,500,000 |
| 44. | Excess D&O/EPL/EL-$5M xs $5M | Navigators Insurance Co. | PT18DOL333215 | 10/13/2019 - 10/13/2026 | $1,450,000 |

[viii] Approximately $36,637 is related to the Debtors' coverage under the Insurance Policies.

[ix] Approximately $20,115 is related to the Debtors' coverage under the Insurance Policies.

[x] Approximately $40,713 is related to the Debtors' coverage under the Insurance Policies.

[xi] Approximately $500 is related to the Debtors' coverage under the Insurance Policies.

## **Exhibit C**

**Premium Financing Agreements**



**BankDirect**
CAPITAL FINANCE

150 North Field Drive, Suite 190
Lake Forest, Illinois 60045
Phone 877-226-5456 Fax: 877-226-5297

Quote Number: 1779078.1

**COMMERCIAL INSURANCE PREMIUM FINANCE AND SECURITY AGREEMENT**

THIS COMMERCIAL INSURANCE PREMIUM FINANCE AND SECURITY AGREEMENT (this "Agreement") is between insured named below as borrower and BankDirect Capital Finance, a division of Texas Capital Bank, N.A. ("BankDirect") as lender, concerning the financing of the premium(s) for one or more commercial insurance policies listed in the Schedule of Policies below (the "Loan"). The terms of this Agreement are stated below and on all subsequent pages of this document.

| Insured / Borrower ("Insured") Name & Business Address (as stated in Policy) | Insured's Agent or Broker ("Agent") Name & Business Address |
|---|---|
| Murray Metallurgical Coal Holdings, LLC<br>46226 National Rd<br>Saint Clairsville, OH 43950 | Reschini Agency, Inc.<br>922 Philadelphia St.<br>Indiana, PA 15701 |
| Telephone Number: 740-338-3100        Taxpayer ID #: | Telephone Number: 724-463-5919        Agency Code: 13532 |

### SCHEDULE OF POLICIES (each, a "Policy")

| Policy Prefix and Number | Effective Date of Policy MM/DD/YY | Name & City of Insurance Company and Name & City of General or Policy Issuing Agent or Company Office | Type of Coverage | Policy Subject to Audit (√) | Policy Term in Months Covered | Min Earned Prem % | Days to Cancel | Short Rate (√) | Premium Amounts |
|---|---|---|---|---|---|---|---|---|---|
| 2043405 | 6/1/2019 | Ironshore Specialty Insurance Company<br>R-T Specialty, LLC<br>2465 Kuser Road Suite 202<br>Hamilton, NJ 08690 | PACKAGE | | 12 | 25% | 10 | ✓ | Premium:  $23,956.00<br>Policy Fee:  $0.00<br>Broker Fee:  $0.00<br>Tax/Stamp:  $1,198.00<br>Inspection:  $0.00 |

*Additional Policies are listed on the attached Schedule of Policies*

**TOTAL PREMIUMS** $362,733.00

| TOTAL PREMIUMS | DOWN PAYMENT | UNPAID PREMIUM BALANCE | FLORIDA DOC STAMP TAX Applicable in Florida only | AMOUNT FINANCED Amount of Loan provided to or on behalf of Insured | FINANCE CHARGE The dollar amount of interest the Loan will cost over the term of the Loan | TOTAL OF PAYMENTS Amount of interest and principal which will have been paid on the Loan after making all scheduled Loan payments | ANNUAL PERCENTAGE INTEREST RATE The cost of interest on the Loan as a yearly percentage rate. |
|---|---|---|---|---|---|---|---|
| $362,733.00 | $55,250.00 | $307,483.00 | $0.00 | $307,483.00 | $6,007.00 | $313,490.00 | 4.24% |

| Payment Schedule:<br>The Loan payment schedule will be: | Number of Loan Payments | Amount of Each Loan Payment* | When Loan Payments are Due ("Due Dates") | |
|---|---|---|---|---|
| | | | First Due Date | Subsequent Monthly Due Dates** |
| | 10 | $31,349.00 | 7/5/2019 | 5th |

*Non-payment of the Loan may result in cancellation of any Policy.    **Subsequent payments are due on the same day of each succeeding period until paid in full.

**Prepayment:** Insured may prepay the outstanding principal balance of the Loan in full at any time. If Insured prepays the Loan in full, Insured will receive a refund of the unearned finance charge, calculated according to the Rule of 78's or the actuarial method as provided by applicable law. Minimum refund is $1.

**Security Interest:** Insured assigns and grants a security interest to BankDirect as security for payment of all amounts payable under this Agreement, in all of Insured's right, title and interest in and to each Policy and all amounts which are or may become payable to Insured under or with reference to the Policies including, among other things, any gross unearned premiums, dividend payments, and all payments on account of loss which results in reduction of any unearned premium in accordance with the term(s) of said Policies.

**Delinquency Charge:** Insured agrees to pay a delinquency charge to BankDirect on any payment required to be made by Insured hereunder which is not received by BankDirect within five (5) days of its due date, unless a longer period is specified under applicable law, in which case the delinquency charge will be imposed on any payment not received by BankDirect within this longer period. The delinquency charge will be the lesser of: (1) 5% of the overdue amount; or (2) the maximum delinquency charge allowed by applicable law.

**Cancellation Charge:** If a default results in cancellation of a Policy, Insured agrees to pay a cancellation charge of $25 or the maximum permitted by applicable law.

**IMPORTANT INFORMATION ABOUT YOUR TERRORISM:** To help the Federal government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies the Insured. We will require such information as we deem reasonably necessary to allow us to properly identify you, such as your name, address and Taxpayer ID # (TIN).

| NOTICE TO INSURED: | 1. DO NOT SIGN THIS AGREEMENT UNTIL YOU READ ALL PAGES OF THE AGREEMENT AND FILL IN ANY BLANK SPACES. 2. YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS AGREEMENT. 3. YOU UNDERSTAND AND HAVE RECEIVED A COPY OF THIS AGREEMENT, KEEP IT TO PROTECT YOUR LEGAL RIGHTS. 4. UNDER THE LAW, YOU HAVE THE RIGHT TO PAY OFF IN ADVANCE THE FULL AMOUNT DUE AND UNDER CERTAIN CONDITIONS TO OBTAIN A PARTIAL REFUND OF THE FINANCE CHARGE. 5. SEE ADDITIONAL PAGES FOR IMPORTANT INFORMATION. |
|---|---|

**REPRESENTATIONS AND WARRANTIES:**
The undersigned Agent and Insured have read the Representations and Warranties on page two of this document, make all such representations and warranties and understand that BankDirect will rely on all such representations and warranties in determining whether or not to accept this Agreement, and agree to be bound by the terms of this Agreement. Insured further acknowledges that upon satisfactory completion of the Agreement, the undersigned Agent may receive a fee from BankDirect for the origination and administration of this Agreement as allowed by applicable law.

All Insureds must sign as named in Policies. If corporation, authorized officers must sign; if partnership, partner must sign as such; signatory acting in representative capacity represents that has authorized this transaction and has authorized signatory to receive all notices hereunder. By signing below Insured agrees to make all payments required by this Agreement and to be bound by all provisions of this Agreement, including those on page two. Insured is not required to enter into an insurance premium financing arrangement as a condition to the purchase of any insurance policy.

_(signature)_ Karen Williams
(Signature of Agent)

CSA                          6/25/19
(Title)                      (Date)

_(signature)_ _____
(Signature of Insured)

Robert D. Moore        06/24/19
(Printed Name & Title)          (Date)
Vice President

BANKDIRECT 1 040114 -DS

Name of Insured: Murray Metallurgical Coal Holdings, LLC

Insured (jointly and severally if more than one) agrees as follows:

**1. Promise to Pay.** In consideration of the payment by BankDirect of the Amount Financed, Insured agrees to pay the Down Payment to the insurance company(ies) listed in the Schedule of Policies, and Insured agrees to pay to the order of BankDirect all of the principal amount of the Loan, all interest thereon and all other amounts payable by Insured hereunder in accordance with the Payment Schedule and the other terms of this Agreement.

**2. Representations and Warranties.** Insured represents and warrants that: (a) the Policies are in full force and effect; (b) the proceeds of the Loan are to be used to purchase insurance for business or commercial purposes; (c) all information provided herein or in connection with this Agreement is true, correct, complete and not misleading; (d) Insured has no indebtedness to the insurers issuing the Policies; (e) Insured is not insolvent nor presently the subject of any insolvency proceeding; and (f) the person signing this Agreement on behalf of Insured is authorized to do so.

**3. Power of Attorney.** Insured hereby irrevocably appoints BankDirect as Attorney-in-Fact with full power of substitution and full authority upon the occurrence of an Event of Default (defined below) to (i) effect cancellation of the Policies, (ii) receive any unearned premium or other amounts with respect to the Policies assigned as security herein, (iii) sign any check or draft issued therefore in Insured's name and to direct the insurance companies to make said check or draft payable to BankDirect and (iv) sign any other instrument or document in the name of and on behalf of Insured to effectuate the purposes of this Agreement. Insured agrees that this appointment and authority cannot be revoked and is coupled with an interest and will terminate only after Insured's obligations under this Agreement are paid in full. Insured agrees that proof of mailing any notice hereunder constitutes proof of receipt of such notice.

**4. Payments Received after Notice of Cancellation.** Insured agrees that any payments made and accepted after a Notice of Cancellation has been sent to any insurance company do not constitute reinstatement or obligate BankDirect to request reinstatement of such insurance Policy(ies), and Insured acknowledges that BankDirect has no authority or duty to reinstate coverage, and that such payments may be applied to Insured's obligations hereunder or under any other agreement with BankDirect, and any such payments will not affect BankDirect's rights or remedies under this Agreement.

**5. Assignments.** Insured agrees not to assign any rights, interests or obligations under any Policy or this Agreement without the prior written consent of BankDirect, except that BankDirect's consent is not required for the rights or interests of mortgagees and loss payees. BankDirect may assign its rights and interests under this Agreement without Insured's consent, and all rights and interests conferred upon BankDirect under this Agreement shall inure to BankDirect's successors and assigns.

**6. Insufficient Funds (NSF) Fees.** If an Insured's check or electronic funding is dishonored for any reason, Insured agrees to pay BankDirect a fee equal to $25 or the maximum amount permitted by applicable law.

**7. Default.** An Event of Default occurs when: (a) Insured does not pay any installment according to the terms of this Agreement or any other agreement; (b) Insured fails to comply with any of the terms of this Agreement; (c) any of the Policies are canceled for any reason; (d) Insured or its insurance companies are insolvent or involved in a bankruptcy or similar proceeding as a debtor; (e) premiums increase under any of the Policies and Insured fails to pay such increased premiums within thirty (30) days of the notification; or (f) Insured is in default under any other agreement with BankDirect.

**8. Rights Upon Default.** If an Event of Default occurs, BankDirect may at its option pursue any and all rights and remedies available, including but not limited to, the following: demand and receive immediate payment of the Loan and any other unpaid amounts due under this Agreement regardless of whether BankDirect has received any refund of unearned premium. BankDirect may take all necessary actions to enforce payment of any unpaid amounts due hereunder. To the extent not prohibited or limited by applicable law, BankDirect is entitled to collection costs and expenses paid or incurred by BankDirect as a result of or in connection with enforcing its rights and remedies under this Agreement and applicable law and to reasonable attorneys' fees if this Agreement is referred to an attorney who is not a salaried employee of BankDirect for collection or enforcement. BankDirect may cancel any or all of the Policies and collect any unearned premiums or other amounts payable under said Policies. Unearned premiums shall be payable to BankDirect only.

**9. Right of Offset.** BankDirect may offset and deduct from any amounts BankDirect owes to Insured with respect to any Policies financed hereunder, any amounts which Insured owes to BankDirect under this Agreement or any other agreement to the extent permitted by applicable law.

Total Premiums: $362,733.00

**10. Finance Charge.** The Finance Charge includes interest on the outstanding principal amount of the Loan. The Finance Charge is computed using a 365-day year. Interest on the Loan shall accrue from the Effective Date of this Agreement or the earliest policy effective date indicated in the Schedule of Policies, whichever is earlier, and continue to accrue until the Loan is paid in full. If BankDirect terminates this Agreement after an Event of Default, Insured will pay interest on the outstanding principal balance of the Loan at the maximum rate permitted under applicable law from the date of such termination until Insured pays the Loan and all other amounts due under this Agreement in full.

**11. Additional Premiums.** Insured agrees to promptly pay to each applicable insurance company any additional premiums due on any Policy.

**12. Agent.** Agent is not the agent of BankDirect and Agent cannot bind BankDirect in any way. BankDirect is not Agent of any insurer and is not liable for any acts or omissions of any insurer. Agent is the agent of Insured, and Insured acknowledges that it has chosen to do business with Agent and the insurance companies issuing the Policies, and that the insolvency, fraud, defalcation or other action or failure to act by any of them shall not relieve or diminish Insured's obligations to BankDirect hereunder.

**13. Corrections.** Except if prohibited by applicable law, BankDirect may correct any errors or omissions in this Agreement and if not known or corrected at the time of signature by or for Insured.

**14. Force or Effect.** This Agreement shall have no force or effect until accepted in writing by BankDirect.

**15. Limitation of Liability: Claims Against BankDirect. Neither BANKDIRECT nor its assignee shall be liable for any loss or damage to the Insured by reason of failure of any insurance company to issue or maintain in force any of the Policies or by reason of the exercise by BANKDIRECT or its assignee of the rights conferred herein, including but not limited to BANKDIRECT's exercise of the right of cancellation, except in the event of willful or intentional misconduct by BANKDIRECT.**

**16. Governing Law.** This Agreement is governed by and construed and interpreted in accordance with the laws of the state where BankDirect accepts this Agreement. BankDirect shall, at its option, prosecute any action to enforce its rights and remedies hereunder in the Circuit Court of Cook County, Illinois, and Insured (i) irrevocably waives any objection to such venue and (ii) will honor any order issued by or judgment enforced in such court.

**17. Miscellaneous.** All rights and remedies in this Agreement are cumulative and not exclusive. If any provision of this Agreement is determined to be invalid or unenforceable under applicable law, the remaining provisions of this Agreement shall continue to be in full force and effect. This Agreement constitutes the entire agreement between BankDirect and Insured with respect to its subject matter and may not be modified except as agreed upon in writing. BankDirect's acceptance of late or partial payments shall not be deemed a waiver by BankDirect of any provisions of this Agreement, and BankDirect is entitled to require Insured to strictly comply with the terms hereof. If any amount contracted for or received by BankDirect hereunder is determined to violate any applicable law, BankDirect may return such prohibited amount to Insured without any further liability therefor or in respect thereof to the fullest extent permitted by law. Any electronic signature or electronic record may be used in the formation of this Agreement, and the signatures of Insured and Agent and the record of this Agreement may be in electronic form (as those terms are used in the Uniform Electronic Transactions Act). A photocopy, a facsimile or other paper or electronic record of this Agreement shall have the same legal effect as a manually signed copy.

**18. CALIFORNIA RESIDENTS: FOR INFORMATION CONTACT THE DEPARTMENT OF CORPORATIONS, STATE OF CALIFORNIA.**

Insured agrees that, in accordance with Section 18608 of the California Financial Code, BankDirect's liability to Insured upon the exercise of BankDirect's authority to cancel the Policies shall be limited to the amount of the principal balance of this loan, except in the event of BankDirect's willful failure to mail the notice of cancellation required under California law.

New York Residents: No charges imposed for obtaining and servicing the financed policies, pursuant to Section 2119 (formerly 129) of the New York Insurance Laws, are financed hereunder unless specified in the Schedule of Policies.

**In connection with the Policies scheduled herein, Agent represents and warrants to BankDirect and its successors and assigns that:**

**1. Payment.** Agent shall remit all funds received from BankDirect and Insured promptly to the insurance company(ies) issuing the financed policy(ies). Agent shall segregate and hold all payments received by it from Insured or any insurance company listed in the Schedule of Policies with respect to the Loan or this Agreement in trust for BankDirect, shall have no right or interest in any such payments and shall immediately deliver all such payments to BankDirect for application to Insured's obligations hereunder.

**2. Signatures Genuine.** Insured's signature on both pages of this Agreement is genuine and authorized.

**3. Authorization By Insured.** If this Agreement has been signed by Agent on behalf of Insured, Agent has been fully authorized to sign this Agreement on behalf of Insured and Insured has authorized this transaction. Agent has given Insured a complete copy of this Agreement.

**4. Authority of Agent.** For each Policy, Agent signing this Agreement is either the authorized policy-issuing agent of the issuing insurance company(ies) or the broker placing the coverage directly with the issuing insurance company(ies), except as indicated on the Schedule of Policies. The person signing this Agreement on behalf of Agent is authorized to do so. Agent is neither authorized to receive any payments from Insured under this Agreement nor to make any representations to Insured for or on behalf of BankDirect.

**5. Not Agent of BankDirect.** Agent is not an agent of BankDirect and is not authorized to bind BankDirect and has not made any representation to the contrary.

**6. Recognition of Assignment.** Agent recognizes the security interest granted in this Agreement, whereby Insured assigns to BankDirect all unearned premiums, dividends and certain loss payments. Upon cancelation of any of the Policies, Agent agrees to pay BankDirect all unearned commissions and unearned premiums upon receipt. If such funds are not remitted to BankDirect within ten (10) days of receipt by Agent, Agent agrees to pay BankDirect interest on such funds at the maximum rate permitted under applicable law. Agent shall not deduct any amounts which Insured owes to Agent from any amounts owing to BankDirect hereunder.

**7. Down Payment.** The down payment and any other payments due from Insured which Agent has agreed to collect, have been collected from Insured.

**8. Policies:** (a) are all cancelable by standard short-rate or pro-rata tables; (b) are not audit or reporting form policies or policies subject to retrospective rating, unless so indicated on the Schedule of Policies in this Agreement, and if so indicated, the deposit premiums are not less than the anticipated premiums to be earned for the full term of the Policies; (c) upon cancellation by Insured or BankDirect, do not require advance notice of cancellation to any party, other than any notice required to be given by BankDirect; (d) are in full force and effect and the premiums indicated are correct for the term of the Policies; (e) have not been financed on an installment payment plan provided by the insurance company(ies); (f) are all cancelable policies; (g) are written for a term of at least one year; (h) are not for personal, family or household purposes; and (i) have no exceptions other than those indicated and comply with BankDirect's eligibility requirements. All information in this Agreement pertaining to the Policies is complete and correct.

**9. Insured:** (a) has not paid for the Policies other than as described in this Agreement; (b) has received a copy of this Agreement; and (c) is not the subject of any proceeding in bankruptcy, receivership or insolvency, or if Insured is the subject of such a proceeding, it is noted on the Agreement in the space in which Insured's name and address is placed. All information in this Agreement pertaining to Insured is complete and correct.

**10. Miscellaneous.** Agent agrees to indemnify and pay BankDirect for and hold BankDirect harmless from and against any losses, costs, damages, fees and expenses (including reasonable attorneys' fees, court costs and collection costs) paid or incurred by BankDirect or its assignee as a result of or in connection with any untrue or misleading representation or warranty made by Agent hereunder, any breach by Agent of this Agreement, any error committed by Agent in completing or failing to complete any portion of this Agreement, or any violation by Agent of any applicable law. Agent shall promptly notify BankDirect of any unpaid increased premiums for the Policies. This Agreement is a valid and enforceable agreement between BankDirect and Agent and there are no defenses to it.

Name of Insured: Murray Metallurgical Coal Holding Total Premiums: $362,733.00

## Schedule of Policies

| POLICY PREFIX AND NUMBER | EFFECTIVE DATE OF POLICY MM/DD/YY | NAME & CITY OF INSURANCE COMPANY AND NAME & CITY OF GENERAL AGENT OR COMPANY OFFICE | TYPE OF COVERAGE | POLICIES SUBJECT TO AUDIT (✓) | TERM IN MONTHS COVERED | MIN EARNED PREM | DAYS TO CANCEL | SHORT RATE (✓) | PREMIUM AMOUNTS | |
|---|---|---|---|---|---|---|---|---|---|---|
| PC304000n | 6/1/2019 | Apollo Consortium ED Broking LLP 150 North Field Drive Suite 190 Lake Forest, IL 60045 | GENERAL LIABILITY | | 12 | 0% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $14,527.00 $0.00 $0.00 $726.00 $0.00 |
| PC304004n | 6/1/2019 | Underwriters Lloyds London(IL) ED Broking LLP 150 North Field Drive Suite 190 Lake Forest, IL 60045 | GENERAL LIABILITY | | 12 | 0% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $3,131.00 $0.00 $0.00 $0.00 $0.00 |
| PC304001n | 6/1/2019 | Apollo Consortium ED Broking LLP 150 North Field Drive Suite 190 Lake Forest, IL 60045 | UMBRELLA | | 12 | 0% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $136,594.00 $0.00 $0.00 $6,830.00 $0.00 |
| | 6/1/2019 | Lexington Insurance Company Risk Specialist Company of Ohio 1300 E 9th Street Suite 1400 Cleveland, OH 44114 | EXCESS LIABILITY | | 12 | 25% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $43,997.00 $0.00 $0.00 $2,200.00 $0.00 |
| PC304002n | 6/1/2019 | Apollo Consortium ED Broking LLP 150 North Field Drive Suite 190 Lake Forest, IL 60045 | EXCESS LIABILITY | | 12 | 0% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $30,104.00 $0.00 $0.00 $1,505.00 $0.00 |
| EXAH8L118 | 6/1/2019 | Ironshore Specialty Insurance Company R-T Specialty LLC Prudential Plaza 180 N. Stetson Ave. STE #4600 Chicago, IL 60601 | EXCESS LIABILITY | | 12 | 25% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $34,892.00 $0.00 $0.00 $1,745.00 $0.00 |
| 10000307501 91 | 6/1/2019 | Starr Surplus Lines Insurance Company 399 Park Ave 8th Fl New York, NY 10022 | EXCESS LIABILITY | | 12 | 25% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $19,157.00 $0.00 $0.00 $958.00 $0.00 |
| P 810-8K95269 | 6/1/2019 | Travelers Indemnity Company One Tower Square Hartford, CT 06183 | BAP | | 12 | 0% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $40,290.00 $0.00 $0.00 $423.00 $0.00 |
| WS11013333 | 6/1/2019 | Insurance Company of the State of PA 175 Water Street, 18th Floor New York, NY 10038 | INTERNATIONAL | | 12 | 100% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $500.00 $0.00 $0.00 $0.00 $0.00 |
| | | | | | | | | | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | |
| | | | | | | | | PAGE 3 TOTALS | | $337,579.00 |



**BankDirect**
CAPITAL FINANCE

150 North Field Drive, Suite 190
Lake Forest, Illinois 60045
Phone 877-226-5456  Fax: 877-226-5297

Quote Number: 1881370.1

**COMMERCIAL INSURANCE PREMIUM
FINANCE AND SECURITY AGREEMENT**

THIS COMMERCIAL INSURANCE PREMIUM FINANCE AND SECURITY AGREEMENT (this "Agreement") is between Insured named below as borrower and BankDirect Capital Finance, a division of Texas Capital Bank, N.A. ("BankDirect") as lender, concerning the financing of the premium(s) for one or more commercial insurance policies listed in the Schedule of Policies below (the "Loan"). The terms of this Agreement are stated below and on all subsequent pages of this document.

| **Insured / Borrower** ("Insured") Name & Business Address (as stated in Policy) | **Insured's Agent or Broker** ("Agent") Name & Business Address |
|---|---|
| Murray Metallurgical Coal Holdings, LLC<br>46226 National Rd<br>Saint Clairsville, OH 43950 | Reschini Agency, Inc.<br>922 Philadelphia St.<br>Indiana, PA 15701 |
| Telephone Number: 740-338-3100    Taxpayer ID #: | Telephone Number: 724-463-5919    Agency Code: 13532 |

### SCHEDULE OF POLICIES (each, a "Policy")

| Policy Prefix and Number | Effective Date of Policy MM/DD/YY | Name & City of Insurance Company and Name & City of General or Policy Issuing Agent or Company Office | Type of Coverage | Policy Subject to Audit (√) | Policy Term in Months Covered | Min Earned Prem % | Days to Cancel | Short Rate (√) | Premium Amounts |
|---|---|---|---|---|---|---|---|---|---|
| PN301440N | 12/15/2019 | Beazley Insurance Company Inc<br>ED Broking LLP<br>150 North Field Drive Suite 190<br>Lake Forest, IL 60045 | Property | | 12 | 0% | 10 | √ | Premium: $436,632.63<br>Policy Fee: $0.00<br>Broker Fee: $0.00<br>Tax/Stamp: $21,831.63<br>Inspection: $0.00 |

*Additional Policies are listed on the attached Schedule of Policies*

| | **TOTAL PREMIUMS** | | | | | | | | $1,231,644.34 |

| TOTAL PREMIUMS | DOWN PAYMENT | UNPAID PREMIUM BALANCE | FLORIDA DOC STAMP TAX Applicable in Florida only | AMOUNT FINANCED Amount of Loan provided to or on behalf of Insured | FINANCE CHARGE The dollar amount of interest the Loan will cost over the term of the Loan | TOTAL OF PAYMENTS Amount of interest and principal which will have been paid on the Loan after making all scheduled Loan payments | ANNUAL PERCENTAGE INTEREST RATE The cost of interest on the Loan as a yearly percentage rate. |
|---|---|---|---|---|---|---|---|
| $1,231,644.34 | $312,081.65 | $919,562.69 | $0.00 | $919,562.69 | $17,289.16 | $936,851.85 | 4.49% |

| **Payment Schedule:** The Loan payment schedule will be: | Number of Loan Payments | Amount of Each Loan Payment* | When Loan Payments are Due ("Due Dates") | |
|---|---|---|---|---|
| | | | First Due Date | Subsequent Monthly Due Dates** |
| | 9 | $104,094.65 | 1/10/2020 | 10th |

*Non-payment of the Loan may result in cancellation of any Policy.  **Subsequent payments are due on the same day of each succeeding period until paid in full.

**Prepayment:** Insured may prepay the outstanding principal balance of the Loan in full at any time. If Insured prepays the Loan in full, Insured will receive a refund of the unearned finance charge, calculated according to the Rule of 78's or the actuarial method as provided by applicable law. Minimum refund is $1.

**Security Interest:** Insured assigns and grants a security interest to BankDirect as security for payment of all amounts payable under this Agreement, in all of Insured's right, title and interest in and to each Policy and all amounts which are or may become payable to Insured under or with reference to the Policies including, among other things, any gross unearned premiums, dividend payments, and all payments on account of loss which results in reduction of any unearned premium in accordance with the term(s) of said Policies.

**Delinquency Charge:** Insured agrees to pay a delinquency charge to BankDirect on any payment required to be made by Insured hereunder which is not received by BankDirect within five (5) days of its due date, unless a longer period is specified under applicable law, in which case the delinquency charge will be imposed on any payment not received by BankDirect within this longer period. The delinquency charge will be the lesser of: (1) 5% of the overdue amount; or (2) the maximum delinquency charge allowed by applicable law.

**Cancellation Charge:** If a default results in cancellation of a Policy, Insured agrees to pay a cancellation charge of $25 or the maximum amount permitted by applicable law.

**IMPORTANT INFORMATION ABOUT YOUR LOAN:** To help the Federal government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies the Insured. We will require such information as we deem reasonably necessary to allow us to properly identify you, such as your name, address and Taxpayer ID # (TIN).

NOTICE TO INSURED:
1. DO NOT SIGN THIS AGREEMENT UNTIL YOU READ ALL PAGES OF THE AGREEMENT AND FILL IN ANY BLANK SPACES. 2. YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS AGREEMENT. 3. YOU UNDERSTAND AND HAVE RECEIVED A COPY OF THIS AGREEMENT, KEEP IT TO PROTECT YOUR LEGAL RIGHTS. 4. UNDER THE LAW, YOU HAVE THE RIGHT TO PAY OFF IN ADVANCE THE FULL AMOUNT DUE AND UNDER CERTAIN CONDITIONS TO OBTAIN A PARTIAL REFUND OF THE FINANCE CHARGE. 5. SEE ADDITIONAL PAGES FOR IMPORTANT INFORMATION.

**REPRESENTATIONS AND WARRANTIES:**
The undersigned Agent and Insured have read the Representations and Warranties on page two of this document, make all such representations and warranties and understand that BankDirect will rely on all such representations and warranties in determining whether or not to accept this Agreement, and agree to be bound by the terms of this Agreement. Insured further acknowledges that upon satisfactory completion of the Agreement, the undersigned Agent may receive a fee from BankDirect for the origination and adminstration of this Agreement as allowed by applicable law.

All Insureds must sign in Policies. If corporation, authorized officers must sign; if partnership, partner must sign as such; signatory acting in representative capacity represents that has authorized this transaction and has authorized signatory to receive all notices hereunder. By signing below Insured agrees to make all payments required by this Agreement and to be bound by all provisions of this Agreement, including those on page two. Insured is not required to enter into an insurance premium financing arrangement as a condition to the purchase of any insurance policy.

(Signature of Agent)

(Title)    President    (Date)  1/6/2020

(Signature of Insured)

(Printed Name & Title)  Robert D. Moore    (Date)  1/6/2020
Vice President

BANKDIRECT 1 040114 -DS

**Name of Insured:** Murray Metallurgical Coal Holdings, LLC

**Total Premiums:** $1,231,644.34

Insured (jointly and severally if more than one) agrees as follows:

**1. Promise to Pay.** In consideration of the payment by BankDirect of the Amount Financed, Insured agrees to pay the Down Payment to the insurance company(ies) listed in the Schedule of Policies, and Insured agrees to pay to the order of BankDirect all of the principal amount of the Loan, all interest thereon and all other amounts payable by Insured hereunder in accordance with the Payment Schedule and the other terms of this Agreement.

**2. Representations and Warranties.** Insured represents and warrants that: (a) the Policies are in full force and effect; (b) the proceeds of the Loan are to be used to purchase insurance for business or commercial purposes; (c) all information provided herein or in connection with this Agreement is true, correct, complete and not misleading; (d) Insured has no indebtedness to the insurers issuing the Policies; (e) Insured is not insolvent nor presently the subject of any insolvency proceeding; and (f) the person signing this Agreement on behalf of Insured is authorized to do so.

**3. Power of Attorney.** Insured hereby irrevocably appoints BankDirect as Attorney-in-Fact with full power of substitution and full authority upon the occurrence of an Event of Default (defined below) to (i) effect cancellation of the Policies, (ii) receive any unearned premium or other amounts with respect to the Policies assigned as security herein, (iii) sign any check or draft issued therefore in Insured's name and to direct the insurance companies to make said check or draft payable to BankDirect and (iv) sign any other instrument or document in the name of and on behalf of Insured to effectuate the purposes of this Agreement. Insured agrees that this appointment and authority cannot be revoked and is coupled with an interest and will terminate only after Insured's obligations under this Agreement are paid in full. Insured agrees that proof of mailing any notice hereunder constitutes proof of receipt of such notice.

**4. Payments Received after Notice of Cancellation.** Insured agrees that any payments made and accepted after a Notice of Cancellation has been sent to any insurance company do not constitute reinstatement or obligate BankDirect to request reinstatement of such insurance Policy(ies), and Insured acknowledges that BankDirect has no authority or duty to reinstate coverage, and that such payments may be applied to Insured's obligations hereunder or under any other agreement with BankDirect, and any such payments will not affect BankDirect's rights or remedies under this Agreement.

**5. Assignments.** Insured agrees not to assign any rights, interests or obligations under any Policy or this Agreement without the prior written consent of BankDirect, except that BankDirect's consent is not required for the rights or interests of mortgagees and loss payees. BankDirect may assign its rights and interests under this Agreement without Insured's consent, and all rights and interests conferred upon BankDirect under this Agreement shall inure to BankDirect's successors and assigns.

**6. Insufficient Funds (NSF) Fees.** If an Insured's check or electronic funding is dishonored for any reason, Insured agrees to pay BankDirect a fee equal to $25 or the maximum amount permitted by applicable law.

**7. Default.** An Event of Default occurs when: (a) Insured does not pay any installment according to the terms of this Agreement or any other agreement; (b) Insured fails to comply with any of the terms of the Agreement; (c) any of the Policies are cancelled for any reason; (d) Insured or its insurance companies are insolvent or involved in a bankruptcy or similar proceeding as a debtor; (e) premiums increase under any of the Policies and Insured fails to pay such increased premiums within thirty (30) days of the notification; or (f) Insured is in default under any other agreement with BankDirect.

**8. Rights Upon Default.** If an Event of Default occurs, BankDirect may at its option pursue any and all rights and remedies available, including but not limited to, the following: demand and receive immediate payment of the Loan and any other unpaid amounts due under this Agreement regardless of whether BankDirect has received any refund of unearned premium. BankDirect may take all necessary actions to enforce payment of any unpaid amounts due hereunder. To the extent not prohibited or limited by applicable law, BankDirect is entitled to collection costs and expenses paid or incurred by BankDirect as a result of or in connection with enforcing its rights and remedies under this Agreement and applicable law and to reasonable attorneys' fees if this Agreement is referred to an attorney who is not a salaried employee of BankDirect for collection or enforcement. BankDirect may cancel any or all of the Policies and collect any unearned premiums or other amounts payable under said Policies. Unearned premiums shall be payable to BankDirect only.

**9. Right of Offset.** BankDirect may offset and deduct from any amounts BankDirect owes to Insured with respect to any Policies financed hereunder, any amounts which Insured owes to BankDirect under this Agreement or any other agreement to the extent permitted by applicable law.

**10. Finance Charge.** The Finance Charge includes interest on the outstanding principal amount of the Loan. The Finance Charge is computed using a 365-day year. Interest on the Loan shall accrue from the Effective Date of this Agreement or the earliest policy effective date indicated in the Schedule of Policies, whichever is earlier, and continue to accrue until the Loan is paid in full. If BankDirect terminates this Agreement after an Event of Default, Insured will pay interest on the outstanding principal balance of the Loan at the maximum rate permitted under applicable law from the date of such termination until Insured pays the Loan and all other amounts due under this Agreement in full.

**11. Additional Premiums.** Insured agrees to promptly pay to each applicable insurance company any additional premiums due on any Policy.

**12. Agent.** Agent is not the agent of BankDirect and Agent cannot bind BankDirect in any way. BankDirect is not Agent of any insurer and is not liable for any acts or omissions of any insurer. Agent is the agent of Insured, and Insured acknowledges that it has chosen to do business with Agent and the insurance companies issuing the Policies, and that the insolvency, fraud, defalcation or other action or failure to act by any of them shall not relieve or diminish Insured's obligations to BankDirect hereunder.

**13. Corrections.** Except if prohibited by applicable law, BankDirect may correct any errors or omissions in this Agreement and if not known or corrected at the time of signature by or for Insured.

**14. Force or Effect.** This Agreement shall have no force or effect until accepted in writing by BankDirect.

**15. Limitation of Liability: Claims Against BankDirect.** Neither BANKDIRECT nor its assignee shall be liable for any loss or damage to the Insured by reason of failure of any insurance company to issue or maintain in force any of the Policies or by reason of the exercise by BANKDIRECT or its assignee of the rights conferred herein, including but not limited to BANKDIRECT's exercise of the right of cancellation, except in the event of willful or intentional misconduct by BANKDIRECT.

**16. Governing Law.** This Agreement is governed by and construed and interpreted in accordance with the laws of the state where BankDirect accepts this Agreement. BankDirect shall, at its option, prosecute any action to enforce its rights and remedies hereunder in the Circuit Court of Cook County, Illinois, and Insured (i) irrevocably waives any objection to such venue and (ii) will honor any order issued by or judgment enforced in such court.

**17. Miscellaneous.** All rights and remedies in this Agreement are cumulative and not exclusive. If any provision of this Agreement is determined to be invalid or unenforceable under applicable law, the remaining provisions of this Agreement shall continue to be in full force and effect. This Agreement constitutes the entire agreement between BankDirect and Insured with respect to its subject matter and may not be modified except as agreed upon in writing. BankDirect's acceptance of late or partial payments shall not be deemed a waiver by BankDirect of any provisions of this Agreement, and BankDirect is entitled to require Insured to strictly comply with the terms hereof. If any amount contracted for or received by BankDirect hereunder is determined to violate any applicable law, BankDirect may return such prohibited amount to Insured without any further liability therefor or in respect thereof to the fullest extent permitted by law. Any electronic signature or electronic record may be used in the formation of this Agreement, and the signatures of Insured and Agent and the record of this Agreement may be in electronic form (as those terms are used in the Uniform Electronic Transactions Act). A photocopy, a facsimile or other paper or electronic record of this Agreement shall have the same legal effect as a manually signed copy.

**18. CALIFORNIA RESIDENTS: FOR INFORMATION CONTACT THE DEPARTMENT OF CORPORATIONS, STATE OF CALIFORNIA.**

Insured agrees that, in accordance with Section 18608 of the California Financial Code, BankDirect's liability to Insured upon the exercise of BankDirect's authority to cancel the Policies shall be limited to the amount of the principal balance of this loan, except in the event of BankDirect's willful failure to mail the notice of cancellation required under California law.

**New York Residents:** No charges imposed for obtaining and servicing the financed policies, pursuant to Section 2119 (formerly 129) of the New York Insurance Laws, are financed hereunder unless specified in the Schedule of Policies.

---

**In connection with the Policies scheduled herein, Agent represents and warrants to BankDirect and its successors and assigns that:**

**1. Payment.** Agent shall remit all funds received from BankDirect and Insured promptly to the insurance company(ies) issuing the financed policy(ies). Agent shall segregate and hold all payments received by it from Insured or any insurance company listed in the Schedule of Policies with respect to the Loan or this Agreement in trust for BankDirect, shall have no right or interest in any such payments and shall immediately deliver all such payments to BankDirect for application to Insured's obligations hereunder.

**2. Signatures Genuine.** Insured's signature on both pages of this Agreement is genuine and authorized.

**3. Authorization By Insured.** If this Agreement has been signed by Agent on behalf of Insured, Agent has been fully authorized to sign this Agreement on behalf of Insured and Insured has authorized this transaction. Agent has given Insured a complete copy of this Agreement.

**4. Authority of Agent.** For each Policy, Agent signing this Agreement is either the authorized policy-issuing agent of the issuing insurance company(ies) or the broker placing the coverage directly with the issuing insurance company(ies), except as indicated on the Schedule of Policies. The person signing this Agreement on behalf of Agent is authorized to do so. Agent is neither authorized to receive any payments from Insured under this Agreement nor to make any representations to Insured for or on behalf of BankDirect.

**5. Not Agent of BankDirect.** Agent is not an agent of BankDirect and is not authorized to bind BankDirect and has not made any representation to the contrary.

**6. Recognition of Assignment.** Agent recognizes the security interest granted in this Agreement, whereby Insured assigns to BankDirect all unearned premiums, dividends and certain loss payments. Upon cancellation of any of the Policies, Agent agrees to pay BankDirect all unearned commissions and unearned premiums upon receipt. If such funds are not remitted to BankDirect within ten (10) days of receipt by Agent, Agent agrees to pay BankDirect interest on such funds at the maximum rate permitted under applicable law. Agent shall not deduct any amounts which Insured owes to Agent from any amounts owing to BankDirect hereunder.

**7. Down Payment.** The down payment and any other payments due from Insured which Agent has agreed to collect, have been collected from Insured.

**8. Policies:** (a) are all cancelable by standard short-rate or pro-rata tables; (b) are not audit or reporting form policies or policies subject to retrospective rating, unless so indicated on the Schedule of Policies in this Agreement, and if so indicated, the deposit premiums are not less than the anticipated premiums to be earned for the full term of the Policies; (c) upon cancellation by Insured or BankDirect, do not require advance notice of cancellation to any party, other than any notice required to be given by BankDirect; (d) are in full force and effect and the premiums indicated are correct for the term of the Policies; (e) have not been financed on an installment payment plan provided by the insurance company(ies); (f) are all cancelable policies; (g) are written for a term of at least one year; (h) are not for personal, family or household purposes; and (i) have no exceptions other than those indicated and comply with BankDirect's eligibility requirements. All information in this Agreement pertaining to the Policies is complete and correct.

**9. Insured:** (a) has not paid for the Policies other than as described in this Agreement; (b) has received a copy of this Agreement; and (c) is not the subject of any proceeding in bankruptcy, receivership or insolvency, or if Insured is the subject of such a proceeding, it is noted on the Agreement in the space in which Insured's name and address is placed. All information in this Agreement pertaining to Insured is complete and correct.

**10. Miscellaneous.** Agent agrees to indemnify and pay BankDirect for and hold BankDirect harmless from and against any losses, costs, damages, fees and expenses (including reasonable attorneys' fees, court costs and collection costs) paid or incurred by BankDirect or its assignee as a result of or in connection with any untrue or misleading representation or warranty made by Agent hereunder, any breach by Agent of this Agreement, any error committed by Agent in completing or failing to complete any portion of this Agreement, or any violation by Agent of any applicable law. Agent shall promptly notify BankDirect of any unpaid increased premiums for the Policies. This Agreement is a valid and enforceable agreement between BankDirect and Agent and there are no defenses to it.

Name of Insured: Murray Metallurgical Coal Holding Total Premiums: $1,231,644.34

## Schedule of Policies

| POLICY PREFIX AND NUMBER | EFFECTIVE DATE OF POLICY MM/DD/YY | NAME & CITY OF INSURANCE COMPANY AND NAME & CITY OF GENERAL AGENT OR COMPANY OFFICE | TYPE OF COVERAGE | POLICIES SUBJECT TO AUDIT (✓) | TERM IN MONTHS COVERED | MIN EARNED PREM | DAYS TO CANCEL | SHORT RATE (✓) | PREMIUM AMOUNTS | |
|---|---|---|---|---|---|---|---|---|---|---|
| ECF727237-1 9 | 12/15/2019 | AXIS Surplus Insurance Company 11680 Great Oaks Way, Suite 500 Alpharetta, GA 30022 | Property | | 12 | 35% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $49,400.00 $0.00 $0.00 $2,470.00 $0.00 |
| BMBP110912 N | 12/15/2019 | Markel Bermuda Ltd ED Broking LLP 150 North Field Drive Suite 190 Lake Forest, IL 60045 | Property | | 12 | 0% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $16,843.34 $0.00 $0.00 $842.17 $0.00 |
| PN301500N | 12/15/2019 | Lloyds of London ED Broking LLP 150 North Field Drive Suite 190 Lake Forest, IL 60045 | Property | | 12 | 0% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $24,700.00 $0.00 $0.00 $1,235.00 $0.00 |
| BMBP110913 N | 12/15/2019 | Allied World Assurance Company Ltd - AWACBE ED Broking LLP 150 North Field Drive Suite 190 Lake Forest, IL 60045 | Property | | 12 | 0% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $67,437.50 $0.00 $0.00 $3,371.88 $0.00 |
| NHT910903 | 12/15/2019 | RSUI Indemnity Company R-T Specialty LLC Prudential Plaza 180 N. Stetson Ave. STE #4600 Chicago, IL 60601 | Property | | 12 | 20% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $39,000.00 $0.00 $0.00 $0.00 $0.00 |
| EPR N1433794500 — | 12/15/2019 | ACE American Insurance Company R-T Specialty LLC Prudential Plaza 180 N. Stetson Ave. STE #4600 Chicago, IL 60601 | Property | | 12 | 0% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $87,360.00 $0.00 $0.00 $0.00 $0.00 |
| BMBP110916 N | 12/15/2019 | Arch Reinsurance Company ED Broking LLP 150 North Field Drive Suite 190 Lake Forest, IL 60045 | Property | | 12 | 0% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $58,093.75 $2,323.75 $0.00 $2,904.69 $0.00 |
| BMBP110911 N | 12/15/2019 | Liberty Specialty Markets Bermuda Ltd ED Broking LLP 150 North Field Drive Suite 190 Lake Forest, IL 60045 | PROPERTY | | 12 | 0% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $56,875.00 $2,275.00 $0.00 $2,843.75 $0.00 |
| BMBP110914 N | 12/15/2019 | Oil Casualty Insurance, Ltd ED Broking LLP 150 North Field Drive Suite 190 Lake Forest, IL 60045 | Property | | 12 | 0% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $24,050.00 $962.00 $0.00 $1,202.50 $0.00 |
| PN306460N | 12/15/2019 | Lloyds of London ED Broking LLP 150 North Field Drive Suite 190 Lake Forest, IL 60045 | Property | | 12 | 0% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $16,250.00 $0.00 $0.00 $812.50 $0.00 |
| | | | | | | | | PAGE 3 TOTALS | | $773,180.08 |

Name of Insured: Murray Metallurgical Coal Holding Total Premiums: $1,231,644.34

## Schedule of Policies

| POLICY PREFIX AND NUMBER | EFFECTIVE DATE OF POLICY MM/DD/YY | NAME & CITY OF INSURANCE COMPANY AND NAME & CITY OF GENERAL AGENT OR COMPANY OFFICE | TYPE OF COVERAGE | POLICIES SUBJECT TO AUDIT (✓) | TERM IN MONTHS COVERED | MIN EARNED PREM | DAYS TO CANCEL | SHORT RATE (✓) | PREMIUM AMOUNTS | |
|---|---|---|---|---|---|---|---|---|---|---|
| NHT910901 | 12/15/2019 | RSUI Indemnity Company R-T Specialty LLC Prudential Plaza 180 N. Stetson Ave. STE #4600 Chicago, IL 60601 | Property | | 12 | 20% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $37,050.00 $0.00 $0.00 $0.00 $0.00 |
| BMBP110913 N | 12/15/2019 | Argo Re Ltd. - Bermuda ED Broking LLP 150 North Field Drive Suite 190 Lake Forest, IL 60045 | Property | | 12 | 0% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $60,125.00 $0.00 $0.00 $3,006.25 $0.00 |
| PR0440293 | 12/15/2019 | Houston Specialty Insurance Company 800 Gessner Road Suite 600 Houston, TX 77024 | Property | | 12 | 25% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $195,000.00 $0.00 $0.00 $9,750.00 $0.00 |
| KA304650N | 12/15/2019 | Lloyds of London ED Broking LLP 150 North Field Drive Suite 190 Lake Forest, IL 60045 | Terrorism | | 12 | 0% | 10 | ✓ | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | $6,663.00 $0.00 $0.00 $333.00 $0.00 |
| | | | | | | | | | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | |
| | | | | | | | | | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | |
| | | | | | | | | | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | |
| | | | | | | | | | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | |
| | | | | | | | | | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | |
| | | | | | | | | | Premium: Policy Fee: Broker Fee: Tax/Stamp: Inspection: | |
| | | | | | | | | PAGE 3 TOTALS | | $773,180.08 |