**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MURRAY METALLURGICAL COAL | ) | Case No. 20-10390 |
| HOLDINGS, LLC, *et al.*,[1] | ) | |
| | ) | Judge John E. Hoffman Jr. |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING
AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING
ADEQUATE PROTECTION, (IV) AUTHORIZING THE DEBTORS TO ENTER INTO
AND PERFORM UNDER CERTAIN NEW COAL SALE CONTRACTS,
(V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING,
AND (VII) GRANTING RELATED RELIEF**

Murray Metallurgical Coal Holdings, LLC ("Met Holdings"), together with its debtor

subsidiaries (collectively, the "Debtors"), respectfully state as follows in support of this motion:

**Relief Requested**

1.  By this motion, the Debtors seek entry of an interim order

(the "Interim Order"), substantially in the form attached hereto as **Exhibit A**,[2] and a final order

(the "Final Order" together with the Interim Order, the "DIP Orders"):[3]

> a.  authorizing the Debtors to obtain secured postpetition financing on a
> superpriority basis in the aggregate principal amount of up to $68.6 million,
> consisting of two facilities and securing certain obligations under
> designated coal contracts, as follows:

---

[1]  The Debtors in these Chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Murray Metallurgical Coal Holdings, LLC (4633); Murray Eagle Mining, LLC (4268); Murray Alabama Minerals, LLC (4047); Murray Alabama Coal, LLC (3838); Murray Maple Eagle Coal, LLC (4435); and Murray Oak Grove Coal, LLC (4878). The Debtors' primary business address is 46226 National Road, St. Clairsville, OH 43950.

[2]  Capitalized terms used but not defined herein shall have the meanings given to such terms in the First Day Declarations, this motion, the DIP Term Sheets, or in the Interim Order, each as defined herein, as applicable.

[3]  The Debtors intend to file the form of Final Order prior to the Final Hearing (as defined herein).

i. a multi-draw super-priority senior secured priming debtor-in-possession term loan facility by and between Met Holdings, as borrower thereunder, certain prepetition term lenders (the "<u>Senior DIP Lenders</u>"), Javelin Global, as "Secured Designated Coal Contract Counterparty," and the administrative agent party thereto (the "<u>Senior DIP Agent</u>") (such facility, the "<u>Senior DIP Facility</u>" and the claims thereunder, the "<u>Senior DIP Obligations</u>"), consisting of (1) $28.9 million of new money delayed draw loans,  (2) a roll-up of $21.5 million prepetition first out term loan obligations, and (3) a designation of Javelin Global as a "Secured Designated Coal Contract Counterparty" (in such capacity, the "<u>DIP Secured Designated Coal Contract Counterparty</u>") in connection with the Oak Grove Master Coal Agreement, pursuant to the terms and conditions of that certain *Senior Secured Super-Priority Priming Debtor-in-Possession Credit Facility Summary of Principal Terms and Conditions*, substantially in the form attached hereto as **Exhibit B** (the "<u>Senior DIP Term Sheet</u>") and as such Senior DIP Term Sheet may be reduced to definitive documentation (including all schedules and ancillary documents thereto, as may be amended, restated, supplemented, or otherwise modified from time to time, the "<u>Senior DIP Credit Agreement</u>"), and

ii. a multi-draw junior secured debtor-in-possession term loan facility, upon the execution  of a stalking horse purchase agreement in connection with the sale of substantially all the assets of Maple Eagle (the "<u>Maple Eagle Sale Transaction</u>"), by and between Met Holdings, as borrower thereunder, certain prepetition term lenders (the "<u>Junior DIP Lenders</u>" and, together with the Senior DIP Lenders, the "<u>DIP Lenders</u>"), and the administrative agent party thereto (the "<u>Junior DIP Agent</u>" and, together with the Senior DIP Agent, the "<u>DIP Agent</u>") (such facility, the "<u>Junior DIP Facility</u>", the claims thereunder, the "<u>Junior DIP Obligations</u>" and, the Junior DIP Facility together with the Senior DIP Facility, the "<u>DIP Facilities</u>"), consisting of loans in an aggregate principal amount equal to (i) an amount equal to (x) certain costs and expenses of the Chapter 11 Cases that are allocated to Murray Maple Eagle Coal, LLC in the initial Approved ME DIP Budget <u>plus</u> (y) certain amounts to pay for any of Murray Alabama Minerals, LLC's Reclamation costs or liabilities arising during these Chapter 11 Cases <u>plus</u> (z) $5 million to be used in accordance with the initial Approved OG DIP Budget (collectively, in an aggregate amount not to exceed $9.3 million, the "<u>Closing Date Junior DIP Commitments</u>"), <u>plus</u> (ii) upon entry of the earlier of the MEC RSA Order or the Final Order, $5 million (to be used for purposes as set forth in the Approved OG DIP Budget), <u>plus</u> (iii) upon entry of the Final Order, such additional amounts not to exceed $3.3 million as necessary to (a) pay for any of Murray Alabama Minerals, LLC's

additional Reclamation Obligations or liabilities arising during the pendency of these Chapter 11 Cases with respect to Murray Alabama Minerals, LLC and (b) pay for any additional costs or liabilities set forth in the Approved ME DIP Budget from time to time with respect to (x) Maple Eagle that arise prior to or as a result of the consummation of the Maple Eagle Sale Transaction (other than prepetition workers' compensation Obligations of Maple Eagle) or (y) Murray Alabama Minerals, LLC that arise prior to the Effective Date, plus (iv) following entry of the Final Order but no earlier than 60 days after the Petition Date, $600,000 (to be used for purposes as set forth in the Approved OG DIP Budget) (the commitments set forth in the preceding clauses (i) through (iv), collectively, the "Junior DIP Commitments"), all pursuant to the terms and conditions of that certain *Junior Secured Non-Priming Debtor-in-Possession Credit Facility Summary of Principal Terms and Conditions*, substantially in the form attached hereto as **Exhibit C** (the "Junior DIP Term Sheet" and, together with the Senior DIP Term Sheet, the "DIP Term Sheets") and as such Junior DIP Term Sheet may be reduced to definitive documentation (including all schedules and ancillary documents thereto, as may be amended, restated, supplemented, or otherwise modified from time to time, the "Junior DIP Credit Agreement" and, together with the Senior DIP Credit Agreement, the "DIP Credit Agreements");

b.    authorizing the Debtors to execute and deliver the DIP Term Sheets and any other agreements and documents related thereto, including the DIP Credit Agreements (collectively, with the DIP Term Sheets, the "DIP Documents"), and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

c.    subject only to the Carve Out (defined herein), granting an allowed superpriority administrative expense claim status in each of these chapter 11 cases and any successor cases under the DIP Facilities for all Senior DIP Obligations, and all Junior DIP Obligations, and all obligations arising under the Postpetition Javelin Facility (as defined herein);

d.    granting to each of the DIP Agent, on behalf of the applicable DIP Secured Parties, and Javelin Global (including in its capacity as a DIP Secured Designated Coal Contract Counterparty) (collectively the "DIP Parties"), automatically perfected security interests in and liens on the DIP Collateral (as defined below, and including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral")), all unencumbered property, and, upon entry of a Final Order, all claims and causes of action arising under Chapter 5 of the Bankruptcy Code and the proceeds and property recovered therefrom, which liens shall be subject to an intercreditor arrangement and to the Carve Out;

e.      authorizing the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, all to the extent provided in, and in accordance with, the DIP Documents;

f.      authorizing the Debtors to use prepetition collateral and providing adequate protection to the prepetition lenders and Javelin Global for any diminution in value of their respective interests in the prepetition collateral, including the Cash Collateral, resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the prepetition collateral, including Cash Collateral, and/or the priming of their respective interests in the prepetition collateral, including the Cash Collateral (including by the Carve Out) ("Diminution in Value");

g.      subject to entry of the Final Order, approving the waiver of all claims under section 506(c) of the Bankruptcy Code against the Senior DIP Agent or the Senior DIP Lenders (and, subject to entry of the Final Order, the Prepetition Secured Parties (defined herein) or Javelin Global, including in its capacity as a Secured Designated Coal Contract Counterparty under the Prepetition Term Loan Credit Agreement), the Prepetition Secured Parties shall be entitled to all rights and benefits of section 552(b) of the Bankruptcy Code, and that the "equities of the case" exception shall not apply to such persons or to the prepetition debt and liabilities;

h.      authorizing (i) the Debtors to enter into, perform under, and/or amend the Postpetition Javelin Facility (defined below), a postpetition prepaid coal sale arrangement between certain Debtors and Javelin Global, (ii) a postpetition coal sale arrangement between certain Debtors and Javelin Global, pursuant to which Javelin Global shall continue as the exclusive offtaker, (iii) a postpetition marketing arrangement between certain Debtors and Javelin Global, and (iv) a designation of Javelin Global as a "Secured Designated Coal Contract Counterparty" under the Senior DIP Credit Agreement;

i.      vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents, the Postpetition Javelin Facility, and the Interim Order;

j.      scheduling of a final hearing (the "Final Hearing") within 25 days of the Petition Date to consider the relief requested herein and approving the form of notice with respect to the Final Hearing; and

k.      granting related relief.

2.      In support of this motion, the Debtors submit the declaration of Gregory Berube, a Senior Managing Director of Evercore Group L.L.C. ("Evercore"), the Debtors' proposed investment banker, attached hereto as **Exhibit D** (the "Berube Declaration"), and the declarations of Robert Moore, the Debtors' President, Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer (the "Moore Declaration"), and Amy Lee, a Senior Director at Alvarez & Marsal North America, LLC, the Debtors' proposed restructuring advisor (the "Lee Declaration," together with the Moore Declaration and Berube Declaration, the "First Day Declarations"), filed contemporaneously herewith.

## Jurisdiction and Venue

3.      The United States Bankruptcy Court for the Southern District of Ohio (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *General Order 30-3* from the United States Bankruptcy Court for the Southern District of Ohio, dated December 4, 2019 (the "General Order"). The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, Rules 4001-2, 4001-3, 7004-1, and 9013-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Ohio (the "Local Rules"), and the General Order.

**Background**

6.     The Debtors are engaged in the mining and production of metallurgical coal. Unlike thermal coal, which is primarily used by the electric utility industry to generate electricity, metallurgical coal is used to produce coke, which is an integral component of steel production.

7.     The Debtors primarily own and operate two active coal mining complexes and other assets in Alabama and West Virginia.  The larger of the two mining complexes, the Oak Grove Mine ("Oak Grove"), is an underground longwall mine located in Alabama.  The other mining complex, known as the Maple Eagle No. 1 Mine ("Maple Eagle" and together with Oak Grove, the "Mining Complexes"), is an underground continuous mining and surface mining complex located in West Virginia.[4]  To preserve liquidity, the Maple Eagle mine has been in a "hot idle"[5] state since September.  The Oak Grove mine has been in a "hot idle" state since November.  The Debtors have been engaged in a marketing process to sell Maple Eagle for several months.

8.     Each of the Debtors is an unrestricted subsidiary of Murray Energy Corporation ("Murray Energy"), which, along with Javelin Investment Holdings LLC ("Javelin"), acquired the mines and other assets of the Debtors from Mission Coal Company, LLC ("Mission") in April 2019 (the "Met Acquisition").  At the time of the Met Acquisition, Mission was a debtor in its own chapter 11 cases pending in the United States Bankruptcy Court for the Northern District of Alabama.[6]

9.     In connection with the Met Acquisition, on April 29, 2019, Met Holdings entered into the Prepetition Term Loan Credit Agreement, which governs, among other things, a secured term credit facility (the "Take-Back Facility") among Met Holdings, as borrower, its subsidiaries

---

[4] The Debtors own a third mine, known as the North River Mine, in Alabama ("North River").

[5] A mine that is in a "hot idle" state means that it is being temporarily idled and maintained in anticipation of returning to operation in the near future.

[6] The Mission bankruptcy cases are still pending.

(the "Met Subs"), as guarantors, Wilmington Savings Fund Society, FSB, as administrative agent, and any additional lenders from time to time party thereto.  The Take-Back Facility matures on April 29, 2023, and is secured by substantially all of the Debtors' assets.

10.     In addition, on April 29, 2019, Met Holdings entered into a Management Services Agreement (the "Management Services Agreement") with Murray Energy pursuant to which Murray Energy manages, administers, and oversees all aspects of the operation of the Mining Complexes, including without limitation, the day-to-day operation, maintenance, and business of the Mining Complexes.

11.     Approximately six months after the Met Acquisition, on October 29, 2019, Murray Energy and its affiliated debtors and debtors in possession (the "MEC Debtors") filed voluntary chapter 11 petitions in the Bankruptcy Court for the Southern District of Ohio (the "MEC Chapter 11 Cases").  The MEC Chapter 11 Cases are being jointly administered under Case No. 19-56885. Significantly, none of the Debtors are debtors in the MEC Chapter 11 Cases.

12.     There are a number of differences between these chapter 11 cases and the MEC Chapter 11 Cases, which warrant keeping them separated from the MEC Chapter 11 Cases, including: (i) none of the Debtors are borrowers or guarantors on the debtor in possession financing obligations in the MEC Chapter 11 Cases; (ii) the Debtors are primarily engaged in mining, extraction, and processing of metallurgical coal, whereas the MEC Debtors are primarily engaged in the mining, extraction, and processing of thermal coal, and each of these commodities is subject to different market pressures; (iii) the lenders to the Debtors under the Take-Back Facility are different from the lenders to the MEC Debtors; and (iv) as a result of the Take-Back Facility and other claims against the assets of the Debtors (including obligations to Javelin Global Commodities (UK) LTD ("Javelin Global")), there was perceived to be little to no equity value in the Debtors

that would flow up to the MEC Debtors, although there was a belief that the Debtors could survive as a going concern without the need for a chapter 11 filing.

13.     Commencing on February 11, 2020 (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b), and have filed their Notice of Election of Complex Chapter 11 Cases.

14.     The Debtors commenced these chapter 11 cases after extensive negotiations with their major stakeholders concerning a global resolution to the Debtors' financial difficulties.  In an effort to ensure that value is maximized for all stakeholders and that the Debtors' remediation obligations are honored at each of their Mining Complexes, these chapter 11 cases have been commenced with a three-pronged strategy that has the support of the Take-Back Facility lenders, Javelin Global, Javelin, and Murray Energy.  First, the Debtors intend to facilitate the consensual sale of substantially all of the assets of Maple Eagle pursuant to Bankruptcy Code section 363.  Second, the Debtors intend to effectuate a reorganization of their remaining operations, which is premised on the continued and future operation of the Oak Grove mining complex, through a sale of Oak Grove pursuant to a plan.  And third, the Debtors intend to ensure that they can continue to comply with their reclamation obligations at the North River mining complex.  These three elements have been memorialized in a Restructuring Support Agreement among Met Holdings, Murray Energy, the Take-Back Facility lenders, and Javelin Global, all as more fully set forth in the Moore Declaration.

**Preliminary Statement**

15.    The Debtors are in urgent need of liquidity. As of the Petition Date, the Debtors

lack the financial wherewithal to fund their operations. The Debtors have managed their cash to

retain sufficient liquidity to maintain their Mining Complexes while the Debtors considered all

options to maximize value for their stakeholders. Now, to resume mining at Oak Grove, facilitate

a sale of Maple Eagle, continue reclamation activities at North River, and fund the administration

of these chapter 11 cases, the Debtors urgently require new money financing. Together with the

liquidity to be provided through the Postpetition Javelin Facility, such new money financing, in

the form of the proposed DIP Facilities, will serve as a cornerstone of the Debtors' restructuring

strategy. Proceeds of the proposed DIP Facilities will be used to honor employee wages and

benefits, procure goods and services integral to the Debtors' mining operations, fund operational

expenses, pay administrative expenses, and allow the Debtors to maintain positive relationships

with all stakeholders. The proposed DIP Facilities send a clear signal to the market that the Debtors

have sufficient funding to resume mining operations at Oak Grove, to sell Maple Eagle, and to

continue reclamation activities at North River.

16.    By this motion, the Debtors seek approval of the DIP Facilities in the aggregate

amount of $68.6 million, that provides for (a) a Senior DIP Facility in an aggregate principal

amount, with respect to the Senior DIP Loans, not to exceed $50.4 million, consisting of (i) $28.9

million of new money term loans,  (ii) approximately $21.5 million of "rolled" prepetition first out

term loan obligations, and (iii) a designation of Javelin Global as a "Secured Designated Coal

Contract Counterparty" in connection with the Oak Grove Master Coal Agreement and (b) upon

the execution of a stalking horse purchase agreement in connection with the sale of Maple Eagle,

a Junior DIP Facility, consisting of up to $18.2 million of new money term loans which includes

amounts necessary to fund certain costs, expenses and liabilities of  Maple Eagle and Debtor Murray Alabama Minerals, LLC arising during these chapter 11 cases.

17.     The DIP Facilities demonstrate substantial support provided to the Debtors by their prepetition lenders notwithstanding the volatility of existing coal markets. More specifically, certain of the Debtors' prepetition term loan lenders negotiated both the new money $47.1 million DIP Facilities and a restructuring support agreement (the "Restructuring Support Agreement") with the Debtors. The lenders party to the Restructuring Support Agreement have committed to provide the full amount of the DIP Facilities. This committed financing is critical to the Debtors' ability to avoid irreparable harm and to stabilize their business for the benefit of all of their stakeholders. Moreover, the Restructuring Support Agreement provides the Debtors with a path to emergence upon the completion of the chapter 11 cases, and provides a platform pursuant to which the Debtors hope to achieve consensus.

18.     In exchange for these significant benefits, the Debtors have made certain commitments under the DIP Facilities. These commitments include the rollup of the prepetition bridge loan facility, the encumbrance of the Debtors' unencumbered assets (including, upon entry of a final order, avoidance actions), and the payment of certain fees and expenses to the DIP Lenders. Under the circumstances described above and herein, these commitments are justified by the facts and circumstances of these cases.

19.     The Debtors' advisors conducted a marketing process for third-party DIP financing proposals by contacting 18 parties. Despite this outreach, follow-up calls, and provision of marketing materials to prospective lenders, no third parties submitted an actionable indication of interest to provide alternative DIP financing. Accordingly, the DIP Facilities, which provide the

cash needed to execute the "Restructuring" contemplated by the Restructuring Support Agreement, represents the only and best postpetition financing the Debtors could obtain.

20.     For these reasons, and for the reasons set forth below, in the Berube Declaration, and in the First Day Declarations, the Debtors firmly believe that approval of the DIP Facilities will avoid irreparable harm to operations (through immediate access to funding under the Interim Order), will maximize the value of the Debtors' estates for the benefit of their respective stakeholders, and is a sound exercise of the Debtors' business judgment. Accordingly, the Debtors respectfully request that the Court approve the entry of the Interim Order and Final Order.

### **Concise Statement Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2**[7]

21.     The chart below contains a summary of the material terms of the proposed DIP Facilities, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

| Applicable Rule | Summary of Material Terms |
| --- | --- |
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Murray Metallurgical Coal Holdings, LLC, as a debtor and debtor-in-possession in Chapter 11 Cases is the Borrower under both the Senior and Junior DIP Facilities.<br><br>*See* Senior DIP Term Sheet at 1; Interim Order at preamble<br><br>*See* Junior DIP Term Sheet at 36 |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | All existing and future direct and indirect subsidiaries of the Borrower and any additional Person required to become a "Guarantor" is a Guarantor under both the Senior and Junior DIP Facilities.<br><br>*See* Senior DIP Term Sheet at 1; Interim Order at ¶ (1)(a)<br><br>*See* Junior DIP Term Sheet at 36; Interim Order at ¶ (1)(d) |
| **Agents**<br>Bankruptcy Rule 4001(c)(1)(B) | Wilmington Savings Fund Society, FSB will act as administrative agent and collateral agent for both the Senior and Junior DIP Lenders. |

---

[7]  The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in the following summary chart but not otherwise defined have the meanings given to them in the DIP Term Sheets or the Interim Order, as applicable.

| Applicable Rule | Summary of Material Terms |
|---|---|
| | *See* Senior DIP Term Sheet at 2–3; Interim Order at ¶ (1)(a)

*See* Junior DIP Term Sheet at 36; Interim Order at ¶ (1)(d) |
| **DIP Lenders**
Bankruptcy Rule 4001(c)(1)(B) | Senior DIP Facility: MC Southwork, LLC and (solely with respect to the Senior DIP Roll Up Loans) Murray Energy.

*See* Senior DIP Term Sheet at 3

Junior DIP Facility: Murray Energy.

*See* Junior DIP Term Sheet at 36 |
| **DIP Secured Designated Coal Contract Counterparty**
Bankruptcy Rule 4001(c)(1)(B) | Senior DIP Facility:  Javelin Global.

*See* Senior DIP Term Sheet at 3; Interim Order at ¶ (1)(b) |
| **Reporting Information**
Bankruptcy Rule 4001(c)(1)(B) | Each week following the second week after the Petition Date (a "Variance Report Date"), the Debtors shall deliver to the Senior DIP Agent and the Senior DIP Lenders (and their advisors) a variance report setting forth, in reasonable detail, any differences between disbursements (broken out between disbursements in respect of (i) "First and Second Day Motion Payments" and (ii) all other disbursements on an aggregate basis) (for the avoidance of doubt, excluding any professional fees (except for UCC professional fees)) for the Testing Period versus projected corresponding disbursements set forth in the Approved OG DIP Budget for such Testing Period (such difference with respect to each line item, a "Line-Item Variance") and on a cumulative basis for the period from the Petition Date to the latest week prior to the Variance Report Date (it being understood that the fourth Senior DIP Variance Report to be delivered (and every Senior DIP Variance Report thereafter) shall also set forth, in reasonable detail, any differences between aggregate receipts for the Testing Period versus projected aggregate receipts set forth in the Approved OG DIP Budget for such Testing Period and on a cumulative basis for the period from the Petition Date to the latest week prior to the Variance Report Date). In addition, there shall be a weekly teleconference among the Debtors, Javelin Global, and the Senior DIP Lenders.  The reporting procedures under the Junior DIP Facility will be substantially the same other than the requirement to test the aggregate receipts for the Testing Period, but with respect to the documents and parties under the Junior DIP Facility.

*See* Senior DIP Term Sheet at 9; Interim Order at ¶¶ 12, 17

*See* Junior DIP Term Sheet at 41 |
| **Term**
Bankruptcy Rule 4001(b)(1)(B)(iii), 4001(c)(1)(B) | Senior DIP Facility: The earliest of: (a) the six month anniversary of the Closing Date (the "Maturity Date"); (b) the date that is thirty-three (33) calendar days after the Petition Date if the Final Order hasn't been entered; (c) the date of consummation of any sale of all or substantially all of the assets of any of the Debtors pursuant to section 363 of the Bankruptcy Code (other than in respect of the Maple Eagle Sale Transaction); (d) the date of acceleration of the Senior DIP Loans, DIP Secured Designated Coal Contract Obligations and the termination of the Senior DIP Commitments upon the occurrence of an Event of Default (as defined below); and (e) the substantial consummation or effective date of any chapter 11 plan. |

| Applicable Rule | Summary of Material Terms |
|---|---|
|  | *See* Senior DIP Term Sheet at 6; Interim Order at ¶ 19(a)

Junior DIP Facility: The earliest of: (a) the Maturity Date; (b) the date that is thirty-three (33) calendar days after the Petition Date if the Final Order has not been entered; (c) the date of acceleration of the Junior DIP Loans and the termination of the Junior DIP Commitments upon the occurrence of an Event of Default; and (d) the substantial consummation or effective date of any chapter 11 plan.

*See* Junior DIP Term Sheet at 39; Interim Order at ¶ 19(a) |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B) | Senior DIP Facility: A multi-draw super-priority senior secured priming debtor-in-possession term loan facility consisting of (1) new money delayed-draw term loans not to exceed $28.9 million and (2) term loans in an aggregate principal amount equal to the total amount of all First Out Term Loan Obligations outstanding on the Petition Date, which such term loans will be deemed to be advanced and shall roll up the Prepetition First Out Term Loan Obligations (the "Senior DIP Roll Up Loans"), and (3) a designation of Javelin Global as a "Secured Designated Coal Contract Counterparty" in connection with the Oak Grove Master Coal Agreement. Once repaid or prepaid, no portion of the Senior DIP Loans may be reborrowed.

During the Interim Period, subject to certain conditions, a portion of the Senior DIP Commitments shall be available to the Borrower on the Closing Date as follows: (a) 50% of the aggregate Prepetition First Out Term Loan Obligations shall be deemed advanced as Senior DIP Roll Up Loans and (b) the Senior DIP Lenders shall fund into the Senior DIP Disbursement Account, in one draw Senior DIP New Money Loans in an aggregate principal amount not to exceed $16.4 million.   Upon the Court's entry of the Final Order, the balance of the Senior DIP Commitments shall be available to the Borrower as follows: (a) 50% of the Prepetition First Out Term Loan Obligations shall be deemed advanced as Senior DIP Roll Up Loans; and (b) the Senior DIP Lenders shall fund into the Senior DIP Disbursement Account, in one draw the remaining amount of the Senior DIP New Money Loans.

*See* Senior DIP Term Sheet at 4–5; Interim Order at ¶ (1)(a)

Junior DIP Facility: A multi-draw junior secured non-priming debtor-in-possession term loan facility in an aggregate principal amount equal to (i) an amount equal to (x) certain costs and expenses of the Chapter 11 Cases that are allocated to Murray Maple Eagle Coal, LLC in the initial Approved ME DIP Budget plus (y) certain amounts to pay for any of Murray Alabama Minerals, LLC's Reclamation costs or liabilities arising during the Chapter 11 Cases plus (z) $5 million to be used in accordance with the initial Approved OG DIP Budget (collectively, in an aggregate amount not to exceed $9.3 million, the "Closing Date Junior DIP Commitments"), plus (ii) upon entry of the earlier of the MEC RSA Order or the Final Order, $5 million (to be used for purposes as set forth in the Approved OG DIP Budget), plus (iii) upon entry of the Final Order, such additional amounts not to exceed $3.3 million as necessary to (a) pay for any of Murray Alabama Minerals, LLC's additional Reclamation Obligations or liabilities arising during the pendency of the Chapter 11 Cases with respect to Murray Alabama Minerals, LLC and (c) pay for any additional costs or liabilities set forth in the Approved ME DIP Budget from time to time with respect to (x) Maple Eagle that arise prior to or as a result of the consummation of the Maple Eagle Sale Transaction (other than prepetition workers' compensation Obligations of Maple Eagle) or (y) Murray Alabama Minerals, LLC that arise prior to the Effective Date, plus (iv) following entry of the Final Order but no earlier than 60 days after the Petition Date, $600,000 (to be used for purposes as set forth in the |

| Applicable Rule | Summary of Material Terms |
|---|---|
| | Approved OG DIP Budget). Once repaid or prepaid, no portion of the Junior DIP Loans may be reborrowed.<br><br>During the Interim Period, subject to the satisfaction or waiver by the Required Junior DIP Lenders (as defined below) of the applicable conditions precedent set forth on Annex A of the Junior DIP Term Sheet, a portion of the Junior DIP Commitments shall be available (the "Interim Availability") to the Borrower on the Closing Date (as defined below), in one draw (the "Initial Junior DIP Loan") in an aggregate principal amount equal to the Closing Date Junior DIP Commitments. Commencing on the Final Order Entry Date, subject to the satisfaction or waiver by the Required Junior DIP Lenders of the applicable conditions precedent set forth on Annex A of the Junior DIP Term Sheet (and receipt by the Junior DIP Agent of a customary borrowing notice), the remaining Junior DIP Commitments shall be available to the Borrower in one or more draws (but not more than one draw for any two week period), in an aggregate principal amount, with respect to each such draw, that Borrower determines is reasonably necessary to fund one or more Permitted Uses for the succeeding two-week period<br><br>*See* Junior DIP Term Sheet at 37; Interim Order at ¶ (1)(d) |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | Customary conditions for financings of this type.<br><br>*See* Senior DIP Term Sheet at **Annex A**; Interim Order at ¶ F(iv)<br><br>*See* Junior DIP Term Sheet at **Annex A** |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Senior DIP Facility</u>: 14.5% prior to an Event of Default, and an additional 2.00% during the continuance of an Event of Default<br><br>*See* Senior DIP Term Sheet at 6<br><br><u>Junior DIP Facility</u>:  16.5 % prior to an Event of Default, and an additional 2.00% during the continuance of an Event of Default.<br><br>*See* Junior DIP Term Sheet at 39 |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | <u>Senior DIP Facility</u>: Subject to customary carve outs, Javelin Global and the Prepetition Term Agent shall receive (1) replacement liens in all DIP Collateral, (2) superpriority administrative expense claims, and (3) the reimbursement of the reasonable and documented postpetition fees and expenses of counsel, in each case subject to the relative priorities set forth in the Intercreditor Annex.<br><br>To the extent that less than 50% of the aggregate amount of the Prepetition First Out Term Loan Obligations are repaid with the proceeds of the Senior DIP Facility upon entry of an interim order approving such facility as set forth above (such unpaid amounts, the "Interim Order Unrolled Prepetition First Out Term Loan Obligations"), on the effective date of any chapter 11 plan, the holders of the remaining Prepetition First Out Term Loan Obligation shall receive, as "adequate protection," a payment, in cash, equal to 5.0% of the aggregate amount of such Interim Order Unrolled Prepetition First Out Term Loan Obligations, which payment shall be in addition to any other adequate protection provided thereon (the  "Interim Order Adequate Protection Payment"). |

| Applicable Rule | Summary of Material Terms |
|---|---|
| | To the extent not all of the Interim Order Unrolled Prepetition First Out Term Loan Obligations are repaid with the proceeds of the Senior DIP Facility upon entry of a final order approving such facility as set forth above (such unpaid amounts, the "Final Order Unrolled Prepetition First Out Term Loan Obligations"), on the effective date of any chapter 11 plan, the holders of the Prepetition First Out Term Loan Obligations shall receive, as "adequate protection," a payment, in cash, equal to 10.0% of the aggregate amount of such Final Order Unrolled Prepetition First Out Term Loan Obligations, which payment shall be in addition to any other adequate protection provided thereon and shall be credited against and reduced by the Interim Order Adequate Protection Payment, if any. <br><br> *See* Senior DIP Term Sheet at 25–26; Interim Order at ¶ F(vi), 10 <br><br> <u>Junior DIP Facility</u>: None <br><br> *See* Junior DIP Term Sheet at 44 |
| **Budget** <br> Bankruptcy Rule 4001 (c)(1)(B) | <u>Senior DIP Facility</u>: The Debtors will prepare and deliver to the DIP Lenders, a thirteen week cash flow forecast with respect to Oak Grove, in form and substance acceptable to the Required Senior DIP Lenders (the "<u>Initial OG DIP Budget</u>"), setting forth the specified line-items and cumulative receipts and operating disbursements (including all necessary and required expenses which the Debtors expect to incur and anticipated uses of proceeds of draws under the Senior DIP Facility, the Junior DIP Facility and any other post-petition financing arrangements) on a weekly basis for the period beginning as of the week of the Petition Date through and including the thirteenth week after such week, as such cash flow forecast may be modified, amended, or supplemented from time to time, with the prior written consent of the Required Senior DIP Lenders in their discretion. <br><br> *See* Senior DIP Term Sheet at 8; Interim Order at ¶ 12 <br><br> <u>Junior DIP Facility</u>: The Debtors will prepare and deliver a thirteen week cash flow forecast with respect to Maple Eagle and North River, in form and substance acceptable to the Required Junior DIP Lenders (the "<u>Initial ME DIP Budget</u>"), setting forth the specified line-items and cumulative receipts and operating disbursements (including all necessary and required expenses which the Debtors expect to incur and anticipated uses of proceeds of draws under the Junior DIP Facility and any other post-petition financing arrangements) on a weekly basis for the period beginning as of the week of the Petition Date through and including the thirteenth week after such week, as such cash flow forecast may be modified, amended, or supplemented from time to time, with the prior written consent of the Required Junior DIP Lenders in their discretion. <br><br> *See* Junior DIP Term Sheet at 40; Interim Order at ¶ 12 |
| **Variance Covenant** <br> Bankruptcy Rule 4001(c)(l)(B) | <u>Senior DIP Facility</u>: The Debtors shall not permit (i) aggregate Line-Item Variance for disbursements to exceed 15.0% for any prior trailing two week period and to exceed 10.0% for any prior trailing four week period and (ii) commencing with the fourth Senior DIP Variance Report to be delivered, aggregate Line-Item Variance for receipts to be less than 15.0% for any prior trailing two week period and to exceed 10.0% for any prior trailing four week period. <br><br> *See* Senior DIP Term Sheet at 10; Interim Order at ¶ 8, 12 |

15

| Applicable Rule | Summary of Material Terms |
|---|---|
| | Junior DIP Facility: The Debtors shall not permit any Line-Item Variance for disbursements to exceed 15.0% for any prior trailing two week period and to exceed 10.0% for any prior trailing four week period.<br><br>*See* Junior DIP Term Sheet at 41; Interim Order at ¶ 8, 12 |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | Customary events of default for financings of this type.<br><br>*See* Senior DIP Term Sheet at 19–25; Interim Order at ¶ 19, 21<br><br>*See* Junior DIP Term Sheet at 44; Interim Order at ¶ 19, 21 |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix)<br><br>Local Rule 4001-2(b)(2)(K) | Indemnification and expense reimbursement provisions ordinary and customary for financings of this type.<br><br>*See* Senior DIP Term Sheet at 27; Interim Order at ¶ 24<br><br>*See* Junior DIP Term Sheet at 45; Interim Order at ¶ 24 |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | The following prepetition secured parties have an interest in Cash Collateral:<br>- Prepetition Term Loan Lenders and Prepetition Term Loan Agent<br>- Javelin Global<br><br>*See* Interim Order ¶ D(a) |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(b)(2)(C) | The Interim Order provides a Carve Out of (i) court and U.S. Trustee fees, (ii) trustee fees up to $20,000, (iii) allowed professional fees of the Debtors, and allowed fees of any official committee of unsecured creditors appointed in the chapter 11 cases subject to the DIP Budget, capped upon the happening of certain events.<br><br>*See* Senior DIP Term Sheet at 13–15; Interim Order at ¶ 26<br><br>*See* Junior DIP Term Sheet at 42 |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | Upfront Option Fee: The Senior DIP Lenders shall receive from the Debtors a nonrefundable upfront option payment equal to 4.00% of the aggregate principal amount of the Senior DIP Commitments;<br><br>*See* Senior DIP Term Sheet at 6–7; Interim Order at ¶ 2(d)(3)<br><br>Agency Fee: an agency fee to the Senior DIP Agent and to the Junior DIP Agent on the Closing Date each in the amount agreed-to by the Debtors and the DIP Agent.<br><br>*See* Senior DIP Term Sheet at 7; Junior DIP Term Sheet at 39; Interim Order at ¶ 2(d)(3) |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B)(x)<br><br>Local Rule 4001-2(b)(2)(C) | Senior DIP Facility: The DIP Orders shall (i) provide that in no event shall the Senior DIP Agent, the DIP Secured Designated Coal Contract Counterparty, or the Senior DIP Lenders (and, subject to entry of the Final Order, the Prepetition Secured Parties or Javelin Global) be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, as applicable, and (ii) approve the waiver of all claims under section 506(c) of the Bankruptcy Code against the Senior DIP Agent, the DIP Secured Designated Coal Contract Counterparty, or the Senior DIP Lenders (and, subject to entry of the Final Order, the Prepetition Secured Parties). The DIP Orders shall also provide |

| Applicable Rule | Summary of Material Terms |
|---|---|
| **Section 552(b)** Bankruptcy Rule 4001(c)(l)(B) | that, subject to entry of the Final Order, the Prepetition Secured Parties and Javelin Global shall be entitled to all rights and benefits of section 552(b) of the Bankruptcy Code, and that the "equities of the case" exception shall not apply to such persons or to the Prepetition Debt.<br><br>*See* Senior DIP Term Sheet at 26; Interim Order at ¶ 29, 30<br><br>Junior DIP Facility: As set forth in the Senior DIP Term Sheet.<br><br>*See* Junior DIP Term Sheet at 44; Interim Order at ¶ 29, 30 |
| **Stipulations to Prepetition Liens and Claims** Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-2(b)(2)(C) | The DIP Loan Documents and the Interim Order shall contain a stipulation and waiver by the Debtors (subject to a challenge period acceptable in form and substance to the Required Senior DIP Lenders), as to the enforceability of the Prepetition Debt, and the validity, priority and perfection of all liens securing the Prepetition Debt.<br><br>*See* Senior DIP Term Sheet at 28; Interim Order at ¶ D<br><br>*See* Junior DIP Term Sheet at 45; Interim Order at ¶ D |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(1)(B)(i)<br><br>Local Rule 4001-2(b)(2)(D) | Obligations under the Senior DIP Facility are secured by valid, binding, enforceable, non-avoidable, and automatically and fully and properly perfected liens on and security interests in (i) the Unencumbered Property, subject to relative rank and priority set forth in the Intercreditor Annex , and (ii) the DIP Collateral, with the liens on DIP Collateral (x) junior only to (a) the Carve-Out and  (b) valid, unavoidable, enforceable, and properly perfected liens or security interests on DIP Collateral solely to the extent such liens are permitted to be senior to the DIP Liens pursuant to the DIP Orders and (iii) the liens and security interests in favor of the Junior DIP Agent on behalf of the Junior DIP Lenders on the Junior DIP Facility Priority Collateral and the liens and security interests in favor of Javelin on the Working Capital Priority Collateral (as defined in the Intercreditor Annex), (y) have the relative rank and priority set forth in the Intercreditor Annex and (z) rank senior to any and all other liens on and security interests in all DIP Collateral.<br><br>*See* Senior DIP Term Sheet at 11–12; Interim Order at ¶ 6, Exhibit 1<br><br>Obligations under the Junior DIP Facility are secured by the DIP Collateral, with the priority described in the Intercreditor Annex.<br><br>*See* Junior DIP Term Sheet at 42; Interim Order at ¶ 6, Exhibit 1<br><br>"DIP Collateral" means all assets and property (real and personal), wherever located, whether now owned by or owing to, or hereafter acquired by, or arising in favor of the Borrower and the Guarantors that are Debtors, including, after entry of the Final Order, all claims and causes of action under Chapter 5 of the Bankruptcy Code and the proceeds thereof.<br><br>*See* Senior DIP Term Sheet at 11–12; Interim Order at ¶ 6(d) |

17

| Applicable Rule | Summary of Material Terms |
|---|---|
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii)<br><br>Local Rule 4001-2(b)(2)(J) | Milestones:<br><br>(a) commence the Chapter 11 Cases in the Bankruptcy Court with respect to each of the Debtors and file the First Day Motions no later than February 11, 2020 (the date of commencement of the Chapter 11 Cases, the "Petition Date");<br><br>(b) file the DIP Motion, the Bidding Procedures Motion and the RSA Motion with the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than one (1) calendar day after the Petition Date);<br><br>(c) obtain entry of the Interim DIP Order by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than four (4) calendar days after the Petition Date);<br><br>(d) obtain entry of the Final DIP Order, the Bidding Procedures Order, the RSA Order and the MEC RSA Order by the Bankruptcy Court (and the Court overseeing the MEC chapter 11 cases) as soon as reasonably practicable after the Petition Date (but in no event later than thirty-three (33) calendar days after the Petition Date);<br><br>(e) file the Approved Plan, the disclosure statement in respect of the Approved Plan (the "Disclosure Statement"), and the motion for approval of the Disclosure Statement and the Solicitation procedures with the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than thirty-three (33) calendar days after the Petition Date);<br><br>(f) cause the Bid Deadline to occur as soon as reasonably practicable after the applicable Bidding Procedures Order is entered (but in no event later than sixty-three (63) calendar days after the Petition Date);<br><br>(g) cause the Auction to occur as soon as reasonably practicable after the applicable Bidding Procedures Order is entered (but in no event later than sixty-eight (68) calendar days after the Petition Date);<br><br>(h) obtain entry of the Disclosure Statement Order by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than sixty-eight (68) calendar days after the Petition Date);<br><br>(i) obtain entry of the Sale Order by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than seventy-three (73) calendar days after the Petition Date);<br><br>(j) cause the Maple Eagle Sale Transaction to be consummated as soon as reasonably practicable after the applicable Sale Order is entered (but in no event later than fourteen (14) calendar days after the applicable Sale Order is entered);<br><br>(k) obtain entry of (i) the Confirmation Order and (ii) an order approving the New First Lien Term Loans (which may be the Confirmation Order), in each case by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than one hundred and three (103) calendar days after the Petition Date); and<br><br>(l) cause the Effective Date to occur as soon as reasonably practicable after the Petition Date (but in no event later than one hundred and thirty-three (133) calendar days after the Petition Date; provided that such date may be extended by up to thirty (30) days, at the discretion of the Requisite Parties, solely to the extent that any regulatory approvals that are necessary to consummate the Restructuring have not been obtained prior to the date that is one hundred and thirty-three (133) calendar days after the Petition Date, such date, the "Outside Date"). |

| Applicable Rule | Summary of Material Terms |
|---|---|
| | *See* Senior DIP Term Sheet at **Annex B**; Junior DIP Term Sheet at 44 |
| **Challenge Period** Bankruptcy Rule 4001(c)(l)(B) | The challenge period is to be determined  *See* Interim Order at ¶ 28 |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv)  Local Rule 4001-2(b)(2)(L) | The DIP Term sheets provide that automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Senior DIP Agent, Javelin Global, and the Senior DIP Lenders to exercise, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in the Senior DIP Loan Documents, and to take the following actions, subject to the Intercreditor Annex: (a) terminate use of any cash collateral; (b) cease making any Senior DIP Loans; (c) declare all Senior DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts and sweep all funds; (e) immediately set-off any and all amounts in accounts maintained by the Debtors against the Senior DIP Obligations, or otherwise enforce any and all rights against the Senior DIP Collateral including, without limitation, disposition of the DIP Collateral solely for application towards the Senior DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under the DIP Orders, the Senior DIP Loan Documents or applicable law to effect the repayment of the Senior DIP Obligations.  The Automatic stay is modified as necessary to permit: (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Secured Parties may reasonably request, to assure the perfection and priority of the DIP Liens and the DIP Superpriority Claims; (b) the Debtors to take all appropriate action to grant the Adequate Protection Liens and the Adequate Protection Claims set forth in the Interim Order, and to take all appropriate action (including such action as the Prepetition Secured Parties may reasonably request) to ensure that the Adequate Protection Liens granted thereunder are perfected and maintain the priority set forth herein; (c) the Debtors to incur all liabilities and obligations, including all the DIP Obligations, to the DIP Secured Parties as contemplated under the Interim Order and the DIP Loan Documents, and to perform under the DIP Loan Documents any and all other instruments, certificates, agreements and documents which may be required, necessary or prudent for the performance by the applicable Debtors under the DIP Loan Documents and any transactions contemplated therein or in this Interim Order; (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents and the Interim Order; (e) the DIP Secured Parties and the applicable Prepetition Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents and the Interim Order; (f) subject to certain other provisions of the Interim Order, the DIP Secured Parties to exercise, upon the occurrence and during the continuance of any Term DIP Termination Event (as defined below) or Javelin DIP Termination Event (as defined below), all rights and remedies provided for in the DIP Loan Documents and take any or all actions provided therein (subject, in each case, to the terms of the Intercreditor Annex); and (g) the implementation and exercise of all of the terms, rights, benefits, privileges, remedies and provisions of this Interim Order and the DIP Loan Documents, in each case, without further notice, motion or application to, or order of this Court  *See* Senior DIP Term Sheet at 24–25; Interim Order at ¶ 13 |
| **Release/ Waiver of Estate Actions** | Release: a release by the Debtors of all claims and causes of action against the holders of Prepetition Debt.  Subject to entry of a final order, a release of DIP Lenders' liability in connection with the DIP Loan Documents or the Interim Order. |

| Applicable Rule | Summary of Material Terms |
|---|---|
| Bankruptcy Rule 4001(c)(l)(B)(viii)] | **Waiver**: The Debtors shall waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the Senior DIP Agent, Javelin Global and the Senior DIP Lenders. The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization unless the DIP Obligations have been indefeasibly paid in full in cash.<br><br>*See* Senior DIP Term Sheet at 25, 28; Interim Order at ¶¶ D(a)(i), 22, 39, 41 |

### Highlighted Provisions Pursuant to Local Rule 4001–2(b)(2)

22.     Key provisions included in the Interim Order required to be highlighted under Local Rule 4001–2(b)(2) (the "Highlighted Provisions") and their locations in the Interim Order required under Local Rule 4001–2(b)(3) is attached hereto as **Exhibit E**.   None of the Highlighted Provisions is proposed to remain in effect if interim approval is granted, but final relief is denied.

### The Debtors' Prepetition Capital Structure

23.     As of the Petition Date, the Debtors have approximately $270 million in debt and other liabilities, including, but not limited to, approximately $169 million related to the Take-Back Facility, approximately $21.5 million under an emergency bridge financing facility,[8] approximately $23.5 million owed to Javelin Global under certain of the Javelin Agreements (excluding, for the avoidance of doubt, the outstanding amount of advances under the Advance Facilities (as defined below)), and approximately $12.7 million in intercompany liabilities owed to Murray Energy and other affiliates.   In addition, the Debtors have approximately $43 million in outstanding trade payables.

---

[8] This facility is documented by amendments to the Take-Back Facility.

### A.     The Prepetition Term Loan Credit Facility

24.     On April 29, 2019, in connection with Met Holdings' acquisition of the Mining Complexes from Mission, the Debtors entered into an agreement whereby they assumed certain loan obligations of Mission (the "Prepetition Term Loan Credit Agreement").  The Prepetition Term Loan Credit Agreement memorializes a $158.3 million secured term loan credit facility (the "Take-Back Facility") among the Debtors, as borrowers and guarantors, the lenders party thereto from time to time (collectively, the "Prepetition Term Loan Lenders"), Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent for such Prepetition Term Loan Lenders (in such capacities, the "Prepetition Term Loan Agent" and, together with the Prepetition Term Loan Lenders and the "Secured Designated Coal Contract Counterparty" under the Prepetition Term Loan Credit Agreement, the "Prepetition Secured Parties").  The Take-Back Facility matures on April 29, 2023 and is secured by (i) a first priority security interest in, among other things, the Debtors' real and personal property (other than the Prepayment Collateral (as defined herein)) as well as the equity of all the Debtors other than Met Holdings (the "Take-Back Collateral") and (ii) a third priority security interest in, among other things, the Debtors' inventory, coal, as-extracted collateral, accounts receivable, deposit accounts, and contracts and agreements (the "Prepayment Collateral").  The Take-Back Facility bears interest at 8 percent per annum and is payable either in cash or, at any time prior to June 30, 2021, payment in kind semi-annually.  On November 15, 2019, the Debtors entered into a First Amendment to the Prepetition Term Loan Credit Agreement, whereby Murray Energy provided an additional $3.5 million to the Debtors under the Take-Back Facility on the same terms as the original facility. As of the Petition Date, there is approximately $165 million in principal outstanding under the Take-Back Facility.

**B.    The Javelin Global Relationship**

25.    On April 29, 2019, each of Murray Oak Grove and Murray Maple Eagle entered into agreements with Javelin Global pursuant to which, among other things, each of Murray Oak Grove and Murray Maple Eagle appointed Javelin Global as the exclusive marketing agent and offtaker for Oak Grove and Maple Eagle.

26.    ***Oak Grove and Maple Eagle Advance Facilities.*** The Master Coal Purchase and Sale Agreement, dated as of April 29, 2019, by and between Murray Oak Grove, as Seller, and Javelin Global, as Buyer (as amended, restated, or otherwise modified from time to time, the "Oak Grove Master Agreement") and the Master Coal Purchase and Sale Agreement, dated as of April 29, 2019, by and between Javelin Global, as Buyer, and Murray Maple Eagle, as Seller (as amended, restated, or otherwise modified from time to time, the "Maple Eagle Master Agreement" and, together with the Oak Grove Master Agreement, the "Javelin Master Agreements") establish general terms and provisions that govern transactions between the parties for the purchase and sale of coal. Individual transactions are agreed and documented pursuant to a written confirmation letter or document (each a "Confirmation") between the parties setting out transaction-specific details, including specific delivery terms, price, and quantity and quality of coal.

27.    The Amendment to Oak Grove Master Agreement, dated as of April 29, 2019, by and between Murray Oak Grove, as Seller, and Javelin Global, as Buyer (as amended, restated, or otherwise modified from time to time, the "Oak Grove Advance Facility") and the Amendment to Maple Eagle Master Agreement, dated as of April 29, 2019, by and between Murray Maple Eagle, as Seller, and Javelin Global, as Buyer (as amended, restated, or otherwise modified from time to time, the "Maple Eagle Advance Facility" and, together  with the Oak Grove Advance Facility, the "Advance Facilities") set out the terms pursuant to which Javelin Global would make weekly

advance payments to Murray Oak Grove and Murray Maple Eagle in connection with the ongoing

purchase and sale of coal from each mine.  The Advance Facilities are secured by a second priority

security interest in the Prepayment Collateral (as defined in the Guaranty, Pledge and Security

Agreement, dated as of April 29, 2019, by and between Javelin Global and the Debtors).  Under

the Advance Facilities, Javelin Global would make weekly advance payments to Murray Oak

Grove and Murray Maple Eagle for acceptable coal deliveries as follows, subject to the terms of

the Advance Facilities:

- the Coal Inventory Payment: an amount equal to seventy percent (70%) of the estimated value of the coal delivered to Javelin Global, subject to certain specified adjustments (each such payment, a "Coal Inventory Payment"); and

- the A/R Payment: in advance of the time such payment would otherwise be due and payable, for any acceptable shipments of coal made pursuant to the Oak Grove Master Agreement or Maple Eagle Master Agreement, 95% of the base price of such shipments (as such price is specified in the applicable Confirmation) (each such payment, a "A/R Payment" and together with the Coal Inventory Payment, the "Advance Payments").

28.      As and when it receives payment for the ultimate resale of coal it purchased from

Murray Oak Grove or Murray Maple Eagle (such resale known as an "Onward Sale"), subject to

its rights thereunder, Javelin Global would remit the final 5%, less certain fees and commissions.

On the Friday of each delivery week, Murray Oak Grove or Murray Maple Eagle, as applicable,

would pay Javelin Global a fee equal to the Advance Payments balance outstanding as of the prior

Friday under the applicable Advance Facility, multiplied by a daily interest rate (for each day

elapsed in such delivery week) of three-month LIBOR plus 7.00% divided by 360 days.  As of

January 31, 2020, the outstanding amount of advances made was $33.3 million.

29.      ***Prepayment Facility.***  Murray Oak Grove and Javelin Global also entered into the

Prepaid Purchase Agreement Confirmation, dated as of April 29, 2019, by and between Murray

Oak Grove, as Seller, and Javelin Global, as Buyer (as amended, restated, or otherwise modified

from time to time, the "<u>Prepayment Facility</u>").  The Prepayment Facility is governed by and subject to the Oak Grove Master Agreement and documents the sale and purchase of coal in the amount and with the specifications set out therein. The Prepayment Facility is secured by a first priority security interest in the Prepayment Collateral (as defined in the Guaranty, Pledge and Security Agreement, dated as of April 29, 2019, by and between Javelin Global and the Debtors) and a second priority security interest in the Take-Back Collateral (as defined in the prepetition Intercreditor Agreement, dated as of April 29, 2019, by and between Javelin Global and Wilmington Savings Fund Society, FSB).  Under the Prepayment Facility, Murray Oak Grove is required to deliver 1 million short tons per calendar year, with cash payment to Javelin Global to the extent quarterly deliveries are below a minimum specified quantity per calendar quarter. On the effective date of the Prepayment Facility, Javelin Global pre-paid the entire amount of $25 million (the "<u>Pre-Payment</u>") for all coal to be delivered under the Prepayment Facility. The Pre-Payment balance (i) is reduced by a fixed dollar amount per short ton of coal delivered by Murray Oak Grove to Javelin Global and (ii) bears interest at a rate of three-month LIBOR plus 7.00% per year.  As of January 31, 2020, $23.4 million was owed to Javelin Global under the Prepayment Facility.

30.     Pursuant to the Coal Marketing Agreement, dated as of April 29, 2019, by and between Murray Oak Grove, as Producer, and Javelin Global, as Marketer (as amended, restated, or otherwise modified from time to time, the "<u>Oak Grove Marketing Agreement</u>") and the Coal Marketing Agreement, dated as of April 29, 2019,  by and between Murray Maple Eagle, as Producer, and Javelin Global, as Marketer (as amended, restated, or otherwise modified from time to time, the "<u>Maple Eagle Marketing Agreement</u>" and, together with the Oak Grove Marketing Agreement, the "<u>Javelin Marketing Agreements</u>") Murray Oak Grove and Murray Maple Eagle

appointed Javelin Global, on an exclusive basis, to perform certain services in connection with the sale of coal in exchange for a marketing commission, including: (i) marketing of coal to prospective customers inside and outside the United States, (ii) providing advice on marketing strategy and brand recognition, (iii) communicating coal sales opportunities to Murray Oak Grove or Murray Maple Eagle, as applicable, (iv) assisting and advising Murray Oak Grove or Murray Maple Eagle, as applicable, in the negotiation of the terms for the sale and delivery of coal to prospective customers, (v) procuring transportation services for delivery of coal and (vi) procuring blending coal.  Javelin Global may act as an agent to procure "agency sale" contracts whereby Murray Oak Grove or Murray Maple Eagle, as applicable, will sell coal to a customer, and may also procure "back-to-back sale" contracts whereby Javelin Global will sell coal to a customer and Murray Oak Grove or Murray Maple Eagle, as applicable, will undertake to supply coal to Javelin Global on the terms set out in the Javelin Master Agreements.

31.    ***Postpetition Javelin Agreements.***   The prepetition Javelin agreements were a critical component of the Debtors' financing and cash flow. The Debtors respectfully request by this Motion to enter into, perform under, and/or amend the Postpetition Javelin Facility.  The Debtors believe that the relief requested hereby will thus fulfill a critical aspect of the Debtors' postpetition operational financing needs.

### C.    The Bridge Loan Facility

32.    Since November 15, 2019, the Debtors have received additional "bridge loans" to afford them an opportunity to explore strategic alternatives. These bridge loans were memorialized in amendments to the Prepetition Term Loan Credit Agreement (the "Bridge Loan Facility").  The Bridge Loan Facility has been increased (and amended) on several separate occasions with funds advanced by MC Southwork LLC ("MC Southwork") and/or Murray Energy, amounts owed

totaling approximately $21.5 million funded on a priority, first-out basis.  The Bridge Loan Facility bears interest at a rate of 8 percent per annum and matures on February 14, 2020, and is secured by the same liens that secure the Take-Back Facility (albeit on a first-out basis).

33.     The Debtors have agreed to "roll up" or immediately repay the Bridge Loan Facility with the proceeds from any debtor in possession financing extended by the Bridge Loan Facility lenders in these chapter 11 cases.  As of the Petition Date, there is approximately $21.5 million in principal outstanding under the Bridge Loan Facility.  Of the $21.5 million, MC Southwork advanced $14.4 million and Murray Energy advanced approximately $7.1 million

### The DIP Facilities and Postpetition Javelin Facility

**I.     The Debtors' Need for Access to Financing and Use of Cash Collateral.**

34.     As described in the Lee Declaration, the Debtors require immediate access to liquidity to resume mining operations at Oak Grove, conduct a sale process for Maple Eagle, and continue reclamation at North River—all with an eye toward confirmation of a chapter 11 plan within the timeframe agreed-to within the Restructuring Support Agreement. As of the Petition Date, the Debtors had very limited liquidity—an amount less than is needed to pay for its ongoing operations in the ordinary course of business. In the months prior to the chapter 11 filing, the Debtors have been forced to delay payments and stretch payment terms for their vendors to retain sufficient liquidity to operate their businesses. Without a cash infusion at this critical point, the Debtors will be unable to mobilize their workforce or satisfy key vendors so as to achieve their business objectives. The lack of immediate liquidity could result in complete shutdown of the Debtors' Mining Complexes and the loss of good paying jobs for the Debtors' employees. The DIP Facilities, together with the Postpetition Javelin Facility, provide the necessary cash to meet immediate operational needs and provide the liquidity for a smooth transition into chapter 11.

### *The DIP Sizing Process.*

35.     Since the retention of Alvarez & Marsal, LLC ("A&M"), the Debtors and A&M have carefully evaluated the Debtors' operations, including determining potential liquidity needs for a chapter 11 case. As part of that analysis, A&M analyzed the Debtors' financial projections and liquidity position. This analysis was based upon the business plan underlying the Restructuring Support Agreement, overlaid with the estimated impact of the commencement of these chapter 11 cases.

36.     The Debtors and A&M also considered the adverse market conditions facing the coal industry as a whole. As further described in the Moore Declaration, domestic and international prices for metallurgical coal declined for years and remain in a state of turmoil.  Confronted with this extremely challenging business climate, the Debtors took proactive steps to reduce costs and lessen the burden of their liabilities, including, among other things, reducing their workforce and "hot idling" the Maple Eagle and Oak Grove mines in the months preceding the Petition Date.  It is not possible or practical to completely shut down operations, especially for underground mines, which risk flooding and other deleterious conditions if they are not properly supervised and protected.  Despite their efforts to reduce operating costs, however, at the present spot price for metallurgical coal, the Debtors are simply unable to repay their liabilities.

37.     Notwithstanding efforts to improve liquidity, the Debtors have faced ongoing funding challenges, even to pay such basic expenses as biweekly payroll.  The Debtors recognize that the failure to pay their employees would make it virtually impossible to preserve operational potential and would jeopardize the marketability of their Mining Complexes.  Accordingly, the Debtors have been working closely with their major stakeholders to address both these immediate liquidity concerns and longer term strategic goals.

38.    The Debtors have asked for relief to pay claims to certain prepetition claimants whose goods and services are necessary to the Debtors' operations. Specifically, the Debtors have requested, or will request, authority to pay or provide adequate protection for certain prepetition claims, including surety bond cash collateralization, critical vendors, taxes, employee wages and benefits, certain legacy healthcare obligations, and utilities. Having the authority to make such payments is essential to the success of the Debtors' carefully structured reorganization. Absent payment to, or authority to pay, certain claimants, the Debtors' business will suffer irreparable harm. Accordingly such payments were included in the sizing of the DIP Facilities.

39.    In addition to the above operational and industry-wide considerations, A&M and the Debtors also considered the incremental administrative costs of a complex chapter 11 filing with a large number of stakeholders, including multiple lender groups, business entities, unions, and governmental entities, each of whom will likely be represented by counsel.

40.    Based on these considerations, the Debtors and their advisors determined that smooth postpetition operations would require incremental liquidity of approximately $68.6 million, assuming a roll up of the approximately $21.5 million of the Debtors' obligation on account of the Bridge Loan Facility. The Debtors believe the proposed DIP Facilities will allow them to operate their businesses and satisfy all administrative costs and expenses associated with these chapter 11 cases as they come due.

### *The Need for Postpetition Financing.*

41.    The Debtors' liquidity is severely constrained and the Debtors' mines are temporarily idled. The Debtors' limited available cash has strained the Debtors' ability to make payments to the vendors and employees supporting their businesses, and drained the time and attention of senior management at critical periods.

42.     Under the Restructuring Support Agreement, the Debtors intend to restart coal production at Oak Grove, a very expensive proposition to be sure.  Without the cash and stability provided by the DIP Facilities and the Postpetition Javelin Facilities, irreparable harm would occur as a result of the Debtors' inability to continue ordinary course operations, which would not only impact revenue generation, but also risk losing the confidence of employees, vendors, and customers.

43.     The proceeds of the DIP Facilities and the advances under the Postpetition Javelin Facilities will allow the Debtors to resume mining activities at Oak Grove and fund their postpetition operations. For these reasons, the Debtors believe that it is in their estates' best interest to obtain financing under the DIP Facilities and enter into, and perform under, the Postpetition Javelin Facilities.

## II.     The Debtors' Efforts to Secure Financing.

44.     The proposal before the Court represents the best available source of postpetition financing available to the Debtors. First, substantially all of the Debtors' assets are encumbered under their prepetition secured credit facilities and other agreements. Second, the Debtors' depressed operating performance and persistent weakness in coal markets substantially limited the Debtors' options for postpetition financing of the size necessary to fund these chapter 11 cases. Third, the Prepetition Secured Parties indicated that they would not consent to "priming" debtor-in-possession financing provided by a third party. As such, the Debtors and their advisors were forced to solicit postpetition financing proposals from third parties on a junior basis or prepare for a priming fight on the first day of these chapter 11 cases.

### A.     The Debtors' Immediate Liquidity Needs.

45.     The Debtors need an immediate capital infusion to operate their business postpetition and to fund these chapter 11 cases. As of the Petition Date, the Debtors lack sufficient

funds to operate their enterprise and continue paying their debts as they come due. *See* Lee Decl. ¶ 32; Berube Decl. ¶ 9

46.     In light of the Debtors' limited liquidity, the Debtors' advisors assisted the Debtors in evaluating potential financing and strategic alternatives for both out-of-court balance sheet solutions and an in-court process. Among other things, A&M worked closely with the Debtors, their management, and other advisors to evaluate the Debtors' cash requirements necessary to continue to operate their business as a going concern. *See* Lee Decl. ¶ 54. Based on this work, and after the Debtors concluded that an out-of-court restructuring was not a viable option, the Debtors determined, in consultation with their advisors, that procuring sufficient financing at the start of these chapter 11 cases would be essential to meet operational expenses and fund these chapter 11 cases. *See* Berube Decl. ¶ 9. The proposed DIP Facilities and Postpetition Javelin Facility are critical to the Debtors' ability to administer these chapter 11 cases, provide the Debtors with sufficient liquidity to continue operations in the ordinary course, and the Restructuring contemplated by the Restructuring Support Agreement for the benefit of their employees, vendors, customers, and other stakeholders. *See* Lee Decl. ¶ 62.

**B.     The Debtors' Strategic Efforts**

47.     As a result of the sector-wide decline that strained liquidity, the Debtors and their advisors turned their attention to out-of-court financial and strategic alternatives in November 2019, including the sale of assets to increase liquidity. *See* Berube Decl. ¶ 11. Because the Debtors had virtually no unencumbered assets, the Debtors had few options available to them at that time. *See* Berube Decl. ¶ 12. Recognizing that engagement with their existing capital structure would be required, the Debtors sought to engage existing creditors, including certain of the Debtors' prepetition lenders, advance facility lenders, and MEC Debtors, to engage in discussions around obtaining additional liquidity. *See* Berube Decl. ¶ 11.

48.     Initial discussions with the Debtors' prepetition lenders focused on a potential restructuring transaction that would provide the Debtors with the ability to continue mining operations and liquidity to weather volatility in the coal markets. *See* Berube Decl. ¶ 12.  However, the Debtors' lack of unencumbered assets greatly limited their ability to raise incremental liquidity. *Id.* Ultimately, the Debtors were not able to obtain the capital needed to restart and sustain mining operations on an ongoing basis. *Id.*

49.     The Debtors, with the assistance of Evercore, also explored a sale of the Maple Eagle and Oak Grove mines outside of bankruptcy. See Berube Decl. ¶ 13.While these efforts resulted in an asset purchase agreement for the Maple Eagle mine, the sale proceeds contemplated under this agreement were not sufficient to meaningfully extend the Debtors' operating runway. *See* Berube Decl. ¶ 13.

50.     The Debtors were able to obtain short-term bridge loans from existing lenders and Murray Energy, on several occasions since November 2019 in an aggregate amount of approximately $25 million, approximately $21 million of which was funded on a priority, first-out basis. *See* Berube Decl. ¶ 14. Additionally, Javelin Global provided incremental liquidity by agreeing to advance above their contractual rates beginning in September. *See* Berube Decl. ¶ 14. These financings provided the Debtors with much needed time to explore strategic alternatives and potential restructuring paths, effectively financed the Debtor's critical expenses, including costs related to idling Maple Eagle and Oak Grove mines, and allowed the Debtors to negotiate a comprehensive DIP financing package and a restructuring support agreement. *See* Berube Decl. ¶ 14. Although these bridge loans only provided liquidity for a week or two at a time and were not sufficient to resume mining operations, they were crucial to preserve the value of the Debtors' assets and provide time to reach a restructuring agreement. *See* Berube Decl. ¶ 14.

C.       **The Debtors' Efforts to Find Financing.**

a.       ***The Marketing Process.***

51.      The Debtors recognized from the outset that it would be particularly difficult to secure third-party DIP financing because time was limited, essentially all of the Debtors' material assets were encumbered by existing liens under their prepetition funded debt, and their prepetition lenders indicated that they would not consent to a "priming" DIP financing provided by a third party.  *See* Berube Decl.  ¶ 16. Thus, to obtain third-party DIP financing, Evercore and the Debtors believed the Debtors might need to engage in a risky and costly "priming" fight or valuation dispute with their prepetition lenders upon the commencement of these chapter 11 cases.  *See* Berube Decl.  ¶ 16.  Further, regardless of prospects of success, the expense and disruption associated with complex litigation on the first day would seriously jeopardize the Debtors' reorganization efforts, as already strained liquidity would be required to fund such a fight. *See* Berube Decl.  ¶ 16.

52.      Notwithstanding these concerns about a priming DIP, the Debtors engaged not only in good faith, arm's-length negotiations with their prepetition lenders but also with other parties outside of their existing capital structure. *See* Berube Decl.  ¶ 17.

53.      In December 2019, Evercore commenced a marketing process for possible DIP financing alternatives, including by reaching out to third-party financing sources.  *See* Berube Decl. ¶ 18. As part of these efforts, Evercore contacted 18 parties total, including five commercial banks and 13 institutional lenders.  *See* Berube Decl.  ¶ 18. Of these 18 third-party financing sources, three parties executed non-disclosure agreements ("NDAs") and received access to non-public information, including DIP marketing materials. *See* Berube Decl.  ¶ 18. The fifteen parties that declined to sign an NDA cited various reasons, including concerns about the industry in general, timeframe constraints, and overall investment selectivity. *See* Berube Decl.  ¶ 18. None

of the third-party financing sources indicated a willingness to provide the Debtors with new money financing on an unsecured, junior-lien, or *pari passu* basis.  *See* Berube Decl.  ¶ 18.

54.     One of the three NDA signatories declined to continue in the diligence process shortly after signing its NDA. Evercore conducted several follow-up calls with the other two potential financing sources and provided them with revised DIP sizing estimates as the Debtors' view of liquidity and operating plan evolved over time.  *See* Berube Decl.  ¶ 19. Despite several follow up calls by Evercore that facilitated diligence, no financing proposals were received from any third parties.  *See* Berube Decl.  ¶ 19. The Debtors received a financing proposal from a third party that finances certain of the Debtors' mining equipment, however, the total amount of new money contemplated under that proposal was significantly less than what was required, and that third party was committing to only a small portion of the proposed funding, thereby requiring participation from other financing sources.  *See* Berube Decl.  ¶ 20.

55.     Given the lack of any actionable third-party financing proposals, the Debtors largely focused their efforts on financing proposals from their existing prepetition lenders and the MEC Debtors, as well as a postpetition facility with Javelin Global. *See* Berube Decl.  ¶ 21. As part of these discussions, the Debtors focused on a DIP term loan to be made by certain prepetition term loan lenders and MEC Debtors. *See* Berube Decl.  ¶ 21. In January 2020, certain prepetition lenders, MEC Debtors, and Javelin Global agreed to negotiate the terms of a restructuring support agreement. *See* Berube Decl.  ¶ 21.

56.     The Debtors' prepetition lenders and MEC Debtors worked constructively with the Debtors, and agreed to a postpetition financing package that (i) injects much needed liquidity into the Debtors' business through (a) $28.9 million of new money senior DIP term loans and (b) $18.2 million of new money DIP term loans upon the execution of a stalking horse purchase agreement

in connection with a sale of the Maple Eagle mine, and (ii) rolls up, on terms substantially consistent with respective prepetition terms, $21.5 million of prepetition first out term loans into a senior DIP term loan facility.  The DIP Facilities were the Debtors' only viable source of postpetition funding and no other or better alternative was reasonably attainable under the circumstances. *See* Berube Decl.  ¶ 22. Likewise, Javelin Global actively negotiated with the Debtors and their prepetition lenders concerning both the terms of an overall restructuring and the Postpetition Javelin Facility. *See* Berube Decl.  ¶ 22.

> **D.    The DIP Facilities.**

57.    The Debtors engaged in good faith, arm's-length negotiations with the DIP Lenders and Javelin Global with respect to funding these chapter 11 cases. *See* Berube Decl.  ¶ 23. As part of the financing package, the parties focused on the ultimate DIP sizing, including the amount necessary to avoid irreparable harm and to put the Debtors on a path to financial and operational stability. *See* Berube Decl.  ¶ 23. It became evident through negotiations that a two-facility structure would accommodate various DIP Lenders' ability to commit financing and would be needed to obtain a holistic solution to fund these chapter 11 cases. *See* Berube Decl.  ¶ 23. Accordingly, DIP lenders (including MC Southwork) ultimately committed to finance these cases through a new money $28.9 million senior DIP term loan facility while Murray Energy committed a $18.2 million junior DIP term loan facility. *See* Berube Decl.  ¶ 23. The DIP Facilities are an integral part of the Debtors' Restructuring Support Agreement, which provides a framework within which the Debtors can effect a Restructuring of their capital structure and resume mining operations at Oak Grove. *See* Berube Decl.  ¶ 23.

58.    The negotiations among the Senior DIP Lenders, Javelin Global, and the Junior DIP Lenders regarding terms for a DIP were vigorous.  *See* Berube Decl. ¶ 24. Over the course of several weeks, the parties exchanged numerous term sheets and mark-ups, each with significant

changes to the material terms of the proposals.  *See* Berube Decl.  ¶ 24. Through these negotiations,

the terms of the DIP Facilities improved to the benefit of the Debtors.  *See* Berube Decl.  ¶ 24.

The DIP Facilities include various fees and postpetition liens, which were expressly required by

the DIP Lenders and Javelin Global as a condition to provide the DIP Facilities and are an integral

component of the financing package.  *See* Berube Decl.  ¶ 24. All interest and fees related to the

Senior and Junior DIP Facilities are payable-in-kind only, improving liquidity during the case and

reducing the amount of new money financing needed.  *See* Berube Decl.  ¶ 24. These fees and

liens were each subject to good faith, arm's length negotiations.  *See* Berube Decl.  ¶ 24. Given

the financial and operating condition of the Debtors, the timing, cost, and risk of administering

these chapter 11 cases, and the Debtors' liability profile, these fees are reasonable. *See* Berube

Decl. ¶ 24.

59.    The DIP Facilities (like the Restructuring Support Agreement) are expressly linked

to certain case milestones.  *See* Berube Decl.  ¶ 25. These milestones provide a structure for the

Debtors' anticipated chapter 11 process, which will allow the parties to develop a comprehensive

solution for the Debtors' liabilities. *See* Berube Decl.  ¶ 25. The milestones were negotiated by the

DIP Lenders as a condition to providing the DIP Facilities and were a critical inducement for the

DIP lenders in providing the Debtors with the cash necessary to operate their business and fund

these cases. *See* Berube Decl.  ¶ 25. The Debtors negotiated these milestones and believe they

provide the Debtors with adequate time to implement a restructuring. *See* Berube Decl.  ¶ 25.

60.    The DIP Facilities are critical to the Debtors' ability to fund operations and pay the

administrative costs of these chapter 11 cases, and also provide the Debtors with sufficient liquidity

to operate their business without creating a value-destructive "priming" or valuation dispute at the

outset of these chapter 11 cases.  *See* Berube Decl.  ¶ 26. The Debtors did not have any other

credible financing proposals. *See* Berube Decl. ¶ 26. Given the financial and operating condition

of the Debtors, the DIP Facilities, including the milestones, fees, and liens included therein, are

appropriate and reasonable, and are the only viable source of postpetition financing reasonably

attainable in these circumstances. *See* Berube Decl. ¶ 26. Moreover, the DIP Facilities are an

essential component to funding the Debtors and providing a path to emergence and are critical to

reassure customers and vendors, and protect operations. *See* Berube Decl. ¶ 26.

### E.  The DIP Financing Is The Best Postpetition Financing Arrangement Available to the Debtors.

61.    The proposed DIP financing maximizes the value of the enterprise by providing the

Debtors with access to significant and crucial liquidity at the outset of these chapter 11 cases. *See*

Berube Decl. ¶ 30. It allows the Debtors to maximize value by continuing operations and provide

new money to adequately fund these chapter 11 cases. *See* Berube Decl. ¶ 30. Simply put, the

Debtors need DIP financing to survive in chapter 11 and have a chance at a successful

reorganization. There were no better offers (indeed no other offers) put forth during the Debtors'

marketing process. The Debtors negotiated in good faith to obtain concessions from the DIP

Lenders and Javelin Global. *See* Berube Decl. ¶ 32.

62.    The terms of the DIP Facilities are reasonable under the circumstances and were

the product of good faith, arm's length negotiations, and such facilities will benefit all stakeholders

in these chapter 11 cases. *See* Berube Decl. ¶¶ 30–31.

### F.  The Postpetition Javelin Facility

63.    The Restructuring Support Agreement contemplates the entry into additional coal

sale contracts relating to Javelin Global's postpetition exclusive purchase and marketing of coal

(the "<u>Postpetition Javelin Prepaid Facility</u>" and the "<u>Postpetition Javelin Advance Facility</u>,"

collectively, the "<u>Postpetition Javelin Facility</u>"). The Postpetition Javelin Facility will provide the

Debtors with liquidity in connection with ongoing purchase and sale of coal from each mine by

Javelin and is a critical component to resuming operations at Oak Grove. See Berube Decl. ¶ 27.

In connection with the Postpetition Javelin Facility, and as provided for in the documentation

governing the global resolution negotiated by all the relevant stakeholders, $5 million of the

prepetition obligations arising under the Prepayment Facility will be converted into postpetition

obligations arising under the Postpetition Javelin Prepaid Facility (the "Rolled Prepayment

Balance" and, together with other obligations under the Postpetition Javelin Prepaid Facility, the

"Postpetition Javelin Prepaid Obligations").  The remaining claims under the Javelin prepetition

facilities shall only recover to the extent of proceeds from the liquidation of collateral owned by

Javelin. See Berube Decl. ¶ 27.  In connection with the Postpetition Javelin Advance Facility,

Javelin Global will purchase coal extracted from Oak Grove after the Petition Date and, subject to

certain terms and conditions set forth therein, pay for such coal in advance of when such payment

would otherwise be due thereunder, giving rise to obligations in connection therewith (the

"Postpetition Javelin Advance Obligations").  Javelin Global will also remain the exclusive

marketer for Oak Grove, giving rise to related obligations (the "Postpetition Javelin Marketing

Obligations," and, together with the Postpetition Javelin Prepaid Obligations and the Postpetition

Javelin Advance Obligations, the "Postpetition Javelin Obligations").

64.     All of the Postpetition Javelin Obligations will be secured by the Debtors' current

assets including, without limitation, as-extracted collateral, accounts receivable, and inventory,

and will have priority over, among other things, the Senior DIP Facility, the Junior DIP Facility,

and the prepetition last out term loans.  The Postpetition Javelin Prepaid Obligations will also be

secured by an additional security interest in all other assets of the Debtors, and such security

interest will be junior to the Senior DIP Facility, the Junior DIP Facility, and the prepetition last

out term loans.  With respect to the Debtors' current assets, the Rolled Prepayment Balance will have priority over the Postpetition Javelin Advance Obligations and the Postpetition Javelin Marketing Obligations.  The intercreditor agreement will continue to govern the relative priorities of the security interests held by Javelin Global and Wilmington Savings Fund Society, FSB.

65.     The Postpetition Javelin Facility will be documented pursuant to amended or amended and restated versions of the Oak Grove Advance Facility, the Oak Grove Marketing Agreement, and the Prepayment Facility (collectively, including any master agreement entered in connection therewith, the "Postpetition Javelin Agreements").

66.     All remaining prepetition obligations arising under the coal sale contracts with Javelin Global will be discharged as of the effective date of the Debtors' chapter 11 plan, unless satisfied through the liquidation of Javelin Global's coal extracted from the Mining Complexes. The Debtors may also enter additional coal sale contracts with Javelin Global in the ordinary course of business.

67.     The Debtors submit that entering into, and performing under, the Postpetition Javelin Facility represents a core and critical part of the Debtors' operations.[9]  The incremental liquidity provided by the Postpetition Javelin Facility is needed by the Debtors at the outset of these chapter 11 cases. *See* Berube Decl.  ¶ 9; Lee Decl.  ¶ 62. At this critical early stage of the Debtors' chapter 11 process, the Debtors' need to resume generating revenue.  Although the Debtors believe that coal sale contracts are transactions within the ordinary course of business and may be entered into without notice and a hearing, certain counterparties (including Javelin Global) may be unwilling to transact with the Debtors without the comfort of knowing that such

---

[9]   Also, in the ordinary course of business, the Debtors may negotiate and enter into amendments to various prepetition and postpetition coal sale contracts.  Nothing herein should be construed to limit the Debtors' ability to amend coal sale contracts in the ordinary course of business.

transactions are authorized.  The loss of or delay of performance under any coal sale contract could

materially impact the Debtors' business plan and jeopardize their restructuring. Thus, it is critical

that the Debtors are able to reassure their counterparties (and the marketplace), that entering into

the Postpetition Javelin Facility with the Debtors is permissible under applicable law, authorized

by the Court, and can continue in the ordinary course. Therefore, the Debtors request entry of an

order authorizing them to enter into, perform under, and/or amend the Postpetition Javelin Facility

in the ordinary course of business and consistent with prepetition practices.  Immediate relief is

required to maximize the Debtors' revenues and chance of success, and granting the relief

requested herein would clearly benefit the Debtors' estates and promote the interests of all

stakeholders.

**<u>Basis for Relief</u>**

**I.      The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents and the Postpetition Javelin Facility.**

**A.      Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

68.      The Court should authorize the Debtors, as an exercise of their sound business

judgment, to enter into the DIP Documents, obtain access to the DIP Facilities, and continue using

Cash Collateral.  The Court should also authorize the Debtors' entry into and performance under

the Postpetition Javelin Facility.  Bankruptcy Code section 364 authorizes a debtor to obtain

secured or superpriority financing under certain circumstances discussed in detail below.  Courts

grant a debtor-in-possession considerable deference in acting in accordance with its business

judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit

does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*,

*In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition

loan and receivables facility because such facility "reflect[ed] sound and prudent business

judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

69.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Dwight's Piano Co.*, 424 B.R. 260, 285 (S.D. Ohio 2009) ("The business-judgment-rule presumption may be rebutted by showing that no reasonable business person could possibly authorize the action in good faith . . .").

70.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition

financing facility.  For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the

Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are
> naturally motivated to obtain financing on the best possible terms, a
> business decision to obtain credit from a particular lender is almost
> never based purely on economic terms.  ***Relevant features of the
> financing must be evaluated, including non economic elements
> such as the timing and certainty of closing, the impact on creditor
> constituencies and the likelihood of a successful reorganization.***
> This is particularly true in a bankruptcy setting where cooperation
> and establishing alliances with creditor groups can be a vital part of
> building support for a restructuring that ultimately may lead to a
> confirmable reorganization plan.  That which helps foster consensus
> may be preferable to a notionally better transaction that carries the
> risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

71.    The Debtors' determination to move forward with the DIP Facilities is an exercise

of their sound business judgment following a good faith, arm's-length process and careful

evaluation of available alternatives.  Specifically, the Debtors and their advisors determined that

the Debtors would require significant postpetition financing to support their operational and

chapter 11 activities. The DIP Facilities will allow the Debtors to: (a) fund capital expenditures

that are essential to the Debtors' continuation as a going concern, (b) provide the liquidity

necessary to continue favorable trade terms with vendors and to reassure other stakeholders, (c)

fund payroll obligations, (d) fund the administrative cost of these chapter 11 cases, and (e) fund a

sale of Maple Eagle—a critical element of the Debtors' restructuring strategy. The Debtors

negotiated the DIP Facilities and DIP Documents with the DIP Lenders and Javelin Global in good

faith, at arm's-length, and with the assistance of their respective advisors, and the Debtors believe

that they have obtained the best financing available under the circumstances. Accordingly, the

Court should authorize the Debtors' entry into the DIP Documents, as it is a reasonable exercise

of the Debtors' business judgment.

72.     Furthermore, the Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the Postpetition Javelin Facility. The Debtors' determination to move forward with the Postpetition Javelin Facility is an exercise of their sound business judgment following a good faith, arm's-length process and careful evaluation of available alternatives. Specifically, the Debtors and their advisors determined that continuing under the Debtors' prepetition relationship with Javelin Global at Oak Grove will allow the Debtors to earn revenue and continue to operate the Mining Complex.  At the same time, entry into the Postpetition Javelin Facility will allow the Debtors to avoid the substantial expense and delay that would come with terminating their relationship with Javelin Global and instead locating and negotiating with a new customer.  The Debtors negotiated the Postpetition Javelin Facility with Javelin Global in good faith, at arm's-length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best outcome under the circumstances. Accordingly, the Court should authorize the Debtors' entry into the Postpetition Javelin Facility, as it is a reasonable exercise of the Debtors' business judgment.

**B.     Coal Sale Contracts Under the Postpetition Javelin Facility Are Ordinary Course Transactions.**

73.     The Debtors have entered into coal sale contracts, and may enter into future coal sale contracts under the Postpetition Javelin Facility, in the ordinary course of the Debtors' business.   Section 363(c)(1) of the Bankruptcy Code provides that a chapter 11 debtor in possession "may enter into transactions . . . [or] may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  The Bankruptcy Code does not define "ordinary course of business."   *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992).  In determining whether a transaction is in the ordinary course of business, courts have looked at whether a transaction is "common practice" in a debtor's industry and whether

"a creditor could reasonably expect" the debtor to enter into such a transaction. *See In re Miller Min., Inc.*, 219 B.R. 219, 222 (Bankr. N.D. Ohio 1998) (applying a two-part "horizontal" and "vertical" test to analyze a postpetition payment); *Deaconess Hosp. LLC v. Nour Mgmn't Co.*, 2010 WL 1254307, at *2 n 9 (N.D. Ohio March 24, 2010) (same); *see also Roth Am., Inc.*, 975 F.2d at 952 (adopting a two-part "horizontal" dimension and "vertical" dimension test looking at industry practice and creditor expectations). ***First***, when determining "common practice," the court analyzes whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry. *Miller Min., Inc.*, 219 B.R. at 223. ***Second***, the transaction must be analyzed on the "reasonable expectation" dimension, where the court "analyzes the transaction from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a different nature from those he accepted when he initially contracted with the debtor." *Id.* at 222. "In other words, the vertical analysis looks at the 'debtor's pre-petition business practices and conduct.'" *In re Blitz U.S.A., Inc.*, 475 B.R. 209, 214 (Bankr. D. Del. 2012) (quoting *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 797 (Bankr. D. Del. 2007)); *see also In re WCI Steel Inc.*, 313 B.R. 414, 417 n.2 (Bankr. N.D. Ohio 2004) (observing that consistent past payments of pension obligations supported a finding that such payments were made in the ordinary course of business).

74.     Here, performance under, entry into, and/or amendment of coal sale contracts under the Postpetition Javelin Facility is an ordinary course transaction based on the Debtors' industry and prepetition practices. While the Debtors' operations are currently idled, coal sale contracts are at the core of the Debtors' business: selling coal pursuant to coal sale contracts generates substantially all of the Debtors' revenue. The Debtors' competitors similarly ship product pursuant

to long- and short-term contracts, and the Debtors historically compete on terms with those competitors.    All of the Debtors' creditors should expect the Debtors to operate and continue operating in this way.    As such, coal sale contracts are transactions in the ordinary course of the Debtors' business.    The Debtors respectfully submit that they seek an order granting the relief requested herein with respect to the Postpetition Javelin Facility solely out of an abundance of caution.

### C.    Authorizing the Debtors to Enter into the Postpetition Javelin Facility Is in the Best Interests of the Debtors and their Estates and Creditors.

75.    To the extent that the Debtors' entry into and performance under the Postpetition Javelin Facility is outside of the ordinary course of business, section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A court may authorize non-ordinary course transactions using property of the estate pursuant to section 363(b) "when a sound business purpose dictates such action."  *Stephens Indus. Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (approving a sale of assets pursuant to section 363(b)); *In re Eagle-Picher Holdings, Inc.*, No. 05-12601, 2005 WL 4030132, at *5 (Bankr. S.D. Ohio Aug. 26, 2005) (authorizing the debtors to implement a key employee retention plan based on section 363(b) after finding the decision was an "exercise of sound business judgment"); *see also In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that the use sale or lease of property of the estate is justified if it is supported by a good business reason); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring a "good business reason" for use under section 363(b) of the Bankruptcy Code).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re*

44

*Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

76.     Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b) of the Bankruptcy Code.  Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions.  *See Granada Invs., Inc. v. DWG Corp.*, 823 F. Supp. 448, 454 (N.D. Ohio 1993) (observing that "courts employ the business judgment rule because in order for a corporation to be managed properly and efficiently, latitude must be given in the handling of corporate affairs") (internal quotation omitted); *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence.") (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *In re First Wellington Canyon Assocs.*, No. 89-593 (CPK), 1989 WL 106838, at \*3 (N.D. Ill. Sept. 8, 1989) (stating that "the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion").

77.     Additionally, section 105(a) of the Bankruptcy Code provides this Court with the power to grant the relief requested herein.  Section 105(a) states that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

78.     The Court should authorize the Debtors to enter into and amend the Postpetition Javelin Facility because, as is explained above, such contracts are vital to the Debtors' business operations.  The relief requested will provide the much-needed liquidity the Debtors require, maximize the utilization of the Debtors' active workforce, save the Debtors significant administrative costs, reduce professionals' fees, and enable the Debtors to continue their business and generate revenues for the benefit of their estates and their creditors.

79.     Courts presiding over coal company bankruptcies regularly grant similar relief to the relief requested herein.  *See, e.g.*, *In re Murray Energy Holdings Co.*, No. 19-56885 (JEH) (Bankr. S.D. Ohio Dec. 10, 2019) (authorizing the debtors to enter into and perform under coal sale contracts); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 19, 2019) (same); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) (same); *In re Peabody Energy Corp.*, No. 16-42529-399 (BSS) (Bankr. E.D. Mo. Apr. 15, 2016) (same); *In re Patriot Coal Corp.*, No. 15-32450 (KLP) (Bankr. E.D. Va. June 4, 2015) (same); *In re James River Coal Co.*, No. 14-31848 (KRH) (Bankr. E.D. Va. Apr. 10, 2014) (same). Accordingly, the Debtors respectfully submit the Court grant the relief requested herein.

> **D.      The Debtors Should Be Authorized to Grant Priming Liens and Superpriority Claims.**

80.     The Debtors propose to obtain financing under the DIP Facilities by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lenders and Javelin Global postpetition security interests in and liens on the DIP Collateral (as defined in the Interim Order) and Prepetition Collateral that are valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order.

81.     The above-described liens on encumbered and unencumbered assets are common features of postpetition financing facilities, and as set forth in greater detail in the Berube Declaration, were a necessary feature here to provide security for the proposed financings. *See* Berube Decl. ¶ 24. Indeed, postpetition financing facilities routinely are secured by the proceeds of a debtor's unencumbered assets such as leaseholds that are subject to leases that prohibit the impositions of liens thereon. *See, e.g.*, *Blackhawk Mining, LLC*, No. 19-11595 (Bankr. D. Del. July 19, 2019) (approving DIP liens on collateral including any leasehold interests or the proceeds thereof as permitted by applicable law); *In re Vanguard Natural Resources, Inc.*, No 19-31786 (DRJ) (Bankr. S.D. Tex. April 30, 2019); *In re Windstream*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. April 22, 2019) (same); *In re Mission Coal Company LLC*, No. 18-04177 (TLM) (Bankr. N.D. Ala. Nov. 20, 2018) (same); *In re Westmoreland Coal Company*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) (same).[10]

82.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 440-41 (Bankr. S.D.N.Y. 2010) (noting that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> i.     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

---

[10] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

      ii.      the credit transaction is necessary to preserve the assets of the estate; and

      iii.      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); s*ee also In re Ames Dep't Stores*, 115 B.R. 34, 37– 40 (Bankr. S.D.N.Y. 1990); *In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *In re Crouse Grp. Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa 1987).

83.     As described above and as set forth in the Berube Declaration, each third-party lender indicated it would be unwilling to provide postpetition DIP financing on an unsecured, junior lien, or *pari passu* basis to the Prepetition Secured Parties.  *See* Berube Decl. ¶ 18. Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided by, the Debtors' existing lenders.  The Debtors, however, also surveyed certain potential lending sources for actionable alternative proposals—but, given that no third-party proposals were submitted, determined that the DIP Facilities provide the best collective opportunity available to the Debtors under the circumstances to fund these chapter 11 cases.  *See* Berube Decl. ¶ 32.

84.     Absent the DIP Facilities, which will assure creditors that the Debtors will have sufficient liquidity to administer these chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  *See* Lee Decl. ¶ 63. Without postpetition financing, the Debtors lack sufficient funds to operate their enterprise, continue paying their debts as they come due, and cover the projected costs of these chapter 11 cases.  *See* Lee Decl. ¶ 63.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facilities, as set forth in the DIP Documents, are reasonable as more fully set forth above and in the Berube Declaration.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

85.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien."  As described above, the Debtors are unable to obtain unsecured credit, junior credit, credit on a *pari passu* basis, or credit secured by unencumbered property only. Therefore, approving a superpriority claim in favor of the DIP Lenders and Javelin Global is reasonable and appropriate.

86.     Similarly, it is essential that the Debtors resume operations under the Postpetition Javelin Facility.  As is explained above, coal sale contracts are at the core of the Debtors' business. The Debtors sell their coal *exclusively* to Javelin Global, which markets and sells the coal to third-parties—the Debtors have no other customers.  Substantially all of the Debtors' revenue is generated by selling coal to Javelin Global.  If the Debtors are unable to resume operating under their agreements with Javelin Global, they will be forced to either forego this revenue or to incur the substantial costs and delay of finding a customer and negotiating new coal sales contracts. Without an ongoing relationship with Javelin Global, the Debtors will be unable to generate revenue or operate their businesses.  Accordingly, the granting of the security interests pursuant to the Postpetition Javelin Facility is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of the Debtors' operations, and maximize the value of their estates for the benefit of all stakeholders.

87.     In addition, the terms of the Postpetition Javelin Facility are fair and reasonable given the circumstances.  Prepetition, the obligations under the Prepayment Facility were secured by the Take-Back Collateral, and the obligations under the Oak Grove Advance Facility, the Prepayment Facility and the Oak Grove Marketing Agreement were secured by the Prepayment Collateral under the Guaranty, Pledge and Security Agreement, dated as of April 29, 2019, by and between Javelin Global and the Debtors, and the Intercreditor Agreement, dated as of April 29, 2019, by and between Javelin Global and Wilmington Savings Fund Society, FSB.  Because the obligations owed to Javelin Global under prepetition coal sale contracts were already fully secured by first- and second-priority liens, junior interests will not be harmed by the grant of what are essentially replacement liens.

88.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  The Debtors may incur "priming" liens under the DIP Facilities if either (a) the prepetition lenders have consented or (b) prepetition lenders' interest in collateral are adequately protected.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facilities if either (a) their prepetition lenders have consented or (b) the prepetition lenders' interests in collateral are adequately protected.

89.     Here, the requisite Prepetition Secured Parties have affirmatively consented to the

DIP Facilities and the Postpetition Javelin Facility and actively facilitated the proposed facilities

and Interim Order.  Moreover, as set forth more fully in the Interim Order, the Debtors propose to

provide a variety of adequate protection to protect the interests of the Prepetition Secured Parties.

Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**E.     No Comparable Alternative to the DIP Facilities is Reasonably Available on More Favorable Overall Terms.**

90.     A debtor need only demonstrate "by a good faith effort that credit was not available

without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code.

*In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber

Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only

a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and

unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky

Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank

FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*,

789 F. 2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior

lien by establishment of unsuccessful contact with other financial institutions in the geographic

area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that

two national banks refused to grant unsecured loans was sufficient to support conclusion that

section 364 requirement was met); *Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that

it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

91.     As noted above, the Debtors do not believe that a more favorable alternative DIP

financing is reasonably available given the realities imposed by the Debtors' existing capital

structure and the Debtors' solicitation of alternative financing proposals.  Indeed, after contacting

18 third parties for alternative financing, no actionable proposals were submitted. *See* Berube

Decl. ¶ 19–21. Thus, the Debtors have determined that the DIP Facilities provide the most

favorable terms. Simply put, the DIP Facilities provide the Debtors with the liquidity they need at

the lowest cost available while simultaneously placing the Debtors on an optimal path for a

successful restructuring. Therefore, the Debtors submit that the requirement of section 364 of the

Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is

satisfied.

       **F.**      **The Proposed Roll Up of the Bridge Loan Facility Is Necessary and Appropriate.**

      92.      To ensure they have sufficient liquidity to meet business cash needs, the Debtors

have agreed to refinance (or "roll up") the Bridge Loan Facility. Because the Bridge Loan Facility

was necessary to provide short term funding to enable the Debtors and their creditors to negotiate

a consensual restructuring strategy and provide a pathway to orderly and efficient chapter 11 cases,

a roll up of the Bridge Loan Facility is appropriate under the circumstances and substantially

beneficial to the Debtors and their stakeholders. *See* Berube Decl. ¶ 14.

      93.      Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and

a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business,

property of the estate." 11 U.S.C. § 363(b)(1). A court may authorize non-ordinary course

transactions using property of the estate pursuant to section 363(b) "when a sound business

purpose dictates such action." *Stephens Indus. Inc. v. McClung*, 789 F. 2d 386, 390 (6th Cir. 1986)

(approving a sale of assets pursuant to section 363(b)). Courts have authorized payment of certain

prepetition claims pursuant to section 363(b) where there is a sound business purpose for doing

so. *See, e.g.*, *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (collecting

cases); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29

B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 to allow contractor to pay prepetition

claims of suppliers who were potential lien claimants because the payments were necessary for

general contractors to release funds owed to debtors); *Ionosphere Clubs*, 98 B.R. at 175 (finding

that a sound business justification existed to justify payment of certain prepetition wages).

94.     Repayment of prepetition debt (often referred to as a "roll-up") is a common feature

in debtor in possession financing arrangements.   Courts in this jurisdiction and others have

approved similar DIP features, including pursuant to interim orders.  *See, e.g.*, *In re Milacron Inc.*,

No. 09-11235 (JVA) (Bankr. S.D. Ohio Mar. 11, 2009) [Docket No. 47] (authorizing

approximately $55 million DIP and a roll-up of approximately $20 million); *see also In re Mattress

Firm, Inc.*, No. 18-12241 (Bankr. D. Del. Oct. 9, 2018) [Docket No. 184] (approving in interim

order the roll-up of all outstanding prepetition revolving obligations); *In re Bon-Ton Stores, Inc.*,

No. 18-10248 (Bankr. D. Del. Feb. 6, 2018) [Docket No. 120] (approving in interim order the roll-

up of all outstanding prepetition revolving obligations); *In re Charming Charlie LLC*, No. 17-

12906 (Bankr. D. Del. Dec 13, 2017) [Docket No. 93] (approving in interim order the roll-up of

all outstanding prepetition revolving obligations; *In re rue21, Inc.*, No. 17-22045 (Bankr. W.D.

Pa. May 18, 2017) [Docket No. 141] (approving in interim order the roll-up of all outstanding

prepetition revolving obligations and $100 million of prepetition term loan  obligations); *In re

Gymboree Corp.*, No. 17-32986 (Bankr. E.D. Va. June 12, 2017) [Docket No. 86] (approving in

interim order the roll-up of all outstanding prepetition revolving obligations and $70 million of

prepetition term loan obligations).

95.     The DIP Facilities reflect a roll up of the full amount outstanding under the Bridge

Loan Facility and the provision for payment of certain categories of prepetition operational costs,

including surety bond cash collateralization, critical vendors, taxes, employee wages and benefits,

certain legacy healthcare obligations, and utilities.  The roll up of funds is a sound exercise of the

Debtors' business judgment and is a material component of the DIP Facilities.

96.      The repayment of the Bridge Loan Facility merely accelerates the satisfaction of

the obligations owed under it without affecting the recovery of other creditors because the Debtors

believe that these obligations are fully secured by the same liens that secure the Take-Back Facility

on a first-out basis relative to the Take-Back Facility, and the Bridge Loan Facility must be repaid

in full before the Debtors can begin repaying the Take-Back Facility.  Thus, the repayment of the

Bridge Loan Facility merely affects the timing, not the amount or certainty, of recovery: the

secured claims arising on account of the Bridge Loan Facility are required by section 1129 of the

Bankruptcy Code to be satisfied in full before recoveries to junior creditors may be provided,

absent consent of such secured parties (which consent the Debtors do not have here).  Given these

circumstances, repayment of the Bridge Loan Facility is reasonable, and a sound exercise of the

Debtors' business judgment.

**II.      The Debtors Should Be Authorized to Use the Cash Collateral.**

97.      Section 363 of the Bankruptcy Code generally governs the use of estate property.

Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use Cash Collateral

with the consent of the secured party.  Here, the Prepetition Secured Parties consent or are deemed

to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth

in the Interim Order.

98.      Section 363(e) of the Bankruptcy Code provides for adequate protection of interests

in property when a debtor uses Cash Collateral.  Further, section 362(d)(1) of the Bankruptcy Code

provides for adequate protection of interests in property due to the imposition of the automatic

stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of

the Bankruptcy Code provides examples of forms of adequate protection, such as granting

replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("[W]hat interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis."); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

99.     As described more fully below, and as set forth in the Interim Order, the Debtors propose to provide the Prepetition Secured Parties with a variety of adequate protection to protect against the postpetition Diminution in Value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay (the "Adequate Protection Obligations"):

  i.    valid and perfected replacement security interests in and liens on the DIP Collateral (subject to the Carve Out and the lien priorities set forth in the Interim Order);

  ii.   allowed, superpriority administrative claims under section 507(b) of the Bankruptcy Code (subject to the Carve Out and the priorities set out in the Interim Order); and

  iii.  the reasonable professional fees and expenses of Javelin Global and the lenders, DIP Agents, and the other agents party thereto under the Prepetition Term Loan Agreement.

100.    The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from any potential Diminution in Value to the Cash Collateral.  In light of the foregoing, the Debtors further submit, and the Prepetition Secured Parties agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties are appropriate.  Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any Diminution in Value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

## III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lenders and DIP Agents Under the DIP Documents.

101.    Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent and the DIP Lenders. In particular, as noted above, the Debtors have agreed to pay the following fees:

a.    to the Senior DIP Lenders:

(i).    an upfront fee of 4.00% of the aggregate principal amount of the Senior DIP Commitments in respect of Senior DIP New Money Loans, in kind, on the Closing Date; and

b.    to the DIP Agent:

(i).    an agency fee on the Closing Date in the amount agreed-to by the Debtors and the DIP Agent.

102.    Courts in this jurisdiction and others have approved similar aggregates in fees in large chapter 11 cases. *See, e.g.*, *In re The Wornick Company Inc.*, No. 08-106544 (JVA) (Bankr. S.D. Ohio Mar. 14, 2008) (approving unspecified amounts of aggregate fees payable to the DIP agent and DIP lender in the final order); *In re Cambrian Holding Company, Inc.*, No. 19-51200 (GRS) (Bankr. E.D. Ky. Jul. 25, 2019) (approving a commitment fee equal to

2.5 percent of the total DIP commitment in the final order); *see also In re Sanchez Energy Corporation*, No. 19-34508 (MI) (Bankr. S.D. Tex. Aug. 15, 2019) (approving an exit fee of 1 percent of the aggregate DIP loan and a backstop fee of 5 percent of each lender's commitment); *In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (approving a cash fee of approximately 2.0 percent of the overall DIP facilities in the final order); *In re PES Holdings LLC*, No. 18-10122 (KG) (Bankr. D. Del. Jan. 23, 2018) (approving a cash fee of approximately 2.0 percent of the overall DIP facilities in the interim order); *In re Toys "R" US, Inc.*, No. 17-34665 (KLP) (Bankr. E.D.Va. Sept. 20, 2017) (approving aggregate fees that were slightly less than 3.0 percent of the overall DIP facilities in the interim order). *In re Alpha Natural Resources, Inc.*, No. 15-33896 (KRH) (Bankr. E.D. Va. Sep. 17, 2015) (approving an upfront fee of 5.00% of the aggregate principal amount of the postpetition term loan).

103.    It is understood and agreed by all parties, that these fees are an integral component of the overall terms of the DIP Facilities, and were required by the DIP Lenders as consideration for the extension of postpetition financing.  *See* Berube Decl. ¶ 24.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

## IV.    The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).

104.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not

such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

105.    As explained herein and in the Berube Declaration, the DIP Documents are the result of (a) the Debtors' reasonable and informed determination that the DIP Lenders provided the best postpetition financing alternative available under the circumstances and (b) extended arm's length, good-faith negotiations between the Debtors and the DIP Lenders.  The Debtors submit that the terms and conditions of the DIP Documents are reasonable under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.    The Automatic Stay Should Be Modified on a Limited Basis.**

106.    The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow:

a.    the Debtors to grant the liens and superpriority claims, and to perform such acts as the DIP Secured Parties may reasonably request, to assure the perfection and priority;

b.    the Debtors to take all appropriate action to grant the adequate protection liens and claims set forth in the Interim Order, and to take all appropriate action (including such action as the Prepetition Secured Parties may reasonably request) to ensure that the liens granted thereunder are perfected and maintain the priority set forth herein;

c.    the Debtors to incur all liabilities and obligations, including all the DIP Obligations, to the DIP Secured Parties as contemplated under the Interim Order and the DIP Loan Documents, and to perform under the DIP Loan Documents any and all other instruments, certificates, agreements and documents which may be required, necessary or prudent for the performance by the applicable Debtors under the DIP Loan Documents and any transactions contemplated therein or in the Interim Order;

d.      the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents and this Interim Order;

e.      the DIP Secured Parties and the applicable Prepetition Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents and the Interim Order;

f.      subject to certain provisions of the Interim Order, the DIP Secured Parties to exercise, upon the termination events, all rights and remedies provided for in the DIP Loan Documents and take any or all actions provided therein (subject, in each case, to the terms of the Intercreditor Annex); and

g.      the implementation and exercise of all of the terms, rights, benefits, privileges, remedies and provisions of the Interim Order and the DIP Loan Documents, in each case, without further notice, motion or application to, or order of the Court.

107.    Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re Milacron Inc.*, No. 09-11235 (JVA) (Bankr. S.D. Ohio Apr. 10, 2009) (modifying automatic stay to permit DIP lender to exercise rights under the DIP facility documents); *see also In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Sept. 29, 2019) (terminating automatic stay after an event of default on an interim basis); *In re Charming Charlie LLC*, No. 19-11534 (CSS) (Bankr. D. Del. July 12, 2019) (terminating automatic stay after a default or event of default and a notice period); *In re Oreck Corporation,* No. 13-04006 (KML) (Bankr. M.D. Tenn. June 12, 2013) (terminating automatic stay after a default or event of default and a notice period); *In re James River Coal Co.*, No. 03-04095 (MFH) (Bankr. M.D. Tenn. Mar. 26, 2003) (same).

## VI.    Failure to Obtain Immediate Interim Access to the DIP Facilities, Postpetition Javelin Facility, and Cash Collateral Would Cause Immediate and Irreparable Harm.

108.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service

59

of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing

on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary

to avoid immediate and irreparable harm to a debtor's estate.

109.    For the reasons noted above, the Debtors have an immediate postpetition need to

use Cash Collateral, and access the liquidity provided by the DIP Facilities and the Postpetition

Javelin Facility.  The Debtors cannot maintain the value of their estates during the pendency of

these chapter 11 cases without access to cash.  The Debtors will use cash, among other things, to

fund the operation of their business, including paying employee wages and benefits, to ensure that

vendors continue to provide necessary goods and services, and to fund the administration of these

chapter 11 cases.  Substantially all of the Debtors' available cash constitutes the Cash Collateral.

The Debtors will therefore be unable to operate their business or otherwise fund these chapter 11

cases without access to Cash Collateral, and will suffer immediate and irreparable harm to the

detriment of all creditors and other parties in interest.  *See* Lee Decl. ¶ 34.  In short, the Debtors'

ability to administer these chapter 11 cases through the use of Cash Collateral is vital to preserve

and maximize the value of the Debtors' estates.

110.    The Debtors request that the Court hold and conduct a hearing to consider entry of

the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final

Hearing, to receive initial funding under the DIP Facilities.  The DIP Facilities provide for $25.7

million in new money funded upon entry of the Interim Order.  The Debtors require this initial

funding prior to the Final Hearing and entry of the Final Order to continue operating, pay their

administrative expenses, and to implement the relief requested in the Debtors' other "first day"

motions.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid

immediate and irreparable harm and prejudice to their estates and all parties in interest, pending

the Final Hearing.

## Request for Final Hearing

111.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that

the Court set a date which is no later than 25 days after the entry of the Interim Order, to hold a

hearing to consider entry of the final order and the permanent approval of the relief requested in

this motion.  The Debtors also request authority to serve a copy of the signed Interim Order, which

fixes the time and date for the filing of objections, if any, to entry of the Final Order, by first class

mail upon the notice parties listed below, and further request that the Court deem service thereof

sufficient notice of the hearing on the final order under Bankruptcy Rule 4001(c)(2).

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

112.    To implement the foregoing successfully, the Debtors seek a waiver of the notice

requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use,

sale, or lease of property under Bankruptcy Rule 6004(h).

## Motion Practice

113.    This motion includes citations to the applicable rules and statutory authorities upon

which the relief requested herein is predicated and a discussion of their application to this

motion.  Accordingly, the Debtors submit that this motion satisfies Local Rule 9013-1(a).

## Notice

114.    The Debtors have provided notice of this motion to the following parties or their

respective counsel:  (a) the U.S. Trustee for the Southern District of Ohio; (b) the holders of the

30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative

agent under the Take-Back Facility; (d) Javelin Investment Holdings LLC; (e) counsel to the Ad

Hoc Group of Prepetition Term Loan Lenders; (f) the administrative agent under the Debtors'

proposed debtor-in-possession financing facility; (g) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors operate; (h) the offices of the attorneys general for the states in which the Debtors operate; (i) the United States Attorney's Office for the Southern District of Ohio; (j) the Internal Revenue Service; (k) the Pension Benefit Guaranty Corporation; (l) the United Mine Workers of America; (m) counsel to each of the lenders of the Debtors' proposed debtor-in-possession financing facility; (n) Murray Energy; (o) Javelin Global; (p) all taxing authorities; (q) all mechanic's lien claimants; (r) all lessors; and (s) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

115.    No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally blank]*

WHEREFORE the Debtors respectfully request that the Court enter the Interim Order substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  February 12, 2020
Columbus, Ohio

/s/ Thomas R. Allen

Thomas R. Allen        (0017513)
Richard K. Stovall      (0029978)
James A. Coutinho      (0082430)
Matthew M. Zofchak   (0096279)
**Allen Stovall Neuman Fisher & Ashton**
17 South High Street, Suite 1220
Columbus, Ohio 43215
Telephone:      (614) 221-8500
Facsimile:      (614) 221-5988
Email:          allen@asnfa.com
                stovall@asnfa.com
                coutinho@asnfa.com
                zofchak@asnfa.com

*Proposed Counsel to the Debtors and Debtors in Possession*

/s/

David M. Hillman (*pro hac vice* pending)
Timothy Q. Karcher (*pro hac vice* pending)
Chris Theodoridis (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone:      (212) 969-3000
Facsimile:      (212) 969-2900
Email:          dhillman@proskauer.com
                tkarcher@proskauer.com
                ctheodoridis@proskauer.com
- and -

Charles A. Dale (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
One International Place
Boston, Massachusetts 02110
Telephone:      (617) 526-9600
Facsimile:      (617) 526-9899
Email:          cdale@proskauer.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MURRAY METALLURGICAL COAL | ) | Case No. 20-10390 |
| HOLDINGS, LLC, *et al.*,[1] | ) | |
| | ) | Judge John E. Hoffman, Jr. |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 365 AND 507
(I) AUTHORIZING DEBTORS TO OBTAIN SENIOR SECURED PRIMING
SUPERPRIORITY POSTPETITION FINANCING, (III) AUTHORIZING DEBTORS TO
ENTER INTO POSTPETITION JAVELIN AGREEMENTS (III) AUTHORIZING USE
OF CASH COLLATERAL, (IV) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING
ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (IV)
SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Murray Metallurgical Coal Holdings, LLC (4633); Murray Eagle Mining, LLC (4268); Murray Alabama Minerals, LLC (4047); Murray Alabama Coal, LLC (3838); Murray Maple Eagle Coal, LLC (4435); and Murray Oak Grove Coal, LLC (4878). The Debtors' primary business address is 46226 National Road, St. Clairsville, OH 43950.

Upon the motion, dated February 12, 2020 (the "**DIP Motion**"),[2] of Murray Metallurgical

Holdings, LLC ("**MMET" or "Borrower**") and the above-captioned debtors and debtors in

possession (collectively, together with the Borrower, the "**Debtors**") in the above-captioned

chapter 11 cases (collectively, together with any Successor Cases (as defined below), the "**Chapter**

**11 Cases**"), seeking entry of an interim order (together with all annexes, schedules and exhibits

hereto, this "**Interim Order**"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c),

364(c)(2), 364(c)(3), 364(d)(1), 364(e),365, 503, 506(c) and 507 of title 11 of the United States

Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and

9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the Local

Bankruptcy Rules for the Southern District of Ohio (the "**Local Rules**"), *inter alia*:

(1)     authorizing the Debtors to obtain postpetition financing on a priming and senior
secured superpriority basis, consisting of the following:

(a)     a new money multiple draw senior term loan facility (the "**Senior DIP
Facility**", and the loans issued thereunder, the "**Senior DIP Loans**") in an aggregate
principal amount of up to $[●] million, of which (x) $[●] million shall be available to the
Borrower, in a single draw on the Closing Date (as defined below), and (y) $[●] million
shall be available to the Borrower, in a single draw following entry of the Final Order (as
defined below), in each case, pursuant to the terms and conditions of this Interim Order
and the "Senior DIP Term Sheet," an execution copy of which is annexed hereto as Exhibit
[B-1] (the "**Senior DIP Term Sheet**"), until such time as the Borrower, the Guarantors
(as defined in the Senior DIP Term Sheet), Wilmington Savings Fund Society, FSB, as
the administrative agent and collateral agent (the "**Senior DIP Agent**"), each of the Senior
DIP Lenders (as defined in the Senior DIP Term Sheet) and Javelin Global Commodities
(UK) LTD, (the "Secured Designated Coal Contract Counterparty", together with the
Senior DIP Agent, and the Senior DIP Lenders, the "**Senior DIP Secured Parties**")
execute a definitive credit agreement in form and substance consistent with the Senior DIP
Term Sheet and otherwise acceptable to the Senior DIP Agent, the Required Senior DIP
Lenders, (as defined in the Senior DIP Term Sheet) and the Senior DIP Secured
Designated Coal Contract Counterparty (as defined in the Senior DIP Term Sheet), which
credit agreement shall, upon its execution, replace and supersede the Senior DIP Term
Sheet in all respects (as may be amended, restated, supplemented, waived or otherwise
modified from time to time in accordance with the terms hereof and thereof, the "**Senior**

---

[2]     Each capitalized term that is not defined herein shall have the meaning ascribed to such term in the applicable
DIP Loan Documents (as defined herein).

**DIP Credit Agreement**"), and any other agreements, instruments, pledge agreements, guarantees, security agreements, intellectual property security agreements, control agreements, instruments, notes and documents executed in connection therewith, (including any Senior DIP Loan Documents (as defined in the Senior DIP Term Sheet) (each as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, and collectively with the Senior DIP Term Sheet and the Senior DIP Credit Agreement (as applicable), the "**Senior DIP Loan Documents**");

(b)     the designation of Javelin Global Commodities (UK) LTD ("**Javelin**") (as defined in the DIP Motion) as a "Secured Designated Coal Contract Counterparty") (in such capacity, the "**Senior DIP Secured Designated Coal Contract Counterpart**") in connection with certain obligations arising under the Oak Grove Master Agreement (such obligations, the "**Senior DIP Secured Designated Coal Contract Obligations**");

(c)     a new term loan facility (the "**DIP Roll Up Facility**", and the loans deemed issued thereunder, the "**DIP Roll Up Loans**"), in an aggregate amount equal to the total amount all Prepetition First Out Term Loan Obligations (as defined in the DIP Term Sheet) outstanding as of the Petition Date (as defined below), of which, upon entry of this Interim Order, $[●] in Prepetition First Out Term Loan Obligations, and upon entry of the Final Order, $[●] in Prepetition First Out Term Loan Obligations, shall be exchanged and substituted for, and shall be deemed advanced and rolled-up, on a dollar for dollar basis, into the Senior DIP Facility and shall be considered Senior DIP Loans (and the lenders thereunder shall be deemed Senior DIP Lenders), and governed by the Senior DIP Term Sheet or Senior DIP Credit Agreement, as the case may be, and this Interim Order, for all purposes hereunder;

(d)     a new money multiple draw junior term loan facility (the "**Junior DIP Facility**", and the loans issued thereunder, the "**Junior DIP Loans**") in an aggregate principal amount of $[●] million, of which (x) $[●] million shall be available to Borrower in a single draw on the Closing Date, (y) an additional $[●] million shall be available to Borrower in a single draw upon entry of an order by this Court in connection with the chapter 11 cases of Murray Energy Corporation ("**MEC**") approving MEC's entry into the Restructuring Support Agreement (as defined in the Senior DIP Term Sheet), and (z) an additional $[●] million shall be available to Borrower in a single draw following entry of the Final Order, in each case, pursuant to the terms and conditions of this Interim Order and the "Junior DIP Term Sheet," an execution copy of which is annexed hereto as Exhibit [B-2] (the "**Junior DIP Term Sheet**", and together with the Senior DIP Term Sheet, the "**DIP Term Sheet**") until such time as the Borrower, the Guarantors (as defined in the Junior DIP Term Sheet), Wilmington Savings Fund Society, FSB, as the administrative agent and collateral agent (the "**Junior DIP Agent**"), and each of the Junior DIP Lenders (as defined in the Junior DIP Term Sheet (together with the Junior DIP Agent, the "**Junior DIP Secured Parties**") execute a definitive credit agreement in form and substance consistent with the Junior DIP Term Sheet and otherwise acceptable to the Junior DIP Agent and the Required Junior DIP Lenders (as defined in the Junior DIP Term Sheet), which credit agreement shall, upon its execution, replace and supersede the Junior DIP Term Sheet in all respects (as may be amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms hereof and thereof, the

"**Junior DIP Credit Agreement**"), and any other agreements, instruments, pledge agreements, guarantees, security agreements, intellectual property security agreements, control agreements, instruments, notes and documents executed in connection therewith, (including any Junior DIP Loan Documents (as defined in the Junior DIP Term Sheet) (each as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, and collectively with the Junior DIP Term Sheet and the Junior DIP Credit Agreement (as applicable), the "**Junior DIP Loan Documents**"); and

(e)      certain facilities (the "**Javelin DIP Facility**", and together with the Senior DIP Facility and the Junior DIP Facility, the "**DIP Facilities**"; the advances made under the Javelin DIP Facility, the "**Javelin DIP Loans**", and together with the Senior DIP Loans and the Junior DIP Loans, the "**DIP Loans**") to be provided by Javelin consisting of:

(i)      an agreement to (1) purchase all coal extracted from the "Oak Grove" mine after the Petition Date and subject to terms and conditions, pay for such coal in advance of when such payment would otherwise be due thereunder (such facility, the "**Javelin DIP Advance Facility**") pursuant to the terms and conditions of this Interim Order and that certain <u>Annex I</u> to Exhibit A of that certain *Amendment to Master Coal Purchase and Sale Agreement*, which amends that certain Amended and Restated Master Coal Purchase and Sale Agreement with respect to the Oak Grove mine (including any confirmations, agreements and other documents entered into in connection therewith, as each may be amended, amended and restated, supplemented or otherwise modified from time to time, by and among Javelin and Murray Oak Grove Coal, LLC ("**Oak Grove**") (substantially in the form attached hereto as <u>Exhibit C-1</u>, as may be amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms hereof and thereof, and including, without limitation, the *Amended and Restated Master Coal Purchase and Sale Agreement*, the "**Javelin DIP Advance Agreement**"), and (2) remain as exclusive marketer for Oak Grove pursuant to that certain *Amended and Restated Coal Marketing Agreement*, by and among Javelin and Oak Grove (substantially in the form attached hereto as <u>Exhibit C-2</u>, as may be amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms hereof and thereof the "**Javelin DIP Marketing Agreement**"); and

(ii)      a prepaid purchase facility (the "**Javelin DIP Prepaid Facility**"), pursuant to which an aggregate amount equal to $5 million in principal amount outstanding under the Javelin Prepetition Prepayment Agreement (as defined below) shall, upon the effectiveness thereof (but subject to entry of this Interim Order), be substituted and replaced for, and shall be deemed rolled-up, on a dollar for dollar basis, into the Javelin DIP Facility in accordance with that certain *Amended and Restated Prepaid Purchase Agreement Confirmation*, by and between Javelin and Oak Grove (substantially in the form attached hereto as <u>Exhibit C-3</u>, as may be amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms hereof and thereof the "**Javelin DIP Prepayment Agreement**", and together with the Javelin DIP

4

Advance Agreement and the Javelin DIP Marketing Agreement, the "**Javelin DIP Facility Agreements**", and together with any other agreements, instruments, pledge agreements, guarantees, security agreements, intellectual property security agreements, control agreements, instruments, notes and other documents executed in connection therewith or other documents related thereto (as amended, restated, supplemented, waived, and/or modified from time to time in accordance with the terms hereof and thereof, the "**Javelin DIP Loan Documents**"; the term "**Javelin Prepetition Prepayment Agreement**" means that certain *Prepaid Purchase Agreement Confirmation* delivered pursuant to the *Oak Grove Master Coal Agreement*, dated as of April 29, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the entry into the Javelin DIP Prepayment Agreement), by and between Oak Grove and Javelin.

(2)      (a) authorizing the Borrower to incur, and for the Guarantors to guarantee (as applicable) on an unconditional joint and several basis, the principal, interest, fees, costs, expenses obligations (whether contingent or otherwise) and all other amounts (including, without limitation, all "Obligations" as defined in the Senior DIP Term Sheet and Senior DIP Secured Designated Coal Contract Obligations), as and when due and payable under each of the Senior DIP Loan Documents (collectively, the "**Senior DIP Obligations**"), (b) authorizing the Debtors to execute, deliver and to perform under the (a) the Senior DIP Term Sheet, the Senior DIP Credit Agreement, and all other Senior DIP Loan Documents, and to perform such other and further acts as may be necessary or desirable in connection with this Interim Order, the Senior DIP Loan Documents and the transactions contemplated hereby and thereby, (c) granting to the Senior DIP Agent, for the benefit of the Senior DIP Secured Parties, and authorizing the Debtors to incur, the Senior DIP Liens (as defined below), as applicable, in all DIP Collateral (as defined below), in each case, in accordance with and subject to the relative rights and priorities of the Senior DIP Agent on behalf of the Senior DIP Secured Parties, the Junior DIP Agent (together with the Senior DIP Agent, the "**DIP Agents**"), on behalf of itself and the Junior DIP Lenders (together with the Senior DIP Lenders, the "**DIP Term Lenders**", and Javelin (together with the DIP Term Lenders, and the and the Senior DIP Secured Designated Coal Contract Counterparty, the "**DIP Lenders**"), the Prepetition Term Loan Agent (as defined below), on behalf of itself and the Prepetition Term Loan Lenders (as defined below) and Javelin as set forth herein and in the "Intercreditor Annex" attached hereto as <u>Exhibit [●]</u> (the "**Intercreditor Annex**), and (d) granting to the Senior DIP Agent, for itself and for the benefit of the Senior DIP Secured Parties, and authorizing the Debtors to incur, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all Senior DIP Obligations, in each case, in accordance with and subject to the terms hereof;

(3)      (a) authorizing the Borrower to incur, and for the Guarantors to guarantee, on an unconditional joint and several basis, the principal, interest, fees, costs, expenses obligations (whether contingent or otherwise) and all other amounts (including, without limitation, all "Obligations" as defined in the Junior DIP Term Sheet) as and when due and payable under each of the Junior DIP Term Loan Documents (collectively, the "**Junior DIP Obligations**"), (b) authorizing the Debtors to execute, deliver and to perform under the Junior DIP Term Sheet, the Junior DIP Credit Agreement and the other Junior DIP Loan Documents, and to perform such other and further acts as may be necessary or desirable in connection with this Interim Order, the Junior DIP Loan Documents and the transactions contemplated hereby and thereby, (c) granting

to the Junior DIP Agent, for itself and for the benefit of the Junior DIP Lenders, and authorizing the Debtors to incur, the Junior DIP Liens (as defined below) in all DIP Collateral, in each case, in accordance with and subject to the relative rights and priorities set forth herein and in the Intercreditor Annex, and (d) granting to the Junior DIP Agent, on behalf of the Junior DIP Secured Parties, and authorizing the Debtors to incur, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all Junior DIP Obligations, in each case, in accordance with and subject to the terms hereof;

(4)    (a) authorizing the Debtors to assume or otherwise enter into each of the Javelin DIP Loan Documents, (b) authorizing Oak Grove to incur, and for each of the other Debtors to guarantee, on an unconditional joint and several basis, the principal, interest, fees, costs, expenses obligations (whether contingent or otherwise) and all other amounts as and when due and payable under each of the Javelin DIP Loan Documents on or after the Petition Date (collectively, the "**Javelin DIP Obligations**", and together with the Senior DIP Obligations and the Junior DIP Obligations, the "**DIP Obligations**"), (c) authorizing the Debtors to execute, deliver and to perform under the Javelin DIP Loan Documents (together with the Senior DIP Loan Documents and the Junior DIP Loan Documents, the "**DIP Loan Documents**"), and to perform such other and further acts as may be necessary or desirable in connection with this Interim Order, the Javelin DIP Loan Documents and the transactions contemplated hereby and thereby, (c) granting to Javelin, and authorizing the Debtors to incur, the Javelin DIP Liens (as defined below) in all DIP Collateral, in each case, in accordance with and subject to the relative priorities set forth herein and in the Intercreditor Annex, and (d) granting to Javelin, and authorizing the Debtors to incur, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all Javelin DIP Obligations, in each case, in accordance with and subject to the terms hereof;

(5)    authorizing the DIP Roll Up Facility and the DIP Roll Up Loans upon the terms set forth herein;

(6)    authorizing the Debtors' use of Prepetition Collateral (as defined below), including Cash Collateral (as defined below), as well as the proceeds of the DIP Facilities, solely in accordance with the Approved Budget (as defined below), subject to permitted variances, and subject to the terms and conditions set forth in this Interim Order and the DIP Loan Documents;

(7)    providing adequate protection, as and to the extent set forth herein, to the Prepetition Secured Parties (as defined below) to protect against the risk of any Diminution in Value (as defined below) of their interests in the Prepetition Collateral (including Cash Collateral);

(8)    modifying or vacating the automatic stay imposed by Section 362 of the Bankruptcy Code or otherwise to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the DIP Loan Documents, and waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, and providing for the immediate effectiveness of this Interim Order;

(9)    waiving the Debtors' right to surcharge the DIP Collateral and, subject to entry of the Final Order (as defined below), waiving the Debtors' right to surcharge the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code and waiving the "equities of the case" exception in section 552(b) of the Bankruptcy Code with respect to the Prepetition Collateral; and

(10)    scheduling a final hearing (the "**Final Hearing**") to consider entry of a final order authorizing, among other things, the relief requested in the DIP Motion on a final basis, which order shall be in form and substance acceptable in all respects to the Required Senior DIP Lenders and Javelin (the "**Final Order**"), and approving the form of notice with respect to the Final Hearing.

The Court having reviewed the DIP Motion, the DIP Loan Documents, the declaration of Gregory Berube, a Senior Managing Director of Evercore Group LLC (the "**Berube Declaration**"), the declarations of Robert Moore, the Debtors' President, Chief Executive Officer, Chief Operating Officer and Chief Financial Officer (the "**Moore Declaration**") and the declaration of Robert Campagna, the Debtor's proposed restructuring advisor (the "**Campagna Declaration**") (collectively, the "**First Day Declarations**"), the pleadings filed with the Court, the evidence and arguments proffered or adduced at the hearing held before this Court on February [13], 2020 (the "**Interim Hearing**"), and upon the record of these Chapter 11 Cases; and adequate notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and all applicable Local Rules; and all objections, if any, to the relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates and their creditors, represents a sound exercise of the Debtors' business judgment and is necessary for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

### IT IS HEREBY FOUND, DETERMINED, ORDERED AND ADJUDGED:[3]

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the

A.      **Chapter 11 Cases.**  Commencing on February 11, 2020 (the "**Petition Date**"), the

Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United

States Bankruptcy Court for the Southern District of Ohio (this "**Court**") commencing these

Chapter 11 Cases.

B.      **Debtors-in-Possession.**    The Debtors continue to manage and operate their

businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.  As

of the date hereof, the United States Trustee (the "**U.S. Trustee**") has not appointed an official

committee of unsecured creditors in these Chapter 11 Cases (together with any statutory committee

that may appointed or formed in the Chapter 11 Cases or any Successor Cases the "**Official**

**Committee**").

C.      **Jurisdiction and Venue.**  The Court has core jurisdiction over the Chapter 11

Cases, the DIP Motion and the parties and property affected thereby pursuant to 28 U.S.C.

§§ 157(a)-(b) and 1334 and the *General Order 30-2 from the United States Bankruptcy Court for*

*the Southern District of Ohio*, dated October 10, 2019.  Venue for these Chapter 11 Cases and the

proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory predicates for the relief set forth herein are sections 105, 361, 362, 363, 364 and 507

of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014 and [Local Rules 2002-

1(b), 4001-2, 9006-1 and 9013-1.]

D.      **Debtors' Stipulations.**    In requesting the DIP Loans and other financial

accommodations, and in exchange for and as a material inducement to the DIP Lenders to agree

---

extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent
any of the following conclusions of law constitute findings of fact, they are adopted as such.

to provide the DIP Loans, as applicable, and make the other financial accommodations, and in exchange for and in recognition of the priming of the Prepetition Term Loan Liens (as defined below) and the consent of the Prepetition Secured Parties to usage of Cash Collateral, the Debtors, for themselves, but subject to paragraph [31], hereof not their estates, hereby admit, stipulate, acknowledge and agree to the following:

(a)   **Prepetition Term Loan Credit Facility:**

(i)   **Prepetition Term Loan Credit Agreement:** Pursuant to that certain Credit Agreement, dated as of April 29, 2019 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "**Prepetition Term Loan Credit Agreement**," and any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" (as defined in the Prepetition Term Loan Credit Agreement), each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "**Prepetition Term Loan Documents**"), among MMET, the Guarantors (together with the Borrower, the "**Prepetition Term Loan Credit Parties**"), Wilmington Savings Fund Society, FSB as administrative agent (solely in such capacity, the "**Prepetition Term Loan Agent**"), the lenders and other parties thereto (the "**Prepetition Term Loan Lenders**"), and the "Secured Designated Coal Contract Counterparty" (as defined in the Prepetition Term Loan Credit Agreement, together with the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders, the "**Prepetition Term Loan Secured Parties**") party thereto, the Prepetition Term Loan Lenders provided credit to the Borrower pursuant to the Prepetition Term Loan Documents (the "**Prepetition Term Credit Loan Facility**"), and the Guarantors irrevocably and unconditionally guaranteed, on a joint and several basis, all of the Prepetition Term Loan Obligations (as defined below);

(ii)   **Prepetition Term Loan Obligations:** As of the Petition Date, the Prepetition Term Loan Credit Parties were jointly and severally liable and indebted to the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders, and the Prepetition Secured Designated Coal Contract Counterparty, without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $[●], consisting of (a) $[●] in outstanding principal amount of First Out Term Loans (as defined in the Prepetition Term Loan Credit Agreement), and (b) $[●] in outstanding principal amount of Last Out Term Loans (as defined in the Prepetition Term Loan Credit Agreement), plus any other amounts due and payable under the Prepetition Term Loan Documents, including, without limitation, all Prepetition Secured Designated Coal Contract Obligations, accrued and unpaid interest thereon, premiums, reimbursement obligations (contingent or otherwise), any fees, costs, expenses (including any attorneys', accountants', appraisers', and financial advisors'' fees and expenses), charges, indemnities, and any other amounts, liabilities or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing or chargeable in in connection therewith (including all "Obligations" as defined in the

Prepetition Term Loan Credit Agreement), in each case, as and to the extent provided in the Prepetition Term Loan Documents (collectively, the "**Prepetition Term Loan Obligations**"); and

(iii)    **Prepetition Term Loan Liens:**  To secure the Prepetition Term Loan Obligations, the Prepetition Term Loan Credit Parties granted to the Prepetition Term Loan Agent, for the benefit of the Prepetition Term Loan Secured Parties and the Prepetition Secured Designated Coal Contract Counterparty, properly perfected continuing liens, mortgages on and security interests in (collectively, the "**Prepetition Term Loan Liens**") in all "Collateral" as defined in the Prepetition Term Loan Credit Agreement (the "**Prepetition Term Loan Collateral**"), subject to the relative rights and priorities set forth in the Prepetition Intercreditor Agreement (as defined below).

(b)    **Prepetition Javelin Facilities:**

(i)    **Prepetition Javelin Oak Grove Working Capital Facility.** Javelin entered into that certain (1) Annex I to Exhibit A of that certain Amendment to Master Coal Purchase and Sale Agreement, dated as of April 29, 2019, which amends that certain *Master Coal Purchase and Sale Agreement*, dated April 29, 2019 (including any confirmations, agreements and documents executed or delivered in connection therewith, each as amended, restated, supplemented, waived or otherwise modified prior to the Petition Date, the "**Prepetition Javelin Oak Grove Master Coal Agreement**"), with Oak Grove and the guarantors party thereto, and (2) that certain *Coal Marketing Agreement*, dated as of April 29, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Javelin Oak Grove Marketing Agreement**", and together with the Prepetition Javelin Oak Grove Master Coal Agreement, the "**Prepetition Javelin Oak Grove Working Capital Facility Documents**" or the "**Prepetition Javelin Oak Grove Working Capital Facility**");

(ii)    **Prepetition Javelin Oak Grove Prepayment Facility.**  Javelin entered into that certain *Prepaid Purchase Agreement Confirmation* delivered pursuant to the *Prepetition Javelin Oak Grove Master Coal Agreement*, (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Javelin Oak Grove Prepayment Agreement**" or the "**Prepetition Javelin Oak Grove Prepayment Facility**"), with Oak Grove and the guarantors party thereto; and

(iii)    **Prepetition Javelin Maple Eagle Working Capital Facility.** Javelin entered into that certain (i) Annex I to Exhibit A of that certain amendment to Master Coal Purchase and Sale Agreement, dated as of April 29, 2019, which amends that certain *Master Coal Purchase and Sale Agreement*, dated as of April 29, 2019 (including any confirmations, agreements and other documents entered into in connection therewith, each as amended, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Javelin Maple Eagle Master Coal Agreement**"), with Maple Eagle Coal, LLC ("**Maple Eagle**") and the guarantors party thereto, and (ii) that certain *Coal Marketing Agreement*, dated as of April 29, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Javelin Maple Eagle Marketing Agreement**", and together with the Prepetition Javelin Maple Eagle Master Coal Agreement, the

"**Prepetition Javelin Maple Eagle Working Capital Facility Documents**" or the "**Prepetition Javelin Maple Eagle Working Capital Facility**", and, together with the Prepetition Javelin Oak Grove Prepayment Agreement and the Prepetition Javelin Oak Grove Working Capital Facility Documents, the "**Prepetition Javelin Loan Documents**" or the "**Prepetition Javelin Facilities**", and together with the Prepetition Term Loan Documents and the Prepetition Term Loan Credit Facility, the "**Prepetition Loan Documents**" or the "**Prepetition Facilities**").

(c)      **Prepetition Javelin Obligations.**  As of the Petition Date, the Debtors were jointly and severally liable and indebted to Javelin without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate amount of not less than $[61.6 million], consisting of (a) $[38.2 million] in amounts outstanding under the Prepetition Javelin Grove Working Capital Documents, and under the Prepetition Javelin Maple Eagle Documents, and (b) [$23.4] in amounts outstanding under the Prepetition Javelin Oak Grove Prepayment Agreement, , plus, in the case of each of the foregoing clauses (a) and (b), any other amounts due and payable under each of the respective Prepetition Javelin Loan Documents as of prior to the Petition Date, including, without limitation, all accrued and unpaid interest thereon, reimbursement obligations (contingent or otherwise), any fees, costs, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses), charges, indemnities, and any other amounts, liabilities or obligations of whatever nature, that may be due, owing or chargeable in in connection therewith, in each case, as and to the extent provided in the respective Prepetition Javelin Loan Documents (collectively, the "**Prepetition Javelin Obligations**").

(d)      **Prepetition Javelin Liens.**  To secure the Prepetition Javelin Obligations, pursuant to that certain Guaranty, Pledge and Security Agreement dated as of April 29, 2019 (the "**Prepetition Javelin Security Agreement**"),  Debtors granted to Javelin (together with the Prepetition Term Loan Secured Parties, the "**Prepetition Secured Parties**") a security interest in and continuing lien (the "**Prepetition Javelin Liens**" in all "Collateral" as applicable, and as defined in the Prepetition Javelin Security Agreement (the "**Prepetition Javelin Collateral**", and together with the Prepetition Term Loan Collateral, the "**Prepetition Collateral**"), subject to the relative rights and priorities set forth in the Prepetition Intercreditor Agreement.

(e)      **Prepetition Intercreditor Agreement**.   Javelin, in its capacities as "Prepayment Representative" and "Working Capital Representative", and Wilmington Savings Fund Society, FSB, in its capacity as "Take Back Representative", are party to that certain Intercreditor Agreement dated as of April 29, 2019 (collectively, together with any consents and acknowledgements executed in connection therewith, the "**Prepetition Intercreditor Agreement**"), which, governed the relative lien priorities and other rights and remedies of the Prepetition Secured Parties with respect to the Prepetition Collateral; it being understood that the Intercreditor Annex (and, upon its execution, the DIP Intercreditor Agreement (as defined therein)), shall be in full force and effect, shall be binding upon each of the Secured Parties (as defined therein) and shall replace and supersede the Prepetition Intercreditor Agreement in its entirety, at which point the Prepetition Intercreditor Agreement shall no longer be in effect.

11

(f)     **Validity and Enforceability of Prepetition Liens.**  Each of the Prepetition Term Loan Liens and the Prepetition Javelin Liens (collectively, the "**Prepetition Liens**") have been properly recorded and perfected under applicable non-bankruptcy law, and are valid, binding, enforceable, non-avoidable and perfected liens in the Prepetition Collateral securing the applicable facility, respectively, with priority over any and all other liens in the Prepetition Collateral securing the applicable pre-petition facility, subject only to (x) pre-existing liens, solely to the extent such liens were senior to the respective Prepetition Liens and such permitted senior liens were existing, valid, enforceable, properly perfected and non-avoidable liens as of the Petition Date or were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code against any of the Prepetition Credit Parties, the "**Permitted Prior Senior Liens**")[4] and (y) the relative rights and priorities set forth in the Prepetition Intercreditor Agreement (as amended and restated by the Intercreditor Annex and the DIP Intercreditor Agreement).  The Prepetition Liens are not subject to any offset, contest, challenge, objection, defense, claim or counterclaim, subordination, recharacterization, avoidance or other claim, cause of action or challenge of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise. The Prepetition Liens were granted to or for the benefit of the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or the commitments and other financial accommodations secured thereby.

(g)     **Validity and Enforceability of Prepetition Secured Obligations.**  Each of the Prepetition Term Loan Obligations and the Prepetition Javelin Obligations (collectively, the "**Prepetition Secured Obligations**"), respectively, constitutes the legal, valid, binding, enforceable and non-avoidable obligations of the Prepetition Credit Parties that are party to the applicable facilities (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of any of the Prepetition Secured Obligations or any payment made to any of the Prepetition Secured Parties (or applied to or paid on account of any of the Prepetition Secured Obligations) at any time is subject to any offset, contest, challenge, objection, defense, claim or counterclaim, subordination, recharacterization, disgorgement, avoidance or any other claim, cause of action or challenge of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise.

(h)     **No Control.** None of the Senior DIP Agent, the Senior DIP Lenders, the Senior DIP Secured Designated Coal Contract Counterparty, the Junior DIP Agent, the Junior DIP Lenders,  the Senior Designated Coal Contract Counterparty (collectively, the "**DIP Term Secured Parties**") or Javelin (together with the DIP Term Secured Parties, the

---

[4]     Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Prior Senior Liens are valid, senior, enforceable, prior, perfected or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Agents, the DIP Term Lenders, Javelin, any of the Prepetition Secured Parties or any Official Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such Permitted Prior Senior Liens and/or security interests (subject to the terms of this Interim Order).  Any alleged claim arising or asserted as a right of reclamation or return (whether asserted under Section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the DIP Facilities, the DIP Liens and the DIP Collateral as such claims had with respect to the Prepetition Liens in the Prepetition Collateral.

"**DIP Secured Parties**") nor the Prepetition Secured Parties controls the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are conducted or is a control person or insider of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facilities, the DIP Loan Documents and/or the Prepetition Facilities or the Prepetition Loan Documents.

(i)      **Release.**  The Debtors, on behalf of themselves and their respective estates, hereby forever and irrevocably release and forever discharge the DIP Secured Parties, the Prepetition Secured Parties, and MEC DIP Secured Parties (as defined below) and each of their respective former, current and future officers, directors, employees, shareholders, owners, members, managers, partners, subsidiaries, affiliates, funds or managed accounts, agents, advisors, attorneys, accountants, investment bankers, consultants and other representatives, together with each of their predecessors and successors in interest (collectively, the "**Releasees**") from any and all claims, offsets, defenses, counterclaims, set off rights, objections, challenges, causes of action and/or choses in action, liabilities, losses, damages, responsibilities, disputes, remedies, actions, suits, controversies, reimbursement obligations (including, attorneys' fees), costs, expenses or judgments of every type, whether known or unknown, asserted or unasserted, fixed or contingent, pending or threatened, of any kind or nature whatsoever, whether arising at law or in equity (including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, recharacterization, subordination, avoidance, any claim arising under or pursuant to Section 105 or Chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law or any other claim or cause of action arising under the Bankruptcy Code or applicable non-bankruptcy law), in each case, arising under, in connection with, or related to the Debtors or their estates, the extent, amount, validity, enforceability, priority, security and perfection of any of the DIP Facilities, the DIP Obligations, the DIP Liens, the DIP Loan Documents, the Prepetition Facilities, the Prepetition Obligations, the Prepetition Liens or the Prepetition Loan Documents and/or the transactions contemplated thereunder and/or hereunder, and any and all other acts, omissions or events occurring prior to entry of this Interim Order; *provided, however*, that, for the avoidance of doubt, the foregoing shall not constitute a release of any rights of the Debtors arising under the DIP Loan Documents.

(j)      **Cash Collateral.**  All of the Debtors' cash, whether existing as of the Petition Date or thereafter, wherever located (including, without limitation, all cash on deposit or maintained by the Debtors in any account or accounts), whether as original collateral or proceeds of other Prepetition Collateral, constitutes "cash collateral" of the Prepetition Secured Parties within the meaning of Section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

(k)      **Default.**  The Prepetition Credit Parties are in default under the Prepetition Loan Documents, including as a result of the Chapter 11 Cases, and an event of default has occurred under the Prepetition Loan Documents.

E.      **Findings Regarding Corporate Authority.** Subject to entry of this Interim Order, each of the Debtors has all requisite limited liability company power and authority to execute and deliver the DIP Loan Documents to which it is a party and to perform its obligations thereunder.

F.      **Findings Regarding Postpetition Financing and Use of Cash Collateral.**

(i)      *Good Cause.*   Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtors to obtain financing pursuant to the DIP Facilities.

(ii)      *Immediate Need for Postpetition Financing and Use of Cash Collateral.* The Debtors' need to use Cash Collateral on an interim basis and to obtain credit pursuant to the DIP Facilities as provided for herein, on an interim basis, is immediate and necessary to avoid serious and irreparable harm to the Debtors, their estates, their creditors and other parties-in-interest.   The Debtors have an immediate need to obtain the DIP Loans and other financial accommodation and to continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other things, (i) avoid the liquidation of these estates, (ii) permit the orderly continuation of the operation of their businesses, including maintaining, amending, renewing, or modifying insurance policies and surety bonds in the ordinary course of business, (iii) maintain business relationships with customers, vendors and suppliers, including purchasing necessary materials and services to maintain compliance with all applicable regulatory and safety requirements, (iv) make payroll, (v) satisfy other working capital, capital improvement and operational needs, (vi) pay professional fees, expenses, and obligations benefitting from the Carve-Out, and (vii) pay costs, fees, and expenses associated with or payable under the DIP Facilities, in each case, subject to the terms of this Interim Order and the DIP Loan Documents. The Debtors' use of Cash Collateral alone would be insufficient to meet the Debtors' cash disbursement needs

during the period of effectiveness of this Interim Order. The access by the Debtors to sufficient

working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral,

incurrence of new indebtedness under the DIP Loan Documents and other financial

accommodations provided under the DIP Loan Documents are necessary and vital to avoid an

immediate liquidation and for the preservation and maintenance of the going concern values of the

Debtors. The terms of the proposed DIP Facilities pursuant to the DIP Loan Documents and this

Interim Order are fair and reasonable, reflect each Debtor's exercise of prudent business judgment,

and are supported by reasonably equivalent value and fair consideration.

(iii)    *No Credit Available on More Favorable Terms.*  The Debtors have been

unable to obtain financing and other financial accommodations from sources other than the DIP

Lenders on terms more favorable than those provided under the DIP Facilities and the DIP Loan

Documents.  The Debtors have been unable to obtain adequate unsecured credit allowable as an

administrative expense under section 503(b)(1) of the Bankruptcy Code.  The Debtors also have

been unable to obtain adequate credit for money borrowed (a) having priority over administrative

expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code,

(b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a

lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject

to a lien.  Postpetition financing is not otherwise available without granting Javelin and each of

the DIP Agents, for the benefit of the respective DIP Secured Parties:  (1) the DIP Liens on all DIP

Collateral, as set forth herein, (2) the DIP Superpriority Claims (as defined below), and (3) the

other protections set forth in this Interim Order.  After considering all alternatives, the Debtors

have properly concluded, in the exercise of their sound business judgment, that the DIP Facilities

represent the best financing available to them at this time, and is in the best interests of all of their stakeholders.

(iv)    *Use of Proceeds of the DIP Facilities and Cash Collateral.*  As a condition to entry into the DIP Loan Documents, the extension of credit and other financial accommodations made under the DIP Facilities and the consent to use Cash Collateral (including, without limitation, the proceeds of the DIP Facilities), each of the DIP Secured Parties require, and the Debtors have agreed, that Cash Collateral, the proceeds of the DIP Facilities and all other cash or funds of the Debtors, shall be used solely in accordance with the terms and conditions of this Interim Order and the DIP Loan Documents, and only for the expenditures set forth in and permitted by the Approved Budget, and for no other purpose.

(v)    *DIP Roll Up Facility.* The DIP Roll Up Facility is necessary because the Prepetition Term Loan Lenders would not have otherwise provided the Senior DIP Facility or consented to the subordination of their Prepetition Term Loan Liens to the DIP Liens, and the Prepetition Secured Parties would not have otherwise consented to the Debtors' use of their Prepetition Collateral (including Cash Collateral). The DIP Roll Up Facility reflects the Debtors' good faith exercise of prudent business judgment, consistent with their fiduciary duties.

(vi)    *Adequate Protection.*  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, to receive adequate protection, as and to the extent set forth in this Interim Order, against the risk of diminution in value of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from, among other things, (a) the use, sale or lease by the Debtors (or other decline in value) of such collateral, (b) the market value decline of such collateral, (c) the imposition of the DIP Liens and the priming (solely to the extent provided for herein) of the Prepetition Liens, (d) the imposition of the Carve-

16

Out (defined below), and (e) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "**Diminution in Value**").  Based on the DIP Motion, the declarations filed in support of the DIP Motion, and the record presented to the Court at the Interim Hearing, the terms of the adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral (including Cash Collateral); provided that nothing in this Interim Order or the DIP Loan Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order and the Approved Budget (subject to permitted variances) and in the context of the DIP Facilities authorized by this Interim Order, (y) be construed as a consent by any Prepetition Secured Party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties, subject to any applicable provisions of the Intercreditor Annex, to seek modification of the grant of adequate protection provided hereby so as to provide new, different or additional adequate protection or assert the interests of any of the Prepetition Secured Parties, and without prejudice to the right of the Debtors and any other party in interest's rights to contest such modification.

(vii)    *Consent.* To the extent such consent is required, the Prepetition Secured Parties have consented or are deemed under the Prepetition Intercreditor Agreement (as amended by the Intercreditor Annex) to have consented to the Debtors' use of Prepetition Collateral (including Cash Collateral) and the Debtors' entry into the DIP Facilities and the DIP Loan

Documents, in each case, in accordance with and subject to the terms and conditions of this Interim

Order and the DIP Loan Documents;

(viii)   *Sections 506(c) and 552(b).*  As a material inducement to the DIP Secured

Parties to agree to provide the DIP Loans and make other financial accommodations in connection

therewith, and in exchange for (a) the DIP Secured Parties' agreement to subordinate their liens

and superpriority claims to the Carve-Out (defined below), (b) the Prepetition Secured Parties'

agreement to subordinate their Prepetition Liens to the DIP Liens, the DIP Superpriority Claims

(as defined below) and the Carve-Out, and (c) the Prepetition Secured Parties' agreement to

consent to the use of Cash Collateral, in each case, in accordance with and subject to the Approved

Budget, the DIP Loan Documents and this Interim Order, each of the DIP Secured Parties and the

Prepetition Secured Parties have required the Debtors to seek this Court's approval at the Final

Hearing of, (1) a waiver of any "equities of the case" exceptions or claims under Section 552(b)

of the Bankruptcy Code, and (2) a waiver of the provisions of Section 506(c) of the Bankruptcy

Code (which waiver shall be without prejudice to the contention of the DIP Secured Parties that

Section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to

section 364 of the Bankruptcy Code).

(ix)   *Business Judgment and Good Faith Pursuant to Section 364(e).*  Based on

the DIP Motion, the declarations filed in support of the DIP Motion, and the record presented to

the Court at the Interim Hearing, (i) the extension of credit and other financial accommodations

made under the DIP Facilities and the DIP Loan Documents, the (ii) the terms of the DIP Facilities,

(iii) the fees and other amounts paid and to be paid thereunder, (iv) the terms of adequate protection

granted to the Prepetition Secured Parties, (v) the terms on which the Debtors may continue to use

Prepetition Collateral (including Cash Collateral), and (vi) the Cash Collateral arrangements

described therein and herein, in each case, pursuant to this Interim Order and the DIP Loan Documents, (a) are fair, reasonable, and the best available to the Debtors under the circumstances; (b) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; (c) are supported by reasonably equivalent value and fair consideration; and (d) represent the best financing available.  The DIP Facilities and the use of Prepetition Collateral (including Cash Collateral) were negotiated in good faith and at arms' length among the Debtors, the DIP Secured Parties and the Prepetition Secured Parties.  The use of Cash Collateral and credit to be extended under the DIP Facilities shall be deemed to have been so allowed, advanced, made, used and/or extended in good faith, and for valid business purposes and uses, within the meaning of Section 364(e) of the Bankruptcy Code, and the DIP Secured Parties and the Prepetition Secured Parties are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

(x)     *Good Faith of DIP Secured Parties*.  The DIP Facilities, the adequate protection granted to the Prepetition Secured Parties and the use of the Prepetition Collateral (including Cash Collateral) hereunder have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and their respective advisors, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facilities and the DIP Loan Documents, including, without limitation, all loans and other financial accommodations made to and guarantees issued by the Debtors pursuant to the DIP Loan Documents and any DIP Obligations shall be deemed to have been extended by the DIP Secured Parties and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the claims, security interests and liens, and other rights, benefits and

protections granted to the DIP Secured Parties (and the successors and assigns thereof) pursuant to this Interim Order and the DIP Loan Documents shall each be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(xi)    *Good Faith of Prepetition Secured Parties.*  The Prepetition Secured Parties have acted in good faith regarding the DIP Facilities and the Debtors' continued use of Prepetition Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of any adequate protection obligations and the granting of adequate protection liens), in accordance with the terms hereof, and the adequate protection claims, security interests and liens, and other rights, benefits and protections granted to the Prepetition Secured Parties (and their successors and assigns thereof) pursuant to this Interim Order and the DIP Loan Documents shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(xii)    *Budget.*  The Debtors have prepared and delivered to the DIP Secured Parties an initial cash flow forecast (the "**Initial Budget**"), a copy of which is attached hereto as Exhibit A, setting forth all line-item and cumulative cash receipts and expenditures (including all necessary and required expenses which the Debtors expect to incur) on a weekly basis for the period beginning as of the week during the which the Petition Date occurs through and including the end of the thirteenth calendar week following such week.  The Debtors believe that the Initial Budget is reasonable under the facts and circumstances known to them, taken as a whole, as of the Petition Date.  The DIP Secured Parties are relying, in part, upon the Debtors' agreement to comply with the Initial Budget, once approved by the Required Senior DIP Lenders and Javelin in

20

accordance with the terms hereof (subject to permitted variances), the other DIP Loan Documents, and this Interim Order in determining to enter into the postpetition financing arrangements provided for in this Interim Order.

(xiii)   *Notice*.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, email, overnight courier or hand delivery, to certain parties-in-interest, including:   (i) the U.S. Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the parties included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors; (v)  counsel to the DIP Agents and counsel to the DIP Lenders; (vi) counsel to each of the Prepetition Secured Parties; (vii) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (viii) all financial institutions at which the Debtors maintain deposit accounts; and (ix) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 and [Local Rules 2002-1, 4001-2 and 9013-1] or requesting to receive notice prior to the date hereof.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances, and such notice is good and sufficient to permit the interim relief set forth in this Interim Order.

(xiv)   *Relief Essential; Necessity of Immediate Entry*.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent entry of this Interim Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed.  The Court concludes that entry of this Interim Order is in the best interests of the Debtors' estates, and is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of their assets and properties.

**NOW THEREFORE,** based upon the foregoing findings and conclusions, the DIP

Motion, the First Day Declaration, the DIP Declaration and the record before the Court, and after

due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.     **DIP Motion Approved.**  The DIP Motion is granted on an interim basis, and the

Interim Financing (as defined below) is authorized and approved, in each case, in accordance with

and subject to the terms and conditions of this Interim Order and the DIP Loan Documents.  Any

objections to the DIP Motion or to the entry of this Interim Order that have not been withdrawn,

waived, or settled, and all reservation of rights included therein, are hereby overruled on the merits.

2.     **Authorization of DIP Facilities.**

(a)     Subject to the terms and conditions of this Interim Order, the Debtors are

hereby authorized to execute, enter into and perform all obligations under the DIP Facilities and

the DIP Loan Documents.  The DIP Loan Documents and this Interim Order govern the financial

and credit accommodations to be provided to the Debtors by the respective DIP Lenders in

connection with the applicable DIP Facilities.

(b)     The DIP Term Sheet, and, upon execution thereof, each of the other DIP

Loan Documents, are hereby approved are hereby approved, and the Debtors are hereby authorized

to execute, enter into and perform all obligations under the DIP Facilities and the DIP Loan

Documents.  Each of the DIP Lenders is hereby authorized to execute, enter into and perform under

each of their respective obligations under the applicable DIP Facilities and the applicable DIP

Loan Documents.  Any DIP Loan Documents entered into by any of the Debtors prior to the date

hereof consistent with this Interim Order are hereby approved.  Without limiting the foregoing, the

Debtors' assumption of the Javelin DIP Agreements is hereby approved, and the Debtors are hereby authorized to execute, enter into and perform all obligations under the Javelin DIP Facilities and the Javelin DIP Loan Documents, subject to the terms and conditions set forth therein, in the DIP Loan Documents and this Interim Order.

(c)    From the entry of this Interim Order through the earliest to occur of (i) entry of the Final Order, or (ii) the DIP Termination Date (as defined below), the Debtors are authorized to incur, and the Guarantors are hereby authorized to unconditionally guarantee, on a joint and several basis, all of the Debtors' DIP Obligations on account of such incurrence under the applicable DIP Facilities, up to an aggregate principal amount of $[●] million in new money Senior DIP Loans (exclusive of Senior DIP Loans that constitute DIP Roll Up Loans and the Option Payment (as defined in the Senior DIP Term Sheet)), and up to an aggregate principal amount of $[●] million in Junior DIP Loans, in each case, on an interim basis, together with applicable interest, protective advances, expenses, fees and other charges payable in connection with such DIP Facilities (the "**Interim Financing**"), as applicable, in each case, subject to the terms and conditions set forth in this Interim Order and the DIP Loan Documents. Notwithstanding anything contained herein to the contrary, monies advanced under the Senior DIP Facility and the Junior DIP Facility and any cash proceeds thereof shall at all times constitute Term Priority Collateral, whether or not such Senior DIP Loans or Junior DIP Loans or the cash proceeds thereof are located in or transferred to an account that otherwise constitutes Working Capital Priority Collateral and whether or not such Senior DIP Loans or Junior DIP Loans or the proceeds thereof are commingled with any other cash or assets of the Debtors that otherwise constitute Working Capital Priority Collateral, and at no time shall monies advanced under the Senior DIP Facility and the Junior DIP Facility or the proceeds thereof constitute Working Capital Priority Collateral.

(d)      Without limiting the foregoing, and without the need for further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of pledge and security agreements, mortgages, deeds of trust and financing statements), and to pay all fees that may be required, necessary or desirable for the Debtors to implement the terms of, performance of their obligations under or effectuate the purposes of and transactions contemplated by this Interim Order, the DIP Facilities and/or the DIP Loan Documents, including, without limitation:

(1)      the execution and delivery of, and performance under, each of the DIP Loan Documents;

(2)      the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Loan Documents, in each case, as the Debtors and the requisite DIP Secured Parties (in accordance with and subject to the terms of the applicable DIP Loan Documents) may agree, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents or other modifications to and under the DIP Loan Documents (and any fees and other expenses (including any attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder; *provided that* any amendment, waiver, consent or other modification of the Javelin DIP Loan Documents or which otherwise materially adversely affects Javelin shall require the prior written consent of Javelin; *provided further that* a copy (which may be provided through electronic mail or facsimile) of the amendment, modification, or supplement is provided to the U.S. Trustee and any Official Committee;

(3)      the non-refundable and, upon entry of this Interim Order, irrevocable payment to the DIP Secured Parties, as the case may be, of all fees, costs and expenses, including, without limitation, (a) any closing fees, upfront fee, exit fee, prepayment fee, unused line fees, arrangement fees, structuring fees, duration fees, commitment fees (including the Option Payment (as defined in the Senior DIP Term Sheet), backstop fees, servicing fees, audit fees, appraisal fees, servicing fees, liquidator fees, agency fees, prepayment premiums or similar amounts (which fees, in each case, shall be, and shall be deemed to have been, approved upon entry of this Interim Order, and which fees shall not be subject to any challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of

24

the indemnification obligations, in each case referred to in the DIP Loan Documents (and in any separate letter agreements between any or all Debtors, on the one hand, and any of the DIP Secured Parties, on the other, in connection with the DIP Facilities), (b) the fees, costs and expenses as may be due from time to time of each of the DIP Agents and the DIP Lenders, including, without limitation, the fees and expenses of the following professionals (whether or not such fees arose before or after the Petition Date (except as provided in clause (B) in this paragraph), and whether or not the transactions contemplated hereby are consummated):   (A) (i) Stroock & Stroock & Lavan LLP, as bankruptcy counsel to the Senior DIP Lenders, (ii) Taft, as local bankruptcy counsel to the Senior DIP Lenders, (iii) Burr & Forman LLP, as regulatory counsel to the Senior DIP Lenders, (iv) Ankura Consulting Group, LLC, as financial advisor to the Senior DIP Lenders, and (v) any other advisor or consultant, in each case, as may be retained by the Required Senior DIP Lenders, (B) solely as it relates to Javelin's post-petition fees and expenses (i) Paul Hastings LLP, as bankruptcy counsel to Javelin, and (ii) McDonald Hopkins LLC, as local bankruptcy counsel to Javelin, (C)(i) [●], as bankruptcy counsel to the Junior DIP Lenders, and (ii) [●] as local bankruptcy counsel, to the Junior DIP Lenders, and (D)(i) Seward & Kissel LLP, as bankruptcy counsel to each of the DIP Agents, and (ii) local counsel and other advisors to each of the DIP Agents (collectively, each of the professionals described in the foregoing clauses (A)-(D), the "**DIP Fees and Expenses**"), in each case, without the need to file retention or fee applications, and without the need to provide notice to any party or obtain further Court approval;

(4)     the granting of the DIP Liens (as defined below) and the Adequate Protection Liens (as defined below), the perfection of the DIP Liens and the Adequate Protection Liens, the granting of the DIP Superpriority Claims (as defined below) and the Adequate Protection Claims (as defined below), and the granting of the DIP Protections, in each case, as set forth herein and in the DIP Loan Documents; and

(5)     the performance of all other acts necessary, required or desirable to implement the DIP Facilities and/or to facilitate the transactions contemplated by the DIP Loan Documents and this Interim Order.

(e)     No DIP Secured Party shall have any obligation or responsibility to monitor any Debtor's use of the DIP Facilities, and each DIP Secured Party may rely upon each Debtor's representations that the amount of DIP Facilities requested at any time and the use thereof are in accordance with the requirements of this Interim Order, the DIP Loan Documents, and Bankruptcy Rule 4001(c)(2).

3.     **DIP Obligations.** Upon entry of this Interim Order, the DIP Term Sheet, and upon execution thereof, each of the other DIP Loan Documents, shall constitute valid, binding, enforceable, and non-avoidable obligations of each the Debtors, and shall be fully enforceable

against each of the Debtors, their estates and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases, or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing and/or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "**Successor Cases**"), and their creditors and other parties in interest, in each case, in accordance with the terms thereof and this Interim Order. No obligation, payment, transfer or grant of security under the DIP Loan Documents or this Interim Order to the DIP Secured Parties shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, 548 or 549 of the Bankruptcy Code, any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or other similar state statute or common law), or subject to any defense, reduction, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim, counterclaim, offset or any other challenge under the Bankruptcy Code or any applicable law.

4.      **No Obligation to Extend Credit.**  The DIP Secured Parties shall have no obligation to make any loan or advance under the applicable DIP Loan Documents unless all of the conditions precedent to the making of such extension of credit by the applicable DIP Secured Parties under the applicable DIP Loan Documents and this Interim Order have been satisfied in full or waived in accordance with their terms.

5.      **Roll-Up of Prepetition First Out Term Loan Obligations.** Upon entry of this Interim Order, $[●] in Prepetition First Out Term Loan Obligations, and upon entry of the Final Order, $[●] in Prepetition First Out Term Loan Obligations, shall be deemed substituted and exchanged for, and rolled up and converted into (on a cashless, dollar for dollar basis) Senior DIP

Loans (and upon the entry of the Interim Order and the Final Order, as applicable, the Prepetition

Term Loan Agent shall correspondingly reduce on its register under the Prepetition Term Loan

Credit Agreement each such holder's Prepetition First Out Term Loan Obligations so substituted

and exchanged for, and rolled up and converted into (on a dollar for dollar basis) Senior DIP

Loans). The "roll-up" shall be authorized as compensation for, in consideration for, and solely on

account of, the agreement of Prepetition Term Loan Lenders to provide the Senior DIP Facility

and to provide other consideration during these Chapter 11 Cases, and not as payments under,

adequate protection for, or otherwise on account of, any Prepetition Term Loan Obligations.

Notwithstanding any other provisions of this Interim Order or the DIP Loan Documents, all rights

of the Prepetition Term Loan Secured Parties shall be fully preserved. The Prepetition Term Loan

Secured Parties would not otherwise consent to the use of their Prepetition Term Loan Collateral

(including Cash Collateral) or the subordination of their liens to any DIP Liens, and the Senior

DIP Lenders would not be willing to provide the Senior DIP Facility or extend credit to the Debtors

thereunder, without the inclusion of the Roll Up Facility. Moreover, the Roll Up Facility will

enable the Debtors to obtain urgently needed financing that they need to administer these Chapter

11 Cases and fund their operations.

6.     **DIP Liens.**

(a)     **DIP Term Liens.** Effective immediately upon entry of this Interim Order,

the Senior DIP Agent, for the benefit of the Senior DIP Secured Parties and the Senior DIP Secured

Designated Coal Contract Counterparty and the Junior DIP Agent, for the benefit of the Junior

DIP Secured Parties, are hereby granted (without the necessity of the execution by the Debtors or

the filing or recordation of mortgages, security agreements, lockbox or control agreements,

financing statements, or any other instruments or otherwise by the Senior DIP Agent, the Senior

DIP Lenders, the Senior DIP Secured Designated Coal Contract Counterparty, the Junior DIP

Agent or the Junior DIP Lenders) valid, binding, enforceable, non-avoidable, and automatically

and properly perfected liens and security interests (as applicable, the "**Senior DIP Liens**" or the

"**Junior DIP Liens**", and collectively, the "**DIP Term Liens**") in all DIP Collateral (as defined

below), as collateral security for the prompt and complete performance and payment when due

(whether at the stated maturity, by acceleration or otherwise) of all Senior DIP Obligations and

Junior DIP Obligations (collectively, the "**DIP Term Loan Obligations**"), respectively, which

DIP Term Liens shall have the following relative rank and priority:

> (1)    pursuant to section 364(c)(2) of the Bankruptcy Code, a valid,
> binding, enforceable, fully-perfected first priority senior security interest in and lien
> upon all of the Debtors' right, title and interest in, to and under all DIP Collateral,
> whether existing on the Petition Date or thereafter acquired, and wherever located,
> in each case that is not otherwise subject to a valid, perfected and non-avoidable
> lien on or as of the Petition Date (or is not subject to a valid and non-avoidable lien
> in existence as of the Petition Date that is perfected subsequent to the Petition Date
> as permitted by section 546(b) of the Bankruptcy Code), and the proceeds, products,
> rents and profits of each of the foregoing (collectively, the "**Unencumbered
> Property**"), subject and subordinate only to the Carve-Out and subject to the
> relative rank and priority as set forth in the Intercreditor Annex; and

> (2)    pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy
> Code, a valid, binding, enforceable, fully-perfected security interest in and lien
> upon all of the Debtors' right, title and interest in, to and under all DIP Collateral
> (other than Unencumbered Property, as described in sub-paragraph (1) above),
> whether existing on the Petition Date or thereafter acquired, and wherever located,
> and the proceeds, products, rents and profits of the foregoing, which lien and
> security interest shall (A) be junior to the Carve-Out and Permitted Prior Senior
> Liens, and (B) have the relative rank and priority as set forth in the Intercreditor
> Annex.

> (b)    **Javelin DIP Liens.**[5] Effective immediately upon entry of this Interim

Order, Javelin is hereby granted (without the necessity of the execution by the Debtors or the filing

---

[5] For the avoidance of doubt, (a) the $5 million in obligations deemed rolled-up and advanced under the Javelin DIP
Prepaid Facility, and the liens granted under the $5 million Javelin DIP Prepaid Facility, shall constitute Javelin DIP
Obligations and Javelin DIP Liens, respectively, and (b)  neither the Javelin DIP Obligations nor the Javelin DIP Liens
shall relate to or secure any Prepetition Javelin Obligations (other than in respect of the $5 million roll-up contemplated
under the Javelin DIP Prepaid Facility).

or recordation of mortgages, security agreements, lockbox or control agreements, financing statements, or any other instruments or otherwise by Javelin) valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests  (collectively, the "**Javelin DIP Liens**", and together with the DIP Term Liens, the "**DIP Liens**") in all DIP Collateral (as defined below), as collateral security for the prompt and complete performance and payment if and when due (whether at the stated maturity, by acceleration or otherwise) of all post-petition obligations arising under each of the Javelin DIP Prepaid Facility (the "**Javelin DIP Prepaid Facility Liens**"), as well as the Javelin DIP Advance Facility and the Javelin DIP Marketing Agreement (the "**Javelin DIP Advance Facility Liens**", and together with the Javelin DIP Prepaid Facility Liens, the "**Javelin DIP Liens**"), which Javelin DIP Liens shall have the following relative rank and priority:

(1)      pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, enforceable, fully-perfected first priority senior security interest in and lien upon all of the Debtors' right, title and interest in, to and under all DIP Collateral, whether existing on the Petition Date or thereafter acquired, and wherever located, in each case that constitutes Unencumbered Property (as defined in the DIP Term Sheet) subject only to the Carve-Out and subject to the relative rank and priority as set forth in the Intercreditor Annex; and

(2)      pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, a valid, binding, enforceable, fully-perfected security interest in and lien upon all of the Debtors' right, title and interest in, to and under all DIP Collateral (other than Unencumbered Property, which is described in sub-paragraph 6(a)(1) above), whether existing on the Petition Date or thereafter acquired, wherever located, and the proceeds, products, rents and profits of the foregoing, which lien and security interest shall (A) be junior to the Carve-Out and Permitted Prior Senior Liens, and (B) have the relative rank and priority as set forth in the Intercreditor Annex.

(c)      Notwithstanding the foregoing, the DIP Liens shall rank junior to "Collateral" as defined in that certain *Equipment Lease Agreement* dated April 29, 2019 (the "**Bay Point Collateral**"), by and between Bay Point Capital Partners II, LP ("**Bay Point**") and Oak

Grove, solely to the extent that Bay Point holds a valid, enforceable, fully perfected and non-avoidable security interest in and lien on the Bay Point Collateral as of the Petition Date.

(d)      For purposes of this Interim Order, the term "**DIP Collateral**" shall mean all assets and properties of each of the Debtors of any kind or nature whatsoever, whether tangible or intangible, real, personal or mixed, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, any of the Debtors, whether prior to or after the Petition Date, whether owned or consigned by or to, or leased from or to, the Debtors, and wherever located, including, without limitation, each of the Debtors' rights, title and interests in (1) all Prepetition Collateral, (2) all "DIP Collateral" as defined in the Senior DIP Term Sheet , (3) subject to entry of a Final Order, all claims and causes of action arising under chapter 5 of the Bankruptcy Code ("**Avoidance Actions**"), whether pursuant to federal law or applicable state law, of the Debtors or their estates, and, subject to entry of the Final Order, all proceeds thereof or judgments therefrom and (4) all proceeds, products, offspring and profits of each of the foregoing and all accessions to, substitutions and replacements for, each of the foregoing, including any and all proceeds of any insurance, indemnity, warranty or guaranty payable to any Debtor from time to time with respect to any of the foregoing; *provided*, *however*, that DIP Collateral shall not include Excluded Collateral;[6] *provided*, *further*, *however*, that DIP Collateral shall include all rents, profits, proceeds and products of any Excluded Collateral for purposes of this Interim Order.

(e)      Notwithstanding anything contained herein or in any of the DIP Loan Documents to the contrary (subject to the Carve-Out and the Permitted Prior Senior Liens, and

---

[6] For purposes of this Interim Order, "**Excluded Collateral**" shall mean any assets or property upon which, and solely to the extent that (and only for so long as), the grant of a DIP Lien as contemplated by this Interim Order, would give rise to a right of termination under an agreement with the Debtors in existence as of the Petition Date, and such of termination is not overridden or excused by the Bankruptcy Code or applicable non-bankruptcy law.

subject to the relative priorities set forth in the Intercreditor Annex), the DIP Liens and the DIP

Superpriority Claims (as defined below) (i) shall not be made subject to or *pari passu* with (A) any

lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or

any Successor Cases, and shall be valid and enforceable against the Debtors, their estates, any

trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any

Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases,

(B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under

section 551 of the Bankruptcy Code or otherwise, or (C) any intercompany or affiliate lien or

claim; and (ii) shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code.

(f)     Any provision of any lease, loan document, easement, use agreement,

proffer, covenant, license, contract, organizational document, or other instrument or agreement

that requires the consent, or the payment of any fees or obligations to, any governmental entity or

non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or

otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, is

and shall hereby be deemed to be inconsistent with the provisions of the Bankruptcy Code, and

shall have no force or effect with respect to the DIP Liens or Adequate Protection Liens on such

leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or

sale thereof by any Debtor, in favor of the DIP Secured Parties or the Prepetition Secured Parties

in accordance with the terms of the DIP Loan Documents and this Interim Order.

7.     **DIP Superpriority Claims.**

(a)     **Term DIP Superpriority Claims.**  Effective immediately upon entry of

this Interim Order, each of the Senior DIP Agent (on behalf of the Senior DIP Secured Parties)

and the Junior DIP Agent (on behalf of the Junior DIP Secured Parties) is hereby granted, pursuant

to section 364(c)(1) and 364(e) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases on account of the Senior DIP Obligations and the Junior DIP Obligations, respectively, with priority over any and all administrative expenses of the kind that are specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113, 1114 or any other provisions of the Bankruptcy Code and any other claims against the Debtors (the "**Term DIP Superpriority Claims**").  The Term DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.  The Term DIP Superpriority Claims shall have recourse against each of the Debtors, on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral (including, subject to entry of the Final DIP Order, Avoidance Actions and the proceeds thereof). The Term DIP Superpriority Claims shall, at all times be (x) junior only to the Carve Out, (y) senior to any and all other administrative expense claims or other claims against the Debtors or their estates, in the Chapter 11 Cases and any Successor Cases, including, without limitation, any claims allowed pursuant to the obligations under or in connection with the Prepetition Secured Obligations and any adequate protection claims granted thereunder, and (z) otherwise subject to the Intercreditor Annex.

(b)    **Javelin DIP Superpriority Claim.**  Effective immediately upon entry of this Interim Order, Javelin is hereby granted, pursuant to section 364(c)(1) and 364(e) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases on account of the Javelin DIP Obligations, with priority over any and all administrative expenses of the kind that are specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113, 1114

or any other provisions of the Bankruptcy Code and any other claims against the Debtors (the "**Javelin DIP Superpriority Claim**", and together with the Term DIP Superiority Claims, the "**DIP Superpriority Claims**").  The Javelin DIP Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.  The Javelin DIP Superpriority Claim shall have recourse against each of the Debtors, on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral (including, subject to entry of the Final DIP Order, Avoidance Actions and the proceeds thereof). The Javelin DIP Superpriority Claim shall, at all times be (x) junior only to the Carve Out, and (y) senior to any and all other administrative expense claims or other claims against the Debtors or their estates, in the Chapter 11 Cases and any Successor Cases, including, without limitation, any claims allowed pursuant to the obligations under or in connection with the Prepetition Secured Obligations and any adequate protection claims granted thereunder, and (z) otherwise subject to the Intercreditor Annex.  The rights and priority of the DIP Superpriority Claims will be subject to the relative priorities set forth herein and in the Intercreditor Annex.

       **8.**       **Deposit and Use of Proceeds of DIP Facilities.**

       (a)       **Use of Proceeds of DIP Facilities and Cash Collateral.**  From and after the Closing Date, until the DIP Termination Date (as defined below), the Debtors shall be authorized to use Cash Collateral, and shall be permitted to draw upon the Interim Financing and the proceeds thereof, subject, in each case, to the terms and conditions of this Interim Order and the DIP Loan Documents, and solely to extent in compliance with the Approved DIP Budget (subject to Permitted Variances (as defined in the DIP Term Sheet), for the following purposes: (i)  for the payment of prepetition amounts acceptable to the Required Senior DIP Lenders and as

authorized by the Court pursuant to orders approving the "first day" motions filed by the Debtors; (ii) for the payment of working capital and other general corporate needs of the Debtors in the ordinary course of business, (iii) for the payment of fees and expenses incurred in connection with the Chapter 11 Cases; (iv) to make the adequate protection payments expressly required hereunder; and (v) for the avoidance of doubt, any amounts due or that may become due under the DIP Loan Documents, and (vi) to pay the fees and expenses related to the DIP Facilities.  For the avoidance of doubt, none of the Debtors will use any DIP Loans, the proceeds of the DIP Facilities or Cash Collateral in a manner or for a purpose other than those consistent with the Approved DIP Budget, the DIP Loan Documents and this Interim Order.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of any Cash Collateral or other proceeds resulting therefrom, except as expressly permitted in this Interim Order, the DIP Loan Documents and the Approved DIP Budget. All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Loan Documents (subject to the Intercreditor Annex).

(b)     The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) other than in the ordinary course of business without the prior written consent of the Required Senior DIP Lenders and, in the case of any Working Capital Priority Collateral, each of Javelin and the Required Senior DIP Lenders (and no such consent shall be implied from any other action, inaction or acquiescence by the Senior DIP Lenders or Javelin, as applicable), except as otherwise provided for in the DIP Loan Documents (subject in each case to the Intercreditor Annex).

9.        **Segregated DIP Term Priority Account**.  The Debtors are authorized and directed to establish the DIP Term Priority Account (as defined in the Senior DIP Term Sheet) with the Senior DIP Agent (or another institution acceptable to the Required Senior DIP Lenders). Notwithstanding anything contained herein or in the Intercreditor Annex to the contrary, all proceeds of the Senior DIP Loans shall be deposited into the DIP Term Priority Account, which account shall, at all times, immediately and automatically, upon entry of this Interim Order (and without the need for any further act by the Senior DIP Agent or any of the Senior DIP Secured Parties) be subject to a first-priority perfected security interest and lien solely in favor of the Senior DIP Agent, on behalf of the Senior DIP Secured Parties and the Senior DIP Secured Designated Coal Contract Counterparty.  For the avoidance of doubt, notwithstanding anything contained herein to the contrary, (a) the DIP Term Priority Account shall not be subject to a security interest or lien in favor of any other person or entity, including, without limitation, the Junior DIP Secured Parties, Javelin or any of the Prepetition Secured Parties), and (b) at no time shall the DIP Term Priority Account or any funds deposited in such account be considered Working Capital Priority Collateral.  Prior to the occurrence of a DIP Termination Event, all funds held in the DIP Term Priority Account may only be withdrawn by the Borrower from such account, and used by the Borrower, solely as expressly permitted under Approved Budget and the Senior DIP Loan Documents.

10.        **Adequate Protection.**

(a)        **Adequate Protection for Prepetition Term Loan Secured Parties.**  Pursuant to Sections 361, 363(e) and 364(d) of the Bankruptcy Code, the Prepetition Term Loan Secured Parties shall receive the following adequate protection:

(i)       **Term Loan Adequate Protection Lien.**  The Prepetition Term Loan Agent, on behalf the Prepetition Term Loan Secured Parties and the Prepetition Secured Designated Coal Contract Counterparty, is hereby granted a valid, binding, enforceable and automatically perfected postpetition lien on all DIP Collateral, to the extent of any Diminution in Value of the Prepetition Term Loan Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) (the "**Term Loan Adequate Protection Lien**"), which Term Loan Adequate Protection Lien (x) shall rank junior to the Carve-Out and the Permitted Prior Senior Liens, (y) shall have the relative rank and priority set forth in the Intercreditor Annex, and (z) shall otherwise rank senior to any and all other liens or security interests in the DIP Collateral.

(ii)      **Term Loan Adequate Protection Claim.**  The Prepetition Term Loan Agent, on behalf of the Prepetition Term Loan Secured Parties and the Prepetition Secured Designated Contract Counterparty, is hereby granted an allowed superpriority administrative expense claim, to the extent of any Diminution in Value of the Prepetition Term Loan Secured Parties' interests in the Prepetition Collateral (including Cash Collateral), as provided for in section 507(b) of the Bankruptcy Code (the "**Term Loan Adequate Protection Claim**") against each of the Debtors on a joint and several basis, which Term Loan Adequate Protection Claim shall be payable from and have recourse to all DIP Collateral (including, upon entry of the Final Order, Avoidance Actions and the proceeds thereof and judgments therefrom), and which shall (x) rank junior to the Carve-Out and the DIP Superpriority Claim, (y) shall have the relative rank and priority set forth in the Intercreditor Annex, and (z) shall otherwise be senior to any and all other administrative expense claims or other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases.

(b)       **Adequate Protection for Javelin.**  Pursuant to Sections 361, 363(e) and 364(d) of the Bankruptcy Code, the Prepetition Secured Parties shall receive the following additional adequate protection:

(i)       **Javelin Adequate Protection Lien.**  Javelin is hereby granted a valid, binding, enforceable and automatically perfected postpetition lien on all DIP Collateral, to the extent of any Diminution in Value of Javelin's pre-petition interests in the Prepetition Collateral (including Cash Collateral) (the "**Javelin Adequate Protection Lien**", and together with the Term Loan Adequate Protection Lien, the "**Adequate Protection Liens**"), which Javelin Adequate Protection Lien (x) shall rank junior to the Carve-Out and the Permitted Prior Senior Liens, (y) shall have the relative rank and priority set forth in the Intercreditor Annex, and (z) shall otherwise be senior to any and all other liens and security interests in the DIP Collateral; and

(ii)      **Javelin Adequate Protection Claim.**  Javelin is hereby granted an allowed superpriority administrative expense claim, to the extent of any Diminution in Value of Javelin's pre-petition interests in the Prepetition Collateral (including Cash Collateral), as provided for in section 507(b) of the Bankruptcy Code (the "**Javelin Adequate Protection Claim**" and with the Term Loan Adequate Protection Claim, the "**Adequate Protection Claims**"), against each of the Debtors on a joint and several basis, which Javelin Adequate

Protection Claim shall be payable from and have recourse to all DIP Collateral (including, upon entry of the Final DIP Order, Avoidance Actions and the proceeds thereof and judgments therefrom) and which shall (x) rank junior to the Carve-Out and the DIP Superpriority Claim, (y) shall have the relative rank and priority set forth in the Intercreditor Annex, and (z) shall otherwise be senior to any and all other administrative expense claims or other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases.

(c)      **Additional Adequate Protection.**  Pursuant to Sections 361, 363(e) and 364(d) of the Bankruptcy Code, as additional adequate protection, the Debtors shall pay all reasonable and documented fees, costs and expenses (except for clause (B) of this paragraph, whether incurred prior to or after the Petition Date) of (A) the Prepetition Term Loan Lenders, (including the fees and expenses of (i) Stroock & Stroock & Lavan LLP, (ii) Taft, (iii) Burr & Forman LLP, and (iv) Ankura Consulting Group, LLC), (B) Javelin, solely as it relates to Javelin's post-petition fees and expenses (including the post-petition fees and expenses of (i) Paul Hastings LLP, and (ii) McDonald Hopkins LLC), and (C) the Prepetition Term Loan Agent (including Seward & Kissel LLP and any local counsel and advisors).  The invoices for such fees and expenses shall not be required to comply with the U.S. Trustee guidelines, may be in summary form only (and shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine), and shall be provided to lead counsel to the Debtors, lead counsel to the Official Committee and the U.S. Trustee (the "**Fee Notice Parties**"). If no objection to payment of the requested fees and expenses are made, in writing by any of the Fee Notice Parties within five (5) calendar days after delivery of such invoices (the "**Fee Objection Period**"), then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors.  If an objection (solely as to

reasonableness) is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, then only the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtors.  Payments of any amounts set forth in this paragraph [●] shall not be subject to recharacterization, subordination or disgorgement.

11.      **Section 507(b) Reservation.**  The receipt by the Prepetition Secured Parties of the adequate protection provided pursuant to paragraphs [●] and [●] of this Interim Order shall not be deemed an admission that the interests of such Prepetition Secured Parties are indeed adequately protected.  Further, this Interim Order shall not prejudice or limit the rights of such Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection (subject to the Intercreditor Annex). Without limiting the foregoing, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided hereunder is insufficient to compensate the Prepetition Secured Parties for any Diminution in Value of their respective interests in Prepetition Collateral during any of the Chapter 11 Cases.

12.      **Approved DIP Budget.**  All borrowings under the DIP Facilities, and the use of Cash Collateral, shall at all times comply with the Approved DIP Budget (subject to Permitted Variances) and the DIP Loan Documents.  The Debtors shall comply with all financial reporting, budget, variance reporting and testing requirements (including, without limitation, the Senior DIP Budget Covenant, the Junior DIP Covenant and all Reporting Requirements, each as defined in the DIP Term Sheet) set forth in the DIP Term Sheet and the DIP Loan Documents.  .

13.     **Modification of Automatic Stay.**  Subject to paragraph [●] hereof, the automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified as necessary to permit: (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Secured Parties may reasonably request, to assure the perfection and priority of the DIP Liens and the DIP Superpriority Claims; (b) the Debtors to take all appropriate action to grant the Adequate Protection Liens and the Adequate Protection Claims set forth herein, and to take all appropriate action (including such action as the Prepetition Secured Parties may reasonably request) to ensure that the Adequate Protection Liens granted thereunder are perfected and maintain the priority set forth herein; (c) the Debtors to incur all liabilities and obligations, including all the DIP Obligations, to the DIP Secured Parties as contemplated under this Interim Order and the DIP Loan Documents, and to perform under the DIP Loan Documents any and all other instruments, certificates, agreements and documents which may be required, necessary or prudent for the performance by the applicable Debtors under the DIP Loan Documents and any transactions contemplated therein or in this Interim Order; (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents and this Interim Order; (e) the DIP Secured Parties and the applicable Prepetition Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents and this Interim Order; (f) subject to paragraphs [●] and [●]] hereof, the DIP Secured Parties to exercise, upon the occurrence and during the continuance of any Term DIP Termination Event (as defined below) or Javelin DIP Termination Event (as defined below), all rights and remedies provided for in the DIP Loan Documents and take any or all actions provided therein (subject, in each case, to the terms of the Intercreditor Annex); and (g) the implementation and exercise of all of the terms, rights,

benefits, privileges, remedies and provisions of this Interim Order and the DIP Loan Documents, in each case, without further notice, motion or application to, or order of this Court.

14.      **Perfection of DIP Liens and Adequate Protection Liens.**  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection and priority of all liens granted herein, including, without limitation, the DIP Liens and the Adequate Protection Liens, without the necessity of execution, filing or recording any financing statement, mortgage, notice or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable law) such liens, or to entitle the Prepetition Secured Parties and the DIP Secured Parties to the priorities granted herein.  Notwithstanding the foregoing, each of the DIP Agents, the Prepetition Term Loan Agent and/or Javelin, without any further consent of any party, is authorized to execute, file or record (and the DIP Agents, Prepetition Term Loan Agent and/or Javelin may require the execution, filing or recording), as each, in its sole discretion deems necessary, such financing statements, mortgages, notices of lien, and other similar documents to enable the DIP Agents, the Prepetition Term Loan Agent and/or Javelin to further validate, perfect, preserve and enforce the applicable DIP Liens or other liens and security interests granted hereunder, perfect in accordance with applicable law or to otherwise evidence the applicable DIP Liens and/or the applicable Adequate Protection Liens, as applicable, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Adequate Protection Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agents, the Prepetition Term

Loan Agent and/or Javelin all such financing statements, mortgages, notices, and other documents

as the DIP Agents, the Prepetition Term Loan Agent and/or Javelin may reasonably request.  The

DIP Agents, the Prepetition Term Loan Agent and/or Javelin, each in its discretion, may file a

photocopy of this Interim Order as a financing statement with any filing or recording office or with

any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices

of lien, or similar instruments.  To the extent that the Prepetition Term Loan Agent or Javelin is a

secured party under any account control agreement, listed as an additional insured, loss payee

under any of the Debtors' insurance policies or is the secured party under any loan document,

financing statement, deed of trust, mortgage or other instrument or document which may otherwise

be required under the law of any jurisdiction to validate, attach, perfect or prioritize liens (any such

instrument or document, a "**Security Document**"), the DIP Agents and Javelin shall also be

deemed to be the secured party under each such Security Document, and shall have all the rights

and powers attendant to that position (including, without limitation, rights of enforcement), and

shall act in that capacity and distribute any proceeds recovered or received in accordance with the

terms of this Interim Order and/or the Final Order, as applicable, and the other DIP Loan

Documents (subject, in each case, to the terms of the Intercreditor Annex).  The Prepetition Term

Loan Agent and Javelin shall serve as agents for each of the DIP Agents and Javelin solely for the

purposes of perfecting their security interests in and liens on all DIP Collateral that is of a type

such that perfection of a security interest therein (but for the entry of this Interim Order) may be

accomplished only by possession or control by a secured party.

15.    **Protection of DIP Lenders' Rights and Adequate Protection Liens.**  Except as

otherwise expressly provided herein and in the Intercreditor Annex, so long as there are any DIP

Obligations outstanding under the DIP Loan Documents, the Prepetition Secured Parties shall

(a) have no right to, and take no action to, foreclose upon or recover in connection with the liens

granted thereto pursuant to the Prepetition Loan Documents, this Interim Order or otherwise seek

or exercise any enforcement rights or remedies against any DIP Collateral or in connection with

the debt and obligations underlying the Prepetition Loan Documents or the Adequate Protection

Liens, including, without limitation, in respect of the occurrence or continuance of any event of

default under any of the Prepetition Loan Documents, (b) be deemed to have consented to any

release of DIP Collateral authorized under the DIP Loan Documents, (c) not file any further

financing statements, patent filings, trademark filings, copyright filings, mortgages, memoranda

of lease, notices of lien or similar instruments, or otherwise take any action to perfect their security

interests in the DIP Collateral unless, solely as to this clause (c), the DIP Lenders file financing

statements or other documents to perfect the liens granted pursuant to the DIP Loan Documents

and/or this Interim Order, or as may be required by applicable state law to continue the perfection

of valid and unavoidable liens or security interests as of the date of filing, and (d) deliver or cause

to be delivered, at the Debtors' cost and expense (for which the Prepetition Secured Parties shall

be reimbursed upon submission to the Debtors of invoices or billing statements), any termination

statements, releases and/or assignments (to the extent provided for herein) in favor of the DIP

Agents, Javelin and the DIP Term Secured Parties or other documents necessary to effectuate

and/or evidence the release, termination and/or assignment of the Adequate Protection Liens on

any portion of the DIP Collateral subject to any sale or disposition approved or arranged for by the

Senior DIP Agent and Javelin as applicable (subject to the Intercreditor Annex).

16.      **Proceeds of Subsequent Financing.**   Without limiting the provisions of the

immediately preceding paragraph, if at any time prior to the indefeasible payment in full in cash

of all of the DIP Obligations [and the Prepetition Secured Obligations], the termination of the DIP

Secured Parties' obligations to extend credit under the DIP Facilities and this Interim Order (including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates), and the satisfaction of the Superpriority DIP Claims and the Adequate Protection Claims, either the Debtors, the Debtors' estates, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Interim Order or the DIP Loan Documents then, unless otherwise agreed by the Required Senior DIP Lenders in their discretion (i) all of the cash proceeds derived from such credit or debt and all Cash Collateral (subject to the Carve-Out) shall immediately be turned over to the DIP Agents or Javelin, as applicable, to be applied to the DIP Obligations pursuant to the DIP Loan Documents and the Intercreditor Annex, and (ii) after payment in full of all DIP Obligations in cash, all the cash proceeds derived from such credit or debt and all Cash Collateral (subject to the Carve-Out) shall immediately be turned over to the Prepetition Term Loan Agent or Javelin, as applicable, to be applied pursuant to the applicable Prepetition Secured Obligations pursuant to the Prepetition Term Loan Documents or the Prepetition Javelin Loan Documents, as applicable, and, in each case, consistent with the Intercreditor Annex.

17.     **Financial Reporting; Access to Books and Records.**  Without limitation to the requirements of the DIP Loan Documents, the Debtors shall (a) provide to the DIP Agents, the Required Senior Lenders, Javelin, and the Prepetition Secured Parties (and, in each case, their respective consultants, advisors and professionals) (i) all financial information required under the DIP Loan Documents, and (ii) reasonable access to the Debtors' books and records, assets and properties, for purposes of monitoring the Debtors' businesses and the value of the DIP Collateral

and Prepetition Collateral, and shall be permitted to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations and inventory appraisals in respect of the DIP Collateral and Prepetition Collateral. The Debtors shall also provide such reports and information required to be provided in the Senior DIP Term Sheet, and such other reports and information as may be reasonably requested by the Prepetition Secured Parties (and their respective professionals), and reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.  In addition, the Debtors hereby authorize their accountants, attorneys, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the DIP Agents, the Required Senior Lenders, Javelin, and the Prepetition Secured Parties (and, in each case, their respective consultants, advisors and professionals) all such information as may be reasonably requested with respect to the business, results of operations and financial condition of any of the Debtors.

> 18. **Maintenance of DIP Collateral.**

> (a) The Debtors shall continue to maintain all property, operational and other insurance as required and as specified in the DIP Loan Documents.  The Debtors shall provide the Senior DIP Agent, the Junior DIP Agent and Javelin and its counsel with evidence of such insurance within one (1) calendar day after entry of this Interim Order.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, each of the DIP Agents and Javelin shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral, with any such distributions on account of such insurance being subject to the Intercreditor Annex.

(b)      The Debtors shall also maintain the cash management system in effect as of the Petition Date, as modified by this Interim Order and any order that may be entered by the Court in accordance with this Interim Order, which has first been agreed to by the Required Senior DIP Lenders and Javelin.  The Debtors shall not open any new account (other than the DIP Term Priority Account) that is not subject to the security interests of each of the Prepetition Secured Parties.

19.    **DIP Termination Events.**

(a)      **Senior DIP Termination Events.** Each of the following shall constitute a "Senior DIP Termination Event" under this Interim Order (each a "**Senior DIP Termination Event**", and the date upon which such DIP Term Loan Termination Event occurs, the "**Senior DIP Termination Date**"), unless waived in writing by the Required Senior DIP Lenders:  (1) the occurrence of an "Event of Default" under and as defined in the Senior DIP Credit Agreement or the Junior DIP Credit Agreement; (2) the occurrence of an event of default under any of the Javelin DIP Facility Agreements; (3) the scheduled maturity date of any of the DIP Facilities;  (4) 4:00 p.m. New York time on the date that is thirty-three (33) calendar days after the Petition Date, if the Final Order, in form and substance acceptable to the Required Senior DIP Lenders and each of the DIP Agents, has not been entered by such date; (5) the Debtors seek any amendment, modification, or extension of this Interim Order, or this Interim Order is otherwise amended, modified or extended, in each case, without the prior written consent of the Required Senior DIP Lenders (and no such consent shall be implied by any other action, inaction, or acquiescence of any of the Senior DIP Lenders) and each of the DIP Agents; or (6) the failure by the Debtors to timely perform any of the material terms, provisions, conditions, covenants, or other obligations under this Interim Order.

(b)      **Javelin DIP Termination Events**.  Each of the following shall constitute a "Javelin DIP Termination Event" under this Interim Order (each a "**Javelin DIP Termination Event**", and the date upon which such Javelin DIP Termination Event occurs, the "**Javelin DIP Termination Date**"; and the date upon the occurrence of either a Javelin DIP Termination Event or a Senior DIP Termination event, the "**DIP Termination Date**"), unless waived in writing by Javelin:  (1) the occurrence of an event of default under any of the Javelin DIP Loan Documents; (2) 4:00 p.m. New York time on the date that is thirty-three (33) calendar days after the Petition Date, if the Final Order, in form and substance acceptable to Javelin, has not been entered by such date; (3) the Debtors seek any amendment, modification, or extension of this Interim Order, or this Interim Order is otherwise amended, modified or extended, in each case, in a manner that materially adversely affects any of the Javelin DIP Loan Documents or the Javelin Prepetition Facilities, without Javelin's prior written consent (and no such consent shall be implied by any other action, inaction, or acquiescence of Javelin); or (4) the scheduled maturity date of any of the DIP Facilities; or (5) the failure by the Debtors to timely perform any of the material terms, provisions, conditions, covenants, or other obligations under this Interim Order.

20.      **Exercise of Remedies.**

(a)      Subject to the Intercreditor Annex, immediately upon the occurrence and during the continuation of a Senior DIP Termination Event or a Javelin DIP Termination Event (as applicable, a "**DIP Termination Event**"), (i) the Senior DIP Agent, at the direction of the Required Senior Lenders, shall (in the case of a Senior DIP Termination Event), and (ii) Javelin may (in the case of a Javelin DIP Termination Event), and any automatic stay, whether arising under section 362 of the Bankruptcy Code or otherwise, is hereby modified, without further notice to, hearing of, or order from this Court, to the extent necessary to permit Javelin or the Senior DIP

46

Agent (as applicable, the "**Applicable DIP Secured Party**") to, upon the delivery of written notice (which may include electronic mail) to the Remedies Notice Parties, (a) declare all DIP Obligations owing under the applicable DIP Facility to be immediately due and payable, (b) terminate, reduce or restrict any commitment to extend credit to the Debtors under the applicable DIP Facility (to the extent any such commitment remains), (c) terminate the applicable DIP Facility and any applicable DIP Loan Documents as to any future liability or obligation thereunder, but without affecting any of the DIP Liens or the DIP Obligations; (d) terminate and/or revoke the Debtors' right, if any, under this Interim Order and the applicable DIP Loan Documents to use any Cash Collateral (subject to the last sentence of this paragraph [●]); (e) invoke the right to charge interest at the default rate under the applicable DIP Facility, (f) freeze monies or balances in the Debtors' accounts; (g) immediately set-off any and all amounts owing by the Applicable DIP Secured Party, including in accounts maintained by the Debtors with the Applicable DIP Secured Party against the applicable DIP Obligations (including, solely with respect to the Senior DIP Agent and the Senior DIP Facility, to immediately set-off and sweep all amounts held in the DIP Term Priority Account), (h) otherwise enforce any and all rights against the DIP Collateral in the possession of the Applicable DIP Secured Party, including, without limitation, disposition of DIP Collateral solely for application towards the applicable DIP Obligations; and (i) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the applicable DIP Loan Documents or applicable law; *provided, however,* that prior to the exercise of any right in clauses (f) though (i) of this paragraph, the Applicable DIP Secured Party shall be required to provide five (5) business days' written notice to counsel to the Debtors, counsel to any Official Committee and the U.S. Trustee (the "**Remedies Notice Parties**") of the Applicable DIP Secured Party's intent to exercise its rights and remedies (the "**Remedies Notice Period**").

(b)     Unless during such Remedies Notice Period the Court determines that a DIP Termination Event has not occurred, the Applicable DIP Secured Party shall be deemed to have received relief from the automatic stay, and may foreclose on all or any portion of the DIP Collateral, collect accounts receivable, and apply the proceeds thereof to the applicable DIP Obligations and/or the applicable Adequate Protection Liens, occupy the Debtors' premises to sell or otherwise dispose of the DIP Collateral, or otherwise exercise all rights and remedies available against the DIP Collateral permitted by applicable law or equity, without further notice to, hearing of, or order from this Court, and without restriction or restraint by any stay under sections 105 of 362 of the Bankruptcy Code, or otherwise (in each case, subject to paragraph [●] hereof).  Upon the occurrence and during the continuation of a DIP Termination Event and the expiration of the Remedies Notice Period, the Applicable DIP Secured Party and any liquidator or other professional acting at the Applicable DIP Secured Party's direction will have the right to access and utilize, on a royalty-free basis, any trade names, trademarks, copyrights or other intellectual property and any warehouse, distribution centers, store or other locations that the Debtors have a right to occupy to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the DIP Collateral consistent with the Intercreditor Annex, including pursuant to any Court approved sale process (subject, in each case, to the rights of third parties in each of the foregoing).

(c)     The Debtors shall reasonably cooperate with the Applicable DIP Secured Party in their exercise of rights and remedies, whether against DIP Collateral or otherwise, and the Debtors waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, other than to dispute whether a DIP Termination Event has in fact occurred; *provided*, *however,* that that none of the Applicable DIP Secured Parties shall object to a request by the

Debtors for an expedited hearing before the Court to contest whether a DIP Termination Event has

in fact occurred.  Notwithstanding anything to the contrary set forth in this paragraph [●],during

the Remedies Notice Period, the Debtors may use Cash Collateral to pay only the following

amounts and expenses:  (i) the Carve-Out; and (ii) amounts that the Debtors have determined in

good faith are in the ordinary course, are critical to the preservation of the Debtors and their estates

and have been approved in advance in writing by the Required Senior DIP Lenders.

      21.     **Real Property Leases.**[7] As a requirement and precondition to the willingness of

the Senior DIP Secured Parties to lend and in furtherance of the Term DIP Superpriority Claims

provided for in this Interim Order and pursuant to the DIP Loan Documents, which are payable

from and have recourse to all DIP Collateral, including, among other things, each lease of

Leasehold Property (as defined in the Senior DIP Term Sheet and/or the Senior DIP Credit

Agreement) to which a Debtor is a counterparty (each, a "**Real Property Lease**"), the Senior DIP

Secured Parties shall have the following protections with respect to the Debtors' Real Property

Leases, regardless of whether any particular Real Property Lease or group of Real Property Leases

constitutes DIP Collateral, which protections shall be enforced by the Senior DIP Secured Parties

(subject to the terms of the Intercreditor Annex) as authorized, approved, and granted pursuant to

the provisions of this Interim Order and in accordance with the terms of the Senior DIP Loan

Documents (and, after the indefeasible payment in full in cash of the Senior DIP Obligations, (i)

the rights of the Senior DIP Agent shall automatically transfer and be available to the Junior DIP

Agent, Javelin and the Prepetition Term Loan Agent, as applicable, in accordance and with and

subject to the terms of the Intercreditor Annex, (ii) defined terms used in this paragraph [●] relating

to the Senior DIP Loan Documents shall be deemed to be references to corresponding defined

---

[7] NTD: This provision replicates a similar provision in the MEC DIP Order; subject to further review by Proskauer.

terms relating to the Junior DIP Loan Documents, the Prepetition Term Loan Documents and the

Prepetition Javelin Loan Documents, as applicable, (iii) any notice herein required to be delivered

pursuant to this paragraph [●] to the Senior DIP Agent shall instead be required to be delivered to

the Junior DIP Agent, Javelin and the Prepetition Term Loan Secured Parties (as the case may be),

and (iv) the automatic stay provisions pursuant to section 362 of the Bankruptcy Code are vacated

and modified to the extent necessary so as to permit the Senior DIP Agent, the Senior DIP Lenders,

the Junior DIP Agent, the Junior DIP Lenders, Javelin and the Prepetition Term Loan Secured

Parties (as the case may be) to exercise any of their rights with respect to Real Property Leases

under this paragraph [●]):

    (a)    *Remedies Upon an Event of Default.*  Subject to the Intercreditor Annex, if a DIP Termination Event shall have occurred and be continuing, the Senior DIP Agent (on behalf of the Senior DIP Secured Parties) shall, with respect to any Real Property Lease or group of Real Property Leases, be permitted, and is hereby authorized, approved, and granted the following rights and remedies:

    (i)    to exercise the Debtors' rights pursuant to section 365(f) of the Bankruptcy Code with respect to any such Real Property Lease(s) and, subject to this Court's approval after notice and hearing, assign any such Real Property Lease(s) in accordance with section 365 of the Bankruptcy Code notwithstanding any language to the contrary in any of the applicable lease documents or executory contracts;

    (ii)    to require any Debtor to complete promptly, pursuant to section 363 of the Bankruptcy Code, subject to the rights of the Senior DIP Secured Parties to credit bid (unless otherwise ordered by the Court), an [Asset Sale] of any such Real Property Lease(s) in one or more parcels at public or private sales for cash, at such time or times and at such price or prices and upon such other terms as the Required Senior DIP Lenders may deem commercially reasonable;

    (iii)    to access the leasehold interests of the Debtors or debtors in possession in any such Real Property Lease(s) for the purpose of (A) marketing such property or properties for sale and (B) removing any DIP Collateral thereon or arranging for the Asset Sale of any such DIP Collateral except to the extent prohibited by the terms of the Real Property Lease (unless the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code); *provided that* the foregoing shall not preclude any counterparty to a Real Property Lease (each, a "**Counterparty**") from an opportunity to be heard in this Court on notice with respect to the foregoing;

(iv)      (A) to find an acceptable (in the Required Senior DIP Lenders' good faith and reasonable discretion) replacement lessee, which may include the Senior DIP Agent, the Senior DIP Lenders or any of their affiliates, to whom such Real Property Lease(s) may be assigned, (B) to hold, and manage all aspects of, an auction or other bidding process to find such acceptable replacement lessee, (C) in connection with any such auction, agree, on behalf of the Debtors, to reimburse reasonable fees and expenses of any stalking horse bidder, if necessary, and/or (D) to notify the Debtors of the selection of any replacement lessee pursuant to this paragraph [●], upon receipt of which the Debtors shall promptly (1) file a motion seeking, on an expedited basis, approval of the Debtors' assumption and assignment of such Real Property Lease(s) to such proposed assignee, and (2) cure any defaults, if any, that have occurred and are continuing under such Real Property Lease(s) to the extent required by the Court (subject to the Senior DIP Agent's and Senior DIP Lenders' right to cure defaults as set forth in paragraph [●]) of this Interim Order); or

(v)      to direct the Debtors to (A) assign any such Real Property Lease(s) to the Senior DIP Agent, Senior DIP Lenders as DIP Collateral securing the Senior DIP Obligations, subject to clause (B), if applicable, (B) seek this Court's approval of the assumption of any such Real Property Lease(s) to the extent that this Court determines pursuant to a final order that an assumption is required in order to assign such lease or leases as DIP Collateral, and (C) promptly cure any default that has occurred and is continuing under such Real Property Lease(s) to the extent required by the Court; provided that any assignment of any such Real Property Lease(s) as DIP Collateral securing the Senior DIP Obligations shall not impair the Debtors' ability to subsequently assume (if not already assumed) and assign such Real Property Lease(s) pursuant to section 365 of the Bankruptcy Code or to enjoy the protections of section 365(f) of the Bankruptcy Code with respect to any such assignment.

(b)      *Right to Credit Bid.* Prior to any assignment of any Real Property Lease or group of Real Property Leases, the Debtors shall first provide at least five (5) business days' prior written notice (the "**Initial Notice Period**") to the Senior DIP Agent, unless such notice provision is waived by the Senior DIP Agent and the Required Senior DIP Lenders, which Initial Notice Period may be extended up to a further twenty-five (25) days by the Required Senior DIP Lenders in their sole discretion by delivering written notice of such extension to the Debtors prior to expiration of the Initial Notice Period, and by any further period as is mutually agreeable between the Required Senior DIP Lenders and the Debtors (such notice period being the "**Aggregate Notice Period**"). During such notice period, the Senior DIP Agent or its designee shall be permitted, subject to the terms of the Senior DIP Loan Documents and the Intercreditor Annex and at the written direction of the Required Senior DIP Lenders, to credit bid all or a portion of the outstanding Senior DIP Obligations (in an amount equal to at least the consideration offered by any other party in respect of such assignment) outstanding under the Senior DIP Facility as consideration in exchange for any such Real Property Lease(s); *provided that* to the extent the Debtors are entitled to retain a portion of the total consideration paid in respect of such assignment in accordance with the Senior DIP Loan Documents, the applicable portion of the consideration to be retained by Debtors shall be paid in cash (provided that such proceeds

shall constitute DIP Collateral and Cash Collateral). In addition, in connection with the exercise of any of the Senior DIP Agent's or the Senior DIP Lenders' rights pursuant to the Senior DIP Loan Documents or this Interim Order to direct or compel a sale or other Asset Sale of any Real Property Lease(s), the Senior DIP Agent or its designee, on behalf of the Senior DIP Secured Parties, shall be permitted (at the written direction of the Required Senior DIP Lenders) to credit bid all or a portion of the outstanding Senior DIP Obligations (in an amount equal to at least the consideration offered by any other party in respect of such sale or other Asset Sale) as consideration in exchange for such Real Property Lease(s). Pursuant to section 364(e) of the Bankruptcy Code, absent a stay pending appeal, the Senior DIP Agent's or its designee's right to credit bid shall not be affected by the reversal or modification on appeal of the Debtors' authorization pursuant to this Interim Order to obtain credit and incur debt as and in accordance with the terms set forth herein.

(c)  *Right of First Refusal with Respect to Proposed Assignments and Rejections of Real Property Leases.* Unless all Senior DIP Obligations shall have indefeasibly been satisfied pursuant to the Senior DIP Loan Documents, the Debtors shall not seek, and it shall constitute a DIP Termination Event and terminate the right of the Debtors under the Senior DIP Loan Documents and this Interim Order if any of the Debtors seeks, the sale or other Asset Sale of, or the rejection or other termination of, or if there is entered an order pursuant to section 365 of the Bankruptcy Code assigning or rejecting, any Real Property Lease or group of Real Property Leases, or if any Real Property Lease or group of Real Property Leases is deemed rejected due to the expiration of the assumption period provided for in section 365(d)(4) (the "**Statutory Rejection Date**"), without the Debtors first providing thirty (30) days' prior written notice to the Senior DIP Agent, or if such notice is given more than thirty (30) days in advance of the Statutory Rejection Date, prior written notice at least equal to the Aggregate Notice Period; *provided, however,* that the right of first refusal of the Senior DIP Agent as set forth in this paragraph [● (c)] shall not apply to (x) any assignment or sale of a Real Property Lease or group of Real Property Leases to a winning bidder at an auction authorized by this Court, and (y) so long as no DIP Termination Event has occurred and is ongoing, or to the extent such action would result in an Termination Event, any assignment or sale of a Real Property Lease or group of Real Property Leases that are not material leases generating cash proceeds (net of reasonable costs, expenses, and any applicable taxes) up to $[250,000] in the aggregate value for all such sales or assignments. During such notice period, the Senior DIP Agent shall be permitted to: (A) notify the Debtors that it elects to take action pursuant to this paragraph, upon receipt of which the Debtors shall promptly withdraw any previously filed rejection motion, (B) find an acceptable (in the Required Senior DIP Lenders' good faith and reasonable discretion) replacement lessee, which may include the Senior DIP Agent, the Senior DIP Lenders or any of their affiliates, to whom any such any Real Property Lease or group of Real Property Leases may be assigned (subject to Court approval), (C) hold, and manage all aspects of, an auction or other bidding process to find such acceptable replacement lessee, (D) in connection with any such auction, agree, on behalf of the Debtors (and subject to Court approval) to reimburse the reasonable fees and expenses of any stalking horse bidder, if necessary, and (E) notify the Debtors of the selection of any replacement lessee pursuant to this paragraph, upon receipt of which the Debtors shall (1) not seek to reject any such Real Property Lease(s), (2) promptly withdraw any pending

motion to reject any such Real Property Lease(s), (3) promptly file a motion seeking, on an expedited basis, approval of the Debtors' assumption and assignment of such Real Property Lease(s) to the Required Senior DIP Lenders' proposed assignee, and (4) promptly cure any defaults that have occurred and are continuing under such Real Property Lease(s) to the extent authorized by the Court; or direct the Debtors to (A) assign any Real Property Lease or group of Real Property Leases as Collateral securing the DIP Obligations (subject to Court approval), (B) seek the Court's approval of the assumption of any such Real Property Lease(s) if it is determined pursuant to a final order of this Court that an assumption is required in order to assign such lease(s) as Collateral, and (C) promptly cure any defaults that have occurred and are continuing under such Real Property Lease(s) (subject to the DIP Lenders' right to cure defaults as set forth in paragraph [●] of this Interim Order) to the extent authorized by the Court; *provided that* any assignment of any Real Property Lease(s) as Collateral securing the Senior DIP Obligations shall not impair the Debtors' ability to subsequently assume (if not already assumed) and assign any such Real Property Lease(s) pursuant to section 365 of the Bankruptcy Code or to enjoy the protections of section 365(f) of the Bankruptcy Code with respect to any such assignment. Notwithstanding anything to the contrary herein, the foregoing rights of the Senior DIP Agent set forth in this paragraph shall not apply to Real Property Leases that are rejected, terminated, sold, or assigned on the effective date of any plan of reorganization in any of the Chapter 11 Cases that, among other things, indefeasibly repays the DIP Obligations in full on the effective date thereof. For the avoidance of doubt, on or prior to the thirtieth (30) day prior to the Statutory Rejection Date (as provided in section 365(d)(4) of the Bankruptcy Code), the Debtors shall have delivered written notice to the Senior DIP Agent of each outstanding Real Property Lease that they intend to reject (including, without limitation, through statutory rejection on the Statutory Rejection Date) from and after the date of such notice (or, if applicable, notice that the Debtors have obtained the applicable landlord's consent to extension of the Statutory Rejection Date); *provided that* if the Debtors fail to deliver any such notice to the Senior DIP Agent prior to such date with respect to any such Real Property Lease(s) (or a notice indicating that no such Real Property Lease(s) shall be rejected), the Debtors shall be deemed, for all purposes hereunder, to have delivered notice to the Senior DIP Agent as of such date that they intend to reject all outstanding Real Property Leases.

(d)      *Assumption Orders.* Any order of this Court approving the assumption of any Real Property Lease shall specifically provide that the applicable Debtor shall be authorized to assign such Real Property Lease pursuant to, and to enjoy the protections of, section 365(f) of the Bankruptcy Code subsequent to the date of such assumption. To the extent that such provision is for any reason not included in any order of the Court approving the assumption of any Real Property Lease, then such Real Property Lease may not be assumed by the applicable Debtor unless the order approving the assumption provides for the assignment of such Real Property Lease, on the date of such order, to an acceptable (in the Required Senior DIP Lenders' good faith and reasonable discretion) replacement lessee (which may include the Senior DIP Agent, the Senior DIP Lenders, or their respective affiliates).

(e)      *Senior DIP Lenders' Right to Cure Defaults.* If any of the Debtors are required to cure any monetary defaults under any Real Property Lease pursuant to any order of this Court or otherwise in connection with any assumption or assumption and assignment

of any such Real Property Lease pursuant to section 365(f) of the Bankruptcy Code, and such monetary default is not, within five (5) business days of the receipt by such Debtor of notice from the Senior DIP Agent pursuant to the applicable provision(s) of the Senior DIP Credit Agreement or any other notice from the Senior DIP Agent requesting the cure of such monetary default, cured in accordance with the provisions of such applicable court order as arranged by the Senior DIP Agent, the Senior DIP Agent or the Senior DIP Lenders may cure any such monetary defaults on behalf of the applicable Debtor(s).

22.     **Postpetition Release.**  In addition, subject to the entry of the Final Order, notwithstanding anything to the contrary set forth herein, upon the repayment of all DIP Obligations owed to the DIP Secured Parties by the Debtors and the termination of the rights and obligations arising under the DIP Loan Documents (which payment and termination shall be on terms and conditions acceptable to the DIP Agents), the DIP Agents and the DIP Lenders shall be deemed released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring on or prior to the date of such repayment and termination, in each case, arising under, in connection with or related to the DIP Loan Documents or the Interim Order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve-Out).

23.     **DIP Fees and Expenses.**  The Debtors are authorized and directed to pay, in cash and on a current basis, all DIP Fees and Expenses, as and when due under the DIP Loan Documents and this Interim Order, whether or not the transactions contemplated hereby are consummated. Payment of all DIP Fees and Expenses shall not be subject to review or allowance by the Court. The invoices for such DIP Fees and Expenses shall not be required to comply with the U.S. Trustee guidelines, may be in summary form only (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the

54

attorney client privilege or of any benefits of the attorney work product doctrine), and shall be provided to counsel to the Debtors, with a copy to the Fee Notice Parties. If no objection to payment of the requested fees and expenses are made, in writing by any of the Fee Notice Parties within the Fee Objection Period, then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors. If an objection (solely as to reasonableness) is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, then only the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtors. Notwithstanding the foregoing, the Debtors are authorized, without further notice or hearing, to (a) pay on the date on which the Interim Financing is initially funded all reasonable and documented fees, costs, and out-of-pocket expenses of each of the DIP Agents, Javelin and the Initial DIP Lenders incurred on or prior to such date to the extent otherwise payable in accordance with the terms of the DIP Loan Documents, and (b) to pay on the date that the first borrowing is made following entry of the Final Order, all DIP Fees and Expenses incurred on or prior to such date to the extent otherwise payable in accordance with the terms of the DIP Loan Documents and this Interim Order. Payments of any amounts set forth in this paragraph [●] shall not be subject to recharacterization, subordination or disgorgement except as expressly provided in the preceding sentence.

24. **Indemnification.** The Debtors shall jointly and severally indemnify and hold harmless each of the DIP Agents, each DIP Secured Party, and each of their respective officers, directors, employees, parents, subsidiaries, affiliates, agents, advisors, attorneys and representatives (each, an "**Indemnified Party**") from and against any and all claims, damages,

losses, liabilities, costs and expenses (including, without limitation, fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case, arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to the DIP Facilities, the DIP Liens, the DIP Loan Documents or the transactions contemplated thereby, or any use made or proposed to be made with the proceeds of the DIP Facilities, whether or not such investigation, litigation or proceeding is brought by any Debtor or any of its subsidiaries, any shareholders or creditors of the foregoing, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or under the DIP Loan Documents are consummated, except to the extent such claim, damage, loss, liability or expense is found in a final non appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct.

25.    **Proofs of Claim.**  The DIP Agents, the DIP Secured Parties and the Prepetition Secured Parties shall not be required to file proofs of claim in any of the Chapter 11 Cases or any of the Successors Cases for any claim allowed herein or therein in respect of the Prepetition Secured Obligations.  Any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases shall not apply to the DIP Secured Parties or the Prepetition Secured Parties; *provided, however*, that notwithstanding any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, the Senior DIP Agent, on behalf of the Senior DIP Secured Parties, the Junior DIP Agent, on behalf of itself and the Junior DIP Lenders, Javelin and the Prepetition Agent on behalf of the Prepetition Secured Parties , may (but are not required) in their discretion to file (and amend and/or

supplement) a proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or any Successor Cases for any claim allowed herein, and any such proof of claim may (but is not required to be) filed as one consolidated proof of claim against all of the Debtors, rather than as separate proofs of claim against each Debtor.  Any proof of claim filed by the DIP Secured Parties or the Prepetition Secured Parties shall be deemed to be in addition to (and not in lieu of) any other proof of claim that may be filed by any such persons.

26.     **Carve-Out.**

(a)     As used in this Interim Order, the "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in <u>clause (iii)</u> below); (ii) all reasonable fees and expenses up to $[20,000] incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in <u>clause (iii)</u> below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (including any restructuring, sale, financing, or other success fee of any investment bankers or financial advisors of the Debtors or the Official Committee, in each case solely to the extent such fee is earned pursuant to the terms of the applicable agreement giving rise to such fee, prior to delivery of a Carve-Out Trigger Notice) (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Official Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the applicable DIP Agent (in accordance with and subject to this Interim Order and the Intercreditor Annex) of a Carve-Out

Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a

Carve-Out Trigger Notice, in the case of each Committee Professional, provided, however,

Allowed Professional Fees for Committee Professionals (but not Debtor Professionals) will be

subject to the monthly professional fee line item included in the Approved DIP Budget with respect

to such Committee Professional (the "**Professional Fee Budget**"); and (iv) Allowed Professional

Fees of Professional Persons in an aggregate amount not to exceed $[750,000] incurred after the

first business day following delivery by the applicable DIP Agent (in accordance with and subject

to this Interim Order and the Intercreditor Annex) of the Carve-Out Trigger Notice, to the extent

allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set

forth in this clause (iv) being referred to as the "**Post-Carve-Out Trigger Notice Cap**"). For

purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by

email (or other electronic means) by the applicable DIP Agent (pursuant to the written instruction

of the Required Senior DIP Lenders or the Required Junior DIP Lenders, as applicable, and in

accordance with and subject to this Interim Order and the Intercreditor Annex) to lead restructuring

counsel to the Debtors, the U.S. Trustee and counsel to the Official Committee, which notice may

be delivered following the occurrence and during the continuation of a Termination Event, stating

that the Post-Carve-Out Trigger Notice Cap has been invoked; provided that nothing herein shall

be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or

compensation described in clauses (i), (ii), (iii), or (iv) above, on any grounds.

(b)     *Carve-Out Reserves.* The Debtors shall establish and fund a segregated account (the

"**Carve-Out Reserve Account**") for purposes of funding the Carve-Out.  Upon entry of this

Interim Order, the Debtors shall deposit in the Carve-Out Reserve Account an amount equal to the

aggregate amount of Allowed Professional Fees projected to accrue from the Commencement Date

through [February 29], 2020 (the "**Initial Funded Reserve Amount**"). Commencing on [March 1], 2020 (or the first business day thereafter), and on the first business day of each month thereafter, the Debtors shall deposit in the Carve-Out Reserve Account an amount equal to the aggregate amount of Allowed Professional Fees projected to accrue for the following month, up to the monthly line-item amount  set forth in the Professional Fee Budget (the "**Monthly Funded Reserve Amoun**t").  At any time prior to the Termination Declaration Date (as defined below), if a restructuring, sale, financing, or other success fee has been earned by a Professional Person in accordance with the terms of the applicable Court-approved agreement, the Debtors shall deposit in the Carve-Out Reserve Account an amount equal to such fee (with respect to Committee Professionals in an amount up to the monthly line-item amount as set forth in the Professional Fee Budget).

(c)     The Carve-Out Reserve Account shall be maintained, and the funds therein (the "**Funded Reserve Amount**") shall be held in trust for the benefit of Professional Persons. Except as otherwise provided in this Interim Order, any and all amounts in the Carve-Out Reserve Account shall not be subject to any cash sweep foreclosure or lender remedy provisions in the Prepetition Loan Documents, the DIP Loan Documents or this Order and neither the Prepetition Secured Parties, the DIP Agents nor the DIP Lenders shall be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary in the Prepetition Credit Documents or DIP Financing Agreements  until the Carve-Out Reserves have been fully funded; *provided, however,* that DIP Secured Parties and the Prepetition Secured Parties shall have a lien and security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the applicable DIP Agent, for the benefit of the respective DIP Secured Parties, for application in accordance with the DIP Loan Documents (subject to the Intercreditor Annex).

(d)        On the day on which a Carve-Out Trigger Notice is given by the applicable DIP

Agent (in accordance with and subject this Interim Order and the Intercreditor Annex) to the

Debtors with a copy to counsel to the Official Committee (the "**Termination Declaration Date**"),

the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand

as of such date and any available cash thereafter held by any Debtor (net of any retainer amounts

held by any Professional) to fund the Carve-Out Reserve Account by an additional amount equal

to the then unpaid amounts of the Allowed Professional Fees (to the extent not already included in

the Funded Reserve Amount), up to the monthly line-item amount for each Committee

Professional (but not Debtor Professionals) as set forth in the Professional Fee Budget; *provided,*

*however,* that in the event that a Termination Declaration Date occurs, Professional Persons shall

have two (2) business days from the delivery of the Carve-Out Trigger Notice to deliver reasonable

good faith estimates of the cumulative total amount of unreimbursed fees and expenses incurred

by such Professional Person ("**Total Fee Estimates**") to the Debtors, and the Debtors shall fund

additional amounts into the Carve-Out Reserve Account equal to the difference between, as

applicable, the Funded Reserve Amount on account of such Professional Person and the amount

accrued and claimed in the applicable Total Fee Estimate (up to the monthly line-item amount for

each Committee Professional as set forth in the Professional Fee Budget) into the Carve-Out

Reserve Account (the "**Pre-Carve Out Trigger Notice Reserve**").

(e)        On the DIP Termination Declaration Date, after funding the Pre-Carve-Out Trigger

Notice Reserve in accordance with the terms of this Interim Order, the Debtors shall utilize all

remaining cash on hand as of such date (net of any retainers held by Professional Persons) and any

available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-

Carve-Out Trigger Notice Cap (the "**Post-Carve-Out Trigger Notice Reserve**" and, together with

the Pre-Carve-Out Trigger Notice Reserve, the "**Carve-Out Reserves**"). All funds in the Pre-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth above (the "**Pre-Carve-Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve-Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay Javelin and the applicable DIP Agent for the benefit of the respective DIP Secured Parties, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all commitments under the DIP Loan Documents (the "**DIP Commitments**") have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date (subject to the Intercreditor Annex).  All funds in the Post-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth above (the "**Post-Carve-Out Amounts**"), and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay Javelin and the applicable DIP Agent for the benefit of the respective DIP Secured Parties, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date (subject to the Intercreditor Annex). Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, if either of the Carve-Out Reserves is not funded in full in the amounts set forth in this paragraph [●(d)], then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth in this paragraph [●(d)], prior to making any payments to the DIP Secured Parties or the Prepetition Secured Parties, as applicable. Notwithstanding anything to the contrary in this

Interim Order, (i) disbursements by the Debtors from the Carve-Out Reserves shall not constitute

DIP Loans or increase or reduce the DIP Obligations, and (ii) the failure of the Carve-Out Reserves

to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out.

(f)      *Payment of Allowed Professional Fees Prior to the Termination Declaration Date.*

Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date

in respect of any Allowed Professional Fees shall not reduce the Post-Carve-Out Trigger Notice

Cap.

(g)      *No Direct Obligation To Pay Allowed Professional Fees.* None of the DIP Secured

Parties or the Prepetition Secured Parties shall be responsible for the payment or reimbursement

of any fees or disbursements of any Professional Person incurred in connection with the Chapter

11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim

Order or otherwise shall be construed to obligate any of the DIP Secured Parties or the Prepetition

Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional

Person or to guarantee that the Debtors have sufficient funds to pay such compensation or

reimbursement.

(h)      *Payment of Carve-Out On or After the Termination Declaration Date.* Any

payment or reimbursement made on or after the occurrence of the Termination Declaration Date

in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-

for-dollar basis.

(i)      For the avoidance of doubt and notwithstanding anything in this Interim Order, the

DIP Facilities or in any Prepetition Loan Documents to the contrary, the Carve-Out shall be senior

to all liens and claims securing the DIP Facilities, the Adequate Protection Liens, and the Adequate

Protection Claims, and any and all other forms of adequate protection, liens, or claims securing

the DIP Obligations or the Prepetition Obligations.

27. **Limitations on the DIP Facilities, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, the Carve-Out and Other Funds.** Notwithstanding anything

contained in the DIP Loan Documents, this Interim Order or any other order of the Court to the

contrary, no DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of

the foregoing, any portion of the Carve-Out or any other cash or funds may be used, directly or

indirectly, by any of the Debtors, any Official Committee or any trustee or other estate

representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or

entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection

therewith):  (a) to object to, contest, prevent, hinder, delay or interfere with, in any way, the DIP

Secured Parties' or the Prepetition Secured Parties' enforcement or realization upon any of the

DIP Collateral, Prepetition Collateral or Cash Collateral, once a DIP Termination Event occurs;

(b) except to the extent expressly permitted by the terms of the DIP Loan Documents and this

Interim Order,  to use or seek to use Cash Collateral or, to sell or otherwise dispose of DIP

Collateral or Prepetition Collateral, in each case, without the consent of the Required Senior DIP

Lenders; (c) to investigate (including by way of examinations or discovery proceedings, whether

formal or informal), prepare, assert, join, commence, support or prosecute any action for any claim,

counter-claim, action, proceeding, application, motion, objection, defense, or other contested

matter seeking any order, judgment, determination or similar relief against, or adverse to the

interests of, in any capacity, against any of the Releasees with respect to any transaction,

occurrence, omission, action or other matter arising under, in connection with or related to this

Interim Order, the DIP Facilities, the DIP Loan Documents, the DIP Obligations, the Prepetition

Liens, the Prepetition Secured Obligations or the Prepetition Loan Documents or the transactions contemplated therein or thereby, including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any claim or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the DIP Loan Documents, the Prepetition Loan Documents, the Prepetition Liens, the Adequate Protection Liens, the Adequate Protection Claims or the Prepetition Secured Obligations, (D) any claim or cause of action seeking to challenge, invalidate, modify, set aside, avoid, marshal, subordinate, or recharacterize in whole or in part, the DIP Obligations, the DIP Liens, the DIP Superpriority Claim, the DIP Collateral, the Prepetition Collateral, the Prepetition Secured Obligations, the Adequate Protection Liens and the Adequate Protection Claims, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to any of the DIP Secured Parties hereunder or under any of the DIP Loan Documents or the Prepetition Secured Parties under any of the Prepetition Loan Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Secured Parties; or the Prepetition Secured Parties' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents or Prepetition Loan Documents and this Interim Order and/or the Final Order (as applicable); *provided*, *however*, that no more than $[●] may be used for allowed fees and expenses incurred solely by any Official Committee, if appointed, in investigating, but not objecting to, challenging, litigating (including by way of discovery), opposing, or seeking to subordinate or recharacterize the validity, enforceability, perfection and

priority of the Prepetition Liens, the Prepetition Obligations or the Prepetition Loan Documents during the Challenge Period (as defined below).

28.   **Reservation of Certain Third Party Rights and Bar of Challenges and Claims.**

(a)   The stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, in paragraph [●] of this Interim Order (collectively, the "**Stipulations**"), shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases) in all circumstances and for all purposes.  The Stipulations shall be binding upon all other parties in interest (including without limitation, any Official Committee, if appointed) and any other person or entity acting or seeking to act on behalf of the Debtors' estates, in all circumstances and for all purposes, unless (1) an Official Committee, if any, or a party in interest (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the Challenge Deadline (as defined below)), has timely and duly filed an adversary proceeding or contested matter (subject to the limitations contained herein) (each, a "**Challenge Proceeding**") by the Challenge Deadline, objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Obligations, the Prepetition Liens or the Prepetition Loan Documents, or otherwise asserting or prosecuting any Avoidance Action or any other claim, counterclaim, cause of action, objection, contest, defense or other challenge (a "**Challenge**") against any of the Prepetition Secured Parties or any of their respective affiliates, subsidiaries, officers, directors, managers, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and the respective successors and assigns thereof (in each case, in their respective capacities as such), arising under, in connection with or related to the Debtors, the Prepetition Obligations, the

Prepetition Liens or the Prepetition Loan Documents, and (2) there is entered a final non-appealable order in favor of the plaintiff in any such timely filed Challenge Proceeding; *provided, however,* that (i) as to the Debtors, any and all such Challenges are hereby irrevocably waived and relinquished as of the Petition Date, and (ii) any pleadings filed in any Challenge Proceeding shall set forth with specificity the basis for such Challenge (and any Challenges not so specified prior to the Challenge Deadline shall be deemed forever, waived, released and barred).

(b)      If no such Challenge Proceeding is timely and properly filed prior to the Challenge Deadline, then, without further notice to any person or entity or order of the Court, (a) the Stipulations shall be binding on all parties in interest (including, without limitation, any Official Committee);  (b) the Prepetition Obligations shall constitute allowed claims and shall not be subject to any defense, claim, counterclaim, recharacterization, subordination, disgorgement, offset, avoidance, for all purposes in these Chapter 11 Cases and any Successor Cases;  (c) the Prepetition Loan Documents shall be deemed to have been valid, as of the Petition Date, and enforceable against each of the Debtors in the Chapter 11 Cases and any Successor Cases; (d) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense; and (e) the Prepetition Obligations, the Prepetition Liens and the Prepetition Loan Documents shall not be subject to any other or further claim or Challenge by any Official Committee, any non-statutory committees appointed or formed in these Chapter 11 Cases or any Successor Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates.

(c)      If any such Challenge Proceeding is timely and properly filed prior to the Challenge Deadline, the Stipulations shall nonetheless remain binding and preclusive (as provided in

paragraph [●](b) hereof) on any Official Committee and on any other person or entity, except to the extent that such Stipulations were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.

(d)    The "**Challenge Deadline**" shall mean the date that is (A) the earlier of (i) [●] days after the entry of the Final Order, or (ii) [●], or (B) such later date that has been agreed to in writing, prior to the expiration of the deadline to commence a Challenge, by (i) with respect to the Prepetition Term Loan Facility, the Prepetition Term Loan Agent (at the direction of the Required Lenders (as defined in the Prepetition Term Loan Credit Agreement)) and (ii) with respect to the Prepetition Javelin Facility, Javelin.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any Official Committee or any non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, and all rights to object to such standing are expressly reserved.

29.    **Section 506(c) Waiver.**  In partial consideration for, among other things, the Carve-Out, the payments to be made under the Approved Budget to administer the Chapter 11 Cases, the priming of certain Prepetition Liens, and consent to the use of Cash Collateral, except to the extent of the Carve-Out, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Cases at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Secured Parties or the Prepetition Secured Parties (as the case may be) upon the DIP Collateral or Prepetition Collateral (as the case may be), shall be charged against or recovered from (a) any of the DIP Secured Parties, the DIP Collateral (including in respect of the Adequate Protection Liens) or any of the DIP Obligations or, (b) subject to entry of the Final Order,

the Prepetition Secured Parties, the Prepetition Collateral or any of the Prepetition Obligations, in each case, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior express written consent of the Required DIP Lenders or the affected Prepetition Secured Party, each in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder).

30.  **Section 552(b) / Marshalling Waiver.**  The Prepetition Secured Parties are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to entry of the Final Order, in no event shall the "equities of the case" exception under section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties or the Prepetition Secured Obligations.  In no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied in accordance with this Interim Order, the DIP Loan Documents and the Prepetition Loan Documents, as applicable (subject to the Intercreditor Annex).

31.  **Payments Free and Clear.** Any and all payments or proceeds remitted to the DIP Agents or the other DIP Secured Parties pursuant to the provisions of this Interim Order, the DIP Loan Documents (including, without limitation, the Approved Budget (subject to permitted variances)) or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by through or on behalf of the Debtors.

32.     **Payments Held in Trust.** Except for payments made by the Debtors in accordance with the Approved DIP Budget as expressly permitted in this Interim Order or the DIP Loan Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to payment in full in cash of all DIP Obligations under the DIP Loan Documents and termination of the DIP Commitments in accordance with the DIP Loan Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Secured Parties (as applicable based on the specific asset at issue) and shall immediately turn over such proceeds to any DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Loan Documents, the Intercreditor Annex and this Interim Order.

33.     **Joint and Several Liability.** Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of this Interim Order.

34.     **Right to Credit Bid.** Subject to the Intercreditor Annex, and without the need for further order of the Court, (a) the Senior DIP Agent or its designee (at the written direction of the Required Senior DIP Lenders), on behalf of the Senior DIP Secured Parties, shall have the unqualified right to credit bid, in accordance with the applicable Senior DIP Loan Documents, up to the full amount of the Senior DIP Obligations, and (b) the Junior DIP Agent or its designee (at the written direction of the Required Junior DIP Lenders), on behalf of the Junior DIP Secured Parties, shall have the unqualified right to credit bid, in accordance with the applicable Junior DIP Loan Documents, up to the full amount of the Junior DIP Obligations, (c) the Prepetition Term

Loan Agent or its designee (at the written direction of the Required Prepetition Term Lenders), on behalf of the Prepetition Term Secured Parties, and Javelin shall each have the right to credit bid, in accordance with the applicable Prepetition Loan Documents, up to the full amount of the Prepetition Secured Obligations under the applicable pre-petition facility, in each case, in connection with any sale or other disposition of all or any portion of the DIP Collateral or Prepetition Collateral (as applicable), including, without limitation, any sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, and shall each automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral or Prepetition Collateral (as applicable) under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code.  The Senior DIP Agent (at the direction of the Required Senior DIP Lenders), the Junior DIP Agent (at the direction of the Required Junior DIP Secured Parties), the Prepetition Term Loan Agent (at the direction of the Required Lenders (as defined in the Prepetition Term Loan Credit Agreement), shall each have the absolute right to assign, transfer, sell or otherwise dispose of its rights to credit bid, except as may be set forth in the applicable DIP Term Loan Documents.

35.    **Rights Preserved.**  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Secured Parties or the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors; (b) the rights of the DIP Secured Parties or the Prepetition Secured Parties under the DIP Loan Documents, the Prepetition Loan Documents, the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to

(i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any or all of the Chapter 11 Cases to a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties or the Prepetition Secured Parties (subject to the Intercreditor Annex). Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors' or any party-in-interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence, except as expressly set forth in this Interim Order.

36.     **No Waiver by Failure to Seek Relief.**  The failure of any of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Loan Documents, the Prepetition Loan Documents or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder or otherwise.  No delay on the part of any party in the exercise of any right or remedy under this Interim Order shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy.  None of the rights or remedies of any party under this Interim Order shall be deemed to have been amended, modified, suspended or waived unless such amendment, modification, suspension or waiver is in writing and signed by the party against whom such amendment, modification, suspension or waiver is sought.  No consents required hereunder by any of the DIP Secured Parties or the Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Secured Parties.

37.    **Binding Effect of this Interim Order.**  Immediately upon entry of the Interim

Order by the Court, this Interim Order shall inure to the benefit of the Debtors, the DIP Secured

Parties and the Prepetition Secured Parties, and the provisions of this Interim Order (Including all

findings and conclusions of law herein) shall be valid and binding upon the Debtors, the DIP

Secured Parties, the Prepetition Secured Parties, any and all other creditors of the Debtors, any

Official Committee or other committee appointed in the Chapter 11 Cases, any and all other parties

in interest and the respective successors and assigns of each of the foregoing, including any trustee

or other fiduciary hereafter appointed as legal representative of any of the Debtors in any of the

Chapter 11 Cases or any Successor Cases, or upon dismissal of any of the Chapter 11 Cases;

*provided, that* the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation

to permit the use of DIP Collateral or Prepetition Collateral (including Cash Collateral) by, or to

extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person

appointed for the estates of the Debtors.

38.    **Survival.**  The terms and provisions of this Interim Order, all of the rights,

privileges, benefits and protections afforded herein and in the DIP Loan Documents (including the

DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate

Protection Claims, and any other claims, liens, security interests, and other protections

(as applicable) granted to the DIP Secured Parties and the Prepetition Secured Parties pursuant to

this Interim Order and the DIP Loan Documents (collectively, the "**DIP Protections**"), and any

actions taken pursuant hereto or thereto, shall survive, shall continue in full force and effect, shall

remain binding on all parties-interest and shall maintain their priorities, and shall not be modified,

impaired or discharged by, entry of any order that may be entered (a) confirming any plan of

reorganization in any of the Chapter 11 Cases, (b) converting any or all of the Chapter 11 Cases to

a case under chapter 7 of the Bankruptcy Code, (c) dismissing any or all of the Chapter 11 Cases,

or (d) pursuant to which the Court abstains from hearing any of the Chapter 11 Cases, in each case,

until (i) in respect of the DIP Facilities, all of the DIP Obligations, pursuant to the DIP Loan

Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being

without prejudice to any terms of provisions contained in the DIP Facilities which survive such

discharge by their terms) and all commitments to extend credit under the DIP Facilities are

terminated, and (ii) in respect of the Prepetition Secured Obligations, all of the Prepetition

Obligations have been indefeasibly paid in full in cash (or, in respect of outstanding letters of credit

(if any), cash collateralized).   This Court shall retain jurisdiction, notwithstanding any such

confirmation, conversion or dismissal, for the purposes of enforcing such DIP Protections and the

Prepetition Secured Parties' adequate protection.

39.     **Discharge Waiver/Release.**  The DIP Obligations shall not be discharged by the

entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases,

notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP

Obligations have been indefeasibly paid in full in cash, on or before the effective date of such

confirmed plan of reorganization, or each of Javelin the Required Senior DIP Lenders have

otherwise agreed in writing in respect of the applicable obligations owed to each of them (including

as reflected in the Restructuring Support Agreement to the extent the Restructuring Support

Agreement remains in full force and effect).   None of the Debtors shall propose or support any

Chapter 11 plan or sale of all or substantially all of the Debtors' assets, or order confirming such

plan or approving such sale, that is not conditioned upon the indefeasible payment of (i) the

DIP Obligations in full in cash on or prior to the earlier to occur of the effective date of such

Chapter 11 plan or sale, without the written consent of the Required Senior DIP Lenders and Javelin (as applicable).

40.     **Good Faith under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order.**  The DIP Secured Parties have acted in good faith in connection with the DIP Facilities, the DIP Loan Documents, the Interim Financing, and with this Interim Order, and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, the DIP Secured Parties and the Prepetition Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Loan Documents.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the Senior DIP Agent, the Junior DIP Agent and the Prepetition Term Loan Agent of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Obligations, the DIP Liens, the Adequate Protection Liens, the Prepetition Liens or the Prepetition Secured Obligations. Notwithstanding any such reversal, modification, vacatur or stay of this Interim Order, any DIP Obligations, DIP Liens, Adequate Protection Obligations or Adequate Protection Liens incurred by the Debtors to the DIP Secured Parties or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agents and the Prepetition Term Loan Agent of the effective date of such reversal, modification, vacatur stay shall be governed in all respects by the original provisions of this Interim Order.

41.     Until and unless the DIP Obligations and the Prepetition Secured Obligations have been indefeasibly paid in full in cash, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:  (a) without the prior written consent of the Required Senior DIP Lenders and Javelin in respect of the applicable obligations owed to each of them, (i) any modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against any Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in Sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in the Chapter 11 Cases, equal or superior to the DIP Superpriority Claims, other than the Carve-Out; (b) without the prior written consent of the Prepetition Term Loan Agent (at the direction of the Required Lenders, as defined in the Prepetition Term Loan Credit Agreement), any order authorizing the use of Cash Collateral resulting from the DIP Collateral or the Prepetition Collateral that is inconsistent with this Interim Order; (c) without the prior written consent of the Required Senior DIP Lenders and Javelin (as applicable), grant any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as expressly provided in the DIP Loan Documents or this Interim Order; or (d) without the prior written consent of the Prepetition Term Loan Agent (at the direction of the Required Lenders, as defined in the Prepetition Term Loan Credit Agreement), grant any lien on any of the Prepetition Collateral with priority equal or superior to the Prepetition Term Loan Liens or the Term Loan Adequate Protection Liens except to the extent expressly provided in this Interim Order.

42.     **Limitation of Liability.** In determining (a) to make any loan or other extension of credit under the DIP Loan Documents, (b) to permit the use of Cash Collateral pursuant to this Interim Order, the DIP Loan Documents or the Prepetition Loan Documents, (c) to exercise any

rights or remedies as and when permitted pursuant to this Interim Order and the DIP Loan Documents, or (d) solely with respect to the lenders or agents under MEC's post-petition debtor in possession financing facilities (the "**MEC DIP Secured Parties**"), to exercise any rights or remedies as and when permitted pursuant to such facilities, none of the DIP Secured Parties, the Prepetition Secured Parties or, solely with respect to the foregoing clause (d), MEC DIP Secured Parties, shall (i) be deemed to be in control of the operations of the Debtors or participating in the management of the Debtors, (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates, or (iii)be deemed to be acting as a "responsible person" or "owner" or "operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29, U.S. §§ 9601 et seq., as amended, or any similar federal or state statute).  Nothing in this Interim Order, the DIP Loan Documents or the Prepetition Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties, the MEC DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors in the operation of their businesses or in connection with their restructuring efforts.

43.     **Interim Order Controls.**  In the event of any conflict or inconsistency between or among the terms or provisions of this Interim Order, any of the DIP Loan Documents, unless such term or provision in this Interim Order is phrased in terms of "defined in" or "as set forth in" the DIP Loan Documents, the terms and provisions of this Interim Order shall govern and control. Notwithstanding anything contained in any other order entered by this Court to the contrary, any payment made pursuant to, or authorization contained in, any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP

Loan Documents, including, without limitation, the Approved Budget (subject to permitted variances).

44.    **No Third Party Rights.**  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary.

45.    **MEC Chapter 11 Cases.**  Notwithstanding anything to the contrary contained herein or in the DIP Loan Documents, except for the rights and remedies available to the Debtors to enforce the DIP Loan Documents, nothing in this Interim Order or the DIP Loan Documents shall be deemed to alter or modify the priority of any claim, or create any administrative expense claim or other priority claim, against the debtors in the chapter 11 cases of MEC or their estates.

46.    ***Nunc Pro Tunc* Effect of this Interim Order.**  This Interim Order shall take effect and shall be enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d) and 7062 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

47.    **Bankruptcy Rules.** The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

48.    **Necessary Action.** The Debtors are authorized to take any and all such necessary actions as are reasonable and appropriate to implement the terms of this Interim Order.

49.    **Headings.** Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

50.     **Notice of Entry of this Interim Order.**  The Debtors' counsel shall serve a copy of this Interim Order or a suitable notice respecting same on all of the following parties: [INSERT]; and (●) any party that has requested notice pursuant to Bankruptcy Rule 2002.

51.     **Final Hearing.**  The Final Hearing is scheduled for [●], 2020, at [●] a.m. / p.m. (prevailing Eastern Time) before this Court in Courtroom A, 5th Floor, United States Bankruptcy Court, 170 N. High Street, Columbus, Ohio 43215. Any objections or responses to entry of a final order granting the relief requested in the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on [●], 2020.

52.     **Objections.** Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon: [INSERT] and any other party that has filed a request for notices with this Court, to allow actual receipt by the foregoing **no later than [●], 2020, at 4:00 p.m., prevailing Eastern Time**.  Any objections by creditors or any other party-in-interest to the DIP Motion or any of the provisions of this Interim Order shall be deemed waived unless filed and received in accordance with the foregoing on or before such date.

53.     **Retention of Jurisdiction.**  The Court shall retain jurisdiction to hear, determine and, if applicable, enforce the terms of, any and all matters arising from or related to the DIP Facilities and/or this Interim Order.

SO ORDERED.

Copies to Default List.

**Exhibit __**

1. From and after the Closing Date of the DIP Facilities to the Definitive Documentation Date[8], each of the DIP Agents, the Senior DIP Lenders, the Junior DIP Lenders, the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders and Javelin (in its capacity as pre- and post-petition buyer, marketer and secured designated coal contract counterparty) (collectively, the "**Secured Parties**") and the Debtors shall be bound by (and, in all respects, the DIP Facilities, the Prepetition Facilities and the applicable agreements, governing the obligations owing to Javelin described in paragraph 5 below shall be governed by) and subject to the terms and provisions of this Intercreditor Annex, as though each of the Secured Parties was a party hereto, and this Intercreditor Annex shall supersede and replace any intercreditor agreement in existence among any of the Secured Parties prior to the Petition Date (except that (i) any such intercreditor agreement or subordination agreement (including Section 2.12 of the Prepetition Term Loan Credit Agreement) entered into between the holders of First Out Term Loans, on the one hand, and the holders of Last Out Term Loans, on the other (each as defined in the Restructuring Term Sheet), shall remain operative (and shall also apply to any Term Loan Adequate Protection Liens) unless and until the First Out Term Loans are "rolled" into the Senior DIP Facility (or, to the extent that the First Out Term Loans are not "rolled" into the Senior DIP Facility, unless and until the First Out Term Loans are converted into, and reclassified as, New First Lien Term Loans (as defined in the Restructuring Term Sheet)) and (ii) Sections 2 and 7 of the Prepetition Intercreditor Agreement shall remain applicable with respect to the subject matter covered thereby, *mutatis mutandis*, except with respect to the Senior DIP Liens vis-a-vis the Prepetition Javelin Liens with respect to the Working Capital Priority Collateral to be reflected in the definitive documentation). From and after the Definitive Documentation Date this Intercreditor Annex shall be superseded and replaced by a definitive intercreditor agreement (the "**DIP Intercreditor Agreement**"), to be executed by the Debtors, the Senior DIP Agent (on behalf of the Senior DIP Secured Parties), the Junior DIP Agent (on behalf of the Junior DIP Secured Parties), the Prepetition Term Loan Agent (on behalf of the Prepetition Term Secured Parties) and Javelin. The DIP Intercreditor Agreement shall be negotiated in good faith, shall be in form similar to the pre-petition intercreditor agreement governing the Prepetition Facilities, as modified to reflect the terms set forth in this Intercreditor Annex, and shall otherwise be satisfactory to, and consented to by, the Required Senior DIP Lenders, the Required Junior DIP Term Lenders, the Required Lenders (as defined in the Prepetition Term Loan Credit Agreement), the Prepetition Term Loan Agent, each of the DIP Agents and Javelin. For the avoidance of doubt, subject to entry of the Interim Order, upon its execution, the DIP Intercreditor Agreement shall immediately and automatically be effective and binding upon the Debtors and each of the Secured Parties.

2. Notwithstanding (A) the date, time, method, manner or order of grant, attachment, or perfection of any liens granted to any Secured Party in respect of all or any portion of the DIP Collateral, (B) the order or time of filing or recordation of any document or instrument for perfecting the liens in favor of any Secured Party in any DIP Collateral, (C) any provision of

---

[8] The term "<u>Definitive Documentation Date</u>" means the date that the definitive documentation described herein is executed by the relevant parties, which date shall be no later than thirty-three (33) days after the Petition Date (or such later date as the Secured Parties may agree in writing).

the Uniform Commercial Code, any other applicable law or any of the Prepetition Debt documents, (D) whether the liens securing the applicable obligations are valid, enforceable, void, avoidable, subordinated, disputed, or allowed, (E) whether the Senior DIP Agent, the Junior DIP Agent, the Prepetition Term Loan Agent or Javelin  in each case directly or through agents, has control over all or any portion of the DIP Collateral, (F) any defect or deficiencies in, or non-perfection (including any failure to perfect or lapse in perfection), setting aside, recharacterization, or avoidance (including as a fraudulent conveyance or otherwise) of, any lien, or (G) any other circumstance whatsoever, the DIP Liens, the Adequate Protection Liens and the Prepetition Liens shall each have the relative ranking and priority illustrated in the chart below:

| Ranking | Term Priority Collateral[9] | Junior DIP Priority Collateral[10] | Working Capital Priority Collateral[11] |
|---|---|---|---|
| *First* | Senior DIP Liens[12] | Junior DIP Liens | Javelin DIP Prepaid Facility Liens |
| *Second* | Term Loan Adequate Protection Liens | Senior DIP Liens | Javelin DIP Advance Facility Liens |
| *Third* | Prepetition Term Loan Liens | Term Loan Adequate Protection Liens | Javelin Adequate Protection Liens |
| *Fourth* | Javelin DIP Prepaid Facility Liens | Prepetition Term Loan Liens | Senior DIP Liens |
| *Fifth* | Javelin Adequate Protection Liens | Javelin DIP Prepaid Facility Liens | Prepetition Javelin Liens |
| *Sixth* | Prepetition Javelin Liens | Javelin Adequate Protection Liens | Term Loan Adequate Protection Liens |
| *Seventh* | Junior DIP Liens | Prepetition Javelin Liens | Prepetition Term Loan Liens |
| *Eighth* | N/A | N/A | Junior DIP Liens |

[9] The term "Term Priority Collateral" means all assets and properties of the Debtors (whether tangible, intangible, real, personal or mixed, and including all books and records related thereto), whether owned on the Closing Date or acquired thereafter, wherever located, other than Working Capital Priority Collateral; *provided*, that, Term Priority Collateral shall include, without limitation, all cash, cash equivalents and insurance, indemnity, guaranty and condemnation proceeds, in each case received as proceeds of, and any other proceeds or products of or in respect of, the assets and properties of the Debtors (in each case other than proceeds or products of or in respect of "current assets" of the Debtors).

[10] The term "Junior DIP Priority Collateral" means Term Priority Collateral consisting of the equity interests and all related rights in Murray Eagle Mining, LLC held by Murray Metallurgical Coal Holdings, LLC and all assets and properties of Murray Maple Eagle Coal, LLC, Murray Eagle Mining, LLC and Murray Alabama Minerals, LLC (whether tangible, intangible, real, personal or mixed, and including all books and records related thereto), whether owned on the Closing Date or acquired thereafter (including all cash, cash equivalents and insurance, indemnity, guaranty and condemnation proceeds, in each case received as proceeds of, and any other proceeds or products of or in respect of the foregoing).

[11] The term "Working Capital Priority Collateral" means all "current assets" of the Debtors (including, without limitation, as extracted Collateral, accounts receivable and inventory), and including all books and records related thereto), except for any such "current assets" described in the proviso to the definition of "Term Priority Collateral", and otherwise defined in a manner consistent with the term "Prepayment Collateral" in the Prepetition Intercreditor Agreement.

[12] For the avoidance of doubt, for the purposes in this Intercreditor Annex, the Senior DIP Liens shall include liens securing the Senior DIP Secured Designated Coal Contract Obligations.

Notwithstanding the foregoing, any intercreditor agreement or subordination agreement (including Section 2.12 of the Prepetition Term Loan Credit Agreement) entered into between the holders of First Out Term Loans, on the one hand, and the holders of Last Out Term Loans, on the other, shall remain operative (and shall also apply to any Term Loan Adequate Protection Liens) unless and until the First Out Term Loans are "rolled" into the Senior DIP Facility (or, to the extent that the First Out Term Loans are not "rolled" into the Senior DIP Facility, unless and until the First Out Term Loans are converted into, and reclassified as, New First Lien Term Loans).

3. Each of the DIP Superpriority Claims and each of the Adequate Protection Claims held by the applicable DIP Secured Parties and Prepetition Secured Parties shall have the relative priority corresponding to the relative priority of each of the liens granted in favor of each of the applicable DIP Secured Parties and Prepetition Secured Parties described in the chart above.

4. Until the Senior DIP Obligations have been indefeasibly paid and satisfied in full in cash, (A) the Senior DIP Agent at the direction of the Required Senior DIP Lenders on behalf of the Senior DIP Secured Parties shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of any of the Term Priority Collateral (subject to paragraph 6 below with respect to the Junior DIP Facility Priority Collateral; and (B) Javelin (x) will not exercise any right or remedies with respect to any Term Priority Collateral or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, and (y) will not contest, protest or object to or otherwise interfere with any action or proceeding brought by the Senior DIP Agent on behalf of the Senior DIP Secured Parties to enforce its rights and remedies relating to the Term Priority Collateral.  Following the indefeasible payment and satisfaction in full in cash of the Senior DIP Obligations, until the Prepetition Term Loan Obligations have been indefeasibly paid and satisfied in full in cash, (A) the Prepetition Term Loan Agent (at the direction of the Required Lenders (as defined in the Prepetition Term Loan Credit Agreement)) on behalf of the Prepetition Term Loan Secured Parties shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of any of the Term Priority Collateral (subject to paragraph 6 below with respect to the Junior DIP Facility Priority Collateral); and (B) Javelin (x) will not exercise any right or remedies with respect to any Term Priority Collateral or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, and (y) will not contest, protest or object to or otherwise interfere with any action or proceeding brought by Prepetition Term Loan Agent or the Prepetition Term Loan Lenders to enforce their rights and remedies relating to the Term Priority Collateral.

5. Until the Javelin DIP Obligations have been indefeasibly paid and satisfied in full in cash, (A) Javelin shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of any of the Working Capital Priority Collateral; and (B) the Senior DIP Agent, the other Senior DIP Secured Parties, the Junior DIP Agent, the Junior DIP Term Lenders, the Prepetition Term Loan Agent and the other Prepetition Term Loan Secured Parties (x) will not exercise any right or remedies with respect to any Working Capital Priority Collateral (including any right of setoff or any right under any lockbox or control agreement with respect to deposit accounts or securities accounts)

or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, and (y) will not contest, protest or object to or otherwise interfere with any action or proceeding brought by Javelin to enforce its rights and remedies relating to the Working Capital Priority Collateral. Following the indefeasible payment and satisfaction in full in cash of the Javelin DIP Obligations, until the Prepetition Javelin Obligations have been indefeasibly paid and satisfied in full in cash, (A) Javelin shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of any of the Working Capital Priority Collateral; and (B) the Senior DIP Agent, the other Senior DIP Secured Parties, the Junior DIP Agent, the Junior DIP Term Lenders, the Prepetition Term Loan Agent and the other Prepetition Term Loan Secured Parties (x) will not exercise any right or remedies with respect to any Working Capital Priority Collateral or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, and (y) will not contest, protest or object to or otherwise interfere with any action or proceeding brought by Javelin to enforce their rights and remedies relating to the Working Capital Priority Collateral.

6. Until the Junior DIP Term Obligations have been (x) indefeasibly paid and satisfied in full in cash or (y) satisfied in accordance with the "Classification and Treatment of Claims" section in the Restructuring Term Sheet, (A) the Junior DIP Agent (at the direction of the Required Junior DIP Lenders) on behalf of the Junior DIP Secured Parties shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of the Junior DIP Priority Collateral; (B) neither the Senior DIP Agent (or any other Senior DIP Secured Party) nor the Prepetition Term Loan Agent (or any Lender or other "Secured Party" (each as defined in the Prepetition Term Loan Credit Agreement)) (x) will exercise any right or remedies with respect to the Junior DIP Priority Collateral or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, or (y) will contest, protest or object to or otherwise interfere with any action or proceeding brought by the Junior DIP Agent on behalf of Junior DIP Secured Parties to enforce its rights and remedies relating to the Junior DIP Facility Priority Collateral; and (C) Javelin (x) will not exercise any right or remedies with respect to the Junior DIP Priority Collateral or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, and (y) will not contest, protest or object to or otherwise interfere with any action or proceeding brought by the Junior DIP Agent on behalf of the Junior DIP Secured Parties to enforce its rights and remedies relating to the Junior DIP Priority Collateral.

7. Until the Senior DIP Obligations have been indefeasibly paid and satisfied in full in cash, (A) the Senior DIP Agent (at the direction of the Required Senior DIP Lenders) on behalf of the Senior DIP Secured Parties shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of any of the Term Priority Collateral (subject to paragraphs 4, 5 and 6 of this Intercreditor Annex); and (B)  except as set forth in paragraph 6 of this Intercreditor Annex, the Junior DIP Agent and the Junior DIP Lenders (x) will not exercise any right or remedies with respect to any Term Priority Collateral (other than with respect to Junior DIP Priority Collateral) or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, (y) will not contest, protest or object to or otherwise interfere with any action or proceeding

brought by the Senior DIP Agent on behalf of the Senior DIP Secured Parties to enforce its rights and remedies relating to any DIP Collateral (other than with respect to Junior DIP Facility Collateral), or (z) or otherwise seek payment or distribution on account of any of the Junior DIP Obligations (other than any payment or distribution with the proceeds of or in respect of Junior DIP Facility Collateral).  Notwithstanding anything contained in this annex to the contrary, in the event, despite MEC's good faith and diligent efforts, MEC fails to obtain entry of an Order of the Court presiding over MEC's chapter 11 cases no later than thirty-three (33) days after the Petition Date, approving MEC's entry into the Restructuring Support Agreement, then, to the extent $5 million in Junior DIP Loans have been previously funded under the Junior DIP Facility, and the proceeds of such loans have been applied to disbursements, fees, costs and expenses related to Oak Grove, then such $5 million in Junior DIP Obligations arising from such loans shall be entitled to the same relative rank and priority as well as super-priority administrative expense status as the Senior DIP Loans, but the relative ranking and priority of the remaining amount of the Junior DIP Facility shall remain unchanged.

### Schedule  1 to Exhibit A

### DIP Budgets

**Oak Grove Budget**

**Murray Metallurgical Coal Holdings ("MMCH")**
**Oak Grove 13 Week Forecast**

| ($ in '000s) | Fcst Week 1 02/15/20 | Fcst Week 2 02/22/20 | Fcst Week 3 02/29/20 | Fcst Week 4 03/07/20 | Fcst Week 5 03/14/20 | Fcst Week 6 03/21/20 | Fcst Week 7 03/28/20 | Fcst Week 8 04/04/20 | Fcst Week 9 04/11/20 | Fcst Week 10 04/18/20 | Fcst Week 11 04/25/20 | Fcst Week 12 05/02/20 | Fcst Week 13 05/09/20 | Total Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Receipts | - | - | 1,875 | 2,184 | 3,351 | 2,611 | 2,495 | 3,968 | 3,556 | 3,549 | 3,775 | 3,598 | 3,572 | 34,532 |
| Operating Disbursements | 7,512 | 6,058 | 4,523 | 6,350 | 2,958 | 6,574 | 3,052 | 4,731 | 5,199 | 6,554 | 2,863 | 4,607 | 2,795 | 63,777 |
| **Net Operating Cash Flow** | (7,512) | (6,058) | (2,649) | (4,166) | 393 | (3,963) | (558) | (763) | (1,643) | (3,005) | 912 | (1,010) | 777 | (29,245) |
| Professional Fees | 1,045 | - | - | 1,244 | 668 | - | - | 1,475 | 655 | - | - | 1,225 | 630 | 6,941 |
| **Net Cash Flow** | (8,556) | (6,058) | (2,649) | (5,410) | (275) | (3,963) | (558) | (2,238) | (2,298) | (3,005) | 912 | (2,235) | 147 | (36,186) |
| **Cash Balance** | | | | | | | | | | | | | | |
| Beginning Balance | - | (8,556) | (14,614) | (17,263) | (22,673) | (22,948) | (26,911) | (27,469) | (29,707) | (32,004) | (35,010) | (34,098) | (36,333) | - |
| Net Cash Flow | (8,556) | (6,058) | (2,649) | (5,410) | (275) | (3,963) | (558) | (2,238) | (2,298) | (3,005) | 912 | (2,235) | 147 | (36,186) |
| **Ending balance** | (8,556) | (14,614) | (17,263) | (22,673) | (22,948) | (26,911) | (27,469) | (29,707) | (32,004) | (35,010) | (34,098) | (36,333) | (36,186) | (36,186) |

**Maple Eagle Budget**

**Murray Metallurgical Coal Holdings ("MMCH")**
**Maple Eagle & Alabama Minerals 13 Week Forecast**

| ($ in '000s) | Fcst Week 1 | Fcst Week 2 | Fcst Week 3 | Fcst Week 4 | Fcst Week 5 | Fcst Week 6 | Fcst Week 7 | Fcst Week 8 | Fcst Week 9 | Fcst Week 10 | Fcst Week 11 | Fcst Week 12 | Fcst Week 13 | Total Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending: | 02/15/20 | 02/22/20 | 02/29/20 | 03/07/20 | 03/14/20 | 03/21/20 | 03/28/20 | 04/04/20 | 04/11/20 | 04/18/20 | 04/25/20 | 05/02/20 | 05/09/20 | |
| Receipts | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Operating Disbursements | 790 | 546 | 771 | 338 | 250 | 337 | 250 | 478 | 1,250 | 337 | 250 | 337 | 250 | 6,185 |
| **Net Operating Cash Flow** | $ (790) | $ (546) | $ (771) | $ (338) | $ (250) | $ (337) | $ (250) | $ (478) | $ (1,250) | $ (337) | $ (250) | $ (337) | $ (250) | $ (6,185) |
| Professional Fees | $ 551 | $ - | $ - | 725 | $ - | $ - | $ - | 616 | $ - | $ - | $ - | 1,260 | $ - | 3,152 |
| **Net Cash Flow** | $ (1,341) | $ (546) | $ (771) | $ (1,062) | $ (250) | $ (337) | $ (250) | $ (1,094) | $ (1,250) | $ (337) | $ (250) | $ (1,597) | $ (250) | $ (9,337) |
| | | | | | | | | | | | | | | |
| **Cash Balance** | | | | | | | | | | | | | | |
| Beginning Balance | $ - | (1,341) | (1,887) | (2,658) | (3,720) | (3,970) | (4,308) | (4,558) | (5,652) | (6,902) | (7,240) | (7,490) | (9,087) | $ - |
| Net Cash Flow | (1,341) | (546) | (771) | (1,062) | (250) | (337) | (250) | (1,094) | (1,250) | (337) | (250) | (1,597) | (250) | (9,337) |
| **Ending balance** | $ (1,341) | $ (1,887) | $ (2,658) | $ (3,720) | $ (3,970) | $ (4,308) | $ (4,558) | $ (5,652) | $ (6,902) | $ (7,240) | $ (7,490) | $ (9,087) | $ (9,337) | $ (9,337) |

Document   Page 152 of 222

**<u>Exhibit B</u>**

**Senior DIP Term Sheet**

**EXHIBIT 1**

**Senior Secured Super-Priority Priming
Debtor-in-Possession Credit Facility**

**<u>Summary of Principal Terms and Conditions</u>**

| | |
|---|---|
| **Borrower:** | Murray Metallurgical Coal Holdings, LLC, a Delaware limited liability company (the "<u>Borrower</u>"), in its capacity as a debtor and debtor-in-possession in the case (together with the cases of its direct and indirect subsidiaries, in their capacities as debtors and debtors-in-possession, collectively, the "<u>Chapter 11 Cases</u>") to be filed under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") with the United States Bankruptcy Court for the Southern District of Ohio, Western Division (the "<u>Bankruptcy Court</u>"). The date of commencement of the Chapter 11 Cases is referred to herein as the "<u>Petition Date</u>". |

| | |
|---|---|
| **Guarantors:** | All existing and future direct and indirect Subsidiaries of the Borrower and any additional Person required to become a "Guarantor" pursuant to Section 6.12 of the Prepetition Term Loan Credit Agreement (as defined below) (each, a Guarantor, and collectively, the "<u>Guarantors</u>"; the Guarantors, together with the Borrower, collectively, the "<u>Debtors</u>"). |

| | |
|---|---|
| **Prepetition Debt:** | Reference is made to the following pre-petition facilities (collectively, the "<u>Prepetition Debt</u>"): |

<u>Prepetition Term Loan Credit Facility</u>. Credit Agreement, dated as of April 29, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "<u>Prepetition Term Loan Credit Agreement</u>"), by and among the Company, the lenders party thereto from time to time (collectively, the "<u>Prepetition Term Lenders</u>"), Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (in such capacities, the "<u>Prepetition Term Agent</u>") for such Prepetition Term Lenders and the other "Secured Parties" party thereto (the other "Secured Parties" party thereto, together with the Prepetition Term Lenders and the Prepetition Term Agent, the "<u>Prepetition Term Secured Parties</u>").[1]

<u>Prepetition Oak Grove Working Capital Facility</u>. (i) Annex I to Exhibit A of that certain Amendment to Master Coal Purchase and Sale Agreement, dated as of April 29, 2019, which constitute the Advance Obligations (as defined therein), which amends that certain Master Coal Purchase and Sale Agreement with respect to the Oak Grove mine, dated as of April 29,

---

[1] Capitalized terms used but not otherwise defined in this Summary of Terms and Conditions (this "<u>Senior DIP Term Sheet</u>") shall have the meanings assigned thereto in the Prepetition Term Loan Credit Agreement.

2019 (including any confirmations, agreements and other documents entered into in connection therewith, as each may be amended, amended and restated, supplemented or otherwise modified from time to time prior to entry into the Postpetition Javelin Facility (as defined in the Restructuring Support Agreement), the "Oak Grove Master Coal Agreement"), by and between Murray Oak Grove Coal, LLC ("Oak Grove") and Javelin Global Commodities (UK) LTD ("Javelin") and (ii) Article 6 of that certain Coal Marketing Agreement with respect to the Oak Grove mine, dated as of April 29, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the entry of the Postpetition Javelin Facility, the "Oak Grove Marketing Agreement" and, together with the Oak Grove Master Coal Agreement, the "Javelin Oak Grove Agreements").

Prepetition Oak Grove Prepayment Facility. The Pre-Payment Balance (as defined therein) made pursuant to that certain Prepaid Purchase Agreement Confirmation delivered pursuant to the Oak Grove Master Coal Agreement, dated as of April 29, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the entry of the Postpetition Javelin Facility, the "Javelin Oak Grove Prepayment Agreement"), by and between Oak Grove and Javelin.

Prepetition Maple Eagle Working Capital Facility. (i) Annex I to Exhibit A of that certain Amendment to Master Coal Purchase and Sale Agreement, dated as of April 29, 2019, which constitute the Advance Obligations (as defined therein), which amends that certain Master Coal Purchase and Sale Agreement with respect to the Maple Eagle mine, dated as of April 29, 2019 (including any confirmations, agreements and other documents entered into in connection therewith, as each may be amended, amended and restated, supplemented or otherwise modified from time to time prior to the entry of the Postpetition Javelin Facility, the "Maple Eagle Master Coal Agreement"), by and between Murray Maple Eagle Coal, LLC ("Maple Eagle") and Javelin and (ii) Article 6 of that certain Coal Marketing Agreement with respect to the Maple Eagle mine, dated as of April 29, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the entry of the Postpetition Javelin Facility, the "Maple Eagle Marketing Agreement" and, together with the Maple Eagle Master Coal Agreement, the "Javelin Maple Eagle Agreements" and, together with the Javelin Oak Grove Agreements and the Javelin Prepayment Agreement, the "Prepetition Javelin Agreements").

| | |
|---|---|
| **DIP Agent:** | Wilmington Savings Fund Society, FSB will act as administrative agent and collateral agent for the Senior DIP Lenders and other Senior DIP Secured Parties with respect to the Senior DIP Facility (in such capacities, the "Senior DIP Agent") and will perform the duties customarily |

associated with such third party roles.  The Senior DIP Agent shall be afforded substantially similar rights, protections, immunities and indemnities afforded to the Prepetition Term Agent under the Prepetition Term Loan Credit Agreement.

**DIP Lenders:**   MC Southwork, LLC (and/or one or more of its respective designated affiliates and/or related funds or accounts) and solely with respect to the Senior DIP Roll Up Loans (as defined below) (and not Senior DIP New Money Loans (as defined below)), Murray Energy Corporation and, subject to the assignment and related provisions of this Senior DIP Term Sheet and the Senior DIP Credit Agreement (as defined below), such other financial institutions or entities, if any, that become party to the Senior DIP Credit Agreement in accordance with its terms and this Senior DIP Term Sheet (collectively, the "<u>Senior DIP Lenders</u>").

**DIP Secured Designated Coal Contract Counterparty:**   Javelin (the "<u>Senior DIP Secured Designated Coal Contract Counterparty</u>").

**DIP Secured Designated Coal Contract:**   Oak Grove Master Coal Agreement (including, for the avoidance of doubt, as amended in connection with the Restructuring, but subject in all respects to the terms and conditions set forth in the definitive documentation).

**Type and Amount of the DIP Facility:**   A multi-draw super-priority senior secured priming debtor-in-possession term loan facility (the "<u>Senior DIP Facility</u>" and the loans thereunder, the "<u>Senior DIP Loans</u>"), consisting of (1) new money delayed-draw term loans in an aggregate principal amount not to exceed $28.9 million (the "<u>Senior DIP New Money Loans</u>"), (2) term loans in an aggregate principal amount equal to the total amount of all First Out Term Loan Obligations (as defined in the Prepetition Term Loan Credit Agreement), including, for the avoidance of doubt, any premiums, fees and expenses payable thereon (such First Out Term Loan Obligations, the "<u>Prepetition First Out Term Loan Obligations</u>"), outstanding on the Petition Date, which such term loans will be deemed to have been advanced and shall roll up and convert (on a cashless, dollar for dollar basis) the Prepetition First Out Term Loan Obligations (the "<u>Senior DIP Roll Up Loans</u>") and (3) a designation of Javelin as a "Secured Designated Coal Contract Counterparty" in connection with the Oak Grove Master Coal Agreement (subject to the terms and conditions set forth in the definitive documentation) (such obligations, the "<u>Senior DIP Secured Designated Coal Contract Obligations</u>"). The commitments to make the Senior DIP Loans are referred to herein as the "<u>Senior DIP Commitments</u>". Once repaid or prepaid, no portion of the Senior DIP Loans may be reborrowed.

3

**Interim Availability:**

During the period commencing on the Closing Date (as defined below), subject to the Bankruptcy Court's entry of the Interim Order (as defined below), and ending on the date that is immediately prior to the Bankruptcy Court's entry of the Final Order (such period, the "Interim Period"), subject to the satisfaction or waiver by the Required Senior DIP Lenders (as defined below) of the applicable conditions precedent set forth on Annex A hereto, a portion of the Senior DIP Commitments shall be available (the "Interim Availability") to the Borrower on the Closing Date (as defined below) as follows:

(a) 50% of the aggregate Prepetition First Out Term Loan Obligations shall be deemed advanced as Senior DIP Roll Up Loans;[2] and

(b) the Senior DIP Lenders shall fund into the Senior DIP Disbursement Account (as defined below), in one draw (the "Initial Senior New Money DIP Loan") Senior DIP New Money Loans in an aggregate principal amount not to exceed $16.4 million.

**Full Availability:**

Upon the Bankruptcy Court's entry of the Final Order (the "Final Order Entry Date") and the satisfaction or waiver by the Required Senior DIP Lenders of the other applicable conditions precedent set forth on Annex A hereto, the balance of the Senior DIP Commitments shall be available (the "Full Availability") to the Borrower as follows:

(a) 50% of the Prepetition First Out Term Loan Obligations shall be deemed advanced as Senior DIP Roll Up Loans; and

(b) the Senior DIP Lenders shall fund into the Senior DIP Disbursement Account, in one draw the remaining amount of the Senior DIP New Money Loans.

**Senior DIP Disbursement Account:**

Proceeds of the Senior DIP New Money Loans shall be deposited, held and disbursed through a newly formed account (the "Senior DIP Disbursement Account") with Wilmington Savings Fund Society, FSB, as escrow agent (the "Senior DIP Escrow Agent") pursuant to an escrow agreement (the "Senior DIP Escrow Agreement") among the Borrower, the Senior DIP Agent, on behalf of the Senior DIP Lenders, and the Senior DIP Escrow Agent, in form and substance satisfactory to the Borrower, the Required Senior DIP Lenders, the Senior DIP Agent and the Senior DIP Escrow Agent. The disbursements of the Senior DIP New Money Loans from the Senior DIP Disbursement Account shall be made

---

[2] NTD: As of Amendment No 12 to Prepetition Term Loan Credit Agreement, principal aggregate amount of Prepetition First Out Term Loan Obligations equals (and principal aggregate amount of Senior DIP Roll Up Loans will equal) $21,358,332.74.

NY 77987404v15

(i) not more than once during any one-month period, (ii) strictly in compliance with the Approved OG DIP Budget (as defined below) (which, for the avoidance of doubt, the Senior DIP Escrow Agent shall have no duty to monitor or confirm compliance with), (iii) for such uses and for the forecast periods as are specified herein and in the Approved OG DIP Budget, (iv) pursuant to a borrowing notice delivered to the Senior DIP Escrow Agent in writing at least two (2) business days prior to each such proposed drawing from the DIP Disbursement Account, which such notice shall be in the form of a customary borrowing notice certifying the amount to be drawn from the Senior DIP Disbursement Account and the date thereof and (v) subject to the terms and conditions set forth herein and in the Senior DIP Escrow Agreement.  The Senior DIP Escrow Agent shall have substantially similar rights and protections as the Senior DIP Agent under the Senior DIP Loan Documents.

**Closing Date:**  The date (which shall be no later than two (2) business days after the date of the Bankruptcy Court's entry of the Interim Order (the "Interim Order Entry Date") on which the specified portion of the Senior DIP Commitments is made available for borrowing under the Senior DIP Facility (the "Closing Date"), subject to satisfaction (or waiver) of the applicable conditions precedent set forth herein.

**Use of Proceeds:**  Proceeds of the Senior DIP Roll Up Loans will be used for the deemed repayment (on a cashless, dollar-for-dollar basis) of all accrued and unpaid Prepetition First Out Term Loan Obligations.

Proceeds of the Senior DIP New Money Loans will be used only (a) for disbursements (including disbursements related to the administration of, or costs and expenses related to, the Chapter 11 Cases approved by the Required Senior DIP Lenders (as defined below)) in respect of the Oak Grove mine as expressly permitted in the Approved OG DIP Budget, subject to the DIP Orders and the Senior DIP Loan Documents and (b) for such other purposes as are consented to in advance in writing by the Required Senior DIP Lenders.

For the avoidance of doubt and notwithstanding anything to the contrary herein, no proceeds of any Senior DIP Loans, the DIP Collateral (including cash collateral), cash or any other funds shall be used to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with the Senior DIP Facility or any Prepetition Debt or to assert any claim or cause of action against the Senior DIP Lenders, the Senior DIP Secured Designated Coal Contract Counterparty, the Senior DIP Agent or the agent or holders of Prepetition Debt, subject to an investigation budget of $25,000 for the official committee of unsecured creditors (the "Creditors' Committee"), if

NY 77987404v15

any, to investigate (but not seek formal discovery or commence any challenge, objection or prosecute) any such claims or causes of action.

**Maturity:** All unfunded Senior DIP Commitments will terminate, and all Senior DIP Obligations (as defined below) will be immediately due and payable in full in cash on the earliest of:

(a) the six month anniversary of the Closing Date (the "<u>Maturity Date</u>");

(b) the date that is thirty-three (33) calendar days after the Petition Date if the Final Order has not been entered by the Bankruptcy Court on or before such date;

(c) the date of consummation of any sale of all or substantially all of the assets of any of the Debtors pursuant to section 363 of the Bankruptcy Code (other than in respect of the Maple Eagle Sale Transaction (as defined in the Restructuring Support Agreement) as and to the extent set forth in the Restructuring Support Agreement);

(d) the date of acceleration of the Senior DIP Loans and the termination of the Senior DIP Commitments upon the occurrence of an Event of Default (as defined below); and

(e) the substantial consummation or effective date of any chapter 11 plan.

**Amortization:** None.

**Interest:** At all times prior to the occurrence of an Event of Default, interest on the Senior DIP Loans shall accrue at a rate per annum equal to 14.50% (the "<u>Interest Rate</u>") and shall be payable by the Borrower in kind, monthly, in arrears.

During the continuance of an Event of Default, the Senior DIP Loans shall accrue at an additional 2.00% per annum and shall be payable by the Borrower in kind, monthly, in arrears.

All interest shall be computed on the basis of a 360-day year consisting of twelve (12) 30-day months.

**Option Payment:** The Senior DIP Lenders shall receive from the Debtors a nonrefundable upfront option payment equal to 4.00% of the aggregate principal amount of the Senior DIP Commitments in respect of Senior DIP New Money Loans, in kind, on the Closing Date (the "<u>Option Payment</u>"). The Option

Payment shall be treated for U.S. federal income tax purposes as a premium for the right of the Borrower to put the loans to the applicable Senior DIP Lenders and thus as an increase to the yield of the Senior DIP New Money Loans, taxable as original issue discount in accordance with the applicable rules under the Internal Revenue Code of 1986 (as amended from time to time) and the U.S. Treasury Regulations thereunder and (b) that no U.S. federal, state or local withholding tax will be withheld or deducted on account of the Option Payment.

**Agency Fee:**    The Debtors shall pay an agency fee to the Senior DIP Agent on the Closing Date in an amount to be agreed between the Debtors and the Senior DIP Agent.

**Documentation:**    The Senior DIP Facility (including the terms and conditions applicable thereto) will be documented pursuant to and evidenced by (a) a credit agreement, negotiated in good faith, in form and substance substantially similar to the Prepetition Term Loan Credit Agreement (with such modifications as are (i) set forth herein, (ii) necessary to reflect the terms of the Interim Order or the Final Order, as applicable, (iii) usual and customary for debtor-in-possession financings of this kind and/or otherwise necessary or desirable to effectuate the financing contemplated hereby and/or to reflect the capital structure and operational requirements of the Debtors and the existence and continuance of the Chapter 11 Cases (including customary representations and warranties, covenants and events of default for debtor-in-possession financings of this kind) and (iv) required by the Required Senior DIP Lenders (in consultation with (x) the Senior DIP Lenders, except the Senior DIP Lenders shall have a consent right with respect to any proposed modification to the voting provisions, pro rata sharing provisions or payment waterfall and other customary "sacred" lender rights and (y) the Senior DIP Secured Designated Coal Contract Counterparty, except that the Senior DIP Secured Designated Coal Contract Counterparty shall have a consent right with respect to any proposed modification to the voting provisions, pro rata sharing provisions or payment waterfall and other customary "sacred" lender rights) and/or the Senior DIP Agent) (the "<u>Senior DIP Credit Agreement</u>"), (b) an order (in form and substance acceptable to the Senior DIP Lenders, the Senior DIP Secured Designated Coal Contract Counterparty and the Senior DIP Agent in their discretion) is entered by the Bankruptcy Court approving the Senior DIP Facility on an interim basis (the "<u>Interim Order</u>"), (c) an order (in form and substance acceptable to the Senior DIP Lenders, the Senior DIP Secured Designated Coal Contract Counterparty and the Senior DIP Agent in their discretion) entered by the Bankruptcy Court approving the Senior DIP Facility on a final basis (the "<u>Final Order</u>", and together with the Interim Order, the "<u>DIP Orders</u>") and (d) as applicable, the related notes, security agreements, collateral agreements, pledge agreements, control

agreements, guarantees, mortgages and other legal documentation or instruments as are, in each case, usual and customary for debtor-in-possession financings of this type and/or reasonably necessary or desirable to effectuate the financing contemplated hereby (including such agreements, documents and instruments constituting "Loan Documents" under, and as defined in, the Prepetition Term Loan Credit Agreement) (all of the foregoing, together with the Senior DIP Credit Agreement, the Senior DIP Escrow Agreement and the DIP Orders, collectively, the "Senior DIP Loan Documents"). Notwithstanding the foregoing or any other provision hereof, thresholds, grace periods, cure periods, materiality qualifiers and definitions of "Material Adverse Effect" shall be removed or otherwise modified in the manner customary for debtor-in-possession facilities of this kind and agreed by the Required Senior DIP Lenders (in consultation with the Senior DIP Lenders and the Senior DIP Secured Designated Coal Contract Counterparty) and the Borrower. The foregoing shall be collectively referred to herein as the "Senior DIP Documentation Principles".

|                          |                          |
|--------------------------|--------------------------|
| **Financial & Other Reporting:** | The Debtors will prepare and deliver a thirteen week cash flow forecast with respect to Oak Grove, in form and substance acceptable to the Required Senior DIP Lenders (the "Initial OG DIP Budget"), and attached to this Senior DIP Term Sheet as Schedule I setting forth the specified line-items and cumulative receipts and operating disbursements (including all necessary and required expenses which the Debtors expect to incur and anticipated uses of proceeds of draws under the Senior DIP Facility, the Junior DIP Facility and any other post-petition financing arrangements) on a weekly basis for the period beginning as of the week of the Petition Date through and including the thirteenth (13th) week after such week, as such cash flow forecast may be amended, supplemented or modified from time to time only with the prior written consent of the Required Senior DIP Lenders in their discretion. Once so approved by the Required Senior DIP Lenders, the Initial OG DIP Budget shall be deemed the "Approved OG DIP Budget" for all purposes of the Senior DIP Loan Documents until superseded by any Updated OG DIP Budget (as defined below) that subsequently is approved by the Required Senior DIP Lenders. |

On or before 12:00 p.m. New York City time on the Thursday of each fourth (4th) calendar week following the Petition Date, the Debtors shall deliver to the Senior DIP Agent and the Senior DIP Lenders a supplement to the Initial OG DIP Budget (or the previously supplemented Approved OG DIP Budget, as the case may be), covering the subsequent 13-week period that commences with the week immediately following the date of delivery of the supplemental budget, consistent with the form and level of detail set forth in the Initial OG DIP Budget and otherwise in form and substance acceptable to the Required Senior DIP Lenders in their

discretion (each such supplemental budget, an "Updated OG DIP Budget"). Upon (and subject to) the approval of any such Updated OG DIP Budget by the Required Senior DIP Lenders in their discretion, such Updated OG DIP Budget shall constitute the then-approved Approved OG DIP Budget. Notwithstanding the foregoing, for informational purposes only, and not for purposes of approval or variance testing, on or before 12:00 p.m. New York City time on the Thursday of each calendar week following the Petition Date, the Debtors shall deliver to the Senior DIP Agent and the Senior DIP Lenders a 13-week cash flow forecast, or a weekly update thereto, with respect to Oak Grove, Maple Eagle and North River.

By no later than 12:00 p.m. New York City time on the Thursday of each calendar week following the second week after the Petition Date (each such Thursday, a "Variance Report Date"), the Debtors shall deliver to the Senior DIP Agent and the Senior DIP Lenders (and their advisors), a variance report (each, a "Senior DIP Variance Report") setting forth, in reasonable detail, any differences between disbursements (broken out between disbursements in respect of (i) "First and Second Day Motion Payments" and (ii) all other disbursements on an aggregate basis) (for the avoidance of doubt, excluding any professional fees (except for UCC professional fees)) for the Testing Period versus projected corresponding disbursements set forth in the Approved OG DIP Budget for such Testing Period (such difference with respect to each line item, a "Line-Item Variance") and on a cumulative basis for the period from the Petition Date to the latest week prior to the Variance Report Date (it being understood that the fourth Senior DIP Variance Report to be delivered (and every Senior DIP Variance Report thereafter) shall also set forth, in reasonable detail, any differences between aggregate receipts for the Testing Period versus projected aggregate receipts set forth in the Approved OG DIP Budget for such Testing Period and on a cumulative basis for the period from the Petition Date to the latest week prior to the Variance Report Date), together with a statement from the Borrower's chief financial officer certifying the information contained in the report. The Senior DIP Variance Report shall also provide a reasonably detailed explanation for any variance. The term "Testing Period" means, with respect to the first Senior DIP Variance Report required to be delivered, the prior two week period and with respect to every Senior DIP Variance Report required to be delivered thereafter, each of the prior two-week and prior four-week periods.

In addition, there shall be a weekly teleconference between the Debtors and the Senior DIP Lenders (and their advisors, including Stroock and Ankura) to discuss the Senior DIP Variance Report, the Chapter 11 Cases, the financial and operational performance of the Debtors, and such other related matters as may be reasonably requested with reasonable advance

notice by the Required Senior DIP Lenders (the reporting and information delivery requirements in this section, collectively, the "Reporting Requirements").

The Debtors shall not permit the aggregate Line-Item Variances for disbursements (for the avoidance of doubt, excluding any professional fees (except for UCC professional fees)) for the two week and four week cumulative periods to exceed 115% and 110%, respectively, of the projected corresponding disbursements for such period set forth in the then-Approved OG DIP Budget, and shall not permit (for the avoidance of doubt, commencing with the third Senior DIP Variance Report to be delivered) the aggregate Line-Item Variances for receipts for the two week and four week cumulative periods to be less than 85% and 90%, respectively, of the projected aggregate receipts for such period set forth in the then-Approved OG DIP Budget (such permitted variances, the "Permitted Variance" and such limitations, the "Senior DIP Budget Covenant").

|                          |                          |
|--------------------------|--------------------------|
| **Voluntary Prepayments:** | The Senior DIP Loans may be prepaid in whole or in part at any time and from time to time after the Closing Date, without premium or penalty. Each prepayment shall be accompanied by payment of all accrued and unpaid interest. |
| **Mandatory Prepayments:** | The following mandatory prepayments shall be required: |

1. Dispositions: Prepayments of the Senior DIP Facility in an amount equal to 100% of the net cash proceeds of sales or other dispositions of any property or assets of the Borrower or any of its Subsidiaries (other than in respect of (x) the Maple Eagle Sale Transaction, (y) until the Junior DIP Facility is paid in full and the commitments thereunder terminated, any proceeds from the sale or other disposition of the Junior DIP Priority Collateral (as defined in the Intercreditor Annex attached to the Restructuring Term Sheet), and (z) sales of other assets of Working Capital Priority Collateral (as defined in the Intercreditor Annex) and such other ordinary course dispositions necessary for the operation of the Borrower's business during the Chapter 11 Cases, in a manner consistent with the Prepetition Term Loan Credit Agreement) without the prior written consent of the Required Senior DIP Lenders.

2. Insurance Proceeds: Prepayments of the Senior DIP Facility in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any property or assets of the Borrower or any of its subsidiaries (other than any such proceeds (x) received prior to the date of commencement of the Chapter 11 Cases, (y)

10

until the Junior DIP Facility is paid in full and the commitments thereunder terminated, any such proceeds with respect to the Junior DIP Priority Collateral or (z) proceeds constituting Working Capital Priority Collateral (as defined in the Intercreditor Annex)).

3. <u>Indebtedness</u>:  Prepayments of the Senior DIP Facility in an amount equal to 100% of the net cash proceeds received from the incurrence of indebtedness by the Borrower or any of its subsidiaries (other than the Junior DIP Facility, the Postpetition Javelin Facility and such other indebtedness otherwise permitted under the Senior DIP Loan Documents).

Mandatory Prepayments will result in a dollar-for-dollar permanent reduction of the then-outstanding Senior DIP Loans in accordance with an application waterfall in a manner consistent with the Prepetition Term Loan Credit Agreement.

The mandatory prepayment requirements in the Senior DIP Loan Documents will include the foregoing and will be consistent with the Senior DIP Documentation Principles.

**Collateral:**   All obligations of the Borrower and the Guarantors to the Senior DIP Lenders, the Senior DIP Secured Designated Coal Contract Counterparty and the Senior DIP Agent under the Senior DIP Facility, including, without limitation, all principal and accrued interest, premiums (if any), costs, fees, expenses, disbursements, reimbursement obligations (whether contingent or otherwise), indemnities and any and all other amounts due or payable under the Senior DIP Facility (collectively, the "<u>Senior DIP Obligations</u>"), shall be secured by continuing, valid, binding, enforceable, non-avoidable, and automatically and fully and properly perfected liens on and security interests in (such liens and securing interests securing the Senior DIP Obligations, collectively, the "<u>Senior DIP Liens</u>"), subject to the Intercreditor Annex) on the following basis:

(a)    pursuant to section 364(c)(2) of the Bankruptcy Code (subject and subordinate in all respects to the Carve-Out), a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all DIP Collateral (as defined below), and the proceeds, products, rents, and profits thereof, in each case, that is not subject to a valid, perfected and non-avoidable lien on or as of the Petition Date (or is subject to a valid and non-avoidable lien in existence on or as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (the "<u>Unencumbered Property</u>"), subject to relative rank and priority set forth in the Intercreditor Annex;

11

(b)    pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code (subject and subordinate in all respects to the Carve-Out), a valid, binding, continuing, enforceable, fully-perfected first priority security interest in and lien upon all DIP Collateral (other than Unencumbered Property, which is described in sub-paragraph (a) above), which liens and security interests shall:

(x) be junior only to (i) the Carve-Out, (ii) valid, unavoidable and enforceable liens or security interests on such DIP Collateral existing on the Petition Date which are (A) fully and properly perfected as of the Petition Date to the extent required by Bankruptcy Code section 546(b) or (B) perfected subsequent to the Petition Date, in the manner and to the extent permitted by Bankruptcy Code section 546(b), in each case, solely to the extent that such liens and security interests are permitted to be senior to the DIP Liens on such DIP Collateral pursuant to the DIP Orders and (iii) the liens and security interests in favor of the Junior DIP Agent on behalf of the Junior DIP Lenders on the Junior DIP Facility Priority Collateral and the liens and security interests in favor of Javelin on the Working Capital Priority Collateral (as defined in the Intercreditor Annex), and (y) have the relative rank and priority set forth in the Intercreditor Annex and (z) rank senior to any and all other liens on and security interests in all DIP Collateral.

"DIP Collateral" means all assets and property (real and personal), wherever located, whether now owned by or owing to, or hereafter acquired by, or arising in favor of the Borrower and the Guarantors that are Debtors, including, after entry of the Final Order, all claims and causes of action under Chapter 5 of the Bankruptcy Code and the proceeds thereof.

**Superpriority DIP Claims:**    Subject only to the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the Senior DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors on a joint and several basis with priority over any and all claims against each of the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations (as defined below), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "Senior DIP Superpriority Claims"), and which

shall be payable from and have recourse to all pre- and postpetition property of the Debtors and all proceeds thereof (including, upon entry of the Final Order all claims and causes of action arising under Chapter 5 of the Bankruptcy Code and the proceeds and property recovered therefrom), subject to the relative priority set forth in the Intercreditor Annex.

Notwithstanding anything contained herein or in the DIP Loan Documents to the contrary, subject only to the Carve-Out and the Intercreditor Annex, the Senior DIP Liens and the Senior DIP Superpriority Claims shall not be (i) subject or subordinate to or made *pari passu* with (A) unless otherwise expressly provided for in the DIP Loan Documents or in this Term Sheet, any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases (including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors), whether under section 363 or 364 of the Bankruptcy Code or otherwise, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, or (C) any intercompany or affiliate liens of the Debtors or security interests of the Debtors; or (ii) subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code.

**Carve-Out:**     As used in this Interim Order, the "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses up to $20,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (including any restructuring, sale, financing, or other success fee of any investment bankers or financial advisors of the Debtors or the Official Committee, in each case solely to the extent such fee is earned pursuant to the terms of the applicable agreement giving rise to such fee, prior to delivery of a Carve-Out Trigger Notice) (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Official Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the applicable DIP Agent (in accordance with and subject to this Interim Order and the Intercreditor Annex) of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; provided, however, such

Allowed Professional Fees in the case of each Committee Professional (but not Debtor Professionals) shall be subject to the monthly professional fee line item included in the Approved Budget with respect to such Committee Professional (the "Professional Fee Budget"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $$750,000 incurred after the first business day following delivery by the applicable DIP Agent (in accordance with and subject to this Interim Order and the Intercreditor Annex) of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being referred to as the "Post-Carve-Out Trigger Notice Cap"). For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the applicable DIP Agent (pursuant to the written instruction of the Required Senior DIP Lenders or the Required Junior DIP Lenders, as applicable, and in accordance with and subject to this Interim Order and the Intercreditor Annex) to lead restructuring counsel to the Debtors, the U.S. Trustee and counsel to the Official Committee, which notice may be delivered following the occurrence and during the continuation of a Termination Event, stating that the Post-Carve-Out Trigger Notice Cap has been invoked; provided that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in clauses (i), (ii), (iii), or (iv) above, on any grounds; provided, further, that in no event shall any DIP Agent be responsible for monitoring or confirming whether any Termination Event has occurred or whether a Post Carve Out Trigger Notice Cap should be invoked.

Carve-Out Reserves. The Debtors shall establish and fund a segregated account (the "Carve-Out Reserve Account") for purposes of funding the Carve-Out.  Upon entry of an Interim Order, the Debtors shall deposit in the Carve-Out Reserve Account an amount equal to the aggregate amount of Allowed Professional Fees projected to accrue from the Commencement Date through February 29, 2020 (the "Initial Funded Reserve Amount"). Commencing on March 1, 2020 (or the first business day thereafter), on the first business day of each month, the Debtors shall deposit in the Carve-Out Reserve Account an amount equal to the aggregate amount of Allowed Professional Fees projected to accrue for the following month, up to the monthly line-item amount for each Committee Professional as set forth in the Professional Fee Budget (the "Monthly Funded Reserve Amount").  No later than the tenth (10th) calendar day of each month, each Professional Person may deliver to the Debtors a reasonable good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred in the preceding month (each such statement, a "Fee Statement"), and to the extent the amount of Allowed Professional Fees accrued and claimed in a Fee Statement exceeds the Initial Funded Reserve Amount or the Monthly Funded

Reserve Amount (as the case may be) for the applicable period or month, respectively, the Debtors shall, within three (3) business days of receipt of such Fee Statement, fund additional amounts into the Carve-Out Reserve Account equal to the difference between, as applicable, the Initial Funded Reserve Amount or the Monthly Funded Reserve Amount and the amount accrued and claimed in the applicable Fee Statement, in each case, up to the monthly line-item amount for each Committee Professional as set forth in the Professional Fee Budget (each, a "Top Off Amount"). At any time prior to the Termination Declaration Date (as defined below), if a restructuring, sale, financing, or other success fee has been earned by a Professional Person in accordance with the terms of the applicable Court-approved agreement, the Debtors shall deposit in the Carve-Out Reserve Account an amount equal to such fee (and in the case of Committee Professionals (but not Debtor Professionals), in an amount up to the monthly line-item amount for such Committee Professionals as set forth in the Professional Fee Budget).

The Carve-Out Reserve Account shall be maintained, and the funds therein (the "Funded Reserve Amount") shall be held in trust for the benefit of Professional Persons. Except as otherwise provided in this Interim Order, any and all amounts in the Carve-Out Reserve Account shall not be subject to any cash sweep and/or foreclosure provisions in the Prepetition Loan Documents or the DIP Loan Documents and neither the Prepetition Secured Parties nor the DIP Lenders shall be entitled to sweep, exercise remedies against or foreclose on such amounts notwithstanding any provision to the contrary in the Prepetition Credit Documents, DIP Financing Agreements, Interim or Final Orders until the Carve-Out Reserves have been fully funded; provided, however, that DIP Secured Parties, Javelin and the Prepetition Secured Parties shall have a lien and security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the applicable DIP Agent, for the benefit of the respective DIP Secured Parties and Javelin, for application in accordance with the DIP Loan Documents (subject to the Intercreditor Annex).

Additional terms pertaining to the Carve-Out Reserve will be included in the Interim and Final Order, as agreed between the Debtors and the Required Senior DIP Lenders.

| | |
|---|---|
| **Conditions Precedent to Closing Date and Interim Availability:** | As set forth on Annex A hereto. |
| **Conditions Precedent to Full** | As set forth on Annex A hereto. |

**Availability:**

| | |
|---|---|
| **Conditions Precedent to All Borrowings:** | Receipt of customary signed borrowing request, accuracy in all material respects of representations and warranties, absence of any Default or Event of Default and the following: |

(a) as a result of such extension of credit, usage of the Senior DIP Commitments shall not exceed (i) the applicable Senior DIP Commitments then in effect and (ii) the aggregate amount authorized by the Interim Order or the Final Order, as the case may be;

(b) the Interim Order or Final Order, as the case may be, and the cash management order, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is adverse to the interests of the Senior DIP Lenders;

(c) satisfaction by the Debtors of all Milestones that have occurred as of each Draw Date;

(d) compliance with Senior DIP Budget Covenant as of the most recent applicable Variance Report Date;

(e) the Senior DIP Agent, on behalf of itself, the Senior DIP Lenders and the other secured parties with respect to the Senior DIP Facility, shall have valid, binding, enforceable, non-avoidable, and automatically and fully and properly perfected liens on, and security interests in, the DIP Collateral, in each case, having the priorities set forth in the DIP Orders and subject only to the payment in full in cash of any amounts due under the Carve-Out;

(f) the Debtors shall have paid the balance of all fees and expenses then due and payable as referenced herein; and

(g) the making of such extension of credit will not violate any requirement of material law and shall not be enjoined, temporarily, preliminarily or permanently.

| | |
|---|---|
| **Representations and Warranties:** | Each of the Debtors (with respect to itself and each of its Subsidiaries) makes the representations and warranties set forth in the Prepetition Term Loan Credit Agreement (excluding the representations and warranties contained in Section 5.18 of the Prepetition Term Loan Credit Agreement) and, in addition, that: |

(a) orders of the Bankruptcy Court remain in effect and not been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is adverse to the interests of the Senior DIP Lenders and the DIP Senior Secured Designated Coal Contract Counterparty; and

(b) the Debtors have not failed to disclose any material assumptions with respect to the Initial OG DIP Budget.

The representations and warranties in the Senior DIP Loan Documents will include the foregoing and will be consistent with the Senior DIP Documentation Principles.

| | |
|---|---|
| **Chapter 11 Cases Milestones:** | The Debtors shall be required to comply with milestones related to the Debtors' Chapter 11 Cases as are set forth on <u>Annex B</u> hereto, and such other milestones as may be included in the Senior DIP Credit Agreement as determined by the Required Senior DIP Lenders in their discretion (collectively, the "<u>Milestones</u>"). |
| **Affirmative Covenants:** | Each of the Debtors (with respect to itself and each of its Subsidiaries) agrees to the affirmative covenants set forth in the Prepetition Term Loan Credit Agreement (excluding the affirmative covenants contained in Sections 6.01 (Financial Statements), 6.02(a) (Compliance Certificate), 6.02(b) (Budget), 6.02(d) (Officer's Certificate), 6.11 (Lender Calls), 6.23(a) (Certain Permits), 6.24 (Certain Long Term Liabilities and Environmental Reserves), 6.25 (Post-Closing Matters) and 6.27 (Time Devoted to Operations) of the Prepetition Term Loan Credit Agreement), the affirmative covenants set forth in the Restructuring Support Agreement and the following, without duplication: |

(a) compliance with the Milestones;

(b) compliance with the Senior DIP Budget Covenant;

(c) compliance with the Reporting Requirements;

(d) compliance with the Restructuring Support Agreement;

(e) delivery to the Senior DIP Agent as soon as practicable in advance of filing with the Bankruptcy Court, the Interim Order and the Final Order (each of which must be in form and substance acceptable to the Senior DIP Lenders, the DIP Senior Secured Designated Coal Contract Counterparty and the Senior DIP Agent), any plan of reorganization or liquidation, and/or any disclosure statement related to such plan;

17

(f) additional reporting requirements consistent with the Senior DIP Documentation Principles, including, without limitation, with respect to litigation, contingent liabilities, material contracts (together with consultation rights) and ERISA and environmental events; and

(g) access to information (including historical information) and personnel, including, without limitation, telephonic meetings as reasonably requested by the Required Senior DIP Lenders or the Senior DIP Lender Advisors with access to all information reasonably requested.

The affirmative covenants in the Senior DIP Loan Documents will include the foregoing and be consistent with the Senior DIP Documentation Principles.

**Negative Covenants:**    Each of the Debtors (with respect to itself and each of its Subsidiaries) agrees to the negative covenants set forth in the Prepetition Term Loan Credit Agreement, modified to eliminate the baskets and carve-outs set forth therein (other than baskets and carve-outs necessary (as determined by the Required Senior DIP Lenders) for the Debtors to run their business in the ordinary course of business in the manner consistent with the Approved OG DIP Budget), the negative covenants set forth in the Restructuring Support Agreement and the following:

(a) create or permit to exist any liens or encumbrances on any assets, other than liens securing the Senior DIP Facility and any permitted liens (which liens shall include Javelin's liens, scheduled liens in existence on the Closing Date to the extent subordinated pursuant to the orders, liens in favor of Bay Point Capital Partners II, LP and junior liens granted in connection with adequate protection granted by the Debtors as required hereunder) and other liens described in "Collateral" above;

(b) create or permit to exist any other superpriority claim which is pari passu with or senior to the claims of the Senior DIP Lenders and other "secured parties" under the Senior DIP Facility, except for the Carve-Out, certain of Javelin's claims, the claims of the Junior DIP Lenders with respect to the Junior DIP Priority Collateral and liens securing the obligations, subject to the Intercreditor Annex;

(c) sell any assets (other than (x) in respect of the Maple Eagle Sale Transaction (as and to the extent set forth in the Restructuring Support Agreement), (y) constituting Junior DIP Priority Collateral and (z) pursuant to the Javelin Agreements and such

other ordinary course dispositions necessary for the operation of the Borrower's business during the Chapter 11 Cases, in a manner consistent with the Prepetition Term Loan Credit Agreement) (including, without limitation, any sale and leaseback transaction and any disposition under Bankruptcy Code section 363) without the prior written consent of the Required Senior DIP Lenders;

(d) modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) its organizational documents, except as required by the Bankruptcy Code or in a manner that is not materially adverse to the interests of the Senior DIP Lenders in their capacities as such without the prior written consent of the Required Senior DIP Lenders or in a manner that is not materially adverse to the interests of the DIP Senior Secured Designated Coal Contract Counterparty, without its prior written consent;

(e) pay pre-petition indebtedness, except as expressly provided for herein, in the Restructuring Support Agreement, or pursuant to "first day" or other orders entered upon pleadings in form and substance reasonably satisfactory to the Required Senior DIP Lenders;

(f) assert any right of subrogation or contribution against any other Debtors until all borrowings under the Senior DIP Facility are paid in full and the Senior DIP Commitments are terminated;

(g) without the consent of the Required Senior DIP Lenders, (i) enter into any Designated Coal Contract or incur any other obligation that would constitute Secured Designated Coal Contract Obligations, or (ii) pay any discretionary bonus amount pursuant to Section 6.04 of the Oak Grove Marketing Agreement; and

(h) except pursuant to the Javelin Agreements, make any Investment (to be defined in the Senior DIP Credit Agreement in a manner consistent with the Senior DIP Documentation Principles) or Restricted Payment (to be defined in the Senior DIP Credit Agreement in a manner consistent with the Senior DIP Documentation Principles) or any debt prepayment except as required hereunder or pursuant to the Javelin Agreements).

The negative covenants in the Senior DIP Loan Documents will include the foregoing and will be consistent with the Senior DIP Documentation Principles.

**Events of Default**     The Facilities shall be subject to the events of default set forth in the

**and Remedies:**   Prepetition Term Loan Credit Agreement (excluding, for the avoidance of doubt, the events of default contained in Sections 8.01(e) (other than any default under that certain Equipment Lease Agreement, dated April 29, 2019 between Murray Oak Grove and Bay Point Capital Partners II, LP), 8.01(f) and 8.01(g) of the Prepetition Term Loan Credit Agreement) and the following:

There shall have occurred any of the following in the Chapter 11 Cases (the "Chapter 11 Defaults"):

(a) the bringing of a motion or application by any Debtors in the Chapter 11 Cases, or the entry of any order by the Bankruptcy Court in the Chapter 11 Cases: (i) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment of all Senior DIP Obligations in full in cash immediately upon the consummation of such financing; (ii) to grant any Lien (other than Liens expressly permitted under the Senior DIP Credit Agreement and the DIP Term Sheet, as applicable) upon or affecting any DIP Collateral; (iii) except as provided in this DIP Term Sheet, the Senior DIP Credit Agreement, the Interim Order or the Final Order, as the case may be, to use cash collateral of the Senior DIP Agent under section 363(c) of the Bankruptcy Code without the prior written consent of the Senior DIP Agent and the Required Senior DIP Lenders; or (iv) that (in the case of any Debtor) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court) approves or provides authority to take any other action or actions adverse to the rights and remedies of the Senior DIP Agent, the DIP Senior Secured Designated Coal Contract Counterparty, or the Senior DIP Lenders under this Senior DIP Term Sheet or the Senior DIP Credit Agreement, as applicable, or their interest in the DIP Collateral;

(b) the filing of any plan of reorganization or disclosure statement attendant thereto, or any amendment, modification or supplement to such plan or disclosure statement, by any Debtor other than a chapter 11 plan that is acceptable to the Required Senior DIP Lenders (and, with respect to any terms that would reasonably be expected to have a materially adverse economic impact on the Senior DIP Lenders that are not Required Lenders, such Senior DIP Lenders and, with respect to any terms that would reasonably be expected to have a materially adverse economic impact on the DIP Senior Secured Designated Coal Contract Counterparty, such DIP Senior Secured Designated Coal Contract Counterparty) (an "Approved Plan") (it being understood that the Plan described in the RSA is an Approved Plan);

(c) the termination or modification of any Debtor's exclusive right to file and solicit acceptances of a plan of reorganization;

(d) the entry of an order in any of the Chapter 11 Cases approving a disclosure statement in respect of a plan other than an Approved Plan, or the entry of an order confirming a plan or plans of reorganization other than an Approved Plan;

(e) the occurrence of any Consenting Term Lender Termination Event (as defined in the Restructuring Support Agreement);

(f) the entry of an order in the Chapter 11 Cases amending, supplementing, staying, vacating or otherwise modifying any Senior DIP Loan Document or the Interim Order or the Final Order in any case without the prior written consent of the Senior DIP Lenders and the DIP Senior Secured Designated Coal Contract Counterparty;

(g) the Final Order is not entered within thirty-three (33) calendar days (or such other period as the Senior DIP Lenders and the DIP Senior Secured Designated Coal Contract Counterparty may agree to in writing) following the Petition Date;

(h) the payment of, or application by any Debtor for authority to pay, any prepetition claim without the Required Senior DIP Lenders' prior written consent other than (i) as provided in any "first day order" in form and substance acceptable to the Required Senior DIP Lenders, or (ii) as set forth in the Approved OG DIP Budget;

(i) the entry of an order by the Bankruptcy Court appointing, or the filing of a motion or application by any Debtor for an order seeking the appointment of, in either case without the consent of the Required Senior DIP Lenders, an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Chapter 11 Cases, with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Borrower or with the power to conduct an investigation of (or compel discovery);

(j) other than the Maple Eagle Sale Transaction (as and to the extent set forth in the Restructuring Support Agreement), the sale without the Senior DIP Agent's and the Required Senior DIP Lenders' written consent, of any Borrower's assets (other than assets

constituting Junior DIP Priority Collateral or as otherwise permitted above under the header "Negative Covenants") either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise;

(k) the dismissal of the Chapter 11 Cases which does not contain a provision for payment in full in cash of all noncontingent monetary Senior DIP Obligations of the Borrower ("Payment in Full") under the Senior DIP Credit Agreement or the DIP Term Sheet, as applicable, or if any Debtor shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases that does not contain a provision for Payment in Full, in each case, without the prior written consent of the Required Senior DIP Lenders;

(l) the conversion of the Chapter 11 Cases from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or a bankruptcy under Debtor Relief Laws, as applicable, or any Debtor shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise;

(m) any Debtor files a motion or application seeking, or the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any DIP Collateral not in accordance with the terms hereof, in an amount in excess of $250,000, or (y) with respect to any lien of or the granting of any lien on any DIP Collateral to any state or local environmental or regulatory agency or authority having priority over the liens in favor of the Senior DIP Agent and the Prepetition Term Agent in an amount in excess of $250,000;

(n) any Debtor files a motion or application seeking, or the entry of an order in the Chapter 11 Cases challenging, subordinating, disgorging, avoiding or requiring repayment of any portion of the payments made on account of the Senior DIP Obligations owing under the Senior DIP Credit Agreement, the DIP Term Sheet, the Prepetition Term Loan Credit Agreement or the other Senior DIP Loan Documents;

(o) the failure of any Debtor to perform any of its obligations under the Interim Order or the Final Order or any violation of any of the terms of the Interim Order or the Final Order, subject to any applicable grace or cure periods set forth therein;

(p) the challenge by any Debtor to the validity, extent, perfection or

22

priority of any liens granted under or obligations arising under, the Senior DIP Loan Documents, the Prepetition Term Loan Credit Agreement, the Interim Order or the Final Order;

(q) the remittance, use or application of proceeds of the Senior DIP Loans, cash collateral, or other cash or funds of the Debtors other than in accordance with the DIP Orders;

(r) any Debtor files a motion or application seeking, or the entry of an order in any of the Chapter 11 Cases granting any other super-priority administrative claim or lien equal or superior to that granted to the Senior DIP Agent, on behalf of itself and the Senior DIP Lenders and the Senior DIP Secured Designated Coal Contract Counterparty, without the consent in writing of the Required Senior DIP Lenders (other than any such Superpriority Administrative Claim or lien that is expressly permitted to have such priority under this Senior DIP Term Sheet);

(s) the filing of a motion or application by any Debtor requesting, or the entry of any order granting, any super-priority claim which is senior or pari passu with the Senior DIP Lenders' claims or with the claims of the Prepetition Term Lenders or the Secured Designated Coal Contract Counterparty, under the Prepetition Term Loan Credit Agreement or the Senior DIP Lenders or the Senior DIP Secured Designated Coal Contract Counterparty under the Senior DIP Loan Documents not in accordance with the terms hereof;

(t) any Debtor files a motion or application seeking, or the entry of an order precluding the Senior DIP Agent or the Prepetition Term Agent or its respective designee from having the right to or being permitted to "credit bid" with respect to the assets of the Debtors;

(u) any attempt by any Debtor to reduce (other than a reduction in accordance with the terms of the Senior DIP Credit Agreement or the DIP Term Sheet, as applicable), avoid, set off or subordinate the Senior DIP Obligations or the liens securing such Senior DIP Obligations to any other debt, including, without limitation, the obligations under the Prepetition Term Loan Credit Agreement;

(v) the reversal, vacation or stay of the effectiveness of either the Interim Order or the Final Order or any provision thereof without the prior written consent of the Required Senior DIP Lenders;

(w) the payment of or granting adequate protection with respect to any obligations under the Prepetition Term Loan Credit Agreement

23

(other than with respect to payment permitted under the Interim Order or the Final Order) without the prior written consent of the Required Senior DIP Lenders;

(x) an application for any of the orders described under the Chapter 11 Defaults including, without limitation, clauses (a), (d), (f), (g), (i), (m), (n), (r), (s) or (t) shall be made by a person other than the Senior DIP Agent or the Senior DIP Lenders and such application is not, to the extent requested by Senior DIP Agent or the Required Senior DIP Lenders, contested by any Borrower in good faith and the relief requested is granted in an order that is not stayed pending appeal; or

(y)  the cessation of liens or super-priority claims granted with respect to this Senior DIP Term Sheet or the Senior DIP Credit Agreement, as applicable, to be valid, perfected and enforceable in all respects; or the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Senior DIP Loan Documents, the DIP Orders, the liens granted under this Senior DIP Term Sheet, the Senior DIP Credit Agreement, the Senior DIP Loan Documents, or the DIP Orders, as applicable, and the DIP Collateral.

The events of default in the Senior DIP Loan Documents will include the foregoing and be consistent with the Senior DIP Documentation Principles.

In all cases subject to the Intercreditor Annex, the Senior DIP Agent, the Senior DIP Secured Designated Coal Contract Counterparty, and the Senior DIP Lenders shall have customary remedies determined appropriate by the Required Senior DIP Lenders, including, without limitation, without further order from the Bankruptcy Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Senior DIP Agent and the Senior DIP Lenders to exercise, upon the occurrence and during the continuance of any Event of Default, subject to any remedies notice period acceptable to the Required Senior DIP Lenders as may be reflected in the DIP Orders, all rights and remedies provided for in the Senior DIP Loan Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable): (a) immediately terminate the Debtors' limited use of any cash collateral; (b) cease making any Senior DIP Loans under the Senior DIP Facility to the Debtors; (c) declare all Senior DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts and sweep all funds contained in the Debtors' deposit accounts; (e) immediately set-

24

off any and all amounts in accounts maintained by the Debtors with the Senior DIP Agent or the Senior DIP Lenders (including all funds held in the Senior DIP Disbursement Account) against the Senior DIP Obligations, or otherwise enforce any and all rights against the Senior DIP Collateral in the possession of any of the applicable Senior DIP Lenders, including, without limitation, disposition of the DIP Collateral solely for application towards the Senior DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under the DIP Orders, the Senior DIP Loan Documents or applicable law to effect the repayment of the Senior DIP Obligations.

The Debtors shall waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the Senior DIP Agent and the Senior DIP Lenders set forth in the DIP Orders and in the Senior DIP Loan Documents.

|                         |                                                                                                          |
|-------------------------|----------------------------------------------------------------------------------------------------------|
| **Adequate Protection:** | As adequate protection, and subject to the Carve-Out the holders of Prepetition Debt shall receive the following: |

(a) Javelin shall receive (1) replacement liens in all DIP Collateral (the "Javelin Adequate Protection Liens"), subject to the relative rights and priorities set forth in the Intercreditor Annex, (2) superpriority administrative expense claims as and to the extent provided in section 507(b) of the Bankruptcy Code (the "Javelin Adequate Protection Claims"), which shall be payable by each of the Debtors, on a joint and several basis, with recourse to all DIP Collateral, subject to the relative priorities set forth in the Intercreditor Annex; (3) the reimbursement of the reasonable and documented postpetition fees and expenses of Paul Hastings LLP, counsel to Javelin and a local bankruptcy counsel.

(b) The Prepetition Term Agent shall receive, on behalf of the Prepetition Term Secured Parties, (1) replacement liens in all DIP Collateral (the "Term Loan Adequate Protection Liens"), subject to the relative rights and priorities set forth in the Intercreditor Annex, (2) superpriority administrative expense claims as and to the extent provided in section 507(b) of the Bankruptcy Code (the "Term Loan Adequate Protection Claims"), which shall be payable by each of the Debtors, on a joint and several basis, with recourse to all DIP Collateral, subject to the relative priorities set forth in the Intercreditor Annex, (3) the reimbursement of the reasonable and documented fees and expenses of Seward & Kissel LLP, as counsel to the Prepetition Term Agent and any other local counsel or advisor retained by the Prepetition Term Agent. In addition, the Debtors shall reimburse the fees and expenses of

Stroock & Stroock & Lavan LLP.

To the extent that less than 50% of the aggregate amount of the Prepetition First Out Term Loan Obligations are repaid with the proceeds of the Senior DIP Facility upon entry of an interim order approving such facility as set forth above (such unpaid amounts, the "Interim Order Unrolled Prepetition First Out Term Loan Obligations"), on the effective date of any chapter 11 plan, the holders of the remaining Prepetition First Out Term Loan Obligation shall receive, as "adequate protection," a payment, in cash, equal to 5.0% of the aggregate amount of such Interim Order Unrolled Prepetition First Out Term Loan Obligations, which payment shall be in addition to any other adequate protection provided thereon (the "Interim Order Adequate Protection Payment").

To the extent not all of the Interim Order Unrolled Prepetition First Out Term Loan Obligations are repaid with the proceeds of the Senior DIP Facility upon entry of a final order approving such facility as set forth above (such unpaid amounts, the "Final Order Unrolled Prepetition First Out Term Loan Obligations"), on the effective date of any chapter 11 plan, the holders of the Prepetition First Out Term Loan Obligations shall receive, as "adequate protection," a payment, in cash, equal to 10.0% of the aggregate amount of such Final Order Unrolled Prepetition First Out Term Loan Obligations, which payment shall be in addition to any other adequate protection provided thereon and shall be credited against and reduced by the Interim Order Adequate Protection Payment, if any.

| | |
|---|---|
| **Marshalling; 552(b) Waiver and Waiver of 506(c) Claims:** | The DIP Orders shall (i) provide that in no event shall the Senior DIP Agent, the DIP Senior Secured Designated Coal Contract Counterparty or the Senior DIP Lenders (and, subject to entry of the Final Order, the Prepetition Term Secured Parties or Javelin) be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, as applicable, and (ii) approve the waiver of all claims under section 506(c) of the Bankruptcy Code against the Senior DIP Agent, the DIP Senior Secured Designated Coal Contract Counterparty or the Senior DIP Lenders (and, subject to entry of the Final Order, the Prepetition Term Secured Parties or Javelin). The DIP Orders shall also provide that, subject to entry of the Final Order, the Prepetition Term Secured Parties and Javelin shall be entitled to all rights and benefits of section 552(b) of the Bankruptcy Code, and that the "equities of the case" exception shall not apply to such persons or to the Prepetition Debt. |
| **Required DIP Lenders:** | Senior DIP Lenders holding, as of the Closing Date, a majority of the aggregate outstanding principal amount of the Senior DIP Loans (the "Required Senior DIP Lenders"). Without abrogating the Murray Entities' fiduciary duties set forth in Section 28 of the Restructuring Support Agreement, for so long as any obligations under the MEC DIP Credit |

Agreement (including any MEC DIP Loans) remain outstanding, no consent (including any deemed consent on account of any inaction or failure to act), waiver, amendment, or approval required by, and given by or obtained from, MEC shall be valid unless such consent, waiver, amendment, or approval is authorized and permitted under the MEC DIP Credit Agreement, and any consent (including any deemed consent on account of any inaction or failure to act), waiver, amendment, or approval given by or obtained from MEC in violation of the MEC DIP Credit Agreement shall be deemed void ab initio and of no force and effect (all defined terms used in this sentence shall have the meaning assigned to such defined terms in the Restructuring Support Agreement).

**Assignments:** The Senior DIP Lenders shall not be permitted to assign Senior DIP Loans without the consent of the Borrower (such consent not to be unreasonably withheld or delayed); provided that (i) no such consent shall be required for any assignment expressly contemplated by the Restructuring Term Sheet and (ii) as a condition to any assignment, the assignee must, in addition to any administrative requirements set forth in the DIP Credit Agreement, prior to such assignment taking effect, execute and deliver to the Senior DIP Agent a duly executed copy of a joinder to the Restructuring Support Agreement.

**Indemnity; Expenses:** Each of the Debtors (with respect to itself and each of its Subsidiaries) agrees to the indemnification and expense reimbursement provisions set forth in the Prepetition Term Loan Credit Agreement. The indemnification and expense reimbursement provisions in the Senior DIP Loan Documents will include the foregoing and will be consistent with the Senior DIP Documentation Principles. To the extent that any of the Debtors fails for any reason to indefeasibly pay any amount pursuant to such indemnification and expense reimbursement provisions to the Senior DIP Agent, each Senior DIP Lender shall severally agree to pay such amounts to the Senior DIP Agent, as more fully set forth in the Senior DIP Loan Documents.

**Miscellaneous:** The Senior DIP Loan Documents and the DIP Orders will, among other provisions acceptable to the Required Senior DIP Lenders and the Senior DIP Agent, also contain the following, each of which shall be in form and substance acceptable to the Required Senior DIP Lenders and the Senior DIP Agent:

(a) a provision that, in connection with any sale of any of the Debtors' assets under section 363 of the Bankruptcy Code or under a chapter 11 plan, the Senior DIP Agent, at the direction of the Required Senior DIP Lenders, the Prepetition Term Agent, at the direction of the requisite Prepetition Term Lenders, and Javelin or their respective designees shall have the absolute right to credit bid

a portion or the full amount of all Senior DIP Obligations (subject to the Intercreditor Annex);

(b) usual and customary yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes); and

(c) a stipulation and waiver by the Debtors (subject to a challenge period acceptable in form and substance to the Required Senior DIP Lenders), as to the enforceability of the Prepetition Debt, the validity, priority and perfection of all liens securing the Prepetition Debt, and a release by the Debtors of all claims and causes of action against the Prepetition Term Secured Parties and Javelin.

**Governing Law:** The Debtors submit to the exclusive jurisdiction and venue of the Bankruptcy Court in Ohio and waive any right to trial by jury. New York law shall govern the Senior DIP Facility (other than security documents to be governed by local law, to be determined by the Required Senior DIP Lenders).

**Counsel to the Required Senior DIP Lenders:** Stroock & Stroock & Lavan LLP

**Counsel to the Senior DIP Agent:** Seward & Kissel LLP

28

**ANNEX A**

### Conditions Precedent

**A.  Conditions Precedent to Closing Date**

1. **Interim Order/Bankruptcy Matters**

   (a) The Chapter 11 Cases for each of the Debtors shall have been commenced in the Bankruptcy Court for the Southern District of Ohio, Western Division, and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter shall have been reviewed in advance by the Senior DIP Lenders and the Senior DIP Agent and shall be acceptable in form and substance to the Required Senior DIP Lenders and the Senior DIP Agent.

   (b) The Bankruptcy Court shall have entered, upon motion in form and substance acceptable to the Senior DIP Lenders and the Senior DIP Agent, the Interim Order no later than four (4) calendar days after the Petition Date, approving and authorizing the Senior DIP Facility and the Junior DIP Facility, all provisions thereof and the priorities and liens granted under Bankruptcy Code section 364(c) and (d), as applicable, in form and substance acceptable to the Senior DIP Lenders and the Senior DIP Agent.

   (c) The Interim Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, that is materially adverse to the interests of the Senior DIP Lenders or the Senior DIP Agent, without the prior written consent of the Senior DIP Lenders and the Senior DIP Agent, as applicable.

   (d) The Debtors shall be in compliance in all respects with the Interim Order.

   (e) Each other Milestone that is required to be complied with prior to or concurrently with entry of the Interim Order shall have been complied with.

   (f) No trustee or examiner with enlarged powers (beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the Borrower or their respective properties.

   (g) A cash management order encompassing the cash management arrangements currently in place under the Prepetition Term Loan Credit Agreement and otherwise acceptable to the Required Senior DIP Lenders shall be in full force and effect.

   (h) The Closing Date shall have occurred on or before the date that is three business days after the date of entry of the Interim Order.

   (i) The Senior DIP Agent shall have a fully perfected lien on the DIP Collateral, having the priorities set forth in the Intercreditor Annex.

2. **Financial Statements, Budgets and Reports**

(a) The Senior DIP Lenders, and the Senior DIP Secured Designated Coal Contract Counterparty and the Senior DIP Agent shall have received and the Senior DIP Lenders shall have approved the Initial OG DIP Budget and such other information (financial or otherwise) as may be reasonably requested by the Required Senior DIP Lenders, in each case, shall be acceptable in form and substance to the Required Senior DIP Lenders.

(b) The Initial Junior DIP Loans (as defined in the Junior DIP Term Sheet) shall have been funded, and the Required Senior DIP Lenders shall be satisfied with the application of the proceeds thereof.

3. **Performance of Obligations**

(a) All costs, fees, expenses (including, without limitation, reasonable and documented legal fees) and other compensation contemplated by the Senior DIP Term Sheet and the Senior DIP Loan Documents to be payable to the Senior DIP Lenders and Senior DIP Agent.

(b) No Default or Event of Default under the Senior DIP Facility shall have occurred or be occurring.

(c) Representations and warranties under the Senior DIP Facility shall be true and correct in all material respects.

(d) Since the Petition Date, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency (other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code by any of the Debtors or their subsidiaries and the commencement of the Chapter 11 Cases) that, individually or in the aggregate, has had or could reasonably be expected to have, a material adverse effect on (a) the business, operation (financial or otherwise), operations or assets of the Borrower and its subsidiaries taken as a whole, or (b) the ability of the Debtors, taken as a whole, to perform their obligations under the Senior DIP Loan Documents or (c) the validity or enforceability of the Senior DIP Loan Documents or the rights and remedies of the Senior DIP Agent, or the Senior DIP Lenders under any Senior DIP Loan Document (including, but not limited to, the enforceability or priority of any liens granted to the Senior DIP Agent under the Senior DIP Loan Documents) (any of the foregoing being a "Material Adverse Effect").

(e) Upon entry of the Interim Order, the entry into this Senior DIP Term Sheet shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently.

4. **Customary Closing Documents**

(a) Satisfaction of customary closing conditions, including, customary legal opinions; customary officer's closing certificates; organizational documents; customary evidence of authority, authorization, execution and delivery; good standing certificates; obtaining of any material third party and governmental consents necessary; "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and beneficial ownership regulations.

(b) Execution and delivery by the Debtors of promissory notes evidencing the loans to be made under the Senior DIP Term Sheet, acceptable in all respects to the Required Senior DIP Lenders (the parties hereto acknowledging that funding prior to the Full Availability shall be made, as to loan documentation, solely on the basis of the Senior DIP Term Sheet and such promissory notes, and that funding of the Senior DIP Loans during the Full Availability is subject to the parties entering into the Senior DIP Loan Documents).

**B.   Conditions Precedent to Full Availability**

**1.   Final Order; Bankruptcy Matters**

(a) Not later than thirty-three (33) calendar days following the Petition Date, the Final Order shall have been entered by the Bankruptcy Court on a motion by the Debtors that is in form and substance acceptable to the Senior DIP Lenders and the Senior DIP Agent, approving and authorizing on a final basis the matters and containing the provisions described in paragraph A.1(a) above, in each case, in form and substance acceptable to the Senior DIP Lenders and the Senior DIP Agent.

(b) The Final Order shall not have been reversed, modified, amended, stayed or vacated.

(c) The Debtors shall be in compliance with the Final Order.

(d) Each of the RSA Order and an order authorizing MEC to enter into and perform its obligations under the restructuring support agreement in the MEC Cases ("MEC RSA Order") shall have been entered by the Bankruptcy Court in the chapter 11 cases of each of MEC as well as the Debtors, on a motion by the Debtors and, with respect to the MEC RSA Order, MEC, that is in form and substance reasonably satisfactory to the Required Senior DIP Lenders, and MEC RSA Order shall not have been reversed, modified, amended, stayed or vacated.

**2.   Other**

(a) The Senior DIP Loan Documents and the Junior DIP Loan Documents shall have been entered into, and the lenders shall be satisfied in their discretion with the perfection of liens and pledges on the UCC collateral securing the Senior DIP Facility and the Junior DIP Facility, as applicable.

(b) The delivery of customary legal opinions as to authority, authorization, execution and delivery, as to the Debtors with respect to the Senior DIP Loan Documents; corporate records and documents from public officials; and officer's certificates.

(c) The Senior DIP Lenders shall have received the required updates of the Approved OG DIP Budget and Senior DIP Variance Reports, in each case in form and substance acceptable to the Required Senior DIP Lenders.

(d) No Default or Event of Default shall have occurred under the Senior DIP Facility or Junior DIP Facility, as applicable.

(e) Representations and warranties shall be true and correct in all material respects at the date of each extension of credit except to the extent such representations and warranties relate to an earlier date.

(f) The Debtors shall have paid the balance of all fees and expenses then payable as referenced herein.

32

**ANNEX B**

**Bankruptcy Milestones**

The Debtors shall be required to comply with the following Milestones:

(a) commence the Chapter 11 Cases in the Bankruptcy Court with respect to each of the Debtors and file the First Day Motions no later than February 11, 2020 (the date of commencement of the Chapter 11 Cases, the "Petition Date");

(b) file the DIP Motion, the Bidding Procedures Motion and the RSA Motion with the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than one (1) calendar day after the Petition Date);

(c) obtain entry of the Interim DIP Order by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than four (4) calendar days after the Petition Date);

(d) obtain entry of the Final DIP Order, the Bidding Procedures Order, the RSA Order and the MEC RSA Order by the Bankruptcy Court (and the Court overseeing the MEC chapter 11 cases) as soon as reasonably practicable after the Petition Date (but in no event later than thirty-three (33) calendar days after the Petition Date);

(e) file the Approved Plan, the disclosure statement in respect of the Approved Plan (the "Disclosure Statement"), and the motion for approval of the Disclosure Statement and the Solicitation procedures with the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than thirty-three (33) calendar days after the Petition Date);

(f) cause the Bid Deadline to occur as soon as reasonably practicable after the applicable Bidding Procedures Order is entered (but in no event later than sixty-three (63) calendar days after the Petition Date);

(g) cause the Auction to occur as soon as reasonably practicable after the applicable Bidding Procedures Order is entered (but in no event later than sixty-eight (68) calendar days after the Petition Date);

(h) obtain entry of the Disclosure Statement Order by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than sixty-eight (68) calendar days after the Petition Date);

(i) obtain entry of the Sale Order by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than seventy-three (73) calendar days after the Petition Date);

(j)    cause the Maple Eagle Sale Transaction to be consummated as soon as reasonably practicable after the applicable Sale Order is entered (but in no event later than fourteen (14) calendar days after the applicable Sale Order is entered);

(k)    obtain entry of (i) the Confirmation Order and (ii) an order approving the New First Lien Term Loans (which may be the Confirmation Order), in each case by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than one hundred and three (103) calendar days after the Petition Date); and

(l)    cause the Effective Date to occur as soon as reasonably practicable after the Petition Date (but in no event later than one hundred and thirty-three (133) calendar days after the Petition Date; provided that such date may be extended by up to thirty (30) days, at the discretion of the Requisite Parties, solely to the extent that any regulatory approvals that are necessary to consummate the Restructuring have not been obtained prior to the date that is one hundred and thirty-three (133) calendar days after the Petition Date, such date, the "Outside Date").

34

**SCHEDULE I**

**<u>Initial OG DIP Budget</u>**

[to be attached]

NY 77987404v15

## <u>Exhibit C</u>

**Junior DIP Term Sheet**

**EXHIBIT II**

**Junior Secured
Debtor-in-Possession Credit Facility**

**Summary of Principal Terms and Conditions**[3]

| | |
|---|---|
| **Borrower:** | The Borrower under the Senior DIP Facility. |
| **Guarantors:** | The Guarantors under the Senior DIP Facility. |
| **DIP Agent:** | Wilmington Savings Fund Society, FSB will act as administrative agent and collateral agent for the Junior DIP Lenders with respect to the Junior DIP Facility (in such capacities, the "<u>Junior DIP Agent</u>") and will perform the duties customarily associated with such third party roles.  The Junior DIP Agent shall be afforded substantially similar rights, protections, immunities and indemnities afforded to the Prepetition Term Agent under the Prepetition Term Loan Credit Agreement. |
| **DIP Lenders:** | Murray Energy Corporation and, subject to this Junior DIP Term Sheet and the Junior DIP Credit Agreement (as defined below) (including the assignment provisions herein and therein), such other financial institutions or entities (if any) that become party to the Junior DIP Credit Agreement in accordance with its terms and this Junior DIP Term Sheet (collectively, the "<u>Junior DIP Lenders</u>"). |
| **Type and Amount of the DIP Facility and Use of Proceeds:** | A multi-draw junior secured debtor-in-possession term loan facility (the "<u>Junior DIP Facility</u>", and the term loans thereunder, the "<u>Junior DIP Loans</u>"), in an aggregate principal amount equal to (i) an amount equal to (x) certain costs and expenses of the Chapter 11 Cases that are allocated to Murray Maple Eagle Coal, LLC in the initial Approved ME DIP Budget (as defined below) plus (y) certain amounts to pay for any of Murray Alabama Minerals, LLC's Reclamation costs or liabilities arising during the Chapter 11 Cases plus (z) $5 million to be used in accordance with the initial Approved OG DIP Budget (collectively, in an aggregate amount not to exceed $9.3 million, the "<u>Closing Date Junior DIP Commitments</u>"), plus (ii) upon entry of the earlier of the MEC RSA Order or the Final Order, $5 million (to be used for purposes as set forth in the Approved OG DIP Budget), plus (iii) upon entry of the Final Order, such additional amounts not to exceed $3.3 million as necessary to (a) pay for any of Murray Alabama Minerals, LLC's additional Reclamation Obligations or liabilities arising during the pendency of the Chapter 11 Cases with respect to Murray Alabama Minerals, LLC and (b) pay for any |

---

[3] NTD: Capitalized terms used but not otherwise defined in this Summary of Terms and Conditions (this "<u>Junior DIP Term Sheet</u>") shall have the meanings assigned thereto in Annex I to the Restructuring Term Sheet to which this Annex II is attached (the "<u>Senior DIP Term Sheet</u>").

NY 77987404v15

additional costs or liabilities set forth in the Approved ME DIP Budget from time to time with respect to (x) Maple Eagle that arise prior to or as a result of the consummation of the Maple Eagle Sale Transaction (other than prepetition workers' compensation Obligations of Maple Eagle) or (y) Murray Alabama Minerals, LLC that arise prior to the Effective Date, plus (iv) following entry of the Final Order but no earlier than 60 days after the Petition Date, $600,000 (to be used for purposes as set forth in the Approved OG DIP Budget) (the commitments set forth in the preceding clauses (i) through (iv), collectively, the "Junior DIP Commitments"). Proceeds of the Initial Junior DIP Loans will be used solely for the purposes set forth in the preceding clauses (i) through (iv) and as prescribed more particularly in the Approved ME DIP Budget (such uses, "Permitted Uses"); provided that, other than respect to the proceeds of the drawing described in the preceding clause (i)(z), (ii) and (iv), the proceeds of the Initial Junior DIP Loans shall not be available to fund the operations of Murray Oak Grove, LLC or the costs and expenses of the Chapter 11 Cases that are allocated to Murray Oak Grove, LLC. Once repaid or prepaid, no portion of the Junior DIP Loans may be reborrowed.

| | |
|---|---|
| **Interim Availability:** | During the Interim Period, subject to the satisfaction or waiver by the Required Junior DIP Lenders (as defined below) of the applicable conditions precedent set forth on Annex A hereto, a portion of the Junior DIP Commitments shall be available (the "Interim Availability") to the Borrower on the Closing Date (as defined below), in one draw (the "Initial Junior DIP Loan") in an aggregate principal amount equal to the Closing Date Junior DIP Commitments. |
| **Full Availability:** | Commencing on the Final Order Entry Date, subject to the satisfaction or waiver by the Required Junior DIP Lenders of the applicable conditions precedent set forth on Annex A hereto (and receipt by the Junior DIP Agent of a customary borrowing notice), the remaining Junior DIP Commitments shall be available ("Full Availability") to the Borrower in one or more draws (but not more than one draw for any two week period), in an aggregate principal amount, with respect to each such draw, that the Borrower determines is reasonably necessary to fund one or more Permitted Uses for the succeeding two-week period. |
| **Junior DIP Disbursement Account:** | Proceeds of the Junior DIP Commitments shall be deposited, held and disbursed through a newly formed account (the "Junior DIP Disbursement Account") with Wilmington Savings Fund Society, FSB, as escrow agent (the "Junior DIP Escrow Agent") pursuant to an escrow agreement (the "Junior DIP Escrow Agreement") among the Borrower, the Junior DIP Agent, on behalf of the Junior DIP Lenders, and the Junior DIP Escrow Agent, in form and substance satisfactory to the Borrower, the Junior DIP Lenders, the Junior DIP Agent and the Junior DIP Escrow Agent. The |

37

disbursements of the Junior DIP Commitments from the Junior DIP Disbursement Account shall be made (i) not more than once during any one-month period, (ii) strictly in compliance with the Approved OG DIP Budget and the Approved ME DIP Budget (which, for the avoidance of doubt, the Junior DIP Escrow Agent shall have no duty to monitor or confirm compliance with), (iii) for such uses and for the forecast periods as are specified herein and in the Approved OG DIP Budget and the Approved ME DIP Budget, (iv) pursuant to a borrowing notice delivered to the Junior DIP Escrow Agent in writing at least two (2) business days prior to each such proposed drawing from the DIP Disbursement Account, which such notice shall be in the form of a customary borrowing notice certifying the amount to be drawn from the Junior DIP Disbursement Account and the date thereof and (v) subject to the terms and conditions set forth herein and in the Junior DIP Escrow Agreement. The Junior DIP Escrow Agent shall have substantially similar rights and protections as the Junior DIP Agent under the Junior DIP Loan Documents.

**Closing Date:**   The date (which shall be no later than two (2) business days after the Interim Order Entry Date) on which the specified portion of the Junior DIP Commitments is made available for borrowing under the Junior DIP Facility (the "<u>Closing Date</u>"), subject to satisfaction (or waiver) of the applicable conditions precedent set forth herein.

**Use of Proceeds:**   Proceeds of the Initial Junior DIP Loans will be used solely as prescribed in the Approved ME DIP Budget (which, for the avoidance of doubt, (x) shall be limited to disbursements other than in respect of the Maple Eagle or North River mines (except with respect to reclamation obligations in respect of the North River mine) and (y) may include, without limitation, interest, fees, costs and expenses related to the Senior DIP Facility (including the fees, costs, disbursements, expenses and indemnification amounts of the Senior DIP Agent and its counsel (Seward & Kissel LLP), local counsel, financial advisors, consultants and other professionals (collectively, the "<u>Senior DIP Agent Advisors</u>"), (b) fees, costs and expenses of the estate professionals retained in the Chapter 11 Cases and approved by the Bankruptcy Court, (c) Carve Out (as defined in the Senior DIP Term Sheet), (d) the fees, costs, disbursements and expenses of the Required Senior DIP Lenders (including the fees and expenses of Stroock & Stroock & Lavan LLP ("<u>Stroock</u>"), counsel to certain Senior DIP Lenders, Ankura Consulting Group, LLC ("<u>Ankura</u>"), financial advisor to certain Senior DIP Lenders, and such other consultants, local counsel, financial advisors and other professionals as reasonably required by the Required Senior DIP Lenders (together with Stroock and Ankura, collectively, the "<u>Senior DIP Lender Advisors</u>")), (e) permitted payments of costs of administration of the Chapter 11 Cases and (f) adequate protection obligations owing under the Interim Order. Proceeds of Junior DIP Loans (other than the Initial Junior DIP Loans), including pursuant to

any Increased Junior DIP Commitments, will be used solely as prescribed in the Approved ME DIP Budget (which, for the avoidance of doubt, shall be limited to disbursements other than in respect of the Oak Grove mine).

**Maturity:**  All unfunded Junior DIP Commitments will terminate, and all Junior DIP Obligations (as defined below) will be immediately due and payable in full in cash on the earliest of:

(a) the six month anniversary of the Closing Date (the "Maturity Date");

(b) if the Final Order has not been entered by the Bankruptcy Court on or before the date that is thirty-three (33) calendar days after the Petition Date, on such date;

(c) the date of acceleration of the Junior DIP Loans and the termination of the Junior DIP Commitments upon the occurrence of an Event of Default (as defined below); and

(d) the substantial consummation or effective date of any chapter 11 plan.

**Amortization:**  None.

**Interest:**  At all times prior to the occurrence of an Event of Default, interest on the Junior DIP Loans shall accrue at a rate per annum equal to 16.50% (the "Interest Rate") and shall be payable by the Borrower in kind, monthly, in arrears.

During the continuance of an Event of Default, the Junior DIP Loans shall accrue at an additional 2.00% per annum and shall be payable by the Borrower in kind, monthly, in arrears.

All interest shall be computed on the basis of a 360-day year consisting of twelve (12) 30-day months.

**Agency Fee:**  The Debtors shall pay an agency fee to the Junior DIP Agent on the Closing Date in an amount to be agreed between the Debtors and the Junior DIP Agent.

**Documentation:**  The Junior DIP Facility will be documented pursuant to and evidenced by (a) a credit agreement, negotiated in good faith, in form and substance substantially similar to the Senior DIP Credit Agreement (with such modifications as are (i) set forth herein, (ii) necessary to reflect the junior, subordinated and "silent" nature of the Junior DIP Facility (except with respect to the Junior DIP Facility Priority Collateral) and (iii) acceptable

39

to the Required Junior DIP Lenders and the Junior DIP Agent) (the "Junior DIP Credit Agreement"), (b) the Interim Order, (c) the Final Order and (d) as applicable, the related notes, security agreements, collateral agreements, pledge agreements, control agreements, guarantees, mortgages and other legal documentation or instruments as are, in each case, usual and customary for junior lien debtor-in-possession financings of this type and/or necessary or desirable to effectuate the financing contemplated hereby and/or otherwise reasonably acceptable to the Required Junior DIP Lenders (including such agreements, documents and instruments constituting "Loan Documents" under, and as defined in, the Prepetition Term Loan Credit Agreement) (all of the foregoing, together with the Junior DIP Credit Agreement, the Junior DIP Escrow Agreement and the DIP Orders, collectively, the "Junior DIP Loan Documents").

|                              |                                                                 |
|------------------------------|-----------------------------------------------------------------|
| **Financial & Other Reporting:** | The Debtors will prepare and deliver a thirteen week cash flow forecast with respect to Maple Eagle and North River, in form and substance acceptable to the Required Junior DIP Lenders (the "Initial ME DIP Budget"), and attached to this Junior DIP Term Sheet as Schedule I setting forth the specified line-items and cumulative receipts and operating disbursements (including all necessary and required expenses which the Debtors expect to incur and anticipated uses of proceeds of draws under the Junior DIP Facility and any other post-petition financing arrangements) on a weekly basis for the period beginning as of the week of the Petition Date through and including the thirteenth (13th) week after such week, as such cash flow forecast may be amended, supplemented or modified from time to time only with the prior written consent of the Required Junior DIP Lenders in their discretion. Once so approved by the Required Junior DIP Lenders, the Initial ME DIP Budget shall be deemed the "Approved ME DIP Budget" for all purposes of the Junior DIP Loan Documents until superseded by any Updated ME DIP Budget (as defined below) that subsequently is approved by the Required Junior DIP Lenders. |

On or before 12:00 p.m. New York City time on the Thursday of each fourth (4th) calendar week following the Petition Date, the Debtors shall deliver to the Junior DIP Agent and the Junior DIP Lenders a supplement to the Initial ME DIP Budget (or the previously supplemented Approved ME DIP Budget, as the case may be), covering the subsequent 13-week period that commences with the week immediately following the date of delivery of the supplemental budget, consistent with the form and level of detail set forth in the Initial ME DIP Budget and otherwise in form and substance acceptable to the Required Junior DIP Lenders in their discretion (each such supplemental budget, an "Updated ME DIP Budget"). Upon (and subject to) the approval of any such Updated ME DIP Budget by the Required Junior DIP Lenders in their discretion, such Updated ME DIP Budget shall constitute the then-approved Approved

40

ME DIP Budget. Notwithstanding the foregoing, for informational purposes only, and not for purposes of approval or variance testing, on or before 12:00 p.m. New York City time on the Thursday of each calendar week following the Petition Date, the Debtors shall deliver to the Junior DIP Agent and the Junior DIP Lenders a 13-week cash flow forecast, or a weekly update thereto, with respect to Oak Grove, Maple Eagle and North River.

By no later than 12:00 p.m. New York City time on the Thursday of each calendar week following the Petition Date (each such Thursday, a "Variance Report Date"), the Debtors shall deliver to the Junior DIP Agent and the Junior DIP Lenders (and their advisors), a variance report (each, a "Junior DIP Variance Report") setting forth, in reasonable detail, any differences between aggregate disbursements (for the avoidance of doubt, excluding any professional fees) for the Testing Period versus projected corresponding disbursements set forth in the Approved ME DIP Budget for such Testing Period (such difference with respect to each line item, a "Line-Item Variance") and on a cumulative basis for the period from the Petition Date to the latest week prior to the Variance Report Date, together with a statement from the Borrower's chief financial officer certifying the information contained in the report. The Junior DIP Variance Report shall also provide a reasonably detailed explanation for any variance. The term "Testing Period" means, with respect to the first Junior DIP Variance Report required to be delivered, the prior two week period and with respect to every Junior DIP Variance Report required to be delivered thereafter, each of the prior two-week and prior four-week periods.

In addition, there shall be a weekly teleconference between the Debtors and the Junior DIP Lenders to discuss the Junior DIP Variance Report, the Chapter 11 Cases, the financial and operational performance of the Debtors, and such other related matters as may be reasonably requested with reasonable advance notice by the Required Junior DIP Lenders (the reporting and information delivery requirements in this section, collectively, the "Reporting Requirements").

The Debtors shall not permit the aggregate Line-Item Variances for disbursements (for the avoidance of doubt, excluding any professional fees) for the two week and four week cumulative periods to exceed 115% and 110%, respectively, of the projected corresponding disbursements for such period set forth in the then-Approved ME DIP Budget (such permitted variances, the "Permitted Variance" and such limitations, the "Junior DIP Budget Covenant").

**Voluntary Prepayments:**    The Junior DIP Loans may be prepaid in whole or in part at any time and from time to time after the Closing Date, without premium or penalty.

NY 77987404v15

Each prepayment shall be accompanied by payment of all accrued and unpaid interest.

| | |
|---|---|
| **Mandatory Prepayments:** | The Debtors shall comply with mandatory prepayment provisions substantially consistent with those in the Senior DIP Loans and subject to the DIP Intercreditor Annex; <u>provided</u> that (x) any net cash proceeds of the Maple Eagle Sale Transaction and any other voluntary or involuntary disposition with respect to the equity interests of Murray Eagle Mining, LLC held by Murray Metallurgical Coal Holdings, LLC or the assets of Murray Maple Eagle Coal, LLC, Murray Eagle Mining, LLC or Murray Alabama Minerals, LLC shall be required to be used to prepay the Junior DIP Facility on a dollar-for-dollar basis and (y) otherwise, there shall be no mandatory prepayments required until the Senior DIP Facility and the Prepetition Term Loan Credit Facility is paid in full. |
| **Collateral:** | All obligations of the Borrower and the Guarantors to the Junior DIP Lenders and the Junior DIP Agent under the Junior DIP Facility, including, without limitation, all principal and accrued interest, premiums (if any), costs, fees, expenses, disbursements, reimbursement obligations, indemnities and any and all other amounts due or payable under the Junior DIP Facility (collectively, the "<u>Junior DIP Obligations</u>"), shall be secured by the DIP Collateral, with the priority described in the Intercreditor Annex. |
| **Superpriority DIP Claims:** | Subject only to the Carve-Out and pursuant to section 364(c)(1) of the Bankruptcy Code, the Junior DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors on a joint and several basis with priority over any and all claims against each of the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations (as defined below), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "<u>Junior DIP Superpriority Claims</u>"), and which shall be payable from and have recourse to all pre- and postpetition property of the Debtors and all proceeds thereof (including all claims and causes of action arising under Chapter 5 of the Bankruptcy Code and the proceeds and property recovered therefrom).   The Junior DIP Superpriority Claims shall have the same rights and priorities as the liens set forth in the Intercreditor Annex. |
| **Carve-Out:** | As set forth in the Senior DIP Term Sheet. |

42

| | |
|---|---|
| **Conditions Precedent to Closing Date and Interim Availability:** | As set forth on <u>Annex A</u> hereto. |
| **Conditions Precedent to Full Availability:** | As set forth on <u>Annex A</u> hereto. |
| **Conditions Precedent to All Borrowings:** | Receipt of customary signed borrowing request, accuracy in all material respects of representations and warranties, absence of any Default or Event of Default and the following: |

(a) as a result of such extension of credit, usage of the Junior DIP Commitments shall not exceed (i) the applicable Junior DIP Commitments then in effect and (ii) the aggregate amount authorized by the Interim Order or the Final Order, as the case may be;

(b) the Interim Order or Final Order, as the case may be, and the cash management order, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is materially adverse to the interests of the Junior DIP Lenders or the Junior DIP Agent;

(c) satisfaction by the Debtors of all Milestones that have occurred as of each Draw Date;

(d) compliance with Junior DIP Budget Covenant as of the most recent applicable Variance Report Date;

(e) the Junior DIP Agent, on behalf of itself and the Junior DIP Lenders shall have valid, binding, enforceable, non-avoidable, and automatically and fully and properly perfected liens on, and security interests in, the DIP Collateral, in each case, having the priorities set forth in the DIP Orders and subject only to the payment in full in cash of any amounts due under the Carve-Out;

(f) the Debtors shall have paid the balance of all fees and expenses then due and payable as referenced herein; and

(g) the making of such extension of credit will not violate any requirement of material law and shall not be enjoined, temporarily,

preliminarily or permanently.

| | |
|---|---|
| **Representations and Warranties:** | Each of the Debtors makes the representations and warranties set forth in the Senior DIP Term Sheet, modified to reflect the junior, subordinated and "silent" nature of the Junior DIP Facility (except with respect to the Junior DIP Facility Priority Collateral). |
| **Chapter 11 Cases Milestones:** | The Debtors shall be required to comply with milestones related to the Debtors' Chapter 11 Cases consistent with those set forth in the Senior DIP Term Sheet. |
| **Affirmative and Negative Covenants:** | Each of the Debtors agrees to comply with the affirmative and negative covenants set forth in the Senior DIP Term Sheet, modified to reflect the junior, subordinated and "silent" nature of the Junior DIP Facility (except with respect to the Junior DIP Facility Priority Collateral). |
| **Events of Default:** | Each of the Debtors agrees to the events of default set forth in the Senior DIP Term Sheet, modified to reflect the junior, subordinated and "silent" nature of the Junior DIP Facility (except with respect to the Junior DIP Facility Priority Collateral), and subject to the DIP Intercreditor Agreement; <u>provided</u> that, there shall be an event of default under the Junior DIP Facility if the definitive Junior DIP Loan Documents, in form and substance satisfactory to the Junior DIP Lenders and Junior DIP Agent acting in good faith, shall not have been entered substantially concurrently with the entry of the Final Order, unless such date is extended by the Junior DIP Lenders acting in good faith. |
| **Adequate Protection:** | None. |
| **Marshalling; 552(b) Waiver and Waiver of 506(c) Claims:** | As set forth in the Senior DIP Term Sheet. |
| **Required DIP Lenders and Voting:** | Junior DIP Lenders holding, as of the Closing Date, a majority of the aggregate outstanding principal amount of the Junior DIP Loans (the "<u>Required Junior DIP Lenders</u>"). Without abrogating the Murray Entities' fiduciary duties set forth in Section 28 of the Restructuring Support Agreement, for so long as any obligations under the MEC DIP Credit Agreement (including any MEC DIP Loans) remain outstanding, no consent (including any deemed consent on account of any inaction or failure to act), waiver, amendment, or approval required by, and given by or obtained from, MEC shall be valid unless such consent, waiver, amendment, or approval is authorized and permitted under the MEC DIP |

Credit Agreement, and any consent (including any deemed consent on account of any inaction or failure to act), waiver, amendment, or approval given by or obtained from MEC in violation of the MEC DIP Credit Agreement shall be deemed void ab initio and of no force and effect (all defined terms used in this sentence shall have the meaning assigned to such defined terms in the Restructuring Support Agreement).

**Assignments:**

The Junior DIP Lenders shall not be permitted to assign Junior DIP Loans without the consent of the Borrower; provided that (i) no such consent shall be required for any assignment expressly contemplated by the Restructuring Term Sheet and (ii) as a condition to any assignment, the assignee must, in addition to any administrative requirements set forth in the DIP Credit Agreement, prior to such assignment taking effect, execute and deliver to the Junior DIP Agent a duly executed copy of a joinder to the Restructuring Support Agreement.

**Indemnity; Expenses:**

Each of the Debtors (with respect to itself and each of its Subsidiaries) agrees to the indemnification and expense reimbursement provisions set forth in the Prepetition Term Loan Credit Agreement. The indemnification and expense reimbursement provisions in the Junior DIP Loan Documents will include the foregoing and will be consistent with the Junior DIP Documentation Principles. To the extent that any of the Debtors fails for any reason to indefeasibly pay any amount pursuant to such indemnification and expense reimbursement provisions to the Junior DIP Agent, each Junior DIP Lender shall severally agree to pay such amounts to the Junior DIP Agent, as more fully set forth in the Junior DIP Loan Documents.

**Miscellaneous:**

The Junior DIP Loan Documents and the DIP Orders will, among other provisions reasonably satisfactory by the Required Junior DIP Lenders and the Junior DIP Agent, also contain the following, each of which shall be in form and substance reasonably satisfactory to the Required Junior DIP Lenders and the Junior DIP Agent:

(a) Usual and customary yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes).

(b) A stipulation by the Debtors, subject to customary challenge periods, as to the enforceability of the Prepetition Debt, the validity, priority and perfection of all liens securing the Prepetition Debt, and a release by the Debtors of all claims and causes of action against the holders of Prepetition Debt.

**Governing Law:**

The Debtors submit to the exclusive jurisdiction and venue of the

|  | Bankruptcy Court in Ohio and waive any right to trial by jury. New York law shall govern the Junior DIP Facility (other than security documents to be governed by local law). |
|---|---|
| **Counsel to the Required Junior DIP Lenders:** | Kirkland & Ellis LLP |
| **Counsel to the Junior DIP Agent:** | Seward & Kissel LLP |

46

**ANNEX A**

### Conditions Precedent

**A. Conditions Precedent to Closing Date**

1. **Interim Order/Bankruptcy Matters**

(a) The Chapter 11 Cases shall have been commenced in the Bankruptcy Court for the Southern District of Ohio, Western Division, and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter shall have been reviewed in advance by the Junior DIP Lenders and the Junior DIP Agent and shall be acceptable in form and substance to the Required Junior DIP Lenders and the Junior DIP Agent.

(b) The Bankruptcy Court shall have entered the Interim Order no later than four (4) calendar days after the Petition Date, approving and authorizing the Junior DIP Facility, all provisions thereof and the priorities and liens granted under Bankruptcy Code section 364(c) and (d), as applicable, in form and substance acceptable to the Junior DIP Lenders and the Junior DIP Agent.

(c) The Interim Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, that is materially adverse to the interests of the Junior DIP Lenders or the Junior DIP Agent, without the consent of the Junior DIP Lenders and the Junior DIP Agent, as applicable.

(d) The Debtors shall be in compliance in all respects with the Interim Order.

(e) Each other Milestone that is required to be complied with prior to or concurrently with entry of the Interim Order shall have been complied with.

(f) No trustee or examiner with enlarged powers (beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the Borrower or their respective properties.

(g) The Closing Date shall have occurred on or before the date that is three business days after the date of entry of the Interim Order.

(h) The Junior DIP Agent shall have a fully perfected lien on the DIP Collateral, having the priorities set forth in the Intercreditor Annex.

(i) The United States Bankruptcy Court for the Southern District of Ohio, Western Division shall have entered an order authorizing Murray Energy Corporation's entry into and performance under the Junior DIP Facility, and the MEC DIP Credit Agreement shall have been amended in accordance with the terms thereof and any orders of the Bankruptcy Court in Murray Energy Corporation's chapter 11 cases to

permit Murray Energy Corporation's entry into and performance under the Junior DIP Facility.

(j) The definitive purchase or similar agreement with respect to the Maple Eagle Sale Transaction shall have been entered into by all parties party thereto and shall be effective.

2. **Financial Statements, Budgets and Reports**

(a) The Junior DIP Lenders and the Junior DIP Agent shall have received and the Junior DIP Lenders shall have approved the Initial ME DIP Budget and such other information (financial or otherwise) as may be reasonably requested by the Required Junior DIP Lenders, in each case, shall be acceptable in form and substance to the Required Junior DIP Lenders.

3. **Performance of Obligations**

(a) All costs, fees, expenses (including, without limitation, reasonable and documented legal fees) and other compensation contemplated by the Junior DIP Term Sheet and the Junior DIP Loan Documents to be payable to the Junior DIP Lenders and the Junior DIP Agent shall have been paid to the extent due.

(b) No Default or Event of Default under the Junior DIP Facility shall have occurred or be occurring.

(c) Representations and warranties under the Junior DIP Facility shall be true and correct in all material respects.

(d) Since the Petition Date, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency (other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code by any of the Debtors or their subsidiaries and the commencement of the Chapter 11 Cases) that, individually or in the aggregate, has had or could reasonably be expected to have, a material adverse effect on (a) the business, condition (financial or otherwise), operations or assets of the Borrower and its subsidiaries taken as a whole, or (b) the ability of the Debtors, taken as a whole, to perform their obligations under the Junior DIP Loan Documents or (c) the validity or enforceability of the Junior DIP Loan Documents or the rights and remedies of the Junior DIP Agent, or the Junior DIP Lenders under any Junior DIP Loan Document (including, but not limited to, the enforceability or priority of any liens granted to the Junior DIP Agent under the Junior DIP Loan Documents) (any of the foregoing being a "Material Adverse Effect").

(e) Upon entry of the Interim Order, the entry into this Junior DIP Term Sheet shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently.

4. **Customary Closing Documents**

NY 77987404v15

(a) Satisfaction of customary closing conditions, including customary officer's closing certificates; organizational documents; customary evidence of authority, authorization, execution and delivery; good standing certificates; obtaining of any material third party and governmental consents necessary; "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and beneficial ownership regulations.

(b) Execution and delivery by the Debtors of promissory notes evidencing the loans to be made under the Junior DIP Term Sheet, in each case acceptable in all respects to the Required Junior DIP Lenders (the parties hereto acknowledging that funding prior to the Full Availability shall be made, as to loan documentation, solely on the basis of the Junior DIP Term Sheet and such promissory notes.

**B.  Conditions Precedent to Full Availability**

**1.  Final Order; Bankruptcy Matters**

(a) Not later than thirty-three (33) calendar days following the Petition Date, the Final Order shall have been entered by the Bankruptcy Court, approving and authorizing on a final basis the matters and containing the provisions described in paragraph A.1(a) above.

(b) The Final Order shall not have been reversed, modified, amended, stayed or vacated.

(c) The Debtors shall be in compliance with the Final Order.

(d) Each of the RSA Order and the MEC RSA Order shall have been entered by the Bankruptcy Court on a motion by the Debtors and, with respect to the MEC RSA Order, MEC, and the MEC RSA Order shall not have been reversed, modified, amended, stayed or vacated.

**2.  Other**

(a) The Junior DIP Loan Documents shall have been entered into, and the lenders shall be satisfied in their discretion with the perfection of liens and pledges on the UCC collateral securing the Junior DIP Facility.

(b) The delivery of customary legal opinions as to authority, authorization, execution and delivery, as to the Debtors with respect to the Junior DIP Loan Documents; corporate records and documents from public officials; and officer's certificates.

(c) The Junior DIP Lenders shall have received the required updates of the Approved ME DIP Budget.

(d) No Default or Event of Default shall have occurred under the Junior DIP Facility.

(e) Representations and warranties shall be true and correct in all material respects at the date of each extension of credit except to the extent such representations and warranties relate to an earlier date.

The Debtors shall have paid the balance of all fees and expenses then payable as referenced herein.

50

**SCHEDULE I**

### Initial ME DIP Budget

[to be attached]

NY 77987404v15

## __Exhibit D__

**Berube Declaration**

**I N THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MURRAY METALLURGICAL COAL | ) | Case No. 20-10390 |
| HOLDINGS, LLC, *et al.*,[1] | ) | |
| | ) | Judge John E. Hoffman Jr. |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF GREGORY BERUBE IN SUPPORT OF
DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING
AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING
ADEQUATE PROTECTION, (IV) AUTHORIZING THE DEBTORS TO ENTER INTO
AND PERFORM UNDER CERTAIN NEW COAL SALE CONTRACTS,
(V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING,
AND (VII) GRANTING RELATED RELIEF**

I, Gregory Berube, make this declaration pursuant to 28 U.S.C. § 1746:

1.    I submit this declaration in support of the motion of the above captioned debtors

and debtors in possession (collectively, the "Debtors") for authority to obtain postpetition debtor

in possession ("DIP") financing and to use cash collateral (the "DIP Motion").[2]  In particular, I

submit this declaration in support of my view that the DIP facilities requested by the DIP Motion

(a) are the product of good faith, arm's-length negotiations, (b) are the only viable source of

postpetition financing and no other, better alternative for the Debtors is reasonably attainable in

---

[1]    The Debtors in these Chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Murray Metallurgical Coal Holdings, LLC (4633); Murray Eagle Mining, LLC (4268); Murray Alabama Minerals, LLC (4047); Murray Alabama Coal, LLC (3838); Murray Maple Eagle Coal, LLC (4435); and Murray Oak Grove Coal, LLC (4878).  The Debtors' primary business address is 46226 National Road, St. Clairsville, OH 43950.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Motion.

the circumstances, and (c) contain reasonable terms and conditions, from a financial point of view, under the circumstances.

2.      The statements in this declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have received from the Debtors' employees or advisors, or professionals of Evercore Group L.L.C. ("Evercore") working directly with me or under my supervision, direction, or control, or from the Debtors' books and records maintained in the ordinary course of their businesses.

3.      I am not being compensated for this testimony other than through payments received by Evercore as a professional retained by the Debtors; none of those payments are specifically payable on account of this testimony.  I am over the age of 18 years and authorized to submit this declaration on behalf of the Debtors.  If I were called upon to testify, I could and would competently testify to the facts set forth herein.

### Background and Qualifications

4.      I am a Senior Managing Director of Evercore's Restructuring and Debt Advisory Group, an investment banking and financial advisory firm.  Evercore has expertise in domestic and cross-border restructurings, mergers and acquisitions, raising debt and equity capital, and other financial advisory services.  Evercore has served as an experienced financial advisor to debtors and creditors in a variety of industries.

5.      I have worked in investment banking for over 15 years and focused the last ten years on restructuring matters.  Prior to joining Evercore in 2018, I was a Managing Director and Head of Americas Restructuring at Goldman Sachs & Co.  I provide investment banking services to debtors and creditors through in-court and out-of-court restructurings across a number of industries.  These matters have included refinancings, exchange offers, amendments, out-of-court restructurings, chapter 11 bankruptcy reorganizations, and mergers and acquisitions.  In particular,

I have been involved in numerous in- and out-of-court restructurings, including, among others, Altegrity, Avaya, Comverse Technologies, CTI Foods, GenOn Energy, GNC, Hexion Holdings LLC, Peabody Energy, Sanchez Energy Corporation, Six Flags, Toys "R" Us, Tronox Inc., Vanguard Natural Resources, Inc., and Weatherford International PLC.  I received a BA from Colgate University.

**Advisor Retention**

6.      In January 2020, the Debtors engaged Evercore to act as their investment banker in connection with the Debtors' balance sheet initiatives. Prior to that time and since the summer of 2019, Evercore advised the Debtors' management team on balance sheet initiatives in its capacity as the investment banker to the MEC Debtors (as defined below). Evercore has worked closely with the Debtors' management team, board of directors, creditors, and other professionals and advisors in exploring various strategic and financial alternatives and otherwise assisting in the Debtors' restructuring efforts, including (a) negotiating and evaluating multiple restructuring proposals, (b) exploring monetizing of certain of Debtor's assets, (c) meeting with the Debtors' existing creditor groups and their respective advisors to discuss potential restructuring solutions, (d) assisting the Debtors with soliciting, negotiating, and documenting the DIP facilities, and (e) preparing for the commencement of these chapter 11 cases. Through such work, Evercore has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

7.      In addition, by order dated December 11, 2019, the Court authorized the retention of Evercore in the chapter 11 cases of Murray Energy Holdings Co. ("Murray Energy") *et al.* [Case No. 19-56885] to serve as investment banker for the debtors (such debtors, the "MEC Debtors"), and Evercore has continued to perform essential investment banking services to the MEC Debtors without interruption.  *See Order Authorizing The Retention And Employment Of Evercore Group*

3

*L.L.C. As Investment Banker To The Debtors And Debtors In Possession Effective Nunc Pro Tunc To The Petition Date*, Case No. 19-56885, [Dkt. 403].

8.      Evercore intends to apply for entry of an order authorizing its retention and employment as investment banker to the Debtors in these chapter 11 cases.

**The Debtors' Efforts to Secure Financing**

**I.      The Debtors' Immediate Liquidity Needs.**

9.      The Debtors need an immediate capital infusion to operate their business postpetition and to fund these chapter 11 cases.  As of the Petition Date, the Debtors lack sufficient funds to operate their enterprise.  Their total cash balance was less than needed to satisfy current obligations, and they do not have readily available sources of additional financing.  Operations at the Debtors' Maple Eagle and Oak Grove mines have been idled since September 2019 and November 2019, respectively, due to lack of sufficient funding to continue normal operations.

10.      In light of the Debtors' limited liquidity, Evercore has assisted the Debtors in evaluating potential financial and strategic alternatives for both out-of-court balance sheet solutions and an in-court process.  Among other things, Evercore has worked closely with the Debtors, their management, and their other advisors to evaluate the Debtors' cash requirements to continue to operate their business as a going concern.  Based on this work, and after the Debtors concluded that an out-of-court restructuring was not viable, the Debtors determined, in consultation with Evercore and their other advisors, that procuring sufficient financing at the start of these chapter 11 cases would be essential to meet operational expenses and fund these chapter 11 cases.  The Debtors seek authority to enter into the DIP facilities to provide funding to administer these chapter 11 cases, and pursue a restructuring as per the Restructuring Support Agreement that contemplates, among other things (i) the sale of Maple Eagle under section 363 of

the Bankruptcy Code, (ii) the sale of Oak Grove through a chapter 11 plan, and (iii) reclamation at Alabama Minerals.

## II.    The Debtors' Capital Structure and Strategic Efforts.

11.    In November 2019, the Debtors and their advisors, including Evercore, began pursuing parallel paths to address the Debtors' liquidity requirements.  On one path, the Debtors and their advisors considered out-of-court financial and strategic alternatives, including the sale of assets to increase liquidity, but it quickly became evident that a comprehensive solution outside of chapter 11 was not actionable.  On the other path, the Debtors engaged with their existing capital structure stakeholders, including the Debtors' prepetition term loan, prepayment facility, working capital facility lenders, and the MEC Debtors, to commence discussions around obtaining additional liquidity.

12.    Initial discussions with the Debtors' prepetition lenders focused on a potential restructuring transaction that would provide the Debtors with the ability to continue mining operations at Oak Grove and liquidity to weather volatility in the coal markets.  However, the Debtors' lack of unencumbered assets greatly limited their ability to raise incremental liquidity. Ultimately, the Debtors were not able to obtain the capital needed to restart and sustain mining operations on an ongoing basis.

13.    The Debtors, with the assistance of Evercore, also explored a sale of the Maple Eagle and Oak Grove mines outside of bankruptcy. While these efforts resulted in an asset purchase agreement for the Maple Eagle mine, the sale proceeds contemplated under this agreement were not sufficient to meaningfully extend the Debtor's operating runway.

14.    The Debtors were able to obtain short-term bridge loans from existing lenders and Murray Energy, on 12 occasions since November in an aggregate amount of approximately $25 million, approximately $21 million of which was funded on a priority, first-out basis.

Additionally, Javelin Global provided incremental liquidity by agreeing to advance above their contractual rates beginning in September.  These financings provided the Debtors with much needed time to explore strategic alternatives and potential restructuring paths, effectively financed the Debtor's critical expenses, including costs related to idling Maple Eagle and Oak Grove mines, and allowed the Debtors to negotiate a comprehensive DIP financing package and a restructuring support agreement.  Although these bridge loans only provided liquidity for a week or two at a time and were not sufficient to resume mining operations, they were crucial to preserve the value of the Debtors' assets and provide time to reach a restructuring agreement.

### III.    The DIP Sizing Process

15.    At the same time, the Debtors, with the assistance of Alvarez & Marsal North America, LLC ("A&M"), analyzed potential liquidity needs in the event that the Debtors needed to file for chapter 11 protection.  Evercore reviewed the DIP sizing analysis prepared by the Debtors and A&M.  This analysis accounted for the potential payment of certain prepetition claims of taxes, employee benefits, and critical vendors to avoid irreparable harm as a result of a chapter 11 filing, as well as professional fees and other anticipated administrative expenses.  Based on the 13-week cash flow forecast and the DIP sizing analysis, the Debtors, in consultation with Evercore and their other advisors, determined that they would require total incremental liquidity of approximately $50 million (in addition to amounts provided under the Postpetition Javelin Facility (as defined below)) to operate postpetition, including resumption of mining operations at Oak Grove.  Evercore relied on this information in its conversations with potential financing providers.

### IV.    The Debtors' Efforts to Find Financing.

#### A.    The Marketing Process.

16.    The Debtors recognized from the outset that it would be particularly difficult to secure third-party DIP financing because time was limited, essentially all of the Debtors' material

6

assets were encumbered by existing liens under their prepetition funded debt, and their prepetition lenders indicated that they would not consent to a "priming" DIP financing provided by a third party. Thus, to obtain third-party DIP financing, Evercore and the Debtors believed the Debtors might need to engage in a risky and costly "priming" fight or valuation dispute with their prepetition lenders upon the commencement of these chapter 11 cases. Further, regardless of prospects of success, the expense and disruption associated with complex litigation on the first day would seriously jeopardize the Debtors' reorganization efforts, as already strained liquidity would be required to fund such a fight.

17.     Notwithstanding these concerns about a priming DIP, the Debtors engaged not only in good faith, arm's-length negotiations with their prepetition lenders, but also with parties outside of the existing capital structure.

18.     In December 2019, at the direction of the Debtors, Evercore commenced a marketing process for possible DIP financing alternatives, including by reaching out to third-party financing sources. As part of these efforts, Evercore contacted 18 parties total, including five commercial banks and 13 institutional lenders. Of these 18 third-party financing sources, three parties executed non-disclosure agreements ("NDAs") and received access to non-public information, including DIP marketing materials. The fifteen parties that declined to sign an NDA cited various reasons, including concerns about the industry in general, timeframe constraints, and overall investment selectivity. None of the third-party financing sources indicated a willingness to provide the Debtors with new money financing on an unsecured, junior-lien, or *pari passu* basis.

19.     One of the three NDA signatories declined to continue in the diligence process shortly after signing its NDA. Evercore conducted several follow-up calls with the other two potential financing sources and provided them with revised DIP sizing estimates as the Debtors'

view of liquidity and operating plan evolved over time.  Despite several follow up calls by Evercore that facilitated diligence, no financing proposals were received from any third parties.

20.    The Debtors received a financing proposal from a third party that finances certain of the Debtors' mining equipment, however, the total amount of new money contemplated under that proposal was significantly less than what was required, and that third party was committing to only a small portion of the proposed funding, thereby requiring participation from other financing sources.

21.    Given the lack of actionable third-party financing proposals, the Debtors largely focused their efforts on financing proposals from their existing prepetition lenders and the MEC Debtors. As part of these discussions, the Debtors focused on a DIP term loan to be made by certain prepetition term loan lenders and the MEC Debtors as well as a postpetition facility by Javelin Global. In January 2020, certain prepetition lenders, the MEC Debtors, and Javelin Global agreed to negotiate the terms of a restructuring support agreement.

22.    The Debtors' prepetition lenders and the MEC Debtors (collectively, the "DIP Lenders") worked constructively with the Debtors and agreed to a postpetition financing package that (i) injects much needed liquidity into the Debtors' business through (a) $28.9 million of new money senior DIP term loans and (b) $18.2 million of new money junior DIP term loans and (ii) rolls up, on terms substantially consistent with respective prepetition terms, $21.5 million of prepetition bridge loan obligations, which provided interim liquidity to negotiate the restructuring in the weeks leading up to the petition date, into the senior DIP facility.  The DIP facilities were the Debtors' only viable source of postpetition funding and no other or better alternative was reasonably attainable under the circumstances. Likewise, Javelin Global actively negotiated with

the Debtors and their prepetition lenders concerning both the terms of an overall restructuring and the Postpetition Javelin Facility, as discussed further herein.

### B.  The DIP Facilities.

23.     The Debtors engaged in good faith, arm's-length negotiations with the DIP Lenders and Javelin Global with respect to funding these chapter 11 cases.  As part of the financing package, the parties focused on the ultimate DIP sizing, including the amount necessary to avoid irreparable harm and to put the Debtors on a path to financial and operational stability.  It became evident through negotiations that a two-facility structure would accommodate various DIP Lenders' ability to commit financing and would be needed to obtain a holistic solution to fund these chapter 11 cases.  Accordingly, DIP Lenders (including MC Southwork) ultimately committed to finance these cases through a new money $28.9 million senior DIP term loan facility while Murray Energy committed a $18.2 million junior DIP term loan facility. The DIP facilities are an integral part of the Debtors' Restructuring Support Agreement, which provides a framework within which the Debtors can effect a Restructuring of their capital structure and resume mining operations at Oak Grove.

24.     The negotiations with both the senior DIP lenders, Javelin Global, and the junior DIP lenders regarding a DIP term loan were vigorous.  Over the course of several weeks, the parties exchanged numerous term sheets and mark-ups, each with significant changes to the material terms of the proposals.  Through these negotiations, the terms of the DIP facilities improved to the benefit of the Debtors.  The DIP facilities include various fees and postpetition liens, which were expressly required by the DIP Lenders and Javelin Global as a condition to provide the DIP facilities and are an integral component of the financing package.  All interest and fees related to the senior and junior DIP facilities are payable-in-kind only, improving liquidity during the case and reducing the amount of new money financing needed.  These fees and liens

were each subject to good faith, arm's length negotiations.  Given the financial and operating condition of the Debtors, the timing, cost, and risk of administering these chapter 11 cases, and the Debtors' liability profile, I believe these fees are reasonable, from a financial point of view, under the circumstances.

25.     The DIP facilities (like the Restructuring Support Agreement) are expressly linked to certain case milestones.  These milestones provide a structure for the Debtors' anticipated chapter 11 process, which will allow the parties to develop a comprehensive solution for the Debtors' liabilities. The milestones were negotiated by the DIP Lenders as a condition to providing the DIP facilities and were a critical inducement for the DIP Lenders in providing the Debtors with the cash necessary to operate their business and fund these cases. The Debtors negotiated with respect to these milestones and believe they provide them the Debtors with adequate time to implement a restructuring.

26.     The DIP facilities are critical to the Debtors' ability to fund operations and pay the administrative costs of these chapter 11 cases, and also provide the Debtors with sufficient liquidity to operate their business without creating a value-destructive "priming" or valuation dispute at the outset of these chapter 11 cases.  The Debtors did not have any other credible financing proposals. Given the financial and operating condition of the Debtors, I believe the DIP facilities, including the milestones, fees, and liens included therein, are appropriate and reasonable, from a financial point of view, and are the only viable source of postpetition financing reasonably attainable in these circumstances.  Moreover, I believe that the DIP facilities are an essential component to funding the Debtors and providing a path to emergence and are critical to reassure customers and vendors, and protect operations.

### C.    The Postpetition Javelin Facilities

27.    The Debtors' Restructuring Support Agreement contemplates the entry into additional coal sale contracts relating to Javelin Global's postpetition purchase and marketing of coal (the "Postpetition Javelin Prepaid Facility" and the "Postpetition Javelin Advance Facility," collectively, the "Postpetition Javelin Facility"). The Postpetition Javelin Facility will provide the Debtors with liquidity in connection with ongoing purchase and sale of coal from each mine by Javelin Global and is a critical component to resuming operations at Oak Grove. In connection with the Postpetition Javelin Facility, and as provided for in the documentation governing the global resolution negotiated by all the relevant stakeholders, $5 million of the prepetition obligations arising under the Prepayment Facility will be converted into postpetition obligations arising under the Postpetition Javelin Prepaid Facility.  The remaining claims under the Javelin Global prepetition facilities shall only recover to the extent of proceeds from the liquidation of collateral owned by Javelin Global.  In connection with the Postpetition Javelin Advance Facility, Javelin Global will purchase coal extracted from Oak Grove after the Petition Date in advance, giving rise to obligations in connection therewith.  Javelin Global will also remain the exclusive marketer for Oak Grove, giving rise to related obligations.

28.    Entering into, and performing under, the Postpetition Javelin Facility represents a core and critical part of the Debtors' operations. The incremental liquidity provided by the Postpetition Javelin Facility is needed by the Debtors at the outset of these chapter 11 cases.

29.    The Debtors and their advisors, including Evercore, determined that continuing under the Debtors' prepetition relationship with Javelin Global at Oak Grove will allow the Debtors to earn revenue and continue to operate the mining complex.  At the same time, entry into the Postpetition Javelin Facility will allow the Debtors to avoid the substantial expense and delay that would come with terminating their relationship with Javelin Global and instead locating and

negotiating with a new customer.  The Debtors negotiated the Postpetition Javelin Facility with Javelin Global in good faith, at arm's-length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best outcome under the circumstances.

**V.      The DIP Financing Is The Best Postpetition Financing Arrangement Available to the Debtors.**

30.      The proposed DIP financing and entry into the Javelin Postpetition Facility preserves the Debtors' enterprise value by providing the Debtors with access to significant and crucial liquidity at the outset of these chapter 11 cases.  It allows the Debtors to continue operations with minimal disruption and provide new money to adequately fund these chapter 11 cases.

31.      In addition to providing the Debtors with incremental liquidity, the DIP facilities are fundamental to the global restructuring of the Debtors, will provide access to the use of cash collateral on a consensual basis, and will allow the Debtors to fund the continued operation of their businesses in the ordinary course during the case.

32.      In sum, it is my professional opinion that the terms of the DIP facilities and the Javelin Postpetition Facility are reasonable, from a financial point of view, under the circumstances and were the product of good faith, arm's length negotiations, and that no other or better financing arrangement was reasonably attainable.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  February 12, 2020

/s/ Gregory Berube
Gregory Berube
Senior Managing Director
Evercore Group L.L.C.
*Proposed Financial Advisor to the Debtors*

**Exhibit E**

**CASH COLLATERAL / POSTPETITION FINANCING CHECKLIST**

The Debtor, through a separately filed motion, agreed order or stipulation, has requested the approval of cash collateral or postpetition financing or both. Attached to the motion as Exhibits B and C is a true and correct copy of the agreement for use of cash collateral or postpetition financing, which contains the following provisions:

| | Page No. | Line No. If applicable | Description of Provision |
|---|---|---|---|
| ☐ | | | (1) Cross-collateralization clauses (i.e., clauses that secure the repayment of prepetition debt with postpetition assets in which the secured lender would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law.) |
| x | Senior DIP Term Sheet at 4–5 | Interim Order at ¶ (1)(a) | (2) Roll-up clauses (i.e., clauses that provide for the use of property of the estate or the proceeds of a postpetition loan to make cash payments on prepetition debt). |
| x | Senior DIP Term Sheet at 25, 28 | Interim Order at ¶¶ D(a)(i), 22, 39, 41 | (3) Provisions or findings of fact that release, waive, or limit any claim or other cause of action belonging to the estate or the trustee, including but not limited to (4), (5), (6), and (7) below: |
| ☐ | | | (4) the release, waiver, or limitation of claims or other causes of action against any secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the interim order and the creditors' committee, if appointed, at least sixty (60) days from the date of its appointment to investigate such matters; |
| x | Senior DIP Term Sheet at 25, 28 | Interim Order at ¶¶ D(a)(i), 22, 39, 41 | (5) the release, waiver or limitation of claims or other causes of action against any secured creditor for alleged prepetition torts or breaches of contract; |
| ☐ | | | (6) the waiver of avoidance actions under the Code; or |
| ☐ | | | (7) any modification of the statute of limitations or other deadline to commence an action. |
| x | Senior DIP Term Sheet at 28; Junior DIP Term Sheet at 45 | Interim Order at ¶ D. | (8) Provisions or findings of fact that determine the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim. |
| x | Senior DIP Term Sheet at 11–12 | Interim Order at ¶ 6(a), 6(d) | (9) Provisions that grant a lien on property of the estate that is not otherwise subject to a lien, grant a junior lien on property of the estate that is subject to a lien, or create a lien senior or equal to any existing lien without the consent of that lienholder. |
| x | Senior DIP Term Sheet at 26; Junior DIP | Interim Order at ¶ 29, 30 | (10) Provisions that release, waive or limit any right under § 506(c) of the Code. |

| | Term Sheet at 44 | | |
|---|---|---|---|
| ☐ | | | (11) A budget that does not provide for the payment of all accrued and unpaid administrative expense claims. |
| x | Senior DIP Term Sheet at 26; Junior DIP Term Sheet at 44 | Interim Order at ¶ 29, 30 | (12) Provisions that release, waive or limit any right under §552(b) of the Code. |
| x | Senior DIP Term Sheet at 11–12 | Interim Order at ¶ 6(a), 6(d) | (13) Provisions that grant a lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 727(a) of the Code. |
| x | Senior DIP Term Sheet at 13–15; See Junior DIP Term Sheet at 42 | Interim Order at ¶ 26 | (14) Provisions that provide disparate treatment with regard to professional fee carveouts for the professionals retained by a creditors' committee from that provided for the professionals retained by the debtor. |
| x | Senior DIP Term Sheet at 25–26 | Interim Order at ¶ F(vi), 10 | (15) Provisions that prime administrative expenses of the kind described in § 503(b) or 507(a) of the Code. |
| ☐ | | | (16) Provisions that waive or modify any entity's authority or right to file a plan or seek an extension of time in which the debtor has the exclusive right to file a plan or otherwise operate to divest the debtor of any discretion in the administration of the estate or limit access to the court to seek any relief under other applicable provisions of law. |
| x | Senior DIP Term Sheet at Annex B | | (17) Provisions that establish deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order. |
| x | Senior DIP Term Sheet at 27; Junior DIP Term Sheet at 45; | Interim Order at ¶ 24 | (18) Provisions providing for the indemnification of any entity. |
| x | Senior DIP Term Sheet at 24–25 | Interim Order at ¶ 13 | (19) Provisions waiving or modifying provisions of the Code or applicable Rules relating to the automatic stay. |
| x | | Interim Order at ¶ 6(a) | (20) Provisions that waive or modify the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien. |
| x | | Interim Order at ¶ 16 | (21) Provisions that waive or modify the debtor's right to move for a court order pursuant to § 363(c)(2)(B) of the Code authorizing the use of cash collateral or § 364 of the Code to obtain credit. |
| ☐ | | | (22) Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. |

| | | | |
|---|---|---|---|
| ☐ | | | (23) Findings of fact on matters extraneous to the approval process. |
| ☐ | | | (24) Provisions that bar the debtor from future bankruptcy filings. |