**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MURRAY METALLURGICAL COAL | ) Case No. 20-10390 (JEH) |
| HOLDINGS, LLC, *et al.*,[1] | ) |
| | ) Judge John E. Hoffman, Jr. |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DEBTORS' MOTION FOR ENTRY OF
AN ORDER (I) AUTHORIZING THE ENTRY INTO
AND PERFORMANCE UNDER THE STALKING
HORSE PURCHASE AGREEMENT, (II) APPROVING
BIDDING PROCEDURES FOR THE SALE OF ASSETS,
(III) SCHEDULING HEARINGS AND OBJECTION DEADLINES WITH
RESPECT TO THE SALE, (IV) SCHEDULING BID DEADLINES
AND AN AUCTION, (V) APPROVING THE FORM AND MANNER
OF NOTICE THEREOF, (VI) APPROVING CONTRACT ASSUMPTION
AND ASSIGNMENT PROCEDURES, AND (VII) GRANTING RELATED RELIEF**

Murray Metallurgical Coal Holdings, LLC ("Met Holdings"), together with its debtor

subsidiaries (collectively, the "Debtors"), respectfully state as follows in support of this motion

(this "Motion"):[2]

**Introduction**

1.       The Debtors commenced these chapter 11 cases to achieve three main goals. First,

the Debtors intend to facilitate the consensual sale (the "Sale") of substantially all of the assets of

---

[1]       The Debtors in these Chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Murray Metallurgical Coal Holdings, LLC (4633); Murray Eagle Mining, LLC (4268); Murray Alabama Minerals, LLC (4047); Murray Alabama Coal, LLC (3838); Murray Maple Eagle Coal, LLC (4435); and Murray Oak Grove Coal, LLC (4878).  The Debtors' primary business address is 46226 National Road, St. Clairsville, OH 43950.

[2]       The facts and circumstances supporting this application are set forth in the Declaration of Robert D. Moore in Support of Chapter 11 Petitions [Dkt. No. 4] (the "Moore Declaration") and Declaration of Amy Lee, Senior Director of Alvarez & Marsal North America, LLC, in Support of First Day Motions [Dkt. No. 5] filed contemporaneously herewith and incorporated by reference herein (collectively, the "First Day Declarations"). Capitalized terms used but not otherwise defined herein have the meanings given to them in the First Day Declarations.

Murray Maple Eagle Coal, LLC ("Maple Eagle") pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code"), which will maximize value for the benefit of all stakeholders.  Second, the Debtors intend to effectuate a sale of their remaining operations, which is premised on the continued and future operation of the Oak Grove (as defined below) mining complex.  And, third, the Debtors intend to ensure that they can continue to comply with their remediation obligations at the North River (as defined below) mining complex.

2.       The Maple Eagle Sale is a critical element of the Debtors' overall restructuring. Pursuant to the Restructuring Support Agreement, dated February 11, 2020 (the "RSA"),[3] among the Debtors and their principal stakeholders, the Debtors agreed to pursue a Sale of Maple Eagle pursuant to Bankruptcy Code section 363.  As set forth in the RSA, (i) the funding of the junior debtor in possession facility (the "Junior DIP Facility") is expressly conditioned upon the execution of a Stalking Horse Purchase Agreement (as defined herein) and (ii) any net proceeds from the Sale will be used first to repay the Junior DIP Facility.  This Motion seeks relief from the Court to (i) authorize Maple Eagle to enter into the Stalking Horse Purchase Agreement, which, among other things, will allow the Debtors to receive the funds from the Junior DIP Facility and (ii) approve the proposed bidding procedures and mechanics surrounding the Auction (as defined herein), if an Auction ultimately proves necessary.

3.       To effectuate the Sale of the Maple Eagle complex as efficiently as practicable, the Debtors seek to expeditiously establish Court-approved bidding procedures for a sale of substantially all of Maple Eagle's assets.[4]

---

[3] In the event of any inconsistency between the RSA and the description of the RSA herein, the RSA shall govern.

[4] The Debtors anticipate filing a disclosure statement (the "Disclosure Statement"), a chapter 11 plan (the "Plan"), and a motion for approval of the Disclosure Statement on or before March 13, 2020, which will set forth the Plan confirmation schedule.  The Debtors believe the Sale of the Maple Eagle assets will be effectuated prior to the Plan confirmation hearing.

4.      The debtor in possession loan facilities (the "<u>DIP Facility</u>")[5] provided to the

Debtors contains various case milestones that pave a clear path forward for these chapter 11 cases.

In particular, the DIP milestones provide that: (a) by February 12, 2020, the Debtors file this

Motion; (b) by March 13, 2020, the Debtors obtain entry of the Order approving the Bid

Procedures; (c) by April 14, 2020, bids for all or certain of Maple Eagle's assets are due; (d) by

April 19, 2020, the Debtors will hold an Auction; (e) by April 24, 2020, the Debtors obtain entry

of the Sale Order, and (f) by May 8, 2020, the Debtors will have effectuated the Sale.  As set forth

below, given the limited amount of funding available to support the Maple Eagle Sale process, and

the regulatory approvals and permitting matters involved in the sale of a coal mine, the Debtors

are proposing an even more accelerated sale process.

5.      Prior to the commencement of these chapter 11 cases, the Debtors have been

engaged in a marketing process for the Maple Eagle complex, which has involved numerous

potential purchasers.  That marketing process resulted in an offer being made for the Maple Eagle

complex in mid-January. Following discussions regarding the Debtors' need for a comprehensive

process to effectuate their restructuring, the Buyer (as defined herein) has agreed to provide the

Stalking Horse Bid (as defined herein) to set the floor price for Maple Eagle's assets pursuant to

the terms of the Stalking Horse Purchase.  While the Debtors believe the assets have already been

subject to a full marketing process, the Debtors have determined, in the exercise of their business

judgment, that the best way to maximize the value of Maple Eagle's assets for all stakeholders,

and to ensure that the process is fair to all constituents, is to market-test the Stalking Horse Bid

---

[5] A thorough description of the DIP Facility is contained in the Debtors' Motion for Entry of Interim And Final Orders
(I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens
and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic
Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief [Dkt. No. 44] filed contemporaneously
herewith.

through an auction process and, if no other bids are received, to expeditiously sell the assets to the

Stalking Horse Bidder without delay.

6.      To implement the sale process, the Debtors submit this Motion, requesting the

Court (a) approve the Bidding Procedures (as defined herein) for the sale of substantially all of

Maple Eagle's assets, (b) set dates and deadlines in connection therewith (including a bid deadline,

the date of the auction, and the hearing dates and objection deadlines relating to the Sale), (c)

approve the form and manner of notice of each of the foregoing, (d) approve procedures for the

assumption and assignment of certain executory contracts and unexpired leases in connection with

the Sale and (e) grant the Debtors any related relief.  The Debtors also seek authority for Maple

Eagle to enter into the Stalking Horse Purchase Agreement with the Stalking Horse Bidder, which

will serve as a competitive baseline bid for any auction for Maple Eagle's assets.  The Stalking

Horse Purchase Agreement provides the Stalking Horse Bidder with protections that are customary

for transactions effectuated pursuant to Bankruptcy Code section 363.

7.      The Sale of Maple Eagle is one element of a carefully constructed restructuring of

six entities that own three Mining Complexes.  The Debtors face important milestones and

deadlines under the DIP Facility and RSA.  At the same time, the Debtors seek to minimize the

time and expense of these chapter 11 cases, so as to ensure sufficient liquidity to fund the

chapter 11 process.  The proposed Sale will yield much-needed certainty as to the value of Maple

Eagle, with the liens on Maple Eagle attaching to any proceeds of the Sale.  As noted above,

pursuant to the RSA, any proceeds of the Sale must be used first to pay down the Junior DIP

Facility.

8.      The Debtors believe an expeditious Sale process for Maple Eagle will serve as a cornerstone of their restructuring and maximize the ultimate value realized by their stakeholders. Moreover, the Debtors believe the establishment of Bidding Procedures, entry into the Stalking Horse Purchase Agreement, and the related relief requested in this Motion are in the best interests of the Debtors' estates and their stakeholders.  Accordingly, the Debtors respectfully request that the Court grant this Motion.

**Relief Requested**

9.      The Debtors hereby seek entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit A**:

    a.    authorizing Maple Eagle to enter into that certain Asset Purchase Agreement attached to the Order as **Exhibit 1** (the "Stalking Horse Purchase Agreement");

    b.    approving the proposed bidding procedures attached as **Exhibit 2** to the Order (the "Bidding Procedures") in connection with the Sale of all, substantially all, or any combination of Maple Eagle's assets (collectively, the "Assets") free and clear of all claims, liens, and encumbrances;

    c.    scheduling (x) an auction in connection with the Sale (the "Auction"), (y) a hearing date in connection with approval of the Sale (the "Sale Hearing"); and (z) the objection deadline for the Sale Hearing (collectively, the "Sale Schedule");

    d.    approving the form and manner of notice of the Auction and Sale Hearing, attached to the Order as **Exhibit 3** (the "Sale Notice");

    e.    approving procedures (the "Assumption Procedures") for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "Assigned Contracts"), and approving the form and manner of notice thereof, attached as **Exhibit 4** to the Order (the "Cure Notice"); and

    f.    granting the Debtors any related relief.

**Jurisdiction and Venue**

10.     The United States Bankruptcy Court for the Southern District of Ohio (the "Court")

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and *General Order 30-3*

from the United States Bankruptcy Court for the Southern District of Ohio, dated December 4,

2019 (the "General Order").   The Debtors confirm their consent, pursuant to rule 7008 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by

the Court in connection with this Motion to the extent that it is later determined that the Court,

absent consent of the parties, cannot enter final orders or judgments in connection herewith

consistent with Article III of the United States Constitution.

11.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The bases for the relief requested herein are Bankruptcy Code sections 105(a), 363,

and 365, Bankruptcy Rules 2002, 3016, 3017, 3020, 6004, and 6006, and Rule 6004-1 of the Local

Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Ohio (the

"Local Rules").

**Background**

13.     The Debtors are engaged in the mining and production of metallurgical coal.

Unlike thermal coal, which is primarily used by the electric utility industry to generate electricity,

metallurgical coal is used to produce coke, which is an integral component of steel production.

14.     The Debtors own and operate two active coal mining complexes and other assets in

Alabama and West Virginia.  The larger of the two mining complexes, the Oak Grove mine ("Oak

Grove"), is an underground longwall mine located in Alabama.  The other mining complex, known

as Maple Eagle (together with Oak Grove, the "Mining Complexes"), is an underground

continuous mining and surface mining complex located in West Virginia.[6]  To preserve liquidity, the Maple Eagle mine has been in a "hot idle"[7] state since September.  The Oak Grove mine has been in a "hot idle" state since November.  The Debtors have been engaged in a marketing process to sell Maple Eagle for several months.

15.     Each of the Debtors is an unrestricted subsidiary of Murray Energy Corporation ("Murray Energy"), which, along with Javelin Investment Holdings LLC ("Javelin"), acquired the mines and other assets of the Debtors from Mission Coal Company, LLC ("Mission") in April 2019 (the "Met Acquisition").  At the time of the Met Acquisition, Mission was a debtor in its own chapter 11 cases pending in the United States Bankruptcy Court for the Northern District of Alabama.[8]

16.     In connection with the Met Acquisition, on April 29, 2019, Met Holdings entered into a credit agreement (the "Take-Back Credit Agreement"), which governs, among other things, a secured term credit facility (the "Take-Back Facility") among Met Holdings, as borrower, its subsidiaries (the "Met Subs"), as guarantors, Wilmington Savings Fund Society, FSB, as administrative agent, and any additional lenders from time to time party thereto.  The Take-Back Facility matures on April 29, 2023, and is secured by substantially all of the Debtors' assets.

17.     In addition, on April 29, 2019, Met Holdings entered into a Management Services Agreement (the "Management Services Agreement") with Murray Energy pursuant to which Murray Energy manages, administers, and oversees all aspects of the operation of the Mining

---

[6] The Debtors own a third mine, known as the North River Mine, in Alabama, which is not currently being operated.

[7] A mine that is in a "hot idle" state means that it is being temporarily idled and maintained in anticipation of returning to operation in the near future.

[8] The Mission bankruptcy cases are still pending.

Complexes, including without limitation, the day-to-day operation, maintenance, and business of the Mining Complexes.

18.    Approximately six months after the Met Acquisition, on October 29, 2019, Murray Energy and its affiliated debtors and debtors in possession (the "MEC Debtors") filed voluntary chapter 11 petitions in the Bankruptcy Court for the Southern District of Ohio (the "MEC Chapter 11 Cases"). The MEC Chapter 11 Cases are being jointly administered under Case No. 19-56885. Significantly, none of the Debtors are debtors in the MEC Chapter 11 Cases.

19.    There are a number of differences between these chapter 11 cases and the MEC Chapter 11 Cases, which warrant keeping them separated from the MEC Chapter 11 Cases, including: (i) none of the Debtors are borrowers or guarantors on the debtor in possession financing obligations in the MEC Chapter 11 Cases; (ii) the Debtors are primarily engaged in mining, extraction, and processing of metallurgical coal, whereas the MEC Debtors are primarily engaged in the mining, extraction, and processing of thermal coal, and each of these commodities is subject to different market pressures; (iii) the lenders to the Debtors under the Take-Back Facility are different from the lenders to the MEC Debtors; and (iv) as a result of the Take-Back Facility and other claims against the assets of the Debtors (including obligations to Javelin Global Commodities (UK) LTD ("Javelin Global")), there was perceived to be little to no equity value in the Debtors that would flow up to the MEC Debtors, although there was a belief that the Debtors could survive as a going concern without the need for a chapter 11 filing.

20.    Commencing on February 11, 2020, (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors filed a motion

requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). Also, the Debtors have filed their Notice of Election of Complex Chapter 11 Cases.

21. The Debtors commenced these chapter 11 cases after extensive negotiations with their major stakeholders concerning a global resolution to the Debtors' financial difficulties. In an effort to ensure that value is maximized for all stakeholders and that the Debtors' remediation obligations are honored at each of their Mining Complexes, these chapter 11 cases have been commenced with a three-pronged strategy that has the support of the Take-Back Facility lenders, Javelin, Javelin Global, and Murray Energy. First, the Debtors intend to facilitate the consensual sale of substantially all of the assets of Maple Eagle pursuant to Bankruptcy Code section 363. Second, the Debtors intend to effectuate a reorganization of their remaining operations, which is premised on the continued and future operation of the Oak Grove mining complex, through a sale of Oak Grove pursuant to a plan. And third, the Debtors intend to ensure that they can continue to comply with their reclamation obligations at the North River mining complex. These three elements have been memorialized in a Restructuring Support Agreement among Met Holdings, Murray Energy, the Take-Back Facility lenders, and Javelin Global, all as more fully set forth in the Moore Declaration.

22. As of the Petition Date, the Debtors have approximately $270 million in debt and liabilities, including but not limited to approximately $169 million related to the Take-Back Facility, approximately $21.5 million under an emergency bridge financing facility, [9] approximately $23.5 million owed to Javelin Global under certain of the Javelin Agreements, and approximately $12.7 million in intercompany liabilities owed to Murray Energy and other affiliates. In addition, the Debtors have approximately $43 million in outstanding trade payables.

---

[9] This facility is documented by amendments to the Take-Back Facility.

<u>**Proposed Sale and Bidding Procedures**</u>

**I.     Summary of Key Terms of the Stalking Horse Purchase Agreement.[10]**

   23.     The pertinent terms of the Stalking Horse Purchase Agreement are summarized in

the following table.[11]

| Term | Summary Description |
|------|---------------------|
| Purchase Price | Cash Component: $750,000<br><br>Assumed Liabilities: approximately $30 million |
| Bid Protections | Breakup Fee: $250,000<br><br>Expense Reimbursement: not to exceed $500,000 |
| Acquired Assets | The Stalking Horse Bidder will acquire all of Maple Eagle's right, title and interest in those assets primarily related to the Maple Eagle No. 1 underground mine, the Sycamore surface mine, the Maple Eagle/Katie preparation plant, and any other facilities primarily related to the foregoing, including all primarily related inventory, equipment, contracts, owned and leased real property, intellectual property (other than Murray Brand IP), prepaid expenses, Transferred Permits, insurance proceeds, and proceeds of the Acquired Assets. |
| Excluded Assets | The Acquired Assets will not include:<br><br>• All assets listed on Schedule 2.2(a)<br><br>• Any employee personnel records, and any benefit plans<br><br>• Any shares of capital stock or other equity interest in or issued by Maple Eagle, and any shares of capital stock or other equity interest in or issued by any other entity in which Maple Eagle holds an equity interest<br><br>• Documents pertaining to ownership, organization, qualification to do business, or existence of Maple Eagle and documents Maple Eagle is required to retain |

---

[10] Capitalized terms used in this section but not defined herein shall have the meanings given to them in the Stalking Horse Purchase Agreement.

[11] The following summary is provided for convenience purposes only. To the extent any of the terms described below are inconsistent with the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement controls in all respects.

| Term | Summary Description |
|---|---|
|  | • Any contract that is not an assumed contract<br><br>• Cash consideration, accounts receivable, claims of Maple Eagle arising out of the Stalking Horse Purchase Agreement or other transaction documents, assets securing surety bonds or financial assurances, tax returns, avoidance actions or other causes of action belonging to Maple Eagle, proceeds of excluded assets, cash and cash equivalents, tax refunds relating to a pre-closing tax period, and all Murray Brand IP |
| Assumed Liabilities | The Stalking Horse Bidder will pay, as and when due, all of the following liabilities of Maple Eagle:<br><br>• All liabilities under the assumed contracts<br><br>• All liabilities relating to the Stalking Horse Bidder's ownership or use of any of the acquired assets for periods following the closing date<br><br>• All cure costs, other than those in connection with certain real property leases<br><br>• All liabilities for reclamation with respect to the acquired assets whether for periods prior to, on, or following the closing date, excluding excluded fines and penalties<br><br>• All liabilities arising out of environmental, health, and safety laws, mining law, MSHA, OSHA, and any mine operating or safety compliance matters arising out of post-closing facts or circumstances, but excluding excluded fines and penalties<br><br>• All liabilities under the Black Lung Act for employees hired by the Stalking Horse Bidder first occurring on or after the lapse of the statutory period following the closing date for the Stalking Horse Bidder to become the responsible operator with respect to such employees<br><br>• All liabilities with respect to the WARN Act arising out of actions taken following the closing date |
| Excluded Liabilities | The Assumed Liabilities will not include:<br><br>• Any intercompany payables of the business owing to any of Maple Eagle's affiliates |

11

| Term | Summary Description |
|---|---|
| | • Any liabilities of Maple Eagle under the Stalking Horse Purchase Agreement or any other transaction document |
| | • All trade payables |
| | • All liabilities related to taxes attributable to a pre-closing tax period or taxes related to the excluded assets |
| | • All liabilities with respect to actions and proceedings pending before the closing date, except as provided on Schedule 2.4(b) |
| | • All liabilities to any owner or former owner of capital stock or warrants, holder of indebtedness for borrowed money, or current or former officer or director of Maple Eagle or any Maple Eagle affiliate |
| | • Cure costs in connection with certain real property leases |
| | • All excluded fines and penalties |
| | • All liabilities with respect to any excluded asset |
| | • All liabilities for sellers costs and expenses in connection with the administration of the bankruptcy case and the negotiation, execution, and consummation of the transactions |
| | • All workers' compensation and occupational health claims arising out of acts prior to the closing date; any liability of Seller or any ERISA affiliate related to a pension plan or compensation or benefits agreement, arrangement, plan, policy, practice, or program; all liabilities with respect to employees occurring prior to the closing date, including obligations under the WARN Act |
| | • All liabilities under the Black Lung Act that are not assumed liabilities |
| | • All liabilities relating to federal, state, or local investigations of, or claims or actions against Seller, arising out of actions taken prior to closing and with notice delivered to Seller prior to closing |
| | • Other liabilities relating to the conduct of the business or to the acquired assets and the use thereof arising prior to the closing date, other than assumed liabilities |

12

| Term | Summary Description |
|------|---------------------|
| Sale of Assets Free and Clear | On the closing date, the Assets will be transferred to the Stalking Horse Bidder, free and clear of all liens, claims and encumbrances, with all customary protections afforded to a buyer under Bankruptcy Code section 363. |
| Closing Conditions | The Stalking Horse Purchase Agreement contains closing conditions as are customary for transactions similar to the Sale and for a company similar to Maple Eagle, including: <ul><li>The parties shall have received approval from the Court approving the Sale of the Assets to the Stalking Horse Bidder, free and clear of all liens, claims and encumbrances;</li><li>The parties' representations and warranties must be true and correct, subject to a "material adverse effect" threshold;</li><li>Compliance with covenants in all material respects;</li><li>Any required regulatory approvals; and</li><li>The Court shall have entered a Sale Order in form and substance reasonably acceptable to the Stalking Horse Bidder and Maple Eagle.</li></ul> |
| Termination Events | The Stalking Horse Purchase Agreement may be terminated at any time prior to the closing only by: <ul><li>Mutual written consent</li><li>Written notice from either party if (i) a Governmental Authority issues a final ruling or order prohibiting the transaction, (ii) the Closing does not occur on or prior to 75 days following the Petition Date, (iii) the Court dismisses or converts to chapter 7 any of these chapter 11 cases, or (iv) a definitive agreement for an alternative transaction is entered</li><li>Written notice from Stalking Horse Bidder upon Maple Eagle's failure to perform its agreements, covenants, representations, or warranties which breach would result in Maple Eagle being unable to satisfy a condition to closing and cannot be cured within 10 days after the Stalking Horse Bidder notifies Maple Eagle of the breach, provided the Stalking Horse Bidder has no right of termination if it is also in breach</li></ul> |

13

| Term | Summary Description |
|------|---------------------|
|  | • Written notice from Maple Eagle upon the Stalking Horse Bidder's failure to perform its agreements, covenants, representations, or warranties which breach would result in the Stalking Horse Bidder being unable to satisfy a condition to closing and cannot be cured within 10 days after Maple Eagle notifies the Stalking Horse Bidder of the breach, provided Maple Eagle has no right of termination if it is also in breach<br><br>• Written notice from the Stalking Horse Bidder if (i) these chapter 11 cases are not commenced by February 13, 2020; (ii) this Motion is not filed by February 13, 2020; (iii) the Order does not authorize Maple Eagle's execution and delivery of the Stalking Horse Purchase Agreement; or (iv) the Order does not authorize the Stalking Horse Bid Protections (as defined herein) |
| Covenants | The Stalking Horse Purchase Agreement includes covenants made or agreed to by the Parties typical and customary for transactions of this nature, including covenants that:<br><br>• Maple Eagle will use commercially reasonable efforts to operate and carry on the business and the acquired assets in the condition in which they exist on the date of entry into the Stalking Horse Purchase Agreement<br><br>• Maple Eagle will use commercially reasonable efforts not to take any action that would reasonably be expected to result in failure of any conditions to closing or to impair the ability of Maple Eagle or Buyer to consummate the closing, except with respect to an alternative transaction |

## II.    The Bidding Procedures.

24.    The Stalking Horse Purchase Agreement is designed to incentivize potential bidders and thereby maximize the potential value of the Maple Eagle assets for the benefit of the Debtors' estates and their various stakeholders.  The Debtors request approval of and authorization to enter into of the Stalking Horse Purchase Agreement, subject only to higher or otherwise better offers, in accordance with the procedures set forth in the Bidding Procedures attached as **Exhibit 2** to the Order.

14

25.    The proposed Bidding Procedures are designed to permit a fair, efficient, competitive, and value-maximizing auction process for Maple Eagle's assets, consistent with the timeline of these chapter 11 cases, to confirm that the bid represented by the Stalking Horse Purchase Agreement (the "Stalking Horse Bid," and the bidder thereunder, the "Stalking Horse Bidder") is the best offer, or promptly identify the alternative bid that is higher or otherwise better.

26.    The Bidding Procedures will provide potential bidders with sufficient notice and time to conduct due diligence to submit binding bids in advance of the Bid Deadline.  Indeed, the Debtors and their advisors have already engaged in a comprehensive marketing process for Maple Eagle's assets, which involved providing numerous parties with the diligence necessary to make an offer.  In creating the Bidding Procedures, the Debtors are seeking to balance their interests in consummating the Sale on a timeline that ensures the Stalking Horse Bidder's willingness to provide a baseline offer while at the same time preserving the opportunity to attract a higher or otherwise better offer.  The Bidding Procedures are designed to encourage all prospective bidders to put their best bid forward.

27.    Because the Bidding Procedures are attached as **Exhibit 2** to the proposed Order, they are not restated fully herein.  Generally speaking, however, the Bidding Procedures establish, among other things:[12]

- the Debtors will serve the Order (setting forth the Sale Schedule), Bidding Procedures, and Sale Notice on all relevant notice parties as soon as practicable after entry of the Order;

- the availability of, access to, and conduct during due diligence by "Potential Bidders";

- the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "Qualified Bids" sufficient to

---

[12] The following summary is provided for convenience purposes only.  To the extent any of the terms described below are inconsistent with the Bidding Procedures, the Bidding Procedures control in all respects.

trigger the Auction and participate in the Auction;

- the manner in which Qualified Bids will be evaluated by the Debtors to determine the starting bid for the Auction;

- the conditions for having the Auction and procedures for conducting the Auction, if any; and

- various other matters relating to the Sale process generally, including the designation of the Back-Up Bid (as defined in the Bidding Procedures), return of any good faith deposits, and certain reservations of rights.

28.     Importantly, the Bidding Procedures recognize and comply with the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all Qualified Bids made at or prior to the Auction, and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

## III.    Proposed Sale Schedule.

29.     The Debtors are seeking approval of the Bidding Procedures and the Sale Schedule to establish a clear and open process for the solicitation, receipt, and evaluation of third-party bids on a timeline that would allow the Debtors to consummate the Sale of Maple Eagle's assets.

30.     Subject to the Court's availability, the key dates and deadlines the Debtors seek to establish pursuant to this Order are as follows, provided that the Debtors may amend the Sale Schedule, in consultation with the Consultation Parties[13] and subject to the terms of the DIP Facility (as amended and restated), from time to time, as necessary:

---

[13] "Consultation Parties" means the following parties: (a) the DIP Lenders (as defined in the Final DIP Order) and their counsel and financial advisors; and (b) counsel and financial advisors to any official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "Committee").  Notwithstanding the foregoing, a party shall not be a Consultation Party if such party is a bidder at the Auction; *provided, however,* if any such Consultation Party notifies the Debtors in writing that it irrevocably forfeits its rights to be a bidder, the foregoing restriction shall no longer apply with respect to such Consultation Party upon the Debtors' receipt of such notice.

a.   **Bid Deadline**:  **March 20, 2020, at 4:00 p.m. (prevailing Eastern Time)** is the deadline by which all Qualified Bids must be ***actually received*** by the parties specified in the Bidding Procedures (the "Bid Deadline").

b.   **Auction**:  The Auction, if necessary, will be held on **March 24, 2020, at 10:00 a.m. (prevailing Eastern Time)** at the offices of counsel to the Debtors, Proskauer Rose LLP, Eleven Times Square, New York, New York 10036.

c.   **Sale Objection Deadline**:  The deadline by which all objections to the Sale (including to any Successful Bids or any Assigned Contract Objection (as defined below)) must be filed with the Court and served so as to be ***actually received*** by the appropriate notice parties (the "Sale Objection Deadline"), is **March 20, 2020, at 4:00 p.m. (prevailing Eastern Time)**.  The deadline by which responses to objections to the Sale must be filed is **March 23, 2020 at 4:00 p.m. (prevailing Eastern Time)**.  In the event there is an Auction, the Sale Objection Deadline and the deadline by which responses thereto must be filed will be set for later dates yet to be determined and subject to the Court's availability.

d.   **Sale Hearing**:  The hearing approving the Sale to the Successful Bidder shall take place before the Court on or about **March 26, 2020, at 10:00 a.m. (prevailing Eastern Time)** or, in the event there is an Auction, at a later date yet to be determined and subject to the Court's availability.

31.   Upon entry of the Order, the Debtors will notify parties of these dates.

**IV.   Notice of Auction.**

32.   On or within three business days after entry of the Order, the Debtors will cause the Sale Notice, substantially in the form attached as **Exhibit 3** to the Order, to be served on the following parties or their respective counsel, if known: (a) the U.S. Trustee for the Southern District of Ohio; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Take-Back Facility; (d) Javelin Investment Holdings LLC; (e) counsel to the Ad Hoc Group of Prepetition Term Loan Lenders; (f) the administrative agent under the Debtors' proposed debtor-in-possession financing facility; (g) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors operate; (h) the offices of the attorneys general for the states in which the

17

Debtors operate; (i) the United States Attorney's Office for the Southern District of Ohio; (j) the Internal Revenue Service; (k) the Pension Benefit Guaranty Corporation; (l) counsel to the Stalking Horse Bidder; (m) Javelin Global Commodities (UK) Ltd; (n) the Contract Counterparties (as defined herein), (o) all parties who have expressed a written interest in some or all of the assets; (p) all known holders of liens, encumbrances, and other claims secured by the assets; (q) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (r) counsel to each of the lenders of the Debtors' proposed debtor-in-possession financing facility; (s) Murray Energy; (t) all taxing authorities; (u) all mechanic's lien claimants; (v) all lessors; and (w) any party that has requested notice pursuant to Bankruptcy Rule 2002.

33.     In addition, within five business days of entry of the Order, the Debtors will publish the Sale Notice, with any modifications necessary for ease of publication, once in *USA Today (National Edition)* and once in *The Columbus Dispatch*, to provide notice to any other potential interested parties.

34.     The Debtors submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale, including the date, time, and place of the Auction (if one is held) and the Bidding Procedures and the dates and deadlines related thereto.  Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and that the Court determine that no other or further notice of the Auction is required.

**V.     Summary of the Assumption and Assignment Procedures.**

35.     The Stalking Horse Purchase Agreement contemplates that certain executory contracts may be assumed and assigned to the Buyer, and that the Buyer will be responsible for all related cure costs.  The Debtors propose the Assumption Procedures set forth below for notifying the counterparties to executory contracts and unexpired leases (the "Contract Counterparties") of

proposed cure amounts in the event Maple Eagle decides to assume and assign such contracts or leases in connection with the Sale.

### A.      Notice of Assumption and Assignment.

36.      On or before March 7, 2020 (the "Assumption and Assignment Service Date"), the Debtors will file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Cure Notice annexed as **Exhibit 4** to the Order on all executory contract and unexpired lease Contract Counterparties (other than the Debtor) and, include as **Exhibit A** to the Cure Notice, a list (the "Assigned Contracts Schedule") that specifies: (a) each of Maple Eagle's executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (*i.e.*, the Assigned Contracts), including the name of the Contract Counterparty to each such contract, and whether or not the underlying agreement would be considered an executory contract or unexpired lease under applicable nonbankruptcy law; (b) the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Assigned Contract (the "Cure Costs"); and (c) the deadline by which any Contract Counterparty to an Assigned Contract may file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto.  The Debtors shall serve, via first class mail, a customized version of the Cure Notice, without the Assigned Contracts Schedule, which will include: (w) instructions (the "Prime Clerk Instructions") regarding how to view the Assigned Contracts Schedule on the Debtors' case website (the "Case Website"); (x) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of Assigned Contracts and rights thereunder; (y) Cure Costs, if any; and (z) the procedures for objecting thereto ((x)-(z) collectively, the "Necessary Notice Information"), on each Contract Counterparty to the Assigned Contracts.  The Debtors shall serve on all parties that requested notice pursuant to Bankruptcy Rule 2002, via ECF, a modified

19

version of the Cure Notice that contains the Prime Clerk Instructions and Necessary Notice Information.  Pursuant to the Bidding Procedures Order, service as set forth herein shall be deemed proper, due, timely, good, and sufficient notice and no other or further notice will be necessary.

37.    A Contract Counterparty listed on the Assigned Contracts Schedule may file an objection (an "Assigned Contract Objection") only if such objection is to the proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any.   All Assigned Contract Objections must:  (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served and ***actually received*** no later than the Sale Objection Deadline (the "Cure Objection Deadline").

38.    If a Contract Counterparty files an Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and the Stalking Horse Bidder or other Successful Bidder has designated in writing that it wishes to take assignment of such Assigned Contract, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, such objection will be resolved at the Sale Hearing or such later date as determined by the Court.  To the extent that any Assigned Contract Objection cannot be resolved by the parties, such Assigned Contract shall be assumed and assigned only upon satisfactory resolution of the Assigned Contract Objection, to be determined in the Stalking Horse Bidder's or other Successful Bidder's discretion. To the extent an Assigned Contract Objection remains unresolved, the Assigned Contract may be conditionally assumed and assigned, subject to the consent of the Stalking Horse Bidder or other

20

Successful Bidder, pending a resolution of the Assigned Contract Objection after notice and a

hearing. If an Assigned Contract Objection is not satisfactorily resolved, the Stalking Horse

Bidder or other Successful Bidder may determine that such Assigned Contract should be rejected

and not assigned, in which case the Stalking Horse Bidder or other Successful Bidder will not be

responsible for any Cure Costs in respect of such contract.

### B.    Supplemental Cure Notice.

39.    If (i) the Debtors discover contracts inadvertently omitted from the Assigned

Contracts Schedule, (ii) the Successful Bidder identifies other executory contracts or unexpired

leases that it desires to assume and assign in connection with the Sale, or (iii) the previously stated

Cure Costs associated with any assigned Contract requires modification, the Debtors may, at any

time after the Assumption and Assignment Service Date: (a) supplement the Assigned Contracts

Schedule with previously omitted Assigned Contracts; (b) remove any Assigned Contracts from

the list of executory contracts and unexpired leases ultimately selected as Assigned Contracts that

the Successful Bidder proposes be assumed and assigned to it in connection with the Sale or add

to such list; and/or (c) modify the previously stated Cure Costs associated with any Assigned

Contract.

40.    In the event that the Debtors exercise any of the rights reserved above, the Debtors

shall promptly serve a supplemental notice of assumption and assignment by electronic

transmission, hand delivery, or overnight mail on the Contract Counterparty, and its attorney, if

known, at the last known address available to the Debtors (a "Supplemental Cure Notice"). Each

Supplemental Cure Notice shall include the same information with respect to listed Assigned

Contracts as would have been included in the Notice of Assumption and Assignment (a

"Supplemental Assigned Contracts Schedule").

41.      Any Contract Counterparty that receives a Supplemental Cure Notice may file an objection (a "Supplemental Assigned Contract Objection") only if such objection is to the proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any.  All Supplemental Assigned Contract Objections must: (a) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any; (b) include appropriate documentation in support thereof; and (c) be filed no later than 4:00 p.m. (prevailing Eastern Time) on the date that is the later of (i) the Sale Objection Deadline and (ii) 7 days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice (the "Supplemental Assigned Contract Objection Deadline").

42.      If a Contract Counterparty files a Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court (a "Supplemental Assigned Contract Hearing") to determine the Cure Costs, if any, and approve the assumption of the relevant Assigned Contracts.  If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Costs and approving the assumption and assignment of any Assigned Contract listed on a Supplemental Cure Notice.

**C.      Additional Notice of Assumption and Assignment Procedures.**

43.      If a Contract Counterparty does not file and serve an Assigned Contract Objection or Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (a) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Assigned Contract or any other document, and (b) the Contract Counterparty will be deemed to have consented to the assumption

22

and assignment of the Assigned Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption and assignment of such Assigned Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Assigned Contract against Maple Eagle or the Successful Bidder, or the property of any of them.

44.     Any objections to the Successful Bidder's proposed form of adequate assurance of future performance must be filed no later than the later of the Sale Objection Deadline or Supplemental Assigned Contract Objection Deadline, as applicable, and such objections will be resolved at the Sale Hearing or Supplemental Assigned Contract Hearing, as applicable.  The Debtors may, with the consent of the Successful Bidder, adjourn the resolution of any such objection to a later hearing.

45.     For the avoidance of doubt, the inclusion of an Assigned Contract on the Assigned Contracts Schedule or Supplemental Assigned Contracts Schedule shall not obligate Maple Eagle to assume any such Assigned Contract or obligate the Stalking Horse Bidder or a Successful Bidder to take assignment of any such Assigned Contract.  The Stalking Horse Bidder or other Successful Bidder shall determine whether to take assignment of any Assigned Contracts pursuant to the terms of the Stalking Horse Purchase agreement or other asset purchase agreement, as applicable.

## **Basis for Relief**

**I.      The Stalking Horse Purchase Agreement and Bidding Procedures Are Fair, Designed to Maximize the Value Received for the Assets, and Are Consistent with the Debtors' Reasonable Business Judgment.**

46.     Bankruptcy Code section 363(b) provides that "[t]he [debtor in possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate" 11 U.S.C. § 363(b)(1).  The Sixth Circuit has made clear that a court may approve a sale of assets when the transaction is supported by a sound business purpose.  *See Stephens Indus.,*

*Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("a bankruptcy court can authorize a sale of all

a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such

action"). A debtor's business judgment is entitled to substantial deference with respect to the

procedures to be used in selling an estate's assets. *See, e.g., In re Schipper*, 933 F.2d 513, 515 (7th

Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he

has an 'articulated business justification.'") (internal citations omitted); *see also In re Martin,* 91

F.3d 389, 395 (3d Cir. 1996) (explaining that courts usually defer to the trustee's "legitimate

business justification" with respect to the "disposition of assets of the estate"); *In re Integrated

Res., Inc.*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that bidding procedures that have been

negotiated by a trustee are to be reviewed according to the deferential "business judgment"

standard, under which such procedures and arrangements are "presumptively valid").

47.     The paramount goal in any proposed sale of property of the estate is to maximize

the proceeds received by the estate. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998)

("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to

maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir.

1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate

at hand"); *In re Integrated Res., Inc.*, 147 B.R. at 659 ("[I]t is a well-established principle of

bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to

such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal

citations omitted).

48.     To that end, courts uniformly recognize that procedures intended to enhance

competitive bidding are consistent with the goal of maximizing the value received by the estate

and therefore are appropriate in the context of bankruptcy transactions. *See, e.g., In re Integrated*

*Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

49.     The Debtors have carefully evaluated a number of qualitative and quantitative factors in designing a process that they believe will maximize the value of their estates, produce maximum recoveries, and result in a successful restructuring of their estates.  This process includes both entry into the Stalking Horse Purchase Agreement and approval of the Bidding Procedures, which are designed to promote active bidding from seriously interested parties and to elicit the highest or otherwise best offers available for substantially all of Maple Eagle's assets.  The Debtors are confident that the Bidding Procedures will allow the Debtors to solicit additional offers and conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to take on the Assets, obligations, and liabilities being transferred.  In particular, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

50.     At the same time, the Bidding Procedures provide the Debtors with an opportunity to consider competing bids and select the highest or otherwise best offers for the completion of the Sale.  As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable, as well as at or above market.

51.      The Debtors submit that the Stalking Horse Purchase Agreement and the Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved in this district and in other jurisdictions.  *See, e.g., In re Murray Energy Holdings Co.*, No. 19-56885 (JEH) (Bankr. S.D. Ohio Jan. 9, 2020) (approving similar bidding procedures); *In re AcuSport Corp.*, No. 18-52736 (JEH) (Bankr. S.D. Ohio May 16, 2018) (approving entry into stalking horse purchase agreement and other bidding procedures); *In re FirstEnergy Solutions Corp.*, No. 18-50757 (AMK) (Bankr. N.D. Ohio Dec. 19, 2018) (similar); *In re Mission Coal Co., LLC*, No. 18-04177 (TOM) (Bankr. N.D. Ala. Dec. 12, 2018) (similar); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Oct. 18, 2018) (similar).[14]

52.      Accordingly, for all of the foregoing reasons, the Debtors believe that the Stalking Horse Purchase Agreement and the Bidding Procedures (a) will encourage robust bidding for the Assets, (b) are consistent with other procedures previously approved by courts in this District, and (c) are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings and should be approved.

**II.    The Bid Protections are Reasonable, Designed to Maximize the Value Received for the Assets and to Encourage Bidding, and are Consistent with the Debtors' Reasonable Business Judgment.**

53.      The Debtors seek approval of customary bid protections in the event the Stalking Horse Purchase Agreement is terminated pursuant to Article 11 thereof, including a break-up fee of $250,000 for the Stalking Horse Bidder (the "Break-Up Fee") and the reimbursement of the

---

[14] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

Stalking Horse Bidder's reasonable out-of-pocket expenses up to $500,000 (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Stalking Horse Bid Protections").  In conjunction with the Bidding Procedures, the Stalking Horse Bid Protections were negotiated at arm's length and were designed to encourage the Stalking Horse Bidder to set a baseline price for the Maple Eagle assets while at the same time preserving the opportunity to attract a higher or otherwise better offer.  Although the Stalking Horse Protections equal 100% of the proposed Cash Consideration, the Assumed Liabilities and, in particular, the Maple Eagle reclamation liabilities are valued at approximately $30 million.  The Debtors submit that the Stalking Horse Bid Protections are fair and reasonable under the circumstances.

54.      Similar bid protections are a widely accepted and, in many cases, necessary component of substantial sales conducted under section 363 of the Bankruptcy Code.  Courts analyzing the appropriateness of bid protections consider whether (i) the protection reflects the debtor's sound business judgment; (ii) the protection hampers, rather than encourages, bidding; and (iii) the amount of the protection is reasonable in relation to the proposed purchase price.  *See In re ASARCO, LLC*, 650 F.3d 593 (5th Cir. 2011); *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014).  The Stalking Horse Bid Protections should be approved under each of these factors.

55.      The Debtors believe, based on their business judgment, that the Stalking Horse Bid Protections will enable them to maximize the value of the Maple Eagle assets while encouraging bidding.  Absent the Stalking Horse Bid Protections, the Stalking Horse Bidder would not have been willing to participate in the Maple Eagle Sale process, to the detriment of the Debtors' estates.  The Stalking Horse Bidder has expended time and resources negotiating, drafting, and performing due diligence activities in connection with entering into the Stalking Horse Purchase Agreement,

despite the fact that the Stalking Horse Bid is subject not only to Court approval, but to potential higher or otherwise better bids from third parties.  The Stalking Horse Bid Protections provide compensation to the Stalking Horse Bidder for both its reasonable out-of-pocket expenses and the risks that it is undertaking.  *See In re APP Plus*, 223 B.R. 870, 874 (Bankr. E.D.N.Y. 1998) (break-up fees are intended to compensate for time, effort, resources, and the risk of losing other investment opportunities while the bidding process unfolds).  This compensation incentivized the Stalking Horse Bidder to enter into the Stalking Horse Purchase Agreement, ensuring there will be a sale of the Maple Eagle assets at a price the Debtors believe is reasonable, while preserving the ability of third parties to submit higher or otherwise better offers.  Accordingly, the Stalking Horse Bid Protections do not hinder bidding.

56.    The Debtors therefore submit that the Stalking Horse Bid Protections are an exercise of the Debtors' sound business judgment, are reasonable, and are in the best interest of the Debtors and their stakeholders.  Accordingly, the Debtors request that the Court approve the Stalking Horse Bid Protections.

### III.    The Form and Manner of the Sale Notice Should Be Approved.

57.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21-days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business.  Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein.  The Debtors seek approval of the Sale Notice as proper notice of the Auction.  The Debtors submit that notice of this Motion and the related hearing to consider entry of the Order, coupled with service of the Sale Notice, as provided for herein, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in

compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.

Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

IV.   **The Assets May Be Sold Free and Clear of Liens, Claims, Interests and Encumbrances under Bankruptcy Code Section 363(f).**

58.   Bankruptcy Code section 363(f) authorizes a debtor to sell assets free and clear of

all liens, claims, interests and encumbrances provided that one of the following conditions is met:

i.    applicable non-bankruptcy law permits sale of such property free and clear of such interests;

ii.   such entity consents;

iii.  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

iv.   such interest is in bona fide dispute; or

v.    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1) - (5).

59.   As section 363(f) of the Bankruptcy Code is stated in the disjunctive, when

proceeding pursuant to section 363(b), it is only necessary for a debtor to meet one of the five

conditions of section 363(f).  *See id.; Mich. Employment Sec. Comm'n v. Wolverine Radio Co. (In

re Wolverine Radio Co.),* 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code

section 363(f) written in disjunctive; holding that court may approve sale "free and clear" provided

at least one of the subsections of section 363(f) is met); *In re Zeigler,* 320 B.R. 362, 381 (Bankr.

N.D.Ill. 2005); *In re Dundee Equity Corp.,* No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12

(Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the

interest concerned may occur if any one of the conditions of §363(f) have been met."); *In re

Bygaph, Inc.,* 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

60.     The Debtors anticipate that the Sale will satisfy one of the five requirements set

forth under section 363(f) of the Bankruptcy Code, either because the affected parties consent to

the Sale of the applicable Assets or some other bases exist under section 363(f) of the Bankruptcy

Code to warrant the sale of the applicable Assets free and clear of such liens or interests.

Accordingly, the Debtors anticipate that one or more prongs of section 363(f) of the Bankruptcy

Code will be satisfied with respect to parties that assert liens on or interests in the Assets.

**V.      The Assumption and Assignment Procedures Should Be Approved.**

61.     To facilitate and effectuate the Sale, the Debtors are seeking approval of the

Assumption and Assignment Procedures.  The Assumption and Assignment Procedures reflect

sound business judgment and are reasonable and necessary to properly notify parties of potential

assumptions and/or assignments and provide the Contract Counterparties with sufficient time to

determine the accuracy of the proposed cure amount and whether the Debtors have provided

adequate assurance of future performance.

62.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession,

"subject to the court's approval, may assume or reject an executory contract or unexpired lease of

the debtor."  11 U.S.C. § 365(a).  Courts reviewing a debtor's decision to assume or reject an

executory contract or unexpired lease apply a business judgment standard.  *See NLRB v. Bildisco*

*& Bildisco*, 465 U.S. 513, 523 (1984) (noting that the business judgment standard traditionally

applies to court authorization of rejection of an executory contract); *In re Orion Pictures Corp.*, 4

F.3d 1095, 1099 (2d Cir. 1993) ("[A] bankruptcy court reviewing a trustee's or debtor-in-

possession's decision to assume or reject an executory contract should examine a contract and the

surrounding circumstances and apply its best 'business judgment' to determine if it would be

beneficial or burdensome for the estate to assume it."); *Phar-Mor, Inc. v. Strouss Bldg. Associates*,

204 B.R. 948, 951–52 (S.D. Ohio 1997) ("Whether an executory contract is 'favorable' or 'unfavorable' is left to the sound business judgment of the debtor."); *In re Federated Dept. Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts and unexpired leases); *See In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 468 (Bankr. S.D.N.Y. 2014) ("At this point, the Court need only evaluate whether the RSA is a valid exercise of Debtors' business judgment: does it make economic sense?").

63.     Under this standard, there "is a presumption that in making a business decision, 'the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *In re Abbott Labs. Derivatives Shareholders Litigation*, 325 F.3d 795, 807 (7th Cir. 2003) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)). Accordingly, in applying the business judgment standard, courts generally give debtors significant discretion in requesting to assume or reject an executory contract or unexpired lease. *In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997) ("[A] court will ordinarily defer to the business judgment of the debtor's management."). When assumption of an executory contract or unexpired lease appears to enhance the debtor's estate, courts should approve the debtor's decision to assume the contract or lease. *See Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc.*, 25 B.R. 484, 495 (Bankr. S.D. Ohio 1982).

64.     Here, the facts clearly demonstrate that the Court should approve the Debtors' decision to assume and assign the Assigned Contracts to the Successful Bidder as a sound exercise of the Debtors' business judgment. First, the Assigned Contracts are necessary to the operation of Maple Eagle. Therefore, it is unlikely that a purchaser would want to acquire the Maple Eagle assets absent assumption and assignment of the Assigned Contracts, and such assumption and

31

assignment is essential to inducing the highest or otherwise best offer for the Maple Eagle assets. In addition, the Assigned Contracts will be assumed and assigned through the process approved by the Court by the Bidding Procedures Order, and thus will be reviewed by key constituents, including the contract and lease counterparties.

65.     In addition, the Debtors submit that the requirements of section 365(b) are satisfied. Upon finding that a debtor has exercised its business judgment in determining that assuming and assigning an executory contract or unexpired lease is in the best interest of its estate, the court must then evaluate whether the assumption meets the requirements of section 365(b) that the debtor (a) cure, or provide adequate assurance of prompt cure of, prepetition defaults, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance. 11 U.S.C. § 365(b)(1).

66.     The Debtors submit that these requirements are satisfied.  Specifically, the Stalking Horse Purchase Agreement will ensure that any defaults associated with the Assigned Contracts are properly cured.  Because the Bidding Procedures Order provides a clear process by which to resolve any disputes over cure amounts or other defaults, the Debtors are confident that any defaults will be cured fairly, efficiently, and properly.

67.     In addition, the Debtors believe that they can and will demonstrate at the Sale Hearing that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder will be satisfied.  Under the Stalking Horse Purchase Agreement, the Stalking Horse Bidder has agreed to provide adequate assurance of its future performance, and to demonstrate such adequate assurance to the Bankruptcy Court as needed.  Also, as required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder or Successful Bidder (*e.g.*, financial credibility,

willingness, and ability of the interested party to perform under the Assigned Contracts), including as it relates to such Qualified Bidder's willingness, and ability to perform under the Assigned Contracts assigned to the Successful Bidder. Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed cure amounts. The Court therefore will have a sufficient basis to authorize Maple Eagle to reject or assume and assign the Assigned Contracts as set forth in the definitive agreement of the Successful Bidder.

68.    Accordingly, the Debtors submit that the Assumption and Assignment Procedures should be approved as a sound exercise of the Debtors' business judgment and as reasonable and necessary measures to adequately notify parties in interest and conduct the proposed sale process in a fair, efficient, and proper manner.

## **Notice**

69.    The Debtors will provide notice of this Motion to: (a) the U.S. Trustee for the Southern District of Ohio; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Take-Back Facility; (d) Javelin Investment Holdings LLC; (e) counsel to the Ad Hoc Group of Prepetition Term Loan Lenders; (f) the administrative agent under the Debtors' proposed debtor-in-possession financing facility; (g) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors operate; (h) the offices of the attorneys general for the states in which the Debtors operate; (i) the United States Attorney's Office for the Southern District of Ohio; (j) the Internal Revenue Service; (k) the Pension Benefit Guaranty Corporation; (l) counsel to the Stalking Horse Bidder; (m) the Contract Counterparties (as defined herein), (n) all parties who have

expressed a written interest in some or all of the assets; (o) all known holders of liens, encumbrances, and other claims secured by the assets; (p) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (q) counsel to each of the lenders of the Debtors' proposed debtor-in-possession financing facility; (r) Murray Energy; (s) Javelin Global; (t) all taxing authorities; (u) all mechanic's lien claimants; (v) all lessors; and (w) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice is required.

*[Remainder of page intentionally left blank.]*

WHEREFORE the Debtors respectfully request that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  February 12, 2020
Columbus, Ohio

/s/ Thomas R. Allen

Thomas R. Allen          (0017513)
Richard K. Stovall        (0029978)
James A. Coutinho        (0082430)
Matthew M. Zofchak   (0096279)
**Allen Stovall Neuman Fisher & Ashton**
17 South High Street, Suite 1220
Columbus, Ohio 43215
Telephone:     (614) 221-8500
Facsimile:     (614) 221-5988
Email:          allen@asnfa.com
                 stovall@asnfa.com
                 coutinho@asnfa.com
                 zofchak@asnfa.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

David M. Hillman (*pro hac vice* pending)
Timothy Q. Karcher (*pro hac vice* pending)
Chris Theodoridis (*pro hac vice* pending)

**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone:     (212) 969-3000
Facsimile:     (212) 969-2900
Email:          dhillman@proskauer.com
                 tkarcher@proskauer.com
                 ctheodoridis@proskauer.com

- and -

Charles A. Dale (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
One International Place
Boston, Massachusetts 02110
Telephone:     (617) 526-9600
Facsimile:     (617) 526-9899
Email:          cdale@proskauer.com

*Proposed Counsel to the Debtors and Debtors
in Possession*

## Exhibit A

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MURRAY METALLURGICAL COAL | ) | Case No. 20-10390 (JEH) |
| HOLDINGS, LLC, *et al.*,[1] | ) | |
| | ) | Judge John E. Hoffman, Jr. |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## ORDER (I) AUTHORIZING THE ENTRY
## INTO AND PERFORMANCE UNDER THE STALKING
## HORSE PURCHASE AGREEMENT, (II) APPROVING BIDDING
## PROCEDURES FOR THE SALE OF ASSETS, (III) SCHEDULING HEARINGS AND
## OBJECTION DEADLINES WITH RESPECT TO THE SALE, (IV) SCHEDULING BID
## DEADLINES AND AN AUCTION, (V) APPROVING THE FORM AND MANNER
## OF NOTICE THEREOF, (VI) APPROVING CONTRACT ASSUMPTION
## AND ASSIGNMENT PROCEDURES, AND (VII) GRANTING RELATED RELIEF

---

[1]    The Debtors in these Chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Murray Metallurgical Coal Holdings, LLC (4633); Murray Eagle Mining, LLC (4268); Murray Alabama Minerals, LLC (4047); Murray Alabama Coal, LLC (3838); Murray Maple Eagle Coal, LLC (4435); and Murray Oak Grove Coal, LLC (4878).  The Debtors' primary business address is 46226 National Road, St. Clairsville, OH 43950.

1

Upon consideration of the motion (the "Motion")[2] of the above captioned debtors and debtors in possession (the "Debtors") for the entry of an order (this "Order"): (a) authorizing Murray Maple Eagle Coal, LLC ("Maple Eagle") to enter into that certain Asset Purchase Agreement attached hereto as **Exhibit 1** (the "Stalking Horse Purchase Agreement"); (b) approving the proposed bidding procedures attached as **Exhibit 2** to this Order (the "Bidding Procedures"); (c) scheduling an auction; (d) approving the form and manner of notice thereof; (e) scheduling dates and deadlines in connection with the sale (the "Sale") of all, substantially all, or any combination of Maple Eagle's assets (the "Assets"); (f) approving the form and manner of notice thereof; (g) approving procedures for assuming and assigning Maple Eagle's executory contracts and unexpired leases (the "Assumption Procedures"); and (h) granting the Debtors related relief; all as more fully set forth in the Motion; and upon the First Day Declarations; and this court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order; and this court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this court having found that it may enter a final order consistent with Article III of the United States Constitution; and this court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before this court (the

---

[2] Capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Motion or the Bidding Procedures, as applicable.

"Hearing"); and this court having determined that the legal and factual bases set forth in the Motion

and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings

had before this court; and after due deliberation and sufficient cause appearing therefor, THE

COURT FINDS THAT:

A.      The findings of fact and conclusions of law herein constitute the court's findings of

fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant

to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are

adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as

such.

B.      Jurisdiction and Venue.  This court has jurisdiction over this matter pursuant to

28 U.S.C. §§ 157 and 1334.  Venue in this court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      The statutory bases for the relief requested in the Motion are sections 105, 363, and

365 of the Bankruptcy Code, Bankruptcy Rules 2002, 3016, 3017, 3020, 6004, and 6006, and Rule

6004-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of Ohio

(the "Local Rules").

D.      Notice of the Bidding Procedures Motion.  Notice of the Motion, the Hearing, and

the proposed entry of this Order was adequate and sufficient under the circumstances of these

chapter 11 cases, and such notice complied with all applicable requirements of the Bankruptcy

Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.  Notice of the Motion has been

given to:  (a) the U.S. Trustee for the Southern District of Ohio; (b) the holders of the 30 largest

unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under

the Take-Back Facility; (d) counsel to the Ad Hoc Group of Prepetition Term Loan Lenders; (e)

Javelin Investment Holdings LLC; (f) the administrative agent under the Debtors' proposed

3

debtor-in-possession financing facility; (g) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors operate; (h) the offices of the attorneys general for the states in which the Debtors operate; (i) the United States Attorney's Office for the Southern District of Ohio; (j) the Internal Revenue Service; (k) the Pension Benefit Guaranty Corporation; (l) counsel to the Stalking Horse Bidder; (m) the Contract Counterparties, (n) all parties who have expressed a written interest in some or all of the assets; (o) all known holders of liens, encumbrances, and other claims secured by the assets; (p) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (q) counsel to each of the lenders of the Debtors' proposed debtor-in-possession financing facility; (r) Murray Energy; (s) Javelin Global; (t) all taxing authorities; (u) all mechanic's lien claimants; (v) all lessors; and (w) any party that has requested notice pursuant to Bankruptcy Rule 2002. Accordingly, no further notice of the Motion, the Hearing, or this Order is necessary or required.

E.     The Debtors have articulated good and sufficient reasons for this Court to: (a) authorize Maple Eagle to enter into the Stalking Horse Purchase Agreement attached hereto as **Exhibit 1**; (b) approve the Bidding Procedures attached hereto as **Exhibit 2**; (c) schedule the Bid Deadline, the Auction, the Sale Objection Deadline, and the Sale Hearing; and (d) approve the form of the Sale Notice attached hereto as **Exhibit 3**; (e) approve the Assumption Procedures and the form and manner of notice of the Cure Notice attached hereto as **Exhibit 4**; and (f) grant the Debtors related relief.

F.     Stalking Horse Purchase Agreement.  The Debtors have demonstrated and proven to the satisfaction of this Court that Maple Eagle's entering into the Asset Purchase Agreement (the "Stalking Horse Purchase Agreement") with the Buyer (including its assignees or designees, the "Stalking Horse Bidder") and performance thereunder is in the best interests of the Debtors,

4

their creditors, and their estates, and that performance under the Stalking Horse Purchase Agreement represents a prudent exercise of the Debtors' sound business judgment. The Debtors have articulated good, sufficient, and sound business justifications and compelling circumstances for the entry into and performance under the Stalking Horse Purchase Agreement in that, among other things, the Stalking Horse Bid constitutes the highest or otherwise best restructuring proposal that the Debtors have received to date and the approval of the Stalking Horse Purchase Agreement is a necessary and constructive step toward the consummation of a sale of all, substantially all, or any combination of Maple Eagle's assets, and the Stalking Horse Purchase Agreement allows the Debtors to solicit the highest or otherwise best bid for Maple Eagle's assets through the Bidding Procedures.

G.    The Stalking Horse Purchase Agreement was negotiated by the parties at arm's-length and in good faith by the Debtors and the Stalking Horse Bidder. Furthermore, the Stalking Horse Purchase Agreement will serve as a minimum or floor bid on which the Debtors, their creditors, suppliers, vendors, and other bidders may rely. The Stalking Horse Bidder is providing a material benefit to the Debtors and their creditors by increasing the likelihood that, given the circumstances, the best possible price for Maple Eagle's assets will be received. Accordingly, Maple Eagle's entry into the Stalking Horse Purchase Agreement is reasonable and appropriate, and represents the best method for maximizing value for the benefit of the Debtors' estates.

H.    <u>Bidding Procedures</u>. The Bidding Procedures are reasonable and appropriate and represent the best available method for maximizing value for the benefit of the Debtors' estates.

I.    The Bidding Procedures were negotiated at arm's length, in good faith, and without collusion. The Bidding Procedures balance the Debtors' interest in emerging expeditiously from

5

these chapter 11 cases while preserving the opportunity to attract value-maximizing proposals beneficial to the Debtors' estates, their creditors, and other parties in interest.

       J.      <u>The Sale Notice</u>.  The Sale Notice, substantially in the form attached hereto as **<u>Exhibit 3</u>**, and incorporated herein by reference as if fully set forth in this Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction.

       K.      <u>The Cure Notice</u>.  The Cure Notice, substantially in the form attached hereto as **<u>Exhibit 4</u>**, and incorporated herein by reference as if fully set forth in this Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Assumption and Assignment Procedures.

**IT IS HEREBY ORDERED THAT:**

       1.      The Motion is granted as provided herein.

       2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the court at the hearing on the Motion or by stipulation filed with the court, are overruled.

       3.      Maple Eagle's entry into and performance under the Stalking Horse Purchase Agreement, substantially in the form attached hereto as **<u>Exhibit 1</u>**, is hereby approved, and the Stalking Horse Purchase Agreement is binding on Maple Eagle, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for Maple Eagle's estate; *provided* that consummation of the Sale to the Stalking Horse Bidder or any other Successful Bidder shall remain subject to entry of a Court order approving the Sale to the Stalking Horse Bidder or any other Successful Bidder.

**I.      Important Dates and Deadlines.**

4.      The following dates and deadlines are hereby approved (and may be amended from time to time by the Debtors in consultation with the Consultation Parties by filing an appropriate notice on the Court's docket and posting such notice on the website of Prime Clerk).[3]

5.      Unless extended by the Debtors, with the consent of the DIP Lenders and in consultation with the other Consultation Parties, the deadline by which all bids for the Assets must be ***actually received*** by the parties specified in the Bidding Procedures is **March 20, 2020, at 4:00 p.m., prevailing Eastern Time**.

6.      The date and time of the Auction, if needed, is **March 24, 2020, at 10:00 a.m., prevailing Eastern Time**, which time may be extended by the Debtors, with the consent of the DIP Lenders and in consultation with the other Consultation Parties, upon written notice filed with the Court, to be held at the offices of Proskauer Rose LLP, located at Eleven Times Square, New York, New York 10036.  The Debtors shall send written notice of the date, time, and place of the Auction to Qualified Bidders no later than two (2) business days before such Auction, and shall post notice of the same no later than two (2) business days before such Auction on the website of the Debtors' notice and claims agent, Prime Clerk at https://cases.primeclerk.com/MurrayMET.

7.      Provided there is no Auction, the deadline to object to approval of the Sale (the "Sale Objection Deadline") is set for **Friday, March 20, 2020, at 4:00 p.m., prevailing Eastern Time**.  Provided there is no Auction, the deadline by which responses to any objections to approval of the Sale must be filed is **Tuesday, March 23, 2020 at 4:00 p.m., prevailing Eastern Time**.

---

[3] "Consultation Parties" means the following parties: (a) the DIP Lenders (as defined in the Final DIP Order) and their counsel and financial advisors; and (b) counsel and financial advisors to any official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "Committee").  Notwithstanding the foregoing, a party shall not be a Consultation Party if such party is a bidder at the Auction; *provided, however,* if any such Consultation Party notifies the Debtors in writing that it irrevocably forfeits its rights to be a bidder, the foregoing restriction shall no longer apply with respect to such Consultation Party upon the Debtors' receipt of such notice.

8.       Provided there is no Auction, the hearing to consider approval of the Sale (the "Sale Hearing") will take place on [____], 2020, at 10:00 a.m., prevailing Eastern Time.

9.       Notwithstanding the foregoing, the Court's approval of the foregoing schedule is without prejudice to all parties' rights to object to the approval of any sale contemplated under this Order at the Sale Hearing on any grounds.

**II.       The Stalking Horse Purchase Agreement.**

10.      The Stalking Horse Bidder shall be deemed a Qualified Bidder, and the bid of the Stalking Horse Bidder contemplated by the Stalking Horse Purchase Agreement (the "Stalking Horse Bid") shall be deemed a Qualified Bid.  The Stalking Horse Bidder is not required to make a Good Faith Deposit.  The Stalking Horse Bidder is entitled to a break-up fee of $250,000 and expense reimbursement up to $500,000 in the event the Stalking Horse Purchase Agreement is terminated pursuant to Article 11 thereof.

**III.      The Bidding Procedures.**

11.      The Bidding Procedures, substantially in the form attached hereto as **Exhibit 2**, are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all bids relating to the proposed sale of the Assets.  Any party desiring to bid on one or more individual Assets or all or substantially all of the Assets shall comply with the Bidding Procedures and this Order.  The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

12.      Each bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale, as set forth in the Bidding Procedures.

13.     Any Qualified Bidder who has a valid and perfected lien on any Assets (a "Secured
Creditor") and the right and power to credit bid claims secured by such liens, shall have the right
to credit bid all or a portion of such Secured Creditor's secured claims within the meaning of
section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to
credit bid its secured claim only with respect to the collateral by which such Secured Creditor is
secured.  Notwithstanding the foregoing, nothing shall affect any rights of parties in interest, if
any, with respect to challenging whether any Qualified Bidder has a valid secured claim and such
bidder's right to credit bid if the Court determines that such bidder does not have a valid secured
claim.

14.     The Debtors may, in consultation with the Consultation Parties: (a) determine
which Qualified Bid or combination of Qualified Bids is the highest or otherwise best offer for
each Asset or Assets; (b) reject at any time before entry of an Order of the court approving the
Successful Bid, any bid that, in the discretion of the Debtors, is (i) inadequate or insufficient,
(ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or
(iii) contrary to the best interests of the Debtors' estates and their creditors; and (c) at or before the
conclusion of the Auction, may impose such other terms and conditions upon Qualified Bidders
as the Debtors determine, in consultation with the Consultation Parties, to be in the best interests
of the Debtors' estates in these cases.

15.     The Debtors are deemed to have complied with all contractual rights of first refusal,
or similar contractual purchasing rights, regarding the Assets.  The Bidding Procedures and the
notice thereof provide all parties in interest with notice of, and the opportunity to participate in,
any potential Sale and/or Auction.

IV.    **Notice Procedures.**

16.    The form of Sale Notice substantially in the form attached hereto as **Exhibit 3** is approved.

17.    On or before three business days after the entry of this Order, the Debtors shall serve the Order and Bidding Procedures by first-class mail or courier service upon: a) the U.S. Trustee for the Southern District of Ohio; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Take-Back Facility; (d) Javelin Investment Holdings LLC; (e) counsel to the Ad Hoc Group of Prepetition Term Loan Lenders; (f) the administrative agent under the Debtors' proposed debtor-in-possession financing facility; (g) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors operate; (h) the offices of the attorneys general for the states in which the Debtors operate; (i) the United States Attorney's Office for the Southern District of Ohio; (j) the Internal Revenue Service; (k) the Pension Benefit Guaranty Corporation; (l) counsel to the Stalking Horse Bidder; (m) the Contract Counterparties (as defined herein), (n) all parties who have expressed a written interest in some or all of the assets; (o) all known holders of liens, encumbrances, and other claims secured by the assets; (p) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (q) counsel to each of the lenders of the Debtors' proposed debtor-in-possession financing facility; (r) Murray Energy; (s) Javelin Global; (t) all taxing authorities; (u) all mechanic's lien claimants; (v) all lessors; and (w) any party that has requested notice pursuant to Bankruptcy Rule 2002.

18.     In addition, within five business days of entry of the Order, the Debtors shall publish the Sale Notice, with any modifications necessary for ease of publication, once in *USA Today (National Edition)* and once in *The Columbus Dispatch*, to provide notice to any other potential interested parties.

## V.     The Assumption Procedures.

19.     The Assumption and Assignment Procedures set forth in the Bidding Procedures Motion regarding the assumption and assignment of the Assigned Contracts proposed to be assumed by Maple Eagle and assigned to a Successful Bidder are approved.

A.     **Cure Notice**.  On or before March 7, 2020, with the Consent of the Stalking Horse Bidder (such consent not to be unreasonably withheld or conditioned) and subject to consultation with the Consultation Parties, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Cure Notice annexed as **Exhibit 4** to this Order on all Contract Counterparties, and post the Cure Notice to the Case Website (https://cases.primeclerk.com/MurrayMET).

B.     **Content of Cure Notice**.  The Cure Notice shall notify the applicable Contract Counterparties that the Assigned Contracts may be subject to assumption and assignment in connection with a proposed sale transaction, and contain the following information: (i) a list of the Assigned Contracts; (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimates of the Cure Costs; and (iv) the deadline by which any Contract Counterparty to an Assigned Contract may file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto; *provided* that service of a Cure Notice does not constitute an admission that such Assigned Contract is an executory contract or unexpired lease or that such Assigned Contract will be assumed at any point by Maple Eagle or assumed and assigned pursuant to any Successful Bid.

C.     **Customized Cure Notice**.  The Debtors shall serve on all Contract Counterparties, via first class mail or electronic mail, a customized version of the Cure Notice, without the Assigned Contracts Schedule, which will include: (a) the Prime Clerk Instructions; (b) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of Assigned Contracts and rights thereunder; (c) Cure Costs, if any; and (d) the Necessary Notice Information.  The Debtors shall serve on the Rule 2002 Notice List, via first class mail or electronic mail, a modified

version of the Cure Notice that contains the Prime Clerk Instructions and Necessary Notice Information.  Service as set forth herein shall be deemed proper, due, timely, good, and sufficient notice and no other or further notice is necessary.

D.      **Objections**.  Objections, if any, to a Cure Notice must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served so as to be **actually received** by counsel to the Debtors prior to **March 20, 2020, at 4:00 p.m. (prevailing Eastern Time)**; *provided* that the Debtors, subject to consultation with the Consultation Parties, may modify the Cure Objection Deadline by filing a notice of such modification on the Court's docket.

E.      **Effects of Filing an Objection to a Cure Notice**.  A properly filed and served objection to a Cure Notice will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Assigned Contract at issue, and/or objection to the accompanying Cure Costs, as set forth in the objection, but will not constitute an objection to the remaining relief requested in the Sale to the Successful Bidder.

F.      **Dispute Resolution**.  Any objection to the proposed assumption and assignment of an Assigned Contract, or Cure Costs, that remain unresolved as of the Sale Hearing, shall be heard at the Sale Hearing (or at such later date as may be fixed by the Court).  Upon entry of an order by the Court resolving such Assigned Contract Objection, the assignment, if approved by the Court, shall be deemed effective as of the later of either (i) the date such Contract Counterparty receives the Cure Notice, or (ii) the Effective Date.  To the extent that any Assigned Contract Objection cannot be resolved by the parties, such Assigned Contract shall be assumed and assigned only upon satisfactory resolution of the Assigned Contract Objection, to be determined in the Stalking Horse Bidder's or other Successful Bidder's reasonable discretion.  To the extent an Assigned Contract Objection remains unresolved, the Assigned Contract may be conditionally assumed and assigned, subject to the consent of the Stalking Horse Bidder or other Successful Bidder, pending a resolution of the Assigned Contract Objection after notice and a hearing.  If an Assigned Contract Objection is not satisfactorily resolved, the Stalking Horse Bidder or other Successful Bidder may determine that such Assigned Contract should be rejected and not assigned, in which case the Stalking Horse Bidder or other Successful Bidder will not be responsible for any Cure Costs in respect of such contract.

G. **Supplemental Cure Notice**.  The Debtors reserve the right, with the consent of the Successful Bidder(s) and subject to consultation with the Consultation Parties, at any time after the Assumption and Assignment Service Date, to:  (a) supplement the Assigned Contract Schedule attached to the Cure Notice with previously omitted Assigned Contracts in accordance with the definitive agreement for a Sale; (b) remove any Assigned Contracts from the list of executory contracts and unexpired leases ultimately selected as Assigned Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale or add to such list; and/or (c) modify the previously stated Cure Costs associated with any Assigned Contracts (a "<u>Supplemental Assigned Contracts Schedule</u>"). In the event that the Debtors exercise any of the rights reserved above, the Debtors will promptly provide the Consultation Parties with notice and an opportunity to object to any such actions, and thereafter will serve a Supplemental Cure Notice by electronic transmission, hand delivery, or overnight mail on the applicable Contract Counterparty, and its attorney, if known, to each impacted Assigned Contract at the last known address available to the Debtors.  Each Supplemental Cure Notice will include the same information with respect to listed Assigned Contracts as was included in the Cure Notice.   Any Assigned Contract Counterparty listed on a Supplemental Cure Notice may file a Supplemental Assigned Contract Objection only if such objection is to the proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any.  All Supplemental Assigned Contract Objections must: (a) state with specificity the legal and factual basis thereof as well as what Cure Costs the objecting party believes are required, if any; (b) include appropriate documentation in support of the objection; and (c) be filed and served on the Objection Recipients no later than 4:00 p.m. (prevailing Eastern Time) on the date that is the later of (i) the Sale Objection Deadline and (ii) seven days from the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice (the "<u>Supplemental Assigned Contract Objection Deadline</u>").

H. **Supplemental Hearing**.  If a Contract Counterparty files a Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors will seek a Supplemental Assigned Contract Hearing to determine the Cure Costs, if any, and approve the assumption of the relevant Assigned Contracts.  If there is no such objection, then the Debtors will obtain entry of an order, including by filing a certification of no objection, fixing the Cure Costs and approving the assumption of any Assigned Contract listed on a Supplemental Cure Notice.

20.     If a Contract Counterparty does not file and serve an Assigned Contract Objection or Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (a) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Assigned Contract or any other document, and (b) the Contract Counterparty will be deemed to have consented to the assumption and assignment of the Assigned Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption and assignment of such Assigned Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Assigned Contract against Maple Eagle or the Successful Bidder, or the property of any of them.

21.     Any objections to the Successful Bidder's proposed form of adequate assurance of future performance must be filed no later than the later of the Sale Hearing or Supplemental Assigned Contract Objection Deadline, as applicable, and such objections will be resolved at the Sale Hearing or Supplemental Assigned Contract Hearing, as applicable.  The Debtors may adjourn the resolution of any such objection to a later hearing.

22.     The inclusion of an Assigned Contract on the Assigned Contract Schedule, Supplemental Assigned Contract Schedule, and/or in a Supplemental Cure Notice will not: (a) obligate Maple Eagle to assume any Assigned Contract listed thereon or obligate the Successful Bidder to take assignment of such Assigned Contract; or (b) constitute any admission or agreement of the Debtors that such Assigned Contract is an executory contract or unexpired lease.  Only those Assigned Contracts that are included on a schedule of assumed and assigned contracts attached to the definitive sale agreement with the Successful Bidder (including amendments or modifications

14

to such schedules in accordance with such agreement) will be assumed and assigned to the Successful Bidder.

23.    Solely in respect of the procedures for assuming and assigning, or rejecting, Executory Contracts or Unexpired Leases, in the event of any inconsistencies between this Order, the Bidding Procedures Motion, or the Bidding Procedures, this Order shall govern in all respects.

## VI.    Miscellaneous.

24.    Notwithstanding anything to the contrary in the Motion or this Order, the relief set forth herein shall be subject to the terms, conditions, limitations, and requirements of the *Final Order (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 364(c)(1), 364(c)(2), 363(c)(3), 364(d)(1) and 364(e), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c)* (together with any approved budget (including any permitted variances) in connection therewith, the "Final DIP Order"), and to the extent there is any inconsistency between the terms of the Final DIP Order and any action taken or proposed to be taken under this Order, the terms of the Final DIP Order (together with any approved budget (including any permitted variances) in connection therewith) shall control.

25.    The failure to include or reference a particular provision of the Bidding Procedures specifically in this Order shall not diminish or impair the effectiveness or enforceability of such provision.

26.     Nothing in this Order shall preclude (a) the Debtors from considering, negotiating and filing, (b) any party in interest from proposing to and negotiating with the Debtors, or (c) any party in interest from seeking relief to file, in each case, a plan of reorganization in lieu of or in connection with a sale of less than substantially all of Maple Eagle's assets.

27.     In the event of any inconsistency between this Order and the Motion and/or the Bidding Procedures, this Order shall govern in all respects.

28.     Notwithstanding anything to the contrary in the Bidding Procedures, any exclusivity, "no shop," or other provision in any Bid that purports to limit the Debtors' ability to market the Assets shall be null and void.

29.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

30.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

31.     The Debtors shall serve this Order in accordance with all applicable rules and shall file a certificate of service evidencing compliance with this requirement.

32.     The Debtors are authorized to take all reasonable actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

33.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

SO ORDERED.

Copies to Default List.

16

## **Exhibit 1**

**Stalking Horse Purchase Agreement**

**Execution Version**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF FEBRUARY 11, 2020**

**BETWEEN**

**PANTHER CREEK MINING, LLC, AS BUYER**

**AND**

**MURRAY MAPLE EAGLE COAL, LLC, AS SELLER**

**Page**

ARTICLE 1 Definitions..........................................................................................................1

    1.1     Definitions..........................................................................................................2
    1.2     Other Definitions and Interpretive Matters.....................................................15

ARTICLE 2 Purchase and Sale.............................................................................................17

    2.1     Purchase and Sale.............................................................................................17
    2.2     Excluded Assets...............................................................................................19
    2.3     Assumed Liabilities..........................................................................................20
    2.4     Excluded Liabilities..........................................................................................21
    2.5     Assignment and Assumption of Contracts.......................................................23
    2.6     Further Assurances...........................................................................................24

ARTICLE 3 Purchase Price...................................................................................................25

    3.1     Consideration....................................................................................................25
    3.2     Allocation of Purchase Price............................................................................25
    3.3     Withholding......................................................................................................26

ARTICLE 4 Closing and Deliveries......................................................................................26

    4.1     Closing Date......................................................................................................26
    4.2     Buyer's Deliveries............................................................................................26
    4.3     Seller's Deliveries.............................................................................................27
    4.4     Supplemental Assignments and Conveyances..................................................28

ARTICLE 5 Representations and Warranties of Seller .........................................................28

    5.1     Organization and Good Standing......................................................................28
    5.2     Authority; Validity; Consents..........................................................................28
    5.3     No Conflict........................................................................................................29
    5.4     Real Property....................................................................................................29
    5.5     Environmental and Health and Safety Matters ................................................29
    5.6     Title to Acquired Assets...................................................................................31
    5.7     Taxes.................................................................................................................31
    5.8     Legal Proceedings.............................................................................................32
    5.9     Compliance with Legal Requirements; Permits ..............................................33
    5.10    Labor Matters...................................................................................................34
    5.11    Employee Benefits............................................................................................35
    5.12    Seller's Intellectual Property............................................................................36
    5.13    Contracts...........................................................................................................36
    5.14    Insurance..........................................................................................................37
    5.15    Brokers or Finders............................................................................................37
    5.16    Affiliate Interests.............................................................................................37
    5.17    Mining..............................................................................................................38
    5.18    MSHA; OSHA..................................................................................................38
    5.19    Warranties Exclusive........................................................................................38

i

ARTICLE 6 Representations and Warranties of Buyer.................................................39

    6.1    Organization and Good Standing .....................................................39
    6.2    Authority; Validity; Consents ........................................................39
    6.3    No Conflict .....................................................................................40
    6.4    Brokers or Finders ..........................................................................40
    6.5    Legal Proceedings ..........................................................................40
    6.6    Qualification ...................................................................................40
    6.7    No Other Representations or Warranties; Condition of the Business; Buyer's
            Reliance ..........................................................................................41
    6.8    Information .....................................................................................41

ARTICLE 7 Actions Prior to the Closing Date ........................................................41

    7.1    Access and Reports; Confidentiality ...............................................41
    7.2    Operations Prior to the Closing Date ..............................................43
    7.3    Regulatory Matters; Cooperation ...................................................43
    7.4    Tax Cooperation .............................................................................44
    7.5    Bankruptcy Court Matters ..............................................................45
    7.6    Updates ...........................................................................................45
    7.7    Surety Bonds; Permits ....................................................................45
    7.8    Fiduciary Obligations .....................................................................48
    7.9    Sale Free and Clear ........................................................................48

ARTICLE 8 Additional Agreements ........................................................................48

    8.1    Taxes ..............................................................................................48
    8.2    Payments Received .........................................................................50
    8.3    Assumed Contracts: Adequate Assurance and Performance .............50
    8.4    Employee Matters ..........................................................................50
    8.5    Post-Closing Books and Records and Personnel .............................51
    8.6    Casualty Loss .................................................................................52
    8.7    Insurance Cooperation ....................................................................52
    8.8    No Use by Buyer of Murray Brand IP ............................................53

ARTICLE 9 Conditions Precedent to Obligations of Buyer to Close ...........................53

    9.1    Accuracy of Representations ...........................................................53
    9.2    Seller's Performance .......................................................................53
    9.3    No Order .........................................................................................53
    9.4    Governmental Authorizations .........................................................54
    9.5    Seller's Deliveries ..........................................................................54
    9.6    Sale Order ......................................................................................54
    9.7    Material Adverse Effect ..................................................................54
    9.8    Frustration of Conditions ................................................................54

ARTICLE 10 Conditions Precedent to the Obligations of Seller to Close......................54

    10.1   Accuracy of Representations ...........................................................54
    10.2   Buyer's Performance ......................................................................55

ii

10.3    No Order ....................................................................................................................55
10.4    Governmental Authorizations.....................................................................................55
10.5    Sale Order ...................................................................................................................55
10.6    Buyer's Deliveries ......................................................................................................55

ARTICLE 11 Termination .................................................................................................................55

11.1    Termination Events .....................................................................................................55
11.2    Effect of Termination ..................................................................................................57

ARTICLE 12 General Provisions .....................................................................................................57

12.1    Survival .......................................................................................................................57
12.2    Confidentiality ............................................................................................................57
12.3    Public Announcements ................................................................................................58
12.4    Notices ........................................................................................................................58
12.5    Waiver..........................................................................................................................59
12.6    Entire Agreement; Amendment ..................................................................................59
12.7    Assignment ..................................................................................................................60
12.8    Severability ..................................................................................................................60
12.9    Expenses ......................................................................................................................60
12.10   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver..............60
12.11   Counterparts ................................................................................................................61
12.12   Parties in Interest; No Third Party Beneficiaries; No Amendment .......................61
12.13   Remedies .....................................................................................................................61
12.14   Specific Performance ..................................................................................................61

113605837v25

### ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of February 11, 2020 (the "Execution Date"), is made and entered into between Panther Creek Mining, LLC, a Delaware limited liability company ("Buyer"), and Murray Maple Eagle Coal, LLC, a Delaware limited liability company ("Seller"). Capitalized terms used herein and not otherwise defined herein have the respective meanings set forth in Article 1.

### RECITALS

**WHEREAS**, Seller is engaged in the business of mining, processing, marketing and selling coal through the Maple Eagle (West Virginia) mining complex, which for avoidance of doubt includes the Maple Eagle No.1 underground mine, the Sycamore surface mine, the Maple Eagle/Katie preparation plant and any other facilities primarily related to the foregoing;

**WHEREAS**, Seller anticipates filing a voluntary petition (the "Bankruptcy Case") under chapter 11 of Title 11 §§101-1330 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Ohio (the "Bankruptcy Court");

**WHEREAS**, on the terms and subject to the conditions set forth in this Agreement and the entry of the Sale Order, (a) Seller desires to sell to Buyer all the Acquired Assets and to assign to Buyer all the Assumed Liabilities, (b) Buyer desires to purchase from Seller all the Acquired Assets and assume all the Assumed Liabilities, and (c) the Parties intend to effectuate the transactions contemplated hereby;

**WHEREAS**, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Buyer pursuant to the Sale Order, free and clear of all Encumbrances (other than Permitted Encumbrances), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 4001, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, Seller's ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court; and

**WHEREAS**, the sole member of Seller has determined that it is advisable and in the best interests of Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and has approved the same;

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants and agreements herein contained, the receipt and sufficiency of which hereby are acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE 1

### DEFINITIONS

1.1     Definitions.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"503(b)(9) Liabilities" means those certain administrative expense claims of the Business arising under 503(b)(9) of the Bankruptcy Code.

"Accounts Receivable" means, with respect to Seller, if any, all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that has not been billed, chattel paper, notes and other rights to payment, including those consisting of all accounts receivable in respect of services rendered or products sold to customers by Seller, any other miscellaneous accounts receivable of Seller, and any claim, remedy or other right of Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto.

"Accrued Payroll" means (i) all wages and other related obligations of the Business that have accrued since the end of the last payroll period immediately prior to the Closing Date, and (ii) all accrued paid time off relating to the Business.

"Acquired Assets" has the meaning set forth in Section 2.1.

"Action" means any action, suit, petition, plea, charge, claim, demand, hearing, inquiry, arbitration, complaint, grievance, summons, litigation, mediation, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, inquest, audit, examination, investigation or similar matter by or before any Governmental Authority.

"Affiliate" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Exchange Act.

"Agreement" has the meaning set forth in the introductory paragraph.

"Alternative Transaction" means (i) the filing of a plan of reorganization contemplating the sale or retention of all or any portion of the Acquired Assets that is inconsistent with the terms of this Agreement, or (ii) a sale, lease or other disposition directly or indirectly by merger, consolidation, tender offer, share exchange or otherwise to one or more third parties of all or substantially all the Acquired Assets, in each case excluding the transactions contemplated hereby.

"Antitrust Law" means, collectively, the HSR Act, Title 15 of the United States Code §§ 1-7, (the Sherman Act), Title 15 of the United States Code §§ 12-27 and Title 29 of the United States Code §§ 52-53, (the Clayton Act), the Federal Trade Commission Act (15 U.S.C.§ 41 et seq.) and the rules and regulations promulgated thereunder and any other Legal Requirements that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, as such of the foregoing are enacted and in effect as of the date hereof.

2

"Applicant Violator System" means the Applicant Violator System established pursuant to the SMCRA or any similar applicable state system.

"Apportioned Taxes" has the meaning set forth in Section 8.1(b).

"Assumed Contracts" has the meaning set forth in Section 2.5(a).

"Assumed Cure Costs" means all Cure Costs other than Excluded Cure Costs.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumption Agreement" means an Assignment and Assumption Agreement in customary form reasonably acceptable to the Parties.

"Available Contracts" has the meaning set forth in Section 2.5(a).

"Avoidance Action" means any claim, right or cause of action of Seller arising under Chapter 5 of the Bankruptcy Code and any analogous state law claims relating to the Acquired Assets or the Business.

"Bankruptcy Case" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Benefit Plan" and "Benefit Plans" have the meanings set forth in Section 5.11(a).

"Bidding Procedures" means bidding procedures in the form attached as Exhibit 2 to the Bidding Procedures Order, with such amendments thereof or supplements thereto as approved by Buyer and Seller.

"Bidding Procedures Order" means the *Order (I) Authorizing the Entry into and Performance under the Stalking Horse Purchase Agreement, (II) Approving Bidding Procedures for the Sale of Assets, (III) Scheduling Hearings and Objection Deadlines with Respect to the Sale, (IV) Scheduling Bid Deadlines and an Auction, (V) Approving the Form and Manner of Notice Thereof, (VI) Approving Contract Assumption and Assignment Procedures, and (VII) Granting Related Relief* to be entered into by the Bankruptcy Court, with such amendments thereof or supplements thereto as approved by Buyer and Seller.

"Bill of Sale" means a Bill of Sale in customary form reasonably acceptable to the Parties.

"Black Lung Act" means the Federal Coal Mine Safety and Health Act of 1969, the Black Lung Benefits Act of 1972, the MSHA, the Black Lung Benefits Reform Act of 1977, or and the Black Lung Benefits Amendments of 1981.

3

"Business" means the business and operations of Seller related to (i) the business and operations related to metallurgical coal, exploration and extraction and related operations at the Maple Eagle (West Virginia) mining complex, which for avoidance of doubt includes the Maple Eagle No.1 underground mine, the Sycamore surface mine, the Maple Eagle/Katie preparation plant and any other facilities primarily related to the foregoing, and (ii) the selling, marketing, purchasing and blending of coal and related operations related to the Acquired Assets, in each case of the foregoing clauses (i) and (ii), other than with respect to such business and operations to the extent they relate to any Excluded Assets or Excluded Liabilities.

"Business Day" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required, unable to or authorized to close.

"Buyer" has the meaning set forth in the introductory paragraph.

"Buyer Employees" has the meaning set forth in Section 8.4(a).

"Cash Consideration" means an amount equal to the sum of (i) Seven Hundred Fifty Thousand Dollars ($750,000).

"Claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, against Seller.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Coal Act" means the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701, et seq.

"Coal Reserves" means any and all of the coal located upon or within the Owned Real Property or Leased Real Property to the extent owned by Seller.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"Code" means the Internal Revenue Code of 1986.

"Collective Bargaining Agreement" has the meaning set forth in Section 5.10(a).

"Contract" means any legally binding agreement, contract, obligation, promise, undertaking, lease (including Leases), sublease, purchase order, arrangement, license, commitment, insurance policy or other binding arrangement or understanding (in each case whether written or oral), and any amendments, modifications or supplements thereto.

"Copyrights" means all United States and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

4

"Cure Costs" means all monetary liabilities, including pre-petition monetary liabilities, of Seller that must be paid or otherwise satisfied to cure all of Seller's monetary defaults under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code.

"Cure Notice" means, with respect to each Available Contract, the notice submitted by Seller to the counterparty or counterparties thereto pursuant to the Bidding Procedures Order setting forth, among other things, the Cure Cost amount with respect thereto as calculated by Seller.

"Data Room" means that certain virtual data room maintained under the name "Maple Eagle VDR" by or on behalf of Seller in connection with the Bankruptcy Case and hosted by Intralinks.

"Deeds" means (i) unless otherwise provided in a Schedule to this Agreement with respect to conveyance of a particular parcel of Real Property, special (or limited) warranty deeds, or jurisdictional equivalents, as the case may be, in recordable form for the appropriate jurisdiction, reasonably acceptable to Buyer, transferring title to the Real Property other than Leased Real Property and Improvements thereon (subject only to Permitted Encumbrances), and (ii) if expressly provided in a Schedule to this Agreement with respect to conveyance of a particular parcel of Real Property, the type of deed or other instrument so specified.

"Determination Date" has the meaning set forth in Section 2.5(a).

"Disclosure Schedules" means the Disclosure Schedules attached hereto, dated as of the date hereof, delivered or made available by Seller to Buyer in connection with the execution of this Agreement, as the same may be supplemented and amended pursuant to Sections 2.5(a) and 7.6.

"Documents" means all of the documents that are used in, held for use in, or that are primarily related to the Business.

"Employees" means all of the employees of Seller on the Execution Date, as well as any additional persons who become employees of Seller in the Ordinary Course of Business of Seller during the period from the Execution Date through and including the Closing Date.

"Encumbrance" means any "interest", as that term is used in Section 363(f) of the Bankruptcy Code, charge, lien, Claim, right, demand, mortgage, lease, debt, losses, damage, demand, fine, judgment, penalty, liability, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, premium, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, rights of others, easement, restrictive covenant, right of way, preemptive right, conditional sale, servitude, conditional sale agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition or otherwise), encroachment, encumbrance, third party interest or other restriction or limitation of any kind, whether imposed by Contract, Legal Requirement, equity or otherwise.

"Environmental Claim" means any written notice of violation, action, claim, Lien, demand, abatement or other Order or directive (conditional or otherwise) by any Governmental

5

Authority or any other Person (including any customer, employee or former employee of any contractor or subcontractor of Seller or the Business) for personal injury (including sickness, disease or death), property damage, damage to the environment (including natural resources), nuisance, pollution, contamination, trespass or other adverse effects on the environment, or for fines, penalties or restrictions resulting from or based upon (i) the Release or threatened Release of or exposure to, any Hazardous Substance, (ii) the manufacture, distribution, use, transport, treatment, storage, disposal, Release or threatened Release, or exposure to Hazardous Substances, (iii) the violation, or alleged violation, of any Environmental, Health and Safety Law or Environmental Permit, or (iv) any contractual obligation to any other Person for or in connection with Releases of Hazardous Substances or violations of any Environmental, Health and Safety Law or Environmental Permit.

"Environmental, Health and Safety Laws" means any and all applicable Legal Requirements concerning or relating to (i) public health and safety (to the extent relating to Release of or exposure to Hazardous Substances), (ii) worker/occupational health and safety (to the extent relating to Release of or exposure to Hazardous Substances), (iii) land use, zoning, odor or noise, or (iv) pollution or protection of the environment or natural resources, including but not limited to those relating to (A) the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, storage, disposal, distribution, importing, labeling, testing, processing, discharge, Release, threatened Release, control, or cleanup involving Hazardous Substances, (B) SMCRA (including its implementing regulations and any state analogs), (C) MSHA, (D) human health as affected by Hazardous Substances, (E) acid mine drainage, and (F) mining operations and activities to the extent relating to Reclamation.

"Environmental Permit" means any and all Permits required under any applicable Environmental, Health and Safety Law.

"Equipment" means all furniture, fixtures, equipment, computers, machinery, vehicles, apparatus, appliances, implements, telephone systems, signage, supplies and all other tangible personal property of every kind and description, and Improvements and tooling used, or held for use, in each case primarily in connection with the operation of the Business, wherever located, including communications equipment, information technology assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties of the vendor applicable thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any Person, trade or business that would be considered a single employer with Seller or any Subsidiary of Seller under Sections 414(b), 414(c), 414(m) or 414(o) of the Code or Section 4001(b) of ERISA or would be under "common control" with Seller or any Subsidiary of Seller within the meaning of Section 4001(a)(14) of ERISA. Any former ERISA Affiliate shall continue to be considered an ERISA Affiliate within the meaning of this definition with respect to the period such entity was an ERISA Affiliate and with respect to Liabilities arising during such period (but, for the avoidance of doubt, not after such period) for which such Person could be liable under the Code or ERISA.

6

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" has the meaning set forth in Section 2.5(a).

"Excluded Cure Costs" means all Cure Costs in connection with the Kingston Sublease and the Pardee Lease.

"Excluded Fines and Penalties" means all monetary fines or penalties assessed or asserted by any Governmental Authority for which Seller or any of its Affiliates have received a written notice of violation, notice of claim, or other notice of similar legal intent or meaning, and to the extent arising from facts or circumstances first existing or occurring, on or prior to the Closing Date and arising out of or related to:  (i) any of the Transferred Permits; (ii) any mine operating or safety compliance matters related to the condition of the Acquired Assets or the mining areas of the Business; (iii) the Acquired Assets' or the Business' compliance with Environmental Laws; and (iv) any conditions arising from any spill, emission, release or disposal into the environment of, or human exposure to, Hazardous Materials resulting from the operation of the Acquired Assets or the Business.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Execution Date" has the meaning set forth in the introductory paragraph.

"FASB 410" has the meaning set forth in Section 5.17(b).

"Final Order" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to by Buyer) and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Action or Order shall have become final in accordance with Bankruptcy Rule 8002; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"FLSA" means Fair Labor Standards Act and any state or local laws governing wages, hours, and/or overtime pay.

"GAAP" means generally accepted accounting principles in the United States of America, consistently applied.

"Governmental Authority" means any United States federal, state or local or any foreign government, multi-national organization, quasi-governmental authority, or other similar recognized governmental authority or regulatory or administrative authority, agency or commission or any court, tribunal or judicial body having jurisdiction.

"Governmental Authorization" means any approval, consent, license, Permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"Hazardous Substance" means (i) any substance, element, compound, material, or chemical that is defined, listed or otherwise classified as a "pollutant," "contaminant," "hazardous waste," "hazardous material" or "hazardous substance" or words of similar import, and is regulated under any Environmental, Health and Safety Laws or any other substance, pollutant, contaminant, waste or related material, or combination thereof, whether solid, liquid, or gaseous in nature, subject to regulation, investigation, remediation, control or corrective action under any Environmental, Health and Safety Laws, in each case due to its toxic, hazardous, dangerous or deleterious properties or characteristics, (ii) petroleum and its refined products, (iii) polychlorinated biphenyls in regulated amounts, (iv) any substance exhibiting characteristics of corrosivity, ignitability, toxicity or reactivity as well as any radioactive or explosive materials, and (v) asbestos, asbestos-containing materials, lead, radon, radioactive materials and substances, and urea formaldehyde in regulated amounts.

"Hearing" means the hearing to consider approval of the transactions contemplated hereby.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, and the rules and regulations promulgated thereunder.

"Improvements" means the buildings, structures, fixtures, systems, facilities, easements, rights-of-way, privileges, improvements, PP&E, licenses, hereditaments, appurtenances and all other rights and benefits appurtenant to or located on the Owned Real Property or Leased Real Property.

"Indebtedness" means, at any time and with respect to any Person:  (i) all indebtedness of such Person for borrowed money; (ii) all indebtedness of such Person for the deferred purchase price of property or services, all carry obligations, all conditional sale obligations and all obligations under any title retention agreement (other than Trade Payables, other expense accruals and deferred compensation items arising in the Ordinary Course of Business); (iii) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the Ordinary Course of Business in respect of which such Person's liability remains contingent); (iv) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of Seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (v) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases, to the extent required to be so recorded; (vi) all reimbursement, payment or similar obligations of such Person, contingent or

8

otherwise, under acceptance, letter of credit or similar facilities; (vii) any accrued interest, premiums, penalties, breakages, "make whole amounts" and other obligations relating to the foregoing that would be payable in connection with the repayment of the foregoing; (vii) all Indebtedness of others referred to in clauses (i) through (vi) above guaranteed directly or indirectly by such Person; and (viii) all Indebtedness referred to in clauses (i) through (vii) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Encumbrance upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Intellectual Property" means all intellectual property, including all Copyrights, Patents, Trademarks and Trade Secrets, owned by Seller and primarily held for use in the Business or the Acquired Assets, excluding the Murray Brand IP.

"Inventory" has the meaning set forth in Section 2.1(a).

"IRS" has the meaning set forth in Section 5.11(b).

"Kingston Sublease" means that certain Sublease Agreement, dated August 2, 2018, as subsequently assigned to Seller pursuant to that certain Lease Assignment and Assumption Agreement, dated April 30, 2019, among Mission Coal Company, LLC, Mission Seminole and other "Sellers" party thereto and Seller and other "Transferees" party thereto.

"Knowledge" means, with respect to any matter in question, in the case of Seller, the actual knowledge of any of the individuals listed on Schedule 1.1(b).

"Lease" has the meaning set forth in the definition of "Leased Real Property."

"Lease Assignments" means one or more assignment and assumption agreements to assign to Buyer any Leases that are to be assumed by Buyer pursuant to this Agreement, in customary form and reasonably acceptable to the Parties.

"Leased Real Property" means, specifically excluding any Excluded Asset, the interests in the real property and real property let, leased or subleased by Seller, as tenant, subtenant, lessee or sublessee, or in which Seller has been granted a possessory interest or right to use or occupy all or any portion of the same including as the same are evidenced by any and all mining leases, coal leases, coal mining leases, underground coal mining and gob gas leases, coal land leases, coal degasification leases, use agreements or other occupancy agreements and all short form leases, memoranda and amendments relating to the foregoing together with, in each case to the extent let, leased, used or occupied by Seller in connection with the Business or the Acquired Assets, any and all underground and surface coal reserves, mineral rights, oil and gas rights and interests, mining rights, surface rights, water rights, rights of way unrecouped minimum, advance or pre-paid production royalties, all buildings and other structures, facilities or Improvements located thereon, all fixtures, systems, Equipment and items of personal property of Seller attached or appurtenant thereto, and all easements, licenses, rights and appurtenances relating to the foregoing (and any present or future rights, title and interests

arising from or related to the foregoing) (each such lease, a "<u>Lease</u>," and collectively, the "<u>Leases</u>").

"<u>Legal Requirement</u>" means any federal, state, provincial, local, municipal, foreign, international, or multinational law (statutory, common or otherwise), constitution, treaty, convention, ordinance, equitable principle, code, rule, regulation or Order enacted, adopted, promulgated, issued or applied by any Governmental Authority or other similar authority, including for the avoidance of doubt MSHA, OSHA, and any Mining Law.

"<u>Liability</u>" means a Claim or Encumbrance of any kind or nature whatsoever (whether known or unknown, asserted or unasserted, direct or indirect, matured or unmatured, absolute or contingent, currently existing or hereinafter arising, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and however arising).

"<u>Material Adverse Effect</u>" means any change, event, state of facts or occurrence that individually or in the aggregate has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on the Acquired Assets (excluding the Excluded Assets), in each case taken as a whole or, excluding any change or effect to the extent that it results from or arises out of:  (i) any reasonably anticipated effects of the filing, commencement or prosecution of the Bankruptcy Case; (ii) the execution and delivery of this Agreement or the announcement thereof or consummation of the transactions contemplated hereby; (iii) changes in Legal Requirements or accounting regulations (including GAAP); (iv) any specific action required to be taken (or omitted) hereby or taken (or omitted) at the written request of Buyer; (v) general or technological changes in the industries in which Seller competes; (vi)  any breach of this Agreement by Buyer; (vii) any changes in financial or securities markets generally or any change or effect of economic or political conditions (including acts of terrorism, hostilities, sabotage, military actions or war, or any material worsening of such acts of terrorism, hostilities, sabotage, military actions or war); or (viii) acts of nature (including earthquakes, storms, severe weather, fires, floods and natural catastrophes) in each case of clauses (iii), (v) and (vii) to the extent that such conditions do not disproportionately affect Seller as compared to other companies that are principally engaged in the same Business as Seller.

"<u>Material Contract</u>" means any Contract that may reasonably be expected to result in aggregate payments by or revenues to any party thereto greater than or equal to $100,000 during the current or any subsequent fiscal year.

"<u>Mining</u>" has the meaning set forth in the definition of Mining Law.

"<u>Mining Financial Assurances</u>" has the meaning set forth in <u>Section 5.17(a)</u>.

"<u>Mining Law</u>" means all Legal Requirements relating to the exploration, extraction, processing, storage and transportation of coal and non-coal minerals and to the Reclamation of lands used for such activities (collectively referred to as "<u>Mining</u>"), including (i) SMRCA, and (ii) MSHA.

"<u>Mining Permits</u>" means all applicable Permits related to Mining or otherwise required by Mining Law.

10

"<u>Mission Contract Mining Agreement</u>" means that agreement entitled West Virginia Contract Mining Agreement, dated April 30, 2019, among Mission Seminole, Seller, Mission Coal Company, LLC and Seminole Coal Resources, LLC.

"<u>Mission Seminole</u>" means Seminole West Virginia Mining Complex, LLC, a Delaware limited liability company.

"<u>Mission Permits</u>" means those Permits listed on <u>Schedule 1.1(c)</u> that designate Mission Seminole as the permittee as of the Execution Date.

"<u>MSHA</u>" means the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § § 801 et. seq., and applicable state analogs.

"<u>Murray Brand IP</u>" means the "Murray" name, logo(s) and brand and any and all intellectual property rights therein or thereto (including any and all Trademarks consisting of, including or incorporating any of the foregoing), and all goodwill arising out of the use of any of the foregoing.

"<u>Notice</u>" has the meaning set forth in <u>Section 12.4</u>.

"<u>Order</u>" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, mandate, precept, command, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Authority or an arbitrator, mediator or other judicially sanctioned Person or body.

"<u>Ordinary Course of Business</u>" means, with respect to any Person, the ordinary and usual course of normal day-to-day operations of such Person and its business, consistent with its past practice.

"<u>OSHA</u>" means the Occupational Safety and Health Act and state analogs.

"<u>Outside Date</u>" has the meaning set forth in <u>Section 11.1(b)(ii)</u>.

"<u>Owned Real Property</u>" means, specifically excluding any Excluded Asset, all real property owned by Seller, and all right, title and interest of Seller therein, together with all of Seller's right, title and interest in and to the following: (i) all buildings, structures, systems, hereditaments and Improvements located on such real property owned by Seller, (ii) all Improvements, fixtures, systems, mine infrastructure, preparation plant structures and Improvements, loadout structures and Improvements, storage facilities, rail sidings, machinery, apparatus, equipment and items of personal property affixed to such real property owned by Seller, (iii) all rights of way, easements, if any, in or upon such real property owned by Seller, licenses and all rights-of-way, beneficial easements, licenses, and other rights, privileges and appurtenances belonging or in any way pertaining to such real property interests owned by Seller (including the right, title and interest of Seller in and to any Coal Reserves, mineral rights, underground and surface coal and mining rights, royalty rights, support rights and waivers, subsidence rights, water and water rights relating or appurtenant to such real property owned by Seller), (iv) all strips and gores and any land lying in the bed of any public road, highway or other access way, open or proposed, adjoining such real property owned by Seller, and (v) any

11

leases out to third parties affecting such real property owned by Seller, subject to any consents as may be required.

"Pardee Lease" means that certain Coal Lease, dated November 1, 2005, between Pardee Minerals, LLC and Maple Coal Co., LLC, as subsequently assigned to Seller pursuant to that certain Lease Assignment and Assumption Agreement, dated April 30, 2019, among Mission Coal Company, LLC, Mission Seminole and other "Sellers" party thereto and Seller and other "Transferees" party thereto.

"Party" or "Parties" means, individually or collectively, as applicable, Buyer and Seller.

"Patents" means United States and foreign patents and patent applications, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals and patent disclosures related thereto.

"Permits" means any and all permits (including Environmental Permits and Mining Permits), licenses, approvals, consents, waivers, franchises, filings, accreditations, registrations, certifications, certificates of occupancy, easements, rights of way, notifications, exemptions, clearances, and authorizations, together with all modifications, renewals, amendments, supplements and extensions thereof and applications therefor, of or from any Governmental Authority or issued or granted pursuant to any Legal Requirements, as amended, supplemented and modified through the Execution Date, that are necessary or required for Seller to currently own the Acquired Assets or to operate the Business as currently conducted or as otherwise conducted during periods from April 29, 2019 through current, and includes those Permits listed on Schedule 1.1(c).

"Permitted Encumbrances" means Encumbrances specifically permitted by the Sale Order.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group (as defined in Section 13(d)(3) of the Exchange Act) or Governmental Authority.

"Petition Date" means the date on which the Bankruptcy Case is filed, which date is expected to be on or about February 11, 2020.

"Post-Closing Tax Period" has the meaning set forth in Section 8.1(b).

"Pre-Closing Tax Period" has the meaning set forth in Section 8.1(b).

"Pre-Paid Expenses" means any of Seller's rights with respect to all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, pre-paid expenses, prepayments, rights under warranties or guaranties, vendor rebates, refunds, credits, rebates and prepayment(s) or deposits of property and other Taxes which are in respect of the Acquired Assets or the Business and other refunds of every kind and nature (whether or not known or unknown or contingent or

12

non-contingent); provided, however, that (i) each of Seller's rights which relate to any Taxes, including any refunds, credits and rebates related thereto shall be included as a Pre-Paid Expense only to the extent that such amount relates to an Assumed Liability of the Buyer, and (ii) any professional fee retainers and pre-paid deposits related thereto shall not be included in the definition of "Pre-Paid Expenses."

"Proceeding" means any Action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Purchase Price" has the meaning set forth in Section 3.1.

"Qualified Bid" has the meaning set forth in the Bidding Procedures.

"Real Property" and "Real Properties" means the Owned Real Property and the Leased Real Property.

"Real Property Taxes" means prepetition and postpetition Taxes related to Real Property, including real property Taxes, reclamation Taxes and other similar property Taxes.

"Reclamation" means reclamation, revegetation, recontouring, abatement, control, remediation, clean-up or prevention of adverse effects of mining activities, including, for the avoidance of doubt, reclamation of land, treatment of water (including perpetual water treatment) or other natural resources and Liabilities in connection with Transferred Permits.

"Release" means (i) any releasing, spilling, discharging, disposing, leaking, pumping, injecting, pouring, depositing, dispersing, emitting, leaching or migrating into the indoor or outdoor environment, including ambient air, surface water, groundwater and surface or subsurface strata, or into or out of any property, including the migration of Hazardous Substances through or in the air, soil, surface water, groundwater, surface or subsurface strata or property, and (ii) the abandonment or discarding of barrels, tanks, containers or receptacles, whether or not sealed or closed, containing Hazardous Substances.

"Remedial Action" shall mean any or all required actions to (i) clean up remove, treat, or in any other way address any Hazardous Substance, (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Substance, (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care, or (iv) correct or otherwise address any non-compliance with Environmental, Health and Safety Laws or Environmental Permits.

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Sale Order" means an order of the Bankruptcy Court, in form and substance satisfactory to Buyer and Seller, approving the consummation of the transactions contemplated hereby, which shall be outside of a plan of reorganization pursuant to Section 363 of the Bankruptcy Code, unless Buyer elects otherwise in its sole and absolute discretion.

13

"<u>Seller</u>" has the meaning set forth in the introductory paragraph.

"<u>Seller Insurance Policies</u>" has the meaning set forth in <u>Section 8.7</u>.

"<u>SMCRA</u>" means the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§1201 et seq.

"<u>Straddle Period</u>" has the meaning set forth in <u>Section 8.1(b)</u>.

"<u>Subsidiary</u>" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body.

"<u>Tax</u>" or "<u>Taxes</u>" (and with correlative meaning, "<u>Taxable</u>" and "<u>Taxing</u>") means: (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, unclaimed property, escheat, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto whether disputed or not); and (ii) any liability for any items described in clause (i) payable by reason of contract, transferee liability or operation of law (including Treasury Regulation Section 1.1502-6) or otherwise.

"<u>Tax Records</u>" means all Tax Returns, schedules and work papers, and all material records and other documents relating to Tax matters.

"<u>Tax Refund</u>" means any Tax refund, credit or similar benefit (including any interest paid or credited with respect thereto).

"<u>Tax Return</u>" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"<u>Taxing Authority</u>" means any Governmental Authority having jurisdiction over the assessment, determination, collection or other imposition of any Taxes.

"<u>Termination Payment</u>" means Two Hundred Fifty Thousand Dollars ($250,000) plus an amount equal to the reasonable out-of-pocket third party costs, fees and expenses of Buyer and its Affiliates (including reasonable costs, fees and expenses for legal, financial advisory, accounting, engineering, environmental and other services, and all filing fees, court costs, other regulatory fees and expenses) related to due diligence and other investigation of the

Business and the Acquired Assets, negotiation of this Agreement and all other documents, instruments and agreements contemplated herein or related hereto, or related to any and all filings in the Bankruptcy Case and applicable Proceedings related to or affecting this Agreement, including any sales procedures, bid procedures, cash collateral, bid protection or sale order, not to exceed Five Hundred Thousand Dollars ($500,000) in reimbursement of the foregoing, for a total not to exceed Termination Payment of Seven Hundred Fifty Thousand Dollars ($750,000), which payment shall be a super priority administrative expense of the debtor(s) in the Bankruptcy Case.

"Trade Payables" means accounts payable obligations and accrued expenses of Seller incurred at any time (including 503(b)(9) Liabilities with respect to any Assumed Contracts), solely to the extent that such obligations relate to the Acquired Assets, including accruals for Lease royalties, utilities and other uninvoiced purchases, but excluding (for the avoidance of doubt) any Liabilities under any Assumed Contracts).

"Trade Secrets" means trade secrets and other confidential and proprietary information and know-how.

"Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names, Internet domain names and any other similar designations of source of goods or services, whether registered or unregistered, and registrations and pending applications to register the foregoing, and all goodwill related to or symbolized by the foregoing.

"Transaction Documents" means this Agreement, the Assumption Agreement, the Bill of Sale, Lease Assignments, and any other agreements, instruments or documents entered into at the Closing pursuant to this Agreement.

"Transfer Taxes" has the meaning set forth in Section 8.1(a).

"Transferred Permits" means all Permits (including Environmental Permits and Mining Permits) held by Seller or used in the Business that primarily relate to the Business or the Acquired Assets, including those designated as "Transferred Permits" on Schedule 1.1(c); provided, however, that Schedule 1.1(c) and the definition of "Transferred Permits" shall be deemed updated and amended to exclude, without further action by any Party, any Permit that primarily relates to an Excluded Asset or an Excluded Liability.

"Treasury Regulations" means the Treasury regulations promulgated under the Code.

"WARN Act" has the meaning set forth in Section 5.10(d).

"WVDEP" means the West Virginia Department of Environmental Protection.

1.2    Other Definitions and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

15

(i)  <u>Calculation of Time Period</u>.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)  <u>Contracts, Agreements and Orders</u>.  Any reference in this Agreement to any contract, license, agreement or order means such contract, license, agreement or order as amended, supplemented or modified from time to time in accordance with the terms thereof.

(iii)  <u>Day</u>.  Any reference in this Agreement to "days" (but not Business Days) means to calendar days.

(iv)  <u>Dollars</u>.  Any reference in this Agreement to "$" means United States dollars.

(v)  <u>Exhibits and Schedules</u>.  All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

(vi)  <u>Gender and Number</u>.  Any reference in this Agreement to gender includes all genders, and any singular term shall be deemed to include the plural, and any plural term the singular.

(vii)  <u>Headings</u>.  The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section," "Article" or "Schedule" are to the corresponding Section, Article or Schedule of this Agreement unless otherwise specified.

(viii)  <u>Herein</u>.  Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear.

(ix)  <u>Including</u>.  The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x)  <u>Law</u>.  Any reference to any law in this Agreement means such law as amended, modified, codified, reenacted, supplemented or superseded in whole or in part, and in effect from time to time.

(xi)  <u>Other</u>.  The words "to the extent" shall be interpreted to mean "to the extent (but only to the extent)".

16

(xii) <u>Person</u>.  Any reference to a Person shall include such Person's successors and permitted assigns.

(xiii)      <u>Made Available</u>.  Any reference in this Agreement to "made available" shall mean that such documents or information referenced shall have been provided in the Data Room prior to the Execution Date or shall have been provided to Buyer or its Representatives prior to the Execution Date.

(b)      <u>No Strict Construction</u>.  Buyer, on the one hand, and Seller, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Seller, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limiting the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE 2

### Purchase and Sale

2.1    <u>Purchase and Sale</u>.

Subject to the entry of the Sale Order and on the terms and subject to the conditions of this Agreement, on the Closing Date, Seller shall unconditionally sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase, acquire and accept from Seller, free and clear of all Encumbrances (other than Permitted Encumbrances), all Seller's direct or indirect right, title and interest in, to or under the properties, rights, claims and assets to the extent primarily related to the Business (in each case, except for and to the extent related to the Excluded Assets or the Excluded Liabilities, as applicable) of every kind and description, wherever situated or located, real, personal or mixed, tangible or intangible, whether identifiable or contingent, owned, leased, licensed, used or held for use, whether or not reflected on the books and records of Seller, as the same shall exist on the Closing Date (collectively, the "<u>Acquired Assets</u>"), including the following:

(a)      all inventory of any kind or nature, merchandise and goods, primarily related to the Business or the Acquired Assets and maintained, held or stored by or for Seller on the Closing Date, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same, including all coal inventory located upon or within Seller's Owned Real Property or Leased Real Property or belonging to Seller, disposables and consumables used, or held for use, in connection with the Business, including any goods in transit ("<u>Inventory</u>");

(b)      all Equipment primarily used in the Business or located on the Real Property, including (i) any software installed on computers located on the Real Property, to the extent such software licenses are assignable, and (ii) those specific assets set forth on Schedule 2.1(b);

17

(c)      all Assumed Contracts;

(d)      all (i) Owned Real Property, and (ii) Leased Real Property (and any agreement and rights related thereto or under the applicable Lease to the extent that such agreement or Lease is an Assumed Contract), in each case, together with all interests in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(e)      all Coal Reserves to the extent of Seller's interest in such Coal Reserves, and all other mineral rights whether owned or leased, and all estate rights providing for the enjoyment of such mineral rights;

(f)      all rights to subside lands associated with mining operations and all rights to the waiver of and release from subsidence liability and indemnity rights under any and all conveyances, representations and instruments or agreements of any kind and nature applicable to Seller's coal mining activities and interests;

(g)      except to the extent prohibited by law, any rights of Seller to the warranties and licenses received from manufacturers or Seller of the Equipment, Improvements or any component thereof;

(h)      subject to Section 7.7(b) and obtaining the consents set forth on Schedule 5.2, all Transferred Permits held by Seller, to the extent assignable;

(i)      all rights of Seller to use haul roads, utility easements and other rights of way and easements used in the operation of the Business;

(j)      all Intellectual Property;

(k)      all Pre-Paid Expenses;

(l)      all goodwill, customer and referral relationships, other intangible property and all privileges, relating to, arising from or associated with any of the Acquired Assets (including the Intellectual Property), the Assumed Liabilities and/or the Business, in each case arising after the Closing;

(m)      to the extent permitted by Legal Requirements and not subject to attorney-client privilege or other work product privilege, all Documents and other books and records (financial, accounting and other) except to the extent primarily related to the Excluded Assets or the Excluded Liabilities, and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, that are used or useful in, held for use in or intended to be used in, or that arise in any way out of or are primarily related to, the Acquired Assets, the Assumed Liabilities or the Business; provided, however, that Seller shall be permitted to keep copies of all of the foregoing to the extent necessary or required by the Bankruptcy Court or in connection with the Bankruptcy Case, subject to Section 12.2;

18

(n)     all insurance proceeds, reserves, benefits or claims under the insurance policies maintained by or for the benefit of the Acquired Assets or the Business to the extent relating to the Acquired Assets, the Business or the Assumed Liabilities;

(o)     all rights, but not obligations, under non-disclosure or confidentiality, non-compete, or non-solicitation agreements (in each case, to the extent transferrable) or key employee retention plans or similar arrangements with (or for the benefit of) employees and agents of Seller or with third parties (including any such non-disclosure or confidentiality, non-compete, or non-solicitation agreements or any key employee retention plans or similar arrangements entered into in connection with or in contemplation of the auction contemplated by the Bidding Procedures (in each case, to the extent transferrable) to the extent relating to the Acquired Assets or the Business and included as an Assumed Contract);

(p)     all telephone, telex and telephone facsimile numbers and other directory listings; and

(q)     all proceeds and products of any and all of the foregoing Acquired Assets.

2.2     Excluded Assets.

Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign, convey or deliver any of the Excluded Assets to Buyer, and Seller shall retain all right, title and interest to, in and under, and all Liabilities with respect to, the Excluded Assets.  For all purposes of and under this Agreement, the term "Excluded Assets" shall consist of the following items, assets and properties:

(a)     the assets, if any, listed on Schedule 2.2(a);

(b)     (i) any Employee personnel files or records, and (ii) any and all Benefit Plans, and any assets, trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect thereof;

(c)     any shares of capital stock or other equity interest in or issued by Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock of other equity interest in or issued by Seller, and any shares of capital stock or other equity interest in or issued by any other entity in which Seller holds an equity interest, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any other entity in which Seller holds an equity interest.

(d)     subject to Section 2.1(m), the limited liability company, partnership and corporate books and records of internal limited liability company, partnership and corporate proceedings, minute books, organizational or governing documents, stock ledgers and other records of Seller as they pertain to ownership, organization, qualification to do business or existence of Seller;

(e)     Documents that Seller is required by Legal Requirements to retain;

19

(f)      any Contract that is not an Assumed Contract;

(g)      all rights under or arising out of insurance policies to the extent not set forth in Section 2.1(n);

(h)      the Cash Consideration;

(i)      all Accounts Receivable;

(j)      any rights, claims or causes of action of Seller under this Agreement or any other Transaction Document;

(k)      any deposits, escrows, surety bonds or other financial assurances and any cash or cash equivalents securing any surety bonds or financial assurances, in each case, described on Schedule 2.2(k);

(l)      all Tax Returns of, or filed by, Seller or its Affiliates for any Tax;

(m)      all (i) Avoidance Actions, and (ii) other causes of action belonging or available to Seller or its estate against other Persons;

(n)      all proceeds received from the sale or liquidation of any Excluded Assets;

(o)      all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank deposits, instruments and investments of Seller, including any cash collateral used to secure surety bonds or other transactional assurances and any deposits or other collateral for workers' compensation obligations, including, for the avoidance of doubt, the Cash Consideration, any proceeds from the sale of Excluded Assets;

(p)      any Tax Refund of Seller that is not described in Section 8.1(b) or relating to a Pre-Closing Tax Period; and

(q)      all Murray Brand IP.

2.3    Assumed Liabilities.

Subject to entry of the Sale Order, on the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer shall, effective at the time of the Closing, assume and agree to discharge and perform when due only the following Liabilities of Seller to the extent, and only to the extent, relating primarily to the Business or any of the Acquired Assets (collectively, the "Assumed Liabilities"):

(a)      all Liabilities under the Assumed Contracts (but excluding, for the avoidance of doubt, all Excluded Cure Costs);

(b)      all Liabilities relating to Buyer's ownership or use of any of the Acquired Assets, in each case for periods following the Closing Date;

20

(c)      all Assumed Cure Costs;

(d)      all Liabilities for Reclamation with respect to any of the Acquired Assets (and the use thereof), whether for periods prior to, on or following the Closing Date, but excluding for avoidance of doubt all Excluded Fines and Penalties;

(e)      all Liabilities relating to the Acquired Assets (and the use thereof) arising out of Environmental, Health and Safety Laws, Mining Law, MSHA, OSHA and any mine operating or safety compliance matters, in each instance arising out of actions taken or facts or circumstances existing following the Closing Date, but excluding for avoidance of doubt all Excluded Fines and Penalties;

(f)      all Liabilities under the Black Lung Act for all Buyer Employees first occurring on or after the lapse of the statutory period following the Closing Date for Buyer to become the responsible operator with respect to such Buyer Employees under the Black Lung Act; and

(g)      all Liabilities or other obligations relating to any of the Acquired Assets (and the use thereof) with respect to the WARN Act arising as a result of actions taken by Buyer or facts or circumstances created or under the control of Buyer existing following the Closing Date.

The assumption by Buyer of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

2.4      Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, (x) Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of, or Liability against, Seller, other than the Assumed Liabilities, and (y) Seller shall be solely and exclusively liable with respect to all Liabilities of Seller, other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "Excluded Liabilities"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include (1) any intercompany payables of the Business owing to any of Seller's Affiliates, (2) any Liabilities of Seller under this Agreement or any other Transaction Document, (3) all Trade Payables, and (4) each of the following Liabilities of Seller and Seller's Affiliates:

(a)      (i) all Liabilities with respect to (A) any Taxes imposed on or with respect to the Business or the Acquired Assets that are attributable to any Pre-Closing Tax Period as determined pursuant to Section 8.1, or (B) any Taxes related to the Excluded Assets; and (ii) all Liabilities for Taxes of Seller or its stockholders or members, including any Liability of Seller for the Taxes of any other Person under Section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise;

(b)      except as provided on Schedule 2.4(b) which shall constitute Assumed Liabilities, all Liabilities with respect to Actions and Proceedings pending before the Closing Date;

21

(c)     all Liabilities to any owner or former owner of capital stock or warrants, holder of Indebtedness for borrowed money, or current or former officer or director of Seller or any Affiliate of Seller;

(d)     all Excluded Cure Costs;

(e)     all Excluded Fines and Penalties;

(f)     all Liabilities with respect to any Excluded Asset, including (i) any Benefit Plan, (ii) Contracts that are not Assumed Contracts, (iii) any and all Collective Bargaining Agreements, if any, and (iv) Liabilities in respect of any compensation or benefit plans, agreements, policies, practices, programs and arrangements of any ERISA Affiliate, including any Benefit Plan;

(g)     except with respect to Assumed Contracts, all Liabilities under any futures contracts, options on futures, swap agreements or forward sale agreements;

(h)     drafts or checks of Seller or Seller's Affiliates outstanding at the Closing;

(i)     any and all Liabilities for Seller's costs and expenses incurred or owed in connection with (i) the administration of the Bankruptcy Case, and (ii) the negotiation, execution and consummation of the transactions contemplated hereby;

(j)     all workers' compensation claims and occupational health claims related to the Acquired Assets, including and with respect to Buyer Employees and former employees of Seller who worked or who were employed at the Acquired Assets, in each case arising out of acts prior to the Closing Date, even if instituted after the Closing Date;

(k)     any Liability of Seller or any ERISA Affiliate (or any predecessor of any of the foregoing) arising under, relating to or with respect to any multiple employer pension plan, single employer pension plan or Multiemployer Plan and any Liability of any ERISA Affiliate arising under, relating to or with respect to any compensation or benefits agreement, arrangement, plan, policy, practice or program, including any Benefit Plan;

(l)     all Liabilities with respect to Employees, or former Employees, or both (or their representatives or beneficiaries, contractors or consultants of Seller, and employees, contractors or consultants of any ERISA Affiliate, for any action or inaction of Seller (or any predecessor of Seller)) occurring prior to or on the Closing Date, including with respect to vacation, payroll, sick leave, unemployment benefits, retirement benefits, pension benefits, employee stock option, equity compensation, employee stock purchase or profit sharing plans, health care and other welfare plans, policies, programs, agreements, arrangements, practices or benefits (including COBRA or the Coal Act), or any other employee plans, policies, programs, practices, agreements, arrangements or benefits or other compensation of any kind to any employee, including under any Benefit Plans of any Subsidiary or ERISA Affiliate, and Liabilities or other obligations of Seller and its predecessors pursuant to the WARN Act to the extent arising or accruing prior to or on the Closing Date; provided, however, that this Section 2.4(j) shall not be deemed to include any pre-Closing Liabilities associated with programs or Contracts established or entered into by Buyer on or following the Closing Date;

22

(m)    all Liabilities arising under the Black Lung Act related to the Business, any of the Acquired Assets or any Employees not expressly described as an Assumed Liability in <u>Section 2.3(f)</u>;

(n)    any and all Liabilities to any current or former Employee, consultant or contractor or any spouse, dependent and/or any beneficiary thereof, relating to any Benefit Plan and any and all Liabilities relating to any benefits or compensation agreement, arrangement, plan, policy, practice or program of any ERISA Affiliate, including any Benefit Plans;

(o)    any and all Liabilities arising under any employment or consulting agreement, Collective Bargaining Agreement or arrangement, or severance, retention or termination agreement, plan, policy, practice, program or arrangement with any employee, consultant or contractor (or its representatives) of Seller;

(p)    all Liabilities (other than Assumed Liabilities) accruing, arising out of, or relating to any federal, state or local investigations of, or Claims or actions against, Seller or any Employee, agents, vendors or representatives of Seller, to the extent arising out of (i) actions taken prior to the Closing, and (ii) notices of such Claims delivered to Seller prior to the Closing; and

(q)    other Liabilities relating to the conduct of the Business or to the Acquired Assets (and the use thereof) arising at any time on or prior to the Closing (other than Assumed Liabilities).

2.5    <u>Assignment and Assumption of Contracts</u>.

(a)    <u>Schedule 2.5(a)</u> sets forth a list of all executory Contracts (including all supply agreements, joint venture agreements, operating and joint operating agreements, participation agreements, exploration agreements (including minerals and coalbed gas exploration agreements) and Leases) relating to the Business, the Acquired Assets or the Assumed Liabilities to which Seller is a party (the "<u>Available Contracts</u>")

Within ten (10) Business Days following the Execution Date (the "<u>Determination Date</u>"), (i) Buyer shall designate in writing which Available Contracts from <u>Schedule 2.5(a)</u> Buyer wishes to "Assume" (the "<u>Assumed Contracts</u>"), which Assumed Contracts shall be deemed assumed and effective as of the Closing Date, (ii) Buyer shall be responsible for any Assumed Cure Costs related thereto, and (iii) Seller shall be responsible for any Excluded Cure Costs related to the Kingston Sublease and the Pardee Lease, if the Kingston Sublease and the Pardee Lease are Assumed Contracts.

All Contracts of Seller that are listed on <u>Schedule 2.5(a)</u> and which Buyer does not designate in writing for assumption shall not be considered an Assumed Contract or Acquired Asset and shall automatically be deemed "<u>Excluded Contracts</u>" and, for the avoidance of doubt, Buyer shall not be responsible for any related Cure Costs of any Excluded Contracts.

Notwithstanding the foregoing, to the extent the Mission Contract Mining Agreement, or any other Contract granting to or otherwise contemplating Seller's receipt of, or entitlement to the use or benefit of, any of the Mission Permits, is designated an Assumed

23

Contract, and at any time on or prior to the Closing Date all Mission Permits are fully transferred to Seller as contemplated in Section 7.7 hereof, Buyer may elect not to take assignment of, and the Assumed Contracts upon and following such election shall not include, the Mission Contract Mining Agreement or such other Contract.

At the Closing, Seller shall, pursuant to the Sale Order, the Assumption Agreement and the Lease Assignments, (A) assign, or cause to be assigned, to Buyer (the consideration for which is included in the Purchase Price) each of the Assumed Contracts that is capable of being assigned, and (B) promptly pay all Excluded Cure Costs (if any) in connection with the Kingston Sublease and the Pardee Lease, if the Kingston Sublease and the Pardee Lease are Assumed Contracts. At the Closing, Buyer shall pay promptly all Assumed Cure Costs (if any) in connection with such assignment and assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Sale Order, the Assumption Agreement and the Lease Assignments.

(b)      Non-Assignment of Contracts and Permits.  Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer an interest in any Contract or any Permit if, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would in any way materially adversely affect any rights of Buyer, as the assignee or transferee, or constitute a violation of a Legal Requirement or a breach of such Contract or Permit (as the case may be). If, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code and the commercially reasonable efforts of Seller, such consent or approval is required but not obtained with respect to an Assumed Contract or a Permit, neither Seller nor Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted nor shall the Closing be delayed nor shall any right to terminate this Agreement arise, in each case, in respect of the Assumed Contracts or the Permits.

Notwithstanding anything contained in this Agreement to the contrary, but subject to Sections 2.6(b) and 7.7, Buyer acknowledges and agrees that (i) the Mission Permits are not held by Seller, but are used in the Business or in connection with the Acquired Assets, and accordingly may only be transferred by Seller to Buyer from and until such date as the Mission Permits are held by Seller, (ii) for so long as the Mission Permits are not held by Seller, the Mission Permits shall not be deemed to be Acquired Assets hereunder, and (iii) Seller shall not be in breach of this Agreement nor shall the Purchase Price be adjusted nor shall the Closing be delayed nor shall any right to terminate this Agreement arise, in each case, as a result of Seller and/or Buyer, as applicable, not being designated as the permittee under the Mission Permits on or prior to the Closing Date.

2.6      Further Assurances.

(a)      Except as otherwise provided herein and subject to the terms and conditions of this Agreement, the Bankruptcy Code and any orders of the Bankruptcy Court, from and after the Execution Date, Seller and Buyer shall take, or cause to be taken, all reasonable actions and to do, or cause to be done, all things reasonably necessary or desirable under applicable Legal Requirements to consummate the transactions contemplated hereby,

24

including (i) preparing and filing as promptly as practicable with any Governmental Authority or other third party all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents, and (ii) obtaining and maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other third party that are necessary, proper or advisable to consummate the transactions contemplated hereby, in each case, after giving effect to the Sale Order.

(b)      At and after the Closing, and without further consideration therefor, Seller shall execute and deliver to Buyer such further instruments and certificates as shall be necessary or desirable (i) to vest, perfect or confirm ownership (of record or otherwise) in Buyer Seller's right, title or interest in, to or under any or all of the Acquired Assets and Business, including the Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances), or (ii) otherwise to effectuate the purposes and intent of this Agreement and the other Transaction Documents or for aiding, assisting, collecting and reducing to possession any of the Acquired Assets and exercising rights with respect thereto.  For the avoidance of doubt, if, after the Closing Date, any Transferred Permits are transferred into the name of Seller, Seller will execute customary agreements of assignment, and take such other customary actions, as are necessary to transfer the Transferred Permits (to the extent assignable) to Buyer.

# ARTICLE 3

## PURCHASE PRICE

3.1      Consideration.

The aggregate consideration (the "Purchase Price") for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to and under the Acquired Assets shall consist of:

(a)      the Cash Consideration; and

(b)      the assumption by Buyer of the Assumed Liabilities from Seller.

3.2      Allocation of Purchase Price.

Following the Closing Date, Seller shall provide to the Buyer an allocation of the applicable portions of the Purchase Price in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (and any similar provisions of state, local, or non-U.S. law, as appropriate).  The Buyer shall provide Seller with any comments to such allocation within 15 days after the date of receipt by the Buyer, and the Buyer and Seller shall negotiate in good faith to finalize such allocation no later than 60 days prior to the earliest due date (taking into account, for these purposes, any applicable extension of a due date) for the filing of a Tax Return to which such allocation is relevant (unless the Buyer does not provide any comments within such 15-day period, in which case Seller's allocation shall be deemed final). If the Parties are unable to mutually agree to such allocation then the Parties shall have no further obligation under this Section 3.2, and each Party shall make its own determination of such allocation for

113605837v25

financial and tax reporting purposes, which determination, for the avoidance of doubt, shall not be binding on the other Party.

      3.3    <u>Withholding</u>.

      Buyer shall be entitled to deduct and withhold from the Purchase Price otherwise payable pursuant to this Agreement to Seller such amounts as Buyer is required to deduct and withhold under applicable Legal Requirements.  To the extent that amounts are so deducted and withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to Seller.

## ARTICLE 4

### CLOSING AND DELIVERIES

      4.1    <u>Closing Date</u>.

      On the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "<u>Closing</u>") shall take place at the offices of Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, no later than two (2) Business Days following the date on which all the conditions set forth in <u>Article 9</u> and <u>Article 10</u> have been satisfied or (if permissible) waived by the Party entitled to waive such condition (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or on such other date and time as Seller and Buyer may mutually agree in writing; <u>provided</u>, that the Parties intend to, and will use their respective reasonable efforts to, cause the Closing to occur on or prior to the Outside Date. The date and time at which the Closing actually occurs is hereinafter referred to as the "<u>Closing Date</u>". Upon consummation of the Closing, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities hereunder, and the Closing, shall be deemed to have occurred as of 12:01 a.m. (New York time) on the Closing Date.

      4.2    <u>Buyer's Deliveries</u>.

      Subject to satisfaction or (if permissible) waiver of the conditions set forth in <u>Article 9</u> and <u>Article 10</u>, at the Closing, Buyer shall deliver (or cause one or more of its Affiliates to deliver) to Seller:

      (a)    the Bills of Sale, Lease Assignments, the Assumption Agreement and each other Transaction Document to which Buyer is a party, duly executed by Buyer;

      (b)    the certificates of Buyer to be received by Seller pursuant to <u>Sections 10.1</u> and <u>10.2</u>;

      (c)    evidence, in form and substance reasonably acceptable to Seller, of receipt of the West Virginia Mining License;

26

(d)      to an account, such account to be designated by Seller two Business Days prior to Closing, by wire transfer of immediately available funds, an amount of cash equal to the sum of the Cash Consideration;

(e)      evidence, in form and substance reasonably acceptable to Seller, of the letter described in Section 7.7(a)(ii); and

(f)      such other documents as Seller may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated hereby.

4.3      Seller's Deliveries.  At the Closing, Seller shall deliver to Buyer:

(a)      the Bills of Sale, Deeds, Lease Assignments and the Assumption Agreement and each other Transaction Document to which Seller is a party, duly executed by Seller; provided, however, that if one or more of the Deeds and/or motor vehicle titles is not delivered by Seller to Buyer on or before the Closing Date, Seller shall deliver such Deeds and/or motor vehicle titles to Buyer no later than 60 days following the Closing Date;

(b)      instruments of assignment of the Intellectual Property that are owned by Seller and included in the Acquired Assets, if any, duly executed by Seller, in form for recordation with the appropriate Governmental Authorities, in customary form and reasonably acceptable to Buyer;

(c)      with respect to the Real Property and mineral rights included in the Acquired Assets, possession of such Real Property or mineral rights, together with copies (and originals in Seller's possession) of all instruments, Leases and agreements evidencing Seller's interest in the same, and any existing surveys, legal descriptions and title policies concerning such Real Property or mineral rights that are in the possession of Seller which shall be deemed to be delivered to the extent located at any of the Real Property;

(d)      a copy of the Sale Order;

(e)      the certificates of Seller to be received by Buyer pursuant to Sections 9.1 and 9.2;

(f)      certificates executed by Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(g)      such other bills of sale, Deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all of the right, title and interest of Seller in, to or under any or all the Acquired Assets, including all Owned Real Property, subject only to Permitted Encumbrances and Assumed Liabilities;

(h)      such ordinary and customary documents (including any factually accurate affidavits) as may be required by any title company or title insurance underwriter to

27

enable Buyer to acquire, at Buyer's sole election and Buyer's sole cost and expense, one or more owner policies of title insurance issued by such title company covering any or all of the Real Property included in the Acquired Assets in form and substance reasonably acceptable to Buyer; and

(i)      such other documents as Buyer may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated hereby.

4.4      Supplemental Assignments and Conveyances.

As reasonably required by Buyer in order to effectuate the transactions contemplated by this Agreement, each Party shall also execute and deliver at (and after) the Closing such other customary documents, assignments, bills of sale, deeds, certificates, corrective instruments and other agreements, and shall take such other customary actions, as are necessary to transfer the Acquired Assets to, and vest title thereto in, or to otherwise provide the benefit thereof to, Buyer, including any such Acquired Assets omitted from such documents, assignments, bills of sale, deeds, certificates, instruments and other agreements delivered at Closing.

# ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows, as of the date hereof and as of the Closing, except as disclosed in the Disclosure Schedules:

5.1      Organization and Good Standing.

Seller is an entity duly organized, validly existing and in good standing under the laws of the State of Delaware. Subject to the applicable provisions of the Bankruptcy Code, Seller has all limited liability company power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted. Seller is duly qualified or licensed to do business and are in good standing in each jurisdiction where the character of its Business or the nature of their properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

5.2      Authority; Validity; Consents.

Seller has, subject to entry of the Sale Order, the requisite limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which Seller is a party and to consummate the transactions contemplated hereby and thereby, and, subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and such other Transaction Documents by Seller and the consummation by Seller of the transactions contemplated herein and therein have been duly and validly authorized by all requisite limited liability company action on the part of Seller. Subject to entry of the Sale Order, this Agreement has been duly and validly executed and delivered by Seller and each other Transaction Document required to be executed

28

and delivered by Seller at the Closing will be duly and validly executed and delivered by Seller at the Closing. Subject to entry of the Sale Order, this Agreement and the other Transaction Documents constitute, with respect to Seller that is party thereto, the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to entry of the Sale Order, and assuming the accuracy of the representations and warranties set forth in Article 6, except (a) as required to comply with the HSR Act and the antitrust legislation of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business, (b) for entry of the Sale Order, (c) for notices, filings and consents required in connection with the Bankruptcy Case, including the requirements of the Bidding Procedures Order, and (d) for the notices, filings and consents set forth on Schedule 5.2, Seller is not required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from, any Governmental Authority in connection with the execution and delivery of this Agreement and the other Transaction Documents to which Seller is a party or the consummation or performance of any of the transactions contemplated hereby and thereby.

      5.3     <u>No Conflict</u>.

      Except as a result of the Bankruptcy Case, neither the execution and delivery by Seller of this Agreement or any other Transaction Document to which it is (or will be) a party nor after giving effect to the Sale Order and the Bidding Procedures Order, the consummation of the transactions contemplated hereby or thereby nor, after giving effect to the Sale Order and the Bidding Procedures Order, compliance by it with any of the provisions hereof or thereof will (a) conflict with or result in a violation of (i) any provision of the certificate of formation or limited liability company agreement of Seller, or (ii) any material Order binding upon Seller or by which the Business or any Acquired Assets are subject or bound, (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under any license, Permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority, or (c) result in the creation of any Encumbrance (other than a Permitted Encumbrance) upon the properties or assets of Seller being sold or transferred hereunder except, in the case of clauses (a) and (b), as would not, individually or in the aggregate, have a Material Adverse Effect.

      5.4     <u>Real Property</u>.

      (a)     <u>Owned Real Property</u>.  <u>Schedule 5.4(a)</u> sets forth an accurate and complete list of the Owned Real Property. Seller owns all Owned Real Property set forth on <u>Schedule 5.4(a)</u>.

      (b)     <u>Leased Real Property</u>.  <u>Schedule 5.4(b)</u> contains a list of all Leased Real Property leased by Seller and used or held for use in the operation of the Business. Seller has made available, to the extent that they are in Seller's possession or control, true and complete copies of all Leases to Buyer. To Seller's Knowledge, the Leases are in full force and effect.

      5.5     <u>Environmental and Health and Safety Matters</u>.

29

(a)     Seller has at all times since April 29, 2019 materially complied and is in material compliance with all applicable Environmental, Health and Safety Laws with respect to the Business and the Acquired Assets.

(b)     There are no material Environmental Claims pending and Seller has not received any written or, to Seller's Knowledge, oral notice or report of any threatened material Environmental Claim with regard to any of the Acquired Assets or the Business, or any prior business for which Seller has retained liability under any Contract, in each case the subject matter of which remains unresolved.

(c)     To Seller's Knowledge, the Real Properties do not contain and have not previously contained, any Hazardous Substances in amounts or concentrations which (i) constitute a material violation of any applicable Environmental, Health and Safety Laws or (ii) would reasonably be expected to give rise to a material Environmental Claim with respect to the Business or Acquired Assets or require a material Remedial Action with respect to the Business or Acquired Assets.

(d)     With respect to the Business and the Acquired Assets, no Seller or, to Seller's Knowledge, any other Person has treated, recycled, stored, disposed of, arranged for or permitted the disposal of, transported, handled, or Released any Hazardous Substances, or owned or operated any property or facility contaminated by any Hazardous Substance, in a manner that has given or would reasonably be expected to give rise to a material Environmental Claim or require a material Remedial Action, excluding matters that have been fully resolved.

(e)     Seller:  (i) holds all material Environmental Permits (each of which is in full force and effect and is not subject to appeal, except as is being contested in good faith by Seller by appropriate proceedings diligently conducted) required for any of their current operations or for the current ownership, operation or use of the Acquired Assets and the Business, including but not limited to all Environmental Permits required for the current coal mining-related operations of Seller or, to the extent currently required, any pending construction or expansion related thereto; (ii) is, and has since April 29, 2019 been, in material compliance with all such Environmental Permits, except as is being contested in good faith by Seller by appropriate proceedings diligently conducted; and (iii) has not received any written notice that any of the Environmental Permits will be voided, canceled or withdrawn or will not be renewed.

(f)     To Seller's Knowledge, none of the Real Properties has any associated direct or indirect acid mine drainage which (i) constitutes a material violation of, or (ii) except as permitted by, and in conformity with the requirements of, the Transferred Permits, could reasonably be expected to give rise to material Liability, Environmental Claim or Remedial Action under any applicable Environmental, Health and Safety Law, Environmental Permit or Mining Permit.

(g)     With respect to the Business and the Acquired Assets, Seller is not a party to any written agreement that requires Seller to conduct a material Remedial Action or require Seller to indemnify, defend or hold harmless any Governmental Authority or other Person from or against any material Environmental Claim or Liability under Environmental, Health and Safety Law, or Remedial Action.

30

(h)      To Seller's Knowledge (and except as permitted by, and in conformity with the requirements of, the Transferred Permits), none of the Acquired Assets contains active or inactive underground storage tanks, above-ground storage tanks, transformers or other equipment containing PCBs, underground injection wells, septic tanks or waste disposal pits (to the extent such tanks or pits constitute Acquired Assets), in each case that could reasonably be expected to give rise to material liability under any applicable Environmental, Health and Safety Law.

(i)      Seller has made available or provided Buyer with copies of all material environmental assessments, audits (including compliance audits), evaluations, studies, and tests conducted or provided to Seller since April 29, 2019 relating to the Business, the Owned Real Property, the Leased Real Property and any Assumed Liability.

(j)      Notwithstanding anything that may be to the contrary contained herein, this Section 5.5 (i) contains the only representations and warranties given or made by Seller with respect to environmental matters, and (ii) does not contain any representations or warranties with respect to events, matters or conditions prior to April 29, 2019.

5.6      Title to Acquired Assets.

Seller has, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.3, and upon entry of the Sale Order, Seller will thereby transfer to Buyer and Buyer will (subject to Section 2.5(b)) be vested, to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code, with good and valid title to, or, in the case of property leased or licensed by Seller, a valid leasehold or licensed interest in, all of the Acquired Assets, free and clear of all Encumbrances, except for (a) the Assumed Liabilities, and (b) Permitted Encumbrances.

5.7      Taxes.

(a)      Seller has timely filed all income Tax and other material Tax Returns required to be filed with the appropriate Governmental Authorities (taking into account any extension of time to file granted to Seller). All such Tax Returns are correct and complete in all material respects and were prepared in substantial compliance with all applicable law, all material Taxes, including those relating to the Business and/or the Acquired Assets, that are due and payable, whether or not shown to be payable on such Tax Returns, have been or will be timely paid before the Closing, except for any unpaid Taxes which are specified in Section 8.1 to be paid at the Closing or expressly assumed by Buyer herein and paid after the Closing. No examination of any such Tax Return of Seller is currently in progress by any Taxing Authority and Seller has not received notice of any contemplated examination of any such Tax Return and no material adjustment has been proposed in writing with respect to any such Tax Returns since April 29, 2019 by any Taxing Authority.

(b)      Seller has not received written notice of any material Tax deficiency outstanding, proposed or assessed against or allocable to Seller and has not executed any waiver of any statute of limitations in respect of Taxes nor agreed to any extension of time with respect to a Tax assessment or deficiency with respect to the Acquired Assets. There are no pending or threatened audits, investigations, disputes, notices of deficiency, claims or other

31

actions for or relating to any Liability for Taxes. There is no dispute or claim concerning any Tax liability of Seller claimed or raised by any Taxing Authority in writing.

(c)  Seller is not in default under, nor to Seller's Knowledge does there exist any condition which, with the giving of notice or passage of time would constitute a default by Seller under, any agreement with any Governmental Authority that provides for or results in a reduction, rebate or exemption from Taxes or any other form of Tax incentive applicable to the Business, except for such defaults or conditions which would not, individually or in the aggregate, have a Material Adverse Effect.

(d)  Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party and all IRS Forms W-2 and Forms 1099 (or any other applicable form) required with respect thereto have been properly and timely distributed.

(e)  Seller is not a party to any Tax allocation or sharing agreement. Seller (i) has not been a member of an affiliated group filing a consolidated federal income Tax Return and (ii) has no liability for the Taxes of any Person (other than Seller) under Treas. Reg. §1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by contract, or otherwise.

(f)  Seller is not and has not been a party to any "listed transaction," as defined in Section 6707A(c)(2) of the Code and Treas. Reg. §1.6011-4(b)(2).

(g)  There are no Encumbrances (other than Permitted Encumbrances) on the Acquired Assets that arose in connection with any failure to pay any Tax.

(h)  No claim has been made in writing by any Governmental Authority in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to taxation by that jurisdiction.

(i)  No power of attorney with respect to Taxes has been executed or filed with any Taxing Authority by or on behalf of Seller that will remain in effect after the Closing Date.

5.8  Legal Proceedings.

Except for the Bankruptcy Case (and proceedings related thereto), there is no material Proceeding or Order pending, outstanding or, to Seller's Knowledge, threatened against or related to the Acquired Assets, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor, to Seller's Knowledge, are there any investigations relating to the Acquired Assets pending or, to Seller's Knowledge, threatened by or before any arbitrator or any Governmental Authority, which, if determined adversely, would be material to the Acquired Assets, taken as a whole.  Schedule 5.8 sets forth a true and complete list of all Proceedings and Orders pending, outstanding or, to Seller's Knowledge, threatened against or related to the Acquired Assets, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority.

32

5.9    Compliance with Legal Requirements; Permits.

(a)    Other than with respect to Permits required under any Environmental, Health and Safety Law or environmental provision of any Mining Law or MSHA, which Permits are addressed in Section 5.5, Seller holds all the material Permits necessary for the operation of the Business as currently conducted and the current ownership or use by Seller of the Acquired Assets.

(b)    Schedule 5.9(b) sets forth a true and complete list of (i) all Permits (including Environmental Permits and Mining Permits) held by Seller or any of its Affiliates, or to which Seller has rights, in the operation of the Business and ownership or use of the Acquired Assets in the State of West Virginia, together with a description of the permitted property, facility or operation, together with a true and complete list of all pending applications for additional Permits, renewals of existing Permits, or amendments to existing Permits held by Seller, which have been submitted to any Governmental Authority or other entity by Seller applicable to the operation of the Business and ownership or use of the Acquired Assets in West Virginia, and (ii) the applicable surety bonds (or other financial assurances) and the amount of the surety bonds (or other financial assurances) under such Permits, in each case, as amended, supplemented and modified through the Execution Date.

(c)    The Permits set forth on Schedule 1.1(c) are all of the Permits held by Seller or in which Seller has rights necessary for the current operation of the Business and the current ownership or use of the Acquired Assets, the absence of which would be reasonably expected to adversely affect the operation of the Business as currently conducted and operated or the Acquired Assets as currently owned or used from and after the Closing. Other than with respect to Permits required under any Environmental, Health and Safety Law or environmental provision of any Mining Law or MSHA, which Permits are addressed in Section 5.5, all such Permits are final, unappealed, valid, in good standing and in full force and effect and Seller is not in default under or in violation of any such Permit, except where such default, or failure to be final, unappealed, valid, in good standing and in full force and effect would not reasonably be expected to be material to the Business.

(d)    Other than with respect to notices issued under any Environmental, Health and Safety Law or environmental provision of any Mining Law or MSHA, which matters are addressed in Section 5.5, Seller has conducted the Business since April 29, 2019 and currently owns and operates the Acquired Assets in accordance, in all material respects, with all Legal Requirements, Orders and Permits applicable to Seller and the Acquired Assets during such period, and the Business is in compliance in all material respects with all applicable Legal Requirements, Orders and Permits (including any anti-bribery Legal Requirements) and has obtained all approvals necessary for owning and operating its assets and has made all necessary filings with all Governmental Authorities having jurisdiction necessary for owning and operating the Acquired Assets, and there are no Orders outstanding under any Mining Law or MSHA with respect to the Real Properties or the Business.

(e)    Other than with respect to notices issued under any Environmental, Health and Safety Law or environmental provision of any Mining Law or MSHA, which matters are addressed in Section 5.5, neither Seller nor, to Seller's Knowledge, any of its Representatives

33

has received, since April 29, 2019, any written notice or other communication from any Governmental Authority that alleges that the Business is not in compliance with any Legal Requirement, Order or Permit applicable to the Business or the operations or properties of the Business or the Acquired Assets or that threatens or states the intention on the part of any issuing authority to revoke, cancel, suspend or modify any Permit necessary for the operation of the Business and the ownership or use of the Acquired Assets (except with respect to regular periodic expirations and renewals thereof). Seller is in material compliance with such Permits. No suspension, revocation or cancellation of any of such Permits is threatened or, to the Knowledge of Seller, contemplated, except with respect to regular periodic expirations and renewals thereof, which renewals Seller has reason to believe will not be granted.

(f)     Except as would not be material to the Business or the Acquired Assets taken as a whole or to the transfer of any Transferred Permit:  (i) Seller has not had any Permits that are necessary for the operation of the Business and the Acquired Assets appealed, denied, revoked, restricted or suspended since April 29, 2019; and (ii) Seller is not currently a party to any Proceeding involving the possible appeal, denial, revocation, restriction or suspension of any Permits that are necessary for the current operation and conduct of the Business and the current ownership or use of the Acquired Assets or any of the privileges granted thereunder (except where the obligation to hold such a Permit is being contested in good faith by appropriate proceedings diligently conducted or is excused by the Bankruptcy Court).

5.10     Labor Matters.

(a)     Except as set forth on Schedule 5.10(a), Seller is not party to or subject to any collective bargaining agreements, works council agreements, labor union contracts, trade union agreements and other agreements (each, a "Collective Bargaining Agreement").

(b)     (i) Since April 29, 2019, no union or group of Employees or former Employees has (A) to Seller's Knowledge, sought to organize any employees for purposes of collective bargaining, (B) made a demand for recognition or certification as an employee representative for purposes of collective bargaining, (C) sought to bargain collectively with Seller, or (D) filed a petition for recognition with any Governmental Authority; (ii) as of this date, no collective bargaining agreement is being negotiated by Seller; and (iii) since April 29, 2019 there have been no actual or, to Seller's Knowledge, threatened strikes, lockouts, material slowdowns or work stoppages, boycotts, handbilling, picketing, walkouts, demonstrations, leafleting, sit-ins, sick-outs, or other forms of organized labor disruption with respect to Seller.

(c)     Schedule 5.10(c) sets forth a true, complete and accurate list of the name, title, employment status, leave status, wage rate and place of employment of all Employees.

(d)     (i) Since April 29, 2019, Seller has not, to Seller's Knowledge, failed to provide advance notice of layoffs or terminations as required by the Worker Adjustment and Retraining Notification Act of 1988, and including any similar state or local Legal Requirement (the "WARN Act"), or any applicable Legal Requirements for employees outside

34

the United States, regarding the termination or layoff of employees or have incurred any material liability or material obligation under such Legal Requirements; (ii) since April 29, 2019, Seller has, to Seller's Knowledge, been in material compliance with all applicable Legal Requirements relating to labor and employment, including but not limited to all Legal Requirements relating to employment practices; the hiring, promotion, assignment, and termination of employees; discrimination; sexual harassment; equal employment opportunities; disability; labor relations; wages and hours; FLSA, classification of independent contractors, hours of work; payment of wages; immigration; workers' compensation; employee benefits; background and credit checks, working conditions; occupational safety and health; family and medical leave; data privacy and data protection; or employee terminations; (iii) except pursuant to procedures established in connection with the Bankruptcy Case, there are no pending or, to Seller's Knowledge, threatened, lawsuits, grievances, unfair labor practice charges, arbitrations, charges, investigations, hearings, actions, claims, or proceedings (including any administrative investigations, charges, claims, actions, or proceedings), against Seller brought by or on behalf of any applicant for employment, any current or former Employee, representative, agents, consultant, independent contractor, subcontractor, or leased employee, volunteer, or "temp" of Seller, or any group or class of the foregoing, any Governmental Authority, any person alleging to be a current or former Employee, or any group or class of the foregoing, alleging violation of any labor or employment Legal Requirements, breach of any collective bargaining agreement, breach of any express or implied contract of employment, wrongful termination of employment, or any other discriminatory, wrongful, or tortious conduct in connection with the employment relationship; (iv) to Seller's Knowledge, no Employee of Seller has since April 29, 2019 been or is being investigated in connection with any misconduct, nor subject to any disciplinary action in connection with such misconduct, that could reasonably be expected to cause any material damage to the reputation or business of Seller or the Employees; (v) to Seller's Knowledge, no employee of Seller has since April 29, 2019 engaged in any conduct or cover-up of such conduct, or aided or assisted any other person or entity to engage in any conduct that could cause or has caused any material damage to the reputation or business of Seller or its Employees, including but not limited to any conduct constituting sexual misconduct, harassment (including sexual harassment), or discrimination; and (vi) to Seller's Knowledge, each of the Employees has all work permits, immigration permits, visas, or other authorizations required by Legal Requirements for such Employee given the duties and nature of such employee's employment.

### 5.11   Employee Benefits.

(a)   Schedule 5.11(a) sets forth a true and complete list of each material Benefit Plan. For purposes of this Agreement, "Benefit Plan" shall mean any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any plan, program, policy, practice, arrangement, Contract or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, compensation, benefit, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change in control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which Seller is the owner, the beneficiary, or both), Section 125 of the Code "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, policy, practice, arrangement, Contract or agreement, whether written or oral, including any other employee benefit plan, agreement, program, policy,

35

arrangement, Contract or practice, including any payroll practice, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the transaction contemplated hereby or otherwise), in each case, (i) under which any current or former officer, director, employee, leased employee or consultant (or any of their respective beneficiaries) of Seller has any present or future right to benefits, (ii) which Seller is a party to or Seller sponsors, maintains, contributes to, or has any obligation to sponsor, maintain or contribute to, or (iii) pursuant to, under or with respect to which Seller has or has any direct or indirect Liability, whether contingent or otherwise, including by reason of their affiliation with any ERISA Affiliate.

(b)     (i) Each Benefit Plan has been established, operated and administered in all material respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and all other Legal Requirements; (ii) with respect to each Benefit Plan, all reports, returns, notices and other documentation that are required to have been filed with or furnished to the Internal Revenue Service (the "IRS"), the United States Department of Labor or any other Governmental Authority, or to the participants or beneficiaries of such Benefit Plan have been filed or furnished on a timely basis in all material respects; and (iii) each Benefit Plan that is intended to be qualified within the meaning of Section 401(a) of the Code is so qualified and has received a favorable determination letter from the IRS or may rely on a favorable opinion letter issued by the IRS.

5.12    Seller's Intellectual Property.

(a)     Schedule 5.12(a) sets forth a true and complete list of all U.S. and foreign: (i) issued Patents and pending applications for Patents; (ii) registered Trademarks and pending applications for Trademarks; and (iii) registered Copyrights and pending applications for Copyrights, in each case which are owned by Seller as of the Execution Date and which are material to the Acquired Assets. Except as set forth on Schedule 5.12(a), Seller is the sole owners of all of the applications and registrations set forth on Schedule 5.12(a), and all such applications and registrations are in effect and subsisting.

(b)     Except as disclosed on Schedule 5.12(b), and except as would not, individually or in the aggregate, have a Material Adverse Effect, to Seller's Knowledge, (i) the conduct of the Business by Seller as currently conducted (including the products and services currently sold or provided by Seller) does not infringe or otherwise violate any Person's intellectual property rights, and no such claims are pending or threatened in writing against Seller, and (ii) no Person is infringing or otherwise violating any Intellectual Property owned by Seller, and no such claims are pending or threatened in writing against any Person by Seller.

(c)     To Seller's Knowledge, the Acquired Assets and any rights provided to Buyer pursuant to the Transaction Documents include all material third party intellectual property rights licensed to Seller that are required to conduct the Business in a substantially similar manner as it is presently being conducted by Seller, except such intellectual property rights as exist under the Excluded Contracts.

5.13    Contracts.

36

Schedule 5.13 sets forth a complete list, as of the date hereof, of all Material Contracts relating to the Business (including Leases) to which Seller is a party. Except as set forth on Schedule 5.13, no Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract. Each Contract is in full force and effect and is a valid and binding obligation of Seller in accordance with its terms and conditions, in each case except (a) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, (b) as set forth on Schedule 5.13 and (c) as would not, individually or in the aggregate, have a Material Adverse Effect. Except as arising as a consequence of the Bankruptcy Case, upon entry of the Sale Order and payment of the Cure Costs with respect thereto, (i) no Seller will be in breach or default of its obligations under any Assumed Contract, (ii) no condition exists that with notice or lapse of time or both would constitute a default by Seller under any Assumed Contract, and (iii) to Seller's Knowledge, no other party to any Assumed Contract is in breach or default thereunder, except in the case of clauses (i), (ii) and (iii) for any breaches or defaults that would not, individually or in the aggregate, have a Material Adverse Effect.

5.14    Insurance.

Schedule 5.14 sets forth a true and complete list of all insurance policies (collectively, the "Insurance Policies") covering the Acquired Assets, the Assumed Liabilities, and the Business, including but not limited to all property, assets, Employees and operations of the Business (including but not limited to policies held by Seller providing property, casualty, liability and workers' compensation coverage, but excluding any policies relating to any Benefit Plan that are set forth on Schedule 5.11(a)). Such policies are in full force and effect (subject to periodic renewals thereof). Except as set forth on Schedule 5.14, Seller has paid all premiums on such policies due and payable prior to the Execution Date, or, if not yet due, have properly accrued for such payables.  All claims and/or circumstances with respect Acquired Assets, the Assumed Liabilities, and the Business likely to give rise to a claim covered by any of the Insurance Policies have been properly reported to and accepted by the applicable insurer.  The limits of the Insurance Policies have not been exhausted, and there are no gaps in historical limits with respect to the Acquired Assets, the Assumed Liabilities, or the Business.  Seller does not have any self-insurance programs covering the Business, the Owned Real Property or the Leased Real Property.  Since the Petition Date, to Seller's Knowledge, Seller has not done anything by way of action or inaction that terminates, cancels, invalidates or makes any changes to the structure, limits or terms and conditions of any such Insurance Policies in whole or in part, including allowing any of the Insurance Policies to expire without renewing such policies or obtaining comparable replacement coverage, or prejudicing rights to insurance payments or coverage.

5.15    Brokers or Finders.

Seller has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

5.16    Affiliate Interests.

37

Other than travel advances entered into in the Ordinary Course of Business of Seller, all Contracts between Seller and any Affiliate of Seller are listed on <u>Schedule 5.16</u>. Other than employment arrangements, compensation benefits and travel advances entered into in the Ordinary Course of Business of Seller, to Seller's Knowledge, no such Affiliate of Seller has any direct or indirect interest in, or controls or is a director, officer, employee or partner of, or consultant to, or lender to or borrower from or has the right to participate in the profits of, (i) any Person which does business with Seller or is competitive with the Business in any material respect, or (ii) any material property, asset or right which is used by Seller. All Indebtedness of any such Affiliate to Seller, and all Indebtedness of Seller to any such Affiliate of Seller, is listed on <u>Schedule 5.16</u>.

   5.17 <u>Mining</u>.

    (a) Seller has, in the amounts and forms required pursuant to applicable Mining Laws and MSHA, obtained all performance bonds and surety bonds, or otherwise provided any financial assurance as (i) required under the applicable Mining Permits or Mining Laws and MSHA for Reclamation of land, water or other natural resources at any current mines, or (ii) required pursuant to any applicable Mining Permit or Mining Laws and MSHA to mitigate any actual or potential environmental impact of such mines (collectively, "<u>Mining Financial Assurances</u>"). <u>Schedule 5.17(a)</u> sets forth a list of all such Mining Financial Assurances maintained by Seller.

    (b) The liability for mine closing and Reclamation obligations recorded on the most recent balance sheet of Seller is set forth on <u>Schedule 5.17(b)</u> and is based on Seller's internal estimates prepared in good faith. All Mining Financial Assurances are described in <u>Schedule 5.17(b)</u>.

   5.18 <u>MSHA; OSHA</u>.

    Since April 29, 2019, except for fully paid, discharged and settled citations and notices of violation by MSHA or other Governmental Authority, Seller, with respect to the Business and Acquired Assets, have conducted their respective business and operations, and their respective assets have been maintained, in compliance in all material respects with MSHA or OSHA, as applicable. There are no investigations pending or, to Seller's Knowledge, threatened by any Governmental Authority or other third Person that would result in the imposition of any material Liability on Seller pursuant to MSHA or OSHA. Seller does not owe any material assessments, penalties, fines, liens, charges, surcharges, nor are there any other material amounts due or owing pursuant to MSHA or OSHA, and there have been no imminent danger orders, unwarrantable failure orders, failure to abate orders, cessation orders, notices of a pattern of violations, or material assessments, under MSHA or OSHA since April 29, 2019 with respect to the Business. <u>Schedule 5.18</u> sets forth all reports of any MSHA or OSHA audits with respect to the Business performed since April 29, 2019 by any Person (including Seller).

   5.19 <u>Warranties Exclusive</u>.

    EXCEPT AS EXPRESSLY SET FORTH IN THIS <u>ARTICLE 5</u> (AS MODIFIED BY THE DISCLOSURE SCHEDULES), SELLER MAKES NO REPRESENTATION OR

WARRANTY, STATUTORY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR THE BUSINESS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. NEITHER SELLER NOR ANY OTHER PERSON, DIRECTLY OR INDIRECTLY, HAS MADE OR IS MAKING, ANY REPRESENTATION OR WARRANTY, WHETHER WRITTEN OR ORAL, REGARDING THE PRO-FORMA FINANCIAL INFORMATION, FINANCIAL PROJECTIONS OR OTHER FORWARD-LOOKING STATEMENTS OF SELLER.

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows, as of the date hereof and as of the Closing:

6.1     Organization and Good Standing.

Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of Delaware. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

6.2     Authority; Validity; Consents.

Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the other Transaction Documents by Buyer and the consummation by Buyer of the transactions contemplated herein and therein have been duly and validly authorized by all requisite limited liability company actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a Party will be duly and validly executed and delivered by Buyer, as applicable, at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Except as required to comply with the HSR Act or as set forth on Schedule 6.2, Buyer is not or will be required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a Party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, registrations, declarations or filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, materially affect Buyer's

ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.3     No Conflict.

Neither the execution and delivery by Buyer of this Agreement or the Transaction Documents to which it is a party nor the consummation of the transactions contemplated hereby or thereby nor compliance by it with any of the provisions hereof or thereof:  (a) conflict with or result in a violation of (i) any provision of the organizational documents of Buyer, or (ii) any judgment, order, writ, injunction, decree, statute, law, ordinance, rule or regulation in any material respect binding upon Buyer; or (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under, (A) any note, bond, mortgage, indenture, deed of trust, contract, commitment, arrangement, license, agreement, lease or other instrument or obligation to which Buyer is a party or by which Buyer may be bound or to which any of Buyer's assets may be subject or affected in any material respect and that, in each case, is material to the business of Buyer, or (B) any material license, permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority.

6.4     Brokers or Finders.

Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated hereby for which Seller (or any affiliate of Seller) is or will become liable, and Buyer shall hold harmless and indemnify Seller and its Affiliates from any claims with respect to any such fees or commissions.

6.5     Legal Proceedings.

There is no Proceeding or Order pending against, or to Buyer's Knowledge, threatened against or affecting, Buyer before any arbitrator or any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated hereby and the other Transaction Documents or which would or would reasonably be expected to impair Buyer's ability to consummate the transactions contemplated hereby and the other Transaction Documents.

6.6     Qualification.

(a)     To Buyer's Knowledge, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer and/or its Affiliates not to qualify as a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b)     As of the Closing, Buyer will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts.

(c)     As of the Closing, Buyer (i) will be eligible to take transfer of, or obtain a replacement for, the Transferred Permits, (ii) will not be listed or "permit blocked" on the Applicant Violator System or by any Governmental Authority, and (iii) will not have been

40

denied any application for any Mining Permit or other Governmental Authorization, other than any denial for violations that may reasonably be expected to be cured by the time of such transfer or obtaining of Permits as contemplated by Section 7.7.

6.7     No Other Representations or Warranties; Condition of the Business; Buyer's Reliance.

Buyer acknowledges that neither Seller nor any other Person is making, and Buyer is not relying on, any representations or warranties whatsoever, statutory, expressed or implied, written or oral, at law or in equity, beyond those expressly made by Seller in Article 5 hereof (as modified by the Disclosure Schedules). Buyer acknowledges that, except as expressly set forth in this Article 6 (as modified by the Disclosure Schedules), neither Seller nor any other Person has, directly or indirectly, made any representation or warranty, statutory, expressed or implied, written or oral, at law or in equity, as to the accuracy or completeness of any information that Seller furnished or made available to Buyer and its Representatives in respect of the Business, and Seller's operations, assets, stock, Liabilities, condition (financial or otherwise) or prospects. Buyer acknowledges that neither Seller nor any other Person, directly or indirectly, has made, and Buyer has not relied on, any representation or warranty, whether written or oral, regarding the pro-forma financial information, financial projections or other forward-looking statements of Seller, and Buyer will make no claim with respect thereto. Buyer acknowledges that the Acquired Assets are being transferred on an "AS IS, WHERE IS" basis.

6.8     Information.

Buyer has conducted such investigations of Seller, the Acquired Assets and the Assumed Liabilities as it deems necessary and appropriate in connection with the execution and delivery of this Agreement and the other Transaction Documents to which Buyer is a party and the consummation of the transaction contemplated hereby and thereby. Neither Seller nor any other Person (including any officer, director, member or partner of Seller or any of its Affiliates) shall have or be subject to any liability to Buyer, or any other Person, resulting from Buyer's use of any information, documents or material made available to Buyer in any "data rooms," management presentations, due diligence or in any other form in expectation of the transactions contemplated hereby or by the other Transaction Documents.

## ARTICLE 7

### ACTIONS PRIOR TO THE CLOSING DATE

7.1     Access and Reports; Confidentiality.

(a)     During the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of Article 11 or entry into an agreement with respect to an Alternative Transaction, Seller shall:  (i) afford Buyer and its Representatives reasonable access, upon reasonable notice, to its personnel, properties, books, Permits, Contracts and records, and furnish promptly to Buyer all available information concerning the Acquired Assets, the Business, properties, any Benefit Plans and personnel as may be reasonably requested in connection with the transactions contemplated hereby; (ii) furnish to Buyer such financial and operating data and

41

other information relating to Seller, the Business and the Acquired Assets as may be reasonably requested; (iii) permit Buyer to make such reasonable inspections and, at Buyer's sole cost and expense, copies thereof as Buyer may require; and (iv) instruct the executive officers and senior business managers, employees, counsel, auditors and financing advisors of Seller to reasonably cooperate with Buyer and its Representatives regarding the same; provided, however, that any such access shall be conducted consistent with and not in violation of the Bidding Procedures Order and in a manner not to unreasonably interfere with the Business. All requests for information made pursuant to this Section 7.1 shall be directed to Jonathan Edelstein, Evercore Group L.L.C., 55 East 52nd Street, New York, NY 10055, or such other person as designated by such person or Seller. Notwithstanding the foregoing, (A) Buyer and its Representatives shall not have access to personnel records of Seller relating to individual performance or evaluation records, medical histories or other information which in Seller's good faith opinion (after consultation with counsel, which may be in-house counsel) is sensitive or the disclosure of which could subject Seller to risk of liability and (B) Buyer and its Representatives shall not conduct or cause to be conducted any sampling, testing or otherwise surface or subsurface invasive investigation of the air, soil, surface water, groundwater, building materials or other environmental media related to the Real Property, the Acquired Assets or the Business, except with the prior written consent of Seller. No investigation pursuant to this Section 7.1 or by Buyer or its Representatives at any time prior to or following the date hereof shall affect or be deemed to modify any representation or warranty made by Seller herein.

(b)      Notwithstanding the foregoing, but subject in all respects to the Bidding Procedures Order, this Section 7.1 shall not require Seller to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of Seller, is reasonably likely to result in any violation of any Legal Requirement or any Contract to which Seller is a party or cause any privilege (including attorney-client privilege) or work product protection that Seller would be entitled to assert to be undermined or waived with respect to such information or (ii) if Seller, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto; provided, that, in the case of clause (i), the Parties shall cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not (in the good faith belief of Seller (after consultation with counsel, which may be in-house counsel)) be reasonably likely to result in the violation of any such Legal Requirement or Contract or be reasonably likely to cause such privilege or work product protection to be undermined with respect to such information or (B) could reasonably (in the good faith belief of Seller (after consultation with counsel, which may be in-house counsel)) be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives of Buyer could be provided access to such information.

(c)      Buyer shall, and shall cause its Affiliates and Representatives to, hold and use (and not use) all non-public documents and information concerning Seller, its assets, the Business or any of Seller's Affiliates furnished to Buyer, its Affiliates or its or their Representatives in connection with the transactions contemplated hereby and the other Transaction Documents strictly in accordance with the Confidentiality Agreement, dated November 27, 2019, between Murray Energy Holdings Co. and Blackhawk Mining, LLC, the provisions of which hereby are incorporated by reference *mutatis mutandis*.

42

7.2    Operations Prior to the Closing Date.

Seller covenants and agrees that, except (a) as expressly contemplated hereby, (b) as disclosed on Schedule 7.2, (c) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), or (d) as otherwise required by Legal Requirements:  (i) Seller shall use its commercially reasonable efforts to operate and carry on the Business as the Business is being conducted on the date hereof and the Acquired Assets in the condition in which they exist on the date hereof (wear and tear in ordinary usage excepted); and (ii) other than with respect to an Alternative Transaction, Seller shall use commercially reasonable efforts not to take or agree to or commit to assist any other Person in taking any action that (A) would reasonably be expected to result in a failure of any of the conditions to the Closing, or (B) would reasonably be expected to impair the ability of Seller or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation.

7.3    Regulatory Matters; Cooperation.

(a)    Subject to Section 7.3(c), as soon as reasonably practicable (and, in any event, within two (2) Business Days, or a later date as agreed by the Parties) following the date of this Agreement, Seller, on the one hand, and Buyer, on the other hand, shall each prepare and file, or cause to be prepared and filed, any notifications required to be filed under the HSR Act with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice, and request early termination of the waiting period under the HSR Act. Buyer, on the one hand, and Seller, on the other hand, shall promptly respond to any requests for additional information or documentary materials in connection with such filings and shall take all other actions necessary to cause the waiting periods under the HSR Act to terminate or expire at the earliest practicable date after the date of filing. Buyer shall be responsible for payment of the applicable filing fee under the HSR Act, and each Party shall be responsible for any other payment of its own respective costs and expenses incurred by such Party (including attorneys' fees and other legal fees and expenses) associated with the preparation of its portion of any antitrust filings.

(b)    Seller, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to obtain (and Buyer shall cause its Subsidiaries to use commercially reasonable efforts to obtain), at the earliest practicable date, all necessary Governmental Authorizations and all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and take all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority. In addition to such actions and the actions to be taken under Section 7.3(a), Seller, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to take (and Buyer shall cause its Subsidiaries to use commercially reasonable efforts to obtain), or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using reasonable best efforts to accomplish the following:  (i) taking all reasonable acts necessary to cause the conditions precedent set forth in Article 9 and Article 10 to be satisfied; (ii) defending of any Proceedings challenging this Agreement or the consummation of the transactions contemplated hereby, including seeking to have any stay or temporary restraining order entered by any court or other Governmental

43

Authority vacated or reversed; (iii) taking all acts reasonably necessary in connection with meeting with any Governmental Authority regarding the transferring of the Transferred Permits; and (iv) executing and delivering any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

(c)     Seller, on the one hand, and Buyer, on the other hand, (i) shall promptly inform each other of any material communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto. In addition, none of Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate threat, in each case to the maximum extent practicable. Subject to restrictions under any Legal Requirements, each of Buyer, on the one hand, and Seller, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Business) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

(d)     Subject to the terms and conditions of this Agreement, Buyer shall and shall cause its Subsidiaries to, take any and all steps reasonably necessary to avoid or eliminate impediments under any Antitrust Law that may be asserted by any Governmental Authority with respect to the transactions contemplated hereby so as to enable the Closing to occur as soon as reasonably possible; provided, however, that notwithstanding anything to the contrary set forth herein, nothing in this Agreement shall require Buyer or any of its Affiliates to propose, negotiate, effect or agree to the sale, divestiture, license or other disposition of any assets or businesses of Buyer or any of its Affiliates (including, following the Closing, the Business and the Acquired Assets); provided further, however, that (i) Seller shall not take any such action without the prior written consent of Buyer in Buyer's sole discretion, and (ii) Buyer shall not be obligated to take any such action if such action would have a Material Adverse Effect on the Business or the Acquired Assets, taken as a whole.

7.4     Tax Cooperation.

Prior to the Closing, Seller and Buyer agree to furnish or cause to be furnished to the other, upon request, as promptly as practicable, information and assistance relating to the Acquired Assets, including access to books and records (including any Tax Records), as is

44

reasonably necessary in connection with (a) the preparation or filing of any Tax Return by Buyer or Seller, (b) the making of any Tax election by Buyer or Seller, (c) Buyer or Seller's claim for any Tax Refund, (d) the determination of liability for Taxes, and (e) any audit, examination or other proceeding in respect of Taxes related to the Acquired Assets. Seller and its Affiliates shall (i) abide by all record retention agreements entered into with any Taxing Authority, and (ii) give Buyer thirty (30) days' written notice prior to transferring, destroying or discarding any Tax Records and, if Buyer so requests, shall allow Buyer to take possession of such Tax Records.

   7.5 <u>Bankruptcy Court Matters</u>.

    (a) <u>Filing of Sale Order</u>. On or prior to March 3 at 6:00 p.m. prevailing Central Time (or such later date as agreed in writing by all the Parties hereto or as otherwise ordered by the Bankruptcy Court), Seller shall have filed with the Bankruptcy Court a proposed form of Sale Order, in form and substance acceptable to Seller and Buyer.

    (b) <u>Hearing</u>. On or prior to the date which is 25 days from the Petition Date (or as otherwise ordered by the Bankruptcy Court), the Bankruptcy Court shall have commenced a hearing to consider approval of the Sale Order, in form and substance acceptable to Seller and Buyer.

    (c) <u>Sale Order</u>. On or prior to the date which is 45 days from the Petition Date (or such later date as agreed in writing by all the Parties hereto or as otherwise ordered by the Bankruptcy Court), the Bankruptcy Court shall have entered the Sale Order, in form and substance acceptable to Seller and Buyer.

   7.6 <u>Updates</u>.

    (a) <u>Seller Supplements and Amendments</u>.  Until the Closing Date, Seller shall deliver any new schedules or supplement or amend the Disclosure Schedules with respect to any matter that, if existing, occurring or known at the Execution Date, would have been required to be set forth or described in the Disclosure Schedules. Any such supplement or amendment shall be deemed to modify the Disclosure Schedules for purposes of this Agreement except to the extent the matters set forth in such supplement or amendment would have a Material Adverse Effect on the Business or the Acquired Assets, taken as a whole. Notwithstanding anything in this <u>Section 7.6(a)</u> to the contrary, in no event will Seller be permitted to supplement or amend any Disclosure Schedules other than Disclosure Schedules required under <u>Article 5</u> without the prior written consent of Buyer and any such supplements or amendments will not be deemed to modify any Schedules other than the Disclosure Schedules required under <u>Article 5</u>.

    (b) <u>Buyer Supplements</u>.  Buyer may supplement or amend <u>Schedule 2.5(a)</u> at any time until the Determination Date.

   7.7 <u>Surety Bonds; Permits</u>.

    (a) <u>Business and Acquired Assets in West Virginia</u>.

45

(i)    Upon the Effective Date and at all times through the Closing Date, as applicable, Seller shall undertake all necessary or appropriate commercially reasonable actions to complete the transfer of the Mission Permits to and in the name of Seller.  To the extent any such Mission Permit is not fully transferred to Seller as of the Closing Date, Seller shall diligently continue its efforts to complete the transfer thereof to Seller for subsequent transfer to Buyer, with Buyer being entitled to all use and benefit of Seller in and to such Mission Permit pending ultimate transfer thereof to Buyer.

(ii)    Prior to the Closing Date, Buyer shall provide evidence of appropriate financial commitments in the form of a letter from a reputable surety licensed to bond mining properties and operations in the State of West Virginia stating that such surety will provide replacement surety bonds or other financial assurances necessary to allow the transfer of the Transferred Permits to Buyer.

(iii)   Immediately following the Execution Date or upon such later date with respect to any Mission Permit that such Mission Permit is transferred to Seller, and by no later than the date required by Legal Requirements or the appropriate Governmental Authority:

(A)    Buyer, with the reasonable cooperation of Seller (if applicable) shall file an application for new Permits or a transfer of all Transferred Permits to Buyer to engage in permitted activities at locations in the State of West Virginia with the WVDEP, in a format and manner acceptable to the WVDEP, along with all applicable fees and shall publish notice of such applications in accordance with the applicable Legal Requirements; and

(B)    The Parties shall use commercially reasonable efforts (at Buyer's expense) to properly file all documents or applications required to transfer, to amend or to acquire all other new Permits or Transferred Permits necessary for the operation of the Business or Acquired Assets by Buyer following the Closing in West Virginia, and Buyer and Seller shall reasonably cooperate (at Buyer's expense), and Seller shall use commercially reasonable efforts to cause Mission Seminole to cooperate, as applicable, in all actions necessary to seek and obtain approval for the transfer thereof.

(iv)   Buyer and Seller shall, and shall cause their Subsidiaries to (and in the case of Seller, shall use commercially reasonable efforts to cause Mission Seminole to):  (A) take all actions and do, or cause to be done, all things necessary under the applicable Legal Requirements with the appropriate Governmental Authority to put in place, to transfer, to amend, or to acquire all Transferred Permits that are necessary for the operation and conduct of the Business or Acquired Assets in West Virginia by or on the Closing Date, unless the applicable Legal Requirements regarding such a Transferred Permit require certain actions to be taken upon or after the Closing, and, in that event, Buyer, at Buyer's sole cost and expense from and after the Closing, shall take, or cause its Subsidiaries to take, all actions and do, or cause to be done, all things necessary or desirable under the applicable Legal Requirements with the appropriate Governmental Authority which can only be taken or done after the Closing to put in place, to transfer, to amend or to acquire such remaining Transferred Permits or new Permits as promptly as reasonably practicable after the Closing;

46

and (B) take all actions and do, or cause to be done, all things necessary under the applicable Legal Requirements to put in place with the WVDEP as promptly as commercially reasonably possible after the Closing, financial assurances necessary to transfer the Transferred Permits to Buyer and to obtain the release of the financial assurances previously placed with respect thereto including, for the avoidance of doubt, any cash collateral.

(v)   Seller agrees to provide, and to use commercially reasonable efforts to cause Mission Seminole to provide (if applicable), at Buyer's sole cost and expense from and after the Closing, any reasonable cooperation as reasonably requested by Buyer to bring about the transfer of the Transferred Permits or the issuance of new Permits to Buyer, as applicable (including execution by an officer of Seller or Mission Seminole, as applicable, of any documentation reasonably requested by Buyer in connection with the transfer of the Transferred Permits).

(vi)  From and after the Closing, Buyer shall use commercially reasonable efforts to pursue the transfer of the Transferred Permits or issuances of new Permits to Buyer as promptly as possible, and Buyer shall operate under the Transferred Permits as the designated operator and contract miner until the Transferred Permits are transferred or new Permits are issued to Buyer. To the fullest extent allowed by and in accordance with the applicable Legal Requirements, Seller shall use commercially reasonable efforts to cause Mission Seminole to grant Buyer the right to conduct, at the sole cost and expense of Buyer, mining operations following the Closing on the Real Property under the Transferred Permits as the designated operator until such time as the Transferred Permits are transferred to, or new Permits are issued to, Buyer. Seller shall take, and shall use commercially reasonable efforts to cause Mission Seminole to take (in each case at the expense of Buyer), all steps that are reasonably necessary to maintain the Transferred Permits prior to transfer thereof to Buyer and shall have (and Buyer grants) all rights of entry onto the Real Property that are reasonably necessary therefor. Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless Seller and/or its Affiliates from any and all Liabilities incurred by Seller, Mission Seminole and/or their respective Affiliates as a result of any action taken by Seller at Buyer's or its Affiliates' request pursuant to this Section 7.7(a)(vi).

(vii) Seller shall use commercially reasonable efforts (at Buyer's sole cost and expense from and after the Closing) to cause, or to cause Mission Seminole to cause, any surety bonds (or other financial assurances) in place as of the Closing with respect to applicable Transferred Permits to remain in place and to maintain current levels of surety bond coverage with respect to any Permits that are not Transferred Permits until such time as the final approval for the transfer of such applicable Transferred Permits to Buyer is received, in each case to the extent required by applicable Legal Requirements. At all times from and after the Closing and prior to the transfer to Buyer of the Transferred Permits and any other Permits not acquired by Buyer before the Closing Date, Buyer shall, and shall cause its Subsidiaries to, at Buyer's sole cost and expense comply with all of the applicable Legal Requirements governing, and all conditions and requirements of, or pertaining to, any such Transferred Permits or other Permits. Buyer shall promptly deliver to Seller written notice of any incidents, violations or occurrences, which Seller shall have the right, but not the obligation, to cure (including right of entry onto the applicable Real Property), and Buyer

47

shall promptly reimburse Seller for the reasonable costs of any such cure. Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless Seller, Mission Seminole and/or their respective Affiliates from any and all Liabilities incurred by Seller and/or its Affiliates as a result of any action taken by Seller at Buyer's or its Affiliates' request pursuant to this <u>Section 7.7(a)(vii)</u>.

(viii)     Notwithstanding anything in this Agreement to the contrary, from and after the Closing, Buyer shall, at its sole cost and expense, (A) until such time as Buyer has posted replacement surety bonds or other required financial assurances, pay or reimburse Seller (within five (5) Business Days of receipt of notice from Seller, which such notice shall contain the applicable surety bond numbers and corresponding premium amounts or other appropriate references as to other forms of financial assurance) for the cost of any premiums that become due after the Closing Date with respect to such surety bonds or the cost of other financial assurances; <u>provided</u>, <u>however</u>, that Buyer shall be entitled to retain any premium refunds that become due upon posting of the replacement surety bonds, and (B) post any addition to the principal amount of any such surety bond or other financial assurance required by the WVDEP or any Governmental Authority after the Closing Date as a result of any action taken by Buyer with respect to the Business and Acquired Assets in West Virginia. Until such time as the Transferred Permits are transferred to Buyer, Buyer shall, and shall cause its Subsidiaries to, take all reasonable and necessary actions such that Buyer will not have been denied, or be made subject to denial of, any application for any Permit or other Governmental Authorization due to application of the Applicant Violator System.

(b)     All fees, expenses, costs, bonds or financial assurances required to be paid or provided in connection with the actions to be taken under this <u>Section 7.7</u> shall be paid or provided by Buyer, except for fees, costs or expenses related to the transfer of Mission Permits from Mission Seminole or an Affiliate thereof to Seller, which fees, costs and expenses shall be paid by Seller.

7.8     <u>Fiduciary Obligations</u>. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require Seller or its sole or managing member, in its capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with any fiduciary obligations.

7.9     <u>Sale Free and Clear</u>. Seller acknowledges and agrees, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances of, against or created by Seller or its bankruptcy estate, shall be fully released from and with respect to the Acquired Assets. On the Closing Date, the Acquired Assets shall be transferred to Buyer, free and clear of all obligations, Liabilities and Encumbrances, other than the Permitted Encumbrances and the Assumed Liabilities.

## ARTICLE 8

### ADDITIONAL AGREEMENTS

8.1     <u>Taxes</u>.

48

(a)       Any transfer, real estate property transfer, documentary, sales, use, stamp, registration, value added, and other such taxes and fees (including any penalties and interest) incurred in connection with the transactions contemplated hereby and not exempted by Section 1146(c) of the Bankruptcy Code ("Transfer Taxes") shall be borne by Buyer. Seller and Buyer shall cooperate to (i) mitigate and/or eliminate the amount of Transfer Taxes resulting from the transactions contemplated herein, and (ii) timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. Buyer shall be responsible for preparing and filing all necessary Tax Returns or other documents with respect to Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by the other Party, the Party responsible for preparing the Tax Return shall deliver it to the other Party not less than ten (10) days before the due date thereof, and the other Party shall promptly execute such Tax Return and return it to the Party responsible for filing it.

(b)       All Liability for any ad valorem Taxes (including, for the avoidance of doubt, real or personal property Taxes, but excluding any Real Property) and unmined mineral Taxes (the "Apportioned Taxes") with respect to the Acquired Assets for a Tax period or year, or portion thereof, that ends on or before the Closing Date (a "Pre-Closing Tax Period") shall be borne by Seller. All Liability for any Apportioned Taxes solely attributable to the Acquired Assets and that are for any Tax period or year, or portion thereof, that begins after the Closing Date (a "Post-Closing Tax Period") shall be borne by Buyer. The total amount of Apportioned Taxes allocable to the Pre-Closing Tax Period of any Tax period or year commencing on or before, and ending after, the Closing Date (a "Straddle Period") shall be the product of (i) such Tax for the entirety of such Straddle Period, multiplied by (ii) a fraction, the numerator of which is the number of days for such Straddle Period included in the Pre-Closing Tax Period and the denominator of which is the total number of days in such Straddle Period, and the balance of Apportioned Taxes shall be allocable to the Post-Closing Tax Period. At the Closing, Apportioned Taxes with respect to each Acquired Asset for the applicable Straddle Period shall be prorated in accordance with the foregoing provisions based on the Tax assessment for such Acquired Asset for such Straddle Period, if available, or if otherwise, based on the Apportioned Taxes paid with respect to such Acquired Asset during the preceding Tax year. With respect to any not yet delinquent Apportioned Taxes relating to a Straddle Period or Pre-Closing Tax Period, Buyer will assume responsibility for the actual payment of all such Taxes to the applicable Governmental Authority. With respect to any Apportioned Taxes relating to a Straddle Period or Pre-Closing Tax Period that are delinquent as of the Closing Date, the amount of which is known and not subject to dispute, Buyer shall either pay the delinquent amount of such Taxes directly to the applicable Governmental Authority at the Closing or, at Buyer's option, to such title company as designated by Buyer at the Closing, for further payment by it to the applicable Governmental Authority. In the event that Buyer or Seller makes any payment of Apportioned Taxes for which it is entitled to reimbursement under this Section 8.1(b), the applicable party shall make such reimbursement no later than 10 days after the presentation of a statement setting forth the amount of the reimbursement to which the party presenting the statement is entitled along with such supporting evidence as is reasonably necessary to calculate the reimbursement amount. Any amounts which may become payable from Seller to Buyer pursuant to Section 8.1 shall constitute a super priority administrative expense of Seller under Section 364(c)(1) of the Bankruptcy Code with priority over any and all

49

administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code and shall be treated for Tax purposes as an adjustment to the Purchase Price, unless otherwise required by law.

(c)     Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Acquired Assets (including access to books and records and Tax Returns and related working papers dated before the Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any federal, state or local business tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Acquired Assets are located; provided, however, that neither Buyer nor Seller shall be required to disclose the contents of its income Tax Returns to any Person other than the Parties. For the avoidance of doubt, Buyer shall prepare and file Tax Returns with respect to Apportioned Taxes and, to the extent required by applicable law, Seller shall promptly execute and return such Tax Returns to Buyer for timely filing. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(c) shall be borne by the Party requesting it.

(d)     Any Tax Refund of Seller that is attributable to Buyer's payment of Apportioned Taxes pursuant to Section 8.1(b) shall be promptly paid to Buyer.

8.2     Payments Received.

Seller, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which belongs to the other and will account to the other for all such receipts.

8.3     Assumed Contracts: Adequate Assurance and Performance. Buyer shall, and shall cause its Affiliates to, use commercially reasonable efforts to provide adequate assurance of the future performance by Buyer of each Assumed Contract as required under Section 365 of the Bankruptcy Code. Buyer and Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's and Seller's Representatives available to testify before the Bankruptcy Court.

8.4     Employee Matters.

(a)     Employees.  Prior to the Closing Date, Buyer shall set initial terms and conditions of employment, including wages, benefits, job duties and responsibilities and work assignment. Buyer shall determine which Employees, if any, to offer employment to, in its sole discretion.  Only Employees who are offered and accept such offers of employment with

50

Buyer based on the initial terms and conditions set by Buyer and further then actually commence employment with Buyer will become "Buyer Employees" after the Closing. Seller shall terminate, or shall cause to be terminated, on or prior to the Closing Date, the employment of all Employees who are offered and accept offers of employment with Buyer pursuant to this Section 8.4(a). Notwithstanding the foregoing, nothing herein will, after the Closing Date, impose on Buyer any obligation to retain any Buyer Employee in its employment for any amount of time or on any terms and conditions of employment. Except as described in the remaining sentences of this Section 8.4, the employment of each such Buyer Employee with Buyer will commence immediately after the Closing Date. In the case of any individual who is offered employment by Buyer and accepts such offer, but who is absent from active employment and receiving short-term disability or workers' compensation benefits, the employment of any such individual with Buyer would commence upon his or her return to active work, and such individual would become a Buyer Employee as of such date. Except as otherwise required by Legal Requirement, specified in this Agreement, or otherwise agreed in writing by Buyer, Buyer shall not be obligated to provide any severance, separation pay, or other payments, rights or benefits, including any key employee retention payments, to any Employee on account of any termination of such Employee's employment before the Closing, and such payments, rights and/or benefits (if any) shall remain obligations of Seller.

(b)     Access to Information.  After the Execution Date, Seller shall provide Buyer and its Affiliates with reasonable access to the Employees and with information, including employee records, compensation and Benefit Plan data, reasonably requested by Buyer and such Affiliates, in each case at such times and in a manner requested by Buyer and reasonably acceptable to Seller, and except as otherwise prohibited by Legal Requirements.

(c)     Payroll Taxes.  For purposes of payroll Taxes with respect to Buyer Employees, Seller shall treat the transactions contemplated hereby, as a transaction described in Treasury Regulation Sections 31.3121(a)(1)-1(b)(2) and 31.3306(b)(1)-(b)(2) (i.e., Buyer shall be treated as a successor for payroll Tax purposes); and as such, Seller and Buyer shall report on a predecessor/successor basis as set forth under the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320.

(d)     No Third Party Beneficiaries; Employment Status.  All provisions contained in this Agreement with respect to employee benefit plans or compensation of Buyer Employees are included for the sole benefit of the respective Parties. Nothing contained herein (i) shall confer upon any former, current or future employee of Seller or Buyer or any legal representative or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (ii) shall cause the employment status of any former, present or future Employee to be other than terminable at will or (iii) shall confer any third party beneficiary rights upon any Buyer Employee or any dependent or beneficiary thereof or any heirs or assigns thereof.

8.5     Post-Closing Books and Records and Personnel.

From and after the Closing Date for a period of one (1) year, each Party shall provide the other Party (and its Representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with such Party's normal business, to the assets, books,

records, systems and other property and any employees of such Party (for the avoidance of doubt, access to assets, books, records, systems and other property and employees of Seller shall be limited to that as is primarily related to the Business and the Acquired Assets) so as to enable Buyer and Seller to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, to prosecute and defend legal Actions or for other like purposes, including Claims, objections and resolutions, and to enable Seller to wind down the Business. During such one (1)-year period, each Party (and their respective Representatives) shall be permitted to make copies of any books and records described in this <u>Section 8.5</u>, subject to the confidentiality requirements set forth in <u>Sections 7.1</u> and <u>12.2</u>. If any Party desires to dispose of any such books and records, such Party shall, thirty (30) days prior to such disposal, provide the other Party with a reasonable opportunity to remove or copy such records to be disposed of at the removing Party's expense. Buyer shall retain such books and records for a period of six (6) years following the Closing.

8.6    <u>Casualty Loss</u>.

Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is condemned or taken by eminent domain, or is damaged or destroyed by act of God, fire, explosion, collision, earthquake, windstorm, flood, terrorism, or other casualty, Seller shall notify Buyer promptly in writing of such fact, and (a) in the case of condemnation or taking, Seller shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing, and (b) in the case of act of God, fire, explosion, collision, earthquake, windstorm, flood, terrorism, or other casualty, Seller shall assign the insurance proceeds therefrom to Buyer at the Closing. Notwithstanding the foregoing, the provisions of this <u>Section 8.6</u> shall not in any way modify Buyer's other rights under this Agreement, including any applicable right to terminate the Agreement if any condemnation, taking, damage or other destruction resulted in a Material Adverse Effect. With regard to any such event occurring after the Petition Date and prior to the Closing, Buyer may elect to exclude the affected Acquired Assets from this Agreement, without reduction to the Purchase Price, and the affected Acquired Assets shall be treated as Excluded Assets for all purposes under this Agreement.

8.7    <u>Insurance Cooperation</u>.

Notwithstanding anything to the contrary in this Agreement, (a) from and after the Closing, Buyer shall be entitled to the benefits under the Insurance Policies held by Seller in effect on or prior to the Closing Date with respect to the Acquired Assets, the Business, and the Assumed Liabilities (collectively, the "<u>Seller Insurance Policies</u>"), but only to the extent permissible under Seller Insurance Policies and subject to the terms, conditions and limitations set forth therein (b) at Closing Seller shall assign, to the extent assignable, to Buyer the right, power and authority, to make directly to the insurer any request for payment under Seller Insurance Policies relating to any claims in respect to the Acquired Assets, the Business, and the Assumed Liabilities that would be covered by Seller Insurance Policies based on event or occurrences on or prior to the Closing with respect to the Acquired Assets, the Business, and the Assumed Liabilities, or in the event Buyer is unable to make direct claim for payment, Seller shall cooperate with Buyer in filing any insurance claims and in the collection of insurance proceeds, including where permitted by law transferring to Buyer the right to pursue insurance proceeds related to such claims; and (c) at Closing Seller shall assign, to the extent assignable, to

Buyer the right to receive any future proceeds (including any proceeds in respect of business interruption insurance for any period after the Closing) relating to any such claim following the Closing.  Any party receiving a notice with respect to any such claim shall promptly notify all other Parties hereto.

       8.8      No Use by Buyer of Murray Brand IP.

      Buyer shall not have any right to, and shall not, (a) at any time use or authorize the use of any Murray Brand IP, (b) register, seek to register, claim any intellectual property or other proprietary right in or use any Trademark that is Murray Brand IP or that may be confusingly similar to any Murray Brand IP, or (c) contest or assist any third party to contest (i) Seller's registered or unregistered intellectual property rights or other proprietary rights in or to any Murray Brand IP or (i) any application by Seller for registration of intellectual property rights in any Murray Brand IP. This Section 8.8 shall survive the Closing and continue in full force and effect thereafter in perpetuity.

# ARTICLE 9

## Conditions Precedent to Obligations of Buyer to Close

      The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Buyer, in its sole and absolute discretion:

       9.1      Accuracy of Representations.

      The representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects (except that those representations and warranties which are qualified as Material Adverse Effect shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date); provided, however, that in the event of a breach of a representation or warranty other than a representation or warranty qualified by Material Adverse Effect, the condition set forth in this Section 9.1 shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a Material Adverse Effect. Buyer shall have received a certificate of Seller to such effect signed by a duly authorized officer of Seller.

       9.2      Seller's Performance.

      The covenants and agreements that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects and Buyer shall have received a certificate of Seller to such effect signed by a duly authorized officer of Seller.

       9.3      No Order.

113605837v25

No Governmental Authority shall have enacted, issued, promulgated, decreed or entered any Final Order from and after the Execution Date, which is in effect and has the effect of prohibiting (or delaying beyond the Outside Date) the consummation of or imposing material modifications on the transactions contemplated hereby.

9.4     Governmental Authorizations.

To the extent that the HSR Act is applicable, any waiting period (and any extension thereof) under the HSR Act and the antitrust legislation of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business contemplated hereby shall have expired or shall have been terminated.

9.5     Seller's Deliveries.

Each of the deliveries required to be made to Buyer pursuant to Section 4.3 shall have been so delivered.

9.6     Sale Order.

The Bankruptcy Court shall have entered the Sale Order in form and substance, including with respect to all findings of fact and conclusions of law, acceptable to Seller and Buyer, and the Sale Order shall have become a Final Order.

9.7     Material Adverse Effect.

Since the Execution Date, no Material Adverse Effect shall have occurred.

9.8     Frustration of Conditions.

Notwithstanding anything to the contrary herein, Buyer may not rely on the failure of any condition set forth in this Article 9 to be satisfied to excuse it from its obligation to effect the transactions contemplated hereby if such failure was caused by Buyer's breach of this Agreement.

# ARTICLE 10

## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF SELLER TO CLOSE

The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Seller, in its sole and absolute discretion:

10.1    Accuracy of Representations.

The representations and warranties of Buyer set forth in Article 6 of this Agreement shall be true and correct in all material respects (except that those representations and warranties which are qualified as to Material Adverse Effect shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date); provided,

54

however, that in the event of a breach of a representation or warranty, the condition set forth in this Section 10.1 shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a material adverse effect on the ability of Buyer to consummate the transactions contemplated hereby. Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer of Buyer.

10.2    Buyer's Performance.

The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects, and Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer of Buyer.

10.3    No Order.

No Governmental Authority shall have enacted, issued, promulgated, decreed, or entered any Final Order from and after the Execution Date, which is in effect and has the effect of prohibiting (or delaying beyond the Outside Date) the consummation of the transactions contemplated hereby.

10.4    Governmental Authorizations.

To the extent that the HSR Act is applicable, any waiting period (and any extension thereof) under the HSR Act and the antitrust legislation of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business contemplated hereby shall have expired or shall have been terminated.

10.5    Sale Order.

The Bankruptcy Court shall have entered the Sale Order in form and substance, including with respect to all findings of fact and conclusions of law, acceptable to Seller and Buyer, and the Sale Order shall have become a Final Order.

10.6    Buyer's Deliveries.

Each of the deliveries required to be made to Seller pursuant to Section 4.2 shall have been so delivered.

## ARTICLE 11

### TERMINATION

11.1    Termination Events.

Notwithstanding anything to the contrary, this Agreement may be terminated at any time prior to the Closing only as follows:

(a)    by mutual written consent of Seller and Buyer;

(b)    by written notice from either Seller or Buyer:

(i)    if a Governmental Authority issues a final, non-appealable ruling or Order permanently restraining, enjoining or otherwise prohibiting consummation of the transactions contemplated hereby where such ruling or Order was not requested, encouraged or supported by Seller or Buyer; provided, however, that the right to terminate this Agreement under this Section 11.1(b)(i) shall not be available to any Party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Outside Date;

(ii)    if the Closing shall not have occurred on or prior to the date that is 75 days following the Petition Date, unless otherwise agreed by the Parties (the "Outside Date"); provided, however, that the terminating party under this Section 11.1(b)(ii) is not (at such time of termination) in breach of any representation, warranty, covenant or other agreement in this Agreement so as to cause any condition to the Closing not to be satisfied;

(iii) if the Bankruptcy Court shall have entered an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Seller under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case; or

(iv)  upon the entry into a definitive agreement for an Alternative Transaction.

(c)    by written notice from Buyer in the event of any breach, or failure to perform, by Seller of any of its agreements, covenants, representations or warranties contained herein, which breach or failure to perform (i) would result in Seller being unable to satisfy a condition set forth in Article 9 by the then-applicable Outside Date, and (ii) cannot be cured within ten (10) Business Days after Buyer notifies Seller of such breach in writing; provided, however, that Buyer shall not have a right of termination pursuant to this Section 11.1(c) if it is then in breach of any of its agreements, covenants, representations or warranties contained herein or in the Sale Order; or

(d)    by written notice from Seller in the event of any breach, or failure to perform, by Buyer of any of its agreements, covenants, representations or warranties contained herein, which breach or failure to perform (i) would result in Buyer being unable to satisfy a condition set forth in Article 10 by the then-applicable Outside Date, and (ii) cannot be cured within ten (10) Business Days after Seller notifies Buyer of such breach in writing; provided, however, that Seller shall not have a right of termination pursuant to this Section 11.1(d) if Seller is then in breach of any of Seller's agreements, covenants, representations or warranties contained herein or in the Sale Order.

(e)    by written notice from Buyer in the event of any of the following: (i) the Bankruptcy Case is not commenced by February 13, 2020; (ii) a motion is not filed for approval of the Bidding Procedures by February 13, 2020; (iii) the Bidding Procedures Order does not authorize the Seller's execution and delivery of this Agreement; and (iv) without limiting the generality of the foregoing, the payment in full of the Termination Payment, upon the terms set forth in this Agreement in the event this Agreement is terminated upon the entry by

56

Seller into an agreement for an Alternative Transaction, is not authorized by the Bidding Procedures Order.

Each condition set forth in this <u>Section 11.1</u> pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in this <u>Section 11.1</u> are applicable, the applicable party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

11.2    <u>Effect of Termination</u>.

In the event of termination of this Agreement by Buyer or Seller pursuant to this <u>Article 11</u>, (a) this Agreement shall become null and void and have no effect, and (b) all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party, except (i) nothing herein shall relieve any Party from Liability for any breach of this Agreement occurring prior to such termination, and (ii) the provisions of <u>Section 7.1(a)</u> (Access and Reports; Confidentiality), <u>Section 12.3</u> (Public Announcements), <u>Section 12.9</u> (Expenses), <u>Section 12.10</u> (Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver) and this <u>Section 11.2</u> (and, to the extent applicable to the interpretation or enforcement of such provisions, <u>Article 1</u> and <u>Article 12</u>), shall expressly survive the termination of this Agreement.  Further, and notwithstanding any provision contained herein that may be to the contrary, in the event of termination of this Agreement following the entry into a definitive agreement for an Alternative Transaction, Seller shall pay to Buyer the Termination Payment not later than one (1) Business Day following the earlier to occur of the consummation of the Alternative Transaction and the termination of this Agreement. Each Party expressly acknowledges that the terms of the preceding sentence are an integral part of this Agreement and that, without such terms, Buyer would not have entered into this Agreement and that any and all amounts payable with respect to the Termination Payment do not constitute a penalty.

# ARTICLE 12

## <u>GENERAL PROVISIONS</u>

12.1    <u>Survival</u>.

All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach thereof.

12.2    <u>Confidentiality</u>.

Each Party agrees that it will treat in confidence all documents, materials and other information which it shall have obtained regarding the other Party and its Affiliates during the course of the negotiations leading to the consummation of the transactions contemplated

57

hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and the Transaction Documents, and, in the event the transactions contemplated hereby shall not be consummated, each Party will return to the other Party all copies of nonpublic documents and materials which have been furnished in connection therewith.  Without limiting the right of either Party to pursue all other legal and equitable rights available to it for violation of this Section 12.2 by the other Party, it is agreed that other remedies cannot fully compensate the aggrieved Party for such a violation of this Section 12.2 and that the aggrieved Party shall be entitled to injunctive relief to prevent a violation or continuing violation hereof.  Notwithstanding the foregoing, Seller may disclose such information contemplated by this Section 12.2 if Seller believes (after consultation with counsel) it is legally required to make such disclosure in order to comply with applicable law, regulation, rule or legal, judicial or administrative process (including any rule, regulation or policy statement of (a) any self-regulatory organization of which Seller or its Affiliates is a member, or (b) in connection with the Bankruptcy Case).

12.3    Public Announcements.

Except as required in the Bankruptcy Case, prior to the Closing, unless otherwise required by applicable Legal Requirement or by obligations of Buyer or Seller or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Buyer, on the one hand, and Seller, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed). From and after the Closing, the Parties may make public statements with respect to this Agreement or the transactions contemplated hereby so long as such announcements do not disclose the specific terms or conditions of this Agreement except where such terms and conditions have already been disclosed as required by Legal Requirement; provided, however, that the issuing party shall use its commercially reasonable efforts to consult with the other party with respect to the text thereof to the extent practicable.

12.4    Notices.

All notices, requests, demands, waivers, approvals, consents and other communications (each, a "Notice") required or permitted to be given under this Agreement shall be in writing and shall be (a) delivered personally or by commercial messenger, (b) sent via a recognized overnight courier service, (c) sent by registered or certified mail (postage prepaid and return receipt requested), or (d) sent by e-mail transmission (provided that, in the case of this clause (d), a copy of such e-mail transmission also shall be transmitted by one of the other foregoing means):

(i)    If to Seller, then to:

c/o Murray Metallurgical Coal Holdings, LLC
46226 National Road
St. Clairsville, OH 43950
Attn:    Robert Moore
Email:   rmoore@coalsource.com

58

with a copy (which shall not constitute notice) to:

Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
Attn:     David Hillman
            Charles Dale
            Timothy Karcher
            James Gerkis
Email:   dhillman@proskauer.com
            cdale@proskauer.com
            tkarcher@proskauer.com
            jgerkis@proskauer.com

**(ii)  If to Buyer:**

c/o Blackhawk Mining, LLC
3228 Summit Square Place, Suite 180
Lexington, KY 40509
Attn:    Elizabeth Nicholas, General Counsel
Email:   enicholas@blackhawkmining.com

with a copy (which shall not constitute notice) to:

Jackson Kelly PLLC
221 NW Fifth Street
Evansville, IN 47708
Attn:    Charles Compton
Email:   charles.compton@jacksonkelly.com

; or to such other Person or address as any Party shall specify by Notice to the other Party.  All Notices shall be deemed given upon receipt or refusal of receipt.

12.5    <u>Waiver</u>.

Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by Legal Requirements, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

12.6    <u>Entire Agreement; Amendment</u>.

This Agreement (including the Disclosure Schedules), the Sale Order, the Bidding Procedures Order and the other Transaction Documents supersede all prior agreements between Buyer, on the one hand, and Seller, on the other hand, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on

59

the one hand, and Seller, on the other hand, with respect to their subject matter. This Agreement may not be amended, modified or supplements except by a written agreement executed by each of the Parties.

12.7    Assignment.

This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of all of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party) and any assignment in contravention of this Section 12.7 shall be null and void ab initio.

12.8    Severability.

The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

12.9    Expenses.

Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated hereby are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby. Any and all fees required by (a) any Governmental Authority or any Person to obtain or for the transfer of a Permit, or (b) incurred in connection with complying with any Antitrust Law, shall be the sole responsibility of Buyer.

12.10    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of

60

an inconvenient forum to the maintenance of any such Action or Proceeding; provided, however, that, if the Bankruptcy Case has been closed pursuant to Section 350(a) of the Bankruptcy Code, all Actions and Proceedings arising out of or relating to this Agreement shall be heard and determined in a New York state court or a federal court sitting in the Borough of Manhattan, New York, New York, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding. The Parties consent to service of process by mail (in accordance with Section 12.4) or any other manner permitted by law.

(c)      THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLER, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

12.11   Counterparts.

This Agreement and any amendment hereto may be executed with counterpart signature pages or in one or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment, and all of which, when taken together, shall constitute one and the same instrument. Delivery of an executed counterpart signature page or counterpart by facsimile or other electronic transmission (including an e-mail attachment that contains a portable document format (.pdf) file of an executed counterpart signature page or executed counterpart) shall be effective as delivery of a manually executed counterpart signature page or counterpart.

12.12   Parties in Interest; No Third Party Beneficiaries; No Amendment.

This Agreement and the other Transaction Documents shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This Agreement and the other Transaction Documents are for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

12.13   Remedies.

Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit Seller or Buyer in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

12.14   Specific Performance.

Each Party recognizes that irreparable damage would occur if any of the provisions of this Agreement were not performed by such Party in accordance with the provisions hereof or were otherwise breached, and that monetary damages alone would not be adequate to compensate the non-breaching Party for its injuries. Accordingly, a non-breaching Party shall be entitled, in addition to any other remedies that may be available, to seek injunctive

61

relief to specifically enforce the provisions of this Agreement. If any Action or Proceeding is brought by the non-breaching Party to enforce any of the provisions of this Agreement pursuant to this Section 12.14, the Party in breach shall waive the defense that there is an adequate remedy at law. Each Party shall waive any requirement for the security or posting of any bond in connection with any Action or Proceeding seeking specific performance of any of the provisions hereof and that the only permitted objection that it may raise in response to any action for specific performance of such provisions is that it contests the existence of a breach or threatened breach of such provisions. The rights and remedies set forth in this Section 12.14 shall be in addition to any other rights and remedies that a Party may have at law, in equity or otherwise.

*[Signature page(s) follow.]*

113605837v25

**IN WITNESS WHEREOF,** the Parties have caused this Asset Purchase Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

<u>**SELLER**</u>:

MURRAY MAPLE EAGLE COAL, LLC

By:     Murray Eagle Mining, LLC
Its:     Managing Member

By:     _Robert D. Moore_____
        Robert D. Moore
        Vice President

**BUYER**:

PANTHER CREEK MINING, LLC

By:

Name: Jesse Parrish

Title: President

## **Exhibit 2**

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MURRAY METALLURGICAL COAL | ) | Case No. 20-10390 (JEH) |
| HOLDINGS, LLC, *et al.*,[1] | ) | |
| | ) | Judge John E. Hoffman, Jr. |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**BIDDING PROCEDURES FOR THE SALE OF**
**SUBSTANTIALLY ALL ASSETS OF MURRAY MAPLE EAGLE COAL, LLC**

On [•], 2020, the United States Bankruptcy Court for the Southern District of Ohio (the "Court") entered the *Order Establishing Bidding Procedures Relating to the Sale of All or a Portion of the Debtors' Assets* [Docket No. __] (the "Bidding Procedures Order"),[2] by which the Court approved the following procedures. These Bidding Procedures set forth the process by which the Debtors are authorized, in consultation with the Consultation Parties,[3] to conduct an auction (the "Auction"), if any, for the sale (the "Sale") of all, substantially all, or any combination of the assets (the "Assets") of Murray Maple Eagle Coal, LLC ("Maple Eagle").

The Buyer (including its assignees or designees, the "Stalking Horse Bidder") submitted a bid (the "Stalking Horse Bid") for certain of the Debtors' assets to set a floor for the Sale. Having announced and received Court approval of the Stalking Horse Bid, the Debtors will now conduct a round of open bidding intended to obtain the highest or otherwise best bid for all, substantially all, or any combination of the Assets, culminating in an Auction for such Assets if competing bids are received.

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Murray Metallurgical Coal Holdings, LLC (4633); Murray Eagle Mining, LLC (4268); Murray Alabama Minerals, LLC (4047); Murray Alabama Coal, LLC (3838); Murray Maple Eagle Coal, LLC (4435); and Murray Oak Grove Coal, LLC (4878). The Debtors' primary business address is 46226 National Road, St. Clairsville, OH 43950.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Bidding Procedures Order.

[3] "Consultation Parties" means the following parties: (a) the DIP Lenders (as defined in the Final DIP Order) and their counsel and financial advisors; and (b) counsel and financial advisors to any official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "Committee"). Notwithstanding the foregoing, a party shall not be a Consultation Party if such party is a bidder at the Auction; *provided, however,* if any such Consultation Party notifies the Debtors in writing that it irrevocably forfeits its rights to be a bidder, the foregoing restriction shall no longer apply with respect to such Consultation Party upon the Debtors' receipt of such notice.

**Copies of the Bidding Procedures Order or other documents related thereto are available upon request to Prime Clerk by calling (877) 427-7610 or visiting the Debtors' restructuring website at (https://cases.primeclerk.com/MurrayMET).**

To the extent that these Bidding Procedures require the Debtors to consult with any Consultation Party in connection with making a determination or taking any action, or in connection with any other matter related to these Bidding Procedures or at the Auction, of any, the Debtors shall do so in a regular and timely manner prior to making such determination or taking any such action.

### Key Dates

These Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Debtors and to submit competing bids for the Assets.  The Debtors shall assist interested parties in conducting their respective due diligence investigations and shall accept Bids until **March 20, 2020 at 4:00 p.m. (prevailing Eastern time)** (the "Bid Deadline").

The key dates for the sale process are as follows:[4]

| | |
|---|---|
| March 20, 2020 at 4:00 p.m. (prevailing Eastern time) | Bid Deadline - Due Date for Bids and Deposits |
| March 23, 2020 at 4:00 p.m. (prevailing Eastern time) | Debtors to determine which Bids are Qualified Bids and notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder. |
| March 24, 2020 at 10:00 a.m. (prevailing Eastern time) | Auction (if necessary), which will be held at Proskauer Rose LLP, Eleven Times Square, New York, New York 10036. |
| [_____], 2020 at 10:00 a.m. (prevailing Eastern time) | Sale Hearing, provided there is no Auction, which will be held at the United States Bankruptcy Court for the Southern District of Ohio, Southern Division, 170 North High Street, Columbus, Ohio 43215. |

Unless otherwise approved by the Court, no modification, extension, waiver or addition to these Bidding Procedures shall be inconsistent with the Stalking Horse Purchase Agreement, the Bidding Procedures Order or any other Order of the Court, unless otherwise ordered by the Court.

---

[4]     These dates are subject to extension or adjournment as provided for herein.

**Submissions to the Debtors.**

These Bidding Procedures set forth the terms by which prospective bidders, if any, may qualify for and participate in an Auction, thereby competing to make the highest or otherwise best offer or combination of offers for all, substantially all, or any combination of the Assets, which in the aggregate will make the highest or otherwise best offer to purchase the Assets. The Debtors, in consultation with the Consultation Parties, may consider bids from multiple bidders (including multiple bids submitted by the same bidder) for the Assets in any combination. The Stalking Horse Purchase Agreement and Stalking Horse Bid referenced herein provide for the Stalking Horse Bidder's acquisition of certain of Maple Eagle's assets, subject to the terms and conditions thereof.

**Potential Bidders.**

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity (other than the Stalking Horse Bidder) interested in consummating a Sale (a "<u>Potential Bidder</u>") must deliver or have previously delivered to the Debtors:

      A.    **an executed confidentiality agreement on terms acceptable to the Debtors (a "<u>Confidentiality Agreement</u>"), to the extent not already executed;**

      B.    **in a form acceptable to the Debtors and their advisors, in consultation with the Consultation Parties: (x) evidence of the financial capability to consummate the Sale, and (y) a written commitment from the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the Sale); and**

      C.    **any other evidence the Debtors, in consultation with the Consultation Parties, may reasonably request to evaluate the buyer.**

**Due Diligence.**

Only Potential Bidders shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors. **No Potential Bidder will be permitted to conduct any due diligence that includes confidential information without entering into a Confidentiality Agreement with the Debtors**. The Debtors will provide to each Potential Bidder that satisfies the foregoing commercially reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post all written due diligence provided to any Potential Bidder to the Debtors' electronic data room. For all Potential Bidders, the due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Assets, liabilities of the Debtors, or the Sale to any person except to a Potential Bidder or to such Potential Bidder's duly authorized representatives to the extent provided in the applicable Confidentiality Agreement.

The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided that* the Debtors may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.

The Debtors also reserve the right to, in consultation with the Consultation Parties, withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors.  Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Potential Bidder.

**All due diligence requests must be directed to** Evercore Group LLC, 55 East 52nd St., New York, New York 10055, Attn:  Gregory Berube (Gregory.berube@evercore.com), Jeremy Matican (matican@evercore.com), Pranav Goel (pranav.goel@evercore.com), and Michael Shilling (michael.shilling@evercore.com).

## I.      Communications with Potential Bidders.

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive communications related to the Sale between and amongst Potential Bidders shall exclusively be through the Debtors and the Debtors' advisors.  Communications between and amongst Potential Bidders is expressly prohibited unless the Debtors expressly consent in writing to such communication.

## II.     Due Diligence from Potential Bidders.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors, regarding the ability of the Potential Bidder to consummate the Sale.  Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, in consultation with the Consultation Parties, to determine that such bidder is no longer a Potential Bidder or that a bid made by such Potential Bidder is not a Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures.  Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process or otherwise in connection with the chapter 11 cases or in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable confidentiality agreement, the Debtors and the Debtors' advisors may disclose confidential information: (i) with the prior written consent of such bidder; (ii) to the applicable bidder; (iii) in accordance with these Bidding Procedures, including to any Consultation Party; and (iv) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

**Qualified Bidders.**

1.  A "Qualified Bidder" is a Potential Bidder (A) who demonstrates the financial capability to consummate the Sale (as determined by the Debtors in consultation with the Consultation Parties), (B) whose Bid is a Qualified Bid (as defined herein), and (C) that the Debtors, in consultation with the Consultation Parties, determine should be considered a Qualified Bidder. Within three business days after the Bid Deadline, the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder. The Stalking Horse Bidder shall be deemed a Qualified Bidder for all purposes under these Bidding Procedures and at all times.

2.  If any Potential Bidder is determined by the Debtors, in consultation with the Consultation Parties, not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit and all accumulated interest thereon on or within five business days after the Bid Deadline.

3.  For the avoidance of doubt, the Debtors expressly reserve the right to notify a Potential Bidder that its bid is not a Qualifying Bid (a "Non-Qualifying Bid") and permit a Potential Bidder to revise or supplement a Non-Qualifying Bid to make it a Qualified Bid.

4.  Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, if any, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Except as otherwise set forth in the Stalking Horse Agreement, without the written consent of the Debtors, in consultation with the Consultation Parties, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase their consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction, if any, as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

**Bid Requirements.**

A proposal, solicitation, or offer (each, a "Bid") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (the "Bid Requirements") as determined by the Debtors, in their reasonable business judgment and after consultation with the Consultation Parties, shall constitute a "Qualified Bid").

I. **Assets. Each Bid must clearly state which Assets that the Qualified Bidder is agreeing to purchase and assume.**

II. **Assumption of Obligations. Each Bid must clearly state which liabilities and obligations of the Debtors the Qualified Bidder is agreeing to assume.**

III. **Purchase Price. Each Bid must clearly set forth the purchase price to be paid for the applicable asset package, including and identifying separately any cash and non-cash components, which non-cash components shall be limited only to credit-bids and assumed liabilities (the "Purchase Price").**

IV. **Minimum Initial Overbid. At a minimum, each Bid seeking to acquire all of Maple Eagle's assets that are the subject of the Stalking Horse Bid must have a Purchase Price that in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, has a monetary value greater than the sum of (i) the Purchase Price, (ii) the Stalking Horse Bid Protections, and (iii) $250,000 (collectively, the "Minimum Initial Overbid").**

V. **Markup of the Stalking Horse Purchase Agreement. Each Bid must be accompanied by an executed purchase agreement as well as a redline of such agreement marked to reflect the amendments and modifications made to the form of the Stalking Horse Purchase Agreement provided by the Debtors to Potential Bidders. Each such purchase agreement must provide a representation that the Qualified Bidder will (i) make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), if applicable, and (ii) submit and pay the fees associated with all necessary filings under the HSR Act as soon as reasonably practicable; *provided, however*, that the timing and likelihood of receiving HSR Act approval will be a consideration in determining the highest or otherwise best Bid.**

VI. **Deposit. Each Bid, other than the Stalking Horse Bid, must be accompanied by a cash deposit in the amount equal to 10 percent of the aggregate cash Purchase Price of the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Deposit").**

VII. **Qualified Bid Documents. Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid, and a copy of the Asset Purchase Agreement**

clearly marked to show all changes requested by the Qualified Bidder, including those related to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid (the "**Qualified Bid Documents**").

VIII. **Committed Financing.** To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtors in consultation with the Consultation Parties, that demonstrates that the Qualified Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors, in consultation with the Consultation Parties.

IX. **Contingencies; No Financing or Diligence Outs.** A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall be acceptable to the Debtors in their business judgment, after consultation with the Consultation Parties.

X. **Identity.** Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Qualified Bidder if such Qualified Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation. Each Bid must also fully disclose whether any current or former officer, director or equity holder of the Debtors, or any entity affiliated with any current or former officer, director or equity holder of the Debtors, will be bidding or otherwise participating in connection with such Bid. Under no circumstances shall any undisclosed insiders, principals, equity holders, or financial backers be associated with any Bid (including any Overbid at the Auction). Each Bid must also include contact information for the specific persons and counsel whom Evercore Group LLC and Proskauer Rose LLP should contact regarding such Bid. All information disclosed pursuant to this paragraph shall be made available by the Debtors to the Consultation Parties promptly upon the Debtors' receipt thereof but in any event no later than one business day following the Bid Deadline.

XI.  **Demonstrated Financial Capacity.  A Qualified Bidder must have, in the Debtors' business judgment, after consultation with the Consultation Parties, the necessary financial capacity to consummate the proposed transactions required by its Bid.**

XII.  **Adequate Assurance of Future Performance.  Each Bid must (i) identify the executory contracts and unexpired leases to be assumed and assigned in connection with the proposed Sale, (ii) provide for the payment of all cure costs related to such executory contracts and unexpired leases by the Qualified Bidder and (iii) demonstrate, in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, that the Qualified Bidder can provide adequate assurance of future performance under all such executory contracts and unexpired leases.**

XIII.  **Time Frame for Closing.  A Bid by a Qualified Bidder must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors, after consultation with the Consultation Parties, which time frame shall include a closing by no later than May 6, 2020.**

XIV.  **Binding and Irrevocable.  A Qualified Bidder's Bid for a particular asset package shall be irrevocable unless and until the Debtors accept a higher Bid for such asset package and such Qualified Bidder is not selected as the Backup Bidder for such asset package.**

XV.  **Expenses; Disclaimer of Fees.  Each Bid (other than a Stalking Horse Bid, solely to the extent set forth in the Stalking Horse Agreement) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidder, solely to the extent set forth in the Stalking Horse Agreement) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction, if any, or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.**

XVI.  **Authorization.  Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors, in consultation with the Consultation Parties) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.**

XVII. **As-Is, Where-Is.** Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Asset Purchase Agreement.

XVIII. **Adherence to Bid Procedures.** By submitting its Bid, each Qualified Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction, if any.

XIX. **Transfer of Mining Permits/Assumption of Reclamation Obligations.** Each Bid must (i) provide that the Bidder will: (a) take transfer of or obtain permits for the mining operations to be acquired; (b) assume all associated reclamation obligations with respect to Maple Eagle; and (c) obtain assignment of or replace the reclamation surety bonds associated with such permits, and (ii) provide evidence of: (a) the Bidder's ability to satisfy the conditions set forth in clause (i) of this paragraph (including verification that the Bidder is not, and will not be as of the time of the transfer, "permit blocked" under the federal Surface Mining Control and Reclamation Act by application of the federal Applicant Violator System); and (b) the Bidder's financial resources necessary to obtain assignment of or replace the reclamation surety bonds associated with such permits, which evidence may include a letter from a surety company confirming that the Bidder is a "qualified buyer" (as such term is used in the surety industry) (clauses (i) and (ii), collectively, the "<u>Reclamation Obligations Bid Requirement</u>").

XX. **Government Approvals.** Each Bid must include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Sale, together with evidence satisfactory to the Debtors, after consultation with the Consultation Parties, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals.

XXI. **Government Approvals Timeframe.** Each Bid must set forth an estimated timeframe for obtaining any required internal, governmental, licensing, regulatory or other approvals or consents for consummating any proposed Sale.

XXII. **Consent to Jurisdiction. The Qualified Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, if any, the construction and enforcement of these Bidding Procedures, the Sale documents, and the Closing, as applicable.**

XXIII. **Bid Deadline. Each Bid must be transmitted via email (in .pdf or similar format) so as to be** <u>**actually received**</u> **on or before 4:00 p.m. (prevailing Eastern Time) on March 20, 2020 by:**

A. **Debtors. Murray Metallurgical Coal Holdings, LLC, 46226 National Road, St. Clairsville, OH 43950, Attn: Andrew Balcar.**

B. **Debtors' Counsel. Proskauer Rose LLP, Eleven Times Square, New York, New York 10036, Attn: David M. Hillman (dhillman@proskauer.com), Timothy Q. Karcher (tkarcher@proskauer.com), and Chris Theodoridis (ctheodoridis@proskauer.com) and Proskauer Rose LLP, One International Place, Boston, Massachusetts 02110, Charles A. Dale (cdale@proskauer.com).**

C. **Debtors' Co-Counsel. Allen Stovall Neuman Fisher & Ashton LLP, 17 South High Street, Suite 1220, Columbus, Ohio 43215, Attn: Thomas R. Allen (allen@asnfa.com) and Richard K. Stovall (stovall@asnfa.com).**

D. **Debtors' Financial Advisors. Evercore Group LLC, 55 East 52nd Street, New York, New York 10055, Attn: Gregory Berube (gregory.berube@evercore.com), Jeremy Matican (matican@evercore.com), Pranav Goel (pranav.goel@evercore.com), and Michael Shilling (michael.shilling@evercore.com) and Alvarez & Marsal, 600 Madison Avenue, New York, NY 10022, Attn: Robert Campagna (rcampagna@alvarezandmarsal.com), Amy Lee (alee@alvarezandmarsal.com), and Holden Bixler (hbixler@alvarezandmarsal.com).**

<u>**Auction.**</u>

The Debtors shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' judgment, after consultation with the Consultation Parties, the highest or otherwise best Qualified Bid or combination of Qualified Bids for the Assets (the "<u>Baseline Bid</u>"), and provide copies of the applicable Qualified Bid Documents supporting the applicable Baseline Bid to each Qualified Bidders at or prior to the Auction. When determining the highest or otherwise best Qualified Bid and selecting the winning bidder, as compared to other Qualified Bids, the Debtors may, in consultation with the Consultation Parties, consider the following factors in addition to any other factors that the Debtors deem appropriate: (a) the number, type, and nature of any changes to the Asset Purchase Agreement or Stalking Horse Purchase Agreement, if any, requested

by the Qualified Bidder, including the type and amount of Assets sought and obligations to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (e) the tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria").  For the avoidance of doubt, when determining the highest or otherwise best Qualified Bid, one dollar of the DIP Claim Amount shall be equal in all respects to one dollar of cash that may be bid by another Qualified Bidder.

If no Qualified Bids other than the Stalking Horse Bid are received by the Bid Deadline, then the Debtors may cancel the Auction, and may decide, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, to designate the Stalking Horse Bid as the Successful Bid, and pursue entry of the order approving a Sale of the Debtors' assets to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement.

The Auction, if any, shall take place at **10:00 a.m. (prevailing Eastern Time) on Tuesday, March 24, 2020**, at the offices of Proskauer Rose LLP, Eleven Times Square, New York, New York 10036, or such later date and time as selected by the Debtors after consultation with the Consultation Parties, and subject to the consent of the DIP Lenders.  The Auction, if any, shall be conducted in a timely fashion according to the following procedures:

### I.    The Debtors Shall Conduct the Auction.

The Debtors and their professionals shall direct and preside over the Auction, if any, in consultation with the Consultation Parties.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid.  The Debtors explicitly reserve the right, in their business judgment and after consultation with the Consultation parties, to exercise their discretion in conducting the Auction, including determining whether to adjourn the Auction to facilitate separate discussions between Qualified Bidders, the Debtors, and the Consultation Parties, as applicable.  The Debtors shall maintain a written transcript of the Auction and all Bids made and announced at the Auction, if any, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only Qualified Bidders and their legal and financial advisors, including the Stalking Horse Bidder, the Consultation Parties, and members and advisors of the Committee and the United States Trustee, shall be entitled to attend the Auction, if any, and the Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives.  Only Qualified Bidders shall be entitled to bid at the Auction, if any.

### II.    Terms of Overbids.

"Overbid" means any bid made at the Auction, if any, by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid.  Each applicable Overbid must comply with the following conditions:

    A.    **Minimum Overbid Increments.  The initial Overbid for all of Maple Eagle's assets shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline**

**Bid by an incremental amount that is not less than $250,000, and successive Overbids higher than the previous bid, as Debtors shall, in consultation with the Consultation Parties, announce at the Auction (the "<u>Minimum Overbid Increment</u>").**

The Debtors reserve the right, in consultation with the Consultation Parties, to announce reductions or increases in the Minimum Overbid Increment at any time during the Auction, if any.  Additional consideration in excess of the amount set forth in the respective Baseline Bid may include: (a) cash and/or noncash consideration; *provided, however,* that the value for such noncash consideration shall be determined by the Debtors in their reasonable business judgment, in consultation with the Consultation Parties; and (b) in the case of a Bid by a Secured Creditor, a credit bid of up to the full amount of the such secured creditors' allowed secured claim including, for the avoidance of doubt, a Bid by the DIP Lenders up to the full amount of the DIP Claim Amount; *provided, however,* that nothing herein shall impact any parties' rights with respect to either (a) challenges to the liens or claims of a Secured Creditor, or (b) solely with respect to Secured Creditors other than the Stalking Horse Bidder, assertions under section 506(c) of the Bankruptcy Code or the effects that such challenges or assertions have, if any, on the ability of the any Secured Creditor to credit bid, in each case, subject to the terms of the Final DIP Order.

B.     **<u>Conclusion of Each Overbid Round</u>.  Upon the solicitation of each round of applicable Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, after consultation with the Consultation Parties, extend from time to time, the "<u>Overbid Round Deadline</u>") by which time any Overbids must be submitted to the Debtors.**

C.     **<u>Overbid Alterations</u>.  An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment after consultation with the Consultation Parties, but shall otherwise comply with the terms of these Bidding Procedures.**

D.     **<u>Announcing Highest Bid</u>.  Subsequent to each Overbid Round Deadline, the Debtors, shall announce whether the Debtors have determined that an Overbid is higher or otherwise better than the Initial Minimum Overbid, or in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.**

III.    **Consideration of Overbids.**

The Debtors reserve the right, in their reasonable business judgment and after consultation with the Consultation Parties, to adjourn the Auction, if any, one or more times to, among other things: (i) facilitate discussions between and amongst the Debtors, the Qualified Bidders and the Consultation Parties, as appropriate; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Debtors and the Consultation Parties with such additional evidence as the Debtors, in their reasonable business judgment, after consultation with the Consultation Parties, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount.

IV.    **Closing the Auction.**

A.    **The Auction, if any, shall continue until there is one (or more) Bids for the Assets that the Debtors determine, in their reasonable business judgment, after consultation with the Consultation Parties, to be the highest or otherwise best Bid or Bids for all Assets. Such Bid (or Bids) shall be declared the "Successful Bid" and such Qualified Bidder, the "Successful Bidder" for such asset package, at which point the Auction will be closed. The Auction, if any, shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Successful Bid(s) is conditioned upon approval by the Court of the Successful Bid(s).**

B.    **A Successful Bidder shall, within one business day after the conclusion of the Auction, submit to the Debtors fully executed revised documentation memorializing the terms of the Successful Bid. The Successful Bid may not be assigned to any party without the consent of the Debtors after consulting with the Consultation Parties.**

C.    **For the avoidance of doubt, nothing in these Bidding Procedures shall prevent the Debtors from exercising their respective fiduciary duties under applicable law.**

D.    **For the avoidance of doubt, no Bid shall be declared the Successful Bid unless such Bid complies with the Reclamation Obligations Bid Requirement.**

E.    **The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, if any, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.**

F.    **As soon as reasonably practicable after closing the Auction, if any, and in any event not less than one business day following closing the**

> **Auction, the Debtors shall cause a notice of Successful Bid and Successful Bidder, and the Qualified Bid Documents for each Successful Bid and Backup Bid, to be filed with the Court.**

V.       **No Collusion; Good-Faith *Bona Fide* Offer.**

Each Qualified Bidder participating at the Auction, if any, will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

**Backup Bidder.**

1.      Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted for all or any portion of the Assets, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for such Asset(s), as determined by the Debtors in the exercise of their reasonable business judgment, after consultation with the Consultation Parties (the "Backup Bid"), shall be required to serve as a backup bidder (the "Backup Bidder") for such Asset(s), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors. For the avoidance of doubt, no Bid shall be declared the Backup Bid unless such Bid complies with the Reclamation Obligations Bid Requirement.

2.      The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction, if any, at the same time the Debtors announce the identity of the Successful Bidder. The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the closing of the transaction with the applicable Successful Bidder. The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder.

3.      If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

All Qualified Bids (other than each Successful Bid and Backup Bid) shall be deemed rejected by the Debtors on and as of the date of approval of each Successful Bid and Backup Bid by the Court. The Debtors, on their behalf and on behalf of each of their respective estates, specifically reserve the right to seek all available damages, including specific performance, from

any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures

## Reservation of Rights.

The Debtors reserve their rights to modify these Bidding Procedures, in their reasonable business judgment, after consultation with the Consultation Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, if any, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction, at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) modifying the Bidding Procedures and/or adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) accepting sealed Bids; (e) canceling the Auction; (f) waiving, or imposing additional, terms and conditions set forth herein with respect to Potential Bidders and (g) rejecting any or all bids or Bids; *provided, however*, that (i) any modification, extension, waiver, or addition to the Bidding Procedures shall not be inconsistent with the Bidding Procedures Order, or any other Order of the Court, unless otherwise ordered by the Court or with the prior consent of the DIP Lenders, and (ii) the Debtors may not waive, amend, or modify the Bidding Procedures or impose terms and conditions on the sale of the Assets in a manner that has an adverse effect on the Reclamation Obligations Bid Requirement.

## Approval of Sale Transactions.

A hearing to consider approval of the Sale of certain of the Assets to the Successful Bidders (the "Sale Hearing") is currently scheduled to take place on or before at **10:00 a.m. (prevailing Eastern Time) on or about March 26, 2020**, before the Honorable John E. Hoffman, at the Court, 170 North High Street, Columbus, Ohio 43215.

**The Sale Hearing may be continued to a later date by the Debtors, after consultation with the Consultation Parties, by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder).**

At the Sale Hearing, the Debtors, in consultation with the Consultation Parties, shall present the Successful Bids to the Court for approval.

## Return of Deposits

The Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by the Debtors, or the Debtors' designee, but shall not become property of the Debtors' estates absent further order of the Court or as expressly provided below. The Deposit of any Qualified Bidder that is neither a Successful Bidder nor a Backup Bidder shall be returned to such Qualified Bidder not later than five business days after the Sale Hearing. The Deposit of each Backup Bidder, if any, shall be returned to such Backup Bidder no later than three business days after the closing of the transaction with the relevant Successful Bidder for the assets bid upon by such Backup Bidder. Upon the return of the Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If a Successful Bidder timely closes on its winning

transaction, its Deposit shall be credited towards the applicable purchase price(s).  If a Successful Bidder (or Backup Bidder, if applicable) fails to consummate a sale transaction because of a breach or failure to perform on the part of such Successful Bidder (or Backup Bidder, if applicable), the Debtors will not have any obligation to return the Deposit deposited by such Successful Bidder (or Backup Bidder, if applicable), and such Deposit shall irrevocably become property of the Debtors without prejudice to any and all rights and remedies that are available to the Debtors at law or in equity.

**Fiduciary Out.**

Nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of any of the Debtors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law; *provided, however*, that the Debtors shall provide the Consultation Parties with advance written notice of such action or inaction within two business days prior to taking such action or inaction.

## **Exhibit 3**

**Sale Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MURRAY METALLURGICAL COAL | ) | Case No. 20-10390 (JEH) |
| HOLDINGS, LLC, *et al.*,[1] | ) |  |
|  | ) | Judge John E. Hoffman, Jr. |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**NOTICE OF AUCTION FOR THE SALE OF THE DEBTORS' ASSETS**

      **PLEASE TAKE NOTICE** that on [•], 2020, the United States Bankruptcy Court for the Southern District of Ohio (the "Court") entered the *Order (I) Authorizing the Entry Into and Performance Under the Stalking Horse Purchase Agreement, (II) Approving Bidding Procedures for the Sale of Assets, (III) Scheduling Hearings and Objection Deadlines with Respect to the Sale (IV) Scheduling Bid Deadlines and an Auction, (V) Approving the Form and Manner of Notice Thereof, (VI) Approving Contract Assumption and Assignment Procedures, and (VII) Granting Related Relief* [Docket No. [•]] (the "Bidding Procedures Order"),[2] authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to conduct an auction (the "Auction") to select the party or parties to purchase the assets of Murray Maple Eagle Coal, LLC.  The Auction will be governed by the bidding procedures approved pursuant to the Bidding Procedures Order (attached to the Bidding Procedures Order as Exhibit 2, the "Bidding Procedures").

Copies of the Bidding Procedures Order, the Bidding Procedures, or other documents related thereto are available upon request to Prime Clerk by calling (877) 427-7610 (United States and Canada) and (917) 962-8958 (International) or visiting the Debtors' restructuring website at https://cases.primeclerk.com/MurrayMET.

      **PLEASE TAKE FURTHER NOTICE** that the Bid Deadline is **Friday, March 20, 2020**, at 4:00 p.m. (prevailing Eastern Time), and that any person or entity who wishes to participate in

---

[1]     The Debtors in these Chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Murray Metallurgical Coal Holdings, LLC (4633); Murray Eagle Mining, LLC (4268); Murray Alabama Minerals, LLC (4047); Murray Alabama Coal, LLC (3838); Murray Maple Eagle Coal, LLC (4435); and Murray Oak Grove Coal, LLC (4878).  The Debtors' primary business address is 46226 National Road, St. Clairsville, OH 43950.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Bidding Procedures Order or the Bidding Procedures, as applicable.

the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that, provided there is no Auction, on or about **March 26, 2020** at 10:00 a.m. (prevailing Eastern Time) or as soon thereafter as the Debtors may be heard, shall be the date and time for the hearing at which the Court will consider approval of the Sale (the "Sale Hearing").

**PLEASE TAKE FURTHER NOTICE** that, in the event there is an Auction, the Debtors intend to conduct the Auction, at which they will consider proposals submitted to the Debtors and their professionals, by and pursuant to the Bidding Procedures as set forth in the Bidding Procedures Order, on **March 24, 2020, at 10:00 a.m. (prevailing Eastern Time)**, at the offices of Proskauer Rose LLP, Eleven Times Square, New York, New York 10036.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right to modify the Bidding Procedures, in their reasonable business judgment in accordance with the Bidding Procedures.

*[Remainder of page intentionally left blank]*

2

Dated:  February 12, 2020
Columbus, Ohio

/s/

Thomas R. Allen (0017513)
Richard K. Stovall (0029978)
James A. Coutinho (0082430)
Matthew M. Zofchak (0096279)
**Allen Stovall Neuman Fisher & Ashton**
17 South High Street, Suite 1220
Columbus, Ohio 43215
Telephone:      (614) 221-8500
Facsimile:      (614) 221-5988
Email:          allen@asnfa.com
                stovall@asnfa.com
                coutinho@asnfa.com
                zofchak@asnfa.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

David M. Hillman (*pro hac vice* pending)
Timothy Q. Karcher (*pro hac vice* pending)
Chris Theodoridis (*pro hac vice* pending)

**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone:      (212) 969-3000
Facsimile:      (212) 969-2900
Email:          dhillman@proskauer.com
                tkarcher@proskauer.com
                ctheodoridis@proskauer.com

                - and -

Charles A. Dale (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
One International Place
Boston, Massachusetts 02110
Telephone:      (617) 526-9600
Facsimile:      (617) 526-9899
Email:          cdale@proskauer.com

*Proposed Counsel to the Debtors and Debtors
in Possession*

3

## **Exhibit 4**

**Cure Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MURRAY METALLURGICAL COAL | ) | Case No. 20-10390 (JEH) |
| HOLDINGS, LLC, *et al.*,[1] | ) | |
| | ) | Judge John E. Hoffman, Jr. |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**NOTICE TO CONTRACT PARTIES TO POTENTIALLY
ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

---

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU
OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN
EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH MURRAY MAPLE
EAGLE COAL, LLC, AS SET FORTH ON <u>EXHIBIT A</u> ATTACHED HERETO.**

 **PLEASE TAKE NOTICE** that on [ ], 2020, the United States Bankruptcy Court for the Southern District of Ohio (the "<u>Court</u>") entered the *Order (I) Authorizing Entry Into and Performance Under the Stalking Horse Purchase Agreement, (II) Approving Bidding Procedures for the Sale of the Debtors' Assets, (III) Scheduling Hearings and Objection Deadlines with respect to the Sale, (IV) Scheduling Bid Deadlines and an Auction, (V) Approving the Form and Manner of Notice Thereof, (VI) Approving Contract Assumption and Assignment Procedures, and (VII) Granting Related Relief* [Docket No. [•]] (the "<u>Bidding Procedures Order</u>"),[2] authorizing the Debtors[3] to conduct an auction (the "<u>Auction</u>") to select the party to purchase the assets of Murray Maple Eagle Coal, LLC ("<u>Maple Eagle</u>"). The Auction will be governed by the bidding procedures approved pursuant to the Bidding Procedures Order (attached to the Bidding Procedures Order as <u>Exhibit 2</u>, the "<u>Bidding Procedures</u>").

 **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures and the terms of any Successful Bid, Maple Eagle **may** assume and assign to the Successful Bidder certain of the Assigned Contracts listed on the Assigned Contracts Schedule, attached hereto as <u>**Exhibit A**</u>,

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Murray Metallurgical Coal Holdings, LLC (4633); Murray Eagle Mining, LLC (4268); Murray Alabama Minerals, LLC (4047); Murray Alabama Coal, LLC (3838); Murray Maple Eagle Coal, LLC (4435); and Murray Oak Grove Coal, LLC (4878). The Debtors' primary business address is 46226 National Road, St. Clairsville, OH 43950.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Bidding Procedures Order.

[3] This relief granted in the Bidding Procedures Order is solely limited to the Debtors.

1

to which you are a counterparty, upon approval of the Sale.  The Assigned Contracts Schedule can also be viewed on the Debtors' Case Website (https://cases.primeclerk.com/MurrayMET).  The Debtors have conducted a review of their books and records and have determined that the cure amount for unpaid monetary obligations under such Assigned Contracts is as set forth on **Exhibit A** attached hereto (the "**Cure Costs**").

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Costs, object to a proposed assignment to the Successful Bidder of any Assigned Contract, or object to the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Assigned Contract, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the correct cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served and **actually received** no later than **March 20, 2020**, at **4:00 p.m. (prevailing Eastern Time)** (the "**Cure Objection Deadline**") by the Court and the following parties: (a) counsel for the Debtors, Proskauer Rose LLP, Eleven Times Square, New York, New York 10036, Attn.:  David M. Hillman, Timothy Q. Karcher, and Chris Theodoridis and One International Place, Boston, Massachusetts 02110, Attn:  Charles A. Dale; (b) counsel to the Ad Hoc Group of Prepetition Term Loan Lenders, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038, Attn.: Jayme T. Goldstein, Christopher Guhin, Erez E. Gilad, and Kirkland & Ellis LLP, 601 Lexington Ave., New York, New York 10022, Attn: Nicole L. Greenblatt and Suhan Shim and 300 N. LaSalle, Chicago, IL 60654, Attn: Joe Graham; and (c) counsel for the Official Committee of Unsecured Creditors.

**PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Costs(s), (b) the proposed assignment and assumption of any Assigned Contract, or (c) adequate assurance of the Successful Bidder's ability to perform is filed by the Cure Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Costs as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional cure amount under the proposed Assigned Contract, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful Bidder has not provided adequate assurance of future performance as of the closing date of the Sale.

**PLEASE TAKE FURTHER NOTICE** that any objection to the proposed assumption and assignment of an Assigned Contract or related Cure Costs in connection with the Successful Bid that otherwise complies with these procedures yet remains unresolved as of the commencement of the Sale Hearing, shall be heard at a later date as may be fixed by the Court.

**PLEASE THAT FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Assigned Contract on the Cure Notice does not require or guarantee that such Assigned Contract will be assumed by Maple Eagle at any time or assumed and assigned, and all rights of Maple Eagle and the Successful Bidder with respect to such Executory Contracts and/or Unexpired Leases are reserved.  Moreover, Maple Eagle explicitly reserves its rights, in its reasonable discretion, to seek to reject or assume each Assigned Contract pursuant to section

2

365(a) of the Bankruptcy Code and in accordance with the procedures allowing Maple Eagle and/or the Successful Bidder, as applicable, to designate any Assigned Contract as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the Assigned Contracts or the validity, priority, or amount of any claims of a counterparty to any Assigned Contract against Maple Eagle that may arise under such Assigned Contract, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Assigned Contract against Maple Eagle that may arise under such Assigned Contract.

*[Remainder of page intentionally left blank]*

3

Dated:   February 12, 2020
Columbus, Ohio

/s/ _____

Thomas R. Allen (0017513)
Richard K. Stovall (0029978)
James A. Coutinho (0082430)
Matthew M. Zofchak (0096279)
**Allen Stovall Neuman Fisher & Ashton**
17 South High Street, Suite 1220
Columbus, Ohio 43215
Telephone:     (614) 221-8500
Facsimile:     (614) 221-5988
Email:          allen@asnfa.com
                stovall@asnfa.com
                coutinho@asnfa.com
                zofchak@asnfa.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

David M. Hillman (*pro hac vice* pending)
Timothy Q. Karcher (*pro hac vice* pending)
Chris Theodoridis (*pro hac vice* pending)

**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone:     (212) 969-3000
Facsimile:     (212) 969-2900
Email:          dhillman@proskauer.com
                tkarcher@proskauer.com
                ctheodoridis@proskauer.com

- and -

Charles A. Dale (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
One International Place
Boston, Massachusetts 02110
Telephone:     (617) 526-9600
Facsimile:     (617) 526-9899
Email:          cdale@proskauer.com

*Proposed Counsel to the Debtors and Debtors
in Possession*

4

**NOTICE OF *DEBTORS' MOTION FOR ENTRY OF***
***AN ORDER (I) AUTHORIZING THE ENTRY INTO AND PERFORMANCE UNDER***
***THE STALKING HORSE PURCHASE AGREEMENT, (II) APPROVING BIDDING***
***PROCEDURES FOR THE SALE OF ASSETS, (III) SCHEDULING HEARINGS AND***
***OBJECTION DEADLINES WITH RESPECT TO THE SALE, (IV) SCHEDULING***
***BID DEADLINES AND AN AUCTION, (V) APPROVING THE FORM AND***
***MANNER OF NOTICE THEREOF, (VI) APPROVING CONTRACT ASSUMPTION***
***<u>AND ASSIGNMENT PROCEDURES, AND (VII) GRANTING RELATED RELIEF</u>***

The Debtors and Debtors in Possession have filed papers with the Court seeking authority to enter into an asset purchase agreement, approval of bidding procedures for the sale of substantially all of Murray Maple Eagle Coal, LLC's assets, and the scheduling of hearings and deadlines related to this proposed sale.

**Your rights may be affected.** You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. If you do not have an attorney, you may wish to consult one.

If you do not want the court to grant the relief sought in the motion, **then on or before twenty-one (21) days from the date set forth in the certificate of service for the motion,** you or your attorney must file with the court a response explaining your position by mailing your response by regular U.S. Mail to Clerk, United States Bankruptcy Court, 221 E. Fourth Street, Atrium Two Suite 800, Cincinnati, Ohio 45202, OR your attorney must file a response using the court's ECF system.

The court must **receive** your response on or before the date set forth above.

You must also send a copy of your response either by 1) the court's ECF System, or by 2) regular U.S. Mail to:

United States Trustee                          Thomas R. Allen, Esq.
550 Main Street, Suite 4-812             Allen Stovall Neuman Fisher & Ashton LLP
Cincinnati, OH 45202                        17 South High Street, Suite 1220
                                                         Columbus, Ohio 43215

If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion and may enter an order granting that relief.