**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| MURRAY METALLURGICAL COAL HOLDINGS, LLC, *et al.*,[1] | ) ) ) ) | Case No. 20-10390 (JEH) |
| | ) ) | Judge John E. Hoffman, Jr. |
| Debtors. | ) ) ) | (Jointly Administered) |

**JOINDER OF MURRAY ENERGY CORPORATION TO THE OBJECTIONS OF THE DEBTORS AND THE AD HOC GROUP OF PREPETITION TERM LOAN LENDERS TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER GRANTING IT STANDING AND AUTHORIZING IT TO PROSECUTE AND SETTLE CERTAIN CLAIMS ON BEHALF OF THE DEBTORS' ESTATES**

**JOINDER**

1. Murray Energy Corporation ("Murray Energy") agrees with, joins in, adopts, and incorporates by reference each of the points, authorities, and arguments raised in the Objections of the above-captioned debtors and debtors in possession's (the "Debtors") and the Ad Hoc Group of Prepetition Term Loan Lenders to the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting it Standing and Authorizing it to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates* [Docket No. 361] (the "Standing Motion") in the above-captioned chapter 11 cases of Murray Metallurgical Coal Holdings, LLC ("Murray Met") for the reasons stated therein as if such points, authorities, and arguments were set forth herein and

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtors' federal tax identification number, if applicable, are: Murray Metallurgical Coal Holdings, LLC (4633); Murray Eagle Mining, LLC (4268); Murray Alabama Minerals, LLC (4047); Murray Alabama Coal, LLC (3838); Murray Maple Eagle Coal, LLC (4435); and Murray Oak Grove Coal, LLC (4878). The Debtors' primary business address is 46226 National Road, St. Clairsville, OH 43950.

expressly asserted by Murray Energy. In addition, in further opposition to the Standing Motion, Murray Energy states as follows:

## PRELIMINARY STATEMENT

2. This is no ordinary standing motion. The Official Committee of Unsecured Creditors (the "Committee") seeks derivative standing to pursue a judgment that recharacterizes as "equity" secured loans issued to Murray Met by another debtor to facilitate its orderly restructuring and to enjoin the Debtors' secured lenders, including Murray Energy, from credit bidding that secured debt in the sale of certain of the Debtors' assets (the "Sale"). The secured loans the Committee seeks to equitize and enjoin include: (a) secured loans that were issued to MC Southwork LLC ("MC Southwork") as consideration for Murray Energy's purchase of Murray Met from the bankruptcy cases of Mission Coal Company, LLC and governed by a senior secured credit agreement (the "Take-Back Facility"); and (b) $10.6 million in prepetition secured loans made from Murray Energy's estate to Murray Met beginning in November 2019 and documented through a series of amendments to the Take-Back Facility (the "Take-Back Amendments"), $3.5 million of which was incurred on a pari passu basis with MC Southwork's prepetition secured loan and the remaining $7.1 million of which was provided as "pre-DIP" loans pursuant to a new superpriority tranche structured to be senior to the pari passu debt. The Standing Motion should be denied for several reasons.

3. *First*, the Committee's recharacterization claim is not colorable. Murray Energy is not the ordinary equity investor or insider the Committee portrays it to be. Murray Energy is its own debtor in possession whose ability to finance the Murray Met estate required (and received) express authority from its own active stakeholders and this Court. Each of the prepetition loans the Committee seeks to recharacterize were made with ***this Court's specific authorization*** and

2

with the consent of Murray Energy's stakeholders, and were provided as senior secured debt to Murray Met. Murray Energy has senior secured claims—including DIP claims rolled up by order of this Court—against Murray Met. These are *not* equity contributions.

4.      *Second*, these loans were supported by the interested parties and authorized by this Court for good reason: but for Murray Energy's secured financing, these Debtors would not have made it to their first day hearing in these cases, and would not be on the precipice of consummating a value-maximizing sale in the best interests of their estates.

5.      *Third*, recharacterizing the secured financing at issue as equity would serve no benefit to these estates. The Debtors have a proverbial bird in hand with the proposed credit bid that will maximize the Debtors' chances of successfully reorganizing and securing jobs for employees and trade partners—the parties whose interests the Committee represents. The Committee's actions threaten that life-line, where superior bids are nonexistent. Recharacterization would also discourage debtors from seeking out-of-court solutions to their liquidity needs and would chill lenders from entering into DIP loans put in place to ensure a streamlined and orderly chapter 11 process for these and other debtors. Such a precedent could have terrible consequences for future cases and undermine the entire statutory promise of DIP loans and the market's expectations regarding pre-DIP rescue loans. The Committee's actions are especially troubling in the current market where financing is as difficult as ever to obtain.

6.      For these reasons, and the reasons discussed below, granting the Committee standing will only do harm. It is a waste of time and money, precious commodities in this environment. Conversely, denying the Committee standing does no harm to the Committee, which will retain its rights to object to the Sale and to plan confirmation.

**BACKGROUND**

7.  Murray Energy filed a chapter 11 voluntary petition on October 29, 2019. That case is pending before this Court at Case No. 2:19-56885 (JEH).

8.  On October 29, 2019, Murray Energy filed its motion for post-petition financing [Murray Energy Docket No. 28] (the "Murray Energy DIP Motion"), which attached as Exhibit B the Murray Energy DIP Credit Agreement [Murray Energy Docket No. 28-2]. Section 6.6(d) of the Murray Energy DIP Credit Agreement allowed Murray Energy to make certain loans to its subsidiaries, and included specific limitations on investments to Murray Met. Among those limitations, the Murray Energy DIP Credit Agreement established two baskets for Murray Energy loans to Murray Met: (i) up to $10 million in the form of equipment financing loans under section 6.6(d)(A)(x), and (ii) only with the consent of Murray Energy's lenders, an additional $10 million under section 6.6(d)(A)(y). The Court granted the Murray Energy DIP Motion on a final basis on December 12, 2019 [Murray Energy Docket No. 431].

9.  On October 29, 2019, Murray Energy also filed its motion to approve maintenance of its prepetition cash management system [Murray Energy Docket No. 13] (the "Murray Energy Cash Management Motion"), including authorization to continue intercompany transactions with the Debtors. Murray Energy's Cash Management Motion described in great detail the company's ordinary course practice of funding subsidiaries, specifically including the Murray Met Debtors. Murray Energy Cash Management Motion at 13-27. The Motion further explained how such "Intercompany Transactions" result in "Intercompany Claims," not equity contributions. *Id.* at 13-15, 37. The Court granted the Murray Energy Cash Management Motion on an interim basis on October 30, 2019 [Murray Energy Docket No. 91], and on a final basis on December 10, 2019 [Murray Energy Docket No. 389] (the "Murray Energy Interim Cash Management Order" and the "Murray Energy Final Cash Management Order," respectively, and together, the "Murray Energy

4

Cash Management Orders"). The Murray Energy Cash Management Orders specifically authorized the Murray Energy debtors to engage in "Intercompany Transactions," including loans to Murray Met, consistent with these past practices, albeit subject to the limitations in the Murray Energy DIP Order. Murray Energy Final Cash Management Order ¶¶ 2, 15.

10. In mid-November 2019, Murray Energy began actively engaging in negotiations with major stakeholders in Murray Met's capital structure, including lenders under the Debtors' Take-Back Facility and the Debtors' advisors, regarding measures to decrease costs, provide additional liquidity, address asset retirement and reclamation obligations, and promote a potential consensual restructuring. Constrained by the limits in its DIP Credit Agreement, Murray Energy obtained consent from its DIP lenders to provide Murray Met with the bridge loans that followed. That funding was only available in the form of senior secured debt and was specifically documented as such. Because Murray Energy never utilized the equipment financing basket of its DIP Credit Agreement, all money advanced to Murray Met was done pursuant to Section 6.6(d)(A)(y) of that Agreement, which required express consent of Murray Energy's lenders.

11. On November 15, 2019, just a few weeks into its own bankruptcy, Murray Energy entered into the first Take-Back Amendment with the Debtors, whereby Murray Energy provided $3.5 million to the Met Debtors as a secured loan pari passu with the existing loans and under the Debtors' Take-Back Facility. Thereafter, MC Southwork and Murray Energy continued to make additional bridge loans to the Debtors, expressly documented as amendments to the Take-Back Facility under a new senior priority "first out" tranche, in the amount of approximately

$7.1 million. In aggregate, Murray Energy funded approximately $10.6 million in prepetition secured loans during Murray Energy's bankruptcy.[2]

12. In January 2020, after extensive arm's length negotiations, Murray Energy, the Murray Energy DIP Lenders, the Debtors, and other interested parties including MC Southwork, reached an agreement in principle on a consensual restructuring path for the Debtors. That agreement included, *inter alia*, $47.1 million in new money DIP financing (the "DIP Facilities") funded by Murray Energy and MC Southwork, to pay for the costs associated with the Debtors' chapter 11 cases. The agreement also included the sale of the Oak Grove mine to a new asset purchase vehicle established by Murray Energy and MC Southwork that will credit bid for such assets (or to a higher or otherwise better bidder) pursuant to a chapter 11 plan. This agreement was documented in the Debtors' Restructuring Support Agreement (the "Met RSA") on February 11, 2020. The Debtors filed their chapter 11 petitions on the same day. [Docket No. 1.]

13. Pursuant to the Met RSA, on February 12, 2020, Murray Energy filed a motion seeking authorization to fund the Debtors' DIP facility, and enter into and perform under the Met RSA [Murray Energy Docket No. 864] (the "Murray Energy Met DIP Motion"). That same day, the Debtors filed their motion for post-petition financing [Docket No. 44] (the "Debtors' DIP Motion").

14. On February 14, 2020, the Court held a joint hearing on the Murray Energy Met DIP Motion and the Debtors' DIP Motion. At the hearing, Murray Energy, the Debtors, and other interested parties discussed, at length, the prepetition secured loans and the proposed additional DIP loan from Murray Energy. Transcript Regarding Hearing Held 2/14/20 [Docket No. 217].

---

[2] Murray Energy ceased funding and MC Southwork provided additional money to Murray Met when Murray Energy had no ability to exceed the caps provided in section 6.6(d) of the Murray Energy DIP Credit Agreement.

Immediately following the hearing, the Court issued interim orders granting both Murray Energy's DIP motion [Murray Energy Docket No. 881] and the Debtors' DIP Motion [Docket No. 130], which included a roll-up of Murray Energy's prepetition secured loans.

15. On March 12, 2020, the Court entered a final order authorizing post-petition financing in this case (the "Final DIP Order") and finding that financing to be "fair and reasonable and in the best interests of the Debtors, their estates and their creditors . . . necessary for the continued operation of the Debtors' businesses," and "in the best interests of all of [the Debtors'] stakeholders." Final DIP Order [Docket No. 248] at 7, 18. The Final DIP Order authorized, among other things, the Senior DIP Facility provided in part by Murray Energy, and the Junior DIP Facility provided by Murray Energy. Under the Final DIP Order, Murray Energy also received a roll-up of the prepetition secured loans and the right to credit bid up to the full aggregate amount of the DIP Facilities and the prepetition secured loans.

## ARGUMENT

16. A creditor can obtain derivative standing to bring certain claims in the place of a debtor where the creditor: "1) has alleged a colorable claim that would benefit the estate, if successful, based on a cost-benefit analysis performed by the bankruptcy court; 2) has made a demand on the debtor-in-possession to file the [ ] action; 3) the demand has been refused; and 4) the refusal is unjustified in light of the statutory obligations and fiduciary duties of the debtor-in-possession in a Chapter 11 reorganization."[3] *In re Gibson Grp., Inc.*, 66 F.3d 1436, 1438 (6th Cir. 1995).

---

[3] The Committee's request for standing appears procedurally defective, as "any party in interest" can pursue recharacterization as a direct claim under section 502(a) of the Bankruptcy Code. *See In re Russell Cave Co., Inc.*, 107 F.App'x 449, 451 (6th Cir. 2004) ("[A] claim seeking to recharacterize debt to equity is the same as objecting to the claim's "allowance"). While this Joinder addresses the Committee's failure to meet the requirements for the relief it expressly seeks—derivative standing—this same failure is equally dispositive of a direct claim for recharacterization and injunctive relief (*i.e.*, the claims are meritless and would cause substantial harm to the Debtors and interested parties). In addition to joining the arguments advanced by the Debtors and the

7

17. The colorable claim prong of the derivative standing test requires courts to determine whether a creditor has asserted "claims for relief that on appropriate proof would support a recovery." *Id.* at 1446 (quoting *In re STN Enterprises*, 779 F.2d 901, 905 (2d Cir. 1985)). The Court "should assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." *STN Enterprises, Inc.*, 779 F.2d at 906.

18. The Committee's recharacterization claim against Murray Energy's loans is frivolous. In its Standing Motion, the Committee simply ignores the source of the loans at issue and the procedural and negotiating history already in the record on two dockets before this Court. *See* Committee's Memo. in support of Mot. at 13-14 [Docket No. 361-4]. Importantly, the secured loans were funded from Murray Energy's Court-approved DIP financing and pursuant to the Court-approved Murray Energy DIP Credit Agreement, several amendments to the Take Back Facility specifying the priority of the loans, and the Court's Order granting the Murray Energy Met DIP Motion and expressly providing for the roll-up of the funding at issue. *See* Murray Energy Docket Nos. 389, 881, 1058. All Murray Energy financings to the Debtors between Murray Energy's petition date and the Debtors' petition date were made pursuant to specific authorization in the Murray Energy DIP Financing and Cash Management Orders—and such financings were, by the Court's orders, loans and not equity contributions.

19. This Court need look no further than the Murray Energy DIP Credit Agreement for confirmation of these obvious facts. Section 6.6 of that Agreement expressly limited Murray Energy's ability to finance Murray Met absent consent from its own lenders. Murray Energy DIP

---

Ad Hoc Committee of Prepetition Term Loan Lenders, Murray Energy reserves the right to assert these arguments against the Committee's claims in the event they are recharacterized as direct claims.

Credit Agreement [Murray Energy Docket No. 28-2] § 6.6(d). And Murray Energy's financing of Murray Met was dribbled out in a series of well-documented loan amendments because the money was only available as senior secured and/or "first out" loans. The history of these loans and their origination from the Murray Energy DIP Credit Agreement as approved by the Court's Murray Energy DIP Order was discussed with the Court *in detail* at the Debtors' first day hearing. *See, e.g.*, Transcript Regarding Hearing Held 2/14/20 [Docket No. 217] at 15:1-25, 16:4-17:3, 33:17-25, 49:18-50:16, 85:17-85:25.

20. Moreover, Murray Energy received express approval from the Court to be a DIP lender to the Debtors in these cases, which was part of an overall package reflected in a heavily negotiated Met RSA subject to scrutiny by Murray Energy's stakeholders. [Murray Energy Docket Nos. 881, 1058; Docket No. 130.] Indeed, Murray Energy sought the Court's approval to be a DIP lender to the Debtors at the February 14 joint hearing. There, Murray Energy and the Debtors made clear that the DIP Facilities were being made to provide financing to the Debtors in the form of a secured loan. *See, e.g.*, Transcript Regarding Hearing Held 2/14/20 at 30:15-31:12. For good reason, the DIP motions advanced by Murray Energy and the Debtors received nearly universal support from the interested parties.

21. Murray Energy and the Debtors were also explicit with the Court and all stakeholders that this debt would be used to credit bid for certain of the Debtors' assets at the Oak Grove mine. *Id.* at 18:25-19:10, 39:12-40:11, 108:22-109:19. Murray Energy's stakeholders have the expectation that this is how the money will be used, *i.e.*, that is the bargain set forth in the Court-approved Met RSA. [Murray Energy Docket No. 881; Docket Nos. 130, 248.] Put simply, the Committee seeks standing to challenge a Court-approved use of secured loans by a debtor as

9

additional secured loans to support another debtor's turnaround to avoid mutual destruction. The Committee's claim is far from colorable.

22. Further to the first prong of the derivative standing test, the Committee's claim, even if it were colorable, would not "benefit the estate." *In re Gibson Grp.,* 66 F.3d at 1438. It would do precisely the opposite. The Committee's "success" in recharacterizing Murray Energy's loans as equity would blow up the sale and exit path that the Debtors have in hand, either resulting in the Debtors' liquidation or requiring the Committee to source a yet-unidentified alternate buyer. In either scenario, Murray Energy's secured claims, including the rolled up amount of the prepetition secured loans that comprise the DIP claims, must be given the statutory (and Court-ordered) priority to which it is entitled and Murray Energy must be paid back from whatever value can be distributed; the Murray Energy estate (and all its creditors) would not tolerate anything less. But that will not benefit the Committee or any stakeholders it purports to represent; it would merely result in assured value destruction for not one but two debtors facing extraordinary challenges.

23. Finally, a successful recharacterization argument would have devastating policy implications for chapter 11 cases and the market for debtor-in-possession financing more generally, which further informs colorability. But for Murray Energy's support, the Debtors would not have made it to or through their first days in these cases and its Committee members would be without the protections afforded under chapter 11. The Court should give pause to discouraging the type of pre-DIP and DIP loans that were made by Murray Energy and MC Southwork, which have allowed the parties to engage in the chapter 11 restructuring process and set a value maximizing floor for all parties, including unsecured creditors in both these cases and Murray Energy's. Setting the precedent the Committee requests would have terrible consequences for future cases and undermine the entire statutory objective of, and market for, DIP loans. *See, e.g.*,

10

*In re Aéropostale, Inc.*, 555 B.R. 369, 422 (Bankr. S.D.N.Y. 2016) (declining to recharacterize a loan from an existing creditor, noting it would be "inappropriate to penalize the [lenders] for lending to a distressed company"); *In re Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 234 (4th Cir. 2006) ("[I]n many cases, an insider will be the only party willing to make a loan to a struggling business and recharacterization should not be used to discourage good-faith loans"). This is even more concerning in the current market, as companies across the country are teetering on the edge of bankruptcy. The Court should deny the Standing Motion and spare the wasteful expense of scant resources that would result from litigating the Committee's meritless claims.

## **CONCLUSION**

For the reasons stated herein and in the Objections of the Debtors and the Ad Hoc Group of Prepetition Term Loan Lenders, Murray Energy requests that the Court enter an order sustaining these objections, denying the relief sought by the Committee, and granting Murray Energy such further relief as may be just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated: April 13, 2020
Cincinnati, Ohio

/s/ *Kim Martin Lewis*

| | |
|---|---|
| Kim Martin Lewis (0043533) | Nicole L. Greenblatt, P.C. (admitted *pro hac vice*) |
| Alexandra S. Horwitz (0096799) | Mark McKane, P.C. (admitted *pro hac vice*) |
| **DINSMORE & SHOHL LLP** | **KIRKLAND & ELLIS LLP** |
| 255 East Fifth Street | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Suite 1900 | 601 Lexington Avenue |
| Cincinnati, Ohio 45202 | New York, New York 10022 |
| Telephone: (513) 977-8200 | Telephone: (212) 446-4800 |
| Facsimile: (513) 977-8141 | Facsimile: (212) 446-4900 |
| Email: kim.lewis@dinsmore.com | Email: nicole.greenblatt@kirkland.com |
| allie.horwitz@dinsmore.com | mark.mckane@kirkland.com |
| | |
| *Counsel to Murray Energy Corporation* | - and – |
| | |
| | Ross M. Kwasteniet, P.C. (admitted *pro hac vice*) |
| | Joseph M. Graham (admitted *pro hac vice*) |
| | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | 300 North LaSalle |
| | Chicago, Illinois 60654 |
| | Telephone: (312) 862-2000 |
| | Facsimile: (312) 862-2200 |
| | Email: ross.kwasteniet@kirkland.com |
| | joe.graham@kirkland.com |
| | |
| | *Counsel to Murray Energy Corporation* |